# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF WISCONSIN

_____

| | |
|---|---|
| FREEDOM FROM RELIGION FOUNDATION, INC., ANNE NICOL GAYLOR, ANNIE LAURIE GAYLOR, PAUL GAYLOR, DAN BARKER, PHYLLIS ROSE, and JILL DEAN,  )))))))) | |
| Plaintiffs,  )) | |
| v.  )) | Case No. 08-CV-588 |
| PRESIDENT BARACK OBAMA, WHITE HOUSE PRESS SECRETARY ROBERT L. GIBBS, WISCONSIN GOVERNOR JIM DOYLE, and SHIRLEY DOBSON, CHAIRMAN OF THE NATIONAL DAY OF PRAYER TASK FORCE,  ))))))))) | |
| Defendants.  )) | |

_____

## MEMORANDUM OF LAW IN SUPPORT OF
## THE FEDERAL DEFENDANTS' MOTION TO DISMISS
## <u>THE FIRST AMENDED COMPLAINT</u>

MICHAEL F. HERTZ
Acting Assistant Attorney General

JAMES GILLIGAN
Assistant Branch Director

BRAD P. ROSENBERG
Trial Attorney

COUNSEL FOR DEFENDANTS
PRESIDENT BARACK OBAMA AND
WHITE HOUSE PRESS SECRETARY
ROBERT L. GIBBS

# TABLE OF CONTENTS

TABLE OF AUTHORITIES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

PRELIMINARY STATEMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

BACKGROUND. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

I.  PLAINTIFFS LACK STANDING. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

    A.  The Individual Plaintiffs Lack Standing to Challenge
the National Day of Prayer. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

        1.  The Individual Plaintiffs Fail to Allege That They Were
Exposed in a Direct and Unwelcome Manner to the
National Day of Prayer. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

        2.  The Individual Plaintiffs Fail to Allege an
Actual or Imminent Injury. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

    B.  FFRF Lacks Standing to Challenge the National Day of Prayer. . . . . . . . . . . . . 17

II.  THE NATIONAL DAY OF PRAYER STATUTE IS CONSTITUTIONAL. . . . . . . . . . 19

    A.  The Supreme Court Has Referenced the National Day of Prayer
as Constitutional in the Context of Another Establishment Clause Challenge. . . 19

    B.  The National Day of Prayer Is Part of Our Country's Religious History. . . . . . . 23

    C.  Under the Supreme Court's Test in Lemon v. Kurtzman,
the National Day of Prayer Statute Is Constitutional. . . . . . . . . . . . . . . . . . . . 26

        1.  The National Day of Prayer Has a Secular Purpose. . . . . . . . . . . . . . . . 27

        2.  The National Day of Prayer's Primary Effect Is
Neither to Advance Nor Inhibit Religion. . . . . . . . . . . . . . . . . . . . . . . 31

        3.  The National Day of Prayer Statute Does Not Foster
An Excessive Entanglement With Religion. . . . . . . . . . . . . . . . . . . . . . 36

III.    PLAINTIFFS' REQUESTED RELIEF RAISES SUBSTANTIAL JUSTICIABILITY
        CONCERNS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

        A.      Plaintiffs' Request for Declaratory and Injunctive Relief Would Require this
                Court to Issue an Advisory Opinion on the Substance of Prayer Proclamations
                That Have Not Yet Been Issued. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

        B.      Plaintiffs' First Amended Complaint Raises Substantial Separation of Powers
                Concerns. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

## TABLE OF AUTHORITIES

**CASES:**

Abington Sch. Dist. v. Schempp, 374 U.S. 203 (1963). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23, 24

Allen v. Wright, 468 U.S. 737 (1984). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 14

Am. Jewish Cong. v. City of Chicago, 827 F.2d 120 (7th Cir. 1987). . . . . . . . . . . . . . . . . 22, 32

Bell Atlantic Corp. v. Twombly, 550 U.S. 544 (2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 9

Books v. City of Elkhart, Ind., 235 F.3d 292 (7th Cir. 2000). . . . . . . . . . . . . . . . . . . . . . . passim

Books v. Elkhart County, Ind., 401 F.3d 857 (7th Cir. 2005). . . . . . . . . . . . . . . . . . . . . . . . 14

City of Los Angeles v. Lyons, 461 U.S. 95 (1983). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

Clinton v. Jones, 520 U.S. 681 (1997). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

County of Allegheny v. ACLU, 492 U.S. 573 (1989). . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

DeBoer v. Village of Oak Park, 267 F.3d 558 (7th Cir. 2001). . . . . . . . . . . . . . . . . . . . . . . . 22

Deveraux v. City of Chicago, 14 F.3d 328 (7th Cir. 1994). . . . . . . . . . . . . . . . . . . . . . . . . . . 42

Doe v. County  of Montgomery, Ill., 41 F.3d 1156 (7th Cir. 1994).. . . . . . . . . . . . . . . . . 7, 10, 15

Doe v. Madison School Dist. No. 321, 177 F.3d 789 (9th Cir. 1999) (en banc). . . . . . . . . . . 9, 13

E.E.O.C. v. Concentra Health Servs., Inc., 496 F.3d 773 (7th Cir. 2007). . . . . . . . . . . . . . . 8, 13

Edwards v. Aguillard, 482 U.S. 578 (1987).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

Engel v. Vitale, 370 U.S. 421 (1962).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25, 26

Fleischfresser v. Dirs. of Sch. Dist. 200, 15 F.3d 680 (7th Cir. 1994). . . . . . . . . . . . . . . . . . . 31

Franklin v. Massachusetts, 505 U.S. 788 (1992). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 40, 41

Freedom From Religion Found., Inc. v. City of Marshfield, 203 F.3d 487 (7th Cir. 2000). . . . . 31

Freedom From Religion Found., Inc. v. Zielke, 845 F.2d 1463 (7th Cir. 2000). . . . . . . . . . passim

Gallaher & Speck, Inc. v. Ford Motor Co., 226 F.2d 728 (7th Cir. 1955).. . . . . . . . . . . . . . . . 29

Gonzales v. N. Twp. of Lake County, 4 F.3d 1412 (7th Cir. 1993). . . . . . . . . . . . . . . . . . . 10, 15

Havens Realty Corp. v. Coleman, 455 U.S. 363 (1982). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

Henson v. CSC Credit Services, 29 F.3d 280 (7th Cir. 1994). . . . . . . . . . . . . . . . . . . . . . . . . . 29

Hunt v. Wash. State Apple Adver. Comm'n, 432 U.S. 333 (1977). . . . . . . . . . . . . . . . . . . . . . . . 18

Ind. Democratic Party v. Rokita, 458 F. Supp. 2d 775 (S.D. Ind. 2006). . . . . . . . . . . . . . . . 14, 18

Indianapolis Minority Contractors Ass'n, Inc. v. Wiley,
        No. IP 94-1175-C-T/G, 1998 WL 1988826 (S.D. Ind. May 13, 1998). . . . . . . . . . . . . . 17

Jimmy Swaggart Ministries v. Bd. of Equalization of Cal., 493 U.S. 378 (1990). . . . . . . . . . . . 36

Lee v. Weisman, 505 U.S. 577 (1992). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 21

Lemon v. Kurtzman, 403 U.S. 602 (1971). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

Lujan v. Defenders of Wildlife, 504 U.S. 555 (1992). . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 8, 15

Lynch v. Donnelly, 465 U.S. 668 (1984). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

Marsh v. Chambers, 463 U.S. 783 (1983). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

McCreary County v. ACLU of Kentucky, 545 U.S. 844 (2005). . . . . . . . . . . . . . . . . . . . . . . . . 27

Metzl v. Leininger, 850 F. Supp. 740 (N.D. Ill. 1994). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36, 37

Mississippi v. Johnson, 71 U.S. 475 (1866). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

Newdow v. Bush, 391 F. Supp. 2d 95 (D.D.C. 2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

Nixon v. Fitzgerald, 457 U.S. 731 (1982). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

N. Shore Gas Co. v. Salomon, Inc., 152 F.3d 642 (7th Cir. 1998). . . . . . . . . . . . . . . . . . . . . . . 42

Organ. of Minority Vendors v. Ill. Cent. Gulf R.R., 579 F. Supp. 574 (N.D. Ill. 1983). . . . . . . . 17

Panama Refining Co. v. Ryan, 293 U.S. 388 (1935). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

Plotkin v. Ryan, No. 99 C 53, 1999 WL 965718 (N.D. Ill. Sept. 29, 1999). . . . . . . . . . . . . 17, 18

Plotkin v. Ryan, 239 F.3d 882 (7th Cir. 2001). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Pocket Veto Case*, 279 U.S. 655 (1929). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Protestant Mem'l Med. Ctr., Inc. v. Maram*, 471 F.3d 724 (7th Cir. 2006).. . . . . . . . . . . . . . . . 39

*Raines v. Byrd*, 521 U.S. 811 (1997). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Rostker v. Goldberg*, 453 U.S. 57 (1981). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Santa Fe Indep. Sch. Dist. v. Doe*, 530 U.S. 290 (2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Seminole Tribe v. Florida*, 517 U.S. 44 (1996). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Sherman v. Cmty. Consol. Dist. 21*, 980 F.2d 437 (7th Cir. 1992). . . . . . . . . . . . . . . . . . . . . . . 21

*Sierra Club v. Franklin County Power of Ill., LLC*, 546 F.3d 918 (7th Cir. 2008). . . . . . . . . . . 18

*Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26 (1976). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Spann v. Colonial Village, Inc.*, 899 F.2d 24 (D.C. Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Swan v. Clinton*, 100 F.3d 973 (D.C. Cir. 1996). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40, 41

*Tamayo v. Blagoyevich*, 526 F.3d 1074 (7th Cir. 2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*United States v. Custiss-Wright Export Corp.*, 299 U.S. 304 (1936). . . . . . . . . . . . . . . . . . . . . 24

*United States v. Indianapolis Baptist Temple*, 224 F.3d 627 (7th Cir. 2000). . . . . . . . . . . . . . . 36

*United States v. Nat'l Dairy Prods. Corp.*, 372 U.S. 29 (1963). . . . . . . . . . . . . . . . . . . . . . . . . 19

*Valley Forge Christian Coll. v. Ams. United for Separation of Church and State*,
        454 U.S. 464 (1982). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

*Van Orden v. Perry*, 545 U.S. 677 (2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

*Van Zandt v. Thompson*, 839 F.2d 1215 (7th Cir. 1988). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Vision Church v. Village of Long Grove*, 468 F.3d 975 (7th Cir. 2006).. . . . . . . . . . . . . . . . passim

*Walz v. Tax Comm'n*, 397 U.S. 664 (1970). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Warth v. Seldin*, 422 U.S. 490 (1975). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 18

*Wynne v. Town of Great Falls, S.C.*, 376 F.3d 292 (4th Cir. 2004). . . . . . . . . . . . . . . . . . . . . . . 9

Youngstown Sheet & Tube Co. v. Sawyer, 343 U.S. 579 (1952). . . . . . . . . . . . . . . . . . . . . . . . . 41

Zorach v. Clauson, 343 U.S. 306 (1952). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20, 32

**STATUTES, LEGISLATIVE MATERIALS, AND REGULATORY MATERIALS:**

U.S. Const. art. I.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

U.S. Const. art. VII. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

Declaration of Independence. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

36 U.S.C. § 119. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 16, 32

Act of Mar. 3, 1865, ch. 100, § 5, 13 Stat. 517 (1865). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

Pub. L. No. 512, 64 Stat. 158 (1950). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

Pub. L. No. 82-324, 66 Stat. 64 (1952). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 35

Pub. L. No. 100-307, 102 Stat. 456 (1988). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Pub. L. No. 107-293, 116 Stat. 2058 (2002). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

