IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

FREEDOM FROM RELIGION FOUNDATION,
INC.; ANNE NICOL GAYLOR; ANNIE LAURIE
GAYLOR; PAUL GAYLOR; DAN BARKER;
PHYLLIS ROSE, and
JILL DEAN,

    Plaintiffs,

  v.              Case No. 08-CV-588

PRESIDENT BARACK OBAMA; WHITE
HOUSE PRESS SECRETARY ROBERT L.
GIBBS; WISCONSIN GOVERNOR JIM DOYLE;
and SHIRLEY DOBSON, CHAIRMAN OF THE
NATIONAL DAY OF PRAYER TASK FORCE,

    Defendants.

BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT
BY DEFENDANT WISCONSIN GOVERNOR JIM DOYLE

## INTRODUCTION

Plaintiffs Freedom From Religion Foundation, Inc., Anne Nicol Gaylor, Annie Laurie Gaylor, Paul Gaylor, Dan Barker, Phyllis, Rose, and Jill Dean have brought the present action to challenge the constitutionality of the National Day of Prayer, its authorizing legislation, and the issuance of presidential and gubernatorial day-of-prayer proclamations.  With regard to defendant Governor Jim Doyle ("Governor Doyle"), Plaintiffs ask this Court to declare that his issuance of day-of-prayer proclamations for the State of Wisconsin violates the Establishment Clause of the United States Constitution and the Wisconsin Constitution and to enjoin such proclamations in the future.

Governor Doyle, by Assistant Attorney General Thomas C. Bellavia, has moved for summary judgment in his favor pursuant to Fed. R. Civ. P. 56, on the grounds that Plaintiffs lack standing and that Governor Doyle's issuance of day-of-prayer proclamations does not violate either the Establishment Clause of the United States Constitution or the Wisconsin Constitution.

## STATEMENT OF FACTS

The facts pertinent to the present motion are fully stated in Governor Doyle's Proposed Findings of Fact and are discussed in detail in the appropriate sections of the Argument in this brief.

## SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *see Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986); *Spath v. Hayes Wheels Intern.-Indiana, Inc.,* 211 F.3d 392, 396 (7th Cir. 2000). A party seeking summary judgment bears the "initial responsibility of informing the district court of the basis for its motion" and identifying those portions of the record it believes supports its position. *Celotex,* 477 U.S. at 323. The moving party does not, however, have the burden to show absence of a genuine issue as to elements on which the non-moving party has the burden of proof. *Id.* at 324-25. In deciding a motion for summary judgment, the court must view all facts and draw all inferences in the light most favorable to the non-moving party. *Schuster v. Lucent Technologies, Inc.,* 327 F.3d 569, 573 (7th Cir. 2003). However, the non-moving party may not simply rest on its allegations; rather, it must come forward with specific facts that would support a jury's verdict

- 2 -

in its favor. *Van Diest Supply Co. v. Shelby County State Bank,* 425 F.3d 437, 439 (7th Cir. 2005).   Summary judgment is not a disfavored procedure, but rather is "an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'"  *Celotex*, 477 U.S. at 327 (citation omitted).


ARGUMENT

I.     PLAINTIFFS LACK STANDING TO CHALLENGE GOVERNOR DOYLE'S ISSUANCE OF DAY-OF-PRAYER PROCLAMATIONS FOR THE STATE OF WISCONSIN.

A.     Plaintiffs Lack Standing To Assert Their Claims Against Governor Doyle Under The United States Constitution.

The threshold question in this case is whether Plaintiffs have standing to litigate their claim that Governor Doyle's issuance of day-of-prayer proclamations for the State of Wisconsin violates the Establishment Clause of the United States Constitution.

Plaintiffs' First Amended Complaint asserts that the individual plaintiffs have standing to sue because each of them has been injured by being made to feel like a political outsider as a result of coming into contact with prayer proclamations through news media reporting and through their advocacy work with Freedom From Religion Foundation ("FFRF").   *See* First Amended Complaint, ¶¶ 89, 94, 109, 112, and 114 (Docket #38).   The First Amended Complaint also asserts that FFRF has standing to sue both in its representative capacity on behalf of its individual members and in its organizational capacity on behalf of its own organizational interests.  *See* First Amended Complaint, ¶¶ 121-22, 124, 126, and 133 (Docket #38).

Governor Doyle contends that the individual plaintiffs lack standing to sue because the

challenged prayer proclamations have not caused any of them to suffer a distinct and palpable injury.  For the same reason, FFRF lacks standing to sue on their behalf in a representative capacity.  Governor Doyle also joins the Federal Defendants' argument that FFRF lacks standing to sue on its own behalf because the challenged prayer proclamations have not caused a distinct and palpable injury to FFRF's ability to carry out its organizational purpose of advocating for church-state separation.

    1.    The individual plaintiffs lack standing because the challenged proclamations have not caused any of them to suffer a distinct and palpable injury.

        a.    The individual plaintiffs cannot establish standing merely by showing that they have been exposed to allegedly unconstitutional government speech.  They must show that they either have been involuntarily subjected to that speech or have had to assume special burdens to avoid it.

The question of standing involves both constitutional limitations and prudential concerns. *Warth v. Seldin*, 422 U.S. 490, 498 (1975).  The constitutional aspect of standing centers on whether the plaintiff has made out a "case or controversy" within the meaning of Article III of the United States Constitution ("Article III").  *Id*.  It is a bedrock principle of federal law that Article III gives a federal court jurisdiction only over a claim that presents a "case or controversy."  *See Raines v. Byrd*, 521 U.S. 811, 818 (1997).  This requirement is especially stringent when the federal court is being asked to decide constitutional claims.  *See Wisconsin's Env. Decade v. State Bar of Wisconsin*, 747 F.2d 407, 411 (7th Cir. 1984), *cert. denied*, 105 S. Ct. 2324 (1985).  "The judicial power of the United States defined by Art. III is not an unconditioned authority to determine the constitutionality of legislative or executive acts."  *Valley*

*Forge, ETC. v. Americans United, ETC.*, 454 U.S. 464, 471 (1982). Accordingly, "[t]he federal courts are not empowered to seek out and strike down any governmental act that they deem to be repugnant to the Constitution." *Hein v. Freedom From Religion Foundation,* 551 U.S. 587, 598 (2007). Rather, federal courts may only determine the constitutionality of a governmental action when required to do so in the performance of the judicial function of resolving concrete disputes properly brought before them for decision. *See id.*; *Younger v. Harris*, 401 U.S. 37, 52 (1971); *United States v. Raines*, 362 U.S. 17, 20 (1960).

The requisite elements for establishing a case or controversy sufficient to give a federal court jurisdiction over a plaintiff's claims are well established:

> [A]t an irreducible minimum, Art. III requires the party who invokes the court's authority to "show that he personally has suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant," and that the injury "fairly can be traced to the challenged action" and "is likely to be redressed by a favorable decision."

*Valley Forge*, 454 U.S. at 472 (citations omitted); *see also Hein*, 551 U.S. at 598. The injury suffered by the plaintiff must be distinct and palpable; that is, there must be "injury in fact." *Warth*, 422 U.S. at 501; *Valley Forge*, 454 U.S. at 473, 475. It is not enough for a plaintiff to assert a "generalized grievance" shared by all or most citizens, nor may a plaintiff obtain standing by asserting the rights of third parties. *Warth*, 422 U.S. at 499. If any one of these elements is absent, the court lacks jurisdiction over the plaintiffs' claims. *See Okpalobi v. Foster*, 244 F.3d 405, 425 (5th Cir. 2001) (en banc). An actual case or controversy must be present, not only at the time a complaint is filed, but at all stages of the litigation. *See Arizonans for Official English v. Arizona*, 520 U.S. 43, 67 (1997).

The distinct and palpable injury suffered by a plaintiff need not be economic injury. Standing may be predicated on non-economic harm. *Valley Forge*, 454 U.S. at 486; *United*

*States v. Students Chal. Reg. Agcy. Pro. (SCRAP)*, 412 U.S. 669, 686 (1973).  However, the

Supreme Court clarified in *Valley Forge* that unless a plaintiff is directly affected by the allegedly

unconstitutional conduct, a spiritual stake without more is insufficient to confer standing.  *Valley*

*Forge*, 454 U.S. at 486-87 n. 22.  The Court explained the basis for standing in an Establishment

Clause case as follows:

> Although respondents claim that the Constitution has been violated, they claim
> nothing else.  They fail to identify any personal injury suffered by them *as a*
> *consequence* of the alleged constitutional error, other than the psychological
> consequence presumably produced by observation of conduct with which one
> disagrees.  That is not an injury sufficient to confer standing under Art. III, even
> though the disagreement is phrased in constitutional terms.  It is evident that
> respondents are firmly committed to the constitutional principle of separation of
> church and State, but standing is not measured by the intensity of the litigant's
> interest or the fervor of his advocacy. . . .
>
> [W]e do not retreat from our earlier holdings that standing may be predicated on
> noneconomic injury.  We simply cannot see that respondents have alleged an
> *injury* of *any* kind, economic or otherwise, sufficient to confer standing.

