UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

| | | |
|---|---|---|
| FREEDOM FROM RELIGION FOUNDATION, INC., ANNE NICOL GAYLOR, ANNIE LAURIE GAYLOR, PAUL GAYLOR, DAN BARKER, PHYLLIS ROSE, and JILL DEAN, | ) ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Case No. 08-CV-588 |
| PRESIDENT BARACK OBAMA, WHITE HOUSE PRESS SECRETARY ROBERT GIBBS, WISCONSIN GOVERNOR JIM DOYLE, and SHIRLEY DOBSON, CHAIRMAN OF THE NATIONAL DAY OF PRAYER TASK FORCE, | ) ) ) ) ) ) ) ) | |
| Defendants. | ) ) ) | |

**DEFENDANT SHIRLEY DOBSON'S MEMO IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

Alan E. Sears, Esq
Benjamin W. Bull, Esq.
ALLIANCE DEFENSE FUND
15100 N. 90th Street
Scottsdale, Arizona
Tel:  480-444-0020
Fx: 480-444-0025

Joel Oster, KS Bar 18547
Kevin Theriot, KS Bar 21565
ALLIANCE DEFENSE FUND
15192 Rosewood
Leawood, KS 66224
Tel: (913) 685-8000
Fax: (913) 685-8001
joster@telladf.org

COUNSEL FOR DEFENDANT SHIRLEY DOBSON

# TABLE OF CONTENTS

I.    INTRODUCTION ...........................................................................................................1

II.   STATEMENT OF UNDISPUTED FACTS ...................................................................3

III.  STANDARD OF REVIEW ...........................................................................................6

IV.   PLAINTIFFS LACK STANDING ................................................................................6

      A.    Plaintiffs Have Not Suffered An Injury In Fact........................................................6

      B.    FFRF Does Not Have Organizational Standing.....................................................10

      C.    Plaintiffs Lack Standing As Their Injuries Cannot be Redressed..........................13

            1.    Any Relief Directing The President On What He Can Say Would Violate
                  The Separation of Powers Doctrine .........................................................13

            2.    Declaring the Public Law Unconstitutional Would Not Redress Plaintiffs'
                  Alleged Injuries.............................................................................................15

            3.    Declaring Previous Presidential Prayer Proclamations Unconstitutional
                  Will Not Redress Plaintiffs' Alleged Injuries...........................................15

      D.    Plaintiffs' Claims Against Future Prayer Proclamations Are Not Ripe ................16

V.    SHIRLEY DOBSON IS A PRIVATE PERSON AND CANNOT VIOLATE THE
      ESTABLISHMENT CLAUSE ......................................................................................16

VI.   PLAINTIFFS' CLAIMS BASED ON THE PRESIDENTIAL PROCLAMATIONS
      MUST BE DISMISSED AS THE ESTABLISHMENT CLAUSE DOES NOT APPLY
      TO THE PRESIDENT...................................................................................................19

VII.  PRAYER PROCLAMATIONS ARE CONSTITUTIONAL ...........................................21

      A.    *Marsh v. Chambers*...................................................................................................21

      B.    *Marsh* Is Still Controlling Law ...........................................................................24

CONCLUSION.......................................................................................................................27

# TABLE OF AUTHORITIES

**Cases:**

*Americans United for Separation of Church and State v. Prison Fellowship Ministries, Inc.,*
509 F.3d 406 (8th Cir. 2007) ............................................................................................19

*ASARCO, Inc. v. Kadish,*
490 U.S. 605 (1989)............................................................................................................6

*Baker v. Carr,*
369 U.S. 186 (1962)..........................................................................................................11

*Beatty v. Washington Metro Area Transit Authority,*
860 F.2d 1117 (D.C. Cir. 1988)........................................................................................14

*Books v. City of Elkhart,*
235 F.3d 292 (7th Cir. 2000) ..............................................................................................8

*Books v. Elkhart County,*
401 F.3d 857 (7th Cir. 2005) .........................................................................................8,10

*Brentwood Academy v. Tennessee Secondary School Athletic Association,*
531 U.S. 288 (2001).....................................................................................................17,19

*Buckley v. Valeo,*
424 U.S. 1 (1976)..............................................................................................................20

*Community for Creative Non-Violence v. Hess,*
745 F.2d 697 (D.C.Cir.1984) ...........................................................................................15

*Cooper v. United States Postal Service,*
577 F.3d 479 (2nd Cir. 2009)...........................................................................................21

*County of Allegheny v. ACLU Greater Pittsburgh Chapter,*
492 U.S. 573 (1989).......................................................................................................9,25

*Crawford v. Marion County Election Board,*
472 F.3d 949 (7th Cir. 2007) ............................................................................................12

*Doe v. County of Montgomery,*
41 F.3d 1156 (7th Cir. 1994) ..............................................................................................8,9

*Edmonson v. Leesville Concrete Co.,*
500 U.S. 614, 620 (1991)..................................................................................................16

*Engel v. Vitale,*
    370 U.S. 421 (1962)................................................................................20

*Elk Grove Unified School Dist. v. Newdow,*
    542 U.S. 1 (2004)..................................................................20,23,24,26

*Florida State Conference of the NAACP v. Browning,*
    522 F.3d 1153 (11th Cir. 2008) ........................................................13

*Freedom From Religion Foundation, Inc. v. Nicholson,*
    536 F.3d 730 (7th Cir. 2008) ............................................................27

*Freedom From Religion Foundation, Inc. v. City of Green Bay,*
    581 F.Supp.2d 1019 (E.D.Wis. 2008)................................................27

*Freedom From Religion Foundation, Inc. v. Olson,*
    566 F.Supp.2d 980 (D.N.D.,2008)......................................................27

*Frothingham v. Mellon,*
    262 U.S. 447 (1923)..............................................................................7

*Hartford Underwriters Ins. Co. v. Union Planters Bank, N. A.,*
    530 U.S. 1 (2000)................................................................................20

*Havens Realty Corporation v. Coleman,*
    455 U.S. 363 (1982)........................................................................11,12

*Hein v. Freedom from Religion Foundation,*
    551 U.S. 587 (2007)..........................................................7,8,10,13,14,27

*Hinrichs v. Speaker of the House of Representatives of the Indiana General Assembly,*
    506 F.3d 584 (7th Cir. 2007) ..............................................................10

*Lamie v. United States Trustee,*
    540 U.S. 526 (2004)............................................................................20

*Lee v. Wiseman,*
    505 U.S. 577 (1992)............................................................................20

*Lujan v. Defenders of Wildlife,*
    504 U.S. 555 (1992)..........................................................................9,16

*Lynch v. Donnelly,*
    465 U.S. 668 (1984)....................................................................24,25,26

*Marbury v. Madison,*
    1 Cranch 137, 170, 2 L.Ed. 60 (1803) ..............................................................7

*Marsh v. Chambers,*
    463 U.S. 783 (1983)..............................................................................................2,21

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,*
    475 U.S. 574 (1986)...................................................................................................6

*McCreary County, Kentucky v. ACLU of Kentucky,*
    545 U.S. 844 (2005)...................................................................................................9

*McGowan v. Maryland,*
    366 U.S. 420 (1961)................................................................................................20

*National Collegiate Athletic Association ("NCAA") v. Tarkanian,*
    488 U.S. 179 (1988)..........................................................................................17,18

