## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF WISCONSIN

---

**FREEDOM FROM RELIGION
FOUNDATION, INC.; ANNE NICOL
GAYLOR; ANNIE LAURIE GAYLOR;
PAUL GAYLOR; DAN BARKER;
PHYLLIS ROSE, and JILL DEAN,**

   **Plaintiffs,**

**v.**   **Case No: 08-CV-588**

**PRESIDENT BARACK OBAMA; WHITE HOUSE
PRESS SECRETARY ROBERT GIBBS; WISCONSIN
GOVERNOR JIM DOYLE; and SHIRLEY DOBSON,
CHAIRMAN OF THE NATIONAL
DAY OF PRAYER TASK FORCE,**

   **Defendants.**

---

## PLAINTIFFS' BRIEF IN OPPOSITION TO
## MOTION FOR SUMMARY JUDGMENT

---

## I.  INTRODUCTION.

  Every year the President of the United States issues an official Prayer Proclamation and dedicates a National Day of Prayer. The President does this because Congress has legislatively mandated that he do so. The President has not hesitated to issue such Prayer Proclamations, which extol the virtues of prayer and exhort all Americans to engage in prayer. This annual message of religious endorsement is then disseminated by the President's Press Secretary with the intent that it will be made known to all Americans.

The posting of the President's Prayer Proclamation on a courthouse door, or mailing it directly to citizens, or handing it out at employment offices, would unquestionably run afoul of the Establishment Clause, just as disseminating it to all citizens merely compounds the offense.  The government, after all, cannot endorse, promote or prefer religion over non-religion, and prayer is quintessentially a religious activity.  For that reason, these plaintiffs have brought this matter to the court challenging the President's endorsement of religion, which the Establishment Clause prohibits.

It is a matter of undisputed fact that the National Day of Prayer is perceived to be and is  recognized as an annual call by the President for Americans to engage in prayer.  It is not a simple acknowledgment of the historical role of religion, but rather, it is an annual exhortation for  all Americans to engage in active prayer.  In fact, in recent years, the President has aligned the National Day of Prayer with blatantly evangelical and fundamentalist Christianity, in a convulsive outpouring of religiosity.  The President's proclamation of this event, constituting explicit government speech, violates the Establishment Clause of the First Amendment to the United States because it is intended to be and perceived as an endorsement of religion, a fact which the defendants to not factually dispute.

Proclamations encouraging all Americans to engage in prayer certainly would not be allowable if posted as a seasonal display before government office buildings.  Presidential Proclamations broadcast across the county are not any less offensive to the Establishment

2

clause. These proclamations, including the 2008 Presidential Proclamation which incorporated recognizably Biblical scripture, are intended as encouragements to pray - - and they are perceived as such. This is no less true of President Obama's 2009 proclamation which "calls upon' American to personally engage in prayer, an inherently religious activity.

The defendants ironically argue that such Presidential Proclamations are immune to challenge because they are distributed to and intended for a national audience. In other words, according to the defendants, proclamations exhorting prayer might be contestable at the neighborhood level, but not when published to all of the citizens as an intended audience, including in the Congressional Record. This argument is not only counterintuitive, but inconsistent with the known historical fact that the National Day of Prayer declared annually by the American President is highly divisive, and not just at the neighborhood level.

Just as courts prohibit the display of religious monuments, creches, menorahs, and Ten Commandments, where a reasonable observer would perceive endorsement, so also these plaintiffs ask the Court to enjoin the annual call to prayer that has been institutionalized by Congress and implemented without discretion by the President with a dedicated National Day of Prayer and official Prayer Proclamations, and celebration of religion. The court has the authority to determine the appearance of endorsement created by a creche or menorah or other religious display; this Court also has the authority and responsibility to examine the propriety of institutionalized exhortations of national prayer required of the President.

The plaintiffs, it should be noted, do not ask the court to determine that Americans

may not pray in their personal lives or attend church to pray; on the contrary the plaintiffs

support both the Free Exercise Clause and the Establishment Clause.  The plaintiffs also are

not seeking to restrain the President from mentioning his or her religious views in public, or

in a speech, or, for example, from ending a speech or remarks with a phrase such as "God

bless America."  The plaintiffs, however, do ask the court to declare unconstitutional the

official dedication of National Days of Prayer and the issuance of official Presidential Prayer

Proclamations that give official government sanction to the endorsement of religion by

exhorting each American to acknowledge and engage in the religious ritual of prayer.  The

plaintiffs only challenge the execution of an egregiously unconstitutional federal law, not

"generalized societal grievances."

     A.    <u>The Defendants Misapprehend The Requirements For Standing</u>.

     The defendants disagree that this Court has the authority to consider the

constitutionality of annual Prayer Proclamations and dedications of a National Day of Prayer.

They imply that the plaintiffs are officious intermeddlers and busybodies, "roaming the

country" for reasons to complain.  The defendants also claim that exposure to the National

Day of Prayer and Presidential Prayer Proclamations is not coercive and no one is forced to

engage in prayer.  Unlike the posting of the Ten Commandments in a courthouse, therefore,

they contend that no one has "unwanted and unwelcome" exposure to Presidential Prayer

Proclamations encouraging the citizenry to take action.  The defendants, instead, apparently

believe that the plaintiffs should merely close their eyes and cover their ears; the plaintiffs

should just ignore the official exhortations of their government which cause much sincere distress and feelings of exclusion detailed by the plaintiffs.

No one has standing to question the dedication of a National Day of Prayer and the issuance of Prayer Proclamations, by the defendants' reasoning. Whether constitutional or not, the defendants insinuate that no one can challenge the dedication of a National Day of Prayer and the issuance of Prayer Proclamations by the President, except perhaps the media itself.

The defendants' argument, however, misperceives the nature of a Presidential Prayer Proclamation and the dedication of a National Day of Prayer. The plaintiffs are an intended part of the audience at which such governmental speech is directed. The intended audience for a Prayer Proclamation is broader than the intended audience for a local nativity scene, and these plaintiffs are part of the President's intended audience, but they are differentially affected because they are non-believers.

The plaintiffs are not obligated to meekly avert their eyes and cover their ears when the government disseminates objectionable speech, which unlike private speech, may not endorse religion. The defendants' argument suggests that these individual plaintiffs are obligated to forego being informed so as to avoid objectionable speech, but as this Court is aware, an informed Citizenry is a duty and it is a strength of our nation.

The Establishment Clause does not require forced or coercive exposure to religious endorsement. Coercion is not the touchstone of the Establishment Clause, which prohibits

governmental endorsement of religion over non-religion - - even if done secretly.  The expectation that nonbelievers should merely ignore or avoid objectionable governmental speech does not prevent the offense.  On the contrary, the defendants' expectation compounds the offense by emphasizing that religious believers are favored, while non-believers are political outsiders.

The defendants do not recognize their own deafness to the offence caused by extolling prayer, while exhorting each citizen to "reaffirm in a dramatic manner the deep religious conviction which has prevailed throughout the history of the United States."  Not all Americans believe in God - - or even believe that religion is a useful and beneficent force in the affairs of men and nations.  As Justice Black stated in his dissent in *Zorach v. Clauson*, 343 U.S. 306, 318-19 (1952) (Black, J., dissenting):

> It was precisely because Eighteenth Century Americans were a religious people divided into many fighting sects that we were given the Constitutional mandate to keep Church and State completely separate. Colonial history had already shown that, here as elsewhere, zealous sectarians entrusted with governmental power to further their causes would sometimes torture, maim, and kill those they branded "heretics," "atheists," or "agnostics."  The First Amendment was therefore to ensure that no one powerful sect or combination of sects could use political or governmental power to punish dissenters whom they could not convert to their faith.  Now, as then, it is only by wholly isolating the state from the religious sphere and compelling it to be completely neutral, that the freedom of each and every denomination and of all non-believers can be maintained.

Thomas Jefferson also recognized that belief in the existence of God is not a prescription for virtue and comfort.  In Jefferson's letter to his nephew, Peter Carr, written

from Paris on August 10, 1787, Jefferson famously observed:

> Question with boldness even the existence of a God; because, if there be one, he must more approve of the homage of reason than that of blindfolded fear . . . Do not be frightened from this inquiry by any fear of its consequences.  If it ends in a belief that there is no God, you will find inducements to virtue in the comfort and pleasantness you feel in its exercise, and the love of others which it will procure you.

The exhortations of an official National Day of Prayer are not based on the intrinsic utility of religion, just as they are not justified by the presumed numerical insignificance of non-believers.  On the contrary, religious identification surveys indicate that at least 15%, or 34 million adult Americans, are now non-religious.  Less than 70% of Americans believe in a traditional theological concept of a personal God.  The non-religious are the fastest-growing segment of the U.S. population, according to American Religious Identification Surveys.  While it may be true that many American are religious in their personal lives, moreover, "we do not count heads before enforcing the Establishment Clause."

The individual plaintiffs in this suit do have standing to object to government speech directed at them.  The Freedom From Religion Foundation also has standing in its representative and organizational capacity based upon the impediment to accomplishing FFRF's organizational goal to ensure the constitutionally-required separation of church and state.

B.    The Defendants Misconstrue The Essence of Prayer Proclamations.

The defendants' argument that Presidential Prayer Proclamations are *per se* constitutional, in any form or permutation, distorts the role of the Court in determining

7

whether government speech gives the appearance of religious endorsement. The defendants ignore that governmental speech may convey improper support for religion depending upon history, content and context. They also brush aside that circumstances may change over time. Pleasant Grove v. Summum, 129 S. Ct. 1125, 1137 (2009). Government speech, moreover, is by no means, free of restraint; most important, "all government speech must comport with the Establishment Clause." Id. Legislative invocations, therefore, are not *per se* constitutional under the Establishment Clause, depending upon context and content. Similarly, a public nativity scene may or may not violate the Establishment Clause, again depending upon the particular display's history and context. Posting the Ten Commandments on government property also may or may not violate the Establishment Clause prohibition on religious endorsement. The same is true of Presidential Prayer Proclamations.

The defendants' suggestion that the Court abdicate any role in evaluating the Presidential Prayer Proclamations and dedication of National Prayer Days is unsupported by precedent, including by the Supreme Court. "It is emphatically the province and duty of the judicial department to say what the law is." Marbury v. Madison, 5 U.S. 137 (1803.) Although the defendants suggest that the Supreme Court has already determined the constitutionality of Presidential Prayer Proclamations, that is not true. The Supreme Court's prior references to Prayer Proclamations do not answer the question now before this Court, which question cannot be determined in the abstract. The defendants also indulge and perpetuate historical inaccuracies in defending the National Day of Prayer, which is neither

8

ubiquitous, nor without controversy and divisiveness.

The defendants ignore the legislative intent behind Congress' direction that annual Prayer Days be dedicated by the President.  They misunderstand and distort the history of the Establishment Clause and the separation of church and state.  The defendants also ignore the context and content of Prayer Day Proclamations and Dedications, in which the President has previously aligned with the National Day of Prayer Task Force, a messianic evangelical organization.  The alignment with the NDP Task Force provides content and context for Presidential Prayer Proclamations, which is relevant to the application of the reasonable observer test for determining improper endorsement.

The defendants incorrectly invite this Court to rule as a matter of law, that Presidential Prayer Day Proclamations inherently comply with the Establishment Clause.  No judicial authority supports the proposition that governmental speech, such as Prayer Day Proclamations, is *per se* constitutional under the Establishment Clause in all circumstances. Official dedications of a National Day of Prayer and Presidential Prayer Proclamations do not constitute mere ceremonial deism if they indicate to a reasonable observer that a preference for religion is being communicated. Ceremonial deism and "ubiquitous" practices are tolerated under the Establishment Clause only where no religious endorsement occurs. Here, the purpose and effect of National Prayer Day Proclamations are precisely the opposite; they intentionally encourage and promote active participation in religious practices.

## II.     STATEMENT OF FACTS.

### A.     <u>Presidential Day of Prayer Proclamations Exhort Prayer and Launch a National Religious Celebration</u>.

National Day of Prayer proclamations by the President routinely include explicit exhortations to pray.  (Ex. 10 at 4-27.)[1]

In fact, National Day of Prayer Proclamations by President Bush in 2008 and 2001 expressly included an annual theme and supporting scriptural reference provided by the NDP Task Force, a fundamentalist evangelical organization dedicated to promoting a blatantly conservative Christian viewpoint.  (Ex. 10 at 1-3.)

These Presidential National Day of Prayer Proclamations are released for public distribution by the Office of the Press Secretary, including in 2008 and 2009 by the press secretaries for presidents Bush and Obama.  (Ex. 12 at 1-3.)

President Obama's own Proclamation concluded with a "call upon Americans to pray in thanksgiving for our freedoms and blessings and to ask for God's continued guidance, grace, and protection for this land that we love."  (Ex. 12 at 2-3.)

All state governors also issued National Day of Prayer Proclamations in 2009, including proclamations from the Governor's of Arkansas, Florida, Iowa, Idaho, Indiana, Kentucky, Louisiana, Massachusetts, Mississippi, Nebraska, New Mexico, South Dakota, Texas, Utah, Virginia and Wyoming, which included references to the NDP Task Force annual theme and supporting scripture.  (Ex. 3 at 1-17.)

---

[1]   Record cites are to Exhibits submitted with Bolton Affidavit.

All state governors also issued National Day of Prayer Proclamations in 2008, including proclamations by the governor's of Colorado, Florida, Idaho, Illinois, Indiana, Kentucky, Louisiana, Massachusetts, Missouri, Nebraska, New Jersey, Utah, Virginia and Wyoming, which proclamations included the NDP Task Force annual theme and supporting scripture. (Ex. 4 at 1-14.)

All state governors likewise issued National Day of Prayer Proclamations in 2007, including proclamations by the governor's of Colorado, Florida, Hawaii, Idaho, Illinois, Indiana, Iowa, Kentucky, Massachusetts, Nebraska, Utah, Virginia and Wyoming, which included the NDP Task Force annual theme and supporting scripture. (Ex. 5 at 1-16.)

All state governors issued National Day of Prayer Proclamations in 2006, including proclamations by the governor's of Arkansas, Colorado, Florida, Idaho, Illinois, Indiana, Louisiana, Nebraska, Utah, Wisconsin and Wyoming which included the NDP Task Force annual theme and supporting scripture. (Ex. 6 at 11.)

All state governor's issued National Day of Prayer Proclamations in 2005, including proclamations by the governor's of Arkansas, Colorado, Florida, Idaho, Illinois, Indiana, Kentucky, Louisiana, Massachusetts, Missouri, Nebraska, North Carolina, Texas, Utah, Virginia and Wisconsin, which included the NDP Task Force annual theme and supporting scripture. (Ex. 7 at 1-17.)

All state governors issued National Day of Prayer Proclamations in 2004, including proclamations by the governors of Arkansas, Colorado, Florida, Idaho, Illinois, Louisiana,

11

Massachusetts, Missouri, Nebraska, New York, North Carolina, Texas, Virginia, Wisconsin and Wyoming, which included the NDP Task Force annual theme and supporting scripture. (Ex. 8 at 1-15.)

Annual National Day of Prayer Proclamations by Wisconsin Governor James Doyle for 2004-2009 included the NDP Task Force annual theme and/or scriptural reference. (Ex. 11 at 1-6.)

The Official Presidential Proclamation issued by the White House is the starting point for the National Day of Prayer; it is an integral part of the yearly national observance. (Ex. 13 at 1.)

The President's support for the National Day of Prayer serves a crucial role in calling Americans to prayer. (Ex. 14 at 1.)

Presidential proclamations advance the cause of prayer and they inspire others to get involved. (Ex. 15 at 2.)

B.   The President's National Day of Prayer Proclamations Is Critical to the Credibility of the Occasion.

Groups like the NDP Task Force consider it especially vital to enlist the support and affirmation of national leaders, as well as proclamations by state governors. (Ex. 16 at 1.)

The NDP Task Force, in fact, provides draft proclamations for the President to consider. (Ex. 14 at 1-2.)

The NDP Task Force annually solicits proclamations from the President, which

are then read by 40,000 Task Force Coordinators at events around the country, and the Presidential Declarations "underscore the need for corporate and personal intercession [that] will lend tremendous prestige and credibility to these gatherings." (Ex. 15 at 1.)

The NDP Task Force considers it "critical" to garner the support of our nation's leaders for the NDP efforts, including by obtaining the written proclamations from governors. (Ex. 17 at 1.)

Active participation by governors in National Day of Prayer observances also is sought, preferably to occur on the steps of the state capital buildings. (Exs. 17-20.)

The NDP Task Force, led by Mrs. Shirley Dobson, writes to each state governor on an annual basis requesting a Prayer Proclamation, while referencing the NDP Task Force annual theme and supporting scriptural reference. (Exs. 21-24.)

