UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WISCONSIN

FREEDOM FROM RELIGION
FOUNDATION, INC.; ANNE NICOL
GAYLOR; ANNIE LAURIE GAYLOR;
PAUL GAYLOR; DAN BARKER;
PHYLLIS ROSE, and JILL DEAN,

        Plaintiffs,

                            Case No: 08-CV-588

v.

PRESIDENT BARACK OBAMA; WHITE HOUSE
PRESS SECRETARY ROBERT GIBBS; WISCONSIN
GOVERNOR JIM DOYLE; and SHIRLEY DOBSON,
CHAIRMAN OF THE NATIONAL
DAY OF PRAYER TASK FORCE,

        Defendants.

## PLAINTIFFS' BRIEF IN SUPPORT OF JUDGMENT IN THEIR FAVOR

## I.     INTRODUCTION.

Every year since 1952, the President of the United States issues an official Prayer

Proclamation and dedicates a National Day of Prayer.[1]  The President does this because

Congress has legislatively mandated that he do so.  The President has not hesitated to issue

such Prayer Proclamations, which extol the virtues of prayer and exhort all Americans to

engage in prayer--solely for the sake of encouraging prayer itself.  This annual message of

---

[1] Plaintiffs' Proposed Findings of Fact are incorporated herein to Brief.

religious endorsement is then disseminated by the President's Press Secretary so that it will be made known to all Americans.

The posting of the President's Prayer Proclamation on a courthouse door, or mailing it directly to citizens, or handing it out at public employment offices, would unquestionably run afoul of the Establishment Clause, just as disseminating it to all citizens merely compounds the offense. The government, cannot endorse, promote or prefer religion over non-religion, and prayer is quintessentially a religious activity.

It is a matter of undisputed fact that the National Day of Prayer is perceived to be and is recognized as an annual call by the President for Americans to engage in prayer. The President's proclamation of this event constitutes explicit devotional government speech that violates the Establishment Clause.

The National Day of Prayer has never had a secular propose, intent, or effect. The intent has always been government proselytizing, to place government endorsement behind prayer and religious belief, and more than that, to call upon citizens to pray and express belief in God. The NDP Proclamations not only wrongly and unconscionably place the imprimatur of government upon belief in God; the NDP Proclamations place the stamp of approval upon religious belief, prayer and worship by the highest executive officer of the land: the President of the United States. The National Day of Prayer laws were entirely the brainchild of Protestant evangelicals. The very law itself was instigated by Billy Graham during a crusade in Washington, D.C. in 1952.

2

The National Day of Prayer law was adopted almost immediately after its suggestion by Rev. Graham by a Congress which openly cited religious motives that are outside the purview of secular government, such as to "instill faith in an Almighty God," to exhort citizens "to unite in a day of prayer each year . . . reaffirming in a dramatic manner that deep religious conviction which has prevailed throughout the history of the United States. "The law itself was enacted for the unconstitutional purpose of ordering the Executive Branch to urge the people of the United States to turn to God in prayer in churches, in groups and as individuals one day every year.  The proviso in the 1952 law that the proclamation never be on a Sunday reveals additional intent to take religion out of its private realm of worship on Sundays in the private sphere, and draw attention to prayer through government action on weekdays.  By ordering a presidential proclamation it was assured that the President's inappropriate and unconstitutional endorsement of prayer as part of his civil duties would be broadcast throughout the land.

Indeed, Presidents since 1952 have dramatically called on citizens not only to pray, but they have even had the temerity to tell Americans what to pray for, in proclamations that emphasize the supposed religious character of the United States government.

The 1988 Amendment which codified the first Thursday in May as the National Day of Prayer was likewise the brainchild of evangelists, namely the National Prayer Committee, whose National Day of Prayer Task Force ( "NDP Task Force" hereafter) chair was Vonette Bright, cofounder of the enormously influential and wealthy Campus Crusade for Christ.

3

The change in law was explicitly Mrs. Bright's idea. In addition to pressure by Protestant evangelicals, moreover, the National Prayer Committee lined up a rabbi and a priest to lobby for the change.

The stated purpose of changing the National Day of Prayer from a free-floating annual date to the first Thursday in May was to "help bring more certainty to the scheduling of events related to the National Day of Prayer, and permit more effective long-range planning."(Ex. 119 at 1.) National Prayer Committee Chairman Pat Boone noted that the roving date "offered little advance notice to adequately inform the grass roots constituencies," but a "definite date will allow millions of citizens ... who have explicit faith in a Prayer-hearing God to be informed about this significant date in our country." (Ex. 119 at 2.)

Since passage of the 1988 law, the NDP Task Force has become a publicity machine, to pressure public officials, including the President and all the state governors, to issue National Day of Prayer proclamations consistent with the NDP Task Force's "Judeo-Christian" bias, so that the NDP Task Force can use the first Thursday in May to mobilize Christian-centered events, rallies, statements and activities at all 50 capitols and government buildings, as well as private churches, across the land.

The rationale for adoption of this unprecedented National Day of Prayer, compelling the executive power to beseech his constituents to pray in contradiction of the dictates of the Establishment Clause of the First Amendment, is based on a historic myth: The assertion that

4

the nation's founders prayed at the Constitutional Convention which adopted the U.S. Constitution.(R.53.) There was no prayer at the Constitutional Convention. That lack of government religious ritual reflected the deliberate intent of the founders to invent a new and secular government which thoroughly separated theology from government. That revolutionary and visionary act of the founders made the United States the first nation in the world to adopt a godless Constitution, which invested sovereignty not in a deity but in "We, the People," and whose only references to religion in government are exclusionary, such as that there shall be no religious test for public office. (U.S. Constitution, Art. VI).

These proclamations, including the 2008 Presidential Proclamation which incorporated recognizably Biblical scripture, are intended as encouragements to pray--and they are perceived as such. This is no less true of President Obama's 2009 proclamation which "calls upon" Americans to personally engage in prayer, an inherently religious activity.

The defendants ironically suggest that such Presidential Proclamations are immune to challenge because they are distributed to and intended for a national audience. In other words, according to the defendants, proclamations exhorting prayer are not contestable when published to all of the citizens as an intended audience, including in the Congressional Record. This argument is not only counterintuitive, but inconsistent with the known fact that the National Day of Prayer declared annually by the American President is highly divisive-- and exclusionary of non-believers.

Just as courts prohibit the display of religious monuments, creches and Ten

5

Commandments on government property, where a reasonable observer would perceive endorsement, so also this court can enjoin the annual call to prayer that has been institutionalized by Congress and implemented without discretion by the President with a dedicated National Day of Prayer, official Prayer Proclamations, and celebration of religion. The court has the authority to determine the appearance of end orsement created by government speech; this Court also has the authority and responsibility to examine the propriety of institutionalized exhortations of national prayer required of the President.

The plaintiffs do not ask the court to determine that Americans may not pray in their personal lives or attend church to pray, or privately sponsor their own day of prayer. On the contrary, the plaintiffs support both the Free Exercise Clause as well as the Establishment Clause. The plaintiffs also are not seeking to restrain the President from exercising his free speech rights, such as by mentioning his or her religious views in public, or in a speech, or, for example, from concluding remarks with a phrase such as "God bless America." The plaintiffs, however, do ask the court to declare unconstitutional the official dedication of National Days of Prayer and the issuance of official Presidential Prayer Proclamations that give official government sanction to the endorsement of religion by exhorting each American to acknowledge and engage in the religious ritual of prayer. The plaintiffs only challenge the execution of an egregiously unconstitutional federal law, not "generalized societal grievances."

A.      The Defendants Misapprehend The Requirements For Standing.

6

The defendants disagree that this Court has the authority to consider the constitutionality of annual Prayer Proclamations and dedications of a National Day of Prayer. They imply that the plaintiffs are officious intermeddlers and busybodies, "roaming the country" for reasons to complain. The defendants also claim that exposure to the National Day of Prayer and Presidential Prayer Proclamations is not coercive and that no one is forced to engage in prayer. They contend that no one has "unwanted and unwelcome" exposure to Presidential Prayer Proclamations encouraging the citizenry to take action. The defendants, instead, apparently believe that the plaintiffs must close their eyes and cover their ears; the plaintiffs must endure the official exhortations of their government which cause the sincere distress and feelings of exclusion detailed by the plaintiffs.

No one has standing to question the dedication of a National Day of Prayer and the issuance of Prayer Proclamations, by the defendants' reasoning. The defendants insinuate that no one can challenge the dedication of a National Day of Prayer and the issuance of Prayer Proclamations by the President, except perhaps the media itself, regardless whether unconstitutional.

The defendants' argument, however, misperceives the nature of a Presidential Prayer Proclamation and the dedication of a National Day of Prayer. The plaintiffs are an intended part of the audience at which such devotional governmental speech is directed. The intended audience for a Prayer Proclamation is broader than the intended audience for a local nativity scene on government property, for instance. These plaintiffs are an intended part of the

7

President's intended audience, who are differentially affected because they are non-believers. In fact, the Presidential Proclamations illegally provide discriminatory government assistance to religious zealots in expressing their message. See Mercier v. LaCrosse, 305 F. Supp. 2d 999, 1010 (W.D. Wis. 2004).

The plaintiffs are not obligated to meekly avert their eyes and cover their ears when the government disseminates unconstitutional speech, which unlike private speech, may not endorse religion. The defendants' argument suggests that these individual plaintiffs are obligated to forego being informed, as by reading the newspaper, watching C-SPAN, or browsing government websites on the first Thursday of every May, so as to avoid objectionable speech, but as this court understands, an informed Citizenry is a duty and it is a strength of the nation.

The Establishment Clause does not require forced or coercive exposure to religious endorsement. Coercion is not the touchstone of the Establishment Clause, which prohibits governmental endorsement of religion over non-religion--even if done secretly. The expectation that nonbelievers should merely ignore or avoid objectionable governmental speech does not prevent the offense. On the contrary, this compounds the offense by emphasizing that religious believers are favored, while non-believers are political outsiders.

The defendants do not recognize their own deafness to the offence caused by extolling prayer, while exhorting each citizen to "reaffirm in a dramatic manner the deep religious conviction which has prevailed throughout the history of the United States." Many

8

Americans do not believe in God--or even believe that religion is a useful and beneficent

force in the affairs of men and nations.  As Justice Black stated in <u>Zorach v. Clauson</u>, 343

U.S. 306, 318-19 (1952) (Black, J., dissenting):

> It was precisely because Eighteenth Century Americans were a religious people divided into many fighting sects that we were given the Constitutional mandate to keep Church and State completely separate.  Colonial history had already shown that, here as elsewhere, zealous sectarians entrusted with governmental power to further their causes would sometimes torture, maim, and kill those they branded "heretics," "atheists," or "agnostics."  The First Amendment was therefore to ensure that no one powerful sect or combination of sects could use political or governmental power to punish dissenters whom they could not convert to their faith.  Now, as then, it is only by wholly isolating the state from the religious sphere and compelling it to be completely neutral, that the freedom of each and every denomination and of all non-believers can be maintained.

Thomas Jefferson also recognized that belief in the existence of God is not a

prescription for virtue and comfort.  In Jefferson's letter to his nephew, Peter Carr, written

from Paris on August 10, 1787, Jefferson famously observed:

> Question with boldness even the existence of a God; because, if there be one, he must more approve of the homage of reason than that of blindfolded fear . . . Do not be frightened from this inquiry by any fear of its consequences.  If it ends in a belief that there is no God, you will find inducements to virtue in the comfort and pleasantness you feel in its exercise, and the love of others which it will procure you.

President Jefferson, a prime source on the meaning of the Establishment Clause,

refused himself to issue such proclamations.  President Jefferson wrote to Reverend Samuel

Miller in 1808 explaining why he refused a request to issue a day of prayer:

> I consider the government of the U.S. as interdicted by the
> constitution from intermeddling with religious institutions, their
> doctrines, disciplines or exercises...Certainly no power to
> prescribe any religious exercise, or to assume authority in
> religious discipline, has been delegated to the general
> government...But it is only proposed that I should *recommend*,
> not prescribe a day of fasting and prayer.  That is, that I should
> *indirectly* assume to the U.S. an authority over religious
> exercises which the Constitution has directly precluded them
> from.  It must be meant too that this recommendation is to carry
> some authority, and to be sanctioned by some penalty on those
> who disregard it; not indeed of fine and imprisonment, but of
> some degree of proscription perhaps in public opinion.  And
> does the change in the nature of the penalty make the
> recommend the less *a law* of conduct for those to whom it is
> directed?   Fasting & prayer are religious exercises.   The
> enjoining them an act of discipline.  Every religious society has
> a right to determine for itself the times for these exercises, & the
> objects proper for them, according to their own particular tenets;
> and this right can never be safer than in their own hands, where
> the constitution has deposited it. (Thomas Jefferson: Writings,
> pgs. 1186-1187, Merrill D. Peterson, ed., New York: Library of
> America, 1994.)

The exhortations of an official National Day of Prayer are not based on any supposed

intrinsic utility of religion, just as they are not justified by the presumed numerical

insignificance of non-believers.  On the contrary, according to an authoritative religious

identification survey, at least 15%, or 34 million adult Americans, are now non-religious.

Less than 70% of Americans believe in a traditional theological concept of a personal God.

The non-religious are the fastest-growing segment of the U.S. population, by religious

identification, according to the American Religious Identification Singular Survey.  While

it may be true that many American are religious in their personal lives, moreover, "we do not count heads before enforcing the Establishment Clause." McCreary County, Kentucky v. ACLU of Kentucky, 545 U.S. 844, 878 (O'Connor, J., concurring) (2005). In fact, being a member of the non-religious community is not a "self-inflicted injury," as the defendants imply.

The individual plaintiffs in this suit do have standing to object to government speech directed at them.    The Freedom From Religion Foundation also has standing in its representative and organizational capacity based upon the impediment to accomplishing FFRF's organizational goal to ensure the constitutionally-required separation of church and state.

B.    The Defendants Misconstrue The Essence of Prayer Proclamations.

The defendants' argument that Presidential Prayer Proclamations are *per se* constitutional, in any form or permutation, distorts the role of the Court in determining whether government speech gives the appearance of religious endorsement. The defendants ignore that governmental speech may convey improper support for religion depending upon content and context, and government speech endorsing and preferring religion is prohibited by the Establishment Clause.

The defendants' suggestion that t he Court abdicate any role in evaluating the Presidential Prayer Proclamations and dedication of National Prayer Days is unsupported by precedent, including by the Supreme Court. "It is emphatically the province and duty of the

11

judicial department to say what the law is."   Marbury v. Madison, 5 U.S. 137 (1803).

Moreover, although the defendants suggest that the Supreme Court has already determined

the constitutionality of Presidential Prayer Proclamations, that is not true.  The Supreme

Court's prior references to Prayer Proclamations do not answer the question now before this

Court, which question cannot be determined in the abstract.  The defendants also indulge and

perpetuate historical inaccuracies in defending the National Day of Prayer, which is neither

ubiquitous, nor without controversy and divisiveness.

The defendants ignore the legislative intent behind Congress' direction that annual

Prayer Days be dedicated by the President.  They misunderstand and distort the history of the

Establishment Clause and the separation of church and state.  The defendants also ignore the

context and content of Prayer Day Proclamations and Dedications, in which previous

Presidents have previously aligned with the National Day of Prayer Task Force, a messianic

evangelical organization.  The alignment with the NDP Task Force provides content and

context for Presidential Prayer Proclamations, which is relevant to the application of the

reasonable observer test for determining improper endorsement.

The defendants unpersuasively invite this Court to rule as a matter of law that

Presidential Prayer Day Proclamations inherently comply with the Establishment Clause.  No

judicial authority supports the proposition that devotional governmental speech, such as

Prayer Day Proclamations, is *per se* constitutional under the Establishment Clause in all

circumstances.  Official dedications of a National Day of Prayer and Presidential Prayer

12

Proclamations send a message to a reasonable observer that a preference for religion is being communicated. Devotional government speech is tolerated under the Establishment Clause only where no religious endorsement occurs. Here, the purpose and effect of National Prayer Day Proclamations are precisely the opposite; they intentionally encourage and promote active participation in religious practices, and disparage or exclude millions of non-believing Americans. If the dedication of a National Day of Prayer, for the purpose of promoting active prayer, does not violate the Establishment Clause, then what is prohibited by the government?

## II.   THE INDIVIDUAL PLAINTIFFS HAVE STANDING TO OBJECT TO GOVERNMENT SPEECH ENDORSING RELIGION, WHICH SPEECH IS DIRECTED AT THEM.

### A.   The Individual Plaintiffs Have Constitutionally Sufficient Contact With The Objectionable Speech.

The defendants deny that the individual plaintiffs have standing to sue based on their exposure to Presidential Prayer Proclamations and dedications of a National Day of Prayer. The defendants essentially argue that the individual plaintiffs have not had to "walk by" unwelcome Presidential Prayer Proclamations, such as occurs with a nativity scene at a county courthouse, and so the plaintiffs allegedly have not been injured. The defendants reason that unwelcome exposure to government speech must have a pedestrian or walk-by attribute, which allegedly is missing with respect to Presidential Prayer Proclamations. Without "pedestrian" exposure to government speech endorsing religion, the defendants conclude that the plaintiffs are merely experiencing "psychic injury common to the general

13

public."

The defendants misapprehend the contact with government speech necessary to support standing. Their interpretation of unwelcome exposure to government speech would effectively disqualify anybody from objecting, unless speech is physically placed in front of an individual by a government official. This test may work for parochial government speech with a limited intended audience, but government speech intended to reach the nation would no longer be objectionable by anyone. Ironically, the Establishment Clause then would only prohibit government speech endorsing religion at the local level, while insulating proclamations to the entire nation that endorse religion. The irony of this argument lies in the fact that a national broadcast promoting religion by the President at Congress' behest is a least as likely to establish a national religion as local government speech endorsing religion.

It is axiomatic that a crucial difference exists between government and private speech that endorses religion: Government speech endorsing religion is forbidden by the Establishment Clause. The Board of Education of West Side Community Schools (District 66) v. Mergens, 496 U.S. 226, 250 (1990). The Supreme Court has consistently recognized this "crucial difference" between government speech endorsing religion, which the Establishment Clause forbids, and private speech endorsing religion. Here, government speech is plainly at issue.

Because the Constitution prohibits government speech endorsing religion, the Supreme Court quite naturally has recognized that individuals objecting to such speech may

14

bring suit to complain.  In this respect, the courts have upheld standing for persons having

unwelcome exposure to objectionable speech.  With regard to local monuments or displays,

therefore, it is enough that a plaintiff allege direct and unwelcome contact with the religious

display, without showing any "special burden" or altered behavior.  Books v. Elkhart County,

401 F.3d 857, 862 (7th Cir. 2005).  *See also* Books v. City of Elkhart, 235 F.3d 292, 299-301

(7th Cir. 2000); Doe v. County of Montgomery, 41 F.3d 1156, 1160-61 (7th Cir. 1994) (the

plaintiff is not required to show "special burden" or altered behavior in order to have

standing).[2]  In the cases of such displays, of course, the intended and foreseeable audience

for the government speech is local, and measurable by foot traffic near the display.  Standing

for such persons is not defeated by voluntarily passing by the display, moreover, because

involuntary or coerced exposure to government speech endorsing religion is not an essential

element of an Establishment Clause violation.  *See* Engel v. Vitale, 370 U.S. 421, 430 (1962).

Not all government speech endorsing religion is characterized by a physical presence

in the public square, as this case illustrates.  In fact, such means are not very effective as a

way to communicate with large numbers of citizens.  While this change in perception affects

the means of communication, it does not reduce the number of persons who may now have

exposure to such governmental speech.  The contrary is true.  That is certainly the case with

Presidential Proclamations.

---

[2]The defendants' reliance on Freedom From Religion Foundation v. Zielke, 845 F.2d 1463 (7th
Cir. 1988), notably ignores a later follow-up case in which the plaintiffs all had standing to complain.
*See* Mercier v. City of La Crosse, 395 F.3d 693 (7th Cir. 2005).

By contrast, the complaint in <u>Valley Forge v. ACLU</u>, 454 U.S. 464 (1982), did not involve government speech at all, unlike Presidential Prayer Proclamations which constitute quintessential speech. That makes a difference, because Prayer Proclamations are intended to be made known to and acted upon by all the citizens of the United States. A Presidential Proclamation, without an intended audience, would not be a proclamation at all. Unlike <u>Valley Forge</u>, and unlike cases involving local religious displays, therefore, the present case deals with government speech which the government intends to be broadcast and made known to the citizenry at large. In this circumstance, the defendants only disingenuously claim that the plaintiffs have "roamed the country" looking for their complaint. As the evidence of record shows, the plaintiffs can not avoid the National Day of Prayer bedlam.

The intended audience for a Presidential Proclamation is also distinguishable from the intended audience for legislative prayer. The Supreme Court has already recognized in <u>Allegheny County v. ACLU</u>, 492 U.S. 573, 603 n. 52 (1989), that Presidential Prayer Proclamations stand on a different footing than "ceremonial deism" such as legislative prayer. The Supreme Court stated:

> It is worth noting that just because *Marsh* sustained the validity of legislative prayer, it does not necessarily follow that practices like proclaiming a National Day of Prayer are constitutional. Legislative prayer does not urge citizens to engage in religious practices, and on that basis could well be distinguishable from an exhortation from government to the people that they engage in religious conduct.

Legislative prayer is distinct from Presidential Prayer Proclamations. In <u>Simpson v. Chesterfield County Board of Supervisors</u>, 404 F.3d 276, 289 (4th Cir. 2005), Judge

16

Niemeyer specifically noted that "when a governmental body engages in prayer for itself and does not impose that prayer on the people, the governmental body is given greater latitude than when the government imposes prayer on the people." Judge Niemeyer further stated that "ever since Marsh, the Supreme Court has continued to recognize the distinction between prayer engaged in by the government for itself and prayer imposed on the people, subjecting the latter form of prayer to heightened scrutiny." Similarly, in Van Zandt v. Thompson, 839 F.2d 1215, 1218 (7th Cir. 1988), the Court viewed "a legislature's internal spiritual practices as a special case," warranting more deference than would be appropriate for government speech projected to an external audience.

When the intended audience for government speech is not internal, legal responsibility may certainly include speech that is republished, such as by the media. The principle is already well recognized in the law that the author or originator of speech may be liable for republication or repetition by third persons if such repetition was foreseeable. Similarly, government speakers, like other speakers, may intend and foresee that their speech will be broadcast through intermediaries, including the print and TV media. In fact, the role of the President's Press Secretary is precisely to disseminate governmental speech, such as Presidential Proclamations, so that they may be communicated widely to the public.

Here, the evidence is overwhelming that the individual plaintiffs and other FFRF members have come in contact with the President's Prayer Proclamations, including through media reporting by newspapers and television, as well as from reporting by members and

17

non-members of the Freedom From Religion Foundation. The defendants do not deny such exposure, but they question whether the means of the exposure should "count" for purposes of standing.

The plaintiffs are individuals who know of and hear about government speech that is disseminated and projected by public officials, especially when they are part of the audience intended for the speech, such as in this case. The individual plaintiffs also have come in contact with Presidential Prayer Proclamations as part of their work on behalf of the Freedom From Religion Foundation, which responds to incorrigible complaints about such Prayer Proclamations by members and non-members. The plaintiffs do not roam the country looking for complaints; they are bombarded with such complaints by persons who object to the government's promotion of religion.

It is naive to argue that a Congressionally-required annual Proclamation by the President is not on its face "omnipresent," and it is disingenuous for the defendants to argue that "the only thing undergirding this law suit is the plaintiffs desire to advance their social cause and to litigate this case." The evidence of record shows years of consistent opposition to the National Day of Prayer. This law suit is not about the plaintiffs' "social cause;" it is about their right to be free from proselytizing prayer and religion in the form of annual injunctions to pray from their government, which invariably link piety with patriotism. The plaintiffs consider this to be on the continuum of theocracy, which is what many people came to this country to avoid: Government telling citizens what to believe about religion, and

18

where to pray, and when to pray and why to pray.

The individual plaintiffs do have the direct and concrete injury necessary to give them standing to object to Presidential Prayer Proclamations and dedications of a National Day of Prayer. The plaintiffs are part of the audience intended for that governmental speech. For the defendants to suggest that these plaintiffs cannot object to that speech assumes an arbitrary distinction with drastic consequences: Requiring pedestrian exposure as a prerequisite for standing ignores the reality of modern communication.

Finally, the defendants unpersuasively claim that the plaintiffs are merely complaining about a generalized grievance that they share with every American. If only that were the case! In fact, the plaintiffs are non-believers and they do not suffer the ignominy of their President promoting and exhorting prayer in common with the purveyors of prayer. The plaintiffs' injury is quite distinct and palpable, as they attest.

B. Standing Does Not Require Contact Plus Something More.

The Seventh Circuit previously has already rejected the defendants' argument in this case that unwelcome contact with religious speech "is trivial and therefore not legally cognizable." Books, 401 F.3d at 861. In Books, the County argued that the plaintiff's injury was entirely psychological, and that such injuries, without more, do not confer standing. The Court rejected the defendant's argument, as other courts have done in government speech cases.

While the Supreme Court did state in Valley Forge that the psychological consequence

19

produced by observation of conduct with which one disagrees is not an injury sufficient to confer standing under Article III, that was a tax-payer standing case which did not involve government speech. Since then, courts have uniformly found that the Valley Forge decision does not mean that "psychological injury" is an insufficient bases of Article III standing. If this were not the case, then subsequent judicial precedents prohibiting government speech that endorses religion would have involved plaintiffs without standing, including the Supreme Court's decisions in *County of Allegheny, and McCreary County, Kentucky v. ACLU of Kentucky*, 545 U.S. 844 (2005). In cases involving unwelcome exposure to religious speech, "the spiritual, value-laden beliefs of the plaintiffs are often most directly affected by an alleged establishment of religion. Accordingly, rules of standing recognize that non-economic or intangible injury may suffice to make an Establishment Clause claim justiciable." *Suhre v. Haywood County*, 131 F.3d 1083, 1087 (4th Cir. 1997).

The defendants, however, demand something more than exposure to unconstitutional government speech. The defendants claim that contact must be involuntary or coercive--and that citizens who pay attention to the speech broadcast by officials cannot complain. The Establishment Clause prohibition on governmental speech endorsing religion, however, is mandatory and self-executing; "assumption of risk" is not a defense.

Nor is "coming to the injury" a proper basis for objecting to standing in a government speech case. *Buono v. Norton*, 212 F.Supp2d 1202, 1211 (C.D. Cal. 2002). In *Buono*, the Court rejected the argument that standing is precluded in government speech cases if the

20

plaintiffs "could have avoided the harm." The Court reasoned as follows:

> The government contends that Plaintiffs' exposure to the cross should be
> disregarded for purposes of standing because Plaintiffs could have avoided the
> harm. However, the Seventh Circuit has expressly rejected such an argument,
> and the Court adopts its reasoning. In *American Civil Liberties Union v. City
> of St. Charles*, 794 F.2d 265 (7th Cir. 1986) (Posner, J.), the Seventh Circuit
> responded to Defendant's contention that "plaintiffs have inflicted this cost on
> themselves and can avoid it by continuing to follow their customary routes and
> shrugging off the presence of the . . . cross." 794 F.2d at 268. The Court held
> "that the injury to the Plaintiffs could have been averted . . . did not deprive
> the plaintiffs of standing," commenting that "if [they] lacked standing . . . no
> one would have standing." *Id*. at 268-69. By the government's logic, all
> individuals offended by a religious display could avoid it and thereby not be
> harmed by it. Such an argument flies in the face of standing jurisprudence and
> would render the Establishment Clause a nullity."

*Buono*, 212 F.Supp2d at 1211. In *Books v. City of Elkhart*, 235 F.3d 292, 297 (7th Cir.

2000), the Seventh Circuit also concluded that plaintiffs had standing, even though their

injury was based, at least in part, on the fact that they "know the [religious symbol] is there,

whether [they] see it or not."

The claim that the plaintiffs failed to avert their eyes and cover their ears is not fatal

to standing. Even deliberate "testing" is sufficient for constitutional standing purposes. In

*Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982), for example, the Supreme Court held

that "testers" have standing to bring suit for alleged violations of the Fair Housing Act, even

where the tester had no intention of buying or renting a home. Since *Havens Realty*, the law

has become well established that such individuals do suffer a cognizable injury that gives

them standing to sue. Kyles v. J.K. Guardian Security Services, Inc., 222 F.3d 289, 297 (7th

Cir. 2000), citing *Village of Bellwood v. Dwivedi*, 895 F.2d 1521, 1527 (7th Cir. 1990). The

21

Supreme Court's logic in *Havens Realty* was based on the fact that discrimination is still discrimination, whenever it occurs. The fact that an individual may discover such discrimination does not render that person an inappropriate party to complain.

The argument for standing in the present case is even more compelling. The Establishment Clause prohibits government officials from promulgating speech that endorses religion. This constitutional proscription would be violated even if the government tried to discreetly favor religion, such as with a "PG" warning on Presidential Proclamations. Here, in the present case, the government speech at issue actually was intended to be broadcast and to become known by all Americans, including these plaintiffs. As part of the intended audience, who are the most injured by being asked to pray by their President, they certainly have the right to complain. In fact, dedication of a National Day of Prayer changes the status of that day for all citizens, as to which status even commercial calendars attest.

The defendants argue incorrectly that governmental speech endorsing religion cannot be called to account by non-believers who "voluntarily" come to know about the actions of their government, including government speech promoting religion. The defendants argue, in effect, that they may endorse religion without objection so long as exposure to such government speech is not forced or coerced. In fact, however, coercion is not a necessary element of a claim under the Establishment Clause. The Supreme Court has consistently rejected the view that coercion is the touchstone of an Establishment Clause violation. *See Engel v. Vitale*, 370 U.S. 421, 430 (1962). To make coercion an essential element of an

22

Establishment Clause violation would make the Free Exercise Clause redundant. *See Allegheny*, 492 U.S. at 628; *Abington School District v. Shempp*, 374 U.S. 203, 223 (1963). It also would render the Establishment Clause a nullity.

Finally, the defendants ignore the fact that the individual plaintiffs are literally bombarded with National Prayer Day messages that "one can hardly avoid." The National Prayer Day Proclamations have been known to these plaintiffs for literally years, from print and broadcast media, as well as from FFRF members and the public. The plaintiffs' steadfast opposition to such offensive government speech, as a result, is itself ubiquitous--and quite sincere.

The injury to the plaintiffs is actually emphasized by the defendants' insinuation that the plaintiffs should just "butt out if they don't like it." The problem of religious endorsement is that some become insiders, while others are made to feel like political outsiders. As the plaintiffs have described in sworn statements, that is the case with Presidential Prayer Day Proclamations. The defendants, however, accept that distinction as normative by implying that the plaintiffs should not look or listen to the President.

C.    The Plaintiffs' Discriminatory Treatment As a Result of Presidential National Day of Prayer Proclamations Also Provides a Basis For Standing.

Discriminatory treatment itself is a harm that is sufficiently particular to qualify as an actual injury for standing purposes. *Planned Parenthood of South Carolina, Inc. v. Rose*, 361 F.3d 786, 789 (4th Cir. 2004). Plaintiffs in such cases can seek equal treatment in the form of a level playing field, regardless of whether this is achieved by extending benefits to the

23

disfavored group or by denying benefits to the favored group.  Id.  For instance, in *Regents of the University of California v. Bakke*, 438 U.S. 265, 281 n. 14 (1978), the Supreme Court explained that a medical school applicant who was denied admission had standing to challenge the school's race-based admissions policy regardless of whether he showed "that he would have been admitted in the absence of the admissions policy."  The applicant in Bakke met "the constitutional requirements" of standing because he had been denied a chance to compete for admission on equal terms.  Similarly, the court said in *Heckler v. Mathews*, 465 U.S. 728, 738 (1984), that the Court frequently entertained attacks on discriminatory statutes or practices even when the government could deprive a successful plaintiff of relief by withdrawing the statute's benefits from both the favored and the excluded class.

This "level playing field" analysis, though typically seen in Equal Protection cases, also applies in First Amendment cases.  *Planned Parenthood of South Carolina*, 361 F.3d at 790.  Just as the plaintiff claiming discrimination under the Fourteenth Amendment has standing to seek a level playing field, so, too, does the plaintiff claiming viewpoint discrimination under the First Amendment.  In short, where, as here, the plaintiffs challenge the law on the ground that it promotes an opposing viewpoint above their own, as to the promotion of prayer and religion, they suffer a cognizable injury that can be redressed by the invalidation of that law.  *See Planned Parenthood of South Carolina*, 361 F.3d at 790.

Here, the plaintiffs assert that Congress' legislation, and the President's proclamation

24

declaring a National Day of Prayer, promotes religion over non-religion, despite the fact that
the plaintiffs have themselves requested that government officials issue counter-balanced
proclamations, such as by proclaiming a Day of Reason. Characterizing the relevant injury
as the inability to obtain their own proclamation, however, obscures the constitutional nature
of the harm in this case. This case is not about people seeking proclamations of their choice;
it is about whether, by enacting National Day of Prayer Legislation, the government has
impermissibly favored one viewpoint over another. Therefore, "the sounder approach is to
recognize discriminatory treatment as the actual injury and to accord the plaintiff standing
on that basis." Id.

The defendants' arguments against standing are not convincing. They claim that the
plaintiffs have suffered no injury because the National Day of Prayer Act, though failing to
authorize expression of the plaintiffs' viewpoint, does not prohibit it. This contention
ignores the obvious. Although the expression of the plaintiffs' secular viewpoint is not
explicitly prohibited, it is effectively prohibited by virtue of what the Act requires, i.e.,
declaration of a National Day of Prayer. The plaintiffs, therefore, cannot, as an alternative,
participate in an "official" day promoting their viewpoint. Further, the defendants "fail to
recognize that the plaintiffs need not show an explicit prohibition on their speech in order to
claim discriminatory treatment." Id. The plaintiffs may base their claim of injury on the
defendants' unequal treatment of two viewpoints, as the Court recognized in *Planned
Parenthood of South Carolina*, specifically in this case the promotion of only the pro-prayer

25

perspective.  Id.

Finally, and relevant to the defendants' prudential argument, the plaintiffs are appropriate parties to challenge the National Day of Prayer.  If the court "were to deny standing to the plaintiffs, it is unlikely that anyone would have standing, and the Act would effectively be immune from attack."  Id. citing Orr v. Orr, 440 U.S. 268, 272 (1979) (granting standing after recognizing the possibility that a statute would otherwise be immune from attack).

The viewpoint discrimination explicit in National Day of Prayer Proclamations is prohibited because it promotes and encourages religion, which is prohibited by the Establishment Clause.  The Free Speech clause, by contrast, has no application because it restricts government regulation of private speech; it does not regulate the government's own speech.  This does not mean there are no restraints on government speech, however, as the courts have consistently recognized that government speech must comport with the Establishment Clause.   Government speech encouraging and praising religion shows prohibited advocacy of a viewpoint preference.  As a result, under the principles discussed in _Planned Parenthood of South Carolina_, the plaintiffs do have standing to seek adjudication of their complaint.

## III.   THE   FREEDOM   FROM   RELIGION   FOUNDATION   HAS ORGANIZATIONAL STANDING BASED ON ITS OWN INJURY, AS WELL AS REPRESENTATIVE STANDING.

The defendants argue incorrectly that the Freedom From Religion Foundation does

not have organizational standing based upon its allocation of resources to address the consequences caused by Prayer Day dedications, which impede the accomplishment of the organization's goals. The defendants claim that organizations cannot manufacture standing merely by dedicating resources to the accomplishment of organizational goals. A defendant's action that affects the ability of an organization to accomplish its goals, however, is a basis for constitutional standing where the organization dedicates resources to uncover and overcome the defendant's wrongful conduct.

Here, the Freedom From Religion Foundation has organizational standing to sue based on its own injury. The Supreme Court recognized such organizational standing in *Havens Realty*, which makes clear that the only injury necessary to confer standing is allocation of the organization's resources to efforts directed against the wrongful conduct of the defendant. *See* Bellwood, 895 F.2d at 1526. In both Havens Realty and Bellwood, the plaintiffs allocated resources in order to investigate and uncover the defendant's illegal discrimination, causing the plaintiffs to suffer an injury-in-fact.

In *Fair Employment Counsel of Greater Washington, Inc. v. B.M.C. Marketing Corp.*, 28 F.3d 1268, 1277 (D.C.Cir. 1994), the Court also held that an organization's need to "counteract the defendants' assertedly illegal practices" is sufficient to confer standing because such a dedication of resources is a "manifestation of the injury that those practices had inflicted upon the organization's non-economic interest in encouraging open housing." *See* also *City of Chicago v. Leadership Council for Metropolitan Open Communities*, 982

27

F.2d 1986, 1096 (7th Cir. 1992) (the only injury which need be shown to confer standing is allocation of the agency's resources to efforts directed against discrimination).  In short, the Circuit Courts agree that an organization meets Article III standing requirements where a defendant's alleged actions cause the organization to devote resources to combat the effects of the alleged wrongful action.  Fairhousing Council of Suburban Philadelphia v. Montgomery Newspapers, 141 F.3d 71, 78 (3rd Cir. 1998).

The Courts, including the Seventh Circuit, also do not consider the dedication of resources to be merely a self-inflicted injury, contrary to defendants' argument.  In Crawford v. Marion County Election Board, 472 F.3d 949, 951 (7th Cir. 2007), for example, the Court expressly held that an organization suffers an injury when a statute "compels it to divert more resources to accomplishing its goals."  The Court further held that "the fact that the added cost has not been estimated and may be slight does not affect standing, which requires only a minimal showing of injury."  Id., citing Friends of the Earth, Inc. v. Laidlaw Environmental Services, Inc., 528 U.S. 167, 180-84 (2000).  In reaching its decision on standing, the *Crawford* Court followed a line of cases, beginning with Havens Realty, holding that an organization has standing to sue on its own behalf if a defendant's illegal acts cause the organization to allocate resources to counteract those illegal acts.  These injuries are deemed sufficiently concrete to constitute cognizable injuries under Article III. *See Havens Realty*, 455 U.S. at 379.

The defendants' argument that the plaintiff's allocation of resources is wholly

28

voluntary, and hence not an injury, is based on a theory not legally recognized.  As the Eleventh Circuit recently stated in Florida State Conference of the NAACP v. Browning, 522 F.3d 1153, 1166 (11th Cir. 2008), the distinction between actions negating the efforts of an organization, which is admittedly an injury under Havens Realty, and an act or law merely causing the organization to voluntarily divert resources in response, finds no support in the law.  When the use of an organization's resources arises from "the organization's need to counteract the defendants' allegedly illegal practices, that drain is simply another manifestation of the injury to the organization's noneconomic goals."  Id, citing *Fair Employment Council of Greater Washington*, 28 F.3d 1267-77.

The defendants naively claim that line-item accounting of dedicated resources is required for organizational standing.  The fact that an organization does not record time allocated to specific efforts does not mean that it has unlimited resources; nor does it mean that tasks are not performed which utilize limited resources.  Under the defendants' reasoning, a law impeding voter registration causes no injury to an organization that registers such voters unless the employees punch a clock before going to work--and even then the defendants would deny any relief given the organization's purpose and mission.  That is simply not the law.

In this case, the diversion of personnel, time and resources by the Freedom From Religion Foundation to counteract the effects of the defendants' devotional Prayer Proclamations constitutes redressible injury under the Constitution.  The fact of such efforts,

29

moreover, is admitted by the defendants.  Presidential Prayer Day Proclamations and Prayer
Day Dedications create a culture of acceptability as to governmental endorsement of religion,
setting off 40,000 observances in 2008 at state capitols, county courthouses, on the steps of
city halls, and in schools--just by the NDP Task Force.  All 50 states now proclaim a
dedicated Day of Prayer to coincide with the President's proclamation.  As a result, a massive
nation-wide convulsion of governmental endorsement occurs, which undermines the ability
of the Freedom From Religion Foundation to accomplish its goals and requires the dedication
of substantial resources to counteract the effects of the defendants' unconstitutional actions.
This dedication of resources, moreover, is not measured by the costs of the present litigation.
The Freedom From Religion Foundation dedicates internal resources responding to, objecting
to, and advising members regarding the government's exhortations that the nation engage in
prayer.  The defendants concede such efforts, but snidely imply that this is just what FFRF
likes to do--as if a policeman likes crime!

The National Day of Prayer, proclaimed by the President while promoting and
encouraging citizens to engage in prayer, clearly affects the institutional interests of an
organization like the Freedom From Religion Foundation.  The Foundation is dedicated to
maintaining the separation of church and state required by the Establishment Clause.[3]  This

---

[3]. FFRF "is an educational group working for the separation of church and state. Its purposes, as stated in
its bylaws, are to promote the Constitutional principle of separation of state and church, and to educate the public on
matters relating to nontheism."  In fulfilling this mission, the Freedom From Religion Foundation acts on countless
violations of separation of state and church on behalf of members and the public through litigation. Such litigation,
however, does not make money for the Foundation, although contributions from members are solicited in order to
fund litigation. The Freedom From Religion Foundation has a fundraising policy, as does any non-profit group
which expects to thrive. The Foundation never phones or emails to solicit money from its members. By mail, it

30

goal is chronically undermined every year by the defendants' actions, which require the allocation of resources to redress the defendants' unconstitutional actions. The dedication of a National Day of Prayer by Presidential proclamation, pursuant to a specially enacted law of Congress, operates as an institutional barrier to the accomplishment of the plaintiff's organizational objectives. The Freedom From Religion Foundation, accordingly , does have organizational standing to challenge the government's annual "poke in the eye," which constitutes a concrete and particularized injury.

Finally, the Freedom From Religion Foundation also has representational standing based upon the standing of its members, including the individual plaintiff members and other FFRF members opposed to the National Day of Prayer. *Hunt v. Washington State Apple Advertising Commission*, 432 U.S. 333, 343 (1977). The named plaintiffs have standing in their own right, as discussed above, and other members have also attended and protested Prayer Day activities, including at state capitols. The defendants concede the awareness of and objection to such activities by FFRF members, in their own Proposed Findings of Fact, which is sufficient to provide representative standing for FFRF.

## IV.    THE PLAINTIFFS' OBJECTION TO CONGRESSIONALLY-MANDATED NATIONAL DAYS OF PRAYER IS NOT MOOT OR SPECULATIVE.

The defendants argue disingenuously that plaintiffs' objection to dedications and

---

announces when a membership is expiring, in accordance with FFRF bylaws. Twice a year it sends by mail a written "special projects" letter to current members which lists ongoing litigation so that members know what they are being asked to support. It is inaccurate, therefore, for the defendants to suggest that the National Day of Prayer litigation is a fund raising tool. The defendants have it backwards: The foundation raises funds so that it may redress important Establishment Clause violations.

31

prayer proclamations is moot because past proclamations are "history," and future proclamations supposedly speculative. The defendants ignore that the President is required to declare a National Day of Prayer each year, and the President has not disavowed the practice. Furthermore, although the defendants claim that prayer proclamations are historically ubiquitous, and statutorily mandated every year, they do not even suggest that any reason exists to believe that President Obama will discontinue issuing annual   prayer proclamations, as he did just this year--or that he will forever be President.  On the other hand, the defendants' argument would have the practical effect of insulating in perpetuity a challenged practice that occurs every year.

This case fits comfortably within the established exception to mootness for disputes "capable of repetition, yet evading review." *Davis v. Federal Elections Commission*, 128 S. Ct. 2759, 2769 (2008).  That exception applies where the challenged action is in its duration too short to be fully litigated prior to cessation or expiration, and a reasonable expectation exists that the complaining party will be subject to the same action again. Id.  That is clearly the case here --beyond speculation.

Even if the President unexpectedly chose to impose a moratorium on further prayer proclamations, that would not moot the plaintiffs' case or make it unduly speculative. Voluntary cessation of a challenged practice does not moot a pending action.  A party cannot evade judicial review by temporarily altering questionable behavior. *Pleasureland Museum, Inc. v. Beutter,* 288 F.3d 988, 999 (7th Cir. 2002).  The Supreme Court, accordingly, imposes

32

a stringent standard for determining whether an issue has been rendered moot by a defendant's voluntary conduct: "A case might become moot if subsequent events made it absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur." *United States v. Concentrated Phosphate Export Association*, 393 U.S. 199, 203 (1968). The party asserting mootness bears a heavy burden of persuading the Court that there is no reasonable expectation that challenged conduct will reappear in the future. *Friends of Earth, Inc. v. Laidlaw Environmental Services, Inc.*, 528 U.S. 167, 189 (2000).

The defendants have not satisfied their "heavy burden." In fact, the defendants point to the Congressional enactment directing the President to issue annual prayer proclamations on the first Thursday in May as support for their position, and the Congressional enactment has not been repealed. The defendants also offer no evidence that the President has implemented an institutional prohibition on future enforcement of the law, which directs him to issue annual prayer proclamations. In these circumstances, the defendants' claim that this case is moot or speculative is totally unsupported, even by so much as a purported declaration of a temporary moratorium.

A moratorium, in any event, would not render the plaintiffs' action moot. The Seventh Circuit recognized this in *Pleasureland Museum*, 288 F.3d at 999, where the Court rejected a mootness argument after the City of Mishawaka purported to "suspend enforcement" of the provisions of an ordinance until the "matter is resolved." The Seventh Circuit found that this standstill did not create mootness because the moratorium was not permanent and could be

33

lifted at any time. The Court premised its holding upon the decision in *City of Los Angeles v. Lyons*, 461 U.S. 95, 97-98 (1983), where the Supreme Court held that a moratorium did not render a claim moot because the moratorium by its terms was not permanent. *See also White v. Lee*, 227 F.3d 1214, 1243 (9th Cir. 2000), recognizing that a moratorium, which "by its terms was not permanent," would not moot an otherwise valid claim for injunctive relief.

If the defendants had actually announced a temporary moratorium in this case, it would not render moot plaintiffs' claims. But the defendants have not declared a moratorium. The defendants, instead, merely suggest that the likelihood of future objectionable prayer proclamations is uncertain. This does not make it "absolutely clear" that their wrongful behavior or conduct cannot reasonably be expected to recur. On the contrary, President Obama has already continued the practice of issuing prayer proclamations which call upon Americans to engage in prayer.[4]

## V.    THE PLAINTIFFS' CLAIMS ARE REDRESSIBLE AGAINST THE PRESIDENT AND HIS PRESS SECRETARY.

The defendants further contend incorrectly that plaintiffs' claims are not redressible by this Court against the President. Although Congress has directed the President by statute to declare a National Day of Prayer each year, the defendants assert that the President

---

[4] Consideration of past Proclamations obviously is integral to the court's evaluation of prospective relief in this case, contrary to the defendants' "forget the past" suggestion.

allegedly is absolutely immune from suit challenging the constitutionality of such legislation. Whether the President's dedication of a National Day of Prayer violates the Establishment Clause or not, the defendants claim that such acts cannot be prevented by judicial action. The defendants, however, misread the authority on which they rely, which authority does not prohibit suit against the President as to the ministerial act of declaring a National Day of Prayer.

The United States system of government is founded on the rule of law, which includes the necessary function of an independent judiciary. The judiciary, in a system of separated powers, has the right and the duty to determine the constitutionality of legislative and executive acts.   That is what courts do.   The present action, therefore, seeking a determination of the constitutionality of Congress' direction to the President to declare a National Day of Prayer, is not an unprecedented or questionable "usurpation" of power by the judiciary.

The Supreme Court has recognized the general principle that courts should not interfere with the exercise of Executive discretion.  *See Mississippi v. Johnson*, 71 U.S. 475 (1866).  The Court, however, has expressly "left open the question whether the President might be subject to a judicial injunction requiring the performance of a purely 'ministerial' duty."  *Franklin v. Massachusetts*, 505 U.S. 788, 802 (1992)

35

The Supreme Court's caveat in *Franklin*, regarding "ministerial" duties, recognizes that judicial inquiry as to the constitutionality of a President's ministerial actions does not implicate separation of power concerns.  If Congress prescribes a ministerial duty for the President, then judicial scrutiny of the constitutionality of that legislative mandate does not in the first instance require a court to evaluate the President's exercise of discretion.  The defendants' argument to the contrary would mean that unconstitutional legislation directing the President to act could never be challenged.

A ministerial duty is one that admits of no discretion, so that the government official in question has no authority to determine whether or not to perform the duty.  *Swan v. Clinton*, 100 F.3d 973, 977 (D.C. Cir. 1996).  A duty is discretionary if it involves judgment, planning, or policymaking; a duty is not discretionary if it involves enforcement or administration of a mandatory duty at the operational level.  *See Beatty v. Washington Metro Area Transit Authority*, 860 F.2d 1117, 1127 (D.C. Cir. 1988).

The plaintiffs seek a determination of the constitutionality of a Congressional Act, which is something this Court is not prohibited from issuing.  Courts frequently rule upon the constitutionality of legislative actions taken by Congress.  Declaring the underlying Congressional Act unconstitutional in this case, therefore, does not intrude upon the constitutional authority vested in the President.  The President's actions can be reviewed for

36

constitutionality, even if they are not reviewable for abuse of discretion. *Franklin*, 505 U.S. at 801; *Youngstown Sheet and Tube Company v. Sawyer*, 343 U.S. 579 (1952); and *Panama Refining Company v. Ryan*, 293 U.S. 388 (1935).

Suit against the President's Press Secretary, moreover, does not raise the same immunity issues involving the President. The plaintiffs have sued the President's Press Secretary, Robert Gibbs, seeking an injunction against his dissemination of National Day of Prayer Proclamations, which are the proclamations at issue in this case. This claim does not implicate immunity issues because the plaintiffs' alleged injury is likely to be redressed by declaratory relief against the Press Secretary. *Franklin*, 505 U.S. at 803; *Duke Power Company v. Carolina Environmental Study Group, Inc.*, 438 U.S. 59, 75, n. 20 (1978); *Allen v. Wright*, 468 U.S. 737, 752 (1984). In fact, the defendants do not really argue to the contrary.

Concern about confronting the elected head of a co-equal branch of government, while still ensuring the rule of law, can be successfully accommodated when the injury at issue can be addressed by injunctive relief against subordinate officials, which the defendants do not deny. *Swan*, 100 F.3d at 978. *See also Barnes v. Kline*, 759 F2d 21 (D.C. Cir. 1985) (Court upheld declaratory and injunctive relief to nullify President's attempted pocket veto). It is "substantially likely," moreover, that the President will abide by an authoritative

37

directive to his Press Secretary, even though the President may not directly be bound by such a determination. *See Franklin*, 505 U.S. at 803.[5]

Here, the plaintiffs' action against the President and his Press Secretary is not barred by separation of powers principles. On the contrary, the defendants seek to eviscerate and limit the constitutional authority of this Court, whose role is to interpret and apply the United States Constitution, including the requirements of the Establishment Clause. The prohibitions of the Establishment Clause, moreover, are not discretionary; the Establishment Clause is a mandatory and self-executing limitation, and the role of the Court is to finally interpret and apply its proscriptions. The claim that the defendants are not subject to the rule of law misunderstands the necessary role of the courts in our system of government.

## VI.   PRESIDENTIAL PRAYER PROCLAMATIONS AND DEDICATIONS OF A NATIONAL DAY OF PRAYER GIVE THE UNDISPUTABLE APPEARANCE OF RELIGIOUS ENDORSEMENT.

### A.   The Endorsement Test is Fact Dependent.

The defendants claim that official Prayer Days have no coercive effect and that they are like legislative prayer or other examples of ceremonial deism, as a matter of law, and without regard for actual fact. In this respect, the defendants' Proposed Findings of Fact are

---

[5]   This reasoning also applies to the defendants' implied threat to unilaterally continue issuing National Prayer Day Proclamations if the authorizing legislation is invalidated. The actions of even such an Imperial President do not prevent relief against Secretary Gibbs, which would still be allowable.

notable for the absence of any proposed facts relating to the merits of the case, perhaps because exhortations to pray, for the sake of prayer, cannot sincerely be interpreted as anything other than religious endorsement.

Proclaiming a National Day of Prayer has been described by the Supreme Court, in Allegheny County, 492 U.S. at 603 n. 52, as "an exhortation from government to the people that they engage in religious conduct." In addition, Presidential Prayer Day Proclamations, including those in 2008, are orchestrated with the NDP Task Force, a patently evangelical organization dedicated to the promotion of Christianity through public prayer. As a result, the content and context of Presidential Prayer Proclamations and Prayer Day dedications give the appearance of endorsement, including specifically the Christian faith, in violation of the Establishment Clause.

The defendants also ask the court to ignore the history of the National Day of Prayer legislation adopted in 1952, at the instigation of Billy Graham, as well as the 1988 Act requiring that the first Thursday in May be the fixed National Day of Prayer, in response to lobbying by conservative religious groups, particularly the National Prayer Committee and the NDP Task Force. The 1988 Act, in particular, facilitated the mobilization of the religious viewpoint of the lobbyists behind the Act.

The defendants also ignore the undisputed historical fact that the National Day of

Prayer is perceived as a religious endorsement by the President and the government, not just an acknowledgment of religion. The annual Presidential Proclamation, as a result, is critical to religious organizers.

The defendants ignore virtually all of the facts relating to the context of Presidential Prayer Proclamations, as well as the source of content for such Proclamations incorporated at the behest of the NDP Task Force. The defendants, nonetheless, argue that an "objective observer" of the President's Prayer Proclamations would not construe them as religious endorsements - - but presumably only if the "objective observer" is deemed not to be aware of the history and context of the Prayer Proclamations, including the concerted action between the President and the NDP Task Force.

The Supreme Court's endorsement test considers whether a reasonable observer aware of the history and context of a religious event would find the event to have the effect of favoring or disfavoring religion. The courts are to ask whether an objective, reasonable observer, aware of the history and context in which the religious speech occurs, would fairly understand the speech to be a government endorsement of religion. *Books,* 401 F.3d at 867; *Sante Fe Independent School District v. Doe*, 530 U.S. 290, 308 (2000). This standard presupposes a person of ordinary understanding and sensibility, familiar with the circumstances surrounding the government's speech. Every government practice must be

40

judged in its unique circumstances to determine whether it constitutes an endorsement or

disapproval of religion, as the Court explained in *Indiana Civil Liberties Union v. O'Bannon*,

259 F.3d 766, 771 (7th Cir. 2001):

> Under the second prong [*Lemon*], we ask, irrespective of the State's stated
> purpose, whether accepting this monument for display on the Statehouse
> grounds has the primary effect of conveying a message that the State is
> advancing or inhibiting religion. The question is: would a reasonable person
> believe that the display amounts to an endorsement of religion? An important
> concern of the effects test is whether the symbolic union of church and state
> effected by the challenged governmental action is sufficiently likely to be
> perceived by adherents of the controlling denominations as an endorsement,
> and by the non-adherents as a disapproval of their individual religious choices.
> Again, to answer these questions we examine the content and context of the
> display.

The Establishment Clause is concerned with the message that the government may

send to its citizenry about the significance of religion. *See Lynch v. Donnelly*, 465 U.S. 668,

692 (1984) (O'Connor, J., concurring), cited in *American Jewish Congress v. City of

Chicago*, 827 F.2d 120, 126 (7th Cir. 1987). Government messages of endorsement and

preference impermissibly send a prohibited signal to non-adherents "that they are outsiders,

not full members of the political community and an accompanying message to adherents that

they are insiders, favored members of the political community." *Lynch*, 465 U.S. at 688. *See*

also *McCreary County,* 545 U.S. at 860-61 (by showing a purpose to favor religion, the

government sends a message to non-adherents that they are outsiders; indeed, the apparent

purpose of government action can have an impact more significant than the result expressly decreed. If the government justified a decision with a stated desire to honor Christ, the divisive thrust of the official action would be inescapable.)

The test of endorsement under the Establishment Clause is analogous to the standard for determining whether a statement suggests a discriminatory preference to an ordinary reader or listener. The recognized standard for determining whether a statement evinces discriminatory preference is whether the statement "suggests a preference to the ordinary reader or listener." *Fair Housing Congress v. Weber*, 993 F.Supp 1286, 1290 (C.D. Cal. 1997). A violation occurs when a communication either implies an obvious discriminatory preference or where the ordinary reader would infer a particular discriminatory preference. Id. at 1291, citing *Blomgren v. Ogle*, 850 F.Supp. 1427, 1440 (E.D. Wash. 1993). The relevant standard applied in such cases is defined in terms of "the natural interpretation of the ordinary reader." Id., citing *United States v. Hunter*, 459 F.2d 205, 215 (4th Cir. 1972). If a message suggests to an ordinary reader a proscribed preference, then the law is violated. Id. The ordinary reader "is neither the most suspicious, nor the most insensitive of our citizenry." *Ragin v. New York Times Co.*, 923 F.2d 995, 1002 (2nd Cir. 1991).

In the present case, the defendants not only ignore the factual context of concerted action between the President and the NDP Task Force; they also ignore the fact that a

42

reasonable observer is aware that prayer is a quintessential religious practice, and that

admonitions to pray inherently give the appearance of endorsement. *Wallace v. Jaffree*, 472

U.S. 38, 56 (1985). Promoting an intrinsically religious practice like prayer, therefore, will

never satisfy the secular purpose requirement necessary for constitutionality. *Jagger v.*

*Douglas County School District*, 862 F.2d 824, 830 (11th Cir. 1989). In fact, these principles

were upheld in *Freedom From Religion Foundation v. Webb*, 93-CV-6056 (District Court,

City and County of Denver, Colorado, 1993), in which Judge McMullen enjoined Denver

Mayor Wellington Webb from actively participating in a Day of Prayer Against Violence

ceremony:

> The challenged conduct here is Mayor Webb's press release and press
> conference endorsing the Day of Prayer. Since prayer is exclusively a
> religious act, the endorsement of a Day of Prayer would logically be
> interpreted by a reasonable person as an endorsement of religion. Because
> from all appearances, Mayor Webb was acting in his official capacity in
> issuing the press release and conducting the press conference endorsing the
> Day of Prayer, the Court concludes that a reasonable person would interpret
> his conduct as governmental endorsement of religion. As such, it violates the
> Establishment Clause.

The constitutionality of Presidential Prayer Proclamations cannot be properly decided

without considering the evidence of history and context. The defendants, however, are

oblivious to the present day reality that the National Day of Prayer has become exactly what

the Establishment Clause is intended to prevent: A battle ground with the government deeply

43

involved.

Here, the record includes overwhelming evidence of the joint and concerted action between the President and the NDP Task Force as to the dedication and celebration of official Days of Prayer, including collaboration on the content of the official Prayer Proclamations.   The defendants, however, ignore all of the factual detail about this relationship between the President and the NDP Task Force, which relationship provides context that is relevant to whether a "reasonable observer," knowing of this concerted action, would find that the Presidents' Prayer Proclamations and Prayer Day dedications give the appearance of official endorsement of religion.

Context and content do count in determining whether public officials have crossed the line between "benign ceremonial deism" and actions that give the appearance of official endorsement of religion.  *See Allegheny County,* 492 U.S. at 598-600.  The defendants, nonetheless, simply ignore the evidence as if it did not exist.  This is not a proper approach for summary judgment.  The court must instead consider the evidence and draw reasonable inferences in favor of the non-moving parties.  This the defendants fail to do--instead, they try to skate by without any evidence going to the merits.

> B.      The Supreme Court Has Not Approved Presidential Prayer Day Dedications.

44

The defendants incorrectly imply that Prayer Proclamations and dedication of Prayer Days constitute nothing more than benign acknowledgments of the historical role of religion in our nation's history that have already been approved by the Supreme Court. The facts tell a different story. Prayer Proclamations are not just "honorary;" they are hortatory.

The Report of the Senate Committee on the Judiciary relating to the National Day of Prayer belies the defendants' claim that the National Day of Prayer "is simply acknowledgment of a tradition." The claim that Congress intended the National Day of Prayer Enactment for the secular purpose of "acknowledging the role of faith" in the Nation's history is simply not true. Instead, the Senate Report describes the intent of Congress for the people of this country to "reaffirm" the Nation's supposed deep religious conviction:

> It would certainly be appropriate if, pursuant to this resolution and the proclamation it urges, that the people of this country were to unite in a day of prayer each year, each in accordance with his own religious faith, thus reaffirming in a dramatic manner the deep religious conviction which has prevailed throughout the history of the United States. (See Exhibit A attached to this Brief.)

The intent to "reaffirm in a dramatic manner" the supposed religious convictions of the nation does not reflect the claimed secular purpose of merely acknowledging the supposed role of religion in the nation's history. Instead the purpose of the National Day of Prayer was "to have the public assemble in churches, synagogues and other places of worship

45

to offer prayers for world peace."  The Passage of the Act, moreover, occurred only after weeks of crusading by Reverend Billy Graham.

Significantly, the Senate Report on the National Day of Prayer Legislation also exposes a very troublesome historical inaccuracy.  The Senate Report states that "when the delegates to the Constitutional Convention encountered difficulties in the writing and formation of a Constitution for this Nation, prayer was suggested and became an established practice at succeeding sessions."  That statement is wrong, but it lies at the core of the defendants' attempt to justify the legislative enactment calling for a National Day of Prayer in 1952, more than 150 years after the signing of the United States Constitution.  Leo Pfeffer, *Church, State & Freedom* (1967), describes the real facts at page 121-122, in his scholarly examination of the Establishment Clause:

> It is perhaps symbolic of the difference in the relationship of state and religion between the Continental Congress and the new government established by the Constitutional Convention of 1787, that whereas the Continental Congress instituted the practice of daily prayers immediately on first convening, the Convention met for four months without any recitation of prayers.  After the Convention had been in session for a month, the octogenarian Franklin, who in earlier years had been pretty much of a Deist, moved "that henceforth prayers imploring the assistance of heaven, and its blessings on our deliberations, be held in this Assembly every morning before we proceed to business, and that one or more of the Clergy of this City be requested to officiate in that service."  The motion was received politely though not without embarrassment.  According to the records of the Convention, "After several unsuccessful attempts for silently postponing the matter by adjourning, the

adjournment was at length carried, without any vote on the motion."

More than symbolic, it is deeply significant that whereas there was scarcely a document or promulgation issued by the Continental Congress that did not contain an invocation to "God" or one of the numerous synonyms of the Deity, the Constitution emerging from the Convention contained no such invocation or reference. This omission was not inadvertent.

The different treatments of religion by the Continental Congress and the Constitutional Convention is significant in its implications about the supposed historical meaning of the Establishment Clause. Leonard W. Levy, *The Establishment Clause: Religion and the First Amendment* (1986), notes this significance, as well as the historical confusion still being perpetuated:

The Constitutional Convention of 1787, which framed the Constitution of the United States, gave only slight attention to the subject of a Bill of Rights and even less to the subject of religion. In contrast to the Declaration of Independence and to many acts of the Continental Congress, the Constitution contains no references to God; the Convention did not even invoke divine guidance for its deliberations. Its finished product made no reference to religion except to prohibit a religious test as a qualification for federal office holders.

There are no other references to the subject of religion at the Constitutional Convention, except for Benjamin Franklin's speech at a critical juncture of the proceedings on the reason that prayers should open its sessions. President Ronald Reagan, who sometimes reinvents history, mistakenly declared that as a result of Franklin's motion, "From that day on they opened all the Constitutional meetings with a prayer." Practical considerations - an unwillingness to let the public think the Convention was in trouble, lack of money to pay a minister, and deference to Philadelphia's Quakers - resulted in

47

the death of the Franklin motion. The Convention, he noted, "Except three or four persons, thought prayers unnecessary."

Id. at 63-64.

They may have prayed at the Continental Congress, but they did not pray at the Constitutional Convention. That is a distinction that makes a difference. The Articles of Confederation adopted by the Continental Congress do not provide a litmus for the interpretation of the Establishment Clause of the United States Constitution. The Articles of Confederation were ratified on March 1, 1871, but they lasted only seven years. They were seriously defective. The Articles were subsequently replaced by the Constitution on June 21, 1788, and that Constitution has lasted more than 200 years. Whereas the Articles of Confederation, moreover, hardly recognized the separation between church and state, the Constitution subsequently incorporated that separation, with continuing success.

In fact, the major architects of the Constitution vigorously opposed government meddling in religion, including the issuance of proclamations of prayer. Thomas Jefferson, for one, opposed such proclamations. "In his view, presidents should have nothing to do with Thanksgiving proclamations or days of prayer or times of devotion. These were religious matters falling into the exclusive province of religious, not political leaders; 'the right to issue such proclamations belong strictly to the former,' Jefferson declared, 'and this right can never

48

be safer than in their own hands, where the Constitution has deposited it.'"   Edwin S.

Gaustad, *Faith of Our Fathers:  Religion in the New Nation*, at p. 45 (1987).  Jefferson's

explanation for refusing to issue prayer proclamations, significantly, evidences that the

divisiveness of such proclamations is of long standing. James Madison shared Jefferson's

view regarding the issuance of prayer proclamations.  Madison's views are particularly

compelling because Madison is falsely cited as a proponent of the Constitutionality of

dedicated days of prayer.  He was not.  Although Madison did stray from his convictions

during a time of war, he did not believe his actions were constitutional.  Levy describes the

circumstances:

> In his "Detached Memoranda" Madison also stated that "religious
> proclamations by the Executive recommending Thanksgivings and fasts are
> shoots from the same root with the Legislative Acts reviewed."  Madison made
> this remarkable judgment about so innocuous an act as a Presidential
> recommendation for a day of Thanksgiving, another extreme example of non-
> preference on a matter respecting religion.     He regarded such
> recommendations as violating the First Amendment: "They seem" he wrote,
> "to imply and certainly nourish the erroneous idea of a national religion."  As
> a President, however, Madison had proclaimed several days of fast and
> thanksgiving, but he found extenuating circumstances in the fact that he was
> Chief Executive during the time a war was fought on national soil.

Levy, *The Establishment Clause: Religion and the First Amendment, at 99-100.  See also
Pfeffer, Church, State & Freedom*, at 266-67:

> Madison was unable to resist the demands to proclaim a day of thanksgiving,

but after retiring from the Presidency he set forth five objections to the practice: (1) an executive proclamation can be only a recommendation, and an advisory government is a contradiction in terms; (2) in any event, it cannot act in Ecclesiastical matters; (3) a Presidential proclamation implies the erroneous idea of a national religion; (4) the tenancy of the practice is "to narrow the recommendation to the standard of the predominant sect," as is evidenced by Adams' calling for a Christian worship; and (5) "the liability of the practice to a subserviency to political views, to the scandal of religion as well as the increase of party animosities."

Even George Washington, whom the defendants rely upon as authority for the constitutionality of Presidential Prayer Proclamations, involves a far different reality than the defendants insinuate.  In the first place, it would be:

> . . . entirely erroneous to assume that the constitutionality of government proclamations of thanksgiving and prayer has always been accepted without question....when in the first Congress after the adoption of the Federal Constitution, a resolution was offered to request the President to "recommend to the people of the United States a day of Thanksgiving and prayer, to be observed by acknowledging with grateful hearts the many signal favours of the Almighty God," objection was raised by another member of Congress that "it is a business with which Congress has nothing to do; it is a religious matter, and as such is proscribed to us." (Leo Pfeffer, Church, State and Freedom, pg. 265 (1967).

In the event, Washington's 1789 Day of Thanksgiving was never challenged, but significantly, *Marbury* had not even been decided as to provide a basis for suit. President Washington, moreover, might well be distressed that his name and actions are now being

50

invoked as justification for an Act of Congress establishing a National Day of Prayer more than 150 years later. According to Thomas Jefferson, President Washington was not a Christian, (*Jefferson Memoirs, Vol IV*, pg. 512), and he was poignantly sensitive to the divisiveness of religion. President Washington, in a letter to Sir Edward Newenham, on October 20, 1792, wrote:

> Of all the animosities which have existed among mankind, those which are caused by difference of sentiment and religion appear to be the most inveterate and distressing, and ought most to be deprecated. I was in hopes that the enlightened and liberal policy which has marked the present age would at least have reconciled Christians of every denomination, so far that we should never again see their religious disputes carried to such a pitch as to endanger the peace of society.

As the largest property holder in the parish in which he lived in Virginia, President Washington was for a time a vestryman, a political office in Virginia. He occasionally attended the Protestant Episcopal church with his wife Martha, but did not take part in communion. The foremost myth maker about President Washington was Parson Mason L. Weems, whose *Life of Washington* (1800) promoted the cherry tree story and other disinformation, such as the claim that Washington prayed in the woods at Valley Forge in the hard Revolutionary War winter of 1777-78. This make-believe scene has been painted, and even appeared on stamps, and is repeated in several of the National Day of Prayer Proclamations, but the myth is not true, and in fact, Washington's diaries reveal that he

51

seldom attended church and frequently walked and traveled on the Sabbath. Washington
has been claimed by many religions, but he kept his private beliefs to himself. (*The
Religious Beliefs of Our Presidents, From Washington to FDR*, Franklin Steiner, pgs. 14-
41.)

Other historical inaccuracies also are resorted to in support of the National Day of
Prayer, including reference to President Lincoln's Gettysburg Address, which supposedly
included the words "under God." In fact, the original address, from which Lincoln read,
includes no reference to a nation "under God," nor does Lincoln's after-speech second draft.
Only a later "commemorative" version of the Gettysburg Address by Lincoln, an unorthodox
deist, added "under God."

The defendants' faulty history, in short, simply cannot be used to support the
constitutionality of Prayer Day Proclamations; nor can their interpretation of Supreme Court
precedent. The United States Supreme Court has recognized in *Allegheny v. American Civil
Liberties Union*, 492 U.S. at 603 n. 52, that official Prayer Proclamations stand on different
footing than "ceremonial deism" such as legislative prayer. The Supreme Court stated:

> It is worth noting that just because Marsh sustained the validity
> of legislative prayer, it does not necessarily follow that practices
> like proclaiming a National Day of Prayer are constitutional.
> Legislative prayer does not urge citizens to engage in religious
> practices, and on that basis could well be distinguishable from

52

> an exhortation from government to the people that they engage
> in religious conduct.

Significantly, the Court's doubt about the constitutionality of Prayer Day Proclamations in

*County of Allegheny* came after the Court's decision in *Lynch v. Donnelly*, 465 U.S. 668, 675

(1984), upon which the defendants rely.  The Court concluded that Lynch teaches only that

the government may celebrate holidays with religious significance in a way that does not

endorse the religious doctrine or aspect of the holiday.  Allegheny, 492 U.S. at 601.

The Supreme Court's concern about religious endorsements has found voice in

subsequent recent decisions as well.  For example, in *McCreary County,* 545 U.S. at 861, the

Court noted that when the government designates Sunday closing laws, it advances religion

only minimally because many working people would take the day off as one of rest

regardless, "but if the government justified its decision with a stated desire for all Americans

to honor Christ, the divisive thrust of the official action would be inescapable."  As a result,

the Supreme Court has upheld Sunday closing statutes on secular grounds, after finding that

the government had forsaken the religious purposes behind predecessor laws.  Id.

The Supreme Court further noted in *McCreary* the difference between passive

symbols and "insistent calls" for religious action.  "Creches placed with holiday symbols and

prayers by legislators do not insistently call for religious action on the part of citizens; the

53

history of posting the [Ten] Commandments [however] expressed a purpose to urge citizens to act in prescribed ways as a personal response to divine authority." 545 U.S. at 877 n. 24.

Finally, the Supreme Court noted in *McCreary* that the framers of the Constitution intended the Establishment Clause to require government neutrality in religion, "including neutrality in statements acknowledging religion. The very language of the Establishment Clause represented a significant departure from early drafts that merely prohibited a single national religion, and the final language instead extended the prohibition to state support for religion in general." Id., at 878. *See* also *Lee v. Weisman*, 505 U.S. 577, 503-506 (1992) (Justice J. Souter, concurring) ("President Jefferson steadfastly refused to issue Thanksgiving Proclamations of any kind, in part because he thought they violated the Religion Clauses.").

The Supreme Court, in short, has not determined that Prayer Day Proclamations are constitutional, even without the evidence of concerted action with patently evangelical organizations, which marks this case. The defendants' argument to the contrary is wrong.

Nor has the constitutionality of Prayer Proclamations and Prayer Day dedications been decided ancillary to any judicial recognition of holidays like Thanksgiving and Christmas. Judicial acknowledgment of such holidays, in fact, has been limited to instances where the justification was based upon the secular aspects of such holidays. By contrast, courts have not sanctioned government recognition of holidays where the justification was based upon

54

"religious connotations." For example, in *Ganulin v. United States*, F. Supp. 2d 824, 834-35 (S.D. Oh.1999), the Court concluded that the United States did not violate the Establishment Clause by giving federal employees a paid vacation day on Christmas, but only because the government was not recognizing the religious significance of the holiday. According to the court, "the conclusion that Christmas has a secular purpose is supported by cases analyzing the constitutionality of school, office, and courthouse closings on other days traditionally celebrated as holy days by Christians," including Good Friday. Id., at 833.

In *Granceier v. Middleton*, 173 F.3d 568, 574 (6th Cir. 1999), the Court similarly summarized the law in regard to Good Friday closings, finally concluding that holiday closings are suspect "if the purpose for which they are instituted is religious." *See also Cammack v. Waihee*, 932 F.2d 765 (9th Cir. 1991); *Metzl v. Leininger*, 57 F.3d 618 (7th Cir. 1995); and *Bridenbaugh v. O'Bannon*, 185 F.3d 796 (7th Cir. 1999). Government recognition of various holidays with supposed religious connotations has been upheld only so long as the recognition is not based on the religious significance of the holiday. That distinction lies at the heart of the Supreme Court's *Allegheny* decision regarding the symbolism of government speech.

In short, the supposed historical support for the constitutionality of the National Day of Prayer is unsupported factually--and non-responsive to the necessary legal analysis to

55

resolve the question.  Professor Pfeffer succinctly rebuts the reasoning that "appeals to the

Almighty in the message of the Chief Executive might be objected to by a fastidious atheist

or agnostic," noting:

> This reasoning assumes that those who initiated or accepted the references to
> God in any particular document anticipated and were willing that the reference
> be taken as authority justifying the particular practice in question.  There is
> rarely any evidence to support such an assumption; on the contrary, it is
> reasonable to assume that many of the original framers of the document would
> have opposed the reference had they anticipated the use to which it was later
> put. . . these references to God that are used to justify concrete practices are
> themselves assumed to be constitutional only because they have not been
> adjudged unconstitutional. . .

Finally, and most important, the question whether particular acts are constitutional

must be determined by the Constitution of the United States, and that document does not

contain any reference to God.  This omission was not accidental or inadvertent, and was the

basis of much opposition to the Constitution.  Citing references to God in court oaths,

legends on coins, Presidential Proclamations and the like would appear to be relying on

secondary evidence, where the primary evidence does not sustain the convention thought to

be proved.  Put somewhat differently, when Justice Douglas in *Zorach* case or Justice

Stewart in *Engle v. Vitale* cited references to God and Presidential Proclamations in

courtroom oaths to prove that the Constitution does not require "that in every and all respects

there shall be a separation of church and state" nor prohibited released-time religious

instruction or public school sponsored prayer recitations, the omission of reference to God in that Constitution might be cited with at least equal force and logic for the direct reverse of the proposition. (Pfeffer, *Church, State and Freedom*, pg. 239 (1967).

The fact is that no court decision has directly considered the constitutionality of National Day of Prayer Proclamations in which that was the question presented--and in which the question was resolved by employing the proper analytical approach to a developed factual record.

C.   Government Speech Must Be Evaluated By Content and Context.

Even with public displays of Nativity scenes, the content and context of the display must be considered in order to determine whether any particular display gives the appearance of endorsement of the religious aspects of the Christmas holiday season.  Courts have not simply generalized that religious holiday displays are constitutionally acceptable.  Public displays, instead, are carefully scrutinized for any appearance of governmental endorsement of the religious significance of the holiday.  Hence, in *Allegheny*, the Supreme Court concluded that the display of a creche had an unconstitutional effect, but a menorah display was allowed because that display in its particular physical setting was deemed a visual symbol for a holiday with a secular dimension.

When employing the proper analytical approach, therefore, a court is charged with the

responsibility of "assessing the totality of the circumstances "to determine whether a reasonable person would believe that government speech amounts to an endorsement of religion." *Books v. City of Elkhart*, 235 F.3d 292, 304 (7th Cir. 2000). The government's use of religious symbolism is unconstitutional if it has the effect of endorsing religious beliefs, and the effect of the government's use of religious symbolism depends on its context. Id.

The appropriate emphasis has remained squarely on evaluating the totality of the circumstances when judging the constitutionality of government speech, including in the Supreme Court's recent Ten Commandments decisions in *McCreary* and *Van Orden v. Perry*, 545 U.S. 677 (2005). In *McCreary and Van Orden*, the Supreme Court reached different conclusions as to the constitutionality of challenged Ten Commandments displays based upon the different circumstances and context of each display. Neither decision, however, leaves any doubt that if an objective observer could conclude from appearances and historic knowledge that the government was demonstrating a religious preference, then the Establishment Clause would be violated.

The concept of "ceremonial deism" also is dependent upon the conclusion that a reasonable observer would not view a religious display or government speech as having religious significance. "The constitutional value of ceremonial deism turns on a shared

58

understanding of its legitimate non-religious purposes." *Elk Grove Unified School District v. Newdow*, 542 U.S. 1, 37 (2004) (J. O'Connor, concurring). This determination, as noted, necessarily involves evaluation of context and content, including circumstances that may change with the passage of time as the actions and motivations of officials change.

Even practices such as legislative prayer are not constitutionally acceptable in all circumstances, as Justice Blackmun recognized in *County of Allegheny*, 492 U.S. at 604 n. 53, stating that "not even the unique history of legislative prayer can justify contemporary legislative prayers that have the effect of affiliating the government with any one specific faith or belief." *See* also *Hinrichs v. Bosma*, 440 F.3d 393, 399 (7th Cir. 2006). Nor does one acquire a vested or protected right in violation of the Constitution. *Marsh v. Chambers*, 463 U.S. 783, 790 (1983).

Here, the defendants avoid the essential analysis. First, they incorrectly equate the legislative prayer in *Marsh* with Presidential Prayer Proclamations which exhort participation in religious activity. Next, they try to equate Thanksgiving and Memorial Day Proclamations marked by prayer with Proclamations extolling and exhorting prayer for its own sake. The two situations are different, and the facts of record in this case establish that the National Day of Prayer is seen as an endorsement of religion, and one that is highly divisive; by contrast, Thanksgiving and Memorial Day honor secular objectives, but there is no secular

justification for exhorting prayer for its own sake. Finally, the defendants incorrectly claim
that the National Day of Prayer supposedly reflects "an unbroken history of official
acknowledgment of the role of religion in American life from at least 1789." This is not true,
as some of the Presidential Proclamations even contradict this claim. For instance, the 1987
National Day of Prayer by Ronald Reagan acknowledged only intermittent Day of Prayer
Proclamations before 1952:

> In 1952 the Congress of the United States, resuming a tradition observed by
> the Continental Congress from 1776 to 1783 and followed intermittently
> thereafter, adopted a resolution calling on the President to set aside and
> proclaim a suitable day each year as a National Day of Prayer.

> In 1983 President Reagan's National Day of Prayer Proclamation similarly noted:

> Two hundred years ago in 1783, the Treaty of Paris officially ended the long,
> weary Revolutionary War during which a National Day of Prayer had been
> proclaimed every Spring for eight years. When peace came, the National Day
> of Prayer was forgotten.

Government speech, whether it involves legislative prayer, official Prayer
Proclamations, government displays of Ten Commandments, or other religious symbols,
must be evaluated in the particular circumstances of each case in order to determine whether
the speech impermissibly endorses religion. In the present case, therefore, the question
immediately before the Court is whether the facts and circumstances relating to Presidential
Prayer Proclamations and Prayer Day dedications are sufficient so that a reasonable observer

60

could find the appearance of endorsement. If the evidence and reasonable inferences support such a conclusion, then the defendants' Motion for Summary Judgment must be denied.

The Court must focus on the content and context in which the government's use of religious symbolism appears. This requires highly fact-specific scrutiny which must be approached on a case-by-case basis. Analysis of an Establishment Clause challenge to government speech is ultimately dependent, in important part, on factual determinations, including what a reasonable observer might fairly understand to be the government's primary message, in its particular setting. On this score, the defendants merely sidestep the evidence.

### D.   The Relationship With the NDP Task Force is Part of the Relevant Content and Context, But Ignored By The Defendants.

The relevant context in this case involves the President issuing Prayer Proclamations and dedicating Days of Prayer, in celebratory and festive circumstances, whereby citizens are encouraged to engage in prayer. The circumstances indicate a preference for religion, including Christianity, and the dedicated Prayer Days involve controversial and divisive exhortations to pray.

Presidential Prayer Proclamations also evidence concerted action with evangelical Christian organizations, including the NDP Task Force. The President's 2008 Prayer Proclamation expressly incorporated the preselected Biblical quote given to him by the NDP

61

Task Force. A reasonable observer would know that the express reference in the President's

Prayer Proclamation was derived from the NDP Task Force, which dictates a single theme

to be used by the President and the governors of all 50 states. By agreeing to incorporate the

NDP Task Force's annual theme, however, the President created the appearance of

endorsement of the NDP Task Force. The alliance with the NDP Task Force created the

intended impression that the NDP Task Force and government are working hand-in-glove

in sponsoring the National Day of Prayer,--a situation that remains fully capable of repetition.

Nor has the government aligned with a "benign" nondenominational organization.

The NDP Task Force is a virulently Christian organization; its organization and promotion

of the National Day of Prayer and corresponding state Prayer Days are based on exclusively

Judeo-Christian principles; and the NDP Task Force Prayer Day dedications are not passive

acknowledgments of the historical significance of religion - - the NDP Task Force claims to

publicize and preserve America's alleged Christian heritage, to encourage and emphasize

prayer, and to glorify the Lord in word and deed.

Proper consideration of Prayer Proclamations and Prayer Day dedications must also

take into account the inherent nature of prayer. In *Jaffree v. Wallace*, 705 F.2d 1526, 1534-

35 (11th Cir. 1983), the Court emphasized that prayer is the quintessential religious practice,

such that no secular purpose generally can be inferred. *See* also *North Carolina Civil*

*Liberties Union v. Constangy*, 947 F.2d 1145, 1150 (4th Cir. 1991) (an act so intrinsically religious as prayer cannot meet, or at least would have difficulty meeting, the secular purpose prong of the *Lemon* Test, citing *Wallace v. Jaffree*, 472 U.S. 38, 56 (1985)).   Moreover, exhortations from government officials to engage in religious conduct, by proclaiming a National Day of Prayer, are distinguishable from Thanksgiving and Memorial Day Proclamations, which holidays also have non-religious significance and which are celebrated by non-believers.  *County of Allegheny*, 492 U.S. at 603 n. 52.  Similarly, one court has found that prayer at Presidential Inaugurals does not have the sole purpose of encouraging prayer for its own sake.  The National Day of Prayer, by contrast, involves "reaffirmation" by action and is blatantly exclusive of atheists and agnostics..

The circumstances of the present case, including the dedication of official Prayer Days, constitute calls to action.  Presidential Prayer Proclamations are issued in a context in which prayer is being promoted and extolled as a religious phenomenon.  Prayer is being promoted as and for the sake of religion.  There is no secular rationale for the Prayer Day celebrations marked by Presidential Prayer Proclamations.   The sole rationale is the encouragement of prayer by government.

E.    The National Day of Prayer Legislation is Facially Unconstitutional and Unconstitutional As Applied.

63

The 1952 Legislation requiring the President to set aside an appropriate day as a National Day of Prayer, as well as the 1988 Legislation requiring that the first Thursday in May in each year be set aside as a National Day of Prayer, are facially unconstitutional and unconstitutional as applied.  The Legislation is facially unconstitutional because the history and understanding of the Legislation establishes that the purpose and intent was to designate a day for the singular purpose of exhorting prayer for its own sake, rather than simply to invoke prayer ceremonially to recognize other purposes, such as occurs at Thanksgiving, or on Memorial Day, or War Remembrances.  The legislation fails the first *Lemon* test.

The National Day of Prayer Legislation in both 1952 and 1988, moreover, is perceived and understood to be a call to prayer.  In fact, the 1988 Legislation, designating a predictable National Day of Prayer was initiated and adopted for the purpose of facilitating the scheduling of events related to the National Day of Prayer by aggressively evangelical organizations wanting to mobilize their membership base with government help.  Pat Boone, Co-Chairman of the National Prayer Committee testified in support of the bill, noting that annual observances with a different day being proclaimed each year "offered little advance notice to adequately inform the grass routes constituencies."  (134 Cong. Rec. E683-01, March 16, 1988.)

The defendants' argument that Presidential Proclamations need not encourage prayer

64

in violation of the Establishment Clause is belied by the evidence of consistent Presidential

Proclamations that encourage all Americans to participate in the inherently religious activity

of prayer.  A review of all the Presidential Proclamations since 1952 shows the consistently

exclusionary and proselytizing message of the Presidential Proclamations:

1. From 1952 - 2009, 45 of the 57 NDP Proclamations have explicitly directed "all" Americans (or "every" or "each" American) to pray. These presidential proclamations occurred in the years: 1952, 1953, 1954, 1955, 1956, 1957, 1961, 1962, 1964, 1965, 1966, 1967, 1970, 1972, 1974, 1975, 1976, 1977, 1978, 1979, 1980, 1983, 1986, 1987,  1989, 1990, 1991, 1992, 1993, 1994, 1995, 1996, 1997, 1998, 1999, 2001, 2000-2008.

2. Other Presidential NDP proclamations have by implication directed everyone to pray, such as Pres. Nixon in 1968, saying "Let us . . . thank God;" Pres. Nixon in 1969 saying "I ask that on this day the people of the United States pray." In 1988, Pres. Ronald Reagan intoned in his NDP Proclamation, "let us join together."  In 1989 Pres. Reagan said "I invite the people of this great nation [to pray]".  In 1990, he said, "I ask my fellow Americans to join with me. . ."

3. In 1964, Pres. Lyndon Baines Johnson said: "I call upon all of our citizens, therefore, to observe the National  Day of Prayer in accordance with our custom—each in his own way and in his own faith," and then giving Americans four things to pray about.

4. In 1958, Pres. Eisenhower called on "my fellow Americans," and even "all who may be visitors," to pray.

65

5.    At least ten Presidential NDP proclamations rely upon and repeat historical errors. The most common error is the statement that the founders prayed at the Constitutional Convention that adopted the deliberately secular Constitution. These inaccurate Presidential proclamations were made in 1961, 1965, 1973, 1984, 1989, 1990, 1994, 1996, 1999 and 2001. At least four other proclamations imply this error.  In 1961, Pres. John F. Kennedy repeated outright this fallacy.    "During the deliberations in the Constitutional Convention they were called to daily prayers."

6.    In 1984, Pres. Ronald Reagan's proclamation correctly notes Benjamin Franklin calling for prayers but fails to note that Franklin's call for prayer was ignored. "With these words, Mr. Franklin called upon the Convention to open each day with prayer, and from the birth of our Republic, prayer has been vital to the whole fabric of American life."  It is not surprising that so many of the NDP Presidential Proclamations repeat this historic error, because The Report to accompany H.J. Res. 382 enacting a National Day of Prayer is based on the same error: "When the delegates to the Constitutional Convention encountered difficulties in the writing and formation of a Constitution for this Nation, prayer was suggested and became an established practice at succeeding sessions."

7.    In 1980, Pres. Jimmy Carter in his NDP Proclamation made this broad generality implying prayer was part of the formation of our secular Constitution: "While never willing to bow to a tyrant, our forefathers were always willing to get to their knees before God."

8.    The 1984 NDP Presidential Proclamation by Pres. Reagan is one of at least five Presidential Proclamations which

repeats as fact the apocryphal story of Washington kneeling in prayer at Valley Forge, which never happened.

9.  The 1958 Proclamation by Pres. Eisenhower ignores nonbelievers, saying the nation was "challenged by an aggressive denial of Divine Providence."

10. The1980 proclamation by Pres. Jimmy Carter likewise says "as a nation we cannot but hope that more of our citizens would, through prayer, come into a closer relationship with their maker." This is not surprising, considering the legislation enacting the NDP likewise heaps disrespect on nonbelievers, by saying the law was designed as a measure against "the corrosive forces of communism which seems simultaneously to destroy our democratic way of life and the faith in an Almighty God on which it is placed."

11. The 1987 proclamation by Pres. Reagan reads like a sermon and chides Americans for "being too proud to make, or too prone to forget" an acknowledgment to deity.

12. The 1991 proclamation by Pres. George H.W. Bush says "we owe constant praise to God."

13. Several proclamations include biblical allusions: 1961; 1970, 1979, 1979, 1984,1986 ("pray without ceasing"); and biblical references in the NDP presidential proclamations issued in 1990, 1991, 1992, 1994, 1997, and in 2000, 2001, 2004 and 2008.

14. All of Pres. George W. Bush's NDP Proclamations encourage special observances in all 50 states, and enjoin citizens to move beyond just prayer to action and attendance at these events.

15.   Most NDP Proclamations have directed "all" Americans not only to pray, but told them what to pray about.  A blatant example include the NDP Proclamations in 1959, in which Pres. Dwight D. Eisenhower called "upon my fellow Americans and all who may be visitors in our country . . . to join in prayer for our Nation . . that we may have Divine guidance in our efforts to lead our children."

16.   Other NDP Proclamations that read like pious laundry lists included the 1960 proclamation by Pres. Eisenhower, who directed "my countrymen" to remember such religious beliefs as that "we shall ever place our trust in the keeping of God's commandments."

17.   In 1961, Pres. John F. Kennedy listed five items over which to "Let us pray," including for "divine guidance in our efforts to lead our children in the ways of the truth."

18.   In 1962, Pres. Kennedy listed four items over which to pray, after expressing the dubious idea that "Almighty God was a dominant power in the lives of our Founding Fathers; and . . . they expressed this faith in prayer."

19.   In 1963, Pres. Kennedy's proclamation was "conscious of the religious character of our people."

20.   On Sept. 25, 1970, several months after ordering the invasion and bombing of Cambodia, Pres. Richard Nixon in his NDP proclamation invited "all Americans to pray that the scourge of war be lifted from the earth."

21.   On Oct. 12, 1971, Pres. Richard Nixon told Americans in his NDP Proclamation: "This hunger can only be met in its fullness through prayer." He urged "that Americans pray for the fullness of reconciliation among all peoples."

22.   In 1979, during Pres. Carter's NDP Proclamation proclaiming Oct. 3, 1979, the National Day of Prayer, he asked "all Americans to join with me on that day to recommit ourselves to God."

23.   The 1983 NDP Proclamation by Pres. Ronald Reagan, declaring May 5, 1983 to be the National Day of Prayer, belied the propaganda of the NDP Task Force, and the misinformed assertions of defendants, that there had been an "unbroken" line of prayer proclamations dating to the nation's inception. Pres. Reagan proclaimed: "Two hundred years  ago in 1783, the Treaty of Paris officially ended the long, weary Revolutionary War during which a National Day of Prayer had been proclaimed every spring for eight years. When peace came the National Day of Prayer was forgotten. For almost half a century, as the Nation grew in power and wealth, we put aside this deepest expression of American belief—our national dependence on the Providence of God.  "It took the tragedy of the Civil War to restore a National Day of Prayer. . . . Revived as an annual observance by Congress in 1952, the National Day of Prayer has become a great unifying force for our citizens who come from all the great religions of the world. Prayer unites people. This common expression of reverence heals and brings us together as a Nation and we pray it may one day bring renewed respect for God to all the peoples of the world."  In conclusion, Pres. Reagan added: "I call upon every citizen of this great Nation to gather together on that day in homes and places of worship to pray. . ."

24.   In 1984, Pres. Reagan quoted II Chronicles 7:14: "If my people, who are called by my name, will humble themselves and pray and seek my face and turn from their wicked ways, then I will hear from heaven and will forgive their sin, and will heal their land."

69

25.    In 1986, Pres. Reagan's NDP Proclamation said "Christ
       enjoins us to 'pray without ceasing.' "

26.    In 1988, Pres. Ronald Reagan in his NDP Proclamation,
       said: "The lesson is clear—that in the winning of freedom
       and in the living of life, the first step is prayer." He added
       that the first step of the American government was
       "humble, heartfelt prayer."

27.    In 1989, Pres. George H.W. Bush gave a very long
       proclamation asserting: "Our Nation's history and the lives
       of millions of men and women around the world provide
       compelling evidence of the power of faith and the efficacy
       of prayer." He spoke of "the Father's House, the New
       Testament parable of the Prodigal son, to show that "God
       answers the prayers of those who place their trust in Him."
       He added:  "I therefore ask my fellow Americans to join
       with me in prayer for our children. Let us strive to help each
       of them sink their roots into the rich soil of God's love for
       the beings He has made in His own image.  Let us show
       them through prayer that we, too, like our Nation's
       Founders, seek our shelter—our rock and our salvation—in
       the arms of God."

28.    In 1991, Pres. George H.W. Bush's NDP Proclamation
       began, "we owe constant praise to Almighty God." . . . "On
       this National Day of Prayer, let us acknowledge with
       heartfelt remorse the many times we have failed to
       appreciate the Lord's gifts and to obey His Commandments.
       Giving humble thanks for His mercy, let us vow to fulfill
       not only our responsibilities but also our potential as one
       Nation under God. Most important let us make our prayers
       pleasing to Him. . . "

29.    "[U]se the powerful medium of prayer," Pres. Clinton urged

70

in his 2000 NDP Proclamation.

30.     In 2001, Pres. George W. Bush used the NDP Task Force
        wording: "The theme of the 2001 National Day of Prayer is
        'One Nation Under God.'  In a prayer written specially for
        the occasion, Americans are asked to pray for 'a moral and
        spiritual renewal to help us meet the many problems we
        face.'  Special observances are scheduled for all 50 States,
        with local volunteers planning a variety of activities
        including prayer breakfasts, concerts, rallies, and student
        gatherings."

31.     In his 2004 NDP Proclamation, Pres. Bush again cited
        scripture, noting "the Lord is near to all who call upon Him.
        . . He also will hear their cry, and save them."

32.     In 2005, Pres. Bush in his NDP Proclamation, enjoined:
        "The Congress by Public Law 100-307, as amended, has
        called on our citizens to reaffirm the role of prayer in our
        society and to honor the freedom of religion by recognizing
        annually a National Day of Prayer."

33.     In 2008, Pres. Bush once again expressly adopted the NDP
        Task Force theme and supporting scripture:  "This year's
        theme, "Prayer! America's Strength and Shield, "is taken
        from Psalm 28:7, "The Lord is my strength and my shield;
        my heart trusts him, and I am helped."  (The Annual
        Presidential Proclamations since 1952 are included as
        Exhibit 116.)

The factual historical record of Presidential Proclamations calling for a National Day

of Prayer rebuts the defendants' suggestion that no prospective relief is necessary or

appropriate, even if President Bush did pander to the National Day of Prayer Task Force, by

incorporating its annual theme and supporting scripture into his own proclamations.  By doing so, President Bush clearly aligned himself with the recognizably Christian expression of the National Day of Prayer Task Force.  This case is not just about those Proclamations, however, because even the most recent Proclamation by President Obama, cautiously issued in the crucible of litigation, expressly called for Americans to engage in prayer -- because that is what the National Day of Prayer is all about.  Virtually all of the Presidential Proclamations since 1952 have gone beyond any acceptable acknowledgment of religion, and instead, they have promoted prayer as a normative and recommended activity for all American citizens.

The history of Presidential Procla mations declaring a National Day of Prayer establishes the facial problem with declaring a National Day of Prayer for the sole purpose of calling to prayer; the record of actual Proclamations demonstrates that actual Presidential Proclamations declaring a National Day of Prayer in fact eviscerate the prohibition on government speech endorsing religion.  Presidential Proclamations constitute government speech that unconstitutionally gives preferential treatment to a pro-prayer viewpoint in contrast to the views of non-believers. *See* Mercier v. LaCrosse, 305 F. Supp. 2d 999, 1011 (W.D. Wis. 2004).  This viewpoint preference, on a matter proscribed by the First amendment, can and should be redressed by invalidation of the National Day of Prayer

72

Legislation.  See Planned Parenthood of South Carolina, 361 F. 3d at 490.

The court should declare the Legislation requiring the President to declare an annual National Day of Prayer to be unconstitutional on its face.  Alternatively, the court should specifically enjoin the defendants from distributing National Day of Prayer Proclamations that encourage and exhort Americans to engage in active prayer.

## VII.   THE DEFENDANT SHIRLEY DOBSON SHOULD BE ENJOINED FROM COLLABORATING IN NATIONAL DAY OF PRAYER ACTIVITIES THAT GIVE THE APPEARANCE OF GOVERNMENTAL ENDORSEMENT.

The defendant Shirley Dobson is the voice and face of the National Day of Prayer Task Force, which has collaborated hand-in-glove with past National Day of Prayer observances, including prayer services in the East Room of the White House and the Cannon Office Building.  Mrs. Dobson also has been instrumental in obtaining National Day of Prayer Proclamations from Presidents and State Governors.  She also has overseen the mobilization of more than 40,000 coordinators and millions of participants in National Day of Prayer observances across the country.

Actions of a private person are attributable to the government if there is a sufficiently close nexus between the government and the challenged action of the private individual so that the action of the latter may be fairly treated as that of the government itself.  Cooper v. U.S. Postal Service, 577 F.3d 479, 491 (2nd Cir. 2009).  A nexus of action exists between

73

a private individual and the government when the private actor operates as a willful participant in concerted activity with the government or its agents.  Id.  In this case, that has certainly been the relationship held by Mrs. Dobson.

Mrs. Dobson, as Chairman or Co-chairman of the National Day of Prayer Task Force since 1989, has insinuated herself into government-sponsored National Day of Prayer observances to such an extent that she is clearly a willful participant in concerted activity with the government.  Mrs. Dobson is the chairman of an organization that maintains a website proclaiming itself as the "Official National Day of Prayer" site.  She obtains annual Proclamations from Presidents and governors, including proclamations that include an annual theme and scriptural reference provided by Mrs. Dobson.  The annual theme and scriptural reference are recognizably Christian and the National Day of Prayer Task Force headed by Mrs. Dobson represents an exclusively Judeo-Christian expression of the National Day of Prayer.  In fact, coordinators of observances at the local level for the NDP Task Force must themselves sign an oath of adherence to the religious perspective of the Task Force. So intertwined is Mrs. Dobson with the National Day of Prayer that Presidential Proclamations in the past have included the Task Force theme and scriptural reference, as do many proclamations issued by state governors.  Mrs. Dobson is so integral to the National Day of Prayer that a heated national debate occurs each year because of the perception and

74

the reality that the National Day of Prayer has been hijacked by evangelical Christians.

## CONCLUSION

For all of the above reasons, the court should grant judgment in the plaintiffs' favor

enjoining further declarations of a National Day of Prayer.

Dated this 10th day of December, 2009.

> BOARDMAN LAW FIRM
> By:
>
> ___*/s/ Richard L. Bolton*_____
> Richard L. Bolton, Esq.
> Boardman, Suhr, Curry & Field LLP
> 1 South Pinckney Street, 4th Floor
> P. O. Box 927
> Madison, WI 53701-0927
> Telephone: (608) 257-9521
> Facsimile: (608) 283-1709
> Attorneys for Plaintiffs

## CERTIFICATE OF SERVICE

I hereby certify that on December 10, 2009, I electronically filed the foregoing document with the Clerk of Court using the CM/ECF system, which will send notification electronically to all attorneys of record.

*/s/Rosalie Stapleton*

F:\DOCS\wd\26318\17\A0932770.WPD

76