UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

| | |
|---|---|
| FREEDOM FROM RELIGION FOUNDATION, INC., ANNE NICOL GAYLOR, ANNIE LAURIE GAYLOR, PAUL GAYLOR, DAN BARKER, PHYLLIS ROSE, and JILL DEAN, | ) ) ) ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) Case No. 08-CV-588 ) ) |
| PRESIDENT BARACK OBAMA, WHITE HOUSE PRESS SECRETARY ROBERT GIBBS, WISCONSIN GOVERNOR JIM DOYLE, and SHIRLEY DOBSON, CHAIRMAN OF THE NATIONAL DAY OF PRAYER TASK FORCE, | ) ) ) ) ) ) ) ) |
| Defendants. | ) ) ) |

**DEFENDANT SHIRLEY DOBSON'S REPLY IN SUPPORT OF HER MOTION FOR SUMMARY JUDGMENT**

| | |
|---|---|
| Alan E. Sears, Esq | Joel Oster, KS Bar 18547 |
| Benjamin W. Bull, Esq. | Kevin Theriot, KS Bar 21565 |
| ALLIANCE DEFENSE FUND | ALLIANCE DEFENSE FUND |
| 15100 N. 90th Street | 15192 Rosewood |
| Scottsdale, Arizona | Leawood, KS 66224 |
| Tel:  480-444-0020 | Tel: (913) 685-8000 |
| Fax: 480-444-0025 | Fax: (913) 685-8001 |
| | joster@telladf.org |

COUNSEL FOR DEFENDANT SHIRLEY DOBSON

# TABLE OF CONTENTS

I.     INTRODUCTION ........................................................................................................1

II.    PLAINTIFFS' ERRONEOUOS FACTUAL FINDINGS ....................................................4

       A.     There was no concerted action between Mrs. Dobson and any United States
              President concerning the National Day of Prayer. ....................................................4

       B.     America has a history of presidential prayer proclamations. ....................................5

       C.     FFRF has not been harmed by the NDP, but has profited quite handsomely from
              attacking religion and prayer. ................................................................................8

III.   PLAINTIFFS LACK STANDING. .......................................................................................9

       A.     Plaintiffs Have Not Suffered An Injury In Fact. ....................................................9

       B.     FFRF Does Not Have Organizational Standing. ....................................................15

IV.    PLAINTIFFS' ALLEGED INJURIES CANNOT BE REDRESSED ..............................18

       A.     Any Relief Directing The President On What He Can Say Would Violate The
              Separation of Powers Doctrine. ............................................................................18

       B.     Declaring the Public Law Unconstitutional Would Not Redress Plaintiffs' Alleged
              Injuries. ................................................................................................................

       C.     Declaring Previous Presidential Prayer Proclamations Unconstitutional Will Not
              Redress Plaintiffs' Alleged Injuries. ....................................................................20

V.     PLAINTIFFS' CLAIMS AGAINST FUTURE PRAYER PROCLAMATIONS ARE
       NOT RIPE. ........................................................................................................................21

VI.    PRESIDENTIAL PRAYER PROCLAMATIONS ARE CONSTITUTIONAL ...............22

       A.     The Establishment Clause Is Not Enforceable Against The President. ................22

       B.     Plaintiffs Have Utterly Ignored the Leading Prayer Case, Marsh v. Chambers. ...22

       C.     Plaintiffs' Endorsement Test Analysis Is In Error. ...............................................24

VII.   MRS. DOBSON IS NOT LIABLE FOR ANY ALLEGED ESTABLISHMENT
       CLAUSE VIOLATIONS. .................................................................................................26

CONCLUSION...................................................................................................................................27

# TABLE OF AUTHORITIES

**Cases:**

*ASARCO, Inc. v. Kadish*,
    490 U.S. 605 (1989)..............................................................................9

*Baker v. Carr*,
    369 U.S. 186 (1962)............................................................................16

*Beatty v. Washington Metro Area Transit Authority*,
    860 F.2d 1117 (D.C. Cir. 1988)........................................................19

*Books v. City of Elkhart*,
    235 F.3d 292 (7th Cir. 2000) ....................................................11,12,13

*Books v. Elkhart County*,
    401 F.3d 857 (7th Cir. 2005) ....................................................11,12,13

*Community for Creative Non-Violence v. Hess*,
    745 F.2d 697 (D.C.Cir.1984)............................................................20

*County of Allegheny v. ACLU Greater Pittsburgh Chapter*,
    492 U.S. 573 (1989)....................................................................11,14,24

*Crawford v. Marion County Election Board*,
    472 F.3d 949 (7th Cir. 2007) ..........................................................17,18

*Doe v. County of Montgomery*,
    41 F.3d 1156 (7th Cir. 1994) ...........................................................  11

*Elk Grove Unified School Dist. v. Newdow*,
    542 U.S. 1 (2004)...............................................................................26

*Florida State Conference of the NAACP v. Browning*,
    522 F.3d 1153 (11th Cir. 2008) ........................................................18

*Freedom From Religion Foundation, Inc. v. Nicholson*,
    536 F.3d 730 (7th Cir. 2008) ............................................................27

*Freedom From Religion Foundation, Inc. v. City of Green Bay*,
    581 F.Supp.2d 1019 (E.D.Wis. 2008)..............................................27

*Freedom From Religion Foundation, Inc. v. Olson*,
    566 F.Supp.2d 980 (D.N.D. 2008)....................................................27

*Havens Realty Corporation v. Coleman*,
    455 U.S. 363 (1982)................................................................15,16,17,18

*Hein v. Freedom from Religion Foundation*,
    551 U.S. 587 (2007)................................................................9,10,14,18,27

*Hinrichs v. Speaker of the House of Representatives of the Indiana General Assembly*,
    506 F.3d 584 (7th Cir. 2007) ................................................................11

*Lujan v. Defenders of Wildlife*,
    504 U.S. 555 (1992)................................................................11,21

*Lynch v. Donnelly*,
    465 U.S. 668 (1984)................................................................5,6,24,25,26

*Marsh v. Chambers*,
    463 U.S. 783 (1983)................................................................3,14,22,23,24

*McCreary County, Kentucky v. ACLU of Kentucky*,
    545 U.S. 844 (2005)................................................................11

*National Collegiate Athletic Association ("NCAA") v. Tarkanian*,
    488 U.S. 179 (1988)................................................................27

*Suhre v. Haywood*,
    131 F.3d 1083 (4th Cir. 1997) ................................................................11

*Swan v. Clinton*,
    100 F.3d 973 (D.C. Cir. 1996) ................................................................19

*U.S. v. Fischer*,
    833 F.2d 647 (7th Cir. 1987) ................................................................20

*Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.*,
    454 U.S. 464 (1982)................................................................9,10,11,17,18

*Van Orden v. Perry*,
    545 U.S. 677 (2005)................................................................23,26

*Wallace v. Jaffree*,
    472 U.S. 38 (1985)................................................................6,25

*Whitmore v. Arkansas*,
    495 U.S. 149 (1990)................................................................11

**<u>Statutes and Constitutional Provisions:</u>**

36 U.S.C. § 119 .................................................................................................................2

U.S. Const. Amend I. ......................................................................................................22

## I.      INTRODUCTION

On January 12, 2010, a devastating earthquake crippled Haiti.  The world was shocked by the tremendous amount of destruction and loss of life that ensued.  Facing the nation, President Obama called Americans to prayer in support of those suffering in Haiti, and asked any who could to donate to the relief efforts.[1]  Secretary of State Hillary Rodham Clinton made a similar plea from Honolulu.[2]  These efforts to call the nation to prayer are consistent with the long established traditions and history of this nation, dating back to George Washington who, after a request by a Joint Resolution of Congress, issued a proclamation calling this nation to a specific day of thanksgiving and prayer to God.[3]

Plaintiffs are attacking this practice.  In an attempt to re-write history, Plaintiffs claim, contrary to established Supreme Court precedent, that this nation does not have a religious history and that the issuance of presidential prayer proclamations has not been a part of America's history.  Plaintiffs' attempts to re-write history should be rejected.  Just like President Obama's call to prayer for those suffering in Haiti, presidential prayer proclamations are consistent with the best of this nation's history and traditions, and are constitutional.

Plaintiffs' claims should be rejected because they lack standing.  Plaintiffs have not suffered the individualized harm needed to confer Article III standing.  This case does not even meet the minimal standing requirements found in monument cases as here, Plaintiffs do not have to pass by a prayer proclamation to conduct civic business at a courthouse.  Rather, this is a case where every single American could claim the same alleged injuries as Plaintiffs.  Where the

---

[1] http://www.whitehouse.gov/the-press-office/remarks-president-rescue-efforts-haiti, attached as Exhibit E to Supplemental Affidavit of Joel Oster, filed contemporaneously with this Reply.
[2] http://news.yahoo.com/video/world-15749633/17590071;_ylt=AhQMIlfH0TwSzimrjhGKTJgWP5Z4.
[3] *Wallace v. Jaffree*, 472 U.S. 38, 100-102 (1985) (Rehnquist dissenting).

entire population shares the same alleged injuries, then the plaintiff has not suffered an individualized injury sufficient to confer Article III standing.[4]

In the same way, Plaintiff Freedom from Religion Foundation, Inc. ("FFRF") lacks organizational standing. Although FFRF tries to claim that it has been harmed by the NDP, in reality, it has turned fighting prayer into a multi-million dollar enterprise.[5] Employing just eight full-time staff and a few interns, FFRF has increased its nets assets from 3.2 million dollars in 2004 to 6.4 million last year. Last year alone, FFRF netted almost one million dollars after all expenses and salaries were paid. Far from harming FFRF, the NDP and this lawsuit serve the organization's overall goals and purposes. Plaintiffs cannot cobble their interests together to manufacture standing when they do not have it individually.

Plaintiffs also lack standing as their alleged injuries cannot be redressed by a favorable court decision. Even if this Court were to declare 36 U.S.C. § 119 ("Public Law") unconstitutional, the President can still issue prayer proclamations, as has been done throughout this nation's history.[6] Even the Plaintiffs conceded that they are not challenging the right of the President to issue future prayer proclamations as that would be too speculative.[7] In addition, the Public Law does not mention any public official other than the President, so it has absolutely no bearing on prayer proclamations by governors. Indeed, Plaintiffs are not asking the Court to enjoin any governor from issuing a proclamation. So striking down the Public Law will not afford Plaintiffs the relief they seek. In addition, this Court cannot enjoin future proclamations

---

[4]*See Hein v. Freedom from Religion Foundation*, 551 U.S. 587, 127 S.Ct. 2553, 2563 (2007) (stating that when the plaintiffs' interests are the same as the public at large, "deciding a constitutional claim based solely on taxpayer standing 'would be not to decide a judicial controversy, but to assume a position of authority over the governmental acts of another and co-equal department, an authority which plainly we do not possess.'")(quoting *Frothingham v. Mellon*, 262 U.S. 447, 489 (1923)).

[5] *See* Anne Laurie Gaylor's deposition, attached as exhibit C, 30:15-32:11.

[6]*See* Amici Curiae Opposition of the American Center for Law and Justice, *et al*., filed in Support of the Defendants' Motions to Dismiss the First Amended Complaint. This brief has been attached as Exhibit G.

[7] *See* Gaylor's Dep., 52:12-53:23; 89:11-90:22.

by the President as it would violate the separation of powers doctrine.  The Plaintiffs' argument that this Court can enjoin ministerial acts of the President does not apply in this case as the issuance of a prayer proclamation is not a ministerial act.

Plaintiffs lack standing to bring any claim against future proclamations as any injury from such proclamations is speculative and not concrete.  Plaintiffs conceded this during their deposition.[8]  Plaintiffs do not know what future prayer proclamations will say, and it would require pure speculation to guess what they might say.

Even if Plaintiffs have standing, they fail to state a claim.  The Establishment Clause does not apply to the President.  Plaintiffs did not even attempt to respond to this argument.

Furthermore, proclaiming a national day of prayer does not violate the Establishment Clause.  This case is controlled by *Marsh v. Chambers*, 463 U.S. 783, 792 (1983), where the Supreme Court held that a legislature can hire a person for the express purpose of giving a prayer for the legislature.  The underlying rationale in *Marsh* was that the practice of legislative prayer has been the tradition in America since the country was founded.  Thus, allowing legislative prayer was not an establishment of religion, but rather recognition that we have a religious heritage, and thus a "tolerable" accommodation of that history.[9]

Plaintiffs ignore *Marsh*, yet it is the most applicable precedent on this matter.  If a legislature can hire a Christian minister to give a prayer for the legislature, then the president and other public officials can surely ask citizens to pray in their own respective ways for free.

The Public Law and the proclamations in this case simply follow the history and traditions of this nation to seek Divine guidance.  No one who understands this nation's history and traditions would think that prayer proclamations are anything other than the "tolerable

---

[8] *See* Gaylor's Dep., 52:12-53:23; 89:11-90:22.
[9] *Marsh*, 463 U.S. at 792.

acknowledgment of beliefs widely held among the people of this country."[10]   And as such, they

do not violate the Establishment Clause.

## II.   PLAINTIFFS' ERRONEOUOS FACTUAL FINDINGS

Plaintiffs have made several factual assertions that are not justified by the evidence and

that do not warrant summary judgment in their favor.[11]

### A.   There was no concerted action between Mrs. Dobson and any United States President concerning the National Day of Prayer.

Plaintiffs flippantly refer to a "concerted action" or the "collaboration" between Mrs.

Dobson and a president concerning the National Day of Prayer, or that the presidential prayer

proclamations were "orchestrated with the NDP Task Force …."  *See* Plaintiffs' Brief, 39, 40,

42, 44, 54, 61, 73 and 74.   Although Plaintiffs repeat this erroneous factual conclusion many

times, they fail to offer any proof of such joint effort.  Plaintiffs allege that the 2008 Presidential

Prayer Proclamation proves the joint, collaborative effort because Mrs. Dobson sent a draft

proclamation to the President.  *See* Plaintiffs' Brief, 74.  But this Proclamation proves nothing of

the sort.  In 2008, Mrs. Dobson sent the President a draft proclamation, like she has done many

times before.  But the President has never issued her suggested proclamation, and did not do so

in 2008.  *See* Shirley Dobson Dep., 56:6-11.  In fact, the 2008 Presidential Prayer Proclamation

is very much different than the one Mrs. Dobson drafted.   *See* 2008 Presidential Prayer

Proclamation, exhibit G, and the 2008 Draft Proclamation, exhibit H.

Plaintiffs allege that Mrs. Dobson is the chairman of the Task Force, a Christian

organization, and the Task Force maintains a website proclaiming itself as "The Official National

Day of Prayer" site.  *See* Plaintiffs' Brief, 74.  The actual website states that it is the official

---

[10] *Marsh*, 463 U.S. at 792.
[11] In addition, Defendant Dobson has filed contemporaneously her Responses to Plaintiffs' Proposed Findings of Facts and her Reply to Plaintiffs' Response to Defendant Dobson's Statement of Undisputed Fact.

website of the "National Day of Prayer Task Force." *See* http://nationaldayofprayer.com/about/our-mission/. The website states, "The National Day of Prayer is an annual observance held on the first Thursday of May, inviting people of all faiths to pray for the nation. It was created in 1952 by a joint resolution of the United States Congress, and signed into law by President Harry S. Truman. **Our Task Force is a privately funded organization** whose purpose is to encourage participation on the National Day of Prayer." *See id.*

But even if the Task Force intentionally tried to deceive people with its website – which it did not – Plaintiffs failed to submit any evidence that the President worked with the Task Force in any meaningful way. Plaintiffs cannot prove that the Task Force acted in concert with the President when it has failed to offer any evidence as to the President's actions.

## B.   America has a history of presidential prayer proclamations.

Plaintiffs' Brief tries to rewrite history to remove America's religious heritage. But history is what it is, and cannot be changed because Plaintiffs wish it were not so. *See, e.g., Lynch v. Donnelly*, 465 U.S. 668, 674 (1984) ("There is an unbroken history of official acknowledgment by all three branches of government of the role of religion in American life from at least 1789."). Plaintiffs' assertion that presidential prayer proclamations have not been an historical practice is simply untrue. In 1789, on the day after the House of Representatives voted to adopt the form of the First Amendment Religion Clauses, Representative Elias Boudinot proposed a resolution asking President George Washington to issue a proclamation calling the nation to a day of thanksgiving and prayer to God, "to be observed by acknowledging with grateful hearts the many and signal favors of Almighty God, especially by affording them an opportunity peaceably to establish a form of government for their safety and happiness." 1 J.

Richardson, Messages and Papers of the Presidents, 1789-1897, p. 64 (1897); 1 Annals of Cong. 914 (1789); *see also Wallace v. Jaffree*, 472 U.S. 38, 101-102 (1985) (Rehnquist, dissenting). The Resolution passed, and within two weeks, George Washington issued a proclamation calling the nation to prayer:

> Now, therefore, I do recommend and assign Thursday, the 26th day of November next, to be devoted by the people of these States to the service of that great and glorious Being who is the beneficent author of all the good that was, that is, or that will be; that we may then all unite in rendering unto Him our sincere and humble thanks for His kind care and protection of the people of this country previous to their becoming a nation; for the signal and manifold mercies and the favorable interpositions of His providence in the course and conclusion of the late war; for the great degree of tranquility, union, and plenty which we have since enjoyed; for the peaceable and rational manner in which we have been enabled to establish constitutions of government for our safety and happiness, and particularly the national one now lately instituted; for the civil and religious liberty with which we are blessed, and the means we have of acquiring and diffusing useful knowledge; and, in general, for all the great and various favors which He has been pleased to confer upon us.
>
> And also that we may then unite in most humbly offering our prayers and supplications to the great Lord and Ruler of Nations, and beseech Him to pardon our national and other transgressions; to enable us all, whether in public or private stations, to perform our several and relative duties properly and punctually; to render our National Government a blessing to all the people by constantly being a Government of wise, just, and constitutional laws, discreetly and faithfully executed and obeyed; to protect and guide all sovereigns and nations (especially such as have shown kindness to us), and to bless them with good governments, peace, and concord; to promote the knowledge and practice of true religion and virtue, and the increase of science among them and us; and, generally, to grant unto all mankind such a degree of temporal prosperity as He alone knows to be best.

*See Wallace,* 472 U.S. at 102-103.

Since George Washington, nearly every president has issued proclamations calling the nation to pray for various reasons. *See Lynch*, 465 U.S. at 675 n.2 ("Presidents Adams and Madison also issued Thanksgiving Proclamations, as have almost all our Presidents")(citing 3 A. Stokes, Church and State in the United States 180-193 (1950).  A compilation of presidential and

6

congressional prayer proclamations is attached as exhibit F.  *See also id*. at 675 ("Our history is replete with official references to the value and invocation of Divine guidance in deliberations and pronouncements of the Founding Fathers and contemporary leaders. Beginning in the early colonial period long before Independence, a day of Thanksgiving was celebrated as a religious holiday to give thanks for the bounties of Nature as gifts from God."); *Zorach v. Clauson*, 343 U.S. 306, 313 (1952) ("We are a religious people whose institutions presuppose a Supreme Being.").

In addition, many governors have issued prayer proclamations.  For example, Jonathan Trumbull, governor of Connecticut, issued this proclamation: "And I do hereby call upon the people …. [to] offer to our Almighty and all gracious God, through our Great Mediator, our sincere and solemn prayers for his Divine assistance and the influences of His Holy Spirit." Jonathan Trumbull, *By His Excellency Jonathan Trumbull, Esq. Governor and Commander in Chief In and Over the State of Connecticut. A Proclamation* (Hudson and Goodwin, 1807).  Even Thomas Jefferson, whom the Plaintiffs hold up as their model of a public official who did not mingle church and state, issued prayer proclamations as governor of Virginia, thus showing the historical practice of such proclamations in this nation. *See* Letter from Thomas Jefferson to Rev. Mr. Millar (Jan. 23, 1808), in 4 Memoir, Correspondence, and Miscellanies from the Papers of Thomas Jefferson at 103-04 (Charlottesville, 1829).

Plaintiffs' attempt to claim that presidential prayer proclamations are not a part of this nation's history is simply a blatant effort to rewrite history to conform to their agenda, and should be rejected.

**C.    FFRF has not been harmed by the NDP, but has profited quite handsomely from attacking religion and prayer.**

Plaintiffs assert that FFRF has been harmed by the issuance of prayer proclamations because it had to spend money to fight the proclamations.  *See* Plaintiffs' Brief, 27.  Far from being harmed, FFRF has turned fighting prayers into a very lucrative multi-million dollar business.

FFRF started in the 1970s because, according to its president Annie Laurie Gaylor, "My mother and I were very concerned about the encroachment of religion on government.  Jerry Falwell was in the senate seat, and it was as if there was a disrespect for the constitutional principle of separation between church and state."  *See* Gaylor's Dep., 17:15-21.[12]  According to its president, FFRF exists to serve two purposes: "we promote the constitutional principle of the separation between church and state," and educate people about the dangers of religion.  *Id*. 23:12-15; 24:13-16.  FFRF accomplishes these purposes in two ways: they litigate and they educate.  *See id*. at 24:16-25.

Rather than harming the FFRF, the NDP and this lawsuit fit perfectly within the FFRF's overall purposes and mission.  When asked if this lawsuit fits within the organization's overall objectives and goals, Ms. Gaylor said "yes."  *Id*. at 48:2-4.  When asked if this lawsuit served the educational function of the organization, she said, "I think there's no question."  *Id*. at 48:5-7.

Not only has the organization not been harmed because the NDP and this lawsuit serve its mission and purpose, but the organization has profited quite handsomely from it.  In 2004, FFRF took in $803,000 in total revenue, and its expenses were only $611,000, making a net income of $192,000.  *See id*. at 31:25-32:11.  FFRF's net assets at the end of 2004 were 3.2 million.  *See id*. at 32:14-19.  In 2008, FFRF brought in over 2 million in revenue, and its expenses were only 1.1

---

[12] Despite Ms. Gaylor's testimony, Defendant's counsel is unaware of any senate seat held by the late Rev. Falwell.

million, netting a profit of $914,000.  *See id*. at 30:15-19.  FFRF's net assets at the end of 2008 had grown to 6.4 million dollars.  *See id*. at 31:20.  FFRF's nice profit is enhanced when you realize that there are only eight full time paid staff at FFRF and a few part time interns.  *See id*. at 17:11-14.  So after all expenses and salaries have been paid, this small organization has over 6.4 million dollars in assets, and made a net income last year of $914,000.  Far from being harmed, the organization is profiting quite nicely from serving its mission to fight religion and prayer.

## III.    PLAINTIFFS LACK STANDING.

### A.    Plaintiffs Have Not Suffered An Injury In Fact.

Plaintiffs only not suffered concrete, individualized harm needed for Article III standing.  *See ASARCO, Inc. v. Kadish*, 490 U.S. 605, 613 (1989) (plaintiffs do not have standing "to challenge laws of general application where their own injury is not distinct from that suffered in general by other taxpayers or citizens.").  For example, Plaintiffs allege that the President intended the proclamation to reach a national audience, which includes them.  *See* Plaintiffs' Brief, 14.  But this negates standing, not confers it.  If the President intended a national audience, then being offended by the proclamation is nothing more than a generalized grievance, shared by the rest of the country.  *See Hein*, 127 S.Ct. at 2563 (stating that when the interests are the same as the public at large, deciding a constitutional claim based solely on taxpayer standing "would be not to decide a judicial controversy, but to assume a position of authority over the governmental acts of another and co-equal department, an authority which plainly we do not possess.")(quoting *Frothingham*, 262 U.S. at 489).

*Valley Forge* is directly on-point – if the harm the plaintiffs claim is purely psychological offense to the government conduct in question, then the plaintiffs lack standing.  In *Valley Forge*, the United States gave away land worth at least $577,500 to a sectarian religious college.  *Id.* at

468.  Like the Plaintiffs in this case, the plaintiffs in *Valley Forge* believed in a strict separation of church and state.  But the Court held that such psychological harm does not confer Article III standing.

> [T]he psychological consequence presumably produced by observation of conduct with which one disagrees … is not an injury sufficient to confer standing under Art. III, even though the disagreement is phrased in constitutional terms. It is evident that respondents are firmly committed to the constitutional principle of separation of church and State, but standing is not measured by the intensity of the litigant's interest or the fervor of his advocacy.

*Id*. at 485-86.

Plaintiffs try to distinguish *Valley Forge* by stating that the government conduct there was not targeted at the plaintiff, while in this case, the government conduct (the prayer proclamations) is targeted at the entire nation, which includes the Plaintiffs. *See* Plaintiffs' Brief, 16.  But plaintiffs' distinction undermines their standing.  If the intended audience is the entire nation, then Plaintiffs have not alleged an injury that is any different than the rest of the population.   If everyone is affected by it, then such injuries are shared by everyone and are generalized grievances.  *See Hein*, 127 S.Ct. at 2562 ("The party who invokes the power must be able to show not only that the statute is invalid but that he has sustained or is immediately in danger of sustaining some direct injury as the result of its enforcement, and not merely that he suffers in some indefinite way in common with people generally.").

A plaintiff cannot "roam the country" seeking to be offended, and then claim standing based on the offense alone.  *See Valley Forge,* 454 U.S. at 487.  Plaintiffs claim that they did not have to roam the country in order to encounter the proclamations, but that their members brought it to their attention.  *See* Plaintiffs' Brief, 18.  But this is not a meaningful distinction.  Plaintiffs do not have to view the proclamations in order to fully engage as citizens or fulfill their civic duties.  The proclamations were not posted on any courthouse door.  They were not read at a

10

public meeting that they attended.  Rather, they had to seek out the proclamations in order to be offended, and this does not confer standing.  *See Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560 (1992); *Whitmore v. Arkansas*, 495 U.S. 149, 155 (1990); *see also Hinrichs v. Speaker of the House of Representatives of the Indiana General Assembly*, 506 F.3d 584 (7th Cir. 2007) (stating that a plaintiff must show that "he has sustained, or is immediately in danger of sustaining some direct injury … and not merely that he suffers in some indefinite way in common with people generally.").

Plaintiffs claim that since *Valley Forge*, "courts have uniformly found that the *Valley Forge* decision does not mean that 'psychological injury' is an insufficient basis for Article III standing."  Plaintiffs' Brief, 20.  But Plaintiffs failed to cite a single case standing for this proposition.  Instead, Plaintiffs cite *County of Allegheny v. ACLU Greater Pittsburgh Chapter*, 492 U.S. 573 (1989) (crèche in county courthouse); *McCreary County, Kentucky v. ACLU of Kentucky*, 545 U.S. 844 (2005) (Ten Commandments display in county courthouse),[13] and *Suhre v. Haywood*, 131 F.3d 1083 (4th Cir. 1997) (Ten Commandments display in county courtroom). Each of these cases involved a religious display on country property where civic business is conducted.  In none of these cases did the court hold that mere psychological injury was enough to confer standing.  *In each case, the alleged injury impacted the ability of the plaintiffs to conduct civic business.*

A proclamation is not the equivalent of a local monument or display.  *See Books v. City of Elkhart*, 235 F.3d 292 (7th Cir. 2000)(*Books I*); *Books v. Elkhart County*, 401 F.3d 857 (7th Cir. 2005) (*Books II*); and *Doe v. County of Montgomery*, 41 F.3d 1156 (7th Cir. 1994).  The facts of

---

[13] The Court did not address standing in either of these cases.  Assumption of standing has no precedential effect. *See Domino's Pizza, Inc. v. McDonald*, 546 U.S. 470, 478-79 (2006) ("The Court often grants certiorari to decide particular legal issues while assuming without deciding the validity of antecedent propositions, and such assumptions -- even on jurisdictional issues -- are not binding in future cases that directly raise the questions.")

these cases highlight the difference.  In *Books I and II*, the plaintiff claimed injury because he had to *pass* a religious monument on the lawn of a County administrative building.  The court described the injuries as follows: "Books and his fellow plaintiff in our earlier *Books* case allege that they were forced to come into direct and unwelcome contact with the City of Elkhart's outdoor Ten Commandments monument *when they entered the municipal building to conduct business or attend public meetings and when they visited the adjacent public library*."  *Id.* (emphasis added).  Similarly in *Doe*, the plaintiff had to pass under a sign over the courthouse door that read "THE WORLD NEEDS GOD" every time he entered the courthouse.  *See* 41 F.3d at 1156.  In such cases, "it is enough for standing purposes that a plaintiff allege that he must come into direct and unwelcome contact with the religious display to participate fully as a citizen and to fulfill legal obligations."  *Books II*, 401 F.3d at 861 (citations omitted).  But unlike these cases, the Plaintiffs here do not have to view the proclamations in order to conduct their public business or fulfill their civic obligations.

Plaintiffs allege that standing is not defeated if a person "voluntarily" passes an offensive display.  *See* Plaintiffs' Brief, 22.  But a person does not have standing to challenge a religious display if he only voluntarily learns of its existence and is thus offended.  The person still has to voluntarily "come into direct and unwelcome contact with the" religious display to participate fully as citizens and to fulfill legal obligations.  *Books II*, 401 F.3d at 861.  Thus, even if a plaintiff voluntarily walked past a religious monument in order to enter a courthouse rather than enter through another entrance, the plaintiff would have standing.  *Books I*, 235 F.3d at 300.  But here, Plaintiffs have made no such showing.  They did not have to view the proclamation in order to fulfill any civic duty.  And their "duty" to learn of governmental proclamations is no different than the rest of the population.

*Buono v. Norton*, 212 F.Supp.2d 1202 (C.D. Calif. 2002), cited by the Plaintiffs, does not support Plaintiffs' standing.  In *Buono*, two persons who regularly visited a national park were offended by the display of a cross in the national park.  One of the plaintiffs went to the location of the cross specifically for the purpose of being offended.  But the court stated that doing so did not give that plaintiff standing!  "The fact that Schwartz initially proactively sought to find the cross is also irrelevant.  Standing sufficient to warrant the imposition of prospective injunctive relief is not based on Schwartz's previous visits to the Preserve, but rather on such future visits.  ***While the fact that he intends to visit the cross regularly "because he finds the presence of the cross … offensive" might not establish an injury in fact,*** Schwartz also asserts that his 'enjoyment of the area' will be lessened due to the presence of the cross when he passes through the Preserve in the future for reasons other than checking on the status of the cross."  *Id*. at 1212 (emphasis added).   Thus, the plaintiff did not have standing to challenge the religious display because he went to it to be offended.  Rather, he had standing because of his future loss of enjoyment of visiting the park due to the existence of the cross.  Here, the existence of the proclamations will not hinder Plaintiffs' ability to enjoy a public park, or fulfill any civic duty.

Plaintiffs cite *Books v. City of Elkhart*, 235 F.3d 292 (7th Cir. 2000), for the proposition that plaintiffs have standing if they "know the [religious symbol] is there, whether [they] see it or not."  *See* Plaintiffs' Brief, 21.  Plaintiffs have seriously misrepresented the ruling in *Books*.  The above quote Plaintiffs provided was from the facts section of the opinion, not the analysis.  They were quoting a statement from the *plaintiff himself* who said he "know[s] the Ten Commandments monument is there whether [he] see[s] it or not."  *Id*. at 297.  But in the analysis section of the opinion where the court addressed the standing issues, the court was clear that in order to have standing, the plaintiff must come into "direct and unwelcome contact with the

[religious] monument to participate fully as citizens … and to fulfill certain legal duties." *Id.* Nowhere in the opinion did the court insinuate that it would be enough for standing if a person did not come into direct contact with the item, but rather, only "knew that it was there."[14]

Plaintiffs cite *Allegheny County v. ACLU*, 492 U.S. 573 (1989), and *Simpson v. Chesterfield County Board of Supervisors*, 404 F.3d 276 (4th Cir. 2005), for the proposition that prayer proclamations are different than legislative prayers. *See* Plaintiffs' Brief, 16. This argument, made in support of standing, has no bearing on standing. Even if legislative prayers were different than prayer proclamations (and there is no meaningful difference), Plaintiffs must still be harmed in some way that is not shared by the general population. For example, in *Simpson*, the plaintiff was a person who attended the public meetings and was thus subjected to the prayers. Here, there were no meetings and no direct personal contact with the proclamations.

In addition, Plaintiffs misrepresented the Court's statement. Plaintiffs cite to a footnote from *Allegheny* that stated that *Marsh* might be different than National Day of Prayer proclamations. But Plaintiffs cut off the quote so that it did not contain the following sentence, which is "But, as this practice is not before us, we express no judgment about its constitutionality." *See* 492 U.S. at 603 n. 52.

Plaintiffs argue that if they are denied standing, then no one would have standing to challenge unconstitutional actions that violate the Establishment Clause. This same argument was already rejected in *Hein*. *See* 127 S.Ct. at 2571 (rejecting the argument that if plaintiffs did not have standing to challenge Executive Branch expenditures in violation of the Establishment Clause, then a parade of horribles would occur, by stating that the political process could correct

---

[14] In addition, "offended observer" standing does not apply in this case. Defendant's counsel is unaware of any Supreme Court or Circuit court opinion that has held that the offended observer test applies against a federal defendant. All of the cases cited by Plaintiffs pertaining to the offended observer test, with the exception of *Buono v. Norton*, 212 F.Supp.2d 1202 (C.D. Calif. 2002), involved a state or local defendant, not a federal defendant.

the problem).   It is also incorrect.  If a person were specifically harmed, he or she would have standing to challenge the proclamations.  For instance, if a government employee, such as the press secretary, were required to attend a religious ceremony, he or she could claim a specific injury.   An employee who was required to write a religious proclamation could claim a constitutional injury.   But the general public does not have standing to challenge government action based only on being aware that it occurred.

**B.      FFRF Does Not Have Organizational Standing.**

Plaintiffs claim that FFRF has organizational standing as Defendants' actions have affected FFRF's ability to accomplish its goals.  *See* Plaintiffs' Brief, 27.  This argument is wholly contradicted by the facts, and is legally incorrect.  As FFRF's president testified, this lawsuit and the NDP *serve* its organizational mission and goals.  *See* Gaylor's Dep., 17:15-21; 23:12-15; 24:13-16; and 48:2-7.   And far from being harmed, it has turned fighting prayer and religion into a multi-million dollar enterprise. *See id*. at 30:15-19; 31:20.

In order to have organizations standing (outside of having members who themselves have standing), the Defendants' actions must still injure the members in some specific way that is not shared by the general population.  A review of the cases pertaining to organizational standing shows the differences in the cases where organizational standing has been awarded and this case, where it would not be appropriate.

In *Havens Realty Corporation v. Coleman*, 455 U.S. 363 (1982), cited by the Plaintiffs, individuals and an organization ("HOME") brought suit against the owner of an apartment complex alleging that certain racial steering practices violated the Fair Housing Act.[15]  *Havens* dealt with the standing of three different types of persons.  First, there was an African American

---

[15] *Havens* dealt with "standing to sue under the Fair Housing Act of 1968", not standing to bring an Establishment Clause claim.  *See id*. at 366.

"renter plaintiff" who wanted to rent an apartment from Havens, but was falsely told that no apartments were available.  *Id*. at 368.  Clearly, this person had standing to sue.  Second, there were "tester plaintiffs" who asked Havens, the owner of the apartment complex, if there were apartments available to rent as a means to test them to see if they were complying with the Act. The African American testers who were falsely told "no" had standing because, according to the Court, the Act conferred standing on "any person" who was given false information about available housing based on race.  *See id*. at 373.  But the Caucasian testers, who were correctly told there were vacancies, did not have standing because they were not given false information, and thus were not injured.  *See id*. at 375.  Thus, even though the Caucasian testers were aware of illegal activities, this awareness did not confer standing to sue in federal court.

Third, the Court held that HOME had organizational standing apart from representing its members.  The Court first stated that special rules do not apply for organizational standing. According to the Court, "In determining whether HOME has standing under the Fair Housing Act, we conclude the same inquiry as in the case of an individual: Has the plaintiff 'alleged such a personal stake in the outcome of the controversy' as to warrant his invocation of federal-court jurisdiction."  *Id*. at 378-79 (quoting *Baker v. Carr*, 369 U.S. 186, 204 (1962)).  HOME alleged that Haven's discriminatory practices impaired its efforts to assist minorities in finding affordable housing.  *See id*. at 379.  The Court held that this was enough for standing.

> If, as broadly alleged, petitioners' steering practices have perceptibly impaired HOME's ability to provide counseling and referral services for low and moderate-income homekeepers, there can be no question that the organization has suffered injury to the organization's activities-with the consequent drain on the organization's resources-constitutes ***far more than simply a setback to the organization's abstract social interests.***

*Id*. (emphasis added).

So in *Havens*, the complained of action – discriminatory housing practices – had a real impact on people – it denied them a place to live.  Persons were being denied housing due to their skin color.  HOME had to spend money and resources to counteract these discriminatory actions in finding people housing.  Here, FFRF is not trying to counteract discriminatory housing practices and spending money to find people homes who were victims of the discriminatory conduct.  Rather, they allege they are being frustrated in their abstract social interest in eliminating the National Day of Prayer.  This type of injury does not confer Article III standing. *See Valley Forge*, 454 U.S. at 474.

Plaintiffs cite *Crawford v. Marion County Election Board*, 472 F.3d 949 (7th Cir. 2007), for the proposition that "an organization suffers an injury when a statute 'compels it to divert more resources to accomplishing its goals.'"  *See* Plaintiffs' Brief, 28 (quoting *Crawford*, 472 F.3d at 951).  Plaintiffs' argument is flawed for several reasons.  First, this quote is not in *Crawford.*  In fact, the undersigned did a search of all federal cases for this quote, or a similar one, and could not find a single case.  But furthermore, *Crawford* does not stand for the proposition that an organization has Article III standing simply because its goals are frustrated. In *Crawford,* the Democrat Party challenged a state law that required photo identification to vote. The Party alleged that the voter ID law would have a disparate impact on lower income voters, and because lower income voters tended to vote for the Democratic candidate, it would have a disparate impact on the Democratic Party.  *See id*. at 951.  The court thus concluded that "the new law injures the Democratic Party by compelling the party to devote resources to getting to the polls those of its supporters who would otherwise be discouraged by the new law from bothering to vote."  *Id.  Crawford* is very much like *Havens* in that it dealt with a real, tangible

17

injury – the right to vote.  It did not pertain to mere psychic injuries, such as being offended or the goal of eradicating offensive prayers.

In the same way, *Florida State Conference of the NAACP v. Browning*, 522 F.3d 1153 (11TH Cir. 2008), is not applicable.  In *Browning*, a political organization brought suit challenging Florida's voter registration statute because it would require the organization to use its scarce time and resources in correcting voter mismatches rather than registering new voters, thus causing them specific injury.

*Havens, Crawford,* and *Browning* are not applicable to FFRF's standing in this case. Each of those cases dealt with a special interest organization expending money and resources to counteract tangible injuries caused by the governmental action in question.  Here, the only money being spent by FFRF is to promote its agenda to be free from *knowing about* the National Day of Prayer.  This is purely an abstract social interest and psychic injury.  If individual plaintiffs who are offended by the prayer proclamations do not have standing, they cannot cobble their claims together and spend some money to fight the proclamations to manufacture standing.

## IV. PLAINTIFFS' ALLEGED INJURIES CANNOT BE REDRESSED.

In order to have standing, a plaintiff must not only allege a particularized injury, but also that the injury can be redressed by a favorable court decision.  *Valley Forge Christian College*, 454 U.S. at 472.  Here, Plaintiffs' requested remedy would violate the Separation of Powers doctrine and even if granted, would not redress their alleged injuries.

### A. Any Relief Directing The President On What He Can Say Would Violate The Separation of Powers Doctrine.

In *Hein,* the Supreme Court strongly cautioned against granting standing in cases such as this.  The Court said,

> Relaxation of standing requirements is directly related to the expansion of judicial power, and lowering the taxpayer standing bar to permit challenges of purely executive actions would significantly alter the allocation of power at the national level, with a shift away from a democratic form of government.   The rule respondents propose would enlist the federal courts to superintend, at the behest of any federal taxpayer, *the speeches, statements, and myriad daily activities of the President, his staff, and other Executive Branch officials*.   This would be quite at odds with … *Flast's* own promise that it would not transform federal courts into forums for taxpayers' "generalized grievances" about the conduct of government, and would open the Judiciary to an arguable charge of providing government by injunction…. *It would deputize federal courts as virtually continuing monitors of the wisdom and soundness of Executive action, and that, most emphatically, is not the role of the judiciary.*

127 S.Ct. at 2570 (citations omitted)(emphasis added).

Plaintiffs respond by saying that courts can enjoin the President from performing "ministerial" duties.   *See* Plaintiffs' Brief, 36.   But issuing prayer proclamations is not a ministerial duty, but a discretionary function of the presidency.   A ministerial duty is one that admits of no discretion, so that the government official in question has no authority to determine whether or not to perform the duty.   *See Swan v. Clinton*, 100 F.3d 973 (D.C. Cir. 1996).   A duty is discretionary if it involves judgment, planning, or policymaking.   *See Beatty v. Washington Metro Area Transit Authority*, 860 F.2d 1117 (D.C. Cir. 1988).

Here, Plaintiffs' allegations prove the discretionary nature of presidential prayer proclamations.   There is nothing in the Public Law concerning the content of the proclamations. The President could issue a proclamation inviting only Christians to pray, all faiths to pray, or those of no faith to pray in their own way through meditation.   In addition, Plaintiffs also allege that President Bush aligned himself with Mrs. Dobson, but there is nothing in the Public Law that requires this action.

But more to the point, the President can issue proclamations with or without Congressional approval.   In fact, many presidents have issued prayer proclamations without

Congressional direction.  *See Amici Curiae* Brief of the American Center for Law and Justice, et

al., A6-A22. Because the issuance of proclamations is not simply a ministerial function, Courts

do not have the power to enjoin the President in the manner requested by the Plaintiffs.[16]

### B.   Declaring the Public Law Unconstitutional Would Not Redress Plaintiffs' Alleged Injuries.

Plaintiffs allege they have been injured due to various prayer proclamations issued by the

governors and local officials.  But even if this Court were to strike down the Public Law, it

would not give Plaintiffs any relief.  The Public Law does not pertain to any public official other

than the president.   Thus, it has no bearing whatsoever on Governor Doyle's prayer

proclamations, or any other public official's prayer proclamation. In addition, even if the Public

Law is stricken, the President could still issue prayer proclamations, as presidents have done

throughout our history.  Thus, Plaintiffs lack standing to challenge the Public Law as they cannot

obtain a remedy that would redress their alleged injuries.

### C.   Declaring Previous Presidential Prayer Proclamations Unconstitutional Will Not Redress Plaintiffs' Alleged Injuries.

Plaintiffs seek a declaratory judgment that previous presidential prayer proclamations are

unconstitutional.   But declaratory judgments, by themselves, do not redress past injuries.

Retrospective declaratory judgments are nothing more than advisory opinions, which a federal

court is prohibited from giving.  *See Community for Creative Non-Violence v. Hess*, 745 F.2d

697, 700-01 (D.C.Cir.1984) ("it is settled that a declaratory judgment is properly denied when

the disputed practice has ended, such as through the repeal of a challenged statute."); *see also*

*U.S. v. Fischer*, 833 F.2d 647 (7th Cir. 1987) ("advisory opinions are forbidden by Article III of

---

[16] In the same way, the Establishment Clause is best viewed as a structural right (similar to the separation of powers doctrine), as compared to an individual right.  *See* Carl Esbeck, *The Establishment Clause As A Structural Restraint On Governmental Power*, 84 Iowa L. Rev. 1 (1998).

the Constitution and by the Federal Declaratory Judgment Act").  Plaintiffs did not respond to this argument.

## V.   PLAINTIFFS' CLAIMS AGAINST FUTURE PRAYER PROCLAMATIONS ARE NOT RIPE.

Plaintiffs lack standing to challenge future prayer proclamations as any injuries from such proclamations are highly speculative, and not concrete.  *See Lujan,* 504 U.S. at 560-1 (stating injury must be "concrete and particularized," and "actual or imminent," not "conjectural or hypothetical").  Plaintiffs conceded this during Mrs. Gaylor's deposition.  *See* Gaylor's Dep., 52:12-53:23; 89:11-90:22.  Any alleged injuries are speculative because we do not know what future prayer proclamations, if issued, will say.   The main target of Plaintiffs' Amended Complaint is the supposed adoption of Task Force Themes in prayer proclamations by President Bush.   But President Bush is no longer the president and cannot issue any more prayer proclamations.  Plaintiffs have made no allegation that President Obama and Shirley Dobson acted jointly and in concert concerning the National Day of Prayer for 2009.  It would be pure speculation and guesswork to predict any alleged relationship between President Obama and Shirley Dobson.

Plaintiffs are asking this court to guess what relationship President Obama and Shirley Dobson will have, and what any future prayer proclamation will say.  Such guess work does not confer Article III standing.

Plaintiffs argue that voluntary cessation of conduct does not moot a case.  *See* Plaintiffs' Brief, 32.  But this is not about mootness.  President Obama has never "aligned" himself with Mrs. Dobson.  It is just pure speculation to guess what future Obama's prayer proclamations might state, or how he might disseminate them.  To suggest that just because President Bush did things a certain way that President Obama will follow is to deny the reality of the oval office.

21

In the same way, Plaintiffs' argument that this case should meet the "capable of repetition, yet evading review" exception to mootness, is off base.  *See* Plaintiffs' Brief, 32, citing *Davis v. Federal Elections Commission*, 128 S.Ct. 2759 (2008).  Here, Plaintiffs case against future prayer proclamations is not moot because the violations have never occurred.

## VI.   PRESIDENTIAL PRAYER PROCLAMATIONS ARE CONSTITUTIONAL

### A.   The Establishment Clause Is Not Enforceable Against The President.

The First Amendment is perfectly clear, "Congress shall make no law respecting the Establishment of religion …"  By its terms, it does not apply to the President.  Surely, the drafters of the First Amendment understood the difference between the President and Congress as they were the ones responsible for creating the three branches of government!

Plaintiffs failed to respond to this argument in their Brief.

### B.   Plaintiffs Have Utterly Ignored the Leading Prayer Case, *Marsh v. Chambers*.

Plaintiffs argue that prayer proclamations are unconstitutional, but never once try to distinguish the leading case on official prayers – *Marsh v. Chambers*, 463 U.S. 783 (1983).  This deliberate avoidance of the most applicable case can only be seen as an attempt to have this Court overrule the essential holding of *Marsh*.  *Marsh* is directly applicable because it involved a practice that has been going on since the Founding Father's era and is a reflection of our nation's religious heritage.

In upholding legislative prayer, the Supreme Court stated, "historical evidence sheds light not only on what the draftsmen intended the Establishment Clause to mean, but also on how they thought that Clause applied to the practice authorized by the First Congress – their actions reveal their intent."  463 U.S. at 790.  The Court pointed out that the historical record shows that the "opening of sessions of legislative and *other deliberative public bodies* with prayer is deeply

embedded in the history and traditions of this country." *Id.* at 786 (emphasis added).  The *Marsh* Court determined that the First Congress "did not consider opening prayers as a proselytizing activity or as symbolically placing the government's official seal of approval on one religious view," but rather, "conduct whose … effect …[harmonized] with the tenets of some or all religions." *Id./* at 792.  The Court concluded, "To invoke Divine guidance on a public body entrusted with making the laws is not, in these circumstances, an 'establishment' of religion or a step toward establishment; it is simply a tolerable acknowledgment of beliefs widely held among the people of this country." *Id.*

In the same way, the practice of issuing public proclamations to pray dates back to George Washington and the First Congress.  *See Van Orden v. Perry*, 545 U.S. 677, 686 (2005) (plurality); *see also Amici Curiae* Brief of the American Center for Law and Justice, A1-A59.  A public proclamation seeking prayer is not a step towards establishment, it is simply a tolerable acknowledgement of this nation's religious heritage.

Plaintiffs cite historical evidence that a few founding fathers did not like the practice of prayer proclamations.  *See* Plaintiffs' Brief, 48.  But unanimous support of a practice is not required in order to show it has historically been followed in the United States.  These same founding fathers mentioned by the Plaintiffs were probably as equally opposed to legislative prayers, but this does not mean that legislative prayers did not historically occur. As Defendant's opening Brief and the Amicus Brief of the American Center for Law and Justice make clear, the practice of official proclamations by the president, with or without congressional approval, has been going on since before the days of George Washington.

### C.       Plaintiffs' Endorsement Test Analysis Is In Error.

The thrust of Plaintiffs' arguments against the constitutionality of prayer proclamations is based on the endorsement test.  *See* Plaintiffs' Brief, 38-40.  As explained above, Plaintiffs have erroneously relied on the Endorsement test to the exclusion of the *Marsh* test.  A careful reading of the Supreme Court's Establishment Clause cases since *Marsh* show that *Marsh* is still controlling law in this area.  Whenever a Court majority has addressed *Marsh*, it has defended the decision.

In *Lynch v. Donnelly*, 465 U.S. 668 (1984), the Court recognized the "unbroken history of official acknowledgment by all three branches of government of the role of religion in American life."  *Id*. at 674.  "[American] history is replete with official references to the value and invocation of Divine guidance in deliberations and pronouncements of the Founding Fathers and contemporary leaders."  *Id*. at 675.  The Court even referred to the National Day of Prayer as another constitutional acknowledgment of America's religious heritage.  *Id.* at 677.  The Court concluded,

> This history may help explain why the Court consistently has declined to take a rigid, absolutist view of the Establishment Clause.  We have refused to construe the Religion Clauses with a literalness that would undermine the ultimate constitutional objective as illuminated by history.  In our modern, complex society whose traditions and constitutional underpinnings rest on and encourage diversity and pluralism in all areas, an absolutist approach in applying the Establishment Clause is simplistic and has been uniformly rejected by the Court.

*Id*. at 678 (citations omitted).

Likewise, the Court in *Allegheny* supported the reasoning in *Marsh* when it stated, "The concurrence [in *Lynch*] … harmonized the result in *Marsh* with the endorsement principle in a rigorous way, explaining that legislative prayer is a [constitutional] form of acknowledgment of religion …."  492 U.S. at 595 n.46 (citations omitted).

24

Even the creator of the Endorsement test, Justice O'Connor, agreed that government acknowledgments of religion that date to the adoption of the Establishment Clause cannot properly be held to violate it.  *See Wallace v. Jaffree*, 472 U.S. 38, 79-80 (1985) (O'Connor, J., concurring).  In her concurring opinion in *Lynch*, she rejected the idea that legislative prayer violated the Establishment Clause.  *See id*. at 688-90.  Justice O'Connor stated that government acknowledgments of religion such as legislative chaplains and Thanksgiving Day proclamations

> serve, in the only ways reasonably possible in our culture, the legitimate secular purposes of solemnizing public occasions, expressing confidence in the future, and encouraging the recognition of what is worthy of appreciation in society.  For that reason, and because of their history and ubiquity, those practices are not understood as conveying government approval of particular religious beliefs.

*Id*. at 693 (O'Connor, J., concurring); *see also Wallace v. Jaffree,* 472 U.S. at 79-80 (O'Connor, J., concurring) (""Whatever the provision of the Constitution that is at issue, I continue to believe that 'fidelity to the notion of constitutional – as opposed to purely judicial – limits on government action requires us to impose a heavy burden on those who claim that practices accepted when [the provision] was adopted are now constitutionally impermissible. …As Justice Holmes once observed, "[i]f a thing has been practiced for two hundred years by common consent, it will need a strong case for the Fourteenth Amendment to affect it.") (citations omitted).

Specifically referring to the National Day of Prayer proclamations, Justice O'Connor opined that such proclamations would "probably withstand Establishment Clause scrutiny given their long history."  *Id*. at 81 n.6.  Consequently, even if the endorsement test were applicable, proclamations to pray easily pass the test.  A reasonable observer, knowing the unique history of prayer proclamations in this country, would not perceive them to be anything more than toleration of religious practices that have been occurring in this nation for over 200 years.  *See*

25

*also Van Orden v. Perry*, 545 U.S. 677, 699 (2005) (Justice Breyer Concurring) ("Neither can this Court's other tests readily explain the Establishment Clause's tolerance, for example, of the prayers that open legislative meetings, certain references to, and invocations of, the Deity in the public words of public officials; the public references to God on coins, decrees, and buildings; or the attention paid to the religious objectives of certain holidays, including Thanksgiving."); *id.* at 723 (Stevens, J. dissenting) ("Our leaders, when delivering public addresses, often express their blessings simultaneously in the service of God and their constituents.…  In this sense, although Thanksgiving Day proclamations and inaugural speeches undoubtedly seem official, in most circumstances they will not constitute the sort of governmental endorsement of religion at which the separation of church and state is aimed." ); *Elk Grove Unified School Dist.*, 542 U.S. at 26 (Rehnquist, concurring in judgment) ("Examples of patriotic invocations of God and official acknowledgments of religion's role in our Nation's history abound"); *Lynch v. Donnelly*, 465 U.S. 668, 675 (1984) ("Our history is replete with official references to the value and invocation of Divine guidance").

## VII.  MRS. DOBSON IS NOT LIABLE FOR ANY ALLEGED ESTABLISHMENT CLAUSE VIOLATIONS.

Plaintiffs' claims against Mrs. Dobson are frivolous and should be dismissed.  First of all, the factual bases for Plaintiffs' claims are tenuous at best.  Although Plaintiffs make the generalized claim over and over in their brief that she *collaborated* with the presidents, the only evidence they submit to support their *collaboration* theory is that Mrs. Dobson sent drafts of proclamations to the presidents, but that these drafts were never used.  *See* Plaintiffs' Brief, 74. This hardly qualifies as evidence of collaboration or joint and concerted action.

The other things that Plaintiffs allege she did do not support collaboration, but are merely activities she did, or the Task Force did, in promoting prayer.  For example, Plaintiffs allege that

26

Mrs. Dobson is the chairman of the National Day of Prayer Task Force, which is a Christian organization. But Plaintiffs failed to present any evidence that the President knew of the Task Forces' religious mission, and purposely used them exclusively to promote the Task Force's religious mission.

But even if Mrs. Dobson did what was alleged, i.e., collaborated with the presidents, it does not mean that she violated the Establishment Clause. *National Collegiate Athletic Association ("NCAA") v. Tarkanian*, 488 U.S. 179 (1988), is directly on point (holding that *NCAA* was not a state actor even though it worked with state university and ordered it to suspend its coach, which it did). Plaintiffs failed to cite this case, nor in any way try to distinguish it. If the NCAA was not found to be a state actor when it ordered a state university to suspend Tarkanian, which it did, then surely Shirley Dobson was not a state actor for her actions in promoting the National Day of Prayer.

**CONCLUSION**

Plaintiff FFRF has been peddling its liberal standing arguments across the country in an effort to eradicate what they deem to be offensive religious expression. But no court has bought it, including the United States Supreme Court, and this Court should not either. *See, e.g., Hein v. Freedom from Religion Foundation*, 551 U.S. at 587, *Freedom From Religion Foundation, Inc. v. Nicholson*, 536 F.3d 730 (7th Cir. 2008) (public interest group lacked standing to challenge integration of faith into health care services to veterans); *Freedom From Religion Foundation, Inc. v. City of Green Bay,* 581 F.Supp.2d 1019 (E.D.Wis. 2008) (FFRF lacked standing to challenge display of nativity scene on roof of city hall); *Freedom From Religion Foundation, Inc. v. Olson*, 566 F.Supp.2d 980 (D.N.D. 2008) (plaintiffs lacked standing to challenge use of funds to support religion).

This case should be dismissed for three simple reasons.  First, prayer proclamations have not injured the Plaintiffs in any way distinct from the general population.  As they point out in their own briefs, the prayer proclamations were intended for a national audience.  These proclamations were not read at any government meeting, or posted at the local town hall. Plaintiffs do not have to see them in order to perform civic duties or to fully engage as citizens. This case is about pure psychic injuries in that plaintiffs are intensely opposed to prayers, but such cases are not justiciable.

Secondly, even if Plaintiffs had been injured, such injuries could not be redressed by a favorable court decision.  Courts cannot enjoin the President from asking the nation to pray, which is what Plaintiffs are seeking.  Such an order would violate the Separation of Powers doctrine.

And third, even if Plaintiffs have standing, prayer proclamations do not violate the Establishment Clause.  This nation has a long history of issuing prayer proclamations, going back to George Washington's first Thanksgiving Day proclamation.  As such, they are simply a tolerable acknowledgment of this nation's religious history and traditions.

Dated:  January 21, 2010

Respectfully submitted,

/s/Joel Oster

Alan E. Sears, Esq.                         Joel Oster, KS Bar 18547
Benjamin W. Bull, Esq.                   Kevin Theriot, KS Bar 21565
ALLIANCE DEFENSE FUND            ALLIANCE DEFENSE FUND
15100 N. 90th Street                       15192 Rosewood
Scottsdale, Arizona                         Leawood, KS 66224
Tel:  480-444-0020                          Tel: (913) 685-8000
Fax: 480-444-0025                           Fax: (913) 685-8001
joster@telladf.org

COUNSEL FOR DEFENDANT SHIRLEY DOBSON

**CERTIFICATE OF SERVICE**

I hereby certify that on January 21, 2010, I electronically filed a copy of the above using

the ECF System for the Western District of Wisconsin, which will send notification of that filing

to all counsel in this litigation who have entered an appearance, including counsel for plaintiffs.

/s/Joel Oster
Joel Oster