134 Cong. Rec. H2761-02 (May 2, 1988). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

S. Rep. No. 82-1389 (1952). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

Fed. R. Civ. P. 8(a)(2). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

58 Fed. Reg. 26,499 (Apr. 30, 1993). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

59 Fed. Reg. 18,287 (Apr. 12, 1994). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

60 Fed. Reg. 14,351 (Mar. 14, 1995). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

61 Fed. Reg. 15,175 (Apr. 2, 1996). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

62 Fed. Reg. 19,663 (Apr. 18, 1997). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

63 Fed. Reg. 24,383 (Apr. 29, 1998). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

64 Fed. Reg. 25,189 (May 5, 1999). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

65 Fed. Reg. 26,481 (May 4, 2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

66 Fed. Reg. 22,103 (Apr. 27, 2001). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

68 Fed. Reg. 23,829 (Apr. 30, 2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

69 Fed. Reg. 25,291 (Apr. 30, 2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

70 Fed. Reg. 23,921 (May 3, 2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

71 Fed. Reg. 26,675 (May 3, 2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

73 Fed. Reg. 3375 (Jan. 14, 2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

73 Fed. Reg. 3855 (Jan. 16, 2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

73 Fed. Reg. 19,387 (Apr. 4, 2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

73 Fed. Reg. 21,213 (Apr. 15, 2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

73 Fed. Reg. 24,135 (Apr. 29, 2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

73 Fed. Reg. 24,137 (Apr. 29, 2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

73 Fed. Reg. 29,383 (May 15, 2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

73 Fed. Reg. 30,725 (May 22, 2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

73 Fed. Reg. 58,863 (Oct. 3, 2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

73 Fed. Reg. 60,603 (Oct. 8, 2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

73 Fed. Reg. 72,301 (Nov. 21, 2008).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

**OTHER AUTHORITIES:**

S. Epstein, Rethinking the Constitutionality of Ceremonial Deism,
        96 Colum. L. Rev. 2083 (1996). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

5 The Founders' Constitution (P. Kurland & R. Lerner eds., 1987). . . . . . . . . . . . . . . . 23, 24

1 J. Richardson, A Compilation of the Messages and Papers of the Presidents
        1789-7897 (1899).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

A. Stokes & L. Pfeffer, Church and State in the United States (rev. 1st ed. 1964). . . . . . . . . . . . 1

Gettysburg Address (1863). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

Inaugural Addresses of the Presidents of the United States,
    S. Doc. No. 101-10 (1989). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

First Inaugural Address of William J. Clinton,
    29 Weekly Comp. Pres. Doc. 77 (Jan. 20, 1993). . . . . . . . . . . . . . . . . . . . . . . . . . . 25

Second Inaugural Address of William J. Clinton,
    33 Weekly Comp. Pres. Doc. 63 (Jan. 20, 1997). . . . . . . . . . . . . . . . . . . . . . . . . . . 25

First Inaugural Address of George W. Bush,
    37 Weekly Comp. Pres. Doc. 209 (Jan. 20, 2001). . . . . . . . . . . . . . . . . . . . . . . . . . . 25

Mayflower Compact, reprinted in 1B Schwartz, The Roots of the Bill of Rights (1980). . . . . . . 23

The Random House Dictionary of the English Language, unabridged (2d ed. 1987). . . . . . . . . . 16

## PRELIMINARY STATEMENT

The tradition of a National Day of Prayer traces its roots to the founding of our Nation. The Continental Congress proclaimed a National Day of Prayer on July 12, 1775.[1]  And the First Congress urged President Washington "to proclaim 'a day of public thanksgiving and prayer, to be observed by acknowledging with grateful hearts, the many and signal favours of Almighty God."[2]  President Washington responded by proclaiming November 26, 1789, a day of thanksgiving to "offer[ ] our prayers and supplications to the Great Lord and ruler of Nations, and beseech Him to pardon our national and other transgressions. . . ."[3] More recently — though still half a century ago — Congress passed a statute directing the President to proclaim each year "a National Day of Prayer, on which the people of the United States may turn to God in prayer and mediation at churches, in groups, and as individuals."[4]  Congress later amended that statute in 1988 to require that the National Day of Prayer be observed on the first Thursday of May of each year.[5]

Plaintiffs take issue with the tradition embodied by the National Day of Prayer.  That much is clear in both their original and amended Complaints.  But plaintiffs' displeasure with the National Day of Prayer does not provide them with standing to challenge it in federal court.  For plaintiffs to have standing, they must allege that they have been exposed in a direct and

---

[1] See 134 Cong. Rec. H2761-02 (May 2, 1988).

[2] Lynch v. Donnelly, 465 U.S. 668, 675 n.2 (1984) (citing A. Stokes & L. Pfeffer, Church and State in the United States 87 (rev. 1st ed. 1964)).

[3] Id. (citing 1 J. Richardson, A Compilation of the Messages and Papers of the Presidents 1789-1897, p. 64 (1899)).

[4] Pub. L. No. 82-324, 66 Stat. 64 (1952).

[5] See Pub. L. No. 100-307, 102 Stat. 456 (1988).

1

unwelcome manner to the National Day of Prayer, resulting in harm to them.  As the federal defendants' original motion to dismiss noted, plaintiffs' Complaint lacked these allegations.  And so, rather than respond to that motion, the plaintiffs filed an Amended Complaint.

In attempting to fix the standing deficiencies evident in their original Complaint, plaintiffs have managed to make matters worse.  The Amended Complaint reveals that the plaintiffs' connection to the National Day of Prayer is so attenuated that they had to conduct an "investigation" about it prior to bringing this lawsuit.  The amendments to their Complaint make clear that plaintiffs' knowledge of the National Day of Prayer is otherwise derived from press releases, media reports, and unidentified individuals who apparently have complained about the event.  Based on this thin reed, plaintiffs want this Court to not only invalidate a federal statute that has been on the books for over fifty years, but issue an injunction that would run directly against the President of the United States of America — a remedy that the Supreme Court has described as being so "extraordinary" that it "should . . . raise[ ] judicial eyebrows."[6]

Even if this Court were inclined to reach the merits of plaintiffs' case, they still have failed to state a claim.  The Supreme Court has opined positively on the acceptability of the National Day of Prayer,[7] which is consistent with many of our nation's historical traditions that recognize and accommodate the role of religion in our society.  That alone should settle matters.  In any event, the National Day of Prayer satisfies the so-called "<u>Lemon</u> test,"[8] as it has an established secular purpose, does nothing to advance religion, and does not foster an excessive

---

[6] <u>Franklin v. Massachusetts</u>, 505 U.S. 788, 802 (1992) (plurality opinion).

[7] <u>Lynch</u>, 465 U.S. at 677-78.

[8] <u>See</u> <u>Lemon v. Kurtzman</u>, 403 U.S. 602 (1971).

2

entanglement with religion.

For the foregoing reasons, as set forth in greater detail below, this Court should dismiss plaintiffs' Amended Complaint for lack of justiciability and standing or, in the alternative, for failure to state a claim.

## BACKGROUND

Plaintiffs consist of six individuals, all of whom reside in Madison, Wisconsin, as well as the Freedom From Religion Foundation, Inc. (hereinafter, "FFRF"). Am. Compl. ¶¶ 4, 7-12. Plaintiffs are self-described "non-believer[s]," Am. Compl. ¶¶ 7-12, while FFRF "is a membership organization working for the separation of church and state and to educate on matters of nontheism," Am. Compl. ¶ 4. Plaintiffs' original Complaint named President George W. Bush and White House Press Secretary Dana Perino as defendants, but their Amended Complaint has substituted President Barack Obama and current White House Press Secretary Robert Gibbs as defendants (hereinafter, the "federal defendants"). Am. Compl. ¶¶ 13-16. Plaintiffs have also sued the Governor of Wisconsin and Shirley Dobson, who plaintiffs allege is the Chair of the "National Day of Prayer Task Force." Am. Compl. ¶¶ 17-19.

Specifically, the National Day of Prayer statute that plaintiffs challenge provides that:

The President shall issue each year a proclamation designating the first Thursday in May as a National Day of Prayer on which the people of the United States may turn to God in prayer and mediation at churches, in groups, and as individuals.

36 U.S.C. § 119 (U.S.C.A. 2008). According to plaintiffs, "U.S. Presidents have issued and intend to continue to issue official Prayer Proclamations, including in 2009 and thereafter, declaring a National Day of Prayer," and that "President Obama will continue to issue annual Prayer Proclamations, if not enjoined." Am. Compl. ¶ 21. Plaintiffs allege that prayer proclamations "convey to non-religious Americans that they are expected to believe in God,"

3

Am. Compl. ¶ 86, "reflect the official policy of the Federal government . . ., sending a message that religion is preferred over non-religion," Am. Compl. ¶ 87, "send a message that believers in religion are political insiders and non-believers are political outsiders," Am. Compl. ¶ 89, and "are intended to convey a message of endorsement to each citizen with an exhortation that all citizens should engage in prayer," Am. Compl. ¶ 90; see also Am. Compl. ¶ 92 (prayer proclamations are allegedly "intended to be, and they are received by citizens, including the plaintiffs, as exhortations to pray"); Am. Compl. ¶ 94 (prayer proclamations "create a hostile environment for non-believers, who are made to feel as if they are political outsiders").

As for how plaintiffs came to learn of the National Day of Prayer, they allege that "knowledge of the annual Prayer Proclamations has existed for many years by the individual plaintiffs," but apparently they have chosen to bring suit now because "the governmental celebration of the annual National Day of Prayer has increased dramatically in recent years." Am. Compl. ¶ 96.  Nonetheless, while plaintiffs assert that they are "subjected to these unwanted proclamations to pray and resulting public celebrations of religion in the public realm," they do not identify any such "celebrations" on behalf of the federal defendants, much less describe how any such celebrations have "increased dramatically"; indeed, the only federal conduct they describe is the dissemination of presidential proclamations by the White House Press Secretary. See Am. Compl. ¶ 95.  To that end, plaintiffs state that prayer proclamations are "projected to citizens throughout the United States, including via the internet and official press releases by Presidential Press Secretaries," and that prayer days "are intended to be, and they are, reported in public media available to citizens everywhere through newspapers and television coverage." Am. Compl. ¶ 91; see also Am. Compl. ¶ 97 (alleging plaintiffs "have been exposed to past Presidential Prayer Proclamations through media reporting" as well as through conversations

with individuals); Am. Compl. ¶ 102 ("The individual plaintiffs know that their President and

Governor annually proclaim an official day of prayer, including from media coverage, complaints

by FFRF members and non-members, and investigation on behalf of FFRF and as citizens.");

Am. Compl. ¶ 109 ("The individual plaintiffs do know, including by investigation, that

Presidential and Gubernatorial proclamations are publicly issued each year that do endorse

religion; these proclamations are publicly available, lest they not be acted upon."); Am. Compl.

¶ 114 ("The individual plaintiffs, moreover, are aware of Presidential and Gubernatorial prayer

proclamations as a result of their advocacy work on behalf of FFRF members, many of whom

have complained to FFRF over the course of years about the government's official designation of

days of prayer.").  Plaintiffs also allege that prayer proclamations "adversely affect the ability of

FFRF to carry out its organizational mission," of "keep[ing] separate church and state." Am.

Compl. ¶¶ 122, 124, see also Am. Compl. ¶ 126 (prayer proclamations "adversely affect the

organizational interests of FFRF, and require the dedication of resources and time by FFRF, and

they frustrate the accomplishment of FFRF's mission to keep separate church and state").

     As to the National Day of Prayer Task Force (hereinafter "NDP Task Force"), plaintiffs

assert that it is "an entity created for the express purpose of organizing and promoting National

Day of Prayer observances conforming to a Judeo-Christian system of values."  Am. Compl.

¶ 19.  Plaintiffs do not allege, however, that the National Day of Prayer task force is affiliated

with or a part of the federal government.  Instead, they allege that presidential prayer

proclamations "violate the Establishment Clause by giving the appearance to an objective

observer that the government prefers Judeo-Christian religious beliefs over other religious

beliefs, including by aligning and partnering with the NDP Task Force as the official organizer of

the National Day of Prayer, under the personal direction of Mrs. Dobson."  Am. Compl. ¶ 27.  To

that end, the Amended Complaint alleges that President Bush, in adopting the NDP Task Force's Theme as part of the 2008 presidential proclamation, "aligned the Office of the President with the NDP Task Force in joint and concerted action to endorse religion in violation of the Establishment Clause."  Am. Compl. ¶ 30.  Thus, plaintiffs allege that "[t]he collaborative relationship between the NDP Task Force and the Presidency indicates to an objective observer that the President prefers and endorses the religious principles of the NDP Task Force."  Am. Compl. ¶ 35; see also Am. Compl. ¶ 47 ("The joint and concerted action between U.S. Presidents and the NDP Task Force in issuing Prayer Proclamations, including those that expressly incorporate references to the NDP Task Force Theme and its Biblical precepts, clearly constitutes the endorsement of religion in violation of the Establishment Clause.").

As to the federal defendants, plaintiff seek a "judgment that Public Law 100-307 is unconstitutional and enjoining its enforcement"; a "judgment declaring that prayer proclamations disseminated by Presidential Press Secretaries violate the Establishment Clause and enjoining their publication"; and a "judgment enjoining the defendants from issuing and disseminating further Prayer Day Proclamations and making designations of official days of prayer."  Am. Compl., Prayer for Relief ¶¶ A, B, F; see also Am. Compl. ¶ 14 (seeking injunction "prohibiting [National Day of Prayer] proclamations by President Obama"); Am. Compl. ¶ 16 (seeking injunction prohibiting Secretary Gibbs "from publishing and publicizing Presidential Prayer Proclamations").  Plaintiffs also seek a "judgment enjoining Shirley Dobson from acting in concert with state and federal officials, in joint action that violates the Establishment Clause, including through joint and collaborative action with the President, the Presidential Press Secretary, and state officials," Am. Compl, Prayer for Relief ¶ D, as well as relief relating exclusively to Governor Doyle and/or Shirley Dobson, Am. Compl., Prayer for Relief ¶¶ C, E.

6

Plaintiffs do not, however, seek any monetary damages.[9]

## ARGUMENT

### I.    PLAINTIFFS LACK STANDING.

"The judicial power of the United States . . . is not an unconditioned authority to determine the constitutionality of legislative or executive acts," but is limited by Article III of the Constitution "to the resolution of 'cases' and 'controversies.'"  Valley Forge Christian Coll. v. Ams. United for Separation of Church and State, 454 U.S. 464, 471 (1982).  In turn, litigants' standing to sue "is an essential and unchanging part of the case-or-controversy requirement," Lujan v. Defenders of Wildlife, 504 U.S. 555, 560 (1992), "determining the power of the court to entertain the suit," Warth v. Seldin, 422 U.S. 490, 498 (1975).

To meet "the irreducible constitutional minimum of standing," a plaintiff must establish: (1) an "actual or imminent" injury; (2) that is "fairly . . . trace[able] to the challenged action of the defendant"; and (3) that would "likely . . . be redressed by a favorable decision."  Lujan, 504 U.S. at 560-61 (internal quotation marks and citations omitted; alterations in original).  As the parties invoking the Court's jurisdiction, plaintiffs bear the burden "clearly to allege facts demonstrating" each of these three elements.  Warth, 422 U.S. at 518; Doe v. County  of Montgomery, Ill., 41 F.3d 1156, 1159 (7th Cir. 1994) ("The party invoking federal jurisdiction bears the burden of establishing the elements of standing").  "[T]he standing inquiry requires careful judicial examination of a complaint's allegations to ascertain whether the particular plaintiff is entitled to an adjudication of the particular claims asserted."  Allen v. Wright, 468 U.S. 737, 752 (1984).  The inquiry must be "especially rigorous when," as here, "reaching the

_____

[9] Plaintiffs do seek the recovery of attorney's fees from Governor Doyle and Shirley Dobson, but not from the federal defendants.  See Am. Compl., Prayer for Relief ¶ G.

merits of the dispute would force [a court] to decide whether an action taken by one of the other two branches of the Federal Government was unconstitutional." Raines v. Byrd, 521 U.S. 811, 819-20 (1997).

Pleading elements of standing is as necessary as pleading the substantive elements of plaintiffs' claims. Standing elements "are not mere pleading requirements but rather an indispensable part of the plaintiff's case, [and] each element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof . . . ." Lujan, 504 U.S. at 561. At the pleadings stage, a plaintiff must provide "'a short and plain statement of the claim showing that [he] is entitled to relief,'" giving the defendant fair notice "of what the . . . claim is and the grounds upon which it rests.'" Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 127 S. Ct. 1955, 1964 (2007) (quoting Fed. R. Civ. P. 8(a)(2)). Under these pleading requirements as recently "retooled" in Bell Atlantic, see Tamayo v. Blagoyevich, 526 F.3d 1074, 1082 (7th Cir. 2008), "a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions"; "[f]actual allegations must be enough to raise a right to relief above the speculative level." Bell Atlantic, 127 S. Ct. at 1965 (emphasis added). The plaintiff must state "plausible grounds," id., "actually suggest[ing] that the plaintiff has a right to relief." E.E.O.C. v. Concentra Health Servs., Inc., 496 F.3d 773, 777 (7th Cir. 2007). See also Tamayo, 526 F.3d at 1084. While these rules "do not require unnecessary detail," a complaint "should contain information that one can provide and that," like the essentials of the plaintiffs' standing, "is clearly important." Concentra Health, 496 F.3d at 780.

In Bell Atlantic, plaintiffs failed to plead facts that, if proven, would have been sufficient to show that defendants conspired to violate the antitrust laws, as opposed to merely engaging in (legal) parallel conduct. Id., 127 S. Ct. at 1965-74. As set forth in more detail below, plaintiffs'

8

Amended Complaint suffers from a similar flaw.  Plaintiffs have pled no facts to show when and how they received or were otherwise directly exposed to prayer proclamations or public celebrations of the National Day of Prayer, other than referring to their longstanding knowledge of such proclamations and their generalized reference to media reporting about the National Day of Prayer.  In other words, all plaintiffs have pled is that they are aware of the National Day of Prayer.  That, however, does not "nudge[ ] their claim across the line from conceivable to plausible," id., 127 S. Ct. at 1974, as plaintiffs have failed to allege the facts necessary to show their connection to the National Day of Prayer, much less any injury arising from it.

> **A.** **The Individual Plaintiffs Lack Standing to Challenge the National Day of Prayer.**
>
> > **1.** **The Individual Plaintiffs Fail to Allege That They Were Exposed in a Direct and Unwelcome Manner to the National Day of Prayer.**

In the Establishment Clause context, a plaintiff must allege a personal connection to the allegedly offensive conduct, such as direct and unwelcome contact, in order to have standing.  In cases involving prayer in a public school setting, for example, "plaintiffs who have had a sufficient personal connection to establish standing include students (or their parents) who attend the school and regular attendees of the legislative body."  Newdow v. Bush, 391 F. Supp. 2d 95, 103 (D.D.C. 2005) (citing Lee v. Weismann, 505 U.S. 577, 584 (1992) (currently enrolled students had standing to challenge graduation prayer); Wynne v. Town of Great Falls, S.C., 376 F.3d 292, 294 (4th Cir. 2004) (plaintiff regularly attended, for roughly two years, monthly town council meetings where prayer was read)).  A plaintiff does not have standing, however, to object to prayers at events that the plaintiff does not attend.  See Doe v. Madison School Dist. No. 321, 177 F.3d 789, 797 (9th Cir. 1999) (en banc) (no standing for parent of former student to challenge prayer at graduation).

Cases involving the display of religious objects similarly emphasize direct and unwelcome contact with sectarian symbols, messages, or conduct.  In Books v. City of Elkhart, Ind., for example, the Seventh Circuit held "that a plaintiff may allege an injury in fact when he is forced to view a religious object that he wishes to avoid but is unable to avoid because of his right or duty to attend the government-owned place where the object is located."  235 F.3d 292, 301 (7th Cir. 2000).  By contrast, in Freedom From Religion Foundation, Inc. v. Zielke, plaintiffs failed to allege that they were exposed to a religious monument during their normal routines. 845 F.2d 1463, 1468 (7th Cir. 1988).  The Seventh Circuit, in affirming this Court's dismissal of plaintiffs' complaint for lack of standing, rejected plaintiffs' claim that they suffered a "rebuke to [their] religious beliefs, respecting religion by virtue of being subjected to a governmental endorsement of unequivocally religious precepts and confusions," finding that "this is exactly the type of psychological harm that the Supreme Court has held cannot confer standing on an aggrieved party."  Id. at 1468 (internal quotation marks omitted) (citing Valley Forge, 454 U.S. at 486-87 n.22).  See also Van Orden v. Perry, 545 U.S. 677, 682 (2005) (plurality opinion) (frequent visitor to capitol grounds had standing to challenge the placement of a Ten Commandments monument on those grounds); County of Montgomery, 41 F.3d at 1161 (standing properly alleged for plaintiffs who asserted "they must come into direct and unwelcome contact with [a religious sign at a county courthouse] in order to fully participate in their local government and fulfil their legal obligations"); Gonzales v. N. Twp. of Lake County, Ind., 4 F.3d 1412, 1416 (7th Cir. 1993) (plaintiffs had standing to challenge a crucifix "memorial" in a public park because plaintiffs "avoid[ed] the area of the park where the crucifix is displayed" and one plaintiff, a park employee, had "quit his job after the cross was erected").  But see County of Montgomery, 41 F.3d at 1161 (no standing for an attorney to challenge religious sign at

10

courthouse where attorney did not have an office in the county, failed to identify any case that required his presence at the courthouse, and had never even been to the courthouse).

The <u>Newdow</u> court, in finding that plaintiff lacked standing to challenge inaugural prayers at the 2005 presidential inauguration, nicely summarized how a lack of connections to an event can undermine standing:

> Here, Newdow lacks any of the indicia of a personal connection found in other prayer or public-display cases.  Certainly the Presidential Inauguration is a national event, but it is only held once every four years.  In order to come into contact with the allegedly offensive prayers, Newdow must either watch it on television or make a special trip to Washington to observe the prayers in person.  He can also avoid the prayers by not watching the television, or by not making the trip to Washington.  But, under either scenario, he does not have the necessary personal connection to establish standing.  Newdow does not come into regular contact with the inaugural prayers, nor is he forced to change his typical routine to avoid them. . . . Hence, without a personal connection to the inauguration that would make his injuries particularized and concrete, Newdow's alleged injuries — general offense and outsider status — are akin to the psychological injuries occurring from the observation of offensive conduct that the Supreme Court in <u>Valley Forge</u> deemed insufficient to establish an injury-in-fact.

<u>Newdow</u>, 391 F. Supp. 2d at 104.

Plaintiffs presumably amended their Complaint to add allegations reflecting some sort of "connection" to the National Day of Prayer.  Instead, in amending their Complaint plaintiffs have made clear that they have not been exposed to any continuing and unwelcome contact with prayer day proclamations or pubic displays of worship in response thereto.  If anything, plaintiffs so-called "investigation on behalf of FFRF and its citizens," Am. Compl. ¶ 102, underscores the fact that plaintiffs lack standing, since any such investigation "does not provide a special license to roam the country in search of governmental wrongdoing and to reveal their discoveries in

11

federal court." <u>Valley Forge</u>, 454 U.S. at 487.[10]  Plaintiffs similarly allege a connection to the

National Day of Prayer based on complaints by unnamed individuals.  <u>See</u> Am. Compl. ¶¶ 97,

102.  But the fact that unidentified third parties — whoever they are — may have expressed

displeasure at some unidentified point in time about the National Day of Prayer does not reflect

any concrete and particularized injury on those third parties' behalf, and it certainly does not

demonstrate any such injury or confer standing for the plaintiffs here.

The remainder of the amendments to plaintiffs' Complaint merely repackage and echo the

insufficient allegations contained in the original Complaint.  To be sure, the Amended Complaint

alleges that 1) the President of the United States issues an annual National Day of Prayer

proclamation; 2) the White House Press Secretary disseminates such proclamations; 3) the news

media reports on the existence of such proclamations; and 4) plaintiffs have been aware of the

existence of such proclamations for a very long time.  However, plaintiffs' mere "knowledge of

the annual Prayer Proclamations," Am. Compl. ¶ 96, does not establish a connection sufficient to

confer standing; otherwise, any aggrieved litigant would have standing so long as they were

aware of conduct that they disliked.  Similarly, the fact that such knowledge "has existed for

many years by the individual plaintiffs," Am. Compl. ¶ 96, or that such proclamations are

published "via the internet and official press releases by Presidential Press Secretaries" and are

"reported in public media," Am. Compl. ¶ 91, does not explain how these plaintiffs have a

connection to the National Day of Prayer, any more than a citizen who is aware of prayers at

---

[10] The Amended Complaint strongly suggests that plaintiffs have been engaging in such "roam[ing]."  <u>See</u> Am. Compl. ¶ 108 ("Religious endorsement by public officials does not become constitutionally acceptable under the Establishment Clause merely because individuals <u>informed themselves</u> that it was occurring.") (emphasis added); <u>id.</u> ¶ 110 ("Knowledge and awareness of government speech endorsing religion, <u>even if sought</u>, does not vitiate or negate the constitutional offense to non-believers . . . .") (emphasis added).

events he or she does not attend, see Madison Sch. Dist. No. 321, 177 F.3d 797, or who is aware

of, but not exposed to, a religious monument at a park, Zeilke, 845 F.2d at 1468, or who

affirmatively watches prayers either on television or in person at a presidential inauguration, see

Newdow, 391 F. Supp. 2d at 104.  In none of these scenarios did plaintiffs have standing; the

same holds true for the plaintiffs here.

Even after amending their Complaint, plaintiffs fail to allege whether and how each of

them actually "received" the 2008 proclamation, which would be a "clearly important" fact,

Concentra Health, 496 F.3d at 780, relating to whether and how plaintiffs were injured in any

way, including whether they were allegedly encouraged to pray.[11] Taking the allegations in the

Amended Complaint at face value, they are most suggestive that plaintiffs were aware of prayer

day proclamations generally and that they "received" the 2008 presidential prayer proclamation

specifically by visiting the White House's web-site in order to download the press release that

contained the proclamation.  (The version of the 2008 prayer proclamation that plaintiffs attached

to their original Complaint contains a White House url address.[12])  Plaintiffs may also have been

aware of the 2008 proclamation through "media reporting," Am. Compl. ¶ 97, though what,

exactly, the media reported about the 2008 National Day of Prayer proclamation the Amended

---

[11] This omission is especially glaring in light of the multiple individual plaintiffs in this lawsuit.  Not one alleges any specific facts regarding how he or she was exposed to the National Day of Prayer.

[12] Plaintiffs appear to have gone through great effort to expose themselves to prayer proclamations, having obtained and attached to the original Complaint such proclamations from all fifty states.  Nonetheless, the individual plaintiffs here are all residents of Madison, Wisconsin.  See Am. Compl. ¶¶ 7-12.  They therefore have no quarrel with — and certainly no standing to challenge — proclamations issued by the governors of Hawaii, New York, Minnesota, or any of the other states they list in their Amended Complaint.  See Am. Compl. ¶¶ 65-85.

13

Complaint does not say.  In either event, the Supreme Court in <u>Valley Forge</u> has rejected

plaintiffs' gambit, finding that plaintiffs lacked standing to challenge the transfer of government

property to a religious educational institution where they learned of that transfer "through a news

release."  <u>Valley Forge</u>, 454 U.S. at 487.  Plaintiffs' allegations that they are "aware" of the

National Day of Prayer squarely fall within the reasoning of <u>Valley Forge</u> and, on that basis,

should be rejected.

**2.      The Individual Plaintiffs Fail to Allege an Actual or Imminent Injury.**

In their Amended Complaint, plaintiffs still fail to allege any injury arising from the

National Day of Prayer.  To be sure, the Amended Complaint makes clear that plaintiffs

disapprove of that tradition.  But mere disapproval of a government policy does not provide a

plaintiff with standing to challenge it.

Even in the Establishment Clause context, the Supreme Court has consistently "rejected

claims of standing predicated on the right, possessed by every citizen, to require that the

Government be administered according to law."  <u>Valley Forge</u>, 454 U.S. at 482-83 (citation and

internal quotation marks omitted); <u>see also Allen</u>, 468 U.S. at 754-55 (same).  "Offense alone in

response to government policies or requirements does not suffice to create standing:  'Otherwise

there would be universal standing:  anyone could contest any public policy or action he disliked.

There must be a concrete injury.'"  <u>Indiana Democratic Party v. Rokita</u>, 458 F. Supp. 2d 775, 810

(S.D. Ind. 2006) (quoting <u>Books v. Elkhart County, Ind.</u>, 401 F.3d 857, 870 (7th Cir. 2005)),

<u>aff'd sub nom. Crawford v. Marion County Election Bd.</u>, 472 F.3d 949 (7th Cir. 2007), <u>aff'd</u>, 128

S. Ct. 1610 (2008); <u>see also Freedom From Religion Found., Inc. v. Zielke</u>, 845 F.2d at 1468 (no

standing for "rebuke to [FFRF's] religious beliefs respecting religion").  Instead, plaintiffs must

"allege adequately an injury in fact . . . show[ing] 'an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical.'"  Books v. City of Elkhart, 235 F.3d at 299 (citing Lujan, 504 U.S. at 560-61); see also County of Montgomery, 41 F.3d at 1159.

Plaintiffs do not allege any specific injury.  At most, plaintiffs allege that prayer proclamations "create a hostile environment for non-believers, who are made to feel as if they are political outsiders."  Am. Compl. ¶ 94.  Even assuming that the National Day of Prayer has this effect on non-believers, absent a direct connection to the National Day of Prayer, this is not a "concrete injury."  It is an assertion of a "psychological consequence presumably produced by observation of conduct with which one disagrees" and, as such, is insufficient to confer Article III standing, "even though the disagreement is phrased in constitutional terms."  Valley Forge, 454 U.S. at 485-86; see also Gonzales, 4 F.3d at 1416 ("Offense to moral and religious sensitivities does not constitute an injury in fact and is insufficient to confer standing."); Newdow, 391 F. Supp. 2d at 103 (rejecting for standing purposes allegation that plaintiff was made to feel "like an outsider" by the inclusion of prayers in the 2005 presidential inauguration).[13]

Plaintiffs' failure to point to any concrete injury that they have suffered at the hands of the National Day of Prayer statute (or any proclamations issued thereunder) is not surprising.  The National Day of Prayer statute merely directs "[t]he President [to] issue each year a

---

[13] The individual plaintiffs and FFRF also assert that they have been injured because they have been subjected "to official admonitions and exhortations to pray" and have been exposed to "unwanted endorsements of religion, which violate the Establishment Clause."  Am. Compl. ¶ 133.  But that is not a factual allegation of a concrete injury; it is a conclusory assertion of an alleged constitutional violation.

15

proclamation" designating a "National Day of Prayer on which the people of the United States

<u>may</u> turn to God in prayer and mediation."  36 U.S.C. § 119 (emphasis added).  The terms of the

statute are <u>voluntary</u> and merely present an invitation for individuals who are so inclined to pray.

As Justice Kennedy aptly put it, the National Day of Prayer does not "require anyone to pray, of

course."  <u>County of Allegheny v. ACLU</u>, 492 U.S. 573, 672 (1989) (Kennedy, J., concurring in

part and dissenting in part).

It is also difficult to see how individual presidential proclamations issued pursuant to the

National Day of Prayer statute could injure plaintiffs.  Plaintiffs allege that "the governmental

celebration of the annual National Day of Prayer has increased dramatically in recent years," Am.

Compl. ¶ 96, but do not identify how any such "celebration" has increased.  All the Amended

Complaint alleges is that the President issues a proclamation, the White House press secretary

disseminates it, and the media report on it.[14]  But a proclamation is merely "a public and official

announcement."  The Random House Dictionary of the English Language, unabridged (2d ed.

1987).  Because the existence of the National Day of Prayer may be ignored with absolutely no

---

[14] Not surprisingly, some people do choose to pray on the National Day of Prayer.  For example, plaintiffs allege that "Sheriff Dean Roland . . . organized a prayer breakfast in recognition of the National Day of Prayer" and note that Wisconsin Supreme Court Justice Michael Gableman was the "keynote speaker" at that breakfast.  Am. Compl. ¶¶ 50, 51; <u>see also</u> Am. Compl. ¶¶ 52-56.  As the federal defendants noted in their original motion to dismiss, neither Sheriff Roland nor Justice Gableman is a defendant in this lawsuit, and no relief that plaintiffs request would prevent Sheriff Roland, Justice Gableman, or anyone else from hosting prayer breakfasts on the First Thursday in May in the future.  Plaintiffs have nonetheless attempted to clarify the purpose of these "prayer breakfast" allegations, noting that "[t]he remarks of Justice Gableman [encouraging citizens to engage in prayer] exemplify the public endorsements of religion that Presidential prayer proclamations bring forth in the public domain."  Am. Compl. ¶ 56.  As plaintiffs still do not allege that they attended (or had any connection whatsoever with) this prayer breakfast, they have not — and cannot — allege any injury arising therefrom.  Accordingly, these allegations are simply irrelevant to plaintiffs' claims.

consequence whatsoever, there is no government action that in any way affects plaintiffs.

**B.      FFRF Lacks Standing to Challenge the National Day of Prayer.**

FFRF fares no better than the individual plaintiffs in its effort to allege standing.  "Our decisions make clear that an organization's abstract concern with a subject that could be affected by an adjudication does not substitute for the concrete injury required by Art. III."  Simon v. E. Ky. Welfare Rights Org., 426 U.S. 26, 40 (1976); see also Organ. of Minority Vendors v. Ill. Cent. Gulf R.R., 579 F. Supp. 574, 589 (N.D. Ill. 1983) ("[a]n injury to an organization's 'abstract social interests' is not enough to confer standing"); Indianapolis Minority Contractors Ass'n, Inc. v. Wiley, No. IP 94-1175-C-T/G, 1998 WL 1988826, at *47 (S.D. Ind. May 13, 1998) (same).

FFRF's allegations that prayer proclamations "adversely affect the ability of FFRF to carry out its organizational mission" of "keep[ing] separate church and state," Am. Compl. ¶¶ 122, 124, and that such proclamations "require the dedication of resources and time by FFRF," Am. Compl. ¶ 126, merely reflect FFRF's abstract concern with "the Constitutional principle of separation of church and state and . . . educat[ion] on matters relating to nontheism," Am. Compl. ¶ 121.  That is not enough.  "Organizations claiming direct injury must satisfy the same standing test as individuals by suffering from a concrete injury that is fairly traceable to the defendants' conduct . . . ."  Plotkin v. Ryan, No. 99 C 53, 1999 WL 965718, at *5 (N.D. Ill. Sept. 29, 1999), aff'd, 239 F.3d 882 (7th Cir. 2001).  To that end, "ordinary expenditures as part of an organization's purpose do not constitute the necessary injury-in-fact required for standing."  Plotkin v. Ryan, 239 F.3d 882, 886 (7th Cir. 2001); see also Havens Realty Corp. v. Coleman, 455 U.S. 363, 379 (1982) (a plaintiff organization must allege that a defendant's actions impede, and therefore make more expensive, the plaintiff group's efforts to promote its interests).

17

In other words, FFRF "cannot convert its ordinary programming costs into an injury in fact." Plotkin v. Ryan, 1999 WL 965718, at *5. To hold otherwise

> would completely eviscerate the standing doctrine. If an organization obtains standing merely by expending resources in response to a statute, then Article III standing could be obtained through nothing more than filing a lawsuit. Such an interpretation flies in the face of well-established standing principles. Indeed, "[a]n organization cannot, of course, manufacture the injury necessary to maintain a suit from its expenditure of resources on that very suit. Were the rule otherwise, any litigant could create injury in fact by bringing a case, and Article III would present no real limitation."

Indiana Democratic Party, 458 F. Supp. 2d at 817 (quoting Spann v. Colonial Village, Inc., 899 F.2d 24, 27 (D.C. Cir. 1990)). Thus, FFRF has failed to allege "that it has itself suffered any distinct and palpable injury as a result" of the National Day of Prayer statute or proclamations issued thereunder. See Freedom From Religion Found. v. Zielke, 845 F.2d at 1469.

Nor does FFRF have standing as a representative of its members. "[E]ven in the absence of injury to itself, an association may have standing solely as the representative of its members." Freedom From Religion Found. v. Zielke, 845 F.2d at 1469 (quoting Warth, 422 U.S. at 511). "An organization has standing to sue [as a representative of its members] if (1) at least one of its members would otherwise have standing; (2) the interests at stake in the litigation are germane to the organization's purpose; and (3) neither the claim asserted nor the relief requested requires an individual member's participation in the lawsuit." Sierra Club v. Franklin County Power of Ill., LLC, 546 F.3d 918, 924 (7th Cir. 2008); see also Hunt v. Washington State Apple Adver. Comm'n, 432 U.S. 333, 343 (1977). But FFRF's allegations fail to meet the requirements of the first element of the test: since FFRF's individual members lack standing, FFRF lacks standing as a representative of its members. See Part I.A, supra.

18

\*          \*          \*

For the foregoing reasons, plaintiffs lack standing to bring this lawsuit.  Accordingly, this Court need not — and should not — reach the merits of plaintiffs' allegations against the federal defendants.  Nonetheless, and for the reasons set forth below, if this Court did reach the merits of plaintiffs' challenges, it should reject them for failure to state a claim.

## II.      THE NATIONAL DAY OF PRAYER STATUTE IS CONSTITUTIONAL.

The National Day of Prayer statute, including its requirement that the President issue National Day of Prayer proclamations, cannot as a matter of law violate the Establishment Clause.

### A.      The Supreme Court Has Referenced the National Day of Prayer as Constitutional in the Context of Another Establishment Clause Challenge.

Plaintiffs ask the Court "to judge the constitutionality of an Act of Congress — 'the gravest and most delicate duty that [a court] is called upon to perform.'"  Rostker v. Goldberg, 453 U.S. 57, 64 (1981) (citation omitted).  It is well established that Acts of Congress are presumptively constitutional.  See United States v. Nat'l Dairy Prods. Corp., 372 U.S. 29, 32 (1963).  This Court should be especially cognizant of that presumption here; the tradition of a National Day of Prayer dates to the founding of our country, and the statute formally authorizing the National Day of Prayer dates back half a century.

Moreover, a Supreme Court decision has discussed the constitutionality of the National Day of Prayer.  In Lynch v. Donnelly, 465 U.S. 668 (1984), the Court unreservedly described the National Day of Prayer as consistent with the Establishment Clause and used it as a benchmark to measure the constitutionality of other government action.  Specifically, the Court held that the Establishment Clause permits a city to include a nativity scene as part of its Christmas display.

19

In reasoning that the creche permissibly "depicts the historical origins of this traditional event long recognized as a National Holiday," 465 U.S. at 680, the Court noted that

> There are countless other illustrations of the Government's acknowledgment of our religious heritage and governmental sponsorship of graphic manifestations of that heritage.  Congress has directed the President to proclaim a National Day of Prayer each year "on which [day] the people of the United States may turn to God in prayer and meditation at churches, in groups, and as individuals." . . . Our Presidents have repeatedly issued such Proclamations.  Presidential Proclamations and messages have also issued to commemorate Jewish Heritage Week . . . and the Jewish High Holy Days . . . . One cannot even look at this brief résumé without finding that our history is pervaded by expressions of religious beliefs . . . .  Equally pervasive is the evidence of accommodation of all faiths and all forms of religious expression, and hostility toward none.  Through this accommodation, as Justice Douglas observed, governmental action has "follow[ed] the best of our traditions" and "respect[ed] the religious nature of our people."

Lynch, 465 U.S. at 677-78 (emphasis added) (internal citations omitted) (quoting Zorach v. Clauson, 343 U.S. 306, 314 (1952) (internal footnote omitted)).[15]  And the Seventh Circuit has cited this very language, relying upon Lynch and its approval of the National Day of Prayer to turn back a challenge by FFRF to a resolution by the Illinois House of Representatives authorizing the construction of a "prayer room" in the Illinois state capitol:

> In Lynch, the Court listed a series of . . . acknowledgments, including congressional proclamations alluding to the religious significance of national

---

[15] In County of Allegheny v. ACLU, Justice Kennedy similarly described the National Day of Prayer as one of several "of our traditional practices recognizing the part religion plays in our society."  Id., 492 U.S. 573, 670, 672 (1989) (Kennedy, J., concurring in part and dissenting in part).  However, Justice Blackmun, writing for the Court's majority and responding to Justice Kennedy's opinion, noted in a footnote that, "as [proclaiming a National Day of Prayer] is not before us, we express no judgment about its constitutionality."  Id. at 603 n.52.  Nonetheless, and subsequent to the Supreme Court's decision in County of Allegheny, Judge Manion referred to Lynch's reference to the National Day of Prayer as an "implic[it] acknowledg[ment] [of] the constitutionality of [that] practice."  Books v. City of Elkhart, 235 F.3d at 323 (Manion, J., concurring in part and dissenting in part); see also id. at 325 (Manion, J., concurring in part and dissenting in part) (describing presidential proclamations for a National Day of Prayer as an "accepted practice[ ]").

holidays and presidential proclamations recognizing a "National Day of Prayer,"
as illustrations of appropriate governmental recognitions of religious faith.

Van Zandt v. Thompson, 839 F.2d 1215, 1221 (7th Cir. 1988) (citing Lynch, 465 U.S. at 676-

78).

Although Lynch did not involve a direct challenge to the National Day of Prayer, that

decision (and the Seventh Circuit's citation to it) is instructive on the National Day of Prayer's

constitutionality.  "When an opinion issues for the [Supreme] Court, it is not only the result but

also those portions of the opinion necessary to that result by which we are bound."  Seminole

Tribe v. Florida, 517 U.S. 44, 67 (1996).  As the Seventh Circuit has observed, "an inferior court

had best respect what the majority [in a Supreme Court decision] says rather than read between

the lines.  If the [Supreme] Court proclaims that a practice is consistent with the establishment

clause, we take its assurances seriously.  If the Justices are just pulling our leg, let them say so."

Sherman v. Community Consol. Dist. 21, 980 F.2d 437, 448 (7th Cir. 1992).[16]

Moreover, the Seventh Circuit has spoken independently of Lynch (and more recently

than County of Allegheny) on the National Day of Prayer.  In DeBoer v. Village of Oak Park, the

court analyzed whether a village could exclude from its village hall, pursuant to a use policy, a

_____

[16] Plaintiffs may attempt to cite subsequent Supreme Court decisions in Lee v. Weisman,
505 U.S. 577 (1992), and Santa Fe Independent School District v. Doe, 530 U.S. 290 (2000), for
the proposition that the Supreme Court has looked upon state-sponsored prayer with disfavor.
However, both of those cases involved prayer in a public school context.  See Lee, 505 U.S. at
599 (holding unconstitutional a religious exercise at graduation where "young graduates who
object are induced to conform"); Santa Fe, 530 U.S. at 317 (policy that "creates the perception of
encouraging the delivery of prayer at a series of important school events" unconstitutional).  As
the Court in Lee made clear, however, "there are heightened concerns with protecting freedom of
conscience from subtle coercive pressure in the elementary and secondary public schools."  Lee,
505 U.S. at 592.  Justice Kennedy, who wrote the opinion for the Court in Lee, also wrote the
separate opinion in County of Allegheny recognizing that the National Day of Prayer is a
traditional practice.  See n.15, supra.

group that wanted to use village hall facilities for a National Day of Prayer assembly.  In holding

that the village's denial of plaintiffs' application to use the village hall constituted viewpoint

discrimination, the court rejected "[t]he notion that religious prayer and worship is not properly

viewed as a method of discussing civic subject matter" and noted that "prayers and the

invocation of divine guidance have been accepted as part of American political discourse

throughout the history of this Republic."  Id., 267 F.3d 558, 569, 570 (7th Cir. 2001).  The court

then went on to describe the National Day of Prayer in very positive terms:

> The civic nature of the NDP assembly as part of that well-established
> practice is particularly evident.  The event was a part of a national observance
> designed to afford citizens who believe that prayer is an important component of
> civic obligation the opportunity to discharge that obligation by praying together
> for the welfare of their country.  Indeed, it is a day designated for this purpose by
> Congress, and recognized each year by the President in a proclamation.

Id. at 570 (internal citation omitted).  See also Books v. City of Elkhart, 235 F.3d at 325

(Manion, J., concurring in part and dissenting in part) (describing presidential proclamations for

a National Day of Prayer as an "accepted practice[ ]"); Am. Jewish Cong. v. City of Chicago, 827

F.2d 120, 133 (7th Cir. 1987) (Easterbrook, J., dissenting) (similar).

This Court need not proceed further in order to conclude that the National Day of Prayer

statute, including its requirement that the President issue National Day of Prayer proclamations,

is fully consistent with the Establishment Clause.  Nonetheless, a review of the role of prayer and

religion in our nation's history, as well as analysis of the National Day of Prayer statute under the

Supreme Court's test in Lemon v. Kurtzman, 403 U.S. 602 (1971), demonstrate that the National

Day of Prayer is constitutional.

**B.      The National Day of Prayer Is Part of Our Country's Religious History.**

"[R]eligion has been closely identified with our history and government."  Abington Sch.

Dist. v. Schempp, 374 U.S. 203, 212 (1963).  Many of the country's earliest settlers came to

these shores seeking a haven from religious persecution and a home where their faith could

flourish.  In 1620, before embarking for America, the Pilgrims signed the Mayflower Compact in

which they announced that their voyage was undertaken "for the glory of God."  Mayflower

Compact (1620), reprinted in 1B. Schwartz, The Roots of the Bill of Rights, at 2 (1980).  Settlers

established many of the original thirteen colonies, including Massachusetts, Rhode Island,

Connecticut, Pennsylvania, Delaware, and Maryland, for the specific purpose of securing

religious liberty for their inhabitants.  Indeed, the Constitutions or Declarations of Rights of

almost all of the original States expressly guaranteed the free exercise of religion.  See 5 The

Founders' Constitution 70-71, 75, 77, 81, 84-85 (P. Kurland & R. Lerner eds., 1987).

The Framers' deep-seated faith also laid the philosophical groundwork for the unique

governmental structure they adopted.  In the Framers' view, government was instituted by

individuals for the purpose of protecting and cultivating the exercise of their fundamental rights.

Central to that political order was the Framers' conception of the individual as the source (rather

than the object) of governmental power.  That view of the political sovereignty of the individual,

in turn, was a direct outgrowth of their conviction that each individual was entitled to certain

fundamental rights, a conviction most famously expressed in the Declaration of Independence:

"We hold these truths to be self-evident, that all men are created equal, that they are endowed by

their Creator with certain unalienable Rights, that among these are Life, Liberty, and the pursuit

of Happiness."  U.S.C.A. Declaration of Independence. Thus, "[t]he fact that the Founding

Fathers believed devotedly that there was a God and that the unalienable rights of man were

23

rooted in Him is clearly evidenced in their writings, from the Mayflower Compact to the Constitution itself."  Schempp, 374 U.S. at 213.

Moreover, the Framers considered references to God in official documents and official acknowledgments of the role of religion in the history and public life of the country to be consistent with the principles of religious autonomy embodied in the First Amendment.  Indeed, two documents to which the Supreme Court has often looked in its Establishment Clause cases — James Madison's Memorial and Remonstrance Against Religious Assessments (1785) and Thomas Jefferson's Bill for Establishing Religious Freedom (1779) — repeatedly acknowledge the Creator.  See 5 The Founders' Constitution, supra, at 77, 82.  Moreover, the Constitution itself refers to the "Year of our Lord" and excepts Sundays from the ten-day period for exercise of the presidential veto.  U.S. Const. art. I, § 7; id. art. VII.

The First Congress — the same Congress that drafted the Establishment Clause — adopted a policy of selecting a paid chaplain to open each session of Congress with prayer.  See Marsh v. Chambers, 463 U.S. 783, 787 (1983).  That same Congress, one day after the Establishment Clause was proposed, also urged President Washington "to proclaim 'a day of public thanksgiving and prayer, to be observed by acknowledging with grateful hearts, the many and signal favours of Almighty God."  Lynch, 465 U.S. at 675 n.2 (emphasis added) (citations omitted).[17]  President Washington responded by proclaiming November 26, 1789, a day of

_____

[17] In the Establishment Clause context in particular, the Supreme Court has recognized that actions of the First Congress are "contemporaneous and weighty evidence" of the Constitution's "true meaning," Marsh, 463 U.S. at 790 (citation and quotation marks omitted), and that "an unbroken practice . . . is not something to be lightly cast aside," Walz v. Tax Comm'n, 397 U.S. 664, 678 (1970).  See also The Pocket Veto Case, 279 U.S. 655, 689 (1929) ("Long settled and established practice is a consideration of great weight in a proper interpretation of constitutional provisions . . . .");  United States v. Curtiss-Wright Export Corp., 299 U.S. 304, 328 (1936) (construction "placed upon the Constitution . . . by the men who were

24

thanksgiving to "offer[ ] our prayers and supplications to the Great Lord and ruler of nations, and beseech Him to pardon our national and other transgressions."  Id. (citation omitted).  President Washington also included a reference to God in his inaugural address:  "[I]t would be peculiarly improper to omit in this first official act my fervent supplications to that Almighty Being who rules over the universe, who presides in the council of nations, and whose providential aids can supply every human defect, that His benediction may consecrate to the liberties and happiness of the people of the United States a Government instituted by themselves for these essential purposes."  Inaugural Addresses of the Presidents of the United States, S. Doc. No. 101-10, at 2 (1989).

Later generations have followed suit.  Since the time of Chief Justice Marshall, the Supreme Court has opened its sessions with "God save the United States and this Honorable Court."  See Engel v. Vitale, 370 U.S. 421, 446 (1962) (Stewart, J., dissenting).  President Abraham Lincoln referred to a "Nation[ ] under God" in the historic Gettysburg Address (1863): "[T]hat we here highly resolve that these dead shall not have died in vain; that this nation, under God, shall have a new birth of freedom; and that government of the people, by the people, for the people, shall not perish from the earth."  Every President who has delivered an inaugural address has referred to God or a Higher Power,[18] and every President, except Thomas Jefferson, has

_____

contemporary with its formation" is "almost conclusive") (citation omitted).

[18] See Inaugural Address of the Presidents of the United States, supra; First Inaugural Address of William J. Clinton, 29 Weekly Comp. Pres. Doc. 77 (Jan. 20, 1993); Second Inaugural Address of William J. Clinton, 33 Weekly Comp. Pres. Doc. 63 (Jan. 20, 1997); First Inaugural Address of George W. Bush, 37 Weekly Comp. Pres. Doc. 209 (Jan. 20, 2001); President Barack Obama's Inauguration Address, available at http://www.whitehouse.gov/the_press_office/President_Barack_Obamas_Inaugural_Address/ (last visisted March 5, 2009).

declared a Thanksgiving Day holiday.[19]  In 1865, Congress authorized the inscription of "in God

we trust" on United States coins.  Act of Mar. 3, 1865, ch. 100, § 5, 13 Stat. 517, 518.  In 1931,

Congress adopted as the national anthem "The Star-Spangled Banner," the fourth verse of which

reads:  "Blest with victory and peace, may the heav'n rescued land Praise the Pow'r that hath

made and preserved us a nation!  then conquer we must, when our cause is just, And this be our

motto 'In God is our Trust.'"  See Engel, 370 U.S. at 449 (Stewart, J., dissenting).  In 1956,

Congress passed legislation to make "In God we trust" the National Motto, and provided that it

be inscribed on all United States currency, above the main door of the Senate, and behind the

Chair of the Speaker of the House of Representatives.  See Act of Nov. 13, 2002, Pub. L. No.

107-293, § 1, 116 Stat. 2058.  And today, Christmas and Thanksgiving are proclaimed as

national holidays:  "by Acts of Congress, it has long been the practice that federal employees are

released from duties on these National Holidays, while being paid from the same public revenues

that provide the compensation of the Chaplains of the Senate and the House and the military

services."  Lynch, 465 U.S. at 676.  "Thus, it is clear that the Government has long recognized —

indeed it has subsidized — holidays with religious significance."  Id.

### C.     Under the Supreme Court's Test in Lemon v. Kurtzman, the National Day of Prayer Statute Is Constitutional.

For the reasons set forth above, the Supreme Court's decision in Lynch, and the well-

established role of the National Day of Prayer in our Nation's cultural fabric, allow this Court to

reject plaintiffs' Establishment Clause challenge without applying the Supreme Court's test in

Lemon v. Kurtzman, 403 U.S. 602 (1971).  For example, in Van Orden v. Perry, Chief Justice

---

[19] See S. Epstein, Rethinking the Constitutionality of Ceremonial Deism, 96 Colum. L. Rev. 2083, 2113 & nn. 174-182 (1996) (listing Thanksgiving proclamations).

Rehnquist found that the <u>Lemon</u> test was "not useful" in determining the constitutionality of a Ten Commandments monument, turning instead to "the nature of the monument and . . . our Nation's history." <u>Id.</u> at 686 (plurality opinion). So too, here: the nature of the National Day of Prayer and its role in our nation's history establish its constitutionality.

Even if this Court applies the <u>Lemon</u> test, the National Day of Prayer easily passes. "Specifically, a government policy or practice violates the Establishment Clause if (1) it has no secular purpose, (2) its primary effect advances or inhibits religion, or (3) it fosters an excessive entanglement with religion." <u>Vision Church v. Village of Long Grove</u>, 468 F.3d 975, 991 (7th Cir. 2006) (citing <u>Lemon</u>, 403 U.S. at 612-13), <u>cert. denied</u>, 128 S. Ct. 77 (2007). The National Day of Prayer satisfies each of these three prongs.

### 1.    The National Day of Prayer Has a Secular Purpose.

First, the National Day of Prayer has a valid "secular purpose." In deciding whether a statue has a valid secular purpose, "a legislature's stated reasons will generally get deference." <u>McCreary County v. ACLU of Kentucky</u>, 545 U.S. 844, 863 (2005). "[T]he secular purpose required has to be genuine, not a sham, and not merely secondary to a religious objective." <u>Id.</u>; <u>see also</u> <u>Vision Church</u>, 468 F.3d at 992 (courts must ensure that government's characterization is "sincere").

Under this standard, the National Day of Prayer has a clear secular purpose. It has been in existence since 1952, and reflects a significant element of the cultural heritage and history of our country. Acknowledging that cultural heritage and history is constitutional, as "'[t]here is an unbroken history of official acknowledgment of the role of religion in American life from at least 1789.'" <u>Van Orden</u>, 545 U.S. at 686 (plurality opinion) (quoting <u>Lynch</u>, 465 U.S. at 674). Indeed, in acknowledgment of the role that various faiths have played in creating the American

27

mosaic, President Bush also annually issued proclamations recognizing the role of Jewish people,[20] celebrating Religious Freedom Day,[21] and honoring Dr. Martin Luther King, Jr.'s contributions ("Dr. King's faith in the Almighty gave him the courage to confront discrimination and segregation, and he preached that all powers of evil are ultimately no match for even one individual armed with eternal truths.").[22]   Put another way, the National Day of Prayer acknowledges the role of faith and religion in our country, just as the National Tartan Day[23] acknowledges the contributions of Scots, German-American Day[24] acknowledges the contributions of German-Americans, and Leif Erikson Day[25] acknowledges the contributions of Nordic Americans to our country.   To the extent it identifies the role of prayer and religion in our society, it is no different than the role that National Physical Fitness and Sports Month[26] plays in identifying the importance of exercise, National Safe Boating Week[27] raises awareness about safe boating practices, or National Park Week[28] celebrates our country's many majestic national

---

[20] Proclamation 8248, Jewish American Heritage Month, 2008 (Apr. 29, 2008), 73 Fed. Reg. 24,135.

[21] Proclamation 8215, Religious Freedom Day, 2008 (Jan. 14. 2008), 73 Fed. Reg. 3375.

[22] Proclamation 8216, Martin Luther King, Jr., Federal Holiday, 2008 (Jan. 16. 2008), 73 Fed. Reg. 3855.

[23] Proclamation 8233, National Tartan Day, 2008 (Apr. 4, 2008), 73 Fed. Reg. 19,387.

[24] Proclamation 8301, German-American Day, 2008 (Oct. 3, 2008), 73 Fed. Reg. 58,863.

[25] Proclamation 8303, Leif Erikson Day, 2008 (Oct. 8, 2008), 73 Fed. Reg. 60,603.

[26] Proclamation 8249, National Physical Fitness and Sports Month, 2008 (Apr. 29, 2008), 73 Fed. Reg. 24,137.

[27] Proclamation 8256, National Safe Boating Week, 2008 (May 15, 2008), 73 Fed. Reg. 29,383.

[28] Proclamation 8239, National Park Week, 2008 (Apr. 15, 2008), 73 Fed. Reg. 21,213.

parks.[29]

The legislative history of the National Day of Prayer confirms its secular purpose.  The

official "purpose" of the original 1952 National Day of Prayer legislation was merely "to direct

the President to proclaim a National Day of Prayer each year."  S. Rep. No. 82-1389 (1952).  And

the statement accompanying the Senate report for the National Day of Prayer makes clear that the

National Day of Prayer is merely a historical acknowledgment of the role of prayer in society:

> From its beginning the United States of America has been a nation fully cognizant of the value and power of prayer.  In the early days of colonization, the Pilgrims frequently engaged in prayer.  When the delegates to the Constitutional Convention encountered difficulties in the writing and formation of a Constitution for this Nation, prayer was suggested and became an established practice at succeeding sessions.  Today, both Houses of Congress are opened daily with prayer.
>
> Prayer has indeed been a vital force in the growth and development of this Nation.  It would certainly be appropriate if, pursuant to this resolution and the proclamation it urges, the people of this country were to unite in a day of prayer each year, each in accordance with his own religious faith, thus reaffirming in a dramatic manner the deep religious conviction which has prevailed throughout the history of the United States.

Id. (emphasis added).  Even the 2008 prayer proclamation with which plaintiffs quarrel echoes

the secular purpose set forth in this legislative history by noting that "[t]he Congress, by Public

Law 100-307, as amended, has called on our nation to reaffirm the role of prayer in our society

by recognizing each year a 'National Day of Prayer.'"  Compl., Ex. 1 (emphasis added).  Other

---

[29] This Court may take judicial notice of matters of public record without converting a motion to dismiss into a motion for summary judgment.  See Henson v. CSC Credit Services, 29 F.3d 280, 284 (7th Cir. 1994).  Presidential proclamations are such matters of public record.  See Gallaher & Speck, Inc. v. Ford Motor Co., 226 F.2d 728, 731 (7th Cir. 1955) ("courts must take judicial notice not only of the statutes but also of public proclamations by the executive").

prayer proclamations by President Bush,[30] and President Clinton, for example,[31] have similarly

---

[30] See, e.g., Proclamation 7430, National Day of Prayer, 2001 (Apr. 27, 2001), 66 Fed. Reg. 22,103 ("The faith of our Founding Fathers established the precedent that prayers and national days of prayer are an honored part of our American way of life."); Proclamation 7672, National Day of Prayer, 2003 (Apr. 30, 2003), 68 Fed. Reg. 23,829 (Noting that first National Day of Prayer was called by the Continental Congress); Proclamation 7780, National Day of Prayer, 2004 (Apr. 30, 2004), 69 Fed. Reg. 25,291 ("In his first Inaugural address, President George Washington prayed that the Almighty would preserve the freedom of all Americans.  On the National Day of Prayer, we celebrate that freedom and America's great tradition of prayer."); Proclamation 7896, National Day of Prayer, 2005 (May 3, 2005), 70 Fed. Reg. 23,921 ("The Continental Congress, meeting in 1775, asked the colonies to pray for wisdom in forming a new Nation.  Throughout the Civil War, President Abraham Lincoln issued exhortations to prayer, calling upon the American people to humble themselves before their Maker and to serve all those in need.  At the height of World War II, President Franklin Roosevelt led our citizens in prayer over the radio, asking for God to protect our sons in battle."); Proclamation 8012, National Day of Prayer, 2006 (May 3, 2006), 71 Fed. Reg. 26,675 (historical citation of a George Washington proclamation:  "It is the duty of all nations to acknowledge the Providence of Almighty God, to obey His will, to be grateful for His benefits, and to humbly implore His protection and favor.").

[31] See Proclamation 6553, National Day of Prayer, 1993 (Apr. 30, 1993), 58 Fed. Reg. 26,499 (describing prayer in context of Declaration of Independence); Proclamation 6668, National Day of Prayer, 1994 (Apr. 12, 1994), 59 Fed. Reg. 18,287 ("From patriots and presidents to advocates for justice, our history reflects the strong presence of prayer in American life."); Proclamation 6777, National Day of Prayer, 1995 (Mar. 14, 2995), 60 Fed. Reg. 14,351 (Noting that "[o]ur nation was built on the steadfast foundation of the prayers of our ancestors" and describing role of prayer among Abraham Lincoln and Frederick Douglass); Proclamation 6877, National Day of Prayer, 1996  (Apr. 2, 1996), 61 Fed. Reg. 15,175 ("A National Day of Prayer, first proclaimed by the Continental Congress in 1775, stems from the understanding that faith is a fundamental part of our nation's social fabric."); Proclamation 6991, National Day of Prayer, 1997 (Apr. 18, 1997), 62 Fed. Reg. 19,663 (Noting that "[o]ur people have always believed in the power of prayer and have called upon the name of the lord through times of peace and war, hope and despair, prosperity and decline," and describing history of faith among George Washington, Abraham Lincoln, and Harry Truman); Proclamation 7088, National Day of Prayer, 1998 (Apr. 29, 1998), 63 Fed. Reg. 24,383 (Noting that "we turn to [prayer] at moments of great joy or crisis in our public life as a Nation" and describing prayer by Continental Congress, in President Washington's first inaugural address, and in President Franklin Roosevelt's first inaugural address); Proclamation 7193, National Day of Prayer, 1999 (May 5, 1999), 64 Fed. Reg. 25,189 (Noting role of prayer among the Great Plains American Indians and the Pilgrims, and quoting Dr. Martin Luther King, Jr.); Proclamation 7303, National Day of Prayer, 2000 (May 4, 2000), 65 Fed. Reg. 26,481 ("The framers of our democracy, on a quest for freedom and equality, were fueled by an abiding faith in a just and loving God, to whom they turned often for guidance and strength.").

framed the National Day of Prayer in historical terms, thus demonstrating its secular purpose of acknowledging the important role that religion generally, and prayer particularly, have played in our society.  See also Part II.B., supra; Part II.C.2, infra.

### 2.    The National Day of Prayer's Primary Effect Is Neither to Advance Nor Inhibit Religion.

For government action to violate the second Lemon prong, it must so advance religion as to amount to an endorsement of religion.  See County of Allegheny, 492 U.S. at 597; Fleischfresser v. Dirs. of Sch. Dist. 200 15 F.3d 580, 688 (7th Cir. 1994).  Under this prong, a court "asks whether, irrespective of government's actual purpose, the practice under review in fact conveys a message of endorsement or disapproval."  Books v. City of Elkhart, 235 F.3d at 302 (internal quotation marks omitted) (quoting Freedom From Religion Found., Inc. v. City of Marshfield, 203 F.3d 487, 493 (7th Cir. 2000)).[32]  However, the Supreme Court does not "adhere to the principle that the Establishment Clause bars any and all governmental preference for religion over irreligion."  Van Orden, 545 U.S. at 684 n.3 (plurality opinion).  Courts apply a "reasonable person" standard under this prong.  See, e.g., Vision Church, 468 F.3d at 993 ("our focus is not on the intent of the city, but on whether a reasonable person, apprised of the circumstances . . . would conclude that the [government's conduct] amounted to an endorsement of religion"); Books v. City of Elkhart, 235 F.3d at 304 ("when employing [the second Lemon prong], we are charged with the responsibility of assessing the totality of the circumstances surrounding the display to determine whether a reasonable person would believe that the display

---

[32] In this regard, the "purpose" and "effect" prongs can be read together.  See Books v. City of Elkhart, 235 F.3d at 301 (noting that "the Supreme Court has, on occasion, articulated these first two [Lemon] prongs in terms of an 'endorsement' test") (citing County of Allegheny, 492 U.S. at 592).

amounts to an endorsement of religion.").

Here, the "primary effect" of the National Day of Prayer is neither to advance nor inhibit religion; it certainly does not endorse it. The statute's language is voluntary, calling as it does on the President to issue a proclamation (i.e., a public announcement) that invites people to pray, if they want to. Just as an individual, pursuant to the proclamation, "may turn to God in prayer," 36 U.S.C. § 119 (emphasis added), another individual may not. See County of Allegheny, 492 U.S. at 672 (the National Day of Prayer does not "require anyone to pray, of course") (Kennedy, J., concurring in part and dissenting in part); see also Am. Jewish Cong., 827 F.2d at 133 (Easterbrook, J., dissenting) (National Day of Prayer has no coercive effect). In this regard, the statute and proclamations issued thereunder do nothing to change the status quo that would exist without the statute (or that prevails on the other 364 days of the year); every day, hundreds of millions of Americans make decisions on whether or not they wish to pray.

Moreover, and viewed in appropriate context, the National Day of Prayer is no different than many of our nation's other acknowledgments of the role of religion in our country's history and culture. See Part II.B, supra. The Supreme Court has stated time and again that official acknowledgments of the Nation's religious history and enduring religious character do not violate the Establishment Clause. For example, the Court has long refused to construe the Establishment Clause so as to "press the concept of separation of Church and state to . . . extremes" by invalidating "references to the Almighty that run through our laws, our public rituals, [and] our ceremonies." Zorach, 343 U.S. at 313. "It is far too late in the day to impose [that] crabbed reading of the Clause on the country." Lynch, 465 U.S. at 687.

Official acknowledgments of religion, such as the National Day of Prayer, are consistent with the Establishment Clause because they do not "establish[ ] a religion or religious faith, or

32

tend[ ] to do so." <u>Id.</u> at 678.  Indeed, "[a]ny notion" that such measures "pose a real danger of

establishment of a state church" would be "farfetched." <u>Id.</u> at 686.  Instead, such "public

acknowledgment of the [Nation's] religious heritage long officially recognized by the three

constitutional branches of government," <u>id.,</u> simply takes note of the historical facts that "religion

permeates our history," <u>Edwards v. Aguillard</u>, 482 U.S. 578, 607 (1987) (Powell, J., concurring).

As Justice Kennedy has put it, "[g]overnment policies of accommodation, acknowledgment, and

support for religion are an accepted part of our political and cultural heritage," and "the

Establishment Clause permits government some latitude in recognizing and accommodating the

central role religion plays in our society." <u>County of Allegheny</u>, 492 U.S. at 657 (Kennedy, J.,

concurring in part and dissenting in part).  "Any approach less sensitive to our heritage would

border on latent hostility toward religion, as it would require government in all its multifaceted

roles to acknowledge only the secular, to the exclusion and so to the detriment of the religious."

<u>Id.</u>

Moreover, the context of proclamations issued pursuant to the National Day of Prayer

statute undercut any notion that the government is endorsing religion.  First, it is not unusual for

presidential proclamations to incorporate prayer and religious themes.  This Court need look no

further than Memorial Day and Thanksgiving Day proclamations.  As to the former, Congress

requests the President

> to issue a proclamation calling upon the people of the United States to observe
> each . . . Memorial Day, by praying, each in accordance with his religious faith,
> for permanent peace; designating a period during such day in which all the people
> of the United States may unite in prayer at such time; and calling upon the
> newspapers, radio stations, and all other mediums of information to join in
> observing such day and period of prayer.

Joint Resolution Requesting the President to issue a proclamation designating May 30, Memorial

33

Day, as a day for a Nation-wide prayer for peace, Pub. L. No. 512, 64 Stat. 158 (1950).

Presidents have issued such proclamations for a Memorial Day "Prayer for Peace" to, among

other things, "pray for the members of our Armed Forces and their families," and to "ask for

God's continued guidance of our country."[33]  In this regard, President Bush's 2008 National Day

of Prayer proclamation merely presaged his 2008 Memorial Day proclamation:

> On this National Day of Prayer, we ask God's continued blessings on our country.  This year's theme, "Prayer!  America's Strength and Shield," is taken from Psalm 28:7, "The Lord is my strength and my shield; my heart trusts in him, and I am helped."  <u>On this day, we pray for the safety of our brave men and women in uniform, for their families, and for the comfort and recovery of those who have been wounded.</u>

Compl., Ex. 1 (emphasis added).[34]  Thus, the "theme" of "Strength and Shield" in President

Bush's 2008 proclamation appropriately framed a prayer for America's soldiers.

Similarly, President's Bush's most recent Thanksgiving Day proclamation has — in

keeping with the historical tradition for that holiday — asked that all Americans "give thanks to

---

[33] Proclamation 8260, Prayer for Peace, Memorial Day 2008 (May 22, 2008), 73 Fed. Reg. 30,725.

[34] Moreover, the "Biblical" language about which plaintiffs complain (Am. Compl. ¶ 28-29) appears in the "preamble" to the 2008 National Day of Prayer proclamation; the text of the proclamation itself provides:

> NOW, THEREFORE, I, GEORGE W. BUSH, President of the United States of America, <u>do hereby proclaim</u> May 1, 2008, as a National Day of Prayer.  I ask the citizens of our Nation
>
> <u>to give thanks, each according to his or her own faith, for the freedoms and blessings we have received</u> and for God's continued guidance, comfort, and protection.  I invite all Americans to join in observing this day with appropriate programs, ceremonies, and activities.

<u>Id.</u> (emphasis added).

God who blessed our Nation's first days and who blesses us today."[35]  The Supreme Court has

recognized the constitutionality of such pronouncements.  See Lynch, 465 U.S. at 676 (noting

that "Executive Orders and other official announcements of Presidents and of the Congress have

proclaimed both Christmas and Thanksgiving National Holidays in religious terms.").  As Justice

Stevens has noted, "although Thanksgiving Day proclamations . . . undoubtedly seem official, in

most circumstances they will not constitute the sort of governmental endorsement of religion at

which the separation of church and state is aimed."  Van Orden, 545 U.S. at 723 (Stevens, J.,

dissenting).  The same can be said for "National Day of Prayer proclamations" as for

"Thanksgiving Day proclamations."

Finally, the fact that the National Day of Prayer has been codified since 1952, see Pub. L.

No. 82-324, 66 Stat. 64 (1952), yet was challenged for the first time in 2008, reveals that the

event cannot be construed to endorse religion.  Justice Breyer described a similar 40-year gap in

challenging the placement of a Ten Commandments monument on the grounds of the Texas State

Capitol as being determinative that the monument did not violate the Establishment Clause:

> those 40 years suggest more strongly than can any set of formulaic tests that few
> individuals, whatever their system of beliefs, are likely to have understood the
> monument as amounting, in any significantly detrimental way, to a government
> effort to favor a particular religious sect, primarily to promote religion over
> nonreligion, to "engage in" any "religious practic[e]," to "compel" any "religious
> practic[e]," or to "work deterrence" of any "religious belief."  Those 40 years
> suggest that the public visiting the capitol grounds has considered the religious
> aspect of the tablets' message as part of what is a broader moral and historical
> message reflective of a cultural heritage.

Van Orden, 545 U.S. at 702-03 (Breyer, J., concurring) (internal citation omitted).

---

[35] Proclamation 8322, Thanksgiving Day, 2008 (Nov. 21, 2008), 73 Fed. Reg. 72,301.
That proclamation also acknowledges the central role that God played in the Thanksgiving Day
proclamations of Presidents Washington and Lincoln.  See id.

### 3.  The National Day of Prayer Statute Does Not Foster An Excessive Entanglement With Religion.

The third <u>Lemon</u> prong prohibits "excessive government entanglement with religion," <u>Lemon</u>, 403 U.S. at 613, and requires a court to examine "the character and purposes of the institutions that are benefitted, the nature of the aid that the State provides, and the resulting relationship between the government and the religious authority." <u>Id.</u> at 615.  Under this prong, a plaintiff must allege "'sponsorship, financial support, and active involvement of the sovereign in religious activity.'"  <u>Vision Church</u>, 468 F.3d at 995 (quoting <u>Jimmy Swaggart Ministries v. Bd. of Equalization of Cal.</u>, 493 U.S. 378, 393 (1990)).[36]  A <u>de minimis</u> advancement or inhibition of religion is insufficient to satisfy the entanglement prong.  <u>See</u> <u>Vision Church</u>, 468 F.3d at 995.  "The general rule is that, to constitute excessive entanglement, the government action must involve 'intrusive government participation in, supervision of, or inquiry into religious affairs.'"  <u>Id.</u> (quoting <u>United States v. Indianapolis Baptist Temple</u>, 224 F.3d 627, 631 (7th Cir. 2000)).

The National Day of Prayer statute, and its requirement that the President issue proclamations thereunder, do not foster an excessive entanglement with religion.  As noted previously, the National Day of Prayer statute is simply an acknowledgment of a tradition with no interaction or supervision by the government, other than the issuance of a proclamation.  That is not entanglement.

For example, in <u>Metzl v. Leininger</u>, a district court struck down an Illinois law making Good Friday a public school holiday.  850 F. Supp. 740 (N.D. Ill. 1994), <u>aff'd</u>, 57 F.3d 618 (7th

---

[36] "Cases that turn on the entanglement prong of the <u>Lemon</u> test typically involve some form of state aid to religious institutions (such as parochial schools) or related schemes requiring state monitoring of religious entities."  <u>Metzl v. Leininger</u>, 850 F. Supp. 740, 749-50 (N.D. Ill. 1994) (collecting cases), <u>aff'd</u>, 57 F.3d 618 (7th Cir. 1995).

Cir. 1995).  The court had expressed several reservations about requiring all public schools in

Illinois to close on Good Friday — "[a] solemn, even mournful day . . . commemorat[ing] for

Christians, Jesus Christ's suffering and death on the cross."  Id. at 741.  But Lemon's

"entanglement" prong was not one of them:  The court was "hard pressed to conceive of a

scenario under which the mere designation of Good Friday as a legal holiday could be seen to

excessively entangle government with religion."  Id. at 750.  So too, here:  Congress's

designation of a National Day of Prayer, and its requirement that the President acknowledge that

day — like the designated national holidays on Thanksgiving and Christmas — simply does not

entangle government with religion.

## III.    PLAINTIFFS' REQUESTED RELIEF RAISES SUBSTANTIAL JUSTICIABILITY CONCERNS.

In amending their Complaint, plaintiffs have made clear that they are seeking not only to

declare the National Day of Prayer statute and President Bush's 2008 proclamation unlawful, but

are also seeking declaratory and injunctive relief prohibiting prayer proclamations generally.

Specifically, plaintiffs seek a declaration that "prayer proclamations disseminated by Presidential

Press Secretaries violate the Establishment Clause" and an injunction "enjoining their

publication."  Am. Compl., Prayer for Relief ¶ B.  Apparently applying a "belts and suspenders"

approach, plaintiffs also seek a "judgment enjoining the defendants from issuing and

disseminating further Prayer Day Proclamations and making designations of official days of

prayer."  Am. Compl., Prayer for Relief ¶ F.  The relief plaintiffs request presents insurmountable

justiciability problems, as this Court cannot begin to predict the substance of future prayer

proclamations.  And even if it could, plaintiffs' request for relief against the "defendants" —

which includes the President of the United States of America — raises substantial separation of powers concerns.

**A.      Plaintiffs' Request for Declaratory and Injunctive Relief Would Require this Court to Issue an Advisory Opinion on the Substance of Prayer Proclamations That Have Not Yet Been Issued.**

As defendants noted in their motion to dismiss the original Complaint, plaintiffs' allegations regarding President Bush's 2008 proclamation were moot.  Plaintiffs then amended their Complaint to make clear that they were seeking relief regarding Presidential proclamations generally.  In so amending, plaintiffs have swapped a moot claim for a conjectural and hypothetical one.

Plaintiffs' Amended Complaint already seeks a declaration that the National Day of Prayer Statute, Pub. L. 100-307, is unconstitutional, as well as an injunction prohibiting the enforcement of that statute.  See Am. Compl., Prayer for Relief ¶ A.  Of course, a President can issue a proclamation — including a proclamation establishing a day of prayer — without express Congressional direction or authorization.  Accordingly, and in an apparent attempt to prohibit the President from issuing prayer proclamations even if this Court finds that the underlying National Day of Prayer statute is unconstitutional, plaintiffs seek a "judgment enjoining the defendants" — including the President of the United States of America — "from issuing and disseminating further Prayer Day Proclamations and making designations of official days of prayer."  Am. Compl., Prayer for Relief ¶ F.  This Court cannot grant that relief.

First, if this Court finds that the National Day of Prayer statute is unconstitutional, then it is unclear whether President Obama (or any other future President, for that matter) will, sua sponte, issue a prayer day proclamation.  Plaintiffs' injury allegations in this regard are therefore entirely hypothetical.  See City of Los Angeles v. Lyons, 461 U.S. 95, 105-110 (1983).

Even assuming that Presidents wish to issue prayer day proclamations in the future, this Court cannot begin to predict the substance of those proclamations, whether by President Obama or any subsequent President.  This was precisely the issue faced by the <u>Newdow</u> court in the context of inaugural prayers.  There, the court found that it "cannot now rule on the constitutionality of prayers yet unspoken at future inaugurations of presidents who will make their own assessments and choices with respect to the inclusion of prayer."  <u>Newdow</u>, 391 F. Supp. 2d at 107, 108; <u>see also</u> <u>City of Los Angeles v. Lyons</u>, 461 U.S. 95, 105-110 (1983).  So too, here:  This Court would have to speculate on the content of future prayer proclamations by this and future Presidents.  This Court cannot issue a judgment on such an "abstract proposition." <u>Protestant Mem'l Med. Ctr., Inc. v. Maram</u>, 471 F.3d 724, 729 (7th Cir. 2006).[37]

### B.     Plaintiffs' First Amended Complaint Raises Substantial Separation of Powers Concerns.

Plaintiffs requested relief raises another fundamental problem:  They want this Court to prescribe the manner by which the President of the United States of America communicates with the country's citizens.  Such relief raises substantial separation of powers concerns and should give this Court pause.

Many Presidential proclamations — including the Memorial Day and Thanksgiving Day proclamations described above — incorporate elements of prayer and can be construed to be an "official day of prayer."  Nobody can imagine a court enjoining a President from issuing Memorial Day or Thanksgiving Day proclamations, yet those proclamations are, at their core,

---

[37] Plaintiffs' request for a "judgment enjoining Shirley Dobson from acting in concert with state and federal officials . . . including through joint and collaborative action with the President [and] the Presidential Press Secretary" is especially speculative in light of the change of Presidential administration.

indistinguishable from National Day of Prayer proclamations.  At minimum, granting the relief plaintiffs request would open the floodgates to challenges to these and countless other presidential proclamations.

That this Court should not start down the path of proscribing the manner and method by which the President of the United States speaks to the nation's citizens is supported by legal authority noting that courts should not issue injunctions against the co-equal Executive and Legislative branches of government.  See Franklin v. Massachusetts, 505 U.S. 788, 802-03 (1992) (plurality opinion) ("[I]n general, 'this court has no jurisdiction of a bill to enjoin the President in performance of his official duties.'" (quoting Mississippi v. Johnson, 71 U.S. 475, 501 (1866)); Clinton v. Jones, 520 U.S. 681, 718-19 (1997) (Breyer, J., concurring) ("constitutional principles counsel caution when judges consider an order that directly requires the President properly to carry out his official duties"); Mississippi v. Johnson, 71 U.S. at 500 ("Neither [Congress nor the President] can be restrained in its action by the judicial department; though the acts of both, when performed, are, in proper cases, subject to its cognizance.")[38]; Swan v. Clinton, 100 F.3d 973, 978 (D.C. Cir. 1996) (citing Franklin to explain why injunctive relief against the President personally is disfavored).  And while the Court in Franklin did not reach the question on the facts of that case of whether an injunction against the President was appropriate, the Court nonetheless noted that "the District Court's grant of injunctive relief against the President himself is extraordinary, and should have raised judicial eyebrows."

---

[38] By noting that a court may not "restrain" the President or Congress in their official functions, but may take "cognizance" of presidential or congressional acts, the Court is describing the difference between injunctive and declaratory relief, which are beyond judicial capacity, and damages, which are available where there is a waiver of sovereign immunity and other prerequisites are met.  Plaintiffs do not seek damages in this case.

Franklin, 505 U.S. at 802 (plurality opinion) (emphasis added).[39]

This line of authority regarding injunctive relief also bears directly on plaintiffs' request for a declaratory judgment, as a declaratory judgment against the President raises the exact same separation of powers concerns.  See Swan, 100 F.3d at 976 n.1 ("Although the following discussion is couched in terms of our ability to grant injunctive relief against the President, similar considerations regarding a court's power to issue relief against the President himself apply to Swan's request for a declaratory judgment").  As Justice Scalia has put it:

> For similar reasons, I think we cannot issue a declaratory judgment against the President.  It is incompatible with his constitutional position that he be compelled personally to defend his executive actions before a court. . . . The President's immunity from such judicial relief is "a functionally mandated incident of the President's unique office, rooted in the constitutional tradition of the separation of powers and supported by our history."  Permitting declaratory or injunctive relief against the President personally would not only distract him from his constitutional responsibility to "take Care that the Laws be faithfully executed," U.S. Const., Art. II, § 3, but, as more and more disgruntled plaintiffs add his name to their complaints, would produce needless head-on confrontations between district judges and the Chief Executive.

Franklin, 505 U.S. at 827-28 (Scalia, J., concurring) (emphasis added) (quoting Nixon v. Fitzgerald, 457 U.S. 731, 749 (1982) (internal footnote omitted)).  Applying this analysis, the court in Newdow concluded that plaintiff's alleged injuries arising from Inauguration Day prayer simply were not redressable by the court. See Newdow, 391 F. Supp. 2d at 104-07.[40]  At

---

[39] This is not to say that Presidential action is beyond judicial review, as "[r]eview of the legality of Presidential action can ordinarily be obtained in a suit seeking to enjoin the officers who attempt to enforce the President's directive."  Franklin, 505 U.S. at 828 (Scalia, J., concurring) (citing Youngstown Sheet & Tube Co. v. Sawyer, 343 U.S. 579 (1952); Panama Refining Co. v. Ryan, 293 U.S. 388 (1935)).

[40] In so holding, the court noted that neither it nor any of the parties had "identified a case in which a court actually issued an injunction or declaratory judgment against the President for acts undertaken in his official capacity."  Newdow, 391 F. Supp. 2d at 106.

41

minimum, this Court should decline to exercise its "discretionary power" to issue a declaratory judgment against the President under these circumstances.  See Deveraux v. City of Chicago, 14 F.3d 328, 330 (7th Cir. 1994); see also North Shore Gas Co. v. Salomon, Inc., 152 F.3d 642, 647 (7th Cir. 1998) (Declaratory Judgment Act "does not obligate courts to issue declaratory judgments.  Instead, district courts have wide discretion to decline to hear such actions.").

## CONCLUSION

For the foregoing reasons, this Court should dismiss plaintiffs' First Amended Complaint with prejudice.

Dated:  March 9, 2009                        Respectfully submitted,

                                             MICHAEL F. HERTZ
                                             Acting Assistant Attorney General

                                             JAMES GILLIGAN
                                             Assistant Branch Director

                                               /s/ Brad P. Rosenberg
                                             BRAD P. ROSENBERG (DC Bar 467513)
                                             Trial Attorney
                                             United States Department of Justice
                                             Civil Division, Federal Programs Branch
                                             Tel: (202) 514-3374
                                             Fax: (202) 616-8460
                                             brad.rosenberg@usdoj.gov

                                             Mailing Address:
                                             Post Office Box 883
                                             Washington, D.C.  20044

                                             Courier Address:
                                             20 Massachusetts Ave., N.W.
                                             Washington, D.C. 20001

                                             COUNSEL FOR DEFENDANTS
                                             PRESIDENT BARACK OBAMA AND
                                             WHITE HOUSE PRESS SECRETARY
                                             ROBERT L. GIBBS

## CERTIFICATE OF SERVICE

I hereby certify that on March 9, 2009, I electronically filed a copy of the Federal Defendants' Memorandum of Law in Support of the Federal Defendants' Motion to Dismiss the First Amended Complaint using the ECF System for the Western District of Wisconsin, which will send notification of that filing to all counsel of record in this litigation.

    /s/ Brad P. Rosenberg
Brad P. Rosenberg