*Id.* at 485-86 (citations and footnote omitted; original emphasis).  The Court went on to hold that

the plaintiffs in *Valley Forge,* who were residents of Maryland and Virginia challenging a transfer

of government property in Pennsylvania, had no standing to sue.  *Id.* at 487.

The above approach to standing is not limited to cases involving concrete or

non-communicative governmental actions, such as the property transaction in *Valley Forge*.  On

the contrary, the United States Court of Appeals for the Seventh Circuit has repeatedly applied

the *Valley Forge* approach to standing in cases that involved alleged governmental religious

speech, rather than a property transaction or some other type of governmental action not

essentially communicative in nature.  *See, e.g.*, *Freedom From Religion Foundation, Inc. v.*

*Zielke*, 845 F.2d 1463 (7th Cir. 1988); *Doe v. County of Montgomery*, 41 F.3d 1156

(7th Cir. 1994); *Books v. City of Elkhart, Indiana* (*Books I*), 235 F.3d 292 (7th Cir. 2000); *Books*

*v. Elkhart County, Ind.* (*Books II*), 401 F.3d 857 (7th Cir. 2005); and *Mercier v. Fraternal Order of Eagles*, 395 F.3d 693 (7th Cir. 2005).

Under those decisions, in order to establish an "injury in fact" from alleged governmental religious speech, a plaintiff must show that he or she either has been "*subjected* to unwelcome religious [speech]" or has been "forced to assume 'special burdens' to avoid [such speech]." *Doe v. County of Montgomery, Ill.*, 41 F.3d 1156, 1159 (7th Cir. 1994) (*quoting Valley Forge*, 454 U.S. at 486-87 n. 22) (emphasis added). Applying that standard to the present case, the individual plaintiffs here lack standing because, like the plaintiffs in *Valley Forge*, they have suffered only a spiritual or psychological injury from observing prayer proclamations with which they strongly disagree, but have neither been *subjected* to those proclamations nor been forced to assume special burdens to avoid them. On the contrary, the record plainly shows that the individual plaintiffs have gone out of their way to seek out such proclamations as part of their zealous advocacy activities on behalf of the principle of church-state separation. The individual plaintiffs here are thus similarly situated to the plaintiffs in *Valley Forge* and likewise lack standing.

        b.     The factual record fails to show that the individual plaintiffs have suffered actual injury caused by any proclamation issued by Governor Doyle.

In order to elicit the factual basis of Plaintiffs' standing claims, Governor Doyle and the Federal Defendants both served interrogatories upon the Plaintiffs, who subsequently served responses to both sets of interrogatories. *See* Affidavit of Thomas C. Bellavia, ¶¶ 5-8, Exhibits 1, 2, 3, and 4.

<u>Governor Doyle's interrogatory number 2</u>

Governor Doyle's interrogatory number 2 instructed Plaintiffs as follows:

For each instance in which any plaintiff in this case claims to have been exposed or subjected to a Wisconsin or federal day-of-prayer proclamation or a Wisconsin or federal day-of-prayer-related activity:

a.     describe the circumstances of the exposure or subjection, including but not limited to date, location, persons present, and nature of the proclamation or activity;

b.     describe the nature of the plaintiff's participation in, observation of, or involvement with the proclamation or activity;

c.     describe how the plaintiff in question came to learn of the proclamation or activity, including but not limited to any steps taken by the plaintiff to become informed about that proclamation or activity;

d.     describe every interest of the plaintiff in question that you contend has been adversely affected by that exposure or subjection; and

e.     describe all changes to the behavior of the plaintiff in question that you contend have been caused by that exposure or subjection.

Affidavit of Thomas C. Bellavia, ¶ 5, Exhibit 1 at 5.  Governor Doyle's interrogatories further instructed that the word "'[d]escribe,' when used in reference to a communication or factual situation means to identify the date and persons involved in the communication or factual situation and to state with particularity all facts known to you that relate in any way to that communication or factual situation."  Affidavit of Thomas C. Bellavia, ¶ 5, Exhibit 1 at 2.

Plaintiffs responded to the above interrogatory with a single sentence, stating: "See Plaintiffs' Answers to Federal Defendants' Interrogatories."  Affidavit of Thomas C. Bellavia, ¶ 6, Exhibit 2 at 2.[1]  An examination of Plaintiffs' Answers to Federal Defendants' Interrogatories, however, shows that those answers failed to establish any factual basis that would give the individual plaintiffs standing to sue Governor Doyle regarding his issuance of day-of-prayer proclamations for the State of Wisconsin.

<u>Plaintiff Anne Gaylor</u>

Plaintiff Anne Gaylor indicated, in her interrogatory responses, that she knew about the National Day of Prayer "from publicity in newspapers and/or on television" and from complaints by members of FFRF.  Affidavit of Thomas C. Bellavia, ¶ 8, Exhibit 4 at 2.  President Bush's 2008 National Day of Prayer proclamation was brought to her attention by her daughter, plaintiff Annie Laurie Gaylor, as part of FFRF's ongoing monitoring of such proclamations.  Affidavit of Thomas C. Bellavia, ¶ 8, Exhibit 4 at 5.  She further noted that such monitoring is reported to her because she is "still officially a consultant with the Foundation, and remains on the Board of Directors."  Affidavit of Thomas C. Bellavia, ¶ 8, Exhibit 4 at 5-6.  Anne Gaylor similarly learned of President Obama's 2009 National Day of Prayer proclamation from Annie Laurie Gaylor.  Affidavit of Thomas C. Bellavia, ¶ 8, Exhibit 4 at 8.  She also described participating in a picket against a Wisconsin Prayer Breakfast held in Madison, Wisconsin, in 1992 and protesting the use of Wisconsin's Great Seal by the breakfast's private sponsors.  Affidavit of Thomas C. Bellavia, ¶

---

[1]This brief and Governor Doyle's proposed findings of fact throughout refer to and rely upon the versions of Plaintiffs' interrogatory answers that were provided by Plaintiffs in late August 2009, *see* Affidavit of Thomas C. Bellavia, ¶¶ 6 and 8, Exhibits 2 and 4, and do not refer to or rely upon the differing versions of those interrogatory answers that were provided by Plaintiffs on October 5, 2009.  *See* Affidavit of Thomas C. Bellavia, ¶¶ 15 and 16, Exhibits 11 and 12.  The facts related to the differing versions of these documents are fully set out in the Affidavit of Thomas C. Bellavia, ¶¶ 14 through 27.

8, Exhibit 4 at 9-10.   In addition, she has discussed the National Day of Prayer with many members of FFRF who call to complain about it and has studied governmental prayer proclamations as part of her efforts to protest and publicize alleged constitutional violations. Affidavit of Thomas C. Bellavia, ¶ 8, Exhibit 4 at 10-11.

<u>Plaintiff Annie Laurie Gaylor</u>

Plaintiff Annie Laurie Gaylor knows about the National Day of Prayer through her work with her mother, Anne Gaylor, in co-founding FFRF, through her work as editor and reporter for FFRF's newspaper, through her contact with day-of-prayer-related activism by FFRF members, and through complaints about the National Day of Prayer received by FFRF.  Affidavit of Thomas C. Bellavia, ¶ 8, Exhibit 4 at 3.   She learned about President Bush's 2008 proclamation through her routine monitoring of the websites of the National Day of Prayer Taskforce and the White House and she annually receives day-of-prayer related mailings through her participation in a Focus on the Family mailing list.  Affidavit of Thomas C. Bellavia, ¶ 8, Exhibit 4 at 6.   She likewise learned about President Obama's 2009 proclamation through her monitoring of the same websites and from national news media.  Affidavit of Thomas C. Bellavia, ¶ 8, Exhibit 4 at 8.   In addition, she has done day-of-prayer-related commentary for an FFRF radio show, has directed FFRF's activities of monitoring the news media and websites, has frequently written and disseminated press releases and news reports for FFRF, has solicited articles for FFRF's newspaper from members known for their activism, and has urged members to protest at local, regional, and national levels.  Affidavit of Thomas C. Bellavia, ¶ 8, Exhibit 4 at 13-15 and 35.

<u>Plaintiff Paul Gaylor</u>

Plaintiff Paul Gaylor learned about the National Day of Prayer long ago through the newspapers and learned about the 2008 and 2009 presidential proclamations through his wife, Anne Gaylor.  Affidavit of Thomas C. Bellavia, ¶ 8, Exhibit 4 at 4, 6, and 8.  He also participated in, took photographs of, and provided security for the picketing of a prayer breakfast in Madison, Wisconsin, in 1992.  Affidavit of Thomas C. Bellavia, ¶ 8, Exhibit 4 at 35.  In addition, he has encountered day-of-prayer-related complaints when working for at least 10 years as an FFRF volunteer.  Affidavit of Thomas C. Bellavia, ¶ 8, Exhibit 4 at 35.

<u>Plaintiff Dan Barker</u>

Plaintiff Dan Barker remembers learning about the National Day of Prayer via a television news story in the early 1980s, though he believes he also had heard of it prior to that time.  Affidavit of Thomas C. Bellavia, ¶ 8, Exhibit 4 at 4.  He also has monitored the National Day of Prayer for years.  Affidavit of Thomas C. Bellavia, ¶ 8, Exhibit 4 at 6 and 8.  In 2008, he anticipated President Bush's proclamation, monitored the National Day of Prayer Task Force's website, learned about the signing of the proclamation from FFRF staff, including co-president Annie Laurie Gaylor, and confirmed its content by looking on the internet.  Affidavit of Thomas C. Bellavia, ¶ 8, Exhibit 4 at 6-7.  In 2009, he again anticipated President Obama's proclamation and learned about its issuance by watching news on the internet.  Affidavit of Thomas C. Bellavia, ¶ 8, Exhibit 4 at 8-9.  In addition, he "has opposed the NDP in written comments that have been published over the years. . . . [and] also has read about protests . . . ."  Affidavit of Thomas C. Bellavia, ¶ 8, Exhibit 4 at 36.

<u>Plaintiff Phyllis Rose</u>

Plaintiff Phyllis Rose learned about the National Day of Prayer and about the 2008 and 2009 presidential proclamations "while working at the Freedom From Religion Foundation." Affidavit of Thomas C. Bellavia, ¶ 8, Exhibit 4 at 4, 7, and 9.  She also indicated that she began volunteering with FFRF because of her concerns about governmental promotion of religion. Affidavit of Thomas C. Bellavia, ¶ 8, Exhibit 4 at 36.

<u>Plaintiff Jill Dean</u>

Plaintiff Jill Dean became aware of the National Day of Prayer "over time by hearing news accounts."  Affidavit of Thomas C. Bellavia, ¶ 8, Exhibit 4 at 4.  She became distinctly aware of the National Day of Prayer in 2008 through news accounts of a prayer breakfast sponsored by the Sheriff of Burnett, County, Wisconsin.  Affidavit of Thomas C. Bellavia, ¶ 8, Exhibit 4 at 4 and 7. She was generally aware of the National Day of Prayer in 2009 through the media, but has no specific recollection of President Obama's 2009 proclamation.  Affidavit of Thomas C. Bellavia, ¶ 8, Exhibit 4 at 9.  She also "has participated in opposition to the National Day of Prayer through her volunteer work for and support of the Freedom From Religion Foundation."  Affidavit of Thomas C. Bellavia, ¶ 8, Exhibit 4 at 37.

<u>Discussion</u>

The above factual record established by Plaintiffs' interrogatory responses fails, for several reasons, to show that any of the individual plaintiffs has suffered any actual injury as a result of any day-of prayer proclamation issued by Governor Doyle.

First, the record is entirely devoid of actual factual evidence that any of the individual plaintiffs has had any exposure at all to a Doyle proclamation.  Such exposure was certainly implied by the allegations in the First Amended Complaint and, for that reason,

Governor Doyle—in anticipation of the present summary judgment motion—instructed the Plaintiffs, in his interrogatory number 2, to identify with particularity, *inter alia*, all facts known to them related to any instance in which any plaintiff in this case claims to have been exposed or subjected to a Wisconsin day-of-prayer proclamation.  Affidavit of Thomas C. Bellavia, ¶ 5, Exhibit 1 at 2 and 5.  In response, Plaintiffs referred Governor Doyle to their answers to the Federal Defendants' interrogatories.  Affidavit of Thomas C. Bellavia, ¶ 6, Exhibit 2 at 2.[2] Because FRCP 33(b)(1) requires that "[e]ach interrogatory shall be answered separately and fully," Plaintiffs have represented that their answers to the Federal Defendants' interrogatories contain all information responsive to Governor Doyle's interrogatory number 2.

As has been shown in detail above, however, the Plaintiffs' answers to the Federal Defendants' interrogatories only discuss their exposure to the *National* Day of Prayer and to certain *presidential* day-of-prayer proclamations.  Those answers provide no evidence responsive to Governor Doyle's demand for specific information about the individual plaintiffs' exposure to *Wisconsin* day-of-prayer proclamations.  Plaintiffs have thus failed to place in the record any factual evidence showing that any individual plaintiff has had any contact with a day-of-prayer proclamation issued by Governor Doyle.  Absent evidence of such exposure, the individual plaintiffs clearly have not shown actual injury from any Wisconsin proclamation and thus lack standing to sue Governor Doyle.

---

[2] As previously noted, this brief and Governor Doyle's proposed findings of fact refer to and rely upon the versions of Plaintiffs' interrogatory answers that were provided by Plaintiffs in late August 2009, *see* Affidavit of Thomas C. Bellavia, ¶¶ 6 and 8, Exhibits 2 and 4, and do not refer to or rely upon the differing versions of those interrogatory answers that were provided by Plaintiffs on October 5, 2009.  *See* Affidavit of Thomas C. Bellavia, ¶¶ 15 and 16, Exhibits 11 and 12.  The facts related to the differing versions of these documents are fully set out in the Affidavit of Thomas C. Bellavia, ¶¶ 14 through 27.

Second, even if Plaintiffs' interrogatory responses had described an exposure to Wisconsin proclamations that was similar to their exposure to the National Day of Prayer, they would still lack standing because those responses only establish contact with day-of-prayer proclamations through news media reporting and in the course of their advocacy activities with FFRF.  The Supreme Court's *Valley Forge* decision teaches, however, that such self-inflicted exposure to allegedly unconstitutional conduct does not give rise to Article III standing.

In reaching the above conclusion, Governor Doyle is not contending that the individual plaintiffs, in order to establish actual injury caused by prayer proclamations, must prove that they have assumed special burdens or altered their behavior in order to avoid those proclamations *Doe*, 41 F.3d at 1160-61.  It would be sufficient, rather, if the plaintiffs could demonstrate that they have been subjected to direct and unwelcome contact with the proclamations they wish to challenge.  *Id; Valley Forge,* 454 U.S. at 767 n. 22.  Plaintiffs here, however, have made no such demonstration.  To be *subjected* to direct and unwelcome contact with a prayer proclamation means to be made to involuntarily submit to that contact.  *See* Webster's Third New International Dictionary 2275 (1986) ("subject," as a transitive verb, means, in pertinent part: "to cause to undergo or submit to : make submit to a particular action or effect : expose <hated to *subject* his wife to such company> <unwilling to *subject* himself to any inconvenience>").

In *Doe*, for example, the Seventh Circuit—while recognizing that special burden or altered behavior is not a necessary precondition to standing—expressly reaffirmed the continued vitality of its earlier decision in *Freedom From Religion Foundation v. Zielke*, 845 F.2d 1463 (7th Cir. 1988), in which individual plaintiffs who had been exposed to a challenged government monument through the news media and in the course of engaging in anti-monument advocacy activities with FFRF were found to lack standing because they had failed to demonstrate *either* that they had

- 14 -

altered their behavior as a result of the monument *or* that they had been exposed to the monument "during their normal routines or in the course of their usual driving or walking routes." *Doe*, 41 F.3d at 1161. In contrast to the plaintiffs in *Zielke*, the court noted that the plaintiffs before it in *Doe* did suffer actual injury because they "must come into direct and unwelcome contact with the sign in order to participate in their local government and fulfill their legal obligations." *Id.* In other words, in order to demonstrate actual injury resulting from allegedly religious government speech, plaintiffs must demonstrate *either*: (1) that they have been required to submit to involuntary exposure to that speech in order to be able to carry out their legal obligations or ordinary business; *or* (2) that they have been required to alter their ordinary behavior in order to avoid unwelcome contact with the challenged government speech. Exposure to government speech only through the news media and in the course of engaging in advocacy activities opposed to that speech, however, does not satisfy either of those two options. *See Doe*, 41 F.3d at 1161 (*citing Zielke*, 845 F.2d at 1468-69). Therefore, the individual plaintiffs in this case, like the individual plaintiffs in *Zielke*, lack standing.

Similarly, in *Books I*, 235 F.3d 292 (7th Cir. 2000), which involved a challenge to a city's Ten Commandments monument, the Seventh Circuit accepted the factual finding of the district court that the plaintiffs in that case "*must* come in direct and unwelcome contact with the Ten Commandments monument to participate fully as citizens of Elkhart and to fulfill their legal obligations." *Books I*, 235 F.3d at 300 (emphasis added); *see also Books II*, 401 F.3d at 861 (noting that the plaintiffs in *Books I* "were *forced* to come into direct and unwelcome contact with the City of Elkhart's outdoor Ten Commandments monument when they entered the municipal building to conduct business or attend public meetings and when they visited the adjacent public library.") (emphasis added). Again, in *Books II*, the Seventh Circuit found that the plaintiff's

- 15 -

injury from a display in a county administration building was indistinguishable from the injury in the earlier *Books I* case because the plaintiff "*must* pass by the display" when he obtains certain tax forms or maps and when he visits the County Health Department. *Books II*, 401 F.3d at 862 (emphasis added).  In contrast, the individual plaintiffs in the present case have been exposed to the challenged prayer proclamations only through the news media and in the course of engaging in advocacy activities, but have not been required to submit to involuntary exposure to those proclamations in order to be able to carry out their ordinary business.[3]

This conclusion is also reinforced by *Mercier v. Fraternal Order of Eagles*, 395 F.3d 693 (7th Cir. 2005), in which the Seventh Circuit reached the merits of an Establishment Clause claim brought by individual members of FFRF who had previously been found, by the district court, to have standing to challenge the same monument that had been at issue in *Zielke*.  *See Mercier v. City of La Crosse*, 276 F.Supp.2d 961, 968-69 (W.D. Wis. 2003).  Unlike the plaintiffs who had lacked standing in *Zielke*, however, the plaintiffs in *Mercier* did not base their claims of actual injury on contact with the challenged monument through the news media and in the course of engaging in advocacy activities with FFRF.  Rather, the *Mercier* plaintiffs, were all residents of the community where the monument was located who had either altered their behavior to avoid the monument or had been "*forced* to view a monument that distresses them every time they visited Cameron Park"  *Mercier*, 276 F.Supp.2d at 969 (emphasis added).  The individual

---

[3]The plaintiffs cannot avoid this requirement by claiming that advocating for the separation of church and state is itself their ordinary business and that they must come into contact with things like prayer proclamations in order to be able to carry out that business.  If that were true, then *everyone* who engages in advocacy activities on behalf of organizations like FFRF or the group involved in *Valley Forge* would automatically have standing to litigate the constitutionality of any government action that is reported to such an organization as a potential violation of the Establishment Clause.  Such a view would be squarely contrary to the findings of no-standing in *Zielke* and *Valley Forge*.  The correct view, rather, is

plaintiffs in the present case, in contrast, have neither altered their behavior to avoid the prayer proclamations that they seek to challenge nor been required to submit to involuntary exposure to those proclamations in order to be able to carry out their ordinary business. Accordingly, in all relevant respects, they are similarly situated to the individual plaintiffs in *Zielke* and, likewise, lack standing.

It does not follow from the above standing analysis that government speech can cause actual injury to a person only when it takes the form of a monument or display that the person might be forced to physically walk or drive by in the course of his or her ordinary business, but cannot cause such injury when it takes the more abstract and generalized form of a governmental proclamation (thereby rendering such proclamations "standing-proof"). On the contrary, it is quite conceivable that that there could be some circumstances in which an individual, in the course of exercising rights or engaging in ordinary activities unrelated to a governmental proclamation, would be involuntarily subjected to exposure to the proclamation and/or would be required to change his or her behavior in order to avoid such exposure. The individual plaintiffs in the present case, however, are not in that kind of situation and it is not the job of this Court to speculate about factual circumstances not before it. What is contended here, rather, is that the individual plaintiffs *in this case* have not been subjected to the type of exposure to a prayer proclamation that would give *them* standing to challenge the proclamation's constitutionality.

In any event, even if it were true that prayer proclamations, due to their abstract and generalized nature, do not cause actual injury to any person in a way that would give rise to standing, that still would not be a basis for conferring standing on the plaintiffs here. On the

---

that exposure to government speech in the course of one's *voluntary* advocacy activities is not the kind of

contrary, the Supreme Court has expressly rejected the notion that a party should be granted standing if it otherwise appears that nobody would have standing. *Schlesinger v. Reservists Committee to Stop the War*, 418 U.S. 208, 227 (1974) ("The assumption that if respondents have no standing to sue, no one would have standing, is not a reason to find standing").

Similarly, the fact that the intended audience for a governmental prayer proclamation may be much broader than the intended audience for a municipal monument also does not affect the standing analysis.  Standing depends not on a defendant's intent, but rather on the characteristics and circumstances of the plaintiff.   Accordingly, standing to challenge a governmental communication does not depend on the government's intent in issuing that communication, but rather depends on a showing by the plaintiff that he/she has suffered actual injury as a result of that communication.   The fact that the government might have theoretically intended for the communication to reach every citizen does not mean that every citizen who objects to the content of that communication automatically has standing to challenge it.

Nor is the standing requirement of either involuntary exposure or a forced change in behavior contrary to the principle that "direct governmental compulsion" is not a necessary element of an Establishment Clause violation.  *Engel v. Vitale*, 370 U.S. 421, 430-431 (1962). What *Engel* says is that a government-sponsored religious activity can run afoul of the Establishment Clause on the merits even if the government does not *compel* anyone to actively participate in that activity.  *Id.   Engel* does not say, however, that anyone who merely reads about a government-sponsored religious activity in a newspaper or who works for an anti-religion organization would automatically have standing to challenge that activity.   On the contrary,

---

*involuntary* exposure that may be used to establish actual injury for standing purposes.

although the plaintiffs' standing was not discussed in *Engel*, it is clear that they had standing as parents of public school pupils who would have been subject to state school attendance laws. *See Engel*, 370 U.S. at 423-24. The fact that a government action that is claimed to violate the Establishment Clause need not itself be coercive, however, does not change the fact that, in order to have standing to challenge such a non-coercive government action, one must demonstrate a sufficiently close relationship to that action to be a proper plaintiff under Article III principles. In the present case, the individual plaintiffs have not demonstrated such a relationship to any prayer proclamation issued by Governor Doyle and they thus lack standing to sue him.

      B.      Plaintiffs Lack Standing To Assert Any Claims Against Governor Doyle Under The Wisconsin Constitution.

To the extent, if any, that Plaintiffs are claiming that Governor Doyle's issuance of day-of-prayer proclamations violates the Wisconsin Constitution, in addition to the United States Constitution, that claim, too, is barred by lack of standing.

The Article III case-or-controversy requirement is applicable to any claims under the Wisconsin Constitution in the present action. Congress has expressly incorporated that constitutional requirement into the federal supplemental jurisdiction statute:

> Except as provided in subsections (b) and (c) or as expressly provided otherwise by Federal statute, in any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they *form part of the same case or controversy under Article III of the United States Constitution*. Such supplemental jurisdiction shall include claims that involve the joinder or intervention of additional parties.

28 U.S.C. § 1367(a) (emphasis added). It follows from this statutory language that where, as here, plaintiffs have asserted one or more federal-law claims over which a federal district court is authorized to exercise original jurisdiction under 28 U.S.C. § 1331, the federal court may also

exercise supplemental jurisdiction over related state-law claims, but only if they form part of the same Article III case or controversy.  Clearly, a state-law claim cannot be part of the same case or controversy as a federal claim where the federal claim itself does not present a case or controversy.  Under 28 U.S.C. § 1367(a), therefore, federal courts do not have supplemental jurisdiction over state-law claims where the underlying federal claims do not themselves present an Article III case or controversy.  In addition, even if the case-or-controversy requirement had not been expressly incorporated into the supplemental jurisdiction statute, it would still apply to all supplemental-jurisdiction claims because that requirement embodies a fundamental constitutional limit on the scope of the judicial power of the United States.  *See Hein*, 127 S. Ct. at 2562.  Because the individual plaintiffs, for the reasons already shown, have not established an Article III case-or-controversy they are thus barred from asserting any claim against Governor Doyle under the Wisconsin Constitution, as well as the United States Constitution.

In the alternative, if the Court concludes that is has the power to exercise supplemental jurisdiction over any state-law claims, it should decline to exercise that power if it finds that Plaintiffs lack standing to assert their federal claims.  Pursuant to 28 U.S.C. § 1331, this Court is statutorily authorized to exercise original jurisdiction only over Plaintiffs' claims under the United States Constitution.  If those claims are dismissed for lack of standing, then there will no longer be any claims in this case over which the Court is authorized to exercise original jurisdiction.  Under 28 U.S.C. § 1367(c)(3), dismissal of all such claims is a basis for a district court to decline to exercise supplemental jurisdiction over any state-law claims.

       C.     FFRF Lacks Standing To Sue Either On Its Own Behalf Or In A Representative Capacity.

Governor Doyle also contends:  (1) that FFRF lacks standing to sue on its own behalf because the challenged prayer proclamations have not caused a distinct and palpable injury to FFRF's ability to carry out its organizational purpose of advocating for church-state separation; and (2) that FFRF also lacks standing to sue in a representative capacity because, as shown above, none of the individual plaintiffs has standing.  On these points, Governor Doyle joins in and relies upon the arguments advanced by the Federal Defendants in their brief in support of their motion for summary judgment.

II.     GOVERNOR DOYLE'S ISSUANCE OF DAY-OF-PRAYER PROCLAMATIONS IS CONSTITUTIONAL.

       A.     Proclamations Recognizing And Encouraging The Practice Of Prayer Are A Constitutionally Permissible Governmental Acknowledgment Of The Role Of Religion In American Life And Do Not Effect An Establishment Of Religion.

Plaintiffs claim that Governor Doyle's issuance of day-of-prayer proclamations for the State of Wisconsin violates the Establishment Clause of the United States Constitution.  That claim fails because the United States Supreme Court has held that this nation's long-accepted tradition of governmental acknowledgments of the role of religion in American life—specifically including the practice of prayer by government officials in official contexts and the issuance of executive proclamations recognizing and encouraging the practice of prayer—is constitutionally permissible and does not amount to a forbidden establishment of religion.

Supreme Court decisions on the Establishment Clause have applied numerous different legal tests.  It is apparent from the diverse reasoning in various decisions and in the many concurring and dissenting opinions that there is no reliable consensus on the Court regarding a

- 21 -

single legal test for determining whether a governmental action constitutes an impermissible establishment. *See, e.g., Lemon v. Kurtzman*, 403 U.S. 602 (1971); *Marsh v. Chambers*, 463 U.S. 783 (1983); *Lynch v. Donnelly*, 465 U.S. 668 (1984); *Wallace v. Jaffree*, 472 U.S. 38 (1985); *County of Allegheny v. American Civil Liberties U.*, 492 U.S. 573 (1989); *Lee v. Weisman*, 505 U.S. 577 (1992); *McCreary County v. Am. Civil Liberties Union*, 545 U.S. 844 (2005); *Van Orden v. Perry*, 545 U.S. 677 (2005).

Notwithstanding this flexibility in the Supreme Court's approach, Plaintiffs clearly believe that the Establishment Clause is strictly intended to protect the freedom of both believers and non-believers by "wholly isolating the state from the religious sphere and compelling it to be completely neutral" vis-à-vis religion. *Zorach v. Clauson*, 343 U.S. 306, 319 (1952) (Black, J., dissenting). Whether one personally agrees or disagrees with Justice Black's dissenting views as a matter of public policy, however, it is clear that those views are not the law. On the contrary, the Supreme Court "consistently has declined to take a rigid, absolutist view of the Establishment Clause." *Lynch*, 465 U.S. at 678. It is true that the general goal of religious neutrality has sometimes been articulated in categorical-sounding language. *See County of Allegheny*, 492 U.S. at 656-57 (1989) (Kennedy, J., concurring in the judgment in part and dissenting in part) (citing examples). In practice, however, the Court has not construed the Establishment Clause as requiring a "relentless extirpation of all contact between government and religion," but instead has found "policies of accommodation, acknowledgment, and support for religion" to be "an accepted part of our political and cultural heritage." *Id.* at 657.

The Court has thus recognized that the metaphor of a wall of separation "is not a wholly accurate description of the practical aspects of the relationship that in fact exists between church and state." *Lynch*, 465 U.S. at 673. Accordingly, the Court has long acknowledged that "total

separation is not possible in an absolute sense" and that some relationship between government and religion is inevitable. *Lemon*, 403 U.S. at 614. According to the Court, "[i]t has never been thought either possible or desirable to enforce a regime of total separation . . ." *Committee for Public Ed. & Religious Lib. v. Nyquist*, 413 U.S. 756, 760 (1973). The Constitution, in this view, does not require "complete separation of church and state," but rather forbids hostility to religion and affirmatively mandates not only tolerance, but accommodation of religion. *See Lynch*, 465 U.S. at 673 (*citing Zorach*, 343 U.S. at 314 and *People of State of Illinois v. Board of Education*, 333 U.S. 203, 211 (1948)). Anything less, according to the Court, would manifest a callous indifference to religion that was never intended by the Establishment Clause and would be hostile to our national tradition of religious freedom. *Id*; *see also County of Allegheny*, 492 U.S. at 657 (Kennedy, J., concurring in the judgment in part and dissenting in part) ("Any approach less sensitive to our heritage would border on latent hostility toward religion, as it would require government in all its multifaceted roles to acknowledge only the secular, to the exclusion and so to the detriment of the religious.").

This view of the delicate balance between neutrality and potential hostility has been famously and eloquently stated by Justices Douglas and Goldberg. In the words of Justice Douglas:

> The First Amendment . . . does not say that in every and all respects there shall be a separation of Church and State. Rather, it studiously defines the manner, the specific ways, in which there shall be no concert or union or dependency one on the other. That is the common sense of the matter. Otherwise the state and religion would be aliens to each other—hostile, suspicious, and even unfriendly. . . . Prayers in our legislative halls; the appeals to the Almighty in the messages of the Chief Executive; the proclamations making Thanksgiving Day a holiday; 'so help me God' in our courtroom oaths—these and all other references to the Almighty that run through our laws, our public rituals, our ceremonies would be flouting the First Amendment. A fastidious atheist or agnostic could even object to the

supplication with which the Court opens each session:  "God save the United States and this Honorable Court."

*Zorach*, 343 U.S. at 312-13.

And in the equally eloquent statement of Justice Goldberg:

It is said, and I agree, that the attitude of government toward religion must be one of neutrality. But untutored devotion to the concept of neutrality can lead to invocation or approval of results which partake not simply of that noninterference and noninvolvement with the religious which the Constitution commands, but of a brooding and pervasive devotion to the secular and a passive, or even active, hostility to the religious. Such results are not only not compelled by the Constitution, but, it seems to me, are prohibited by it.

Neither government nor this Court can or should ignore the significance of the fact that a vast portion of our people believe in and worship God and that many of our legal, political and personal values derive historically from religious teachings. Government must inevitably take cognizance of the existence of religion. . . .

*School District of Abington School TP., PA. v. Schempp*, 374 U.S. 203, 306 (1963) (Goldberg, J., concurring, joined by Harlan, J.).

Consistent with this approach, the Court has noted that, "[i]n our modern, complex society, whose traditions and constitutional underpinnings rest on and encourage diversity and pluralism in all areas, an absolutist approach in applying the Establishment Clause is simplistic and has been uniformly rejected by the Court."  *Lynch*, 465 U.S. at 678.  Accordingly, the Court does not interpret the Establishment Clause as mechanically invalidating all governmental conduct that gives special recognition to religion, but instead scrutinizes such conduct "to determine whether, in reality, it establishes a religion or religious faith, or tends to do so."  *Lynch*, 465 U.S. at 678 (*citing Walz v. Tax Commission of City of New York*, 397 U.S. 664, 669 (1970)).  This inquiry calls for a type of line drawing that is not amenable to any fixed, *per se* rule and the Court has thus "repeatedly emphasized our unwillingness to be confined to any single test or criterion in this

sensitive area." *Id.* at 679 (*citing Tilton v. Richardson*, 403 U.S. 672, 677-78 (1971); *Nyquist*, 413 U.S. at 773).

In opposing an excessively literal or absolutist interpretation of the Religion Clauses, the Supreme Court has emphasized that the ultimate constitutional objective of those provisions must be "'illuminated by history.'" *Lynch*, 465 U.S. at 678 (*quoting Walz*, 397 U.S. at 671 (1970)). In this regard, the Court has held that "[t]here is an unbroken history of official acknowledgment by all three branches of government of the role of religion in American life from at least 1789." *Lynch*, 465 U.S. at 674. That history, according to the Court, "is replete with official references to the value and invocation of Divine guidance in deliberations and pronouncements of the Founding Fathers and contemporary leaders." *Id.* at 675. This history "is pervaded by expressions of religious belief" and by "accommodation of all faiths and all forms of religious expression, and hostility toward none." *Id.* at 677. By accommodating religion in this way, government "has 'follow[ed] the best of our traditions' and 'respect[ed] the religious nature of our people.'" *Id.* at 678 (*quoting Zorach*, 343 U.S. at 314).

These historical traditions are too numerous to be described at length in the present brief, but they have been frequently detailed in Supreme Court opinions. *See, e.g., Marsh*, 463 U.S. at 786-90; *Lynch*, 465 U.S. at 673-78; *County of Allegheny*, 492 U.S. at 670-74 (Kennedy, J., concurring in the judgment in part and dissenting in part); *Lee*, 505 U.S. at 633-35 (Scalia, J., dissenting). Some of these traditions are also described at greater length in the Federal Defendants' brief in support of their summary judgment motion. In order to avoid burdening the Court with undue repetition, Governor Doyle relies on any additional description of those traditions in the Federal Defendants' brief.

The important thing to note about these traditions is that they are not exceptions to the constitutional prohibition against the establishment of religion, but rather provide the context of historical practices and understanding that the Court uses to illuminate what the Framers intended the Establishment Clause to mean and how they thought it should be applied. *See Marsh*, 463 U.S. at 790; *County of Allegheny*, 492 U.S. at 670 (Kennedy, J., concurring in the judgment in part and dissenting in part). Any proper interpretation of the Establishment Clause cannot be one that would invalidate practices that have been accepted as legitimate for hundreds of years or "other practices with no greater potential for an establishment of religion." *Id.*; *see also Walz*, 397 U.S. at 681 (Brennan, J., concurring) (recognizing that the existence of a practice from the beginning of the Nation's life, while not conclusive, is a fact of considerable import in construing the Establishment Clause).

In the context of these venerable historical traditions, governmental displays and observances that coincide or harmonize with the tenets of some religions are constitutionally permissible—not because they do not advance religion in some sense, but because any such advancement is sufficiently indirect, remote, or incidental that it does not constitute an impermissible establishment of religion. *See Lynch*, 465 U.S. at 683. It is "far-fetched," according to the Court, to suggest that such governmental acknowledgments of religion "pose a real danger of establishment." *Lynch*, 465 U.S. at 686. On the contrary, in light of "their history and ubiquity," such acknowledgments of religion by government cannot fairly be understood as conveying governmental endorsement of particular religious beliefs, but rather serve "the legitimate secular purposes of solemnizing public occasions, expressing confidence in the future, and encouraging the recognition of what is worthy of appreciation in society." *Lynch*, 465 U.S. at 693 (O'Connor, J., concurring).

It does not follow, of course, that symbolic recognition or accommodation of religious faith by government can never violate the Establishment Clause.  On the contrary, it is clear that such governmental acknowledgments of religion may not go so far as to directly or indirectly "coerce anyone to participate in religion or its exercise, or otherwise act in a way which 'establishes a [state] religion or religious faith, or tends to do so.'"  *Lee*, 505 U.S. at 587 (*quoting Lynch*, 465 U.S. at 678).  Even where coercion is absent, as in the present case, it would be impermissible for government speech to go so far as to obtrusively "place the government's weight behind an obvious effort to proselytize on behalf of a particular religion." *County of Allegheny*, 492 U.S. at 661 (Kennedy, J., concurring in the judgment in part and dissenting in part); *see also Lee*, 505 U.S. at 641 (Scalia, J., dissenting) (noting the unconstitutionality of sectarian government speech).  The possibility of these types of infringements, however, "does not justify a ban on all government recognition of religion." *Id.*

In particular, the Supreme Court has expressly approved traditional governmental acknowledgments of the practice of prayer, including both prayer by government officials in officials contexts and the issuance of executive proclamations that recognize and encourage the practice of prayer—both public and private.

Most importantly, in *Marsh*, the Court specifically held that a state legislature's practice of starting each legislative day with a prayer by a chaplain paid by the state was neither an establishment of religion nor a step toward establishment.  *Marsh*, 463 U.S. at 792.  In reaching that conclusion, the Court emphasized that the practice of opening sessions of legislatures and other public deliberative bodies with prayer "is deeply embedded in the history and tradition of this country" and, throughout that history, "has coexisted with the principles of disestablishment and religious freedom." *Id.* at 786.

- 27 -

The Court in *Marsh* was especially persuaded by certain prayer-related actions of the First Congress, seventeen members of which had been delegates to the Constitutional Convention and the actions of which have always been properly regarded as having the greatest weight in the interpretation of the Constitution. *See Lynch*, 465 U.S. at 673-74. First, the Court noted that "the First Congress, as one of its early items of business, adopted the policy of selecting a chaplain to open each session with prayer." *Marsh*, 463 U.S. at 787-88. Even more tellingly, just three days prior to its passage of the Bill of Rights, the First Congress enacted a statute authorizing the payment of those congressional chaplains. *Id.* at 788. In addition, the Court noted that "the practice of opening sessions with prayer has continued without interruption ever since that early session of Congress . . . [and] has also been followed consistently in most of the states." *Id.* at 788-89. From this evidence, the Court concluded that "[c]learly the men who wrote the First Amendment Religion Clause did not view paid legislative chaplains and opening prayers as a violation of that Amendment." *Id.* at 788. The Court also found this historical evidence to be consistent with its earlier Establishment Clause decisions, concluding that the practice of "legislative prayer presents no more potential for establishment than the provision of school transportation, . . . beneficial grants for higher education, . . . or tax exemptions for religious organizations." *Id.* at 791 (*citing Everson v. Board of Education*, 330 U.S. 1 (1947); *Tilton v. Richardson*, 403 U.S. 672 (1971); and *Walz,* 397 U.S. 664 (1970).

The First Congress's clear endorsement of the practice of legislative prayer, as discussed in *Marsh*, has been described by the Court as a "striking example of the accommodation of religious belief intended by the Framers." *Lynch*, 465 U.S. at 674. In addition to specifically approving the practice of legislative prayer, the Supreme Court has also observed that the reasons supporting that practice likewise support the equally venerable tradition of both including and

encouraging prayers of petition and thanksgiving in government ceremonies and official proclamations. *See Id.* at 675 and nn. 2-3; *Lee,* 505 U.S. at 633-36 (Scalia, J., dissenting) (citing examples). The National Day of Prayer at issue in the present case—including both Congress' directive to the President and the Presidential proclamations issued thereunder—has been emphasized by the Court as a prime example of this accepted tradition. *Lynch*, 465 U.S. at 677*; see also County of Allegheny*, 492 U.S. at 672 (Kennedy, J., concurring in the judgment in part and dissenting in part); *c.f. Engel,* 370 U.S. at 449 (1962) (Stewart, J., dissenting). This national tradition, according to the Court, is not rigidly sectarian and includes such things as Presidential acknowledgment of the Jewish High Holy Days and proclamation of Jewish Heritage Week. *See Lynch*, 465 U.S. at 677.

It is true that Justice Blackmun, writing for the Court in *County of Allegheny*, noted in *dicta* that the constitutionality of a National Day of Prayer "does not necessarily follow" from the *Marsh* decision's approval of legislative prayer. *County of Allegheny*, 492 U.S. at 603 n. 52. More specifically, Justice Blackmun suggested that government urging citizens to pray might be distinguishable from legislators themselves engaging in prayer. *Id.* This speculation, however, omits any reference to the aforementioned national tradition of both including and encouraging prayers of petition and thanksgiving in government ceremonies and official proclamations. Nor did Justice Blackmun consider the obvious fact that the daily conduct of prayer by the people's lawmakers in the very chamber that is the center of governmental authority would reasonably appear to be a *substantially greater* endorsement of religion than is a simple, once-per-year ceremonial proclamation that merely encourages citizens to themselves engage in the private practice of prayer in accordance with their own diverse traditions. *See* Complaint (Docket #1), Exhibits 1 and 3; *c.f. County of Allegheny*, 492 U.S. at 667 (Kennedy, J., concurring in the

- 29 -

judgment in part and dissenting in part).   In any event, Justice Blackmun himself noted that the Court was expressing no judgment about the constitutionality of the National Day of Prayer, which was not before the Court in that case.  *Id.* at 603 n. 52.

The Supreme Court also has specifically noted that the long-standing practice of governmental proclamations that encourage prayers of petition and thanksgiving by the people are not invalidated by the religious nature of prayer.  On the contrary, the Court has observed that the traditional national celebration of Thanksgiving—as expressed both in Presidential proclamations and in Congressional recognition of Thanksgiving as an official National Holiday—retains its "religious overtones" and "has not lost its theme of expressing thanks for Divine aid."  *Lynch*, 465 U.S. at 675; *see also County of Allegheny*, 492 U.S. at 671 (Kennedy, J., concurring in the judgment in part and dissenting in part) (noting the "forthrightly religious nature" of Thanksgiving proclamations throughout the nation's history).   Christmas, likewise, has been recognized as a National Holiday without having lost its religious significance.  *Lynch*, 465 U.S. at 675.   The federal government, according to the Court, has long proclaimed these holidays in religious terms and has recognized and subsidized them with their religious significance.  *Id.* at 676.

In short, the Supreme Court has accepted that government in this country has a long tradition of acknowledging and sponsoring manifestations of the nation's religious heritage, including prayer.  *Lynch*, 465 U.S. at 677.

           B.     Governor Doyle's Issuance Of Day-Of-Prayer Proclamations Is Well Within The Accepted Tradition Of Governmental Recognition And Encouragement Of The Practice Of Prayer.

When Governor Doyle's issuance of day-of-prayer proclamations is evaluated under the above legal principles, it is clear that his actions present no more potential for establishing religion

than do the practice of legislative prayer approved in *Marsh* and the long-accepted tradition of encouraging prayers of petition and thanksgiving in government proclamations.

The factual basis for Plaintiffs' constitutional claim against Governor Doyle is narrow in scope.  The First Amended Complaint alleges, in relevant part, that Governor Doyle is the Governor of the State of Wisconsin and that he issued a prayer proclamation in 2008 while acting in his official capacity.  First Amended Complaint, ¶¶ 17, 57 (Docket #38).  Governor Doyle has admitted those allegations.  Answer and Affirmative Defenses to First Amended Complaint by Defendant Wisconsin Governor Jim Doyle, ¶¶ 17, 57 (Docket #43).

In addition, Plaintiffs submitted a copy of Governor Doyle's 2008 day-of-prayer proclamation as Exhibit 3 to the original Complaint in this matter.  Although the authenticity of that exhibit was not specifically alleged in the First Amended Complaint, Governor Doyle admits that the exhibit is a true and correct copy of the day-of-prayer proclamation that he issued in 2008.  That proclamation reads as follows:

> WHEREAS, the citizens of the State of Wisconsin are a diverse group of people of nearly every nationality and represented by a variety of religious traditions; and
>
> WHEREAS, the history of our state is replete with leaders who voluntarily call upon their God, from the prayers sent heavenward during the Constitutional Convention to those murmured in the heat of the battle at Omaha Beach during World War II, to the intercessions offered in the aftermath of tragedies such as Columbine, September 11th, and the space shuttle break up, whether the need be great or small, Americans of faith have sought the Lord's help with life's challenges and adversities throughout our history; and
>
> WHEREAS, the citizens of the State of Wisconsin have relied on prayer as a source of strength and guidance in war and peace and as our service men and women are currently defending the United States; and
>
> WHEREAS, the theme for the upcoming observance is "America, Unite in Prayer'; and

- 31 -

WHEREAS, prayer is a comfort for many people, especially during times of trial and tribulation; and

WHEREAS, the citizens of Wisconsin should gather together on this day in their homes, churches, meeting places and chosen places of worship to pray in their own way for unity of the hearts of all mankind, and for strong moral character in the lives of the people of all nations, as well as, peace and understanding throughout the world;

NOW, THEREFORE, I, Jim Doyle, Governor of the State of Wisconsin, do hereby proclaim May 1, 2008

WISCONSIN DAY OF PRAYER

Complaint (Docket #1), Exhibit 3.

Plaintiffs have not specified any factual basis for their constitutional claims against Governor Doyle other than the 2008 proclamation quoted above.  The First Amended Complaint refers generally to annual issuance of such proclamations but provides no specific factual allegations in support of that reference, other than the allegations related to the 2008 proclamation.  *See* First Amended Complaint, ¶ 57 (Docket #38).

Accordingly, in an attempt to elicit any additional factual basis for Plaintiffs' claim, Governor Doyle served interrogatories on Plaintiffs which, among other things, instructed them to "[i]dentify every Wisconsin day-of-prayer proclamation on which plaintiffs rely to support any of the claims in the First Amended Complaint."  Affidavit of Thomas C. Bellavia, ¶ 5, Exhibit 1 at 4. The interrogatories also expressly instructed that, "[w]hen used in connection with a document, 'identify' means to state the date of the document, describe the nature and substance of the document with sufficient particularity to enable the document to be identified, and to state the last known location of the document."  *See* Affidavit of Thomas C. Bellavia, ¶ 5, Exhibit 1 at 3.

In response to the demand that they identify every Wisconsin proclamation on which they are relying with particularity, Plaintiffs answered:  "All Day of Prayer proclamations by Wisconsin

- 32 -

governors give the appearance of religious endorsement in violation of the Establishment Clause, including without limitation the 2008 proclamation."   Affidavit of Thomas C. Bellavia, ¶ 6, Exhibit 2 at 2.[4]   Plaintiffs' non-specific reference to "[a]ll Day of Prayer proclamations by Wisconsin governors" and the use of the phrase "including without limitation" are not responsive to Governor Doyle's request that Plaintiffs identify with particularity the Wisconsin proclamations on which they are relying in this action.   Because the only Wisconsin proclamation that plaintiffs identified with the requisite particularity is the 2008 proclamation, and because Fed R. Civ. P. 33(b)(1) requires that "[e]ach interrogatory shall be answered separately and fully," the plain inference from Plaintiffs' response, as provided, is that Plaintiffs' are relying only the 2008 proclamation.  Accordingly, this discussion is limited to that proclamation.

Plaintiffs claim that the above proclamation extols prayer and exhorts Wisconsin citizens to pray in a way that amounts to an official state endorsement of religion, in violation of the Establishment Clause.  *See* First Amended Complaint, ¶¶ 57-58 and 128 (Docket #38).  Plaintiffs also claim, inferentially, that the above proclamation incorporates the National Day of Prayer Task Force's ("NDPTF") official theme for 2008 and thereby aligns the Wisconsin proclamation with the particular religious views of the NDPTF in a way that amounts to an unconstitutional endorsement of those views.   A close examination of the proclamation's language, however, shows that both of Plaintiffs' claims fail.

---

[4]As previously noted, this brief and Governor Doyle's proposed findings of fact refer to and rely upon the versions of Plaintiffs' interrogatory answers that were provided by Plaintiffs in late August 2009, *see* Affidavit of Thomas C. Bellavia, ¶¶ 6 and 8, Exhibits 2 and 4, and do not refer to or rely upon the differing versions of those interrogatory answers that were provided by Plaintiffs on October 5, 2009.  *See* Affidavit of Thomas C. Bellavia, ¶¶ 15 and 16, Exhibits 11 and 12.  The facts related to the differing versions of these documents are fully set out in the Affidavit of Thomas C. Bellavia, ¶¶ 14 through 27.

The proclamation begins in its first paragraph, by expressly acknowledging the diversity of the people of Wisconsin, specifically including their religious diversity.  This prominent emphasis on diversity refutes any suggestion that the proclamation is impermissibly sectarian.

The second paragraph of the proclamation acknowledges the role of prayer in the nation's history, from the time of the Constitutional Convention to the present, particularly in times of war and national tragedy.  This is the kind of traditional acknowledgment of religion that the Supreme Court has approved.  The same paragraph also characterizes prayer as seeking "the Lord's help with life's challenges and adversities." This reference to "the Lord[]" is non-sectarian and associates prayer only with the challenges and adversities of this world, and not with divine salvation or particular religious dogmas.

The proclamation's third paragraph acknowledges the role of prayer in the history of the people of Wisconsin, with particular reference to the Wisconsin men and women currently defending the nation in the armed services.  Again, this is within the accepted national tradition of religious acknowledgment and the patriotic reference to the armed services situates the proclamation even more firmly in that tradition.  The third paragraph also acknowledges prayer as "a source of strength and guidance" in this life, again with no sectarian reference to divine salvation or particular religious dogmas.

The fourth paragraph provides that the theme of the 2008 day-of-prayer proclamation is "America, Unite in Prayer."  The NDPTF theme for 2008 was "Prayer! America's Strength and Shield."  *See* Affidavit of Thomas C. Bellavia, ¶¶ 11 and 13, Exhibit 9; *see also* Complaint (Docket #1), Exhibit 1.  The phrase "America, Unite in Prayer" had been the NDPTF theme for 2007.  *See* Affidavit of Thomas C. Bellavia, ¶¶ 11-12, Exhibit 8.  However, the fact that Governor Doyle used that phrase in 2008, when the NDPTF had selected a different theme, refutes

Plaintiffs' suggestion that Governor Doyle has somehow engaged in joint or concerted action with Defendant Dobson and/or the NDPTF regarding such themes.  In itself, the phrase "America, Unite in Prayer" is entirely non-sectarian and not even very religious, apart from the unadorned reference to prayer as such.  On the contrary, the association of the word "Prayer" with the words "America" and "Unite" makes it clear that the theme is an acknowledgement of the civic role of prayer in American society.  Once again, such acknowledgment is well within the long-accepted tradition of governmental recognition and encouragement of the practice of prayer.[5]

The fifth paragraph of the proclamation acknowledges the role of prayer in comforting people, especially in difficult times.  Once again, this acknowledgment is non-sectarian and associates prayer only with the difficulties of this life, and not with divine salvation or particular religious dogmas.

The proclamation's sixth paragraph encourages the people of Wisconsin to pray on the designated day, but it does not command or otherwise coerce them to do so.  It also encourages people to "gather together" for prayer, thereby again emphasizing the social or civic function of prayer, as opposed to any specifically religious function.   The proclamation additionally encourages people to have such gatherings in "their homes, churches, meeting places and chosen places of worship," thereby making it clear that what is being encouraged is the *private* practice of prayer.  The reference to a wide variety of different kinds of gathering places also emphasizes the diversity of such private practice in Wisconsin.  The proclamation does not encourage the

---

[5]Even if the 2008 proclamation had adopted the NDPTF theme of "Prayer! America's Strength and Shield," Plaintiffs' claims would still fail.  First, that phrase, in itself, bears no sectarian meaning.  Second, the association of "Prayer" with "America[]"is an acknowledgement of the civic role of prayer in our national society.    Third, the use of the phrase "America's Strength and Shield" reinforces the proclamation's patriotic references to the nation's military traditions and to the service men and women currently defending our nation.

people to assemble for prayer in the halls of government or to pray in any particular manner or according to the tenets of a particular religion.   On the contrary, the proclamation expressly encourages the people of Wisconsin to pray "in their own way," thereby making strikingly clear the proclamation's inclusive and non-sectarian character.

Finally, the subjects of prayer encouraged in the sixth paragraph—*i.e.*, "unity of the hearts of all mankind;" "strong moral character in the lives of the people of all nations;" and "peace and understanding throughout the world"—are all non-sectarian subjects that again merely acknowledge the ethical and social role of prayer, rather than any specifically religious function. Likewise, the express references to "all mankind," "people of all nations," and "throughout the world" make it entirely clear that the prayer being suggested is expressly intended to be inclusive of the diversity of all people.

If Congress and the state legislatures do not run afoul of the Establishment Clause when they begin each day throughout the year with a state-sponsored prayer for divine guidance offered by a chaplain whose salary is paid at government expense, then it is hard to comprehend how that constitutional provision could be violated by a gubernatorial proclamation, issued only once per year, that expressly recognizes the religious diversity of the state's citizenry, acknowledges the role of prayer in citizens' lives throughout the state's history, and designates a single day of the year on which citizens are encouraged "to gather together . . . in their homes churches, meeting places and chosen places of worship to pray in their own way for unity of the hearts of all mankind, and for strong moral character in the lives of the people of all nations, as well as, peace and understanding throughout the world."   Complaint (Docket #1), Exhibit 3.   Nor can a proclamation with so much emphasis on diversity, including religious diversity, and on the civic

and ethical dimensions of prayer reasonably or plausibly be characterized as an attempt by government to engage in sectarian religious endorsement or proselytization.

For all of these reasons, therefore, the Court should conclude that Governor Doyle's issuance of day-of-prayer proclamations for the State of Wisconsin is well within the tradition of governmental acknowledgment of the role of religion in American life approved in *Marsh* and *Lynch* and does not effect or tend to effect an unconstitutional establishment of religion.

C.   Governor Doyle's Wisconsin Day-Of-Prayer Proclamations Are Also Constitutional Under The Test Of *Lemon v. Kurtzman*.

For the reasons set forth above, this Court can and should reject Plaintiffs' claims under the Establishment Clause without having to apply the legal test of *Lemon,* 403 U.S. 602.  Even if this Court applies the *Lemon* test, however, Governor Doyle's Wisconsin day-of-prayer proclamations should be found constitutional under that test.  The Federal Defendants, in their brief in support of their motion for summary judgment, set forth the reasons for upholding the National Day of Prayer under the *Lemon* test.  Governor Doyle's proclamations should also be upheld under that test for the same reasons.  On this point, Governor Doyle joins in and relies upon the arguments advanced by the Federal Defendants in their brief in support of their motion for summary judgment.

D.   Governor Doyle's Issuance of Wisconsin Day-Of-Prayer Proclamations Does Not Violate the Wisconsin Constitution.

In addition to Plaintiffs' claims under the Establishment Clause of the United States Constitution, the First Amended Complaint also claims that Governor Doyle's issuance of Wisconsin day-of-prayer proclamations violates the Wisconsin Constitution.  *See* First Amended

Complaint, ¶¶ 128 and 130 (Docket #38).  This state-law claim fails on the merits for the same reasons that the federal-law claim fails.

The First Amended Complaint does not identify the part of the Wisconsin Constitution allegedly violated by Governor Doyle's actions, but Governor Doyle assumes that Plaintiffs intend to refer to Wis. Const. art. I, § 18, which reads as follows:

> The right of every person to worship Almighty God according to the dictates of conscience shall never be infringed; nor shall any person be compelled to attend, erect or support any place of worship, or to maintain any ministry, without consent; nor shall any control of, or interference with, the rights of conscience be permitted, or any preference be given by law to any religious establishments or modes of worship; nor shall any money be drawn from the treasury for the benefit of religious societies, or religious or theological seminaries.

The Wisconsin Supreme Court has remarked that "the language of art. I, § 18, while more specific than the terser clauses of the First Amendment, carries the same import . . .; both provisions "are intended and operate to serve the same dual purpose of prohibiting the establishment of religion and protecting the free exercise of religion." *Jackson v. Benson*, 218 Wis. 2d 835, 876-77, 578 N.W.2d 602 (1998) (citations and internal quotation marks omitted).  With regard to free exercise of religion claims, the Wisconsin constitutional provision is not subsumed by the federal First Amendment.  *Id.* at 877 n. 21 (discussing *State v. Miller*, 202 Wis. 2d 56, 549 N.W.2d 235 (1996)).  However, with regard to establishment of religion claims, the Wisconsin Supreme Court interprets Wis. Const. art. I, § 18 in accordance with United States Supreme Court cases interpreting the Establishment Clause.  *Id.* at 877; *King v. Village of Waunakee*, 185 Wis. 2d 25, 54-55, 517 N.W.2d 671 (1994).  Therefore, because Plaintiffs in this case advance establishment of religion claims, those claims fail under the Wisconsin Constitution for the same reasons they fail under the United States Constitution.

CONCLUSION

For the foregoing reasons, Governor Doyle's Motion for Summary Judgment should be granted and judgment should be entered in his favor denying all of the relief requested against him in the First Amended Complaint and granting him such further relief as the Court deems appropriate.

Dated this 9th day of October, 2009.


s/Thomas C. Bellavia
THOMAS C. BELLAVIA
Assistant Attorney General
State Bar #1030182

Attorney for Defendant Governor Jim Doyle

Wisconsin Department of Justice
Post Office Box 7857
Madison, Wisconsin 53707-7857
Telephone:  (608) 266-8690
Fax:  (608) 267-2223
E-mail:  *bellaviatc@doj.state.wi.us*

bellaviatc\cases\misc cases\ffrf v obama\br\2009 10-09 brief.doc