*Park 'N Fly v. Dollar Park & Fly, Inc.,*
    469 U.S. 189 (1985)................................................................................................20

*School Dist. Of Abington Tp., Pa. v. Schempp,*
    374 U.S. 203 (1963)...........................................................................................21,22

*Suhre v. Haywood,*
    131 F.3d 1083 (4th Cir. 1997) .............................................................................9

*Swan v. Clinton,*
    100 F.3d 973 (D.C. Cir. 1996) ............................................................................14

*U.S. v. Fischer,*
    833 F.2d 647 (7th Cir. 1987) ...............................................................................15

*Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.,*
    454 U.S. 464 (1982)....................................................................1,6,7,8,9,12,13

*Van Orden v. Perry,*
    545 U.S. 677 (2005).....................................................................................22,23,24,26

*Wallace v. Jaffree,*
    472 U.S. 38 (1985).......................................................................................20,25,26

*Walz v. Tax Commission of New York,*
    397 U.S. 664 (1970)................................................................................................20

*Whitman v. American Trucking Ass'ns, Inc.*,
    531 U.S. 457 (2001)....................................................................................21

*Whitmore v. Arkansas*,
    495 U.S. 149 (1990)......................................................................................9

## Statutes and Constitutional Provisions:

36 U.S.C. § 119 ..............................................................................................1

U.S. Const. Amend I............................................................................................19

Fed.R.Civ.P. 56(c) ..........................................................................................6

## I.   INTRODUCTION

Plaintiffs lack standing as they have not suffered an injury in fact that was sufficiently concrete and particularized, or that was direct and unwelcome.  Plaintiffs are all members of Freedom from Religion Foundation ("FFRF"), a special interest group that seeks out these proclamations so they can oppose them.  In fact, the co-presidents of FFRF, Plaintiffs Dan Barker and Annie Laurie Gaylor, joined the mailing list of Focus on the Family and regularly monitor the National Day of Prayer Task Force's ("Task Force") website to learn of the offending proclamations.  But mere offense is not enough to confer standing for Article III purposes, and a plaintiff is not allowed to "roam the country [or the internet] in search of governmental wrongdoing" in order to gain standing.  *See Valley Forge Christian College v. Americans United for Separation of Church and State*, 454 U.S. 464, 487 (1982).

In the same way, FFRF lacks organizational standing as none of their members have standing.  Although Plaintiffs try to bootstrap organizational standing because they have spent money and resources combating prayer proclamations, such expenditures do not confer Article III standing.  The alleged wrongdoing of the Defendants only caused psychic harm – being offended by prayer.  If no single person can obtain standing because of being offended by prayer, then a group of offended persons cannot cobble their concerns together to obtain standing.

Plaintiffs also lack standing as their alleged injuries cannot be redressed by a favorable court decision.  Even if this Court were to declare 36 U.S.C. § 119 ("Public Law") unconstitutional, the President can still issue prayer proclamations, as has been done throughout this nation's history.[1]  In addition, the Public Law does not pertain to state governors, and so its repeal would have no bearing on prayer proclamations by Governor Doyle.  And the Court

---

[1] *See* Amici Curiae Opposition of the American Center for Law and Justice, et al., filed in Support of the Defendants' Motions to Dismiss the First Amended Complaint.

cannot enter an injunction on Presidential speech as such an injunction would violate the separation of powers.  Thus, striking down the Public Law will not afford Plaintiffs the relief they request.

Even if Plaintiffs have standing, their claims have no merit.  All claims against Mrs. Dobson must be dismissed as she is not a state actor, but a private person.  By petitioning her government to act in a certain way, she did not become a state actor.  The alleged injurious action here is the issuance of a prayer proclamation.  Even though Mrs. Dobson sent correspondence to government officials requesting that they recognize the National Day of Prayer, this does not turn her into a state actor.

In any event, proclaiming a National Day of Prayer does not violate the Establishment Clause.  This case is controlled by *Marsh v. Chambers*, 463 U.S. 783, 792 (1983), where the Supreme Court held that a legislature can hire a person for the express purpose of giving a prayer for the legislature.  If a legislature can hire a Christian minister to give a prayer for the legislature, then the President and other public officials can surely ask citizens to volunteer to pray in their own respective ways.  The Public Law and the proclamations in this case simply follow the history and traditions of this nation to seek Divine guidance.  No one who understands this nation's history and traditions would think that prayer proclamations are anything other than the "tolerable acknowledgment of beliefs widely held among the people of this country."[2]  And as such, they do not violate the Establishment Clause.

Finally, all claims against Mrs. Dobson based on the presidential proclamations must be dismissed as the Establishment Clause does not apply to the President.  The First Amendment of the U.S. Constitution says "Congress shall make no law respecting the establishment of religion …."  By its very terms, it does not apply to the President.

---

[2] *Marsh*, 463 U.S. at 792.

## II.     STATEMENT OF UNDISPUTED FACTS ("SOF")

1.      Plaintiff Freedom from Religion Foundation, Inc. ("FFRF"), is a non-stock corporation comprised of members who are opposed to government endorsement of religion. Amended Complaint, ¶¶ 4 and 5.

2.      Plaintiff Anne Nicol Gaylor is a lifetime member and president emeriti of FFRF. *Id*. at ¶ 7.

3.      Plaintiff Paul Gaylor is a lifetime member and board member of FFRF.  *Id*. at ¶ 8.

4.      Plaintiff Annie Laurie Gaylor is a lifetime member and co-president of FFRF.  *Id*. at ¶ 9.

5.      Plaintiff Dan Barker is a lifetime member and co-president of FFRF.  *Id*. at ¶ 10.

6.      Plaintiff Phyllis Rose is a lifetime member and Secretary of the FFRF Executive Council.  *Id*. at ¶

7.      Plaintiff Jill Dean is a lifetime member and a board member of FFRF.  *Id*. at ¶

8.      Anne Gaylor claims to have learned about the National Day of Prayer ("NDP") from publicity in the newspapers and television.  Plaintiffs' Responses to Defendants President Barack Obama and Robert L. Gibbs' First Set of Interrogatories ("Plaintiffs' Responses to Federal Interrogatories"), 2.

9.      Annie Laurie Gaylor claims to have learned about the NDP through her work at FFRF, including from her mother (Anne Gaylor), her own investigations, and from those who called the FFRF's office.  *Id*. at 3.

10.     Paul Gaylor claims to have learned about the NDP through the newspapers.  *Id*. at 4.

11.     Dan Barker claims to have learned about the NDP through television.  *Id*.

12.     Phyllis Rose claims to have learned about the NDP from FFRF.  *Id.*

13.     Jill Dean claims to have learned about the NDP through news accounts.  *Id.*

14.     Anne Gaylor claims to have learned about President Bush's 2008 NDP proclamation from her daughter, Annie Laurie Gaylor.  *Id.* at 5.

15.     Annie Laurie Gaylor claims to have learned about President Bush's 2008 NDP proclamation from the Task Force's website, which she claims she routinely monitors.  *Id.* at 6.

16.     Annie Laurie Gaylor also claims to have signed up for the "Focus on the Family" mailing list and receives regular mailings about the Task Force and the NDP.  *Id.*

17.     Paul Gaylor claims to have learned about President Bush's 2008 NDP proclamation through his wife.  *Id.*

18.     Dan Barker claims to have learned about President Bush's 2008 NDP proclamation by monitoring the Task Force's website and via a telephone call from Annie Laurie Gaylor.  *Id.*

19.     Phyllis Rose claims to have learned about President Bush's 2008 NDP proclamation from the FFRF.  *Id.* at 7.

20.     Jill Dean claims to have learned about President Bush's 2008 NDP proclamation as a result of a local Burnett County prayer breakfast controversy.  *Id.*

21.     Anne Gaylor claims to have learned about President Obama's 2009 NDP Proclamation from Annie Laurie Gaylor.  *Id.* at 8.

22.     Annie Laurie Gaylor claims to have learned about President Obama's 2009 NDP Proclamation from the media and then by monitoring the White House website and the Task Force's website.  *Id.*

23.     Paul Gaylor claims to have learned about President Obama's 2009 NDP Proclamation from Anne Gaylor.  *Id.*

24.     Dan Barker claims to have learned about President Obama's 2009 NDP Proclamation through the internet news.  *Id.*

25.     Phyllis Rose claims to have learned about President Obama's 2009 NDP Proclamation from FFRF.  *Id.*

26.     Anne Gaylor claims that she has been injured by the NDP in that it has made her work of separating church and state harder.  *Id.* at 38.

27.     Anne Gaylor also claims that the NDP legislation is a "slap to the face" because she is personally "free from religion."  *Id.*

28.     Paul Gaylor claims that he was injured by the NDP in that he is "personally very offended by public prayer."  *Id.* at 40.

29.     Annie Laurie Gaylor claims that the 1952 law establishing the NDP has made it difficult for the FFRF to "protect the constitutional principle of the separation between church and state."  *Id.* at 41.

30.     Plaintiffs claim to be injured simply by the presidential or gubernatorial requests to pray.  *Id.* at 42.

31.     Shirley Dobson is a private person.  *See* Affidavit of Dave Butts, 1.

32.     She is the Chairman for the National Day of Prayer Task Force ("Task Force").  *Id.*

33.     The Task Force is controlled by and run by the National Prayer Committee ("NPC").  *Id.* at 1-2.

34.     The NPC is made up of eighteen executive council members, and Shirley Dobson is not a member.  *Id*. at 1.

35.     Mrs. Dobson serves as Chairman of the Task Force at the direction and control of the NPC.  *Id*. at 2.

36.     The Task Force employs 10 paid staff to carry out its mission.  Mrs. Dobson is not a paid staff member.  *Id*.

## III.   STANDARD OF REVIEW

Summary judgment is proper where no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). In considering such a motion, the court must view the evidence and draw all reasonable inferences in favor of the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574, 587 (1986). This case is ripe for summary judgment.  There are no disputes of material facts, and Defendants are entitled to judgment as a matter of law.

## IV.   PLAINTIFFS LACK STANDING.

### A.   Plaintiffs Have Not Suffered An Injury In Fact.

Plaintiffs have only alleged generalized grievances that could be shared with the rest of the country – not the specific, concrete harm that is needed to confer Article III standing.  *See ASARCO, Inc. v. Kadish*, 490 U.S. 605, 613 (1989) (plaintiffs do not have standing "to challenge laws of general application where their own injury is not distinct from that suffered in general by other taxpayers or citizens.").  This is because "[t]he judicial power of the United States defined by Art. III is not an unconditional authority to determine the constitutionality of legislative or executive acts."  *Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.*, 454 U.S. 464 (1982).  "The federal courts are not empowered to seek and strike

6

down any governmental act that they deem to be repugnant to the Constitutional.  Rather, federal

courts sit 'solely to decide on the rights of individuals.'"  *Hein v. Freedom From Religion*

*Foundation, Inc.*, 127 S.Ct. 2553, 2562 (2007) (*quoting Marbury v. Madison*, 1 Cranch 137, 170,

2 L.Ed. 60 (1803)).  Federal courts

> have no power *per se* to review and annul acts of Congress on the ground that
> they are unconstitutional.  The question may be considered only when the
> justification for some *direct injury* suffered or threatened, presenting a justiciable
> issue, is made to rest upon such an act.…  The party who invokes the power must
> be able to show not only that the statute is invalid but that he has sustained or is
> immediately in danger of sustaining some *direct injury* as the result of its
> enforcement, and *not merely that he suffers in some indefinite way in common
> with people generally.*

*Frothingham v. Mellon*, 262 U.S. 447 (1923) (emphasis added).

Plaintiffs have not been harmed in any specific way other than they were offended by the

proclamations.  *See* SOF, ¶¶ 26-30; *see also* Plaintiffs' Responses to Federal Interrogatories, 38-

42.  For example, Anne Gaylor claims to be injured by the NDP because it makes her work of

promoting a strict separation of church and state harder.  *See id*. at 38.  Plaintiffs claim that they

do not like the fact that local officials are "misusing their office" to promote prayer.  *Id*. at 39.

Plaintiffs claim that the "NDP law weakens the Establishment Clause."  *Id*.  Plaintiffs are

"discouraged" that the NDP goes on every year because "nothing fails like prayer."  *Id*.  Plaintiff

Paul Gaylor claimed that he is personally "very offended" by prayer due to his childhood.  *Id*. at

40.  Plaintiffs claim that they were injured simply because a president or a governor suggested

they ought to pray.  *Id*. at 42.

The root of Plaintiff's claimed injuries is nothing more than offense to prayer and

religion, which does not confer Article III standing.  *Valley Forge* is directly on-point in that if

the harm the plaintiffs claim is purely psychological offense to the government conduct in

question, then the plaintiffs lack standing.  In *Valley Forge*, the United States gave away land

worth at least $577,500 to a sectarian religious college.  *Id.* at 468.  Like the Plaintiffs in this case, the plaintiffs in *Valley Forge* believed in a strict separation of church and state.  But the Court held that such psychological harm does not confer Article III standing.

> [T]he psychological consequence presumably produced by observation of conduct with which one disagrees … is not an injury sufficient to confer standing under Art. III, even though the disagreement is phrased in constitutional terms. It is evident that respondents are firmly committed to the constitutional principle of separation of church and State, **but standing is not measured by the intensity of the litigant's interest or the fervor of his advocacy.**

*Id.* at 485-86 (emphasis added). *See also Hein*, 127 S.Ct. at 2562 ("The party who invokes the power must be able to show not only that the statute is invalid but that he has sustained or is immediately in danger of sustaining some direct injury as the result of its enforcement, and not merely that he suffers in some indefinite way in common with people generally."). Consequently, it does not matter if the Plaintiffs are *intensely* offended by prayer or religion – the intensity of a litigant's interest of the fervor of his advocacy does not convert an offense into a concrete injury for Article III standing.  *See id.*

The law has not changed since *Valley Forge* was decided – mere psychological offense is still not enough.  *See Books v. City of Elkhart*, 235 F.3d 292 (7th Cir. 2000)(*Books I*); *Books v. Elkhart County*, 401 F.3d 857 (7th Cir. 2005) (*Books II*); and *Doe v. County of Montgomery*, 41 F.3d 1156 (7th Cir. 1994).  In *Books I and II*, the plaintiff claimed injury because he had to *pass* a religious monument on the lawn of a County administrative building in order to conduct civic business.  The court described the injuries as follows: "Books and his fellow plaintiff in our earlier *Books* case alleges that they were forced to come into direct and unwelcome contact with the City of Elkhart's outdoor Ten Commandments monument *when they entered the municipal building to conduct business or attend public meetings and when they visited the adjacent public library*."  *Id.*  Similarly in *Doe*, the plaintiff had to pass under a sign over the courthouse door

that read "THE WORLD NEEDS GOD" every time he entered the courthouse.  *See* 41 F.3d at 1156.  In such cases, "it is enough for standing purposes that a plaintiff allege that he must come into direct and unwelcome contact with the religious display **to participate fully as a citizen and to fulfill legal obligations**."  *Books II*, 401 F.3d at 861 (citations omitted) (emphasis added).  But mere offense is not enough – the plaintiff must come into direct and unwelcome contact with the religious display while the person is trying to participate fully as a citizen and fulfill legal obligations.  *See also See County of Allegheny v. ACLU Greater Pittsburgh Chapter*, 492 U.S. 573 (1989) (person had standing to challenge crèche **in county courthouse**); *McCreary County, Kentucky v. ACLU of Kentucky*, 545 U.S. 844 (2005) (Ten Commandments display in **county courthouse**), and *Suhre v. Haywood*, 131 F.3d 1083 (4th Cir. 1997) (Ten Commandments display in **county courtroom**).

But unlike these cases, the Plaintiffs here do not have to come into direct and unwelcome contact with the proclamations in order to conduct their public business or fulfill their civic obligations.  Rather, the facts show that they sought the proclamations out!  Annie Laurie Gaylor signed up for the Focus on the Family mailing list so she could receive regular news about the NDP.  SOF, ¶16.  Dan Barker regularly monitors the Task Force's website.  SOF, ¶ 18.  All of the Plaintiffs are members of the FFRF, a special interest group that seeks out this information because they are so offended by public religion that they have devoted their lives to fighting it.  SOF, ¶¶ 1-7.

A person does not have standing to challenge a religious display if he only voluntarily *learns* of its existence and is thus offended.  A plaintiff cannot "roam the country" seeking to be offended, and then claim standing based on the offense.  *See Valley Forge,* 454 U.S. at 487; *see also Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560 (1992); *Whitmore v. Arkansas*, 495 U.S.

149, 155 (1990); *Hinrichs v. Speaker of the House of Representatives of the Indiana General Assembly*, 506 F.3d 584 (7th Cir. 2007) (stating that a plaintiff must show that "he has sustained, or is immediately in danger of sustaining some direct injury … and not merely that he suffers in some indefinite way in common with people generally."). A person still has to "come into direct and *unwelcome* contact with the" religious display to participate fully as citizens and to fulfill legal obligations. *Books II*, 401 F.3d at 861 (emphasis added). Plaintiffs contact with the proclamations was not sufficiently direct or unwelcome to confer Article III standing.

Plaintiffs argue that if they are denied standing, then no one would have standing to challenge unconstitutional proclamations that violate the Establishment Clause. This same argument was already rejected in *Hein*. *See* 127 S.Ct. at 2571 (rejecting the argument that if plaintiffs did not have standing to challenge Executive Branch expenditures in violation of the Establishment Clause, then a parade of horribles would occur, and stating that the political process could correct the problem). But furthermore, it is incorrect. If a person were specifically harmed by a proclamation, he or she would have standing. For instance, if a government employee, such as the press secretary, were required to attend a religious ceremony, he or she could claim a specific injury. An employee who was required to write a religious proclamation could claim a constitutional injury. But the general public does not have standing to challenge government action based only on being aware that it occurred, thus causing offense.

### B. FFRF Does Not Have Organizational Standing.

In order to have organizations standing (outside of having members who themselves have standing), the Defendants' actions must still injure the members in some specific way that is not shared by the general population. A review of the cases pertaining to organizational standing

10

shows the differences in the cases where organizational standing has been awarded and this case, where it would not be appropriate.

In *Havens Realty Corporation v. Coleman*, 455 U.S. 363 (1982), individuals and an organization ("HOME") brought suit against the owner of an apartment complex alleging that certain racial steering practices violated the Fair Housing Act.[3]  *Havens* dealt with the standing of three different types of persons.  First, there was an African American "renter plaintiff" who wanted to rent an apartment from Havens, but was falsely told that no apartments were available. *Id*. at 368.  Clearly, this person had standing to sue.  Second, there were "tester plaintiffs" who asked Havens, the owner of the apartment complex, if there were apartments available to rent as a means to test them to see if they were complying with the Act.  The African American testers who were falsely told "no" had standing because, according to the Court, the Act conferred standing on "any person" who was given false information about available housing based on race.  *See id*. at 373.  But the Caucasian testers, who were correctly told there were vacancies, did not have standing because they were not given false information, and thus were not injured. *See id*. at 375.  *Thus, even though the Caucasian testers were aware of illegal activities, this awareness did not confer standing to sue in federal court!*

Third, the Court held that HOME had organizational standing apart from representing its members.  The Court first stated that special rules do not apply for organizational standing. According to the Court, "In determining whether HOME has standing under the Fair Housing Act, we conclude the same inquiry as in the case of an individual: Has the plaintiff 'alleged such a personal stake in the outcome of the controversy' as to warrant his invocation of federal-court jurisdiction."  *Id*. at 378-79 (quoting *Baker v. Carr*, 369 U.S. 186, 204 (1962)).  HOME alleged

---

[3] *Havens* dealt with "standing to sue under the Fair Housing Act of 1968", not standing to bring an Establishment Clause claim.  *See id*. at 366.

that Haven's discriminatory practices impaired its efforts to assist minorities in finding affordable housing. *See id.* at 379. The Court held that this was enough for standing.

> If, as broadly alleged, petitioners' steering practices have perceptibly impaired HOME's ability to provide counseling and referral services for low and moderate-income homekeepers, there can be no question that the organization has suffered injury to the organization's activities-with the consequent drain on the organization's resources-constitutes ***far more than simply a setback to the organization's abstract social interests.***

*Id.* (emphasis added).

So in *Havens*, the complained of action – discriminatory housing practices – had a real impact on people. It denied them a place to live. Persons were being denied housing due to their skin color. HOME had to spend money and resources to counteract these discriminatory actions in finding people housing. Here, FFRF is not trying to counteract discriminatory housing practices and spending money to find people homes who were victims of the discriminatory conduct. Rather, they allege they are being frustrated in their abstract social interest in eliminating the National Day of Prayer. This type of injury does not confer Article III standing. *See Valley Forge*, 454 U.S. at 474.

In *Crawford v. Marion County Election Board*, 472 F.3d 949 (7th Cir. 2007)*,* the Democratic Party challenged a state law that required photo identification to vote. The Democratic Party alleged that the voter ID law would have a disparate impact on lower income voters, and because lower income voters tended to vote for the Democratic candidate, it would have a disparate impact on the Democratic Party. *See id.* at 951. The court thus concluded that "the new law injures the Democratic Party by compelling the party to devote resources to getting to the polls those of its supporters who would otherwise be discouraged by the new law from bothering to vote." *Id. Crawford* is very much like *Havens* in that it dealt with a real, tangible injury – the right to vote. It did not pertain to mere psychic injuries, such as being offended or

the goal of eradicating offensive prayers. *See also Florida State Conference of the NAACP v. Browning*, 522 F.3d 1153 (11TH Cir. 2008) (a political organization had standing to challenge Florida's voter registration statute because it would require the organization to use its scarce time and resources in correcting voter mismatches rather than registering new voters, thus causing them specific injury).

*Havens, Crawford,* and *Browning* show that FFRF does not have standing in this case. Each of those cases dealt with a special interest organization expending money and resources to counteract tangible injuries caused by the governmental action in question. Here, the only money being spent by FFRF is to promote its agenda to be free from *knowing about* the National Day of Prayer. This is purely an abstract social interest and psychic injury. If individual plaintiffs who are offended by the prayer proclamations do not have standing, they cannot cobble their claims together and spend some money to fight the proclamations to manufacture standing.

### C.   Plaintiffs Lack Standing As Their Injuries Cannot be Redressed.

In order to have standing, a plaintiff must not only allege a particularized injury, but also that the injury can be redressed by a favorable court decision. *Valley Forge Christian College*, 454 U.S. at 472. Here, Plaintiffs' requested remedy would not redress their alleged injuries, and further would violate the Separation of Powers Doctrine.

### 1.   *Any Relief Directing The President On What He Can Say Would Violate The Separation of Powers Doctrine.*

In *Hein,* the Supreme Court addressed whether a person has standing to challenge the expenditures of the Executive Branch in violation of the Establishment Clause. Even though *Hein* dealt with tax-payer standing, the Court's response is applicable here as well. The Court stated:

Relaxation of standing requirements is directly related to the expansion of judicial power, and lowering the taxpayer standing bar to permit challenges of purely executive actions would significantly alter the allocation of power at the national level, with a shift away from a democratic form of government.   The rule respondents propose would enlist the federal courts to superintend, at the behest of any federal taxpayer, *the speeches, statements, and myriad daily activities of the President, his staff, and other Executive Branch officials*.   This would be quite at odds with … *Flast's* own promise that it would not transform federal courts into forums for taxpayers' "generalized grievances" about the conduct of government, and would open the Judiciary to an arguable charge of providing government by injunction…. *It would deputize federal courts as virtually continuing monitors of the wisdom and soundness of Executive action, and that, most emphatically, is not the role of the judiciary.*

127 S.Ct. at 2570 (citations omitted)(emphasis added).

Issuing prayer proclamations is not a ministerial duty, but a discretionary function of the presidency.  A ministerial duty is one that admits of no discretion, so that the government official in question has no authority to determine whether or not to perform the duty.  *See Swan v. Clinton*, 100 F.3d 973 (D.C. Cir. 1996).   A duty is discretionary if it involves judgment, planning, or policymaking.  *See Beatty v. Washington Metro Area Transit Authority*, 860 F.2d 1117 (D.C. Cir. 1988).  The facts of this case prove the discretionary nature of presidential prayer proclamations.   There is nothing in the Public Law concerning the content of the proclamations.  The President could issue a proclamation inviting only Christians to pray, all faiths to pray, or those of no faith to pray in their own way through meditation.  Plaintiffs also allege that President Bush aligned himself with Mrs. Dobson, but there is nothing in the Public Law that requires this action, making it ministerial.

But more to the point, the President can issue proclamations with or without Congressional approval.  In fact, many presidents have issued prayer proclamations without Congressional direction.  *See Amici Curiae* Brief of the American Center for Law and Justice, et

14

al., A6-A22. Because the issuance of proclamations is not simply a ministerial function, Courts

do not have the power to enjoin the President in the manner requested by the Plaintiffs.[4]

> **2.    *Declaring the Public Law Unconstitutional Would Not Redress Plaintiffs' Alleged Injuries.***

Plaintiffs allege they have been injured due to Governor Doyle's prayer proclamations

and the Presidential prayer proclamations.  But even if this Court were to strike down the Public

Law, it would not give Plaintiffs any relief.  The Public Law does not pertain to any public

official other than the President.  Thus, it has no bearing whatsoever on Governor Doyle's prayer

proclamations. In addition, even if the Public Law is stricken, the President could still issue

prayer proclamations, as presidents have done throughout our history.     Thus, Plaintiffs lack

standing to challenge the Public Law as they cannot obtain a remedy that would redress their

alleged injuries.

> **3.    *Declaring Previous Presidential Prayer Proclamations Unconstitutional Will Not Redress Plaintiffs' Alleged Injuries.***

Plaintiffs seek a declaratory judgment that previous presidential prayer proclamations are

unconstitutional.   But declaratory judgments, by themselves, do not redress past injuries.

Retrospective declaratory judgments are nothing more than advisory opinions, which a federal

court is prohibited from giving.  *See Community for Creative Non-Violence v. Hess*, 745 F.2d

697, 700-01 (D.C.Cir.1984) ("it is settled that a declaratory judgment is properly denied when

the disputed practice has ended, such as through the repeal of a challenged statute."); *see also*

*U.S. v. Fischer*, 833 F.2d 647 (7th Cir. 1987) ("advisory opinions are forbidden by Article III of

the Constitution and by the Federal Declaratory Judgment Act").

---

[4] In the same way, the Establishment Clause is best viewed as a structural right (similar to the separation of powers doctrine), as compared to an individual right.  *See* Carl Esbeck, *The Establishment Clause As A Structural Restraint On Governmental Power*, 84 Iowa L. Rev. 1 (1998).

**D.     Plaintiffs' Claims Against Future Prayer Proclamations Are Not Ripe.**

In addition, Plaintiffs lack standing to challenge future prayer proclamations as any injuries from such proclamations are highly speculative, and not concrete.  *See Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560-61 (1992) (stating injury must be "concrete and particularized," and "actual or imminent," not "conjectural or hypothetical").  Any alleged injuries are speculative because we do not know what future prayer proclamations, if issued, will say.  The main target of Plaintiffs' Amended Complaint is the supposed adoption of Task Force Themes in prayer proclamations by President Bush.  But President Bush is no longer the president and cannot issue any more prayer proclamations.  Plaintiffs have offered no evidence, and in fact have not even alleged, that President Obama and Mrs. Dobson have acted jointly and in concert concerning the National Day of Prayer.  It would be pure speculation and guesswork to predict any future relationship between President Obama and Mrs. Dobson.  It would require even more speculation to guess what President Obama's future proclamations, if issued, would say.  It very well could encourage Christians, Hindus, Muslims, Jews, Wiccans, and *even Atheists* to pray or meditate in their own way.  Plaintiffs are asking this court to guess what relationship President Obama and Mrs. Dobson will have, and what any prayer proclamation, if one is issued, will say.  Such guess work does not confer Article III standing.

**V.     SHIRLEY DOBSON IS A PRIVATE PERSON AND CANNOT VIOLATE THE ESTABLISHMENT CLAUSE.**

Plaintiffs' claims against Mrs. Dobson must be dismissed as she is a private person, not a state actor.  Although a private person can, under certain rare occasions, be held to be a state actor for purposes of section 1983 liability, this is not such an occasion.

In *Edmonson v. Leesville Concrete Co*., the Supreme Court held that two inquiries were paramount in determining whether a private person should be considered a state actor.  *See* 500

U.S. 614, 620 (1991).  First, does "the claimed constitutional deprivation [ ] result from the exercise of a right or privilege having its source in state authority …."  *Id.*  Second, "whether the private party charged with deprivation could be considered in all fairness a state actor …"  *Id.*

Here, the "source" of the state authority that caused the alleged harm was the President and the Governor who issued official proclamations.  The alleged constitutional deprivation was caused, not by the act of a private individual, but by the act of a governmental official.  *See Brentwood Academy v. Tennessee Secondary School Athletic Association*, 531 U.S. 288, 295 (2001) ("The judicial obligation is not only to 'preserv[e] an area of individual freedom by limiting the reach of federal law and avoi[d] the imposition of responsibility on a State for conduct it could not control,' but also to assure that constitutional standards are invoked 'when it can be said that the state is *responsible* for the specific conduct of which the plaintiff complains.'") (emphasis in original) (citations omitted).

*National Collegiate Athletic Association ("NCAA") v. Tarkanian*, 488 U.S. 179 (1988), is directly on point.  Tarkanian was a high profile basketball coach for the University of Nevada, Las Vegas ("UNLV").  The NCAA was an unincorporated association of public and private universities that adopted rules governing its member institutions' programs for student athletes. *See id*. at 179.  UNLV was a public university that was a member of the NCAA and was Tarkanian's employer.  Based on allegations that Tarkanian violated the NCAA rules, the NCAA investigated his activities and concluded that he did violate the rules on recruiting practices.  The NCAA then ordered that Tarkanian be suspended by UNLV, which it did.  Tarkanian then brought suit against the NCAA claiming it was a state actor, and that its investigation of him violated his Fourteenth Amendment rights to due process.

17

The NCAA defended itself by claiming that it was not a state actor subject to liability under 42 U.S.C. §1983. The theory proposed by Tarkanian is the same theory proposed by the Plaintiffs in this case – that even though the NCAA was a private entity, it should be liable for constitutional violations because it worked jointly with a state actor, UNLV, to cause his injuries. *See id*. at 191. The Supreme Court rejected this argument.

> These contentions fundamentally misconstrue the facts of this case. In the typical case raising a state action issue, a private party has taken the decisive step that caused the harm to the plaintiff, and the question is whether the State was sufficiently involved to treat that decisive conduct as state action. This may occur if the State creates a legal framework governing the conduct, if it delegates its authority to the private actor, or sometimes if it knowingly accepts the benefits derived from unconstitutional behavior. Thus, in the usual case we ask whether the State provided a mantle of authority that enhanced the power of the harm-causing individual actor.

*Id*. at 192 (citations omitted).

The Court held that the "final act" that caused the harm, the suspension, was done not by the NCAA, but by UNLV. *Id*. at 192. Thus, NCAA was not held to be a state actor.

In the same way, the decisive step that caused the alleged harm in this case was the *issuance* of the proclamations, not the petitioning for them to be issued. It does not matter that Mrs. Dobson wanted the proclamations to be issued. It is irrelevant if she actively petitioned her government to issue such proclamations. The bottom line is that even if she did everything that the Plaintiffs claim she did, it does not matter. She did not issue the proclamations. The facts were much worse in *Tarkanian*. There, the NCAA did not simply ask UNLV to suspend its coach. It did it under threat of sanctions! *See id*. at 186. If the NCAA was not considered a state actor when it ordered UNLV to suspend its coach under threat of sanctions, then Mrs. Dobson is not a state actor by simply petitioning and lobbying her government to take a certain course of action.

This case is nowhere close to the facts of the cases where courts have found that a private actor should be considered a state actor.  For example, in *Brentwood Academy,* 531 U.S. at 288, the Court, in a 5-4 decision, held that a high school state interscholastic athletic association ("Association") was a state actor when (1) 84 percent of its member schools were public schools within the state, (2) public school officials made up the voting membership of the Association's governing council and control board, (3) the Association was largely funded by gate receipts received by attendance at public high school games, (4) the Association's staff could join the state retirement system, (5) the State Board of Education had long acknowledged the Association's role in regulating interscholastic competition for public schools, and (6) the State Board of Education's members sat as nonvoting members of the Association's governing bodies. Even with all of these facts, the Association was only found to be a state actor by a narrow 5-4 vote.

In the present case, Mrs. Dobson petitioned her government to take a certain course of action.  There was no intermingling of duties as was evident in *Brentwood Academy.  See also Americans United for Separation of Church and State v. Prison Fellowship Ministries, Inc.*, 509 F.3d 406 (8th Cir. 2007) (private organization deemed to be state actor when it *contracted* with the state to run a prison).

## VI.   PLAINTIFFS' CLAIMS BASED ON THE PRESIDENTIAL PROCLAMATIONS MUST BE DISMISSED AS THE ESTABLISHMENT CLAUSE DOES NOT APPLY TO THE PRESIDENT.

The First Amendment is perfectly clear, "Congress shall make no law respecting the Establishment of religion …"  By its terms, it does not apply to the President.  Surely, the drafters of the First Amendment understood the difference between the President and Congress as they were the ones responsible for creating the three branches of government!

19

The first task in deciphering the meaning of a Constitutional provision is to apply the plain meaning of the text. *See Lamie v. United States Trustee*, 540 U.S. 526 (2004) ("The starting point in discerning congressional intent is the existing statutory text"); *Park 'N Fly v. Dollar Park & Fly, Inc*., 469 U.S. 189, 194 (1985); *Hartford Underwriters Ins. Co. v. Union Planters Bank, N. A.,* 530 U.S. 1, 6 (2000) (stating it is well established that "when the statute's language is plain, the sole function of the courts-at least where the disposition required by the text is not absurd-is to enforce it according to its terms."). The language is clear – the Establishment Clause applies to Congress, not the President.

The Supreme Court agrees that the Establishment Clause was designed to combat *congressional* action. In *McGowan v. Maryland*, the Supreme Court stated: "The purpose of the Establishment Clause was to assure that the *national legislature* would not exert its power in the service of any purely religious end; that it would not, as Virginia and virtually all of the Colonies had done, make of religion, as religion, an object of *legislation*." 366 U.S. 420 (1961) (emphasis added).[5] Not a single decision by the Supreme Court has found the Executive to be bound by the Establishment Clause. Instead, the Court's Establishment Clause jurisprudence has focused on either legislative enactments or, under the incorporation doctrine and through the Fourteenth Amendment, state or local governments. *See*, *e.g., id.* (adjudicating a challenge to state Blue laws).[6]

---

[5] *See also Buckley v. Valeo*, 424 U.S. 1 (1976) ("We have, of course, held that the Religion Clauses "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof" require *Congress*, and the *States* through the Fourteenth Amendment, to remain neutral in matters of religion."); *School Dist. Of Abington Tp., Pa. v. Schempp*, 374 U.S. 203 (1963) ("As we have indicated, the Establishment Clause has been directly considered by this Court eight times in the past score of years and, with only one Justice dissenting on the point, it has consistently held that the clause withdrew all *legislative* power respecting religious belief or the expression thereof.").

[6] *See also Engel v. Vitale*, 370 U.S. 421 (1962) (state public schools); *Walz v. Tax Commission of New York*, 397 U.S. 664 (1970) (city tax system); *Wallace v. Jaffree*, 472 U.S. 38 (1985) (state public schools); *Lee v. Wiseman*, 505 U.S. 577 (1992) (state public schools); *Elk Grove Unified School Dist. v. Newdow*, 542 U.S. 1 (2004) (state public school).

*Cooper v. United States Postal Service*, 577 F.3d 479 (2nd Cir. 2009) did find that an executive agency is bound by the Establishment Clause.  But this decision did not address the threshold question of whether the Clause can be properly applied to a non-legislative entity at all, making its holding inapplicable to this issue.  Further, executive agencies are distinguishable from the Executive himself.  Executive agencies exercise not only executive power but also quasi-legislative power, bringing them within the reasonable scope of the Establishment Clause's limitations.  *See Whitman v. American Trucking Ass'ns, Inc*., 531 U.S. 457, 472 (2001).  But the Executive himself is not Congress, does not possess legislative powers, and is not bound by the Establishment Clause.  Consequently, all claims based on the presidential prayer proclamations must be dismissed, including the claim that Mrs. Dobson acted jointly with the President in the issuance of such proclamations.

## VII.   PRAYER PROCLAMATIONS ARE CONSTITUTIONAL.

### A.  *Marsh v. Chambers*

The legal issues concerning the merits of this case have already been settled by the Supreme Court in a much more difficult case – *Marsh v. Chambers*, 463 U.S. 783, 792 (1983).  In *Marsh*, the Nebraska Legislature asked a single chaplain to pray for its deliberations, and actually paid for such prayers.  The plaintiffs made the same arguments that the Plaintiffs are making here, and argued that seeking prayers for the state violated the Establishment Clause.  *See id*. at 793.  In rejecting this argument, the Court began by looking to this country's history.  Indeed, this nation has enjoyed a long history and tradition of seeking Divine guidance.  In *School Dist. of Abington Township v. Schempp*, 374 U.S. 203 (1963), the Court stated:

> It is true that religion has been closely identified with our history and government .... The fact that the Founding Fathers believed devotedly that there was a God and that the unalienable rights of man were rooted in Him is clearly evidenced in their writings, from the Mayflower Compact to the Constitution itself .... It can be

21

truly said, therefore, that today, as in the beginning, our national life reflects a
religious people who, in the words of Madison, are "earnestly praying, as ... in
duty bound, that the Supreme Lawgiver of the Universe ... guide them into every
measure which may be worthy of his [blessing ... .]"

*Id*. at 212-213.

From George Washington to today, Presidents have issued proclamations asking for
national prayer. *See Van Orden v. Perry*, 545 U.S. 677, 686 (2005) (plurality).  In 1789, both the
House and the Senate passed resolutions asking President George Washington to issue an
exhortation to the nation to pray and be thankful.   They asked President Washington to
"recommend to the people of the United States a day of public thanksgiving and prayer, to be
observed, by acknowledging, with grateful hearts, the many and signal favors of Almighty God."
*See id*. (citing 1 Annals of Cong. 90, 914 (internal quotation marks omitted)).  President
Washington then issued a proclamation setting aside November 26 as a day for the people to
pray to God to give thanks for God's protection and mercy.  In his proclamation, he stated:

> Now, therefore, I do recommend and assign Thursday, the 26th day of November
> next, to be devoted by the people of these States to the service of that great and
> glorious Being who is the beneficent author of all the good that was, that is, or
> that will be; that we may then all unite in rendering unto Him our sincere and
> humble thanks for His kind care and protection of the people of this country
> previous to their becoming a nation; for the signal and manifold mercies and the
> favorable interpositions of His providence in the course and conclusion of the late
> war; for the great degree of tranquility, union, and plenty which we have since
> enjoyed; for the peaceable and rational manner in which we have been enabled to
> establish constitutions of government for our safety and happiness, and
> particularly the national one now lately instituted; for the civil and religious
> liberty with which we are blessed, and the means we have of acquiring and
> diffusing useful knowledge; and, in general, for all the great and various favors
> which He has been pleased to confer upon us.

*Id*. at 687 (citing J. Richardson, Messages and Papers of the Presidents, 1789-1897, p. 64
(1899)).   Almost all of the Presidents since Washington have issued similar Thanksgiving

proclamations.   *See Elk Grove Unified School Dist. v. Newdow*, 542 U.S. 1, 26 (2004)

(Rehnquist, concurring in judgment).

Throughout our history, Presidents have, at critical times, likewise themselves invoked

the name of God. Abraham Lincoln, concluding his masterful Gettysburg Address in 1863, said:

> It is rather for us to be here dedicated to the great task remaining before us – that
> from these honored dead we take increased devotion to that cause for which they
> gave the last full measure of devotion-that we here highly resolve that these dead
> shall not have died in vain-that this nation, under God, shall have a new birth of
> freedom-and that government of the people, by the people, for the people, shall
> not perish from the earth.

*Id.* (quoting 1 Documents of American History 429 (H. Commager ed. 8th ed.1968)).  Lincoln's

second inaugural address, delivered on March 4, 1865, made repeated references to God,

concluding:

> With malice toward none, with charity for all, with firmness in the right as God
> gives us to see the right, let us strive on to finish the work we are in, to bind up
> the nation's wounds, to care for him who shall have borne the battle and for his
> widow and his orphan, to do all which may achieve and cherish a just and lasting
> peace among ourselves and with all nations.

*Id.*

Woodrow Wilson, appearing before Congress on April 1917 to request a declaration of

war against Germany, observed:

> But the right is more precious than peace, and we shall fight for the things which
> we have always carried nearest our hearts – for democracy, for the right of those
> who submit to authority to have a voice in their own Governments, for the rights
> and liberties of small nations, for a universal dominion of right for such a concert
> of free peoples as shall bring peace and safety to all nations and make the world
> itself at last free. To such a task we can dedicate our lives and our fortunes,
> everything that we are and everything that we have, with the pride of those who
> know that the day has come when America is privileged to spend her blood and
> her might for the principles that gave her birth and happiness and the peace
> which she has treasured. God helping her, she can do no other.

*Id.* at 28-29.

Justice Stevens, in his dissent in *Van Orden*, recognized this nation's history of seeking prayers. He said, "Our leaders, when delivering public addresses, often express their blessings simultaneously in the service of God and their constituents.…   In this sense, although Thanksgiving Day proclamations and inaugural speeches undoubtedly seem official, in most circumstances they will not constitute the sort of governmental endorsement of religion at which the separation of church and state is aimed." 545 U.S. at 723 (emphasis added).

Regarding this history, the Court in *Marsh* concluded,

> In light of the unambiguous and unbroken history of more than 200 years, there can be no doubt that the practice of opening legislative sessions with prayer has become part of the fabric of our society. To invoke Divine guidance on a public body entrusted with making the laws is not, in these circumstances, an "establishment" of religion or a step toward establishment; it is simply a tolerable acknowledgment of beliefs widely held among the people of this country.

*Id*. at 792; *see also Elk Grove Unified School Dist.*, 542 U.S. at 26 (Rehnquist, concurring in judgment) ("Examples of patriotic invocations of God and official acknowledgments of religion's role in our Nation's history abound"); *Lynch v. Donnelly*, 465 U.S. 668, 675 (1984) ("Our history is replete with official references to the value and invocation of Divine guidance").

Just as the Nebraska Legislature's practice of hiring a chaplain to open its sessions with prayer did not violate the Establishment Clause, so to the Public Law that merely invites all people to pray for this nation is constitutional.

### B.    *Marsh* **Is Still Controlling Law**

The Supreme Court's Establishment Clause cases since *Marsh* show that *Marsh* is still controlling law in this area.  Whenever a Court majority has addressed *Marsh*, it has defended the decision, even when applying a different Establishment Clause test.  In *Lynch*, the Court recognized the "unbroken history of official acknowledgment by all three branches of government of the role of religion in American life."  465 U.S. at 674.  "[American] history is

24

replete with official references to the value and invocation of Divine guidance in deliberations and pronouncements of the Founding Fathers and contemporary leaders." *Id*. at 675. The Court even referred to the National Day of Prayer as another constitutional acknowledgment of America's religious heritage. *Id.* at 677. The Court concluded,

> This history may help explain why the Court consistently has declined to take a rigid, absolutist view of the Establishment Clause. We have refused to construe the Religion Clauses with a literalness that would undermine the ultimate constitutional objective as illuminated by history. In our modern, complex society whose traditions and constitutional underpinnings rest on and encourage diversity and pluralism in all areas, an absolutist approach in applying the Establishment Clause is simplistic and has been uniformly rejected by the Court.

*Id*. at 678 (citations omitted).

Likewise, the Court in *Allegheny* supported the reasoning in *Marsh* when it stated, "The concurrence [in *Lynch*] … harmonized the result in *Marsh* with the endorsement principle in a rigorous way, explaining that legislative prayer is a [constitutional] form of acknowledgment of religion …." 492 U.S. at 595 n.46 (citations omitted).

Even the creator of the Endorsement test, Justice O'Connor, agreed that government acknowledgments of religion that date to the adoption of the Establishment Clause cannot properly be held to violate it. *See Wallace v. Jaffree*, 472 U.S. 38, 79-80 (1985) (O'Connor, J., concurring). In her concurring opinion in *Lynch*, she rejected the idea that legislative prayer violated the Establishment Clause. *See id*. at 688-90. Justice O'Connor stated that government acknowledgments of religion such as legislative chaplains and Thanksgiving Day proclamations

> serve, in the only ways reasonably possible in our culture, the legitimate secular purposes of solemnizing public occasions, expressing confidence in the future, and encouraging the recognition of what is worthy of appreciation in society. For that reason, and because of their history and ubiquity, those practices are not understood as conveying government approval of particular religious beliefs.

*Id*. at 693 (O'Connor, J., concurring); *see also Wallace v. Jaffree,* 472 U.S. at 79-80 (O'Connor, J., concurring) ("Whatever the provision of the Constitution that is at issue, I continue to believe that fidelity to the notion of constitutional – as opposed to purely judicial – limits on government action requires us to impose a heavy burden on those who claim that practices accepted when [the provision] was adopted are now constitutionally impermissible. …As Justice Holmes once observed, '[i]f a thing has been practiced for two hundred years by common consent, it will need a strong case for the Fourteenth Amendment to affect it.'") (citations omitted).

Specifically referring to the National Day of Prayer proclamations, Justice O'Connor opined that such proclamations would "probably withstand Establishment Clause scrutiny given their long history."  *Id*. at 81 n.6.  Consequently, even if the Endorsement Test were applicable, proclamations to pray easily pass the test.  A reasonable observer, knowing the unique history of prayer proclamations in this country, would not perceive them to be anything more than toleration of religious practices that have been occurring in this nation for over 200 years.  *See also Van Orden*, 545 U.S. at 677 (Justice Breyer Concurring) ("Neither can this Court's other tests readily explain the Establishment Clause's tolerance, for example, of the prayers that open legislative meetings, certain references to, and invocations of, the Deity in the public words of public officials; the public references to God on coins, decrees, and buildings; or the attention paid to the religious objectives of certain holidays, including Thanksgiving."); *id*. at 723 (Stevens, J. dissenting) ("Our leaders, when delivering public addresses, often express their blessings simultaneously in the service of God and their constituents.…  In this sense, although Thanksgiving Day proclamations and inaugural speeches undoubtedly seem official, in most circumstances they will not constitute the sort of governmental endorsement of religion at which the separation of church and state is aimed." ); *Elk Grove Unified School Dist.*, 542 U.S. at 26

(Rehnquist, concurring in judgment) ("Examples of patriotic invocations of God and official acknowledgments of religion's role in our Nation's history abound"); *Lynch*, 465 U.S. at 675 ("Our history is replete with official references to the value and invocation of Divine guidance").

## CONCLUSION

Plaintiff FFRF has been peddling its liberal standing arguments across the country in an effort to eradicate what they deem to be offensive religious expression.   But no court has bought it, including the United States Supreme Court, and this Court should not either.  *See, e.g., Hein v. Freedom from Religion Foundation*, 551 U.S. at 587, *Freedom From Religion Foundation, Inc. v. Nicholson*, 536 F.3d 730 (7th Cir. 2008) (public interest group lacked standing to challenge integration of faith into health care services to veterans); *Freedom From Religion Foundation, Inc. v. City of Green Bay,* 581 F.Supp.2d 1019 (E.D.Wis. 2008) (FFRF lacked standing to challenge display of nativity scene on roof of city hall); *Freedom From Religion Foundation, Inc. v. Olson*, 566 F.Supp.2d 980 (D.N.D. 2008) (plaintiffs lacked standing to challenge use of funds to support religion).

Summary judgment should be granted.   Plaintiffs have not suffered any harm that is concrete or particularized, nor was any contact with prayer proclamations direct or unwelcome. Rather, Plaintiffs' contact with the proclamations was a result of their investigative efforts and the national media. This case is about pure psychic "injuries" resulting from Plaintiffs' intense opposition to prayers and offense to them.  But such cases are not justicable.

Even if Plaintiffs have been injured, such injuries could not be redressed by a favorable court decision.  Courts cannot enjoin the President from asking the nation to pray, which is what Plaintiffs are seeking.  Such an order would violate the Separation of Powers doctrine.

Moreover, Plaintiffs' claims have no merit.  Mrs. Dobson is not a state actor, but a private person.  And Prayer proclamations do not violate the Establishment Clause.  This nation has a long history of issuing prayer proclamations, going back to George Washington's first Thanksgiving Day proclamation.  As such, they are simply a tolerable acknowledgment of this nation's religious history and traditions.

Dated:  October 9, 2009

Respectfully submitted,


|  |  |
|---|---|
| Alan E. Sears, Esq | /s/Joel Oster |
| Benjamin W. Bull, Esq. | Joel Oster, KS Bar 18547 |
| ALLIANCE DEFENSE FUND | Kevin Theriot, KS Bar 21565 |
| 15100 N. 90th Street | ALLIANCE DEFENSE FUND |
| Scottsdale, Arizona | 15192 Rosewood |
| Tel:  480-444-0020 | Leawood, KS 66224 |
| Fx: 480-444-0025 | Tel: (913) 685-8000 |
|  | Fax: (913) 685-8001 |
|  | joster@telladf.org |

COUNSEL FOR DEFENDANT SHIRLEY DOBSON




## CERTIFICATE OF SERVICE

I hereby certify that on October 9, 2009, I electronically filed a copy of the above using the ECF System for the Western District of Wisconsin, which will send notification of that filing to all counsel in this litigation who have entered an appearance, including counsel for plaintiffs.

/s/Joel Oster
Joel Oster