The resulting support for the National Day of Prayer by governors helps further efforts to call the nation to prayer. (Ex. 24 at 1.)

The NDP Task Force also seeks annual participation by federal officials in its Cannon Office Building observance of the National Day of Prayer. (Exs. 25-39.)

The Cannon Office Building observance by the NDP Task Force is symbolic of thousands of others that take place throughout the country, and overflow crowds each year fill the Cannon Caucus Room and adjoining hallways. (Ex. 25 at 5.)

Participation in NDP Task Force observances of the National Day of Prayer by federal officials is viewed as "partnering in calling the nation to prayer." (Ex. 25 at 4.)

13

The NDP Task Force values the participation of such leaders and dignitaries in National Day of Prayer activities.  (Exs. 25-39.)

Official statements from the President and governors constitute statements of support of the NDP Task Force observance.  (Ex. 29 at 1.)

The Presidential Proclamation is the linchpin, however, as an important symbol and affirmation of the annual National Day of Prayer observance, which the NDP Task Force incorporates into its promotional materials.  (Ex. 30 at 1.)

The National Day of Prayer is seen as a memorial to our nation's supposed Christian heritage.  (Exs. 33-34.)

C.  Conservative Religious Groups Have Hijacked the Government's Endorsement for Themselves.

The National Day of Prayer Task Force considers "foundational to our country the understanding that God is the Source of freedom," including the Christian God of the Bible. (Ex. 35 at 1.)

A tremendous outpouring of prayer and repentance allegedly encompasses the nation at the time of the National Day of Prayer, as hands join together to cry out to God and hearts are allegedly changed and hope restored.  (Ex. 36 at 1.)

The NDP Task Force hopes that its annual theme and supporting scripture will draw Americans closer to God.  (Ex. 37 at 1.)

The NDP Task Force desires that its annual theme and supporting scripture be incorporated into official proclamations by government officials.  (Exs. 25-39.)

14

The NDP Task Force also holds a prayer service in the Caucus Room of the Cannon Office Building each year on the National Day of Prayer, which service is attended by many federal officials.  (Exs. 25-28, 31, 33-39, and 41-43.)

The mission of the National Day of Prayer Task Force is to encourage personal repentance and prayer, while mobilizing the Christian community.  (Ex. 44 at 1.)

The National Day of Prayer Task Force was created by the National Prayer Committee for the express purpose of organizing and promoting prayer observances conforming to a Judeo-Christian system of values.  (Ex. 44 at 1.)

The National Prayer Committee provides "collective servant leadership to the National Prayer Movement."  (Ex. 51 at 1.)

According to the National Prayer Committee, the National Day of Prayer itself was established by an Act of Congress to encourage Americans to pray for our nation, its people and its leaders.  (Ex. 57 at 2.)

The National Day of Prayer Task Force now promotes the National Day of Prayer as a means to encourage prayer.

The NDP Task Force represents a conservative Judeo-Christian expression of the national observance, based on the belief that this country was birthed in prayer and in reverence for the God of the Bible.  (Ex. 44 at 1.)

The NDP Task Force believes that for true Christians, prayer is communion with God, through which individuals actually experience a relationship with God.  (Ex. 47 at 1.)

15

The NDP Task Force limits participation by coordinators and volunteers to persons holding a Judeo-Christian perspective.  (Ex. 44 at 1.)

      D.     <u>National Day of Prayer Legislation was Motivated by Religious Intent</u>.

The National Prayer Committee and the first NDP Task Force Chairman, Vonette Bright, actually led the efforts leading in 1988 to President Reagan signing into law the requirement that the first Thursday in May of each year be designated the National Day of prayer. (Ex. 60 at 1.)

Before 1988, the President unpredictably called the nation to a day of prayer each year, as required by 1952 Legislation.  (Ex. 60 at 1.)

In January 1983, President Reagan declared May 5 a National Day of Prayer, in an effort to "bring renewed respect for God."  (Ex. 58 at 1.)

The initial impetus for legislation requiring an annual National Day of Prayer came from the Reverend Billy Graham, who promoted it in the midst of a crusade in the nation's Capital in 1952.  (Ex. 55 at 1 and Ex. 56 at 2.)

The 1952 resolution mandating an annual National Day of Prayer was described as a measure against "the corrosive forces of communism which seeks simultaneously to destroy our democratic way of life and the faith in an Almighty God on which it is placed."  (Ex. 55 at 1 and Ex. 56 at 2.)

The Statement of the Judiciary Committee in 1952, in considering National Day of Prayer legislation, further stated that "it would certainly be appropriate if, pursuant to this

16

resolution and the proclamation it urges, the people of this country were to unite in a day of prayer each year, each in accordance with his own religious faith, thus reaffirming in a dramatic manner the deep religious conviction which has prevailed throughout the history of the United States."  (Ex. 53 at 1.)

Contemporaneous reporting of President Truman's signing of the Prayer Day Bill, in the New York Times on April 18, 1952, indicated that "the purpose of the resolution is to have the public assemble in churches, synagogues, and other places of worship to offer prayers for world peace."  (Ex. 54 at 1.)

The subsequent change in the law in 1988, to designate a predictable Day of Prayer, on the first Thursday in May, facilitated efforts by the National Day of Prayer Task Force to organize prayer observances.  (Ex. 2 at 40-41.)

     E.    <u>The NDP Task Force Promotes a Very Conservative Christian Agenda</u>.

Shirley Dobson is the chairperson of the NDP Task Force, and her husband is the founder and head of Focus on the Family.  (Ex. 66 at 4.)

The NDP Task Force directs its events to those Judeo-Christians who agree with the Lausanne Covenant, which was adopted by fundamentalists and other Evangelical Protestants from over 150 nations during the International Congress on World Evangelization at Lausanne, Switzerland in 1974.  (Ex. 50 at 3.)

The Lausanne Covenant includes such beliefs as the inspiration and inerrancy of the Bible, the Trinity, the Second Coming of Jesus Christ, the Anti-Christ, etc.  (Ex. 50 at 3 and

66 at 4-5.)

The adherence of the NDP Task Force to the Lausanne Covenant has the effect of excluding even traditional Jewish groups, or any other non-Christian organization or inter-faith groups.  (Ex. 50 at 3 and Ex. 66 at 5.)

The NDP Task Force, in effect, is an exclusively Evangelical Christian non-profit organization recognizing only those NDP events which are organized by Evangelical groups. (Ex. 50 at 3.)

F.     Support By Public Officials for the National Day of prayer Is Important and Pressured.

Today millions of individuals participate in the National Day of Prayer observances. (Ex. 62.)

Wikipedia describes the National Day of prayer as a day "designated by the United States Congress when People are asked to come together and pray, especially for their country."  (Ex. 56 at 1.)

Participation in NDP Task Force observances by public officials is noteworthy, and the total participation in such observances numbers in the millions.  (Ex. 49 and 61-62.)

The National Day of Prayer Task Force considers it significant that all fifty governors issue National Day of Prayer Proclamations.  (Ex. 61 at 1.)

The State National Day of Prayer proclamations acknowledge, though, the federal designation of the Day of Prayer by Congress and the President in their own proclamations. (Exs. 3-9.)

18

Pressure is put on governors to issue such proclamations, including in 2007 when pressure was put on New York Governor Eliot Spitzer to issue a National Day of Prayer proclamation.  (Ex. 64 at 1-6)

James Dobson, head of Focus on the Family, and husband of Shirley Dobson, Chairman of the National Day of Prayer Task Force, was instrumental in publicly pressuring Governor Spitzer to issue a National Day of Prayer Proclamation.

Minnesota Governor Jesse Ventura also was criticized in 1999 for refusing to issue a National Day of Prayer Proclamation.  (Ex. 65 at 1.)

This year, President Obama announced in advance that he would release a Presidential Proclamation declaring May 7, 2009, to be the National Day of Prayer.  (Ex. 96 at 1.)

For his part, President Bush, in his National Day of Prayer public comments, lauded the Dobson's and the National Day of Prayer Task Force and promoted the role of prayer at exclusive annual National Day of Prayer prayer observances in the East Room of the White House.  (Ex. 63 at 1-4.)

G       The National Day of Prayer is Divisive.

The National Day of Prayer, however, is highly divisive, amid concerns that it has been hijacked by fundamentalist Christians, including the NDP Task Force.  (Exs. 66-92.)

The participation of public officials in National Day of Prayer observances, including at public government buildings in Washington D.C., and State Capital buildings throughout the nation, fuel the perception that the National Day of Prayer is intended to promote and

19

encourage religion.  (Exs. 66-92.)

The NDP Task Force, in fact, seeks generous contributions to extend its efforts to bring the name of Christ out from behind church walls and into the public front-lines in all fifty states.  (Ex. 52 at 1.)

The Alliance Defense Fund also is using the present law suit challenging the National Day of Prayer as a vehicle to solicit donations, including by a video presentation.  (Ex. 94 at 1.)

Nonbelievers, however, are reported to represent a very significant part of the American population, constituting approximately 15 percent or thirty-four million Americans, in a recent definitive American Religious Identification Survey.  (Ex. 97.)

The nonreligious are the fastest-growing segment of the United States population. (Ex. 97.)

H.    <u>Shirley Dobson Testimony Shows that the National Day of Prayer is Premised on Government Endorsement of Religion</u>.

Shirley Dobson has been the chairman of the NDP Task Force since 1991.  (Ex. 2 at 1.)

Mrs. Dobson admits that one of the goals of the NDP Task Force is to encourage prayer.  (Exhibit 2 at 2.)

Focus on the Family provided start-up money for the NDP Task Force.  (Exhibit 2 at 6.)

The purpose of the NDP Task Force is to promote and encourage the role of prayer,

20

mobilizing around the National Day of Prayer.  (Ex. 2 at 10-11.)

According to Mrs. Dobson, the United States was founded on the Judeo-Christian system of values, and birthed in prayer, and founded on the God of the Bible.  (Ex. 2 at 11-12.)

The NDP Task Force promotes a Judeo-Christian expression of the National Day of Prayer.  (Ex. 2 at 13.)

The National Day of Prayer legislation passed by Congress is an encouragement for the American people of all faiths to pray.  (Ex. 2 at 16.)

It is beneficial to the NDP Task Force that government officials participate in the National Day of Prayer activities.  (Ex. 2 at 24-25.)

The NDP Task Force annually writes to each governor requesting a National Day of Prayer Proclamation.  (Ex. 2 at 27.)

The NDP Task Force requests state governors to designate the same day as the day set aside by the President for the National Day of Prayer.  (Ex. 2 at 39.)

The 1988 legislation making the first Thursday in May the National Day of Prayer facilitated mobilizing support for the National Day of Prayer by creating predictability.  (Ex. 2 at 40-41.)

Vonette Bright, the first chairman of the NDP Task Force, was involved in promoting legislation in 1988 for a specific National Day of Prayer designation in May.  (Ex. 2 at 42-44.)

Mrs. Dobson is the voice and the face of the NDP Task Force.  (Ex. 2 at 46.)

The NDP Task Force is a project of the National Prayer Committee, the purpose of which is to mobilize prayer.  (Exhibit 2 at 48-49.)

The current budget of the NDP Task Force is about $1.2 million.  (Ex. 2 at 65.)

Mrs. Dobson's husband, James Dobson, as head of Focus on the Family, put pressure on New York Governor Eliot Spitzer to issue a National Day of Prayer proclamation in 2007.  (Ex. 2 at 74-80.)

The NDP Task Force chooses an annual theme for each year's National Day of Prayer.  (Ex. 2 at 82.)

The NDP Task Force's annual theme and supporting scripture is selected by Mrs. Dobson after praying to the Lord.  (Ex. 2 at 83.)

The supporting scripture for each National Day of Prayer theme is exclusively chosen from the Bible, which source is readily recognizable.  (Ex. 2 at 84-85.)

The NDP Task Force includes reference to its annual theme and supporting scripture in letters sent to each governor requesting a proclamation.  (Ex. 2 at 85-86.)

The NDP Task Force considers it desirable if governors incorporate the NDP Task Force's annual theme and scriptural reference in their official proclamations.  (Ex. at 86.)

The National Day of Prayer is a rallying point for the NDP Task Force in focusing on prayer for the country.  (Ex. 2 at 92.)

The National Day of Prayer is a day set aside by Congress for prayer.  (Ex. 2 at 93.)

Prayer from the perspective from the NDP Task Force is related to the relationship with the God of the Bible.  (Ex. 2 at 95-96.)

The Judeo-Christian expression of the National Day of Prayer involves praying to the God of the Bible.  (Ex. 2 at 99.)

Mrs. Dobson has attended ten White House prayer services for the National Day of Prayer and she has spoken at eight of these events.  (Ex. 2 at 108 and 110.)

The NDP Task Force also holds a prayer gathering at the Cannon Office Building on the National Day of Prayer.  (Ex. 2 at 113.)

The Cannon Office Building observance is conducted as a prayer service by the NDP Task Force.  (Ex. 2 at 116.)

Mrs. Dobson would like for the President to encourage prayer and she believes that Congress encourages prayer by designating a National Day of Prayer.  (Ex. 2 at 123-124.)

Mrs. Dobson was pleased with the National Day of Prayer proclamation issued by President Obama, which did encourage people to pray.  (Ex. 2 at 136.)

It is important that the President sign a proclamation because he is the leader of the nation and many people look to the President as the moral and spiritual leader of the country, and since Congress has set aside the National Day of Prayer, and because the President is the leader of the American people, the NDP Task Force likes to see the President encourage people of all faiths to pray.  (Ex. 2 at 137-138.)

Mrs. Dobson understands the National Day of Prayer to be about calling Americans

to come before Almighty God.  (Ex. 2 at 159-160.)

National Day of Prayer proclamations by state governors lend support to the National Day of Prayer.  (Ex. 2 at 160-161.)

Support by the nation's leaders is critical to the NDP Task Force's efforts.  (Ex. 2 at 163.)

People look to their leaders in giving them direction, so it is critical that the leaders support the National Day of Prayer because they are role models to their people.  (Ex. 2 at 163-164.)

The NDP Task Force hopes that leaders of the country will call the nation to prayer, including by issuing proclamations.  (Ex. 2 at 166.)

An integral part of the yearly national observance of the National Day of Prayer is the official presidential proclamation, which is very important to groups like the NDP Task Force.  (Ex. 2 at 172-173.)

The annual theme and supporting scripture of the NDP Task Force is readily recognized by the Task Force's constituency as coming from a Judeo-Christian background.  (Ex. 2 at 204.)

Having a designated day of prayer, as adopted in 1988, was important to people of faith who wanted to have a day that they could predictably know was going to be a day of prayer, instead of just leaving it up to the President to choose.  (Ex. 2 at 250.)

24

I.   <u>The Plaintiffs Have Had Exposure to Presidential Proclamations, Which Have Caused Particularized Harm Which FFRF Has Long Opposed.</u>
.

The Plaintiff, Anne Gaylor, learned about the National Day of Prayer from publicity in newspapers and/or on television, making it pretty hard to avoid knowing about the National Day of Prayer.  (Ex. 1 at 2.)

Anne Gaylor also knew about the National Day of Prayer from complaints by members who phoned FFRF when they picked up on violations of the separation of church and state.  (Ex. 1 at 2.).

The National Day of Prayer was and is truly shocking to Anne Gaylor, who grew up at time when state/church separation was really respected.  One did not expect to find people praying in government meetings or on government property, much less telling people to pray, according to Ms. Gaylor.  (Ex. 1 at 2-3.)

Annie Laurie Gaylor has known and been concerned about the National Day of Prayer since at least shortly after 1976 (if not before), when she, at age 21, with her mother Anne Gaylor, co-founded the Freedom From Religion Foundation as a regional group dedicated to work for state/church separation in Madison, Wisconsin.  (Ex. 1 at 3.)

Annie Laurie Gaylor has served as a volunteer, an officer, a Board Member, and/or staff member since the group went national in 1978, and she became Co-President in 2004. (Ex. 1 at 3.)

Annie Laurie Gaylor joined the staff as editor of FFRF's newspaper, in 1985. Freethought Today not only reports on FFRF actions but chronicles state/church violations

around the country, as well as the views and activism of FFRF membership toward prayer, religion and religion in government.  (Ex. 1 at 3.)

Annie Laurie Gaylor has regularly reported on the National Day of Prayer, federal, state or local incidents, as well as reporting on activism by members over the National Day of Prayer and government-sponsored prayer.  She has also highlighted violations in articles she has written or edited.  (Ex. 1 at 3.)

FFRF exists to correct violations of the separation between church and state, so it hears complaints about violations yearly, says Annie Laurie Gaylor.  (Ex. 1 at 3.)

FFRF's office has received phone calls about violations each year since at least 1978. Since 1988, after the change in the law making the first Thursday in May the annual National Day of Prayer, complaints by members have increased.  (Ex. 1 at 3.)

The complaints FFRF receives each year about the National Day of Prayer have made Annie Laurie Gaylor very aware of how much division and controversy the proclamations create, and how so many FFRF members have wished FFRF to take action against the practice.  (Ex. 1 at 3.)

FFRF members and members of the public are in continual contact with the FFRF office over countless violations of the Establishment Clause. Prominent violations and federal violations, such as enactment of the 1952 law establishing the National Day of Prayer, are of special concern to FFRF members.  (Ex. 1 at 3-4.)

Paul Gaylor, FFRF member for 33 years, volunteer, longtime Board member, and

former Officer, read about the National Day of Prayer in the newspapers so long ago he doesn't recall the first time.  (Ex. 1 at 4.)

Dan Barker heard of the National Day of Prayer before the 1980s, when he was a minister, but he distinctly remembers seeing or hearing something on television (probably a news story) in the early 1980s when President Ronald Reagan signed one of the National Day of Prayer Proclamations.  (Ex. 1 at 4.)

Jill Dean became aware of the National Day of Prayer over time by hearing news accounts, although she cannot recall the very first time she heard or saw such a report.  (Ex. 1 at 4.)

Ms. Dean was distinctly aware of the National Day of Prayer in 2008.  Her awareness was prompted by news accounts of a National Day of Prayer prayer breakfast sponsored by the Burnett County Sheriff, in Wisconsin, at which event Wisconsin's newly elected Supreme Court Justice, William Gableman, appeared as the key note speaker.  (Ex. 1 at 4.)

Ms. Dean has been a volunteer worker for the Freedom From Religion Foundation since her retirement, in part because opposing governmental endorsement of religion is an important, but unpopular cause.  (Ex. 1 at 4.)

Ms Dean considers opposition to the establishment of religion to be important because events like the National Day of Prayer send a message that some citizens are better than others; such events like the National Day of Prayer categorize and distinguish between individuals who are supposedly better than others, while making no reference or

acknowledgment of non-believers.  (Ex. 1 at 5.)

According to Ms. Dean, events like the National Day of Prayer essentially make non-religious persons invisible, which both saddens and angers Ms. Dean.  (Ex. 1 at 5.)

The government sends a message through events like the National Day of Prayer that if a person doesn't pray, then they are un-American; such persons are devalued and made to feel like they are outside the norm of good citizenship, according to Ms. Dean.  (Ex. 1 at 5.)

Ms. Dean also is quite concerned that promotions like the National Day of Prayer send a message about religion that is untrue.  (Ex. 1 at 5.)

The premise of government officials who promote religion is that the United States is a Christian nation defined by a very conservative variety of Christianity, according to Ms. Dean.  (Ex. 1 at 5.)

That depiction of the United States as a conservative Christian nation is historically inaccurate, according to Ms. Dean, who notes that many of the immigrants to the United States left their home countries because of religious intolerance, while the United States now ironically tries to define itself as a Christian nation characterized by religious intolerance.  (Ex. 1 at 5.)

Ms. Dean, in short, is aware of and personally opposed to government promotion of religion, such as through the National Day of Prayer, because it has the effect of disenfranchising non-religious persons, like Ms. Dean, while favoring religious conservatives.  (Ex. 1 at 5.)

The 2008 National Day of Prayer Proclamation by President Bush was brought to Anne Gaylor's attention by her daughter, Annie Laurie Gaylor, because FFRF has monitored this activity, while putting up with it for so many years.  (Ex. 1 at 6.)

Annie Laurie Gaylor reports on violations to Anne regularly since Anne is the principal founder and president emeritus of the national state/church watchdog FFRF, and Anne is still officially a consultant with the Foundation, and remains on the Board of Directors.  (Ex. 1 at 6.)

Annie Laurie Gaylor first learned about the 2008 proclamation from the National Day of Prayer Taskforce website before the event itself, which she has routinely monitored in the spring for many years.  (Ex. 1 at 6.)

Annie Laurie Gaylor also corroborated the 2008 proclamation at the White House website, which is her usual practice.  (Ex. 1 at 6.)

Annie Laurie routinely has also checked the NDP Task Force website every year to see how many governors capitulate to the NDP Task Force, and what the NDP Task Force dictates for the annual theme and selected Bible verse.  (Ex. 1 at 6.)

Annie Laurie Gaylor has reported on governors who refused to issue proclamations in the past, such as Connecticut Governor Lowell Weicker (1991-1995), and Minnesota Governor Jesse Ventura.  (Ex. 1 at 6.)

Annie Laurie Gaylor was also aware of the public pressure put on New York Governor Eliot Spitzer to issue a National Day of Prayer Proclamation in 2007.  (Ex. 1 at 6.)

Dan Barker, while working at FFRF, also has been watching the National Day of Prayer for years.  (Ex. 1 at 7.)

In early 2008, Barker anticipated President Bush's signing and had been to the NDP Task Force website to see what wording they were recommending.  (Ex. 1 at 7.)

Barker was at Harvard University for a debate on April 22, 2008, and on that day or the next, April 23, he heard by telephone from FFRF staff, including co-president Annie Laurie Gaylor, that President Bush had issued the proclamation.  (Ex. 1 at 7.)

On April 22 or 23, 2008, Barker learned, and soon after confirmed by looking on the internet, that President Bush had incorporated the "Prayer! America's Strength and Shield".  (Ex. 1 at 7.)

Annie Laurie Gaylor monitored both the White House website and the NDP Task Force in advance of the 2009 proclamation.  (The NDP Task Force website was stripped of much of its archives and did not do its usual detailed announcements prior to the event.)  (Ex. 1 at 7-8.)

Annie Laurie Gaylor learned that President Obama would be issuing a proclamation from numerous prominent national news stories in the Washington Post and over the wire, which reported extensively on the expected proclamation.  (Ex. 1 at 8.)

Annie Laurie Gaylor was also able to verify the wording of Obama's proclamation at the White House official website by the first Thursday in May 2009.  (See links to referenced news stories: http://tinyurl.com/djmw9x; http://tinyurl.com/c999z6; and

http://tinyurl.com/c3547g.)  (Ex. 1 at 8.)

Barker learned by watching the news on the internet on May 7 or 8, 2009, that President Obama had issued a National Day of Prayer Proclamation on May 7.  (Ex. 1 at 8.)

J.      The Plaintiffs Have Acted On Their Sincere Objection to the National Day of Prayer.

Anne Gaylor picketed the First Annual Wisconsin Prayer Breakfast, outside the Concourse Hotel in Madison, Wis., Friday, March 20, 1992, where she leafletted 600 participants and passersby.  (Ex. 1 at 9.)

The first-ever "Wisconsin Prayer Breakfast" event in 1992 was an offshoot of the National Day of Prayer.  (Ex. 1 at 9.)

Anne Gaylor also formally protested the misuse of the Great Seal of the State of Wisconsin by the Madison Kiwanis-West, who were the private sponsors of the prayer breakfast, but who advertised and promoted the event as the "Wisconsin Prayer Breakfast" using the state seal of Wisconsin.  (Ex. 1 at 9.)

The main guest speaker at the prayer breakfast in 1992 was U.S. Senate Chaplain Rev. Richard C. Halverson, who had previously denied FFRF and its staff member (now President) Dan Barker, an ordained minister, the ability to present a message to open the U.S. Senate instead of a prayer.  (Ex. 1 at 9.)

During the picketed prayer breakfast, Halverson made such attacks as: "Atheism has no room for human rights."  In speaking about the dissolution of the Soviet Union, Halverson said, "It was not the failure of politics or economics but it was because of atheism."  (Ex. 1

31

at 9-10.)

Anne Gaylor has talked with innumerable FFRF members from 1978 until her retirement in 2004, which members have called to see if there was something as an organization that FFRF could do about the National Day of Prayer. (Ex. 1 at 10.)

FFRF has responded in various ways, over the years, including by contacting various offending public officials; by promoting secular proclamations for government officials to make; by publicizing violations after FFRF began publishing a newspaper in 1983 ten times a year; by periodically alerting members to ongoing violations; and by encouraging and publicizing efforts to protest the National Day of Prayer and local and regional off-shoots. (Ex. 1 at 10.)

Anne Gaylor has studied National Day of Prayer proclamations by various public officials, and contacted officials to protest the violation of a basic constitutional principle, sometimes releasing a statement to media. (Ex. 1 at 11.)

In the case of the picket of the Wisconsin Prayer Breakfast in 1992, Anne Gaylor carried a sign, helped compose a press release and leaflet, phoned area members to interest other protesters, and contacted media about FFRF's counterpicket and complaint about the misuse of the Great Seal of Wisconsin. (Ex. 1 at 11.)

Anne Gaylor has been contacted by various media for comment about the National Day of Prayer proclamations and government-fostered prayer over the many years. (Ex. 1 at 11.)

Since 1978, when Anne Gaylor was asked to take FFRF national, as an organization, she received countless complaints from FFRF members and members of the public about National Day of Prayer-related violations, including comments by public officials, use of public facilities, and prayer breakfasts that had the appearance of public sponsorship. (Ex. 1 at 11.)

As president of FFRF, in November 1993, Anne authorized the filing of a lawsuit in Denver, Colorado, with the FFRF Denver chapter, to enjoin the mayor's office from cosponsoring a National Day of Prayer. As a result, Judge John N. McMullen, District Court, enjoined the mayor from "any further endorsement, promotion, sponsorship or support of the Day of Prayer." (FFRF v. Wellington Webb, Mayor of Denver, Case No. 93 CV 6056, District Court, City and County of Denver, Colo.) (Ex. 1 at 11.)

Anne Gaylor's many activities include writing press releases and letters, as well as being quoted in Freethought Today and by other media, about her objections to the National Day of Prayer and related violations. (Ex. 1 at 12.)

Prior to the National Day of Prayer each year, the Freethought Radio show has included commentary about the National Day of Prayer, promoted a National Day of Reason, played part of the song by Dan Barker "Nothing Fails Like Prayer," and also provided other timely commentary on government prayer throughout the year. (Ex. 1 at 12.)

FFRF also monitors the news under Annie Laurie Gaylor's direction, and looks for updates at the White House website, NDP Task Force website and various governor websites.

The National Day of Prayer violations occur every year, and therefore, they are not hard to find referenced, according to Annie Laurie Gaylor.  (Ex. 1 at 13.)

FFRF also has issued news releases critical of National Day of Prayer activities, sometimes asking for secular alternatives aimed at expressing the point of view of FFRF members and in some instances, asking members to take action.  (Ex. 1 at 13-14.)

Annie Laurie Gaylor has been responsible for writing and disseminating many press releases from 1985 to present opposing the National Day of Prayer.  (Ex.1 at 13-14.)

Annie Laurie Gaylor has reported on National Day of Prayer violations in Freethought Today, from January 1985 to present, and on the FFRF website.  (Ex. 1 at 14.)

Annie Laurie Gaylor has written, solicited or edited, typeset (and, for at least 7 years, pasted up) innumerable articles regarding prayer and government, since at least 1988. (Ex. 1 at 8-37.

Annie Laurie Gaylor has tirelessly observed and participated in protesting the NDP by monitoring violations, often reporting on violations or FFRF protests of the violations, writing press releases or letters of complaint and urging members to protest violations at local, regional or national levels.  (Ex. 1 at 37.)

Paul Gaylor participated in and took photographs and was security for the "first annual Wisconsin prayer breakfast" counterpicket, at the Concourse Hotel, 1 W. Dayton St., Madison, Wis., Friday, March 20, 1992.  (Ex. 1 at 37.)

As an FFRF volunteer, Paul Gaylor also helped to open the heavy volume of mail for FFRF for at least 10 years, and he encountered letters or clippings related to complaints about

the National Day of Prayer and governmental prayer and prayer breakfasts, etc., and he discussed these violations and strategies to deal with them with his wife, Anne Gaylor, and other members of the FFRF Executive Council and Board of Directors.  (Ex. 1 at 37.)

Dan Barker too has opposed the National Day of Prayer, in written comments that have been published over the years.  (Ex. 1 at 38.)

Phyllis Rose, for her part has become aware that the National Day of Prayer occurs every year, at which time the President issues a proclamation encouraging all citizens to pray.  (Ex. 1 at 38.)

Ms. Rose is offended and disturbed by the government asking persons to pray.  (Ex. 1 at 38.)

Ms. Rose is offended by the government taking a position regarding religion, including the position that Americans are a better people because of their religious convictions.  (Ex. 1 at 38.)

Ms. Rose, in fact, began volunteering with the Freedom From Religion Foundation because she found the government's promotion of religion to be harder and harder to ignore.  (Ex. 1 at 38.)

Ms. Rose is opposed to the government's promotion of religion and the false insinuation that Americans are better because of prayer.  (Ex. 1 at 38.)

Ms. Rose believes that her views regarding the separation of church and state are not being represented in government.  (Ex. 1 at 38-39.)

The assumption that the United States is a better country and that individuals are better

35

persons as a result of prayer is not shared by Ms. Rose.  (Ex. 1 at 39.)

The superiority of prayerfulness seems to have become mainstream view in the United States government, however, as reflected by the National Day of Prayer, according to Ms. Rose.  (Ex. 1 at 39.)

Ms. Rose feels that persons who profess religious beliefs are, in fact, accorded greater political influence.  (Ex. 1 at 39.)

K.   FFRF Has Dedicated Substantial Resources to Oppose the National Day of Prayer, Which are Required As a Result of the Official Sanction of the Government.

Substantial staff time and staff efforts have been dedicated by FFRF opposing the National Day of Prayer, including by individual plaintiffs, as well as by staff attorney, Rebecca Kratz.  (Ex. 1 at 39-40.)

In Anne Gaylor's 28 years as president of FFRF, the repetition of National Day of Prayer violations, along with the accelerating local and regional violations and increased publicity about them all, and increased pressure by the religious right to involve public officials at all levels and to dictate the content of prayer proclamations, made Anne's work harder.  (Ex. 1 at 40.)

One cannot separate church and state when the highest office holder in the country is telling everybody to pray, according to Anne Gaylor.  (Ex. 1 at 40.)

State and local officials imitating the National Day of Prayer proclamation and events have made the work of FFRF all the harder.  (Ex. 1 at 40.)

FFRF's membership has urged FFRF to continue to protest the National Day of Prayer,

36

and the members expect FFRF to show leadership and represent the views of the nonreligious who are excluded by National Day of Prayer proclamations and events.  (Ex. 1 at 40.)

The National Day of Prayer law weakens the Establishment Clause, creates a bad example, and encourages public officials to promote their personal religious convictions on public time and dime and with their imprimatur of support.  (Ex. 1 at 41.)

The National Day of Prayer law clearly has produced countless similar violations, which the proclamations are intended to do, according to Anne Gaylor.  (Ex. 1 at 41-42.)

Because the purpose of FFRF is state/church separation, it is destructive to its organization to have an illegal and unconstitutional law promoted year after year all across the country by public employees and politicians, notes Anne Gaylor.  (Ex. 1 at 42.)

It has been a continual burden on FFRF just replying to complaints about the National Day of Prayer, dealing with members who are impatient and urging FFRF to do something about it.  (Ex. 1 at 43.)

According to Annie Laurie Gaylor, the 1952 law establishing a National Day of Prayer has long impeded the ability of the Freedom From Religion Foundation to protect the constitutional principle of the separation between church and state.  (Ex. 1 at 43.)

When FFRF members have phoned the office, irate over the existence of the National Day of Prayer, Annie Laurie Gaylor, as a co-founder, Board Member, longtime staff member and now co-president and officer, has felt her hands were tied in addressing the fallout from the National Day of Prayer law, given the apparent government sanction of the event.  (Ex. 1 at 43-44.)

It is clear to Annie Laurie Gaylor that the 1952 law has spawned a whole host of other violations, at the national, state and local levels around the country. These violations include the National Prayer Breakfast (put on by a private Christian fundamentalist entity, but attracting almost every member of Congress, the President and international dignitaries every February and ample media coverage). The violations also include annual gubernatorial proclamations.  They include National Day of Prayer involvement by many mayors and county executives and other public officials, including sheriffs, who make proclamations or host official prayer breakfasts or who allow prayer breakfasts to use their official position in the title.  In fact, there are now many state or local prayer breakfasts spawned by the National Day of Prayer.  (Ex. 1 at 44.)

FFRF members have attended National Day of Prayer or related prayer breakfast events to monitor them, have written letters to public officials about such events, have sometimes picketed events held on courthouse steps or municipal buildings, but it is impossible to get to the heart of the problem--that it is unconstitutional and unconscionable for a public official to direct "the religious exercise of his constituents" (in Thomas Jefferson's words).  (Ex. 1 at 44.)

FFRF members also are injured when the President and the Governors order them to pray, or tell them to pray, or even simply suggest that they and all other citizens ought to pray.  (Ex. 1 at 45.)

Annie Laurie Gaylor does not believe in a god.  She does not believe that prayer can suspend the natural laws of the universe.  She considers the very concept of prayer to be

absurd. This intellectual aversion to prayer is shared by the membership of the Freedom From Religion Foundation and by rationalists, who by definition reject the idea of the supernatural. (Ex. 1 at 45.)

When the President proclaims a National Day of Prayer, Annie Laurie Gaylor and other FFRF members feel excluded, disenfranchised, affronted, offended and deeply insulted. (Ex. 1 at 45.)

When the President tells "all" Americans to pray, as most of them have exhorted in their Proclamations since 1952, this admonishment disenfranchises "all" who do not pray or believe in prayer or believe in a deity who answers prayer. (Ex. 1 at 45.)

Annie Laurie Gaylor feels as excluded as most Christians would feel if the President or their Governor were to issue a prayer proclamation to Allah, pointing out that Mohammed is his Prophet, or as they would feel if Vishnu were referenced, or Jehovah. (Ex. 1 at 45.)

No so-called civil religion or prayer to a deity can possibly include atheists, agnostics and other self-identified "nonreligious." (Ex. 1 at 45.)

Annie Laurie Gaylor feels deeply embarrassed by governmental displays of faith, religion or worship, but when they are directed at her, the feeling of being coerced and told how to think about religion is magnified. (Ex. 1 at 45.)

Annie Laurie Gaylor considers being told to pray, or even being encouraged to pray, by a President or Governor to be a tyrannical act, which robs her of freedom of conscience. (Ex. 1 at 46.)

Reading the 2008 Proclamation, by President Bush, Barker was told by his President

39

that "America trusts in the abiding power of prayer and asks for the wisdom to discern God's will in times of joy and of trial.  As we observe this National Day of Prayer, we recognize our dependence on the Almighty, we thank Him for the many blessings He has bestowed upon us, and we put our country's future in His hands."  (Ex. 1 at 46.)

It appeared to Barker that President Bush was assuming that he, as an American, was also "observing," "recognizing," and "thanking God."  (Ex. 1 at 46.)

Reading further, Barker was informed that President Bush asked "the citizens of our nation to give thanks . . . for God's continued guidance, comfort, and protection."  (Ex. 1 at 46.)

Barker is a citizen of the United States, but he does not believe in "God" or any god, so he felt excluded by that wording and concluded that President Bush considered only believers to be part of "we, the people."  (Ex. 1 at 46-47.)

Similar to President Bush the year before, Barker read that President Obama called upon "Americans to pray in thanksgiving for our freedoms and blessings and to ask for God's continued guidance, grace, and protection for this land that we love."  (Ex. 1 at 47.)

Because Barker does not believe in God, or pray, he wondered how his president could ask him, an American, to "ask for God's guidance."  Barker felt excluded, like a second-class American.  (Ex. 1 at 47.)

The FFRF office has received countless complaints over the years by members, and members of the public, critical of the National Day of Prayer, at the federal, state or local level.  (Ex. 1 at 47.)

40

FFRF has had several major campaigns to encourage public officials to balance National Day of Prayer proclamations and religious proclamations with secular proclamations.  They are identified at FFRF's website: http://ffrf.org/timely/proclamations. (Ex. 1 at 48.)

To balance or respond to the National Day of Prayer and its related spawns, FFRF and its members have asked governors, mayors and county executives to issue "Celebrate State/Church Separation Month," "Freethought Week," and Give Thanks for State/Church Separation Week."  (Ex. 1 at 48.)

FFRF has also suggested a "National Day of Reason" for the first Thursday in May (2005 news release).  (Ex. 1 at 48.)

FFRF, in the late 1980s, also sent letters to all mayors of cities of 30,000 or more, asking them not to issue religious proclamations and suggesting secular alternatives.  (Ex. 1 at 48.)

In 2005, the Freedom from Religion Foundation wrote to each of the state governors complaining about the public observance of the National Day of Prayer and requesting issuance of secular proclamations.  (Ex. 98.)

FFRF has been actively involved in opposing the establishment of religion by government, including long opposition to the National Day of Prayer.  (Exs. 98-114.)

In 2008, FFRF vigorously opposed a National Day of Prayer Breakfast hosted by the Sheriff of Burnett County in Wisconsin, to which observance the Sheriff invited participants on his official letterhead.  (Ex. 103.)

41

The Burnett County National Day of Prayer observance featured newly-elected Wisconsin Supreme Court Justice Michael Gableman, who espoused a creationist philosophy and the need for public prayer.  (Ex. 103 at 3-4.)

Media coverage of local governmental observances of the National Day of Prayer have become pervasive and they have been opposed by FFRF.  (Exs. 103-105.)

The Freedom from Religion Foundation is an educational group working for the separation of church and state; its purposes are to promote the constitutional principle of separation of church and state and to educate the public on matter of nontheism.  (Ex. 112 at 3.)

L.     <u>FFRF Has a Long Record of Advocacy of the Separation of Church and State</u>.

FFRF tries to fulfill its purpose by acting on violations of separation of church and state on behalf of members and the public, including by filing successful law suits that have ended a variety of First Amendment violations.  (Ex. 113 at 1.)

FFRF also publishes the only freethought newspaper in the United States, Free Thought Today; sponsors annual high school and college Free Thought essay competitions with cash awards; conducts annual national conventions; promotes freedom from religion with educational products, bumper stickers, literature, etc.; publishes useful free thought books; provides speakers for events in debates; and has established a free thought book collection at the University of Wisconsin Memorial Library.  (Ex. 113 at 1.)

FFRF's challenge to the National Day of Prayer in this court action is only identified as one of many activities of the Foundation in its 2008 Year In Review.  (Ex. 114.)

42

FFRF's opposition to the National Day of Prayer via the pending litigation does not represent the Foundation's first public opposition, which has been a constant in FFRF actions; FFRF has publicly expressed its objection to the National Day of Prayer for many years. (Exs. 103-111.)

FFRF raises national awareness of the need to keep state and church separate, including by generating "significant publicity through its legal and educational challenges, free thought activities and the accomplishments of individual members."  (Ex. 112 at 5.)

III.     **THE INDIVIDUAL PLAINTIFFS HAVE STANDING TO OBJECT TO GOVERNMENT SPEECH ENDORSING RELIGION, WHICH SPEECH IS DIRECTED AT THEM.**

A.     The Individual Plaintiffs Have Constitutionally Sufficient Contact With The Objectionable Speech.

The defendants' deny that the individual plaintiffs have standing to sue based on their exposure to Presidential Prayer Proclamations and dedications of a National Day of Prayer. The defendants essentially argue that the individual plaintiffs have not had to "walk by" unwelcome Presidential Prayer Proclamations, such as occurs with a creche or menorah at a county courthouse, and so the plaintiffs allegedly have not been injured.  The defendants reason that unwelcome exposure to government speech necessarily must have a pedestrian or walk-by attribute, which allegedly is missing with respect to Presidential Prayer Proclamations.  Without "pedestrian" exposure to government speech endorsing religion, the defendants conclude that the plaintiffs are merely experiencing "psychic injury common to the general public."

43

The defendants misapprehend the contact with government speech necessary to support standing. Their interpretation of unwelcome exposure to government speech would effectively disqualify anybody from objecting, unless speech is physically placed in front of an individual by a government official. This test may work for parochial government speech with a limited intended audience, but government speech intended to reach the nation would no longer be objectionable by anyone. Ironically, the Establishment Clause then would only prohibit government speech endorsing religion at the local level, while insulating proclamations to the entire nation that endorse religion. The irony of this argument lies in the fact that a national broadcast promoting religion by the President at Congress' behest is a least as likely to establish a national religion as local government speech endorsing religion.

It is axiomatic that a crucial difference exists between government and private speech that endorses religion: Government speech endorsing religion is forbidden by the Establishment Clause. *The Board of Education of West Side Community Schools (District 66) v. Mergens*, 496 U.S. 226, 250 (1990). The Supreme Court has consistently recognized this "crucial difference" between government speech endorsing religion, which the Establishment Clause forbids, and private speech endorsing religion. Here, government speech is plainly at issue.

Because the Constitution prohibits government speech endorsing religion, the Supreme Court quite naturally has recognized that individuals objecting to such speech may bring suit to complain. In this respect, the courts have upheld standing for persons having unwelcome exposure to objectionable speech. With regard to local monuments or displays,

44

therefore, it is enough that a plaintiff allege direct and unwelcome contact with the religious display, without showing any "special burden" or altered behavior. *Books v. Elkhart County*, 401 F.3d 857, 862 (7th Cir. 2005). *See also Books v. City of Elkhart*, 235 F.3d 292, 299-301 (7th Cir. 2000); *Doe v. County of Montgomery*, 41 F.3d 1156, 1160-61 (7th Cir. 1994) (the plaintiff is not required to show "special burden" or altered behavior in order to have standing).[2]  In the cases of such displays, of course, the intended and foreseeable audience for the government speech is local, and measurable by foot traffic near the display.  Standing for such persons is not defeated by voluntarily passing by the display, moreover, because involuntary or coerced exposure to government speech endorsing religion is not an essential element of an Establishment Clause violation. *See Engel v. Vitale*, 370 U.S. 421, 430 (1962).

Not all government speech endorsing religion is characterized by a physical presence in the public square, as this case illustrates.  In fact, such means are not very effective as a way to communicate with large numbers of citizens.  The Supreme Court has recognized this reality in its  analysis of public forums, noting that a forum often now exists "more in a metaphysical than in a spatial or geographic sense." *See Rosenberger v. Rector & Visitors of the University of Virginia*, 515 U.S. 819, 830 (1995).  While this change affects the means of communication, it does not reduce the number of persons who may now have exposure to such governmental speech.   The contrary is true.   That is certainly the case with Presidential Proclamations.

---

[2]The defendants' reliance on *Freedom From Religion Foundation v. Zielke*, 845 F.2d 1463 (7th Cir. 1988), notably ignores a later similar case in which the plaintiffs all had standing to complain. *See Mercier v. City of La Crosse*, 395 F.3d 693 (7th Cir. 2005).

By contrast, the complaint in *Valley Forge v. ACLU,* 454 U.S. 464 (1982), did not involve government speech at all, unlike Presidential Prayer Proclamations which constitute quintessential speech.  That makes a difference, because prayer Proclamations are intended to be made known to and acted upon by all the citizens of the United States.  A Presidential Proclamation, without an intended audience, would not be a proclamation at all.  Unlike *Valley Forge*, and unlike cases involving local religious displays, therefore, the present case deals with government speech which the government intends to be broadcast and made known to the citizenry at large.  In this circumstance, the defendants only disingenuously claim that the plaintiffs have "roamed the country" looking for their complaint.  As the evidence of record shows, the plaintiffs can not avoid the National Day of Prayer bedlam.

The intended audience for a Presidential Proclamation is also distinguishable from the intended audience for legislative prayer.  The Supreme Court has already recognized in *Allegheny County v. ACLU*, 492 U.S. 573, 603 n. 52 (1989), that Presidential Prayer Proclamations stand on a different footing than "ceremonial deism" such as legislative prayer.  The Supreme Court stated:

> It is worth noting that just because *Marsh* sustained the validity of legislative prayer, it does not necessarily follow that practices like proclaiming a National Day of Prayer are constitutional.  Legislative prayer does not urge citizens to engage in religious practices, and on that basis could well be distinguishable from an exhortation from government to the people that they engage in religious conduct.

A limited intended audience for a legislative prayer also may be a distinguishing fact in some circumstances.  In *Simpson v. Chesterfield County Board of Supervisors*, 404 F.3d

46

276, 289 (4th Cir. 2005), Judge Niemeyer specifically noted that "when a governmental body engages in prayer for itself and does not impose that prayer on the people, the governmental body is given greater latitude than when the government imposes prayer on the people." Judge Niemeyer further stated that  "ever since *Marsh*, the Supreme Court has continued to recognize the distinction between prayer engaged in by the government for itself and prayer imposed on the people, subjecting the latter form of prayer to heightened scrutiny." Similarly, in *Van Zandt v. Thompson*, 839 F.2d 1215, 1218 (7th Cir. 1988), the Court viewed "a legislature's internal spiritual practices as a special case," warranting more deference than would be appropriate for government speech projected to an external audience.

When the intended audience for government speech is not internal, legal responsibility may certainly include speech that is republished, such as by the media.  The principle is already well recognized in the law that the author or originator of speech may be liable for republication or repetition by third persons if such repetition was foreseeable.  *See Weaver v. Beneficial Finishing Co.*, 98 S.E.2d 687, 690 (V.A. 1957); *Blueridge Bank v. Veribanc, Inc.*, 866 F.2d 681, 689 (4th Cir. 1989); *Wright v. Bachmurski*, 29 P.3d 979, 984-985 (Kan. App. 2001), and *Ringler Associates, Inc. v. Maryland Casualty Co.*, 80 Cal. App. 4th 1165, 1180 (2000).  Similarly, government speakers, like other speakers, may intend and foresee that their speech will be broadcast through intermediaries, including the print and TV media. In fact, the role of the President's Press Secretary is precisely to disseminate governmental speech, such as Presidential Proclamations, so that they may be communicated widely to the public.

47

Here, the evidence is overwhelming the individual plaintiffs and other FFRF members have come in contact with the President's Prayer Proclamations, including through media reporting by newspapers and television, as well as from reporting by members and non-members of the Freedom From Religion Foundation.  The defendants do not deny such exposure, but question whether the means of the exposure should "count" for purposes of standing.

The plaintiffs are individuals who know of and hear about government speech that is disseminated and projected by public officials, especially when they are part of the audience intended for the speech, such as in this case.  The individual plaintiffs also have come in contact with Presidential Prayer Proclamations as part of their work on behalf of the Freedom From Religion Foundation, which responds to incorrigible complaints about such Prayer Proclamations by members and non-members.  The plaintiffs do not roam the country looking for complaints; they are bombarded with such complaints by persons who object to the government's promotion of religion.

The individual plaintiffs do have the direct and concrete injury necessary to give them standing to object to Presidential Prayer Proclamations and dedications of a National Day of Prayer.  The plaintiffs are part of the audience intended for that governmental speech.  For the defendants to suggest that these plaintiffs cannot object to that speech assumes an arbitrary distinction with drastic consequences:   Requiring pedestrian exposure as a prerequisite for standing ignores the reality of modern communication.

Finally, the defendants unpersuasively claim that the plaintiffs are merely complaining

48

about a generalized grievance that they share with every American. If only that were the case. In fact, the plaintiffs are non-believers and they do not suffer the distress of their President promoting and exhorting prayer in common with the purveyors of prayer. The plaintiffs' injury is quite distinct and palpable, as they attest.

B. Standing Does Not Require Contact Plus Something More.

In cases involving government speech, exposure is sufficient to confer standing. The Seventh Circuit previously has already rejected the defendants' same argument that unwelcome contact with religious speech "is trivial and therefore not legally cognizable." *Books*, 401 F.3d at 861. In *Books*, the County argued that the plaintiff's injury was entirely psychological, and that such injuries, without more, do not confer standing. The Court rejected the defendant's argument, as other courts have done in government speech cases.

While the Supreme Court did state in *Valley Forge* that the psychological consequence produced by observation of conduct with which one disagrees is not an injury sufficient to confer standing under Article III, that was a tax-payer standing case which did not involve government speech. Since then, courts have uniformly found that the *Valley Forge* decision does not mean that "psychological injury" can never be a sufficient basis for the conferral of Article III standing. If this were not the case, then none of the subsequent judicial precedents prohibiting government speech that endorses religion would have involved plaintiffs with standing, including the Supreme Court's decisions in *County of Allegheny,* and *McCreary County, Kentucky v. ACLU of Kentucky*, 545 U.S. 844 (2005). In cases involving unwelcome exposure to religious speech, "the spiritual, value-laden beliefs of the plaintiffs are often

49

most directly affected by an alleged establishment of religion.  Accordingly, rules of standing

recognize that non-economic or intangible injury may suffice to make an Establishment

Clause claim justiciable."  *Suhre v. Haywood County*, 131 F.3d 1083, 1087 (4th Cir. 1997).

The defendants, however, demand something more than exposure to unconstitutional

government speech.  The defendants claim that contact must be involuntary or coercive - -

and that citizens who pay attention to the speech broadcast by officials cannot complain.  The

Establishment Clause prohibition on governmental speech endorsing religion, however, is

mandatory and self-executing; "assumption of risk" is not a defense.

Nor is "coming to the injury" a proper basis for objecting to standing in a government

speech case.  *Buono v. Norton*, 212 F.Supp2d 1202, 1211 (C.D. Cal. 2002).  In *Buono*, the

Court rejected the argument that standing is precluded in government speech cases if the

plaintiffs "could have avoided the harm."  The Court reasoned as follows:

> The government contends that Plaintiffs' exposure to the cross should be
> disregarded for purposes of standing because Plaintiffs could have
> avoided the harm.  However, the Seventh Circuit has expressly rejected
> such an argument, and the Court adopts its reasoning.  In *American Civil
> Liberties Union v. City of St. Charles*, 794 F.2d 265 (7th Cir. 1986)
> (Posner, J.), the Seventh Circuit responded to Defendant's contention
> that "plaintiffs have inflicted this cost on themselves and can avoid it by
> continuing to follow their customary routes and shrugging off the
> presence of the . . . cross."  794 F.2d at 268.  The Court held "that the
> injury to the Plaintiffs could have been averted  . . . did not deprive the
> plaintiffs of standing," commenting that "if [they] lacked standing . . . no
> one would have standing."  *Id*. at 268-69.  By the government's logic, all
> individuals offended by a religious display could avoid it and thereby not
> be harmed by it.  Such an argument flies in the face of standing
> jurisprudence and would render the Establishment Clause a nullity."

*Buono*, 212 F.Supp2d at 1211.  In *Books v. City of Elkhart*, 235 F.3d 292, 297 (7th Cir.

2000), the Seventh Circuit also concluded that plaintiffs had standing, even though their injury was based, at least in part, on the fact that they "know the [religious symbol] is there, whether [they] see it or not."

The argument that the plaintiffs should just avert their eyes and cover their ears is not constitutionally required for standing.   Even deliberate "testing" is sufficient for constitutional standing purposes.  In *Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982), for example, the Supreme Court held that "testers" have standing to bring suit for alleged violations of the Fair Housing Act, even where the tester had no intention of buying or renting a home.   Since *Havens Realty*, the law has become well established that such individuals do suffer a cognizable injury that gives them standing to sue.   *Kyles v. J.K. Guardian Security Services, Inc.*, 222 F.3d 289, 297 (7th Cir. 2000), citing *Village of Bellwood v. Dwivedi*, 895 F.2d 1521, 1527 (7th Cir. 1990).  The Supreme Court's logic in *Havens Realty* was based on the fact that discrimination is still discrimination, whenever it occurs.  The fact that an individual may discover such discrimination does not render that person an inappropriate party to complain.

The argument for standing in the present case is even more compelling.   The Establishment Clause prohibits government officials from promulgating speech that endorses religion.  This constitutional proscription would be violated even if the government tried to discreetly favor religion, such as with a "PG" warning on Presidential Proclamations.  Here, in the present case, the government speech at issue actually was intended to be broadcast and to become known by all Americans, including these plaintiffs.  As part of the intended

audience, they certainly have the right to complain.

The defendants argue incorrectly that governmental speech endorsing religion cannot be questioned by non-believers who "voluntarily" come to know about the actions of their government, including government speech promoting religion. The defendants argue, in effect, that they may endorse religion without objection so long as exposure to such government speech is not forced or coerced. In fact, however, coercion is not a necessary element of a claim under the Establishment Clause. The Supreme Court has consistently rejected the view that coercion is the touchstone of an Establishment Clause violation. *See Engel v. Vitale*, 370 U.S. 421, 430 (1962). To make a showing of coercion an essential element of an Establishment Clause violation would make the Free Exercise Clause a redundancy. *See Allegheny*, 492 U.S. at 628; *Abington School District v. Shempp*, 374 U.S. 203, 223 (1963). It also would render the Establishment Clause a nullity.

Finally, the defendants ignore the fact that the individual plaintiffs are literally bombarded with National Prayer Day messages that "one can hardly avoid." The National Prayer Day Proclamations have been known to these plaintiffs for literally years, from print and broadcast media, as well as from FFRF members and the public. The plaintiffs' steadfast opposition to such inappropriate government speech, as a result, is itself ubiquitous- - and sincere.

The injury to the plaintiffs is actually emphasized by the defendants' insinuation that the plaintiffs should just "butt out if they don't like it." The problem of religious endorsement is that some become insiders, while others are made to feel like political

outsiders.   As the plaintiffs have described in sworn statements, that is the case with Presidential Prayer Day Proclamations.  The defendants, however, accept that distinction as normative by implying that the plaintiff should not look or listen to the President.

      C.    <u>The Plaintiffs' Discriminatory Treatment As a Result of Presidential National Day of Prayer Proclamations Also Provides a Basis For Standing</u>

Discriminatory treatment itself a harm that is sufficiently particular to qualify as an actual injury for standing purposes.  <u>Planned Parenthood of South Carolina, Inc. v. Rose</u>, 361 F.3d 786, 789 (4th Cir. 2004).  Plaintiffs in such cases may seek equal treatment in the form of a level playing field, regardless of whether this is achieved by extending benefits to the disfavored group or by denying benefits to the favored group.  <u>Id</u>.  For instance, in <u>Regents of the University of California v. Bakke</u>, 438 U.S. 265, 281 n. 14 (1978), the Supreme Court explained that a medical school applicant who was denied admission had standing to challenge the school's race-based admissions policy regardless of whether he showed "that he would have been admitted in the absence of the admissions policy."  The applicant in <u>Bakke</u> met "the constitutional requirements" of standing because he had been denied a chance to compete for admission on equal terms.  Similarly, the court said in <u>Heckler v. Mathews</u>, 465 U.S. 728, 738 (1984), that the Court frequently entertained attacks on discriminatory statutes or practices even when the government could deprive a successful plaintiff of relief by withdrawing the statute's benefits from both the favored and the excluded class.

This "level playing field" analysis, though typically seen in Equal Protection cases,

also applies in First Amendment cases.  <u>Planned Parenthood of South Carolina</u>, 361 F.3d at 790.  Just as the plaintiff claiming discrimination under the Fourteenth Amendment has standing to seek a level playing field, so, too, does the plaintiff claiming viewpoint discrimination under the First Amendment.  In short, where, as here, the plaintiffs challenge the law on the ground that it promotes an opposing viewpoint above their own, as to the promotion of prayer and religion, they suffer a cognizable injury that can be redressed by the invalidation of that law.  <u>See</u> <u>Planned Parenthood of South Carolina</u>, 361 F.3d at 790.

Here, the plaintiffs complain that Congress' legislation and the President's proclamation declaring a National Day of Prayer promotes religion over non-religion, despite the fact that the plaintiffs have themselves requested that government officials issue counter-balanced proclamations, such as by proclaiming a Day of Reason.  Characterizing the relevant injury as the inability to obtain their own proclamation, however, obscures the constitutional nature of the harm in this case.  This case is not about people seeking proclamations of their choice; it is about whether, by enacting National Day of Prayer Legislation, the government has impermissibly favored one viewpoint over another.  Therefore, "the sounder approach is to recognize discriminatory treatment as the actual injury and to accord the plaintiff standing on that basis."  <u>Id</u>.

The defendants' arguments against standing are not convincing.  They claim that the plaintiffs have suffered no injury because the National Day of Prayer Act, though failing to authorize expression of the plaintiffs' viewpoint, does not prohibit it.  This contention ignores the obvious.  Although the expression of the plaintiffs' secular viewpoint is not

explicitly prohibited, it is effectively prohibited by virtue of what the Act requires, i.e. declaration of a National Day of Prayer.  The plaintiffs, therefore, cannot, as an alternative, participate in an official declared day promoting their viewpoint.  Further, the defendants "fail to recognize that the plaintiffs need not show an explicit prohibition on their speech in order to claim discriminatory treatment."  Id.  The plaintiffs may base their claim of injury on the defendants' unequal treatment of two viewpoints, as the court recognized in Planned Parenthood of South Carolina, specifically in this case the promotion of only the pro-prayer perspective.  Id.

Finally, and relevant to the defendants' prudential argument, the plaintiffs are appropriate parties to challenge the National Day of Prayer.  If the court "were to deny standing to the plaintiffs, it is unlikely that anyone would have standing, and the Act would effectively be immune from attack."  Id. citing Orr v. Orr, 440 U.S. 268, 272 (1979) (granting standing after recognizing the possibility that a statute would otherwise be immune from attack.

The viewpoint discrimination explicit in National Day of Prayer Proclamations is prohibited because it promotes and encourages religion which is prohibited by the Establishment Clause.  The Free Speech clause, by contrast, has no application because it restricts government regulation of private speech; it does not regulate the government's own speech.  Summum, 129 S. Ct. at 1131.  As the Supreme Court recognized, "if every citizen were to have a right to insist that no one paid by public funds express a view with which he disagreed, debate over issues of great concern to the public would be limited to those in the

55

private sector and the process of government as we know it radically transformed." <u>Id</u>.

This does not mean there are no restraints on government speech, however, as the courts have consistently recognized.  "For example, government speech must comport with the Establishment Clause."  <u>Id</u>.  Government speech endorsing religion, therefore, is prohibited, just as government speech encouraging religion by private individuals shows prohibited advocacy of a viewpoint preference.  As a result, under the principles discussed in <u>Planned Parenthood of South Carolina</u>, the plaintiffs do have standing to seek adjudication of their complaint.

## IV.   THE FREEDOM FROM RELIGION FOUNDATION HAS ORGANIZATIONAL STANDING BASED ON ITS OWN INJURY, AS WELL AS REPRESENTATIVE STANDING.

The defendants argue incorrectly that the Freedom From Religion Foundation does not have organizational standing based upon its allocation of resources to address the consequences caused by Prayer Day dedications, which impede the accomplishment of the organization's goals.  The defendants claim that organizations cannot manufacture standing merely by dedicating resources to the accomplishment of organizational goals.  A defendant's action that affects the ability of an organization to accomplish its goals, however, is a basis for constitutional standing where the organization dedicates resources to uncover and overcome the defendant's wrongful conduct.

Here, the Freedom From Religion Foundation has organizational standing to sue based on its own injury.  The Supreme Court recognized such organizational standing in *Havens Realty*, which makes clear that the only injury necessary to confer standing is allocation of

56

the organization's resources to efforts directed against the wrongful conduct of the defendant. *See Bellwood*, 895 F.2d at 1526.   In both *Havens Realty* and *Bellwood*, the plaintiffs allocated resources in order to investigate and uncover the defendant's illegal discrimination, causing the plaintiffs to suffer an injury-in-fact.

In *Fair Employment Counsel of Greater Washington, Inc. v. B.M.C. Marketing Corp.*, 28 F.3d 1268, 1277 (D.C.Cir. 1994), the Court also held that an organization's need to "counteract the defendants' assertedly illegal practices" is sufficient to confer standing because such a dedication of resources is a "manifestation of the injury that those practices had inflicted upon the organization's non-economic interest in encouraging open housing." *See* also *City of Chicago v. Leadership Council for Metropolitan Open Communities*, 982 F.2d 1986, 1096 (7th Cir. 1992) (the only injury which need be shown to confer standing is allocation of the agency's resources to efforts directed against discrimination).   In short, the Circuit Courts agree that an organization meets Article III standing requirements where a defendant's alleged actions cause the organization to devote resources to combat the effects of the alleged wrongful action.   *Fairhousing Council of Suburban Philadelphia v. Montgomery Newspapers*, 141 F.3d 71, 78 (3rd Cir. 1998).

The Courts, including the Seventh Circuit, do not consider the dedication of resources to be merely a self-inflicted injury, contrary to defendants' argument.   In *Crawford v. Marion County Election Board*, 472 F.3d 949, 951 (7th Cir. 2007), for example, the Court expressly held that an organization suffers an injury when a statute "compels it to divert more resources to accomplishing its goals."   The Court further held that "the fact that the added cost has not

been estimated and may be slight does not affect standing, which requires only a minimal showing of injury." *Id*, citing *Friends of the Earth, Inc. v. Laidlaw Environmental Services, Inc.*, 528 U.S. 167, 180-84 (2000).  In reaching its decision on standing, the *Crawford* Court followed a line of cases, beginning with *Havens Realty*, holding that an organization has standing to sue on its own behalf if a defendant's illegal acts cause the organization to allocate resources to counteract those illegal acts.  These injuries are deemed sufficiently concrete to constitute cognizable injuries under Article III.  *See Havens Realty*, 455 U.S. at 379.

The defendants' argument that the plaintiff's allocation of resources is wholly voluntary, and hence not an injury, is based on a theory not legally recognized.  As the Eleventh Circuit recently stated in *Florida State Conference of the NAACP v. Browning*, 522 F.3d 1153, 1166 (11th Cir. 2008), the distinction between actions negating the efforts of an organization, which is admittedly an injury under *Havens Realty*, and an act or law merely causing the organization to voluntarily divert resources in response, finds no support in the law.  When the use of an organization's resources arises from "the organization's need to counteract the defendants' allegedly illegal practices, that drain is simply another manifestation of the injury to the organization's noneconomic goals."  *Id*, citing *Fair Employment Council of Greater Washington*, 28 F.3d 1267-77.

The defendants naively claim that line-item accounting of dedicated resources is required for organizational standing.  The fact that an organization does not record time allocated to specific efforts does not mean that it has unlimited resources; nor does it mean

that  tasks are not performed which utilize limited resources.  Under the defendants

reasoning, a law impeding voter registration causes no injury to an organization that registers

such voters unless the employees punch a clock before going to work - -and even then the

defendants would deny any relief given the organization's purpose and mission.  That is

simply not the law.

In this case, the diversion of personnel, time and resources by the Freedom From

Religion Foundation to counteract the effects of the defendants' Prayer Proclamations

constitutes redressible injury under the Constitution.  The fact of such efforts, moreover, is

admitted by the defendants.  Presidential Prayer Day Proclamations and Prayer Day

Dedications create a culture of acceptability as to governmental endorsement of religion,

setting off 40,000 observances in 2008 at state capitols, county courthouses, on the steps of

city halls, and in schools.  All 50 states now proclaim a dedicated Day of Prayer to coincide

with the President's proclamation.  As a result, a massive nation-wide convulsion of

governmental endorsement occurs, which undermines the ability of the Freedom From

Religion Foundation to accomplish its goals and requires the dedication of substantial

resources to counteract the effects of the defendants' unconstitutional actions.  This

dedication of resources, moreover, is not measured by the costs of the present litigation.  The

Freedom From Religion Foundation dedicates internal resources responding to, objecting to,

and advising members regarding the government's exhortations that the nation engage in

prayer. The defendants concede such efforts, but snidely imply that this is just what FFRF

likes to do - - as if a policeman likes crime!

59

The National Day of Prayer, proclaimed by the President while promoting and encouraging citizens to engage in prayer, clearly affects the institutional interests of an organization like the Freedom From Religion Foundation. The Foundation is dedicated to maintaining the separation of church and state required by the Establishment Clause. This goal is chronically undermined every year by the defendants' actions, which require the allocation of resources to redress the defendants' unconstitutional actions. The dedication of a National Day of Prayer by Presidential proclamation, pursuant to a specially enacted law of Congress, operates as an institutional barrier to the accomplishment of the plaintiff's organizational objectives. The Freedom From Religion Foundation, accordingly, does have organizational standing to challenge the government's annual "poke in the eye," which constitutes a concrete and particularized injury.

Finally, the Freedom From Religion Foundation also has representational standing based upon the standing of its members, including the individual plaintiff members and other FFRF members opposed to the National Day of Prayer. *Hunt v. Washington State Apple Advertising Commission*, 432 U.S. 333, 343 (1977). The named plaintiffs have standing in their own right, as discussed above, and other members have also attended and protested Prayer Day activities, including at state capitols. The defendants concede the awareness of and objection to such activities by FFRF members, in their own Proposed Findings of Fact, which is sufficient to provide representative standing for FFRF.

## III.   THE PLAINTIFFS' OBJECTION TO CONGRESSIONALLY-MANDATED NATIONAL DAYS OF PRAYER IS NOT MOOT OR SPECULATIVE.

The defendants argue disingenuously that plaintiffs' objection to dedications and prayer proclamations is moot because past proclamations are "history," and future proclamations speculative.  The defendants ignore that the President is required to declare a National Day of Prayer each year, and the President has not disavowed the practice. Furthermore, although the defendants claim that prayer proclamations are historically ubiquitous, and statutorily mandated every year, they do not even suggest that any reason exists to believe that President Obama will discontinue issuing annual prayer proclamations, as he did just this year.  On the other hand, the defendants' argument would have the practical effect of insulating in perpetuity a challenged practice that occurs every year.

This case fits comfortably within the established exception to mootness for disputes "capable of repetition, yet evading review."  Davis v. Federal Elections Commission, 128 S. Ct. 2759, 2769 (2008).  That exception applies where the challenged action is in its duration too short to be fully litigated prior to cessation or expiration, and a reasonable expectation exists that the complaining party will be subject to the same action again.  Id.  That is clearly the case here --beyond speculation.

Even if the President unexpectedly chose to impose a moratorium on further prayer proclamations, that would not moot the plaintiffs' case or make it unduly speculative. Voluntary cessation of a challenged practice does not moot a pending action.  A party cannot evade judicial review by temporarily altering questionable behavior. *Pleasureland Museum,*

*Inc. v. Beutter,* 288 F.3d 988, 999 (7th Cir. 2002). The Supreme Court, accordingly, imposes a stringent standard for determining whether an issue has been rendered moot by a defendant's voluntary conduct: "A case might become moot if subsequent events made it absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur." *United States v. Concentrated Phosphate Export Association*, 393 U.S. 199, 203 (1968). The party asserting mootness bears a heavy burden of persuading the Court that there is no reasonable expectation that challenged conduct will reappear in the future. *Friends of Earth, Inc. v. Laidlaw Environmental Services, Inc.*, 528 U.S. 167, 189 (2000).

The defendants have not satisfied their "heavy burden." In fact, the defendants point to the Congressional enactment directing the President to issue annual prayer proclamations on the first Thursday in May as support for their position, and the Congressional enactment has not been repealed. The defendants also offer no evidence that the President has implemented an institutional prohibition on future enforcement of the law, which otherwise directs him to issue annual prayer proclamations. In these circumstances, the defendants' claim that this case is moot or speculative is totally unsupported, even by so much as a purported declaration of a temporary moratorium.

A moratorium, in any event, would not render the plaintiffs' action moot. The Seventh Circuit recognized this in *Pleasureland Museum*, 288 F.3d at 999, where the Court rejected a mootness argument after the City of Mishawaka purported to "suspend enforcement" of the provisions of an ordinance until the "matter is resolved." The Seventh Circuit found that this standstill did not create mootness because the moratorium was not permanent and could be

lifted at any time. The Court premised its holding upon the decision in *City of Los Angeles v. Lyons*, 461 U.S. 95, 97-98 (1983), where the Supreme Court held that a moratorium did not render a claim moot because the moratorium by its terms was not permanent. *See also White v. Lee*, 227 F.3d 1214, 1243 (9th Cir. 2000), recognizing that a moratorium, which "by its terms was not permanent," would not moot an otherwise valid claim for injunctive relief.

If the defendants had actually announced a temporary moratorium in this case, it would not render moot plaintiffs' claims. But the defendants have not declared a moratorium. The defendants, instead, merely suggest that the likelihood of future objectionable prayer proclamations is uncertain. This does not make it "absolutely clear" that their wrongful behavior or conduct cannot reasonably be expected to recur. On the contrary, President Obama has already continued the practice of issuing prayer proclamations which call upon American to engage in prayer.[3]

## IV. THE PLAINTIFFS' CLAIMS ARE REDRESSIBLE AGAINST THE PRESIDENT AND HIS PRESS SECRETARY.

The defendants further contend incorrectly that plaintiffs' claims are not redressible by this Court against the President. Although Congress has directed the President by statute to declare a National Day of Prayer each year, the defendants assert that the President allegedly is absolutely immune from suit challenging the constitutionality of such legislation. Whether the President's dedication of a National Day of Prayer violates the Establishment Clause or not, the defendants claim that such acts cannot be prevented by judicial action.

---

[3] Consideration of past Proclamations obviously is integral to the court's evaluation of prospective relief in this case, contrary to the defendants' "forget the past" suggestion.

The defendants, however, misread the authority on which they rely, which authority does not prohibit suit against the President as to the ministerial act of declaring a National Day of Prayer.

The United States system of government is founded on the rule of law, which includes the necessary function of an independent judiciary. The judiciary, in a system of separated powers, has the right and the duty to determine the constitutionality of legislative and executive acts. That is what courts do. The present action, therefore, seeking a determination of the constitutionality of Congress' direction to the President to declare a National Day of Prayer, is not an unprecedented or questionable "usurpation" of power by the judiciary.

The Supreme Court has recognized the general principle that courts should not interfere with the exercise of Executive discretion. *See Mississippi v. Johnson*, 71 U.S. 475 (1866). The Court, however, has expressly "left open the question whether the President might be subject to a judicial injunction requiring the performance of a purely 'ministerial' duty." *Franklin v. Massachusetts*, 505 U.S. 788, 802 (1992)

The Supreme Court's caveat in *Franklin*, regarding "ministerial" duties, recognizes that judicial inquiry as to the constitutionality of a President's ministerial actions does not implicate separation of power concerns. If Congress prescribes a ministerial duty for the President, then judicial scrutiny of the constitutionality of that legislative mandate does not require a court to evaluate the President's exercise of discretion. The defendants' argument to the contrary would mean that unconstitutional legislation directing the President to act

64

could never be challenged.

A ministerial duty is one that admits of no discretion, so that the government official in question has no authority to determine whether or not to perform the duty. *Swan v. Clinton*, 100 F.3d 973, 977 (D.C. Cir. 1996). A duty is discretionary if it involves judgment, planning, or policymaking; a duty is not discretionary if it involves enforcement or administration of a mandatory duty at the operational level. *See Beatty v. Washington Metro Area Transit Authority*, 860 F.2d 1117, 1127 (D.C. Cir. 1988).

The plaintiffs seek a determination of the constitutionality of a Congressional act, which is something this Court is not prohibited from issuing. Courts frequently rule upon the constitutionality of legislative actions taken by Congress. Declaring the underlying Congressional Act unconstitutional in this case, therefore, does not intrude upon the constitutional authority vested in the President. The President's actions can be reviewed for constitutionality, even if they are not reviewable for abuse of discretion. *Franklin*, 505 U.S. at 801; *Youngstown Sheet and Tube Company v. Sawyer*, 343 U.S. 579 (1952); and *Panama Refining Company v. Ryan*, 293 U.S. 388 (1935).

Suit against the President's Press Secretary, moreover, does not raise the same immunity issues involving the President. The plaintiffs have sued the President's Press Secretary, Robert Gibbs, seeking an injunction against his dissemination of National Day of Prayer Proclamations, which are the proclamations at issue in this case. This claim does not implicate immunity issues because the plaintiffs' alleged injury is likely to be redressed by declaratory relief against the Press Secretary. *Franklin*, 505 U.S. at 803; *Duke Power*

*Company v. Carolina Environmental Study Group, Inc.*, 438 U.S. 59, 75, n. 20 (1978); *Allen v. Wright*, 468 U.S. 737, 752 (1984).  In fact, the defendants do not really argue to the contrary.

Concern about confronting the elected head of a co-equal branch of government, while still ensuring the rule of law, can often be successfully accommodated.  This is true when the injury at issue can be addressed by injunctive relief against subordinate officials, which the defendants do not deny.  *Swan*, 100 F.3d at 978.  See also Barnes v. Kline, 759 F2d 21 (D.C. Cir. 1985)(Court upheld declaratory and injunctive relief to nullify President's attempted pocket veto).  It is "substantially likely," moreover, that the President will abide by an authoritative direction to his Press Secretary, even though the President may not directly be bound by such a determination.  *See Franklin*, 505 U.S. at 803.[4]

Here, the plaintiffs' action against the President and his Press Secretary is not barred by separation of powers principles.  On the contrary, it is the defendants who seek to eviscerate and limit the constitutional authority of this Court, whose role is to interpret and apply the United States Constitution, including the requirements of the Establishment Clause.  The prohibitions of the Establishment Clause, moreover, are not discretionary; the Establishment Clause is a mandatory and self-executing limitation, and the role of the Court is to finally interpret and apply its proscriptions.  The claim that the defendants are not subject to the rule of law misunderstands the necessary role of the courts in our system of

---

[4]  This reasoning also applies to the defendants' implied threat to unilaterally continue issuing National Prayer Day Proclamations if the authorizing legislation is invalidated.  In any event, even in that speculative case, relief against Secretary Gibbs would still be allowable.

government.

## V. PRESIDENTIAL PRAYER PROCLAMATIONS AND DEDICATIONS OF A NATIONAL DAY OF PRAYER GIVE THE APPEARANCE OF RELIGIOUS ENDORSEMENT.

### A. The Endorsement Test is Fact Dependent.

The defendants contend that Presidential Prayer Proclamations and dedications of a National Day of Prayer constitute mere acknowledgments and recognition of the role of prayer in our nation's history. The defendants also claim that official Prayer Days have no coercive effect and that they are like legislative prayer or other examples of ceremonial deism, as a matter of law, and without regard for actual fact. In this respect, the defendants' Proposed findings of fact are notable for the absence of any facts relating to the merits of the case.

Proclaiming a National Day of Prayer has been described by the Supreme Court, in *Allegheny County*, 492 U.S. at 603 n. 52, as "an exhortation from government to the people that they engage in religious conduct." In addition, Presidential Prayer Day Proclamations, including those in 2008, are orchestrated with the NDP Task Force, a patently evangelical organization dedicated to the promotion of Christianity through public prayer. As a result, the content and context of Presidential Prayer Proclamations and Prayer Day dedications give the appearance of endorsement, including specifically the Christian faith, in violation of the Establishment Clause.

The defendants also ignore the history of the National Day of Prayer legislation adopted in 1952, at the instigation of Billy Graham, as well as the 1988 Act requiring that the

first Thursday in May be the fixed National Day of Prayer, in response to lobbing by conservative religious groups, particularly the National Prayer Committee and the NDP Task Force. The 1988 Act, in particular, facilitated the mobilization of the religious viewpoint of the lobbyists behind the Act.

The defendants also ignore the undisputed historical fact that the National Day of Prayer is perceived as a religious endorsement by the President and the government, not just an acknowledgment of religion. The annual Presidential Proclamation, as a result, is critical to religious organizers.

The defendants ignore virtually all of the facts relating to the context of Presidential Prayer Proclamations, as well as the source of content for such Proclamations incorporated at the behest of the NDP Task Force. The defendants, nonetheless, argue that an "objective observer" of the President's Prayer Proclamations would not construe them as religious endorsements - - but presumably only if the "objective observer" is deemed not to be aware of the history and context of the Prayer Proclamations, including the concerted action between the President and the NDP Task Force.

The Supreme Court's endorsement test considers whether a reasonable observer aware of the history and context of a religious event would find the event to have the effect of favoring or disfavoring religion. The courts are to ask whether an objective, reasonable observer, aware of the history and context in which the religious speech occurs, would fairly understand the speech to be a government endorsement of religion. *Books*, 401 F.3d at 867; *Sante Fe Independent School District v. Doe*, 530 U.S. 290, 308 (2000). This standard

68

presupposes a person of ordinary understanding and sensibility, familiar with the circumstances surrounding the government's speech. Every government practice must be judged in its unique circumstances to determine whether it constitutes an endorsement or disapproval of religion, as the Court explained in *Indiana Civil Liberties Union v. O'Bannon*, 259 F.3d 766, 771 (7th Cir. 2001):

> Under the second prong [*Lemon*], we ask, irrespective of the State's stated purpose, whether accepting this monument for display on the Statehouse grounds has the primary effect of conveying a message that the State is advancing or inhibiting religion. The question is: would a reasonable person believe that the display amounts to an endorsement of religion? An important concern of the effects test is whether the symbolic union of church and state effected by the challenged governmental action is sufficiently likely to be perceived by adherents of the controlling denominations as an endorsement, and by the non-adherents as a disapproval of their individual religious choices. Again, to answer these questions we examine the content and context of the display.

The Establishment Clause is concerned with the message that the government may send to its citizenry about the significance of religion. *See Lynch v. Donnelly*, 465 U.S. 668, 692 (1984) (O'Connor, J., concurring), cited in *American Jewish Congress v. City of Chicago*, 827 F.2d 120, 126 (7th Cir. 1987). Government messages of endorsement impermissibly send a prohibited signal to non-adherents "that they are outsiders, not full members of the political community and an accompanying message to adherents that they are insiders, favored members of the political community." *Lynch*, 465 U.S. at 688. *See* also *McCreary County,* 545 U.S. at 860-61 (by showing a purpose to favor religion, the government sends a message to non-adherents that they are outsiders; indeed, the apparent

purpose of government action can have an impact more significant than the result expressly decreed. If the government justified a decision with a stated desire to honor Christ, the divisive thrust of the official action would be inescapable).

The test of endorsement under the Establishment Clause is analogous to the standard for determining whether a statement suggests a discriminatory preference to an ordinary reader or listener. The recognized standard for determining whether a statement evinces discriminatory preference is whether the statement "suggests a preference to the ordinary reader or listener." *Fair Housing Congress v. Weber*, 993 F.Supp 1286, 1290 (C.D. Cal. 1997). A violation occurs when a communication either implies an obvious discriminatory preference or where the ordinary reader would infer a particular discriminatory preference. *Id*. at 1291, citing *Blomgren v. Ogle*, 850 F.Supp. 1427, 1440 (E.D. Wash. 1993). The relevant standard applied in such cases is defined in terms of "the natural interpretation of the ordinary reader." *Id*., citing *United States v. Hunter*, 459 F.2d 205, 215 (4th Cir. 1972). If a message suggests to an ordinary reader that proscribed preference, the law is violated. *Id*. The ordinary reader "is neither the most suspicious, nor the most insensitive of our citizenry." *Ragin v. New York Times Co.*, 923 F.2d 995, 1002 (2nd Cir. 1991).

The "ordinary reader test" is similar in application to the test used by the courts to determine whether government speech has the appearance of improperly endorsing religion. The ordinary reader test, like the endorsement test, moreover, is fact dependent, which makes summary judgment inappropriate in most cases. As the Court noted in *Ragin*, 923 F.2d at 1001, "the present complaint cannot be dismissed for failure to state a claim for relief . . .

70

Given the ordinary reader test, it can hardly be said that the allegations [of the Complaint] are insufficient to enable plaintiffs to prove" that discriminatory advertisements were published.

In the present case, the defendants not only ignore the factual context of concerted action between the President and the NDP Task Force; they also ignore the fact that a reasonable observer is aware that prayer is a quintessential religious practice, and that admonitions to pray inherently give the appearance of endorsement. *Wallace v. Jaffree*, 472 U.S. 38, 56 (1985).  Promoting an intrinsically religious practice like prayer, therefore, will never satisfy the secular purpose requirement necessary for constitutionality.  *Jagger v. Douglas County School District*, 862 F.2d 824, 830 (11th Cir. 1989).  In fact, these principles were upheld in *Freedom From Religion Foundation v. Webb*, 93-CV-6056 (District Court, City and County of Denver, Colorado, 1993), in which Judge McMullen enjoined Denver Mayor Wellington Webb from actively participating in a Day of Prayer Against Violence ceremony:

> The challenged conduct here is Mayor Webb's press release and press conference endorsing the Day of Prayer.  Since prayer is exclusively a religious act, the endorsement of a Day of Prayer would logically be interpreted by a reasonable person as an endorsement of religion. Because from all appearances, Mayor Webb was acting in his official capacity in issuing the press release and conducting the press conference endorsing the Day of Prayer, the Court concludes that a reasonable person would interpret his conduct as governmental endorsement of religion.  As such, it violates the Establishment Clause.

The constitutionality of Presidential Prayer Proclamations cannot be properly decided with out considering the evidence of history and context.  The defendants, however, are

oblivious to the present day reality that the National Day of Prayer has become exactly what the Establishment Clause is intended to prevent: a battle ground with the government deeply involved.

Here, the record include overwhelming evidence of the joint and concerted action between the President and the NDP Task Force as to the dedication and celebration of official Days of Prayer, including collaboration on the content of the official Prayer Proclamations.   The defendants, however, ignore all of the factual detail about this relationship between the President and the NDP Task Force, which relationship provides context that is relevant to whether a "reasonable observer," knowing of this concerted action, would find that the Presidents' Prayer Proclamations and Prayer Day dedications give the appearance of official endorsement of religion.

Context and content do count in determining whether public officials have crossed the line between "benign ceremonial deism" and actions that give the appearance of official endorsement of religion.  *See Allegheny County,* 492 U.S. at 598-600.  The defendants, nonetheless, simply ignore the evidence as if it did not exist.  This is not a proper approach for summary judgment.  The court must instead consider the evidence and draw reasonable inferences in favor of the non-moving parties.  This the defendants fail to do - - instead, they try to skate by without evidence at all.

72

B.    The Supreme Court Has Not Approved Presidential Prayer Day
      Dedications.

The defendants incorrectly imply that Prayer Proclamations and dedication of Prayer

Days constitute nothing more than benign "recognition of the role of religion and prayer in

American history," already approved by the Supreme Court.  The facts tell a different story,

involving much more context and content than the defendants concede, but even without

concerted action between the President and the NDP Task Force, official Prayer

Proclamations are more than mere acknowledgments of the history and role of religion in

America.  Prayer Proclamations are not just "honorary;" they constitute government speech

literally exhorting citizens to engage in prayer.

The Report of the Senate Committee on the Judiciary relating to the National Day of

Prayer belies the defendants' claim that the National Day of Prayer "is simply

acknowledgment of a tradition."   The claim that Congress intended the National Day of

Prayer Enactment for the secular purpose of "acknowledging the role of faith" in the Nation's

history is simply not true.  Instead, the Senate Report describes the intent of Congress for the

people of this country to "reaffirm" the Nation's supposed deep religious conviction:

> It would certainly be appropriate if, pursuant to this resolution and the
> proclamation it urges, that the people of this country were to unite in a
> day of prayer each year, each in accordance with his own religious faith,
> thus reaffirming in a dramatic manner the deep religious conviction
> which has prevailed throughout the history of the United States.  (See
> Exhibit A attached to this Brief.)

The intent to "reaffirm in a dramatic manner" the supposed religious convictions of the

nation does not reflect the claimed secular purpose of merely acknowledging the supposed role of religion in the nation's history.  Instead the purpose of the National Day of Prayer was "to have the public assemble in churches, synagogues and other places of worship to offer prayers for world peace."  The Passage of the Act, moreover, occurred only after weeks of crusading by Billy Graham.

Significantly, the Senate Report on the National Day of Prayer Legislation also exposes a very troublesome historical inaccuracy.  The Senate Report states that "when the delegates to the Constitutional Convention encountered difficulties in the writing and formation of a Constitution for this Nation, prayer was suggested and became an established practice at succeeding sessions."  That statement is wrong, but it lies at the core of the defendants' attempt to justify the legislative enactment calling for a National Day of Prayer in 1952, more than 150 years after the signing of the United States Constitution.  Leo Pfeffer, Church, State & Freedom (1967), describes the real facts at page 121-122, in his scholarly examination of the Establishment Clause:

> It is perhaps symbolic of the difference in the relationship of state and religion between the Continental Congress and the new government established by the Constitutional Convention of 1787, that whereas the Continental Congress instituted the practice of daily prayers immediately on first convening, the Convention met for four months without any recitation of prayers.  After the Convention had been in session for a month, the octogenarian Franklin, who in earlier years had been pretty much of a Deist, moved "that henceforth prayers imploring the assistance of heaven, and its blessings on our deliberations, be held in this Assembly every morning before we proceed to business, and that one or more of the Clergy of this City be requested to officiate in that service."

The motion was received politely though not without embarrassment. According to the records of the Convention, "After several unsuccessful attempts for silently postponing the matter by adjourning, the adjournment was at length carried, without any vote on the motion."

More than symbolic, it is deeply significant that whereas there was scarcely a document or promulgation issued by the Continental Congress that did not contain an invocation to "God" or one of the numerous synonyms of the Deity, the Constitution emerging from the Convention contained no such invocation or reference. This omission was not inadvertent.

The different treatments of religion by the Continental Congress and the Constitutional Convention is significant in its implications about the supposed historical meaning of the Establishment Clause. Leonard W. Levy, <u>The Establishment Clause: Religion and the First Amendment</u> (1986), notes this significance, as well as the historical confusion still being perpetuated:

The Constitutional Convention of 1787, which framed the Constitution of the United States, gave only slight attention to the subject of a Bill of Rights and even less to the subject of religion. In contrast to the Declaration of Independence and to many acts of the Continental Congress, the Constitution contains no references to God; the Convention did not even invoke divine guidance for its deliberations. Its finished product made no reference to religion except to prohibit a religious test as a qualification for federal office holders.

There are no other references to the subject of religion at the Constitutional Convention, except for Benjamin Franklin's speech at a critical juncture of the proceedings on the reason that prayers should open its sessions. President Ronald Reagan, who sometimes reinvents history, mistakenly declared that as a result of Franklin's motion, "From that day on they opened all the Constitutional meetings with a prayer." Practical considerations - an unwillingness to let the public think the Convention was in trouble, lack of money to pay a minister, and

deference to Philadelphia's Quakers - resulted in the death of the Franklin motion.  The Convention, he noted, "Except three or four persons, thought prayers unnecessary."

*Id*. at 63-64.

They may have prayed at the Continental Congress, but they did not pray at the Constitutional Convention.  That is a distinction that makes a difference.  The Articles of Confederation adopted by the Continental Congress do not provide a litmus for the interpretation of the Establishment Clause of the United States Constitution.  The Articles of Confederation were ratified on March 1, 1871, but they lasted only seven years.  They were seriously defective.  The Articles were subsequently replaced by the Constitution on June 21, 1788, and that Constitution has lasted more than 200 years.  Whereas the Articles of Confederation, moreover, hardly recognized the separation between church and state, the Constitution subsequently incorporated that separation, with continuing success.

In fact, the major architects of the Constitution vigorously opposed government meddling in religion, including the issuance of proclamations of prayer.  Thomas Jefferson, for one, opposed such proclamations.  "In his view, presidents should have nothing to do with Thanksgiving proclamations or days of prayer or times of devotion.  These were religious matters falling into the exclusive province of religious, not political leaders; 'the right to issue such proclamations belong strictly to the former,' Jefferson declared, 'and this right can never be safer than in their own hands, where the Constitution has deposited it.'"  Edwin S. Gaustad, Faith of Our Fathers:  Religion in the New Nation, at p. 45 (1987).  Jefferson's

explanation for refusing to issue prayer proclamations, significantly, evidences that the First Amendment restricts not only Congress, but the President as well.  In fact, no known authority supports the defendants' claim that the Establishment Clause has no applicability to the President.

James Madison shared Jefferson's view regarding the issuance of prayer proclamations.  Madison's views are particularly compelling because Madison is falsely cited as a proponent of the Constitutionality of dedicated days of prayer.  He was not.  Although Madison did stray from his convictions during a time of war, he did not believe his actions were constitutional.  Levy describes the circumstances:

> In his "Detached Memoranda" Madison also stated that "religious proclamations by the Executive recommending Thanksgivings and fasts are shoots from the same root with the Legislative Acts reviewed." Madison made this remarkable judgment about so innocuous an act as a Presidential recommendation for a day of Thanksgiving, another extreme example of non-preference on a matter respecting religion.  He regarded such recommendations as violating the First Amendment: "They seem" he wrote, "to imply and certainly nourish the erroneous idea of a national religion."  As a President, however, Madison had proclaimed several days of fast and thanksgiving, but he found extenuating circumstances in the fact that he was Chief Executive during the time a war was fought on national soil.

Levy, The Establishment Clause: Religion and the First Amendment, at 99-100.  *See* also Pfeffer, Church, State & Freedom, at 266-67:

> Madison was unable to resist the demands to proclaim a day of thanksgiving, but after retiring from the Presidency he set forth five objections to the practice: (1) an executive proclamation can be only a recommendation, and an advisory government is a contradiction in terms; (2) in any event, it cannot act in Ecclesiastical matters; (3) a Presidential

77

proclamation implies the erroneous idea of a national religion; (4) the tenancy of the practice is "to narrow the recommendation to the standard of the predominant sect," as is evidenced by Adams' calling for a Christian worship; and (5) "the liability of the practice to a subserviency to political views, to the scandal of religion as well as the increase of party animosities."

The defendants' faulty history does not support the constitutionality of Prayer Day Proclamations; nor does their interpretation of Supreme Court precedent.  The United States Supreme Court has recognized in *Allegheny v. American Civil Liberties Union*, 492 U.S. at 603 n. 52, that official Prayer Proclamations stand on different footing than "ceremonial deism" such as legislative prayer.  The Supreme Court stated:

It is worth noting that just because Marsh sustained the validity of legislative prayer, it does not necessarily follow that practices like proclaiming a National Day of Prayer are constitutional.  Legislative prayer does not urge citizens to engage in religious practices, and on that basis could well be distinguishable from an exhortation from government to the people that they engage in religious conduct.

Significantly, the Court's doubt about the constitutionality of Prayer Day Proclamations in *County of Allegheny* came after the Court's decision in *Lynch v. Donnelly*, 465 U.S. 668, 675 (1984), upon which the defendants rely.

The Supreme Court's concern about religious endorsements has found voice in subsequent recent decisions as well.  For example, in *McCreary County,* 545 U.S. at 861, the Court noted that when the government designates Sunday closing laws, it advances religion only minimally because many working people would take the day off as one of rest regardless, "but if the government justified its decision with a stated desire for all Americans

78

to honor Christ, the divisive thrust of the official action would be inescapable." As a result, the Supreme Court has upheld Sunday closing statutes on secular grounds, after finding that the government had forsaken the religious purposes behind predecessor laws. *Id*.

The Supreme Court further noted in *McCreary* the difference between passive symbols and "insistent calls" for religious action. "Creches placed with holiday symbols and prayers by legislators do not insistently call for religious action on the part of citizens; the history of posting the [Ten] Commandments [however] expressed a purpose to urge citizens to act in prescribed ways as a personal response to divine authority." 545 U.S. at 877 n. 24.

Finally, the Supreme Court noted in *McCreary* that the framers of the Constitution intended the Establishment Clause to require government neutrality in religion, "including neutrality in statements acknowledging religion. The very language of the Establishment Clause represented a significant departure from early drafts that merely prohibited a single national religion, and the final language instead extended the prohibition to state support for religion in general." *Id*., at 878. *See* also *Lee v. Weisman*, 505 U.S. 577, 503-506 (1992) (Justice J. Souter, concurring) ("President Jefferson steadfastly refused to issue Thanksgiving Proclamations of any kind, in part because he thought they violated the Religion Clauses.").

The Supreme Court, therefore, has not determined that Prayer Day Proclamations are proper acknowledgments of religion, even without the concerted action of patently evangelical organizations, which marks this case. The defendants' argument to the contrary is wrong.

79

Nor has the constitutionality of Prayer Proclamations and Prayer Day dedications been decided ancillary to any judicial recognition of holidays like Thanksgiving and Christmas. Judicial acknowledgment of such holidays, in fact, has been limited to instances where the justification was based upon the secular aspects of such holidays.  By contrast, courts have not sanctioned government recognition of holidays where the justification was based upon "religious connotations."  For example, in *Ganulin v. United States*, F. Supp. 2d 824, 834-35 (S.D. Oh.1999), the Court concluded that the United States did not violate the Establishment Clause by giving federal employees a paid vacation day on Christmas, but only because the government was doing no more than recognizing the cultural significance of the holiday, rather than its religious significance.  According to the court, "the conclusion that Christmas has a secular purpose is supported by cases analyzing the constitutionality of school, office, and courthouse closings on other days traditionally celebrated as holy days by Christians," including Good Friday.  *Id*., at 833.

In *Granceier v. Middleton*, 173 F.3d 568, 574 (6th Cir. 1999), the Court summarized the law in regard to Good Friday closings, finally concluding that holiday closings are suspect "if the purpose for which they are instituted is religious."  *See also Cammack v. Waihee*, 932 F.2d 765 (9th Cir. 1991); *Metzl v. Leininger*, 57 F.3d 618 (7th Cir. 1995); and *Bridenbaugh v. O'Bannon*, 185 F.3d 796 (7th Cir. 1999).  Government acknowledgment of various holidays with supposed religious connotations has been upheld only so long as the acknowledgment was not based on the religious significance of the holiday.  In fact, that

distinction lies at the heart of the Supreme Court's *Allegheny* decision regarding the symbolism of government speech.

      C.    <u>Government Speech Must Be Evaluated By Content and Context</u>.

Even with public displays of creches and Nativity scenes, the content and context of the display must be considered in order to determine whether any particular display gives the appearance of endorsement of the religious aspects of the Christmas holiday season. Courts have not simply generalized that religious holiday displays constitute no more than the "acknowledgment" of the historical significance of Christmas in America. Public displays, instead, are carefully scrutinized for any appearance of governmental endorsement of the religious significance of the holiday. Hence, in *Allegheny*, the Supreme Court concluded that the display of a creche had an unconstitutional effect, but a menorah display was allowed because that display in its particular physical setting was deemed a visual symbol for a holiday with a secular dimension.

When employing the proper analytical approach, therefore, a court is charged with the responsibility of "assessing the totality of the circumstances surrounding the display to determine whether a reasonable person would believe that the display amounts to an endorsement of religion." *Books v. City of Elkhart*, 235 F.3d 292, 304 (7th Cir. 2000). The government's use of religious symbolism is unconstitutional if it has the effect of endorsing religious beliefs, and the effect of the government's use of religious symbolism depends on its context. *Id*.

The appropriate emphasis has remained squarely on evaluating the totality of the circumstances when judging the constitutionality of public religious displays, including in the Supreme Court's recent Ten Commandments decisions in *McCreary* and *Van Orden v. Perry*, 545 U.S. 677 (2005). In *McCreary* and *Van Orden*, the Supreme Court reached different conclusions as to the constitutionality of challenged Ten Commandments displays based upon the different circumstances and context of each display. Neither decision, however, leaves any doubt that if an objective observer could conclude from appearances and historic knowledge that the government was demonstrating a religious preference, then the Establishment Clause would be violated.

The concept of "ceremonial deism" also is dependent upon the conclusion that a reasonable observer would not view a religious display or government speech as having religious significance. "The constitutional value of ceremonial deism turns on a shared understanding of its legitimate non-religious purposes." *Elk Grove Unified School District v. Newdow*, 542 U.S. 1, 37 (2004) (J. O'Connor, concurring). This determination, as noted, necessarily involves evaluation of context and content, including circumstances that may change with the passage of time as the actions and motivations of officials change. *Summum*, 129 S. Ct. at 1136.

Even practices such as legislative prayer are not constitutionally acceptable in all circumstances, as Justice Blackmun recognized in *County of Allegheny*, 492 U.S. at 604 n. 53, stating that "not even the unique history of legislative prayer can justify contemporary

82

legislative prayers that have the effect of affiliating the government with any one specific faith or belief." *See also Henrichs v. Bosma*, 440 F.3d 393, 399 (7th Cir. 2006).  Nor does one acquire a vested or protected right in violation of the Constitution.  *Marsh v. Chambers*, 463 U.S. 783, 790 (1983).

Here, the defendants avoid the essential analysis.  First, they incorrectly equate the legislative prayer in *Marsh* with Presidential Prayer Proclamations which exhort participation in religious activity.  Next, they try to equate Thanksgiving and Memorial Day Proclamations marked by prayer with Proclamations extolling and exhorting prayer in its own right.   The two situations are different, and the facts of record in this case establish that the National Day of Prayer is seen as an endorsement of religion, and one that is highly divisive.  Finally, the defendants incorrectly claim that the National Day of Prayer supposedly reflects "an unbroken history of official acknowledgment of the role of religion in American life from at least 1789."  This is not true, as some of the Presidential Proclamations even contradict this claim.  For instance, the 1987 National Day of Prayer by Ronald Reagan acknowledged only intermittent Day of Prayer Proclamations before 1952:

> In 1952 the Congress of the United States, resuming a tradition observed by the Continental Congress from 1776 to 1783 and followed intermittently thereafter, adopted a resolution calling on the President to set aside and proclaim a suitable day each year as a National Day of Prayer.

In 1983 President Reagan's National Day of Prayer Proclamation similarly noted:

> Two hundred years ago in 1783, the Treaty of Paris officially ended the

long, weary Revolutionary War during which a National Day of Prayer
had been proclaimed every Spring for eight years.  When peace came, the
National Day of Prayer was forgotten.

Government speech, whether it involves legislative prayer, official Prayer
Proclamations, government displays of Ten Commandments, or other religious symbols,
must be evaluated in the particular circumstances of each case in order to determine whether
the speech impermissibly endorses religion.  In the present case, therefore, the question
immediately before the Court is whether the facts and circumstances relating to Presidential
Prayer Proclamations and Prayer Day dedications is sufficient so that a reasonable observer
could find the appearance of endorsement.  If the evidence and reasonable inference support
such a possibility, then the defendants' Motions must be denied.

The Court must focus on the content and context in which the government's use of
religious symbolism appears.  This requires highly fact-specific scrutiny which must be
approached on a case-by-case basis.  Analysis of an Establishment Clause challenge to
government speech is ultimately dependent, in important part, on factual determinations,
including what a reasonable observer might fairly understand to be the government's primary
message, in its particular setting.  The defendants merely side step the evidence.

D.    The Relationship With the NDP Task Force is Part of the Relevant Content
        and Context, But Ignored By The Defendants.

The relevant context in this case involves the President issuing Prayer Proclamations
and dedicating Days of Prayer, in celebratory and festive circumstances, whereby citizens are

84

encouraged to engage in prayer.  The Prayer Proclamations are not issued in circumstances that merely give passive "acknowledgment" of the history of religion in America.  Instead, the circumstances indicate a preference for religion, including Christianity, and the dedicated Prayer Days involve controversial and divisive exhortations to pray.

Presidential Prayer Proclamations also evidence concerted action with evangelical Christian organizations, including the NDP Task Force.  The President's 2008 Prayer Proclamation expressly incorporated the preselected Biblical quote given to him by the NDP Task Force.  A reasonable observer would know that the express reference in the President's Prayer Proclamation was derived from the NDP Task Force, which dictates a single theme to be used by the President and the governors of all 50 states, although the defendants completely ignore this fact.  By agreeing to incorporate the NDP Task Force's annual theme, however, the President created the appearance of endorsement of the NDP Task Force.  The alliance with the NDP Task Force created the intended impression that the NDP Task Force and government are working hand-in-glove in sponsoring National Day of Prayer, - - a situation that remains fully capable of repetition.

Nor has the government aligned with a "benign" nondenominational organization. The NDP Task Force is a virulently Christian organization; its organization and promotion of the National Day of Prayer and corresponding state Prayer Days are based on exclusively Judeo-Christian principles; and the NDP Task Force Prayer Day dedications are not passive acknowledgments of the historical significance of religion - - the NDP Task Force claims to

publicize and preserve America's alleged Christian heritage, to encourage and emphasize prayer, and to glorify the Lord in word and deed.

Proper consideration of Prayer Proclamations and Prayer Day dedications must also take into account the inherent nature of prayer.  In *Jaffree v. Wallace*, 705 F.2d 1526, 1534-35 (11th Cir. 1983), the Court emphasized that prayer is the quintessential religious practice, such that no secular purpose generally can be inferred.  *See* also *North Carolina Civil Liberties Union v. Constangy*, 947 F.2d 1145, 1150 (4th Cir. 1991) (an act so intrinsically religious as prayer cannot meet, or at least would have difficulty meeting, the secular purpose prong of the *Lemon* test, citing *Wallace v. Jaffree*, 472 U.S. 38, 56 (1985)).  Exhortations from government officials to engage in religious conduct, such as by proclaiming a National Day of Prayer, are distinguishable from passive acknowledgment of religious heritages. *County of Allegheny*, 492 U.S. at 603 n. 52.  The National Day of Prayer contemplates "reaffirmation" by action.

The circumstances of the present case, including the dedication of official Prayer Days, constitute calls to action that are distinguishable from "benign" acknowledgments of religion.  Presidential Prayer Proclamations are issued in a context in which prayer is being promoted and extolled as a religious phenomenon. Prayer is being promoted as and for the sake of religion.  There is no secular rationale for the Prayer Day celebrations marked by Presidential Prayer Proclamations, except the encouragement of prayer.

E.    The National Day of Prayer Legislation is Facially Unconstitutional and

86

Unconstitutional As Applied.

The 1952 Legislation requiring the President to set aside an appropriate day as a National Day of Prayer, as well as the 1988 Legislation requiring that the first Thursday in May in each year be set aside as a National Day of Prayer, are facially unconstitutional and unconstitutional as applied.  The Legislation is facially unconstitutional because the history and understanding of the Legislation establishes that the purpose and intent was to designate a day for the singular purpose of exhorting prayer for its own sake, rather than simply to invoke prayer ceremonially to recognize other purposes, such as Thanksgiving, or Memorial Day, or War Remembrances.  The legislation fails the first lemon test.

The National Day of Prayer Legislation in both 1952 and 1988, moreover, is perceived and understood to be a call to prayer, rather than a mere acknowledgment of the role of prayer.  In fact, the 1988 Legislation, designating a predictable National Day of Prayer was initiated and adopted for the purpose of facilitating the scheduling of events related to the National Day of Prayer by organizations wanting to mobilize their membership base.  Pat Boone, Co-Chairman of the National Prayer Committee testified in support of the bill, noting that annual observances with a different day being proclaimed each year "offered little advance notice to adequately inform the grass routes constituencies."  (134 Cong. Rec. E683-01, March 16, 1988.)

The defendants' argument that Presidential Proclamations need not encourage prayer in violation of the Establishment Clause is belied by the evidence of consistent Presidential

Proclamations that uniformly go beyond merely acknowledging religion, but rather encourage all Americans to participate in the inherently religious activity of prayer. A review of all the Presidential Proclamations since 1952 shows their consistently exclusionary and proselytizing message of the Presidential Proclamations.

1. From 1952 - 2009, 44 of the 57 NDP Proclamations have explicitly directed "all" Americans (or "every" or "each" American) to pray. These presidential proclamations occurred in the years: 1952, 1953, 1954, 1955, 1956, 1957, 1961, 1962, 1964, 1965, 1966, 1967, 1970, 1972, 1974, 1975, 1976, 1977, 1978, 1979, 1980, 1983, 1986, 1987, 1989, 1990, 1991, 1992, 1993, 1994, 1995, 1996, 1997, 1998, 1999, 2001, 2000-2008.

2. Other Presidential NDP proclamations have by implication directed everyone to pray, such as Pres. Nixon in 1968, saying "Let us . . . thank God;" Pres. Nixon in 1969 saying "I ask that on this day the people of the United States pray." In 1988, Pres. Ronald Reagan intoned in his NDP Proclamation, "let us join together." In 1989 Pres. Reagan said "I invite the people of this great nation [to pray]". In 1990, he said, "I ask my fellow Americans to join with me. . ."

3. In 1964, Pres. Lyndon Baines Johnson said: "I call upon all of our citizens, therefore, to observe the National Day of Prayer in accordance with our custom—each in his own way and in his own faith," and then giving Americans four things to pray about.

4. In 1958, Pres. Eisenhower called on "my fellow Americans," and even "all who may be visitors," to pray.

5. At least ten Presidential NDP proclamations rely upon and repeat historical errors. The most common error is the statement that the founders prayed at the Constitutional Convention that adopted the deliberately secular Constitution. These inaccurate Presidential proclamations were made in 1961, 1965, 1973, 1984, 1989, 1990, 1994, 1996, 1999 and 2001. At least four other proclamations

imply this error.  In 1961, Pres. John F. Kennedy repeated outright this fallacy.  "During the deliberations in the Constitutional Convention they were called to daily prayers."

6.  In 1984, Pres. Ronald Reagan's proclamation notes Benjamin Franklin calling for prayers which he did, but incorrectly states: In fact, Franklin's call for prayer was ignored. "With these words, Mr. Franklin called upon the Convention to open each day with prayer, and from the birth of our Republic, prayer has been vital to the whole fabric of American life."  It is not surprising that so many of the NDP Presidential Proclamations repeat this historic error, because The Report to accompany H.J. Res. 382 enacting a National Day of Prayer is based on the same error: "When the delegates to the Constitutional Convention encountered difficulties in the writing and formation of a Constitution for this Nation, prayer was suggested and became an established practice at succeeding sessions."

7.  In 1980, Pres. Jimmy Carter in his NDP Proclamation made this broad generality implying prayer was part of the formation of our secular Constitution: "While never willing to bow to a tyrant, our forefathers were always willing to get to their knees before God."

8.   The 1984 NDP Presidential Proclamation by Pres. Reagan is one of at least five Presidential Proclamations which repeats as fact the apocryphal story of Washington kneeling in prayer at Valley Forge, which never happened.

9.  The 1958 Proclamation by Pres. Eisenhower ignores nonbelievers, saying the nation was "challenged by an aggressive denial of Divine Providence."

10.  The 1980 proclamation by Pres. Jimmy Carter likewise says "as a nation we cannot but hope that more of our citizens would, through prayer, come into a closer relationship with their maker."  This is not surprising, considering the legislation enacting the NDP likewise heaps disrespect on nonbelievers, by saying the law was designed as a measure against "the corrosive forces of communism which seems simultaneously to destroy

89

our democratic way of life and the faith in an Almighty God on which it is placed."

11.     The 1987 proclamation by Pres. Reagan reads like a sermon and chides Americans for "being too proud to make, or too prone to forget" an acknowledgment to deity.

12.     The 1991 proclamation by Pres. George H.W. Bush says "we owe constant praise to God."

13.     Several proclamations include biblical allusions: 1961; 1970, 1979, 1979, 1984,1986 ("pray without ceasing"); and biblical references in the NDP presidential proclamations issued in 1990, 1991, 1992, 1994, 1997, and in 2992, 2001, 2004 and 2008.

14.     All of Pres. George W. Bush's NDP Proclamations encourage special observances in all 50 states, and enjoin citizens to move beyond just prayer to action and attendance at these events.

15.     Most NDP Proclamations have directed "all" Americans not only to pray, but told them what to pray about.  A blatant example include the NDP Proclamations in 1959, in which Pres. Dwight D. Eisenhower called "upon my fellow Americans and all who may be visitors in our country . . . to join in prayer for our Nation . . that we may have Divine guidance in our efforts to lead our children."

16.     Other NDP Proclamations that read like pious laundry lists included the 1960 proclamation by Pres. Eisenhower, who directed "my countrymen" to remember such religious beliefs as that "we shall ever place our trust in the keeping of God's commandments."

17. In 1961, Pres. John F. Kennedy listed five items over which to "Let us pray," including for "divine guidance in our efforts to lead our children in the ways of the truth."

18. In 1962, Pres. Kennedy listed four items over which to pray, after expressing the dubious idea that "Almighty God was a dominant power in the lives of our Founding Fathers; and . . . they expressed this faith in prayer."

19. In 1963, Pres. Kennedy's proclamation was "conscious of the religious character of our people."

20. On Sept. 25, 1970, several months after ordering the invasion and bombing of Cambodia, Pres. Richard Nixon in his NDP proclamation invited "all Americans to pray that the scourge of war be lifted from the earth."

21. On Oct. 12, 1971, Pres. Richard Nixon told Americans in his NDP Proclamation: "This hunger can only be met in its fullness through prayer." He urged "that Americans pray for the fullness of reconciliation among all peoples."

22. In 1979, during Pres. Carter's NDP Proclamation proclaiming Oct. 3, 1979, the National Day of Prayer, he asked "all Americans to join with me on that day to recommit ourselves to God."

23. The 1983 NDP Proclamation by Pres. Ronald Reagan, declaring May 5, 1983 to be the National Day of Prayer, belied the propaganda of the NDP Task Force, and the misinformed assertions of defendants, that there had been an "unbroken" line of prayer proclamations dating to the nation's inception. Pres. Reagan proclaimed: "Two hundred years  ago in 1783, the Treaty of Paris officially ended the long, weary Revolutionary War during which a National Day of Prayer had been proclaimed every spring for eight years. When peace came the National Day of Prayer was forgotten. For almost half a century, as the Nation grew in power and wealth, we put aside this deepest expression of American belief—our national

dependence on the Providence of God.  "It took the tragedy of the Civil War to restore a National Day of Prayer. . . . Revived as an annual observance by Congress in 1952, the National Day of Prayer has become a great unifying force for our citizens who come from all the great religions of the world. Prayer unites people. This common expression of reverence heals and brings us together as a Nation and we pray it may one day bring renewed respect for God to all the peoples of the world."  In conclusion, Pres. Reagan added: "I call upon every citizen of this great Nation to gather together on that day in homes and places of worship to pray. . ."

24.    In 1984, Pres. Reagan quoted II Chronicles 7:14: "If my people, who are called by my name, will humble themselves and pray and seek my face and turn from their wicked ways, then I will hear from heaven and will forgive their sin, and will heal their land."

25.    In 1986, Pres. Reagan's NDP Proclamation said "Christ enjoins us to 'pray without ceasing.' "

26.    In 1988, Pres. Ronald Reagan in his NDP Proclamation, said: "The lesson is clear—that in the winning of freedom and in the living of   life, the first step is prayer." He added that the first step of the American government was "humble, heartfelt prayer."

27.    In 1989, Pres. George H.W. Bush gave a very long proclamation asserting: "Our Nation's history and the lives of millions of men and women around the world provide compelling evidence of the power of faith and the efficacy of prayer." He spoke of "the Father's House, the New Testament parable of the Prodigal son, to show that "God answers the prayers of those who place their trust in Him." He added:  "I therefore ask my fellow Americans to join with me in prayer for our children. Let us strive to help each of them sink their roots into the rich soil of God's love for the beings He has made in His own image.  Let us show them through prayer that we, too, like our Nation's Founders, seek our shelter—our rock and our salvation—in the arms of God."

28.    In 1991, Pres. George H.W. Bush's NDP Proclamation began, "we owe constant praise to Almighty God." . . . "On this National Day of Prayer, let us acknowledge with heartfelt remorse the many times we have failed to appreciate the Lord's gifts and to obey His Commandments. Giving humble thanks for His mercy, let us vow to fulfill not only our responsibilities but also our potential as one Nation under God. Most important let us make our prayers pleasing to Him. . . "

29.    "[U]se the powerful medium of prayer," Pres. Clinton urged in his 2000 NDP Proclamation.

30.    In 2001, Pres. George W. Bush used the NDP Task Force wording: "The theme of the 2001 National Day of Prayer is 'One Nation Under God.' In a prayer written specially for the occasion, Americans are asked to pray for 'a moral and spiritual renewal to help us meet the many problems we face.' Special observances are scheduled for all 50 States, with local volunteers planning a variety of activities including prayer breakfasts, concerts, rallies, and student gatherings."

31.    In his 2004 NDP Proclamation, Pres. Bush again cited scripture, noting "the Lord is near to all who call upon Him.
. . He also will hear their cry, and save them."

32.    In 2005, Pres. Bush in his NDP Proclamation, enjoined: "The Congress by Public Law 100-307, as amended, has called on our citizens to reaffirm the role of prayer in our society and to honor the freedom of religion by recognizing annually a "National Day of Prayer."

33.    In 2008, Pres. Bush once again expressly adopted the NDP Task Force theme and supporting scripture:   "This year's theme, "Prayer! America's Strength and Shield, "is taken from Psalm 28:7, "The Lord is my strength and my shield; my heart trusts him, and I am helped." (The Annual Presidential Proclamations since 1952 are attached chronologically to this brief for the convenience of the court.)

The factual historical record of Presidential Proclamations calling for a National Day of Prayer rebuts the defendants' suggestion that no prospective relief is necessary or appropriate, even if former President Bush inappropriately incorporated the National Day of Prayer Task Force annual theme and supporting scripture into his own proclamations. By doing so, President Bush clearly aligned himself with the recognizably Christian expression of the National Day of Prayer Task Force. This case is not just about those Proclamations, however, because even the most recent proclamation by President Obama, cautiously issued in the crucible of litigation, expressly called for Americans to engage in prayer -- because that is what the National Day of Prayer is all about. Virtually all of the Presidential Proclamations since 1952 have gone beyond any acceptable acknowledgment of religion, and instead they have promoted prayer as a normative and recommended activity for all of American citizens.

The history of Presidential Proclamations declaring a National Day of Prayer establishes the facial problem with declaring a National Day of Prayer as such; the record of actual Proclamations further demonstrates that, at least as applied, Presidential Proclamations declaring a National Day of Prayer go beyond any Constitutional acceptability for mere acknowledgments of religion. Presidential Proclamations constitute government speech that unconstitutionally gives preferential treatment to a pro-prayer viewpoint in contrast to the views of non-believers. See Mercier v. LaCrosse, 305 F. Supp. 2d 999, 1011 (W. D. Wis. 2004). This viewpoint preference, on a matter proscribed by the First amendment, can and

should be redressed by invalidation of the National Day of Prayer Legislation. <u>Planned Parenthood of South Carolina</u>, 361 F. 3d at 490.

The court should declare the Legislation requiring the President to declare an annual National Day of Prayer to be unconstitutional on its face. Alternatively, the court should specifically enjoin the defendants from distributing National Day of Prayer Proclamations that encourage and exhort Americans to engage in active prayer.

**CONCLUSION**

For all of the above reasons, the court should deny the defendants' Motion for Summary Judgment.

Dated this 18th day of November 2009.

BOARDMAN LAW FIRM
By:

   /s/ Richard L. Bolton
Richard L. Bolton, Esq.
Boardman, Suhr, Curry & Field LLP
1 South Pinckney Street, 4th Floor
P. O. Box 927
Madison, WI  53701-0927
Telephone:  (608) 257-9521
Facsimile:  (608) 283-1709
Attorneys for Plaintiffs

95

CERTIFICATE OF SERVICE

I hereby certify that on November 18, 2009, I electronically filed the foregoing document with the Clerk of Court using the CM/ECF system, which will send notification electronically to all attorneys of record.

/s/Lisa E. Hibbard

@PFDesktop\::ODMA/WORLDOX/F:/DOCS/wd/26318/17/A0924033.WPD