UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

| | |
|---|---|
| FREEDOM FROM RELIGION FOUNDATION, INC., ANNE NICOL GAYLOR, ANNIE LAURIE GAYLOR, PAUL GAYLOR, DAN BARKER, PHYLLIS ROSE, and JILL DEAN,<br><br>        Plaintiffs,<br><br>        v.<br><br>PRESIDENT BARACK OBAMA, WHITE HOUSE PRESS SECRETARY ROBERT GIBBS, WISCONSIN GOVERNOR JIM DOYLE, and SHIRLEY DOBSON, CHAIRMAN OF THE NATIONAL DAY OF PRAYER TASK FORCE,<br><br>        Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)    Case No. 08-CV-588<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

**DEFENDANT SHIRLEY DOBSON'S RESPONSES TO PLAINTIFFS'
PROPOSED FINDINGS OF FACT**

    Defendant Shirley Dobson submits this response to Plaintiffs' Proposed Findings of Fact

submitted on December 12, 2009 ("PFF" or "Pl's PFF").

**RESPONSES**

    1.    The National Day of Prayer is a day set aside by Congress for prayer. (Ex. 123 at

63.)[1]

    <u>Response</u>:  Disputed for purposes of summary judgment.  Plaintiffs cite Shirley Dobson's

deposition for this fact, but Shirley Dobson does not speak for Congress or the President.  She is

a private citizen.

---

[1] Plaintiffs' references to exhibits have been included in the recitation of their alleged facts.

2.      The impetus for an annual National Day of Prayer, by legislation, came from the Reverend Billy Graham, who suggested it in the midst of a crusade in the nation's Capitol in 1952.

Response:  This is not a relevant fact, and is disputed for purposes of summary judgment. Presidential prayer proclamations have been issued since George Washington, which far precede Billy Graham's life.  *See Lynch v. Donnelly*, 465 U.S. 668, 675 n.2 (1984) ("Presidents Adams and Madison also issued Thanksgiving Proclamations, as have almost all our Presidents.").

3.      The resolution mandating an annual National Day of Prayer was described as a measure against "the corrosive forces of communism which seeks simultaneously to destroy our democratic way of life and the faith in an Almighty God on which it is placed." (Ex. 55 at 1 and Ex. 56 at 2).

Response:  Disputed for purposes of summary judgment and this fact is not relevant as it is only an alleged quote from Wikipedia and the Pluralism Project representing the individual viewpoint of Senator Robertson.  Pl. Ex. 55 at 1; Pl. Ex. 56 at 2.  *See also Glanville v. Dupar, Inc.*, 2009 WL 3255292 *5 n.2 (S.D.Tex.) ("Wikipedia in an inherently unreliable source" as "the content on this website is provided by volunteers from around the world – anyone with internet access can provide or modify content.  Thus, not only is the information unreliable, but it can potentially change on a day-top-day basis.")

4.      On April 2, 1952, the Committee on the Judiciary issued a Report to Accompany H.J. Res. 382 to create a National Day of Prayer, noting the Purpose "is to direct the President to proclaim a National Day of Prayer each year." (Ex. 53).

Response:  Not disputed for purposes of summary judgment.

5.       The Report to Accompany H.J. Res. 382 to create a National Day of Prayer Statement claimed: "When the delegates to the Constitutional Convention encountered difficulties in the writing and formation of a Constitution for this Nation, prayer was suggested and became an established practice at succeeding sessions."  (Ex. 53).

Response:  Not disputed for purposes of summary judgment.

6.       The Statement encouraged the people of this country "to unite in a day of prayer each year, each in accordance with his own religious faith, thus reaffirming in a dramatic manner that deep religious conviction which has prevailed throughout the history of the United States." (Ex. 53 at 1).

Response:   Disputed.   Plaintiffs have selectively quoted from the Report.   The actual Report states:

Purpose

The purpose of the proposed legislation is to direct the President to proclaim a national Day of Prayer each year.

Statement

From its beginning the United States of America has been a nation fully cognizant of the allure and power of prayer. In the early days of colonization, the Pilgrims frequently engaged in prayer.  When the delegates to the Constitutional Convention encountered difficulties in the writing and formation of a Constitution for the Nation, prayer was suggested and became an established practice at succeeding sessions.  Today, both Houses of the Congress are opened daily with prayer.

Prayer has indeed been a vital force in the growth and development of this nation. It would certainly be appropriate if, pursuant to this resolution and the proclamation it urges, the people of this country were to unite in a day of prayer each year, each in accordance with his own religious faith, thus reaffirming in a dramatic manner the deep religious conviction which has prevailed throughout the history of the United States.

Pl. Ex. 53 (Report to Accompany H.J. Res. 382, at 1); *see also Zorach v. Clauson*, 343 U.S. 306, 313 (1952) ("We are a religious people whose institutions presuppose a Supreme Being."); *Lynch v. Donnelly*, 465 U.S. 668, 674 (1984) ("There is an unbroken history of official acknowledgment by all three branches of government of the role of religion in American life from at least 1789."); *id.* at 675 n.2 ("Presidents Adams and Madison also issued Thanksgiving Proclamations, as have almost all our Presidents")(citing 3 A. Stokes, Church and State in the United States 180-193 (1950); *id.* at 675 ("Our history is replete with official references to the value and invocation of Divine guidance in deliberations and pronouncements of the Founding Fathers and contemporary leaders. Beginning in the early colonial period long before Independence, a day of Thanksgiving was celebrated as a religious holiday to give thanks for the bounties of Nature as gifts from God.").

7.      In fact, the members of the Constitutional Convention did not pray at any session before adopting the entirely godless and secular U.S. Constitution, as noted by Constitutional Convention Secretary Benjamin Franklin.     (Pfeffer, Church, State & Freedom, at 121-122 (1967)).

Response:  Disputed.  *See* Pl Ex. 53 (S. Rep. No. 1389 (1952)).  There is no question that religion has played a significant role in the history and traditions of our nation, including prayers before legislative sessions and official proclamations calling the nation to prayer.  *See Lynch*, 465 U.S. at 668, 685 n.2 (stating that the First Congress urged President Washington "to proclaim 'a day of public thanksgiving and prayer, to be observed by acknowledging with grateful hearts, the many and signal favours of almighty God.'")

8.      "Public Law 324, a Joint Resolution, was approved on April 17, 1952: "Resolved by the Senate and House of Representatives of the United States of America in Congress

assembled, That the President shall set aside and proclaim a suitable day each year, other than a Sunday, as a National Day of Prayer, on which the people of the United States may turn to God in prayer and meditation in churches, in groups, and as individuals. (Ex. 53).

Response:  Not disputed for purposes of summary judgment.

9.      Contemporaneous reporting of President Truman's signing of the Prayer Day Bill, in the New York Times on April 18, 1952, recognized that "the purpose of the resolution is to have the public assemble in churches, synagogues, and other places of worship to offer prayers for world peace."

Response:   Disputed for purposes of summary judgment.   The New York Time's reporting of the purpose of a law in 1952 is not relevant to the legal issues herein.  In any event, the purpose of 1952 law is stated on the law itself and speaks for itself.  *See* Pl. Ex 53.

10.      Public Law 324 was signed by President Harry Truman on April 17, 1952.

Response:  Not disputed for purposes of summary judgment.

11.      Presidential NDP proclamations are released by the Office of the Press Secretary, including in 2008 and 2009 by the press secretary for Presidents Bush and Obama. (Ex. 12 at 1-3).

Response:  Disputed as to any legal conclusion contained in this fact that presidential proclamations must be released by a press secretary.  Otherwise, Mrs. Dobson does not dispute this for purposes of summary judgment.

12.      The National Day of Prayer legislation passed by Congress is an encouragement for the American people of all faiths to pray.  (Ex. 123 at 14).

Response:  Disputed.  The evidence Plaintiffs cite is Shirley Dobson's deposition, who does not speak for Congress, the President, or the legislation.  Pl. Ex. 123.  She is a private

person.  The legislation does not encourage people to pray.  Instead, the statute establishing a

National Day of Prayer uses permissive language, stating "the people of the United States <u>may</u>

turn to God in prayer and meditation at churches, in groups, and as individuals." 36 U.S.C.A. §

119 (West 2008) (emphasis added) ("Public Law").   In his 2009 National Day of Prayer

Proclamation, President Obama explicitly recognized the right of individuals to "worship or not

worship according to the dictates of their conscience."  Dobson Ex. A (President Obama's 2009

Proclamation).[2]

13.     This year, President Obama announced in advance that he too would release a

Presidential Proclamation declaring May 7, 2009, to be the National Day of Prayer. (Ex. 96 at

11).

<u>Response</u>:  Not disputed for purposes of summary judgment.  But President Obama also

announced that the White House would not be hosting any National Day of Prayer events.  Pl.

Ex. 96.  In addition, President Obama did not issue the proclamation until the afternoon of May

7, 2009.  Pl. Ex. 123 (Dobson Dep., 174:21-22).

14.     Wikipedia describes the National Day of Prayer as being "designated by the

United States Congress as a day when people are asked to come together and pray, especially for

their country."  (Ex. 56 at 1).

<u>Response</u>:  Disputed for purposes of summary judgment.  Wikipedia is not a reliable

source of information and can be easily manipulated.  *See Glanville*, 2009 WL 3255292 at *5 n.2

("Wikipedia in an inherently unreliable source" as "the content on this website is provided by

volunteers from around the world – anyone with internet access can provide or modify content.

Thus, not only is the information unreliable, but it can potentially change on a day-top-day

basis.").  The Public Law speaks for itself, and states, "the people of the United States <u>may</u> turn

---

[2] Mrs. Dobson's exhibits are attached to the Affidavit of Joel Oster, filed contemporaneously with this Reply.

to God in prayer and meditation at churches, in groups, and as individuals." 36 U.S.C.A. § 119 (West 2008) (emphasis added).  The National Day of Prayer was established to "call upon Americans to both pray and meditate in what ever way was appropriate for them."  Dobson Ex. B (Letter to President Barack Obama from Interfaith Alliance).

15.     In fact, Presidential NDP Proclamations routinely include exhortations to American citizens to pray.  (Pl. Ex. 10 at 4-27).  (Pl. Ex. 116).

<u>Response</u>:     Disputed.     The proclamations speak for themselves, and Plaintiffs' characterization is misleading.   The National Day of Prayer was established to "call upon Americans to both pray and meditate in what ever way was appropriate for them."  Dobson Ex. B (Letter to President Barack Obama from Interfaith Alliance).  When signing the Proclamation in 1964, President Johnson stated:  "I cannot proclaim that all Americans will pray on October 20th.  Nor would I do so even if I could."  Pl. Ex. 116 (Presidential Prayer Proclamations 1952-2008).  President Obama's 2009 Proclamation recognized the right of all Americans to "worship or not worship according to the dictates of their conscience."   Dobson Ex. A (2009 Proclamation).  Plaintiffs themselves admit that "meditation" is not the same thing as "praying." Dobson Ex. C, 47:11-12 (Anne Laurie Gaylor's deposition).

16.     Most Presidents have explicitly directed "all" Americans, "every" American or "each" American, without exception, to pray in their NDP Proclamations.   These explicit instructions by Presidents occurred in at least 44 official Presidential NDP Proclamations during the years: 1952, 1953, 1954, 1955, 1956, 1957, 1961, 1962, 1964, 1965, 1966, 1967, 1970, 1972, 1974, 1975, 1976, 1977, 1978, 1979, 1980, 1983, 1986, 1987, 1989, 1990, 1991, 1992, 1993, 1994, 1995, 1996, 1997, 1998, 1999, 2001, 2000, 2002, 2003, 2004, 2005, 2006, 2007, and 2008 (Ex. 116).

Response:  Disputed. Presidential Proclamations are voluntary and cannot direct anyone to pray.  A proclamation is merely "a public and official announcement."  The Random House Dictionary of the English Language, unabridged (2d ed. 1987).

17.    Presidential NDP Proclamations not only have directed Americans to pray, but have dictated subjects, issues, or specific items about which Americans ought to pray.  For example, in 1959, President Dwight D. Eisenhower called "upon my fellow Americans and all who may be visitors in our country . . . to join in prayer for our Nation . . ." and specified five items over which to pray, including "that we may have Divine guidance in our efforts to lead our children."  (Ex. 116).

Response:  Disputed. Presidential Proclamations are voluntary and cannot force anyone to pray.  A proclamation is merely "a public and official announcement."  The Random House Dictionary of the English Language, unabridged (2d ed. 1987).  In the same way, President George Washington's prayer proclamation did not force anyone to pray when he asked the nation to render unto God

> our sincere and humble thanks for His kind care and protection of the people of this country previous to their becoming a nation; for the signal and manifold mercies and the favorable interpositions of His providence in the course and conclusion of the late war; for the great degree of tranquility, union, and plenty which we have since enjoyed; for the peaceable and rational manner in which we have been enabled to establish constitutions of government for our safety and happiness, and particularly the national one now lately instituted; for the civil and religious liberty with which we are blessed, and the means we have of acquiring and diffusing useful knowledge; and, in general, for all the great and various favors which He has been pleased to confer upon us.
>
> And also that we may then unite in most humbly offering our prayers and supplications to the great Lord and Ruler of Nations, and beseech Him to pardon our national and other transgressions; to enable us all, whether in public or private stations, to perform our several and relative duties properly and punctually; to render our National Government a blessing to all the people by constantly being a Government of wise, just, and constitutional laws, discreetly and faithfully executed and obeyed; to protect and guide all sovereigns and nations (especially

such as have shown kindness to us), and to bless them with good governments, peace, and concord; to promote the knowledge and practice of true religion and virtue, and the increase of science among them and us; and, generally, to grant unto all mankind such a degree of temporal prosperity as He alone knows to be best.

*See* 1 Annals of Cong. 914 (1789), cited in *Wallace v. Jaffree*, 472 U.S. 38, 102-103 (1985)(Renquist, dissenting).

18.    Some Presidential NDP Proclamations have included pious laundry lists, including the 1960 Proclamation by President Eisenhower, who directed "my countrymen" to "ever place our trust in the keeping of God's commandments." (Ex. 116).

<u>Response</u>:  Disputed as the term "pious laundry lists" is vague and as proclamations do not direct people to do anything but are voluntary in nature. A proclamation is merely "a public and official announcement."   The Random House Dictionary of the English Language, unabridged (2d ed. 1987).

19.    In 1961, President John F. Kennedy listed five matters about which he directed Americans to explicitly pray, including "divine guidance in our efforts to lead our children in the ways of the truth." (Ex. 116).

<u>Response</u>:  Disputed, as proclamations do not direct people to do anything but are voluntary in nature. A proclamation is merely "a public and official announcement."   The Random House Dictionary of the English Language, unabridged (2d ed. 1987).

20.    In 1962, President Kennedy listed four items in his annual NDP Proclamation about which Americans were to pray, after expressing the idea that "Almighty God was a dominant power in the lives of our Founding Fathers; and . . . they expressed this faith in prayer."  (Ex. 116).

Response:  Not disputed for purposes of summary judgment, although the proclamation speaks for itself.  Pl. Ex. 116 (Presidential Prayer Proclamations 1952-2008).

21.     On Sept. 25, 1970, several months after ordering the invasion and bombing of Cambodia, President Richard Nixon, in his NDP Proclamation, specifically invited "all Americans to pray that the scourge of war be lifted from the earth."  (Ex. 116).

Response:  Not disputed for purposes of summary judgment, although the proclamation speaks for itself.  Pl. Ex. 116 (Presidential Prayer Proclamations 1952-2008).

22.     In 1979, President Jimmy Carter, in proclaiming Oct. 3, 1979 to be the National Day of Prayer, asked "all Americans to join with me on that day to recommit ourselves to God." (Ex. 116).

Response:  Not disputed for purposes of summary judgment, although the proclamation speaks for itself.  Pl. Ex. 116 (Presidential Prayer Proclamations 1952-2008).

23.     In 1980, President Carter, in designating Oct. 6, 1980 as the National Day of Prayer, said: "I further ask that all who so desire make this a Day of Fast as well." (Ex. 116).

Response:  Not disputed for purposes of summary judgment, although the proclamation speaks for itself.  Pl. Ex. 116 (Presidential Prayer Proclamations 1952-2008).

24.     In 1980, President Jimmy Carter's Presidential NDP Proclamation additionally made comments critical of unbelievers or Americans who do not pray or have a "close relationship" with a deity: "As a nation we cannot but hope that more of our citizens would, through prayer, come into a closer relationship with their maker."  (Ex. 116).

Response:  Disputed as Plaintiffs mischaracterize President Carter's statement as critical of Americans who do not pray.  Pl. Ex. 116 (Presidential Prayer Proclamations 1952-2008).

25.     In January 1983, President Ronald Reagan declared May 5 a National Day of Prayer, in an effort to "bring renewed respect for God."  (Ex. 58 at 1).

Response:  Not disputed for purposes of summary judgment, although the proclamation speaks for itself.

26.     The 1983 NDP Proclamation by President Reagan belies the assertion that there has been an "unbroken" line of prayer Proclamations dating to the nation's inception.  President Reagan acknowledge[d] that a national day of prayer was "forgotten" for almost half a century, and then again for nearly a century until it was "revived as an annual observance by Congress in 1952." (Ex. 116).

Response:  Disputed.  The practice of calling the nation to prayer has been going on since George Washington.  *See Lynch*, 465 U.S. at 675 n.2 ("Presidents Adams and Madison also issued Thanksgiving Proclamations, as have almost all our Presidents")(citing 3 A. Stokes, Church and State in the United States 180-193 (1950),  Pl. Ex. 55 (Harvard Research Report re: NDP, at 1); Pl. Ex. 56 (Encyclopedia Explanation of NDP, at 1).

27.     Many Presidential NDP Proclamations have included scriptural references, as for example in 1984 when President Reagan quoted II Chronicles 7:14 from the New Testament in his NDP Proclamation: "If my people, who are called by my name, will humble themselves and pray and seek my face and turn from their wicked ways, then I will hear from heaven and will forgive their sin, and will heal their land."  (Ex. 116).

Response:  Disputed as to the fact that "many" presidential Proclamations have included scriptural references.  Plaintiffs quote from a single proclamation.  Pl. Ex. 116 (Presidential Prayer Proclamations 1952-2008).  Furthermore, the proclamations speaks for themselves.

28.     Presidential Proclamations not infrequently have included Christian references, as for example in 1986 when President Reagan's NDP Proclamation said: "Christ enjoins us to 'pray without ceasing.'" Ex. 116.

Response:  Disputed, as the term "not infrequently" is vague.  Plaintiffs quote from a single Proclamation and furthermore, the proclamations speak for themselves.  Pl. Ex. 116 (Presidential Prayer Proclamations 1952-2008).

29.     The 1987 NDP Proclamation by President Ronald Reagan chided Americans for "being too proud to make, or too prone to forget" an acknowledgment to deity. (Ex. 116).

Response:  Disputed as the term "chided" is a mischaracterization of the proclamation, which speaks for itself.  President Reagan acknowledged "times of distress, grief and war . . . impel us to acknowledgments we are often too proud to make, or to prone to forget, in periods of peace and prosperity."  Pl. Ex. 116 (Presidential Prayer Proclamations 1952-2008).

30.     In 1988, President Reagan in his NDP Proclamation said that the first step of the American government was "humble, heartfelt prayer."  (Ex. 116).

Response:  Disputed, as President Reagan did not say that the first step of the American government was "humble, heartfelt prayer."  Rather he said, "in the winning of freedom and in the living of life, the first step is prayer."  Pl. Ex. 116 (Presidential Prayer Proclamations 1952-2008).

31.     Prior to 1988, the President would call the nation to a day of prayer whenever he chose each year, with the exception of Sundays.  (Ex. 60 at 1).

Response:  Not disputed for purposes of summary judgment, but otherwise immaterial.  *See Bowen v. Kendrick*, 487 U.S. 589 (1988) (a law is not invalidated just because it benefits religion).

32.     Nonetheless, according to the National Prayer Committee, the National Day of Prayer was established by an Act of Congress in 1952 to encourage Americans to pray for our nation, its people, and its leaders. (Ex. 57 at 2).

Response:  Not disputed for purposes of summary judgment, but otherwise immaterial as the opinion of the National Prayer Committee does not speak for the government as to the purpose of an act.

33.     The National Prayer Committee exists to provide collective leadership to the National Prayer Movement.

Response:  Not disputed for purposes of summary judgment, but otherwise immaterial as the purposes of a private organization are not relevant to the purposes of the government.

34.     The NDP Task Force is a project of the National Prayer Committee, the purpose of which is to mobilize prayer.

Response:  Not disputed for purposes of summary judgment, but otherwise immaterial.

35.     The National Prayer Committee and the first NDP Task Force Chairman, Vonette Bright, directed the efforts leading in 1988 to President Reagan signing into law the requirement that the first Thursday in May of each year be designated the National Day of Prayer.  (Ex. 60 at 1).

Response:   Disputed for purposes of summary judgment, and otherwise immaterial. Plaintiffs point to no factual evidence indicating that the NDP Task Force's efforts directly led President Reagan to sign into law the requirement that the first Thursday in May be designated the National Day of Prayer.  *See* Pl. Ex. 60 (National Prayer Committee Web Page re: NDP Strategic Projects, at 1).

36.     Mrs. Vonette Bright promoted legislation for a Day of Prayer on a specific day each year because she believed in the power of prayer; she believed that there should be a day in this Country in which the Nation is covered in prayer; and she wanted to facilitate that, if possible. (Ex. 123 at 31-32).

Response: Not disputed for purposes of summary judgment, but otherwise immaterial.

37.     Mrs. Bright, cofounder with Dr. Bill Bright of Campus Crusade for Christ, told Shirley Dobson how the first Thursday in May amendment in 1988 came about: Mrs. Bright got up at 5 a.m. one day to phone some Congressmen about setting aside a [specific] day for the National Day of Prayer.  A committee was formed and the first Thursday of May change came from that.  (Ex. 123 at 43-44).

Response:  Immaterial.  Not disputed for purposes of summary judgment as to the extent that this excerpt represents the views of Mrs. Bright as expressed to Shirley Dobson, two private individuals neither of whom is an attorney or legal expert.

38.     The Campus Crusade for Christ website biography of Vonette Bright credits her with the achievement of introducing legislation that was approved by both houses of Congress to make the first Thursday of May a permanent date for The National Day of Prayer.  (Ex. 117 at 3).

Response:  Not disputed for purposes of summary judgment, but otherwise immaterial.

39.     Congressman Tony P. Hall, while introducing the 1988 National Day of Prayer bill on March 16, 1988, remarked that designating each first Thursday in May as the annual date on which the National Day of Prayer is celebrated, would "help bring more certainty to the scheduling of events related to the National Day of Prayer, and permit more effective long-range planning." (Ex. 118 at 2).

Response:  Not disputed for purposes of summary judgment, but otherwise immaterial.

40.    "The annual observance would be so much easier to celebrate if its occurrence was not subject to the issuance of an annual Proclamation.  The event has a tradition of some consequence for increasing our nation's awareness of the need for divine assistance," said Rev. Msgr. Joseph F. Rebman, Chancellor, Diocese of Wilmington, Delaware, in urging passage of the bill.  (Ex. 118 at 3).

Response  Not disputed for purposes of summary judgment, but otherwise immaterial.

41.    Pat Boone, Co-Chairman of the National Prayer Committee, complained that having a different day proclaimed each year "had offered little advance notice to adequately inform the grass roots constituencies.  I believe a definite date will allow millions of citizens within our nation who have explicit faith in a Prayer-hearing God to be informed about this significant day in our country." (Ex. 119 at 3).

Response:  Not disputed for purposes of summary judgment, but otherwise immaterial.

42.    S.1378, "An act to provide for setting aside the first Thursday in May as the date on which the National Day of Prayer is celebrated," was approved by the Senate on May 5, 1988, and signed into law by President Ronald Reagan on May 9, 1988.  (Ex. 120).

Response:  Not disputed for purposes of summary judgment.

43.    After signing the 1988 law, President Reagan encouraged people of all faiths to participate in the National Day of Prayer. (Ex. 123 at 28-29).

Response:  Disputed.  This proposed factual finding paraphrases Mrs. Dobson's view of President Reagan's signing of the 1988 law.  Pl. Ex. 123 (Dobson Dep., 28:22-29:9).

44.    Groups like the NDP Task Force would have trouble mobilizing a National Day of Prayer if it didn't know well in advance when it was going to take place.  (Ex. 123 at 29-30).

Response: Not disputed for purposes of summary judgment, but otherwise immaterial. This proposed factual finding paraphrases Mrs. Dobson's view of the National Day of Prayer. Mrs. Dobson was asked whether the NDP Task Force would have trouble mobilizing a National Day of Prayer if it didn't know well in advance when it was going to take place. She responded that the statement was "correct." Pl. Ex. 123 (Dobson Dep., 29:18). In 2009, however, the White House did not disclose President Obama's intention to issue a Proclamation until earlier in the week of May 7th. President Obama did not in fact issue his NDP Proclamation until that afternoon. While the NDP Task Force did not learn of the President's Proclamation until after 3:00 p.m., it was able to organize various observances throughout the country, as well as its traditional breakfast in the Cannon House Office Building on Capitol Hill. Pl. Ex. 123 (Dobson Dep., 174:15-175:6). In addition, Mrs. Dobson points out that just because she might have "trouble" mobilizing an event, does not mean that she could not mobilize such an event.

45.     The change in the law in 1988, to make predictable the Day of Prayer, on the first Thursday in May, facilitated efforts by the NDP Task Force to organize prayer observances. (Ex. 123 at 29).

Response: Not disputed for purposes of summary judgment, but otherwise immaterial. *See Bowen v. Kendrick*, 487 U.S. 589 (1988) (a law is not invalidated just because it benefits religion).

46.     The law in 1988 mandating that the first Thursday in May of each year be designated as a National Day of Prayer was more meaningful than the 1952 legislation because people of faith wanted to have a day that they could know was going to be a day of prayer, instead of just letting it be at the whim of the President. (Ex. 123 at 163-64).

Response:  Disputed for purposes of summary judgment, and otherwise immaterial.  This proposed factual finding paraphrases Shirley Dobson's response to a deposition question posed by plaintiffs' counsel.  It represents her viewpoint and opinion only.  Pl. Ex. 123 (Dobson Dep., 163:22-164:13).

47.    Since the 1988 legislation mandating the designation of a specific day, the National Day of Prayer is now even included on commercial calendars.  (Ex. 123 at 140 & 164).

Response:  Disputed.  This proposed factual finding paraphrases Shirley Dobson's response to a deposition question posed by plaintiffs' counsel.  Ms. Dobson specifically stated that "National Day of Prayer is put – is on many of our calendars in America."  It is not included on commercial calendars, as plaintiffs' phrasing suggests.  Pl. Ex. 123 (Dobson Dep., 164:16).

48.    Groups like the NDP Task Force have been successful in mobilizing Christians to engage in prayer in part because it unifies people of faith and it is beneficial to have a central event that people can gather around.  (Ex. 123 at 85-86).

Response:  Not disputed for purposes of summary judgment, but otherwise immaterial.  It is irrelevant to this lawsuit that the Task Force, a private organization, believes that prayer unifies people of faith.

49.    Having a designated day of prayer, as adopted in 1988, was important to people of faith who wanted to have a day that they could predictably know was going to be a day of prayer, instead of just leaving it up to the President to choose.  (Ex. 123 at 164).

Response:  Not disputed for purposes of summary judgment, but otherwise immaterial.  The views of one private citizen do not speak for all people of faith generally, nor the government.  She represents her viewpoint and opinion only.  Pl. Ex. 123 (Dobson Dep., 164:10-13).

50.     Campus Crusade for Christ of which Vonette Bright is a founder and still affiliated, boasts 25,000 employees and is a major international evangelical force.  Its purpose: "Helping to fulfill the Great Commission in the power of the Holy Spirit by winning people to faith in Jesus Christ, building them in their faith and sending them to win and build others; and helping the Body of Christ do evangelism and discipleship."

Response:  Not disputed for purposes of summary judgment, but otherwise immaterial.

51.     Campus Crusade for Christ uses a lot of their staff as part of the Task Force to promote the National Day of Prayer, according to Mrs. Dobson.  (Ex. 123 at 25).

Response:  Not disputed for purposes of summary judgment, but otherwise immaterial.

52.     When Mrs. Bright asked Mrs. Dobson to become co-chair of the NDP Task Force, Mrs. Dobson told her she would pray about it and talk to her husband and get back to her.  (Ex. 123 at 8-9).

Response:  Not disputed for purposes of summary judgment, but otherwise immaterial.

53.     Shirley Dobson's husband, James Dobson, is the founder of Focus on the Family. (Ex. 66 at 4).

Response:  Not disputed for purposes of summary judgment, but otherwise immaterial.

54.     Once Shirley Dobson became chair of the NDP Task Force, Focus on the Family provided startup money for the NDP Task Force: $100,000 for the first year, $50,000 the second, $25,000 the third.  (Ex. 123 at 7-8).

Response:  Not disputed for purposes of summary judgment, but otherwise immaterial.

55.     Shirley Dobson accepted Mrs. Bright's overture and became co-chairman of the NDP Task Force in 1989, and she has been the chairman since 1991.  (Ex. 123 at 42).

Response:  Not disputed for purposes of summary judgment, but otherwise immaterial.

56.     Mrs. Dobson is now the recognized voice and the face of the National Day of Prayer.  (Ex. 123 at 42).

Response:  Disputed.  Mrs. Dobson's statement, "I'm the name, the face, and the voice," was made in response to a question regarding the circulation of the NDP Task Force's newsletter.  This indicates that Mrs. Dobson believes she is the "name, the face, and the voice" for the organization, and not the National Day of Prayer itself.  Pl. Ex. 123 (Dobson Dep., 42:5-8).

57.     One of the goals of the NDP Task Force is to encourage prayer.  (Ex. 2 at 4).

Response:  Not disputed for purposes of summary judgment, but otherwise immaterial.

58.     The NDP Task Force promotes and encourages the role of prayer by mobilizing around the National Day of Prayer.  (Ex. 123 at 10).

Response:  Not disputed for purposes of summary judgment, but otherwise immaterial.

59.     The National Day of Prayer is a rallying point, as a day for focusing on prayer, because it is declared as such by the President each year.  (Ex. 123 at 62).

Response:  Disputed for purposes of summary judgment, and otherwise immaterial.  This proposed finding states the opinion of Mrs. Dobson, as expressed in her deposition.  But it mischaracterizes her statement.  Mrs. Dobson stated that the "National Day of Prayer is a rallying point.  It's a day when we're focusing on prayer for our country."  Plaintiffs' counsel then asked, "And you know that because it's declared as such by the President each year," to which Mrs. Dobson responded, "[c]orrect."  Pl. Ex. 123 (Dobson Dep., 62:23).  Moreover, President Obama did not issue his NDP Proclamation until the afternoon of May 7, 2009.  While the NDP Task Force did not learn of the President's Proclamation until after 3:00 p.m., it was able to organize various observances throughout the country, as well as a breakfast.  Pl. Ex. 123 (Dobson Dep.,

174:21-175:6).   However, the Proclamation was issued too late in the day to be used by the Cannon House observance, NDP Task Force coordinators, or anyone else.  Pl. Ex. 123 (Dobson Dep., 174:21-175:6).  According to Mrs. Dobson, even if the NDP statute were struck down, the NDP Task Force would still be able to coordinate prayer events on the first Thursday in May of each year and call it the National Day of Prayer.  Pl. Ex. 123 (Dobson Dep., 175:14-19).

60.     The National Day of Prayer is a rallying point for the NDP Task Force in focusing on prayer for the country.  (Ex. 123 at 62).

Response:  Not disputed for purposes of summary judgment, but otherwise immaterial.

61.     The National Day of Prayer is set aside by Congress, so it's a day when Americans pray for their country and for its leaders, and a day that symbolizes the country, which is why the NDP Task Force chose to make the American flag a prominent part of its logo.  (Ex. 123 at 47).

Response:  Disputed for purposes of summary judgment, and otherwise immaterial.  This statement is vague and ambiguous.  Furthermore, it attempts to represent only the opinion of Mrs. Dobson, as expressed in her deposition.  Ex. 123 (Dobson Dep., 47:7-10).  The National Day of Prayer is not a day where Americans must pray for their country.  Instead, it is a day where Americans can "both pray and meditate in what ever way was appropriate for them." Dobson Ex. B (Letter to President Barack Obama from Interfaith Alliance).  As President Johnson recognized, the President may not proclaim that all Americans will pray on the National Day of Prayer.  Pl. Ex. 116 (Presidential Prayer Proclamations 1952-2008).  President Obama indicated that the National Day of Prayer does not symbolize the country, focusing instead on the freedom that Americans have "to worship or not to worship" as they see fit.  Dobson Ex. A (2009 Proclamation).

62.     Mrs. Dobson's initial understanding of the National Day of Prayer was that it is a special day set aside specifically for prayer.

Response:  Not disputed for purposes of summary judgment, but otherwise immaterial.

63.     The NDP Task Force was created by the National Prayer Committee for the express purpose of organizing and promoting prayer observances conforming to a Judeo Christian system of values.  (Ex. 44 at 1).

Response:  Not disputed for purposes of summary judgment, but otherwise immaterial.

64.     The Judeo-Christian expression of the National Day of Prayer involves praying to the God of the Bible.  (Ex. 123 at 67).

Response:   Disputed for purposes of summary judgment, and otherwise immaterial. Plaintiffs cite to Mrs. Dobson's deposition testimony which reflect her opinion about *her* Judeo-Christian expression.  Pl. Ex. 123 (Dobson Dep., 67:10-14).

65.     The NDP Task Force expression of the National Day of Prayer is based on the Bible, which says that God is the one and only, and his son, Jesus Christ, is the way to salvation, which is the belief of the Christian church.  (Ex. 123 at 69).

Response:  Not disputed for purposes of summary judgment, but otherwise immaterial for purposes of litigation. Pl. Ex. 123 (Dobson Dep., 69:6-10).

66.     Mrs. Dobson understands the National Day of Prayer to involve proclaiming reliance on an Almighty God in calling Americans to come before Him on behalf of the Nation. (Ex. 123 at 121-22).

Response:  Not disputed for purposes of summary judgment, but otherwise immaterial.

67.     The NDP Task Force's annual theme, including in 2009, represents an effort to

point Americans to the eternal source of encouragement and help, i.e., the God of the Bible (Ex. 123 at 121-22).

Response:  Not disputed for purposes of summary judgment, but otherwise immaterial.

68.    The official Proclamation issued by the President is an integral part of the yearly national observance.  (Ex. 13 at 1).

Response:  Disputed.  Plaintiffs are stating as fact the opinion of Mrs. Dobson, which she expressed in a letter to President Obama.  The official Proclamation is not an integral component of the observance.  In 2009, for example, President Obama did not issue his NDP Proclamation until the afternoon of May 7, 2009.  While the NDP Task Force did not learn of the President's Proclamation until after 3:00 p.m., it was able to organize various observances throughout the country, as well as a prayer breakfast.  Pl. Ex. 123 (Dobson Dep., 174:21-175:6).  Moreover, according to Mrs. Dobson, even if the NDP statute were struck down, the NDP Task Force would still be able to coordinate prayer events on the first Thursday in May of each year and call it the National Day of Prayer.  Pl. Ex. 123 (Dobson Dep., 175:17-19).

69.    The President's support for the National Day of Prayer serves a crucial role in calling Americans to prayer.  (Ex. 14 at 1).

Response:  Disputed.  Once again, plaintiffs are stating as fact the opinion of Mrs. Dobson, which she expressed in a letter to President Bush.  As President Johnson indicated, the President "cannot proclaim that all Americans will pray" on the National Day of Prayer.  (Pl. Ex. 116).  President Obama's 2009 Proclamation recognized the right of all Americans to "worship or not worship according to the dictates of their conscience." Dobson Ex. A (2009 Proclamation).

70.     Because the President is the leader of the Country, and the people look to the President as the moral leader, and sometimes even the spiritual leader of the Nation, Mrs. Dobson would like to see the President encourage people of all faiths to pray.  (Ex. 123 at 92).

Response:  Not disputed for purposes of summary judgment, but otherwise immaterial as this is only the reflection of one person's opinion.

71.     The NDP Task Force actually offers draft Proclamations for the President to consider. (Ex. 14 at 1-2).

Response:  Not disputed for purposes of summary judgment.

72.     Mrs. Dobson would like for the President to encourage prayer and she believes that Congress encourages prayer by designating a National Day of Prayer (Ex. 123 at 82-83).

Response:  Not disputed for purposes of summary judgment, but otherwise immaterial as this represents the opinion of only one private person.

73.     Most recently, Mrs. Dobson was pleased with the NDP Proclamation issued by President Obama, which encouraged people to pray. (Ex. 123 at 91).

Response:  Not disputed as to being the opinion of only one private person.

74.     It is important to the NDP Task Force that the President sign a Proclamation because he is the leader of the nation and many people look to the President as the moral and spiritual leader of the country, and since Congress has set aside the National Day of Prayer, and because the President is the leader of the American people, the NDP Task Force likes to see the President encourage people of all faiths to pray.  (Ex. 123 at 92).

Response:  Not disputed for purposes of summary judgment, but otherwise immaterial as this represents the opinion of only one private person.

75.     Mrs. Dobson acknowledges that the intended audience for Proclamations by the President is the people of the Nation, and in the case of Proclamations by governors, the people of each state.  (Ex. 123 at 134).

Response:  Not disputed for purposes of summary judgment, but otherwise immaterial as this represents the opinion of only one private person.

76.     Mrs. Dobson understands the National Day of Prayer to be about calling Americans to come before Almighty God.  (Ex. 123 at 106).

Response:  Not disputed for purposes of summary judgment, but otherwise immaterial as this represents the opinion of only one private person.

77.     NDP Proclamations by state governors also lend support to the National Day of Prayer.  (Ex. 123 at 107).

Response:  Not disputed, but otherwise immaterial as this represents the opinion of only one private person.

78.     Support by the nation's leaders is critical to the NDP Task Force's efforts.  (Ex. 123 at 108-109).

Response:  Not disputed for purposes of summary judgment, but otherwise immaterial as this represents the opinion of only one private person.

79.     People look to their leaders in giving them direction, so it is critical that the leaders support the National Day of Prayer because they are role models.  (Ex. 123 at 109).

Response:  Not disputed for purposes of summary judgment, but otherwise immaterial as this represents the opinion of only one private person.

80.     The NDP Task Force, therefore, hopes that the leaders of the country will call the nation to prayer, including by issuing Proclamations.  (Ex. 123 at 110).

Response:  Not disputed for purposes of summary judgment, but otherwise immaterial as this represents the opinion of only one private person.

81.    The NDP Task Force promotes the National Day of Prayer as a means to encourage prayer, which involves establishing a relationship with God.  (Exs. 45-47).

Response:  Not disputed for purposes of summary judgment, but otherwise immaterial as it reflects the opinions, including the theological opinions, of one private person.

82.    The NDP Task Force represents the Judeo-Christian expression of the national observance, based on the belief that this country was birthed in prayer and in reverence for the God of the Bible.  (Ex. 44 at 1).

Response:  Not disputed for purposes of summary judgment, but otherwise immaterial.

83.    According to Mrs. Dobson, the United States was founded on the Judeo-Christian system of values, and birthed in prayer, and founded on the God of the Bible. (Ex. 123 at 11).

Response:  Not disputed for purposes of summary judgment, but otherwise immaterial as this represents the opinion of only one private person.

84.    The NDP Task Force promotes only a Judeo-Christian expression of the National Day of Prayer.  (Ex. 123 at 11-12, 14, 67).

Response:  Not disputed for purposes of summary judgment, but otherwise immaterial.

85.    The NDP Task Force believes that for true Christians, prayer is communion with God, through which individuals actually experience a relationship with God.  (Ex. 47 at 1).

Response:  Not disputed for purposes of summary judgment, but otherwise immaterial.

86.    The NDP Task Force chooses an annual theme for each year's National Day of Prayer.  (Ex. 123 at 56).

<u>Response</u>:  Disputed.  The Task Force chooses an annual theme for itself for the National Day of Prayer.  (Ex. 123 at 56).  It does not choose an annual theme for the President or any governor.  *Id*.

87.     The NDP Task Force chooses an annual theme purportedly as a way to bring "unity to the Nation."  (Ex. 123 at 61).

<u>Response</u>:  Not disputed for purposes of summary judgment, but otherwise immaterial.

88.     The NDP Task Force desires that its annual theme and supporting scripture be incorporated into official Proclamations by government officials.  (Ex. 25-39).

<u>Response</u>:  Disputed as the cited evidence does not support this, but otherwise immaterial.

89.     Shirley Dobson supposedly goes before the Lord every year in prayer, and asks him what is in his heart for our nation, and through prayer God usually gives Mrs. Dobson a theme for that year.  (Ex. 123 at 56-57).

<u>Response</u>:  Not disputed for purposes of summary judgment, but otherwise immaterial.

90.     The Bible is the handbook of the NDP Task Force.  (Ex. 123 at 64).

<u>Response</u>:  Disputed and immaterial.  According to her deposition testimony, Mrs. Dobson indicated that the Christian Bible was the handbook of Christianity, not of the NDP Task Force.  Pl. Ex. 123 (Dobson Dep., 64:20-22).

91.     Prayer from the perspective of the NDP Task Force is related to the relationship with the God of the Bible.  (Ex. 123 at 64).

<u>Response</u>:  Not disputed for purposes of summary judgment, but otherwise immaterial.

92.     The supporting scripture for each National Day of Prayer theme is exclusively chosen from the Bible, a source that is readily recognizable.  (Ex. 123 at 57).

Response:  Disputed.  The themes chosen by Mrs. Dobson are for the Task Force, and does not select the theme for any Presidential or governor proclamation.  In fact, President Obama did not incorporate the NDP Task Force's proposed theme into his 2009 Proclamation. Dobson Ex. A (2009 Proclamation).

93.     Presidential Proclamations advance the cause of prayer and inspire others to get involved.  (Ex. 15 at 2).

Response:  Disputed.  Plaintiffs propose as fact the opinion of only one private person, Shirley Dobson, expressed to President Bush in a letter offering a draft Presidential Proclamation.

94.     The NDP Task Force solicits Proclamations from the President, which are then read by some 40,000 Task Force coordinators at events around the country, and the presidential proclamations "underscore the need for corporate and personal intercession [that] will lend tremendous prestige and credibility to these gatherings."  (Ex. 15 at 1).

Response:  Not disputed for purposes of summary judgment in that the NDP Task Force solicits Proclamations from the President, but disputed that these Proclamations are read at events around the country.  The 2009 Presidential Proclamation was issued on the afternoon of May 7, 2009.  According to Mrs. Dobson, "it was too late to be used by the Cannon House observance and by our coordinators and by anyone else."  Pl. Ex. 123 (Dobson Dep., 175:3-5).

95.     In his 1991 official NDP Proclamation, President George H.W. Bush told all Americans, including all unreligious Americans that "we owe constant praise to God."  Bush added: "Giving humble thanks for His mercy, let us vow to fulfill not only our responsibility but also our potential as one Nation under God.  Most important let us make our prayers pleasing to Him . . ." (Ex. 116).

Response:  Disputed.  There is no evidence of how many Americans retrieved President Bush's 1991 Proclamation, much less that "all Americans" and "all unreligious Americans" did so.  Pl. Ex. 116 (Presidential Prayer Proclamations 1952-2008).

96.     President George W. Bush in his NDP public comments lauded the Dobson's and the NDP Task Force and promoted the role of prayer at exclusive annual NDP prayer observances in the East Room of the White House.  (Ex. 63 at 1-4).

Response:  Not disputed for purposes of summary judgment, but otherwise immaterial.

97.     Mrs. Dobson has attended ten White House prayer services for the National Day of Prayer and she has spoken at eight of these events.  (Ex. 123 at 72 and 74).

Response:  Not disputed for purposes of summary judgment.

98.     Mrs. Dobson, as Chairman of the NDP Task Force, even received personal "thank-you's" from President George W. Bush as a result of the Task Force's NDP observances in Washington.  (Ex. 40 at 1-2).

Response:  Not disputed for purposes of summary judgment.

99.     The NDP Task Force bound all the state National Day of Prayer Proclamations by governors into a presentable package and presented it as a unique gift to President Bush on the National Day of prayer.  (Ex. 123 at 52).

Response:  Not disputed for purposes of summary judgment.

100.     The NDP Proclamation by President Bush in 2001 expressly included the NDP Task Force annual theme and supporting scriptural reference.  "The theme of the 2001 National Day of Prayer is 'One Nation under God.'   In a prayer written specially for the occasion, Americans are asked to pray for 'a moral and spiritual renewal to help us meet the many problems we face.'   Special observances are scheduled for all 50 States, with local volunteers

planning a variety of activities including prayer breakfasts, concerts, rallies, and student gatherings." (Ex. 10 at 1-3).

Response:  Not disputed for purposes of summary judgment.

101.    In his 2004 NDP Proclamation, President Bush used the NDP Task Force scriptural theme, "the Lord is near to all who call upon Him . . . He also will hear their cry, and save them."  (Ex. 116).

Response:  Not disputed for purposes of summary judgment, but the contents of the proclamation speak for themselves.

102.    In 2008, President Bush also adopted the NDP Task Force theme and scripture verse: "This year's theme, 'Prayer! America's Strength and Shield,' is taken from Psalm 28:7, "The Lord is my strength and my shield; my hea[r]t trusts him, and I am helped.'" (Ex. 10, at 1-3).

Response:  Not disputed for purposes of summary judgment.

103.    President Obama's 2009 NDP Proclamation concluded with a "call upon Americans to pray in thanksgiving for our freedoms and blessings and to ask for God's continued guidance, grace, and protection for this land that we love.'" (Ex. 12 at 2-3).

Response:  Not disputed for purposes of summary judgment, but the proclamation speaks for itself.

104.    The Presidential Proclamation is an important symbol and affirmation of the annual National Day of Prayer observance, which the NDP Task Force incorporates into its promotional materials.  (Ex. 30 at 1).

Response: Disputed that the NDP Task Force incorporates the Presidential Proclamation into its promotional materials, and that the Proclamation is an important symbol of the National

Day of Prayer observance.  The 2009 Presidential Proclamation, for example, was issued on the afternoon of May 7, 2009.   While the NDP Task Force did not learn of the President's Proclamation until after 3:00 p.m., it was able to organize various observances throughout the country, as well as its traditional breakfast in the Cannon House Office Building on Capitol Hill. Pl. Ex. 123 (Dobson Dep., 174:15-175:6).   According to Mrs. Dobson, however, "[the Proclamation] was too late to be used by the Cannon House observance and by our coordinators and by anyone else."  Pl. Ex. 123 (Dobson Dep., 175:3-5).

105.    The National Day of Prayer stands as a memorial to our nation's supposed Christian heritage.  (Exs. 33-34).

Response:  Disputed.  This view of the National Day of Prayer came from the NDP Task Force's October 22, 2004 letter to Senator Bill Frist, inviting him to the organization's observance celebration.  The letter reflects the NDP Task Force's view that the National Day of Prayer "is a memorial to our Christian heritage."  Pl. Ex. 33 (S. Dobson 2004 letter to Sen. Frist). However, the National Day of Prayer was established so that Americans could "both pray and meditate in what ever way was appropriate for them."  Dobson Ex. A (Letter to President Barack Obama from Interfaith Alliance). The Report to Accompany H.J. Res. 382 to create a National Day of Prayer Statement deemed it "appropriate" if, pursuant to presidential proclamations, the people united in a day of prayer "each in accordance with his own religious faith."  Pl. Ex. 53 (Report to Accompany H.J. Res. 382, at 1) (emphasis added).

106.    The NDP Task Force considers "foundational to our country the understanding that God is the Source of freedom, including the Christian God of the Bible." (Ex. 35 at 1).

Response:  Not disputed for purposes of summary judgment, but otherwise immaterial.

107.    A tremendous outpouring of prayer and repentance encompasses the nation at the time of the National Day of Prayer as hands join together to cry out to God and hearts are allegedly changed and hope restored.  (Ex. 36 at 1).

Response:  Disputed and immaterial.  Plaintiffs propose as fact a characterization of the National Day of Prayer put forth by a private organization, the Task Force, in a letter to Chaplain Barry Black.  The nature of the National Day of Prayer is voluntary.  According to the statute establishing the National Day of Prayer, "the people of the United States may turn to God in prayer and meditation at churches, in groups, and as individuals." 36 U.S.C.A. § 119 (West 2008) (emphasis added).  President Truman established the National Day of Prayer in 1952 to "call upon Americans to both pray and meditate in what ever way was appropriate for them." Dobson Ex. B (Letter to President Barack Obama from Interfaith Alliance).  In the most recent NDP Proclamation, President Obama celebrated the right of individuals to "worship or not worship according to the dictates of their conscience."  Dobson Ex. A (2009 Proclamation).

108.    The NDP Task Force hopes that its annual theme and supporting scripture will draw Americans closer to God.  (Ex. 37 at 1).

Response:  Not disputed for purposes of summary judgment, but otherwise immaterial.

109.    The NDP Task Force promotes, publicizes and provides resources to "constituents" to help them celebrate the National Day of Prayer.  (Ex. 123 at 16).

Response:  Not disputed for purposes of summary judgment.

110.    The NDP Task Force limits participation by coordinators and volunteers to persons holding a Judeo-Christian perspective.  (Ex. 44 at 1).

Response:  Not disputed for purposes of summary judgment, but otherwise immaterial.

111.    The NDP Task Force, led by Mrs. Dobson writes to each state governor on an annual basis requesting a prayer Proclamation, while referencing the NDP Task Force annual theme and supporting scriptural reference.  (Exs. 21-24).  (Ex. 123 at 21, 23, 50, 585, 115, and 121).

Response:  Disputed.  The Task Force does not ask that the proclamations incorporate the Task Force's theme.  *See* Pl. Exs.  21-24; Ex 123.

112.    Letters written by the NDP Task Force to governors requesting Proclamations are signed by Shirley Dobson, who reviews such letters before signing them.  (Ex. 123 at 23 and 148).

Response:  Not disputed for purposes of summary judgment, but otherwise immaterial.

113.    The NDP Task Force requests state governors to designate the same day as the day set aside by the President for the National Day of Prayer.  (Ex. 123 at 28).

Response:  Not disputed for purposes of summary judgment, but otherwise immaterial.

114.    The NDP Task Force considers it desirable if governors incorporate the NDP Task Force's annual theme and scriptural reference in their official Proclamations.  (Ex. 123 at 86).

Response:   Disputed.   The citation offered by the Plaintiffs does not support this assertion.  Furthermore, the letters to the governors do not request that they incorporate the Task Force's theme or verse in their proclamations.  *See* Pl. Exs. 21-23.

115.    All state governors issued NDP Proclamations in 2009, including Proclamations from the Governors of Arkansas, Florida, Iowa, Idaho, Indiana, Kentucky, Louisiana, Massachusetts, Mississippi, Nebraska, New Mexico, South Dakota, Texas, Utah, Virginia,

Wisconsin, and Wyoming, which all included references to the NDP Task Force annual theme and supporting scripture.  (Ex. 3 at 1-17).

Response:  Not disputed for purposes of summary judgment, but otherwise immaterial.

116.   All state governors also issued NDP Prayer Proclamations in 2008, including Proclamations by the governors of Colorado, Florida, Idaho, Illinois, Indiana, Kentucky, Louisiana, Massachusetts, Missouri, Nebraska, New Jersey, Utah, Virginia, Wisconsin, and Wyoming, which Proclamations included the NDP Task Force annual theme and supporting scripture.  (Ex. 4 at 1-14).

Response:  Not disputed for purposes of summary judgment, but otherwise immaterial.

117.   All state governors likewise issued NDP Prayer Proclamations in 2007, including Proclamations by the governors of Colorado, Florida, Idaho, Illinois, Indiana, Iowa, Kentucky, Massachusetts, Nebraska, Utah, Virginia, Wisconsin, and Wyoming, which included the NDP task Force annual theme and supporting scripture.  (Ex. 5 at 1-16).

Response:  Not disputed for purposes of summary judgment, but otherwise immaterial.

118.   All state governors issued NDP Prayer Proclamations in 2006, including Proclamations by the governors of Arkansas, Colorado, Florida, Idaho, Illinois, Indiana, Louisiana, Nebraska, Utah, Wisconsin and Wyoming which included the NDP Task Force annual theme and supporting scripture.  (Ex. 6 at 11).

Response:  Not disputed for purposes of summary judgment, but otherwise immaterial.

119.   All state governors issued NDP Prayer Proclamations in 2005, including Proclamations by the governors of Arkansas, Colorado, Florida, Idaho, Illinois, Indiana, Kentucky, Louisiana, Massachusetts, Missouri, Nebraska, North Carolina, Texas, Utah, Virginia,

and Wisconsin, which included the NDP Task Force annual theme and supporting scripture.
(Ex. 7 at 1-17).

Response:  Not disputed for purposes of summary judgment, but otherwise immaterial.

120.    All state governors issued NDP Prayer Proclamations in 2004, including
Proclamations by the governors of Arkansas, Colorado, Florida, Idaho, Illinois, Louisiana,
Massachusetts, Missouri, Nebraska, New York, North Carolina, Texas, Virginia, Wisconsin, and
Wyoming, which included the NDP Task Force annual theme and supporting scripture.  (Ex. 8 at
1-15).

Response:  Not disputed for purposes of summary judgment, but otherwise immaterial.

121.    Annual NDP Proclamations by Wisconsin Governor James Doyle for 2004-2009
included the NDP Task Force annual theme and/or scriptural reference.  (Ex. 11 at 1-6).

Response:  Disputed for the 2008 Proclamation, otherwise not disputed for purposes of
summary judgment, but otherwise immaterial.  Pl. Ex. 11 at 1-6.

122.    The NDP Task Force considers it especially vital to enlist the support and
affirmation of national leaders, including Proclamations by state governors.  (Ex. 16 at 1).

Response: Not disputed for purposes of summary judgment, but otherwise immaterial.

123.    The NDP Task Force considers it "critical" to garner the support of our nation's
leaders for the NDP efforts, including by obtaining the written Proclamations from governors.
(Ex. 17 at 1).

Response:  Not disputed for purposes of summary judgment, but otherwise immaterial.

124.    If governors do not issue Proclamations, the NDP Task Force asks coordinators to
set up an appointment at the governor's office and follow up, as well as inviting all governors to

actively participate in the National Day of Prayer observance, most appropriately on the steps of the Capitol Buildings to give visibility to the National Day of Prayer.  (Exs. 17-20).

Response:  Not disputed for purposes of summary judgment, but otherwise immaterial.

125.    In 2007, pressure was put on New York Governor Eliot Spitzer, to issue a NDP Proclamation.

Response:  Not disputed for purposes of summary judgment to the extent that efforts were made to have Governor Spitzer issue a proclamation, but otherwise immaterial.

126.    James Dobson, head of Focus on the Family, and husband of Shirley Dobson, Chairman of the NDP Task Force, was instrumental in publicly pressuring Governor Spitzer to issue a NDP Proclamation.  (Ex. 64 at 1, 3 and 5-6; Ex. 123 at 54).

Response:  Not disputed for purposes of summary judgment to the extent that efforts were made to have Governor Spitzer issue a proclamation, but otherwise immaterial.

127.    Minnesota Governor Jesse Ventura was criticized in 1999 for refusing to issue a NDP Proclamation.  (Ex. 65 at 1).

Response:  Not disputed for purposes of summary judgment in that Governor Ventura was criticized by the Minnesota Family Council, the state affiliate of Family Research Council "the leading proponent of a Christian conservative 'family values' agenda inside the Beltway." Pl. Ex. 65 (Article re: Pressure on Governor Ventura, at 1).

128.    The NDP Task Force considers it significant that all fifty governors issue NDP Proclamations.  (Ex. 61 at 1).

Response:  Not disputed for purposes of summary judgment, but otherwise immaterial.

129.    The State NDP Proclamations acknowledge the federal designation of the Day of Prayer by Congress and the President in their own Proclamations.  (Exs. 3-9).

Response:  Not disputed for purposes of summary judgment, but the contents of the proclamations speak for themselves.  Pl. Exs. 3-9 (State NDP Proclamations).

130.    Millions of individuals participate in the NDP call to prayer by the NDP Task Force, supported by 30-40,000 NDP Task Force volunteers across the country.  (Ex. 62).

Response:  Not disputed for purposes of summary judgment in that 30-40,000 NDP Task Force volunteers participate in National Day of Prayer observances across the country.  But disputed in that "millions of individuals" observe the National Day of Prayer.  While one article claims that "3 million Americans" were expected to participate in 2002, Pl. Ex. 62 (Articles re: Magnitude of NDP Observances), another stated that "tens of thousands of people" would take part in 2008. Pl. Ex. 62 (Articles re: Magnitude of NDP Observances).

131.    Mrs. Dobson is pleased when governors use the theme of the NDP Task Force because it was given to her by the Lord.  (Ex. 123 at 58).

Response:  Not disputed for purposes of summary judgment, but otherwise immaterial in that it reflects the view of one private person.

132.    Support for the National Day of Prayer by governors helps further efforts to call the nation to prayer.  (Ex. 24 at 1).

Response:  Disputed to the extent that this proposed finding of fact is based upon a form letter to state governors from the NDP, requesting their participation in the National Day of Prayer.  This letter represents the opinion of the organization only.  Pl. Ex. 24 (S. Dobson 2005 Letter to State Governors, at 1).

133.    The NDP Task Force holds a prayer service in the Caucus Room of the Cannon Office Building each year on the National Day of Prayer as an observance, which is attended by many federal officials and seeks their annual participation.  (Exs. 25-28, 31, 33-39, and 41-43).

Response:  Disputed as to vagueness of the term "many."  The remainder of the paragraph is not disputed for purposes of summary judgment.

134.   The Cannon Office Building observance by the NDP Task Force is symbolic of thousands of others that take place throughout the country, and overflow crowds each year fill the Cannon Caucus Room and adjoining Hallways.  (Ex. 25 at 5).

Response:  Disputed to the extent that this description is one offered by the NDP Task Force in its promotion of the Cannon Office Building Observance to Father Daniel P. Coughlin, Chaplain of the House of Representatives.  It represents the perspective of the NDP Task Force only.  Pl. Ex. 25 (S. Dobson Letters to Federal Officials Requesting Participation, at 5).

135.   The use of the Cannon Office Building for an annual NDP service is free to the NDP Task Force and is approved yearly by the Speaker of the House.  (Ex. 123 at 81-82).

Response:  Not disputed for purposes of summary judgment.

136.   The Cannon Office Building is chosen in particular because it represents the seat of government and provides easy access to Congressmen.  (Ex. 123 at 77).

Response:  Disputed.  This proposed finding of fact represents the opinion of Mrs. Dobson, as expressed during her deposition.  Furthermore, Mrs. Dobson's statements are inaccurately summarized, as she stated that the observance is held in the Cannon office building "because it's a nice room," and that "it's in Washington, D.C., and we feel that's the seat of our government."  Pl. Ex. 123 (Dobson Dep., 77:9-12).

137.   God TV now webcasts the Cannon Office Building NDP event.  (Ex. 123 at 80).

Response:  Not disputed for purposes of summary judgment, but otherwise immaterial.

138.   Representatives of all three branches of government are invited to attend the Cannon Office Building event.  (Ex. 123 at 77-78).

Response:  Not disputed for purposes of summary judgment.

139.    The federal representatives attend a prayer service, and are invited to speak and often do speak; invited speakers have included members of the judiciary.  (Ex. 123 at 78).

Response:  Not disputed for purposes of summary judgment.

140.    The NDP Task Force requests that federal officials speaking at the Task Force observance in Washington include a description of the significant role that prayer has played in their personal and professional lives.  (Ex. 26 at 1-2).

Response:  Not disputed for purposes of summary judgment.

141.    More Republicans than Democrats typically attend the Cannon Building prayer service conducted by the NDP Task Force, which says something about their prayer life, jokes Mrs. Dobson.  (Ex. 123 at 124-125).

Response:  Not disputed for purposes of summary judgment, but otherwise immaterial as it only represents the views of one private person.

142.    Participation in NDP Task Force observances of the National Day of Prayer by federal officials is viewed by Mrs. Dobson as "partnering in calling the nation to prayer."  (Ex. 25 at 4).

Response:  Not disputed for purposes of summary judgment, but otherwise immaterial.

143.    The NDP Task Force values the participation of leaders and dignitaries in National Day of Prayer activities.  (Exs. 25-39).

Response:  Not disputed for purposes of summary judgment, but otherwise immaterial.

144.    Official statements from the President and governors constitute statements of support of the NDP Task Force observance.  (Ex. 29 at 1).

Response:  Disputed as Plaintiffs mis-characterize a statement made by the NDP Task Force in a letter to South Dakota's Governor Mike Rounds.  The letter stated "each year the National Day of Prayer Task Force receives official statements of support from the President of the United States as well as governors of the 50 states, Puerto Rico, and the U.S. Virgin Islands." Pl. Ex. 29 (S. Dobson 2005 Letter to S. D. Governor, at 1).

145.    The NDP Task Force has students gather around flagpoles on the National Day of Prayer, including little children.  (Ex. 123 at 85-86).

Response:  Not disputed for purposes of summary judgment, but otherwise immaterial.

146.    The NDP Task Force even has a school prayer event guide put together by a prayer warrior.  (Ex. 123 at 167).

Response:  Not disputed for purposes of summary judgment, but otherwise immaterial.

147.    Regional coordinators may also ask mayors, city council members or school board members to participate in the National Day of Prayer.  (Ex. 123 at 24).

Response:  Not disputed for purposes of summary judgment, but otherwise immaterial.

148.    The mission of the NDP Task Force is to encourage personal repentance and prayer, while mobilizing the Christian community.  (Ex. 44 at 1).

Response:  Not disputed for purposes of summary judgment, but otherwise immaterial.

149.    Mrs. Dobson considers the National Day of Prayer important in part because she believes before the founding fathers came over here, they prayed, and so did people who came over here from every land, and when they landed safely the first thing they did was pray again. (Ex. 123 at 11-12).

Response:  Not disputed for purposes of summary judgment, but otherwise immaterial.

150.    Participation in NDP Task Force observances by public officials is noteworthy

and the participants in such observances number in the millions.  (Exs. 49 and 61-62).

Response:  Dispute as the term "noteworthy" is vague, but do not dispute that public officials do participate in NDP Task Force observances.  Dispute that "participants" in such observances number in the millions due to vagueness of language.  Millions of public officials do not participate in NDP Task Force observances.  The NDP Task Force does reach out to millions of Americans to participate, however.   Pl. Ex. 49 (NDP Taskforce Description of 2008 Observance); Pl. Ex. 61 (April 2008 Article re All Governors Sign Proclamations); Pl. Ex. 62 (Articles re: Magnitude of NDP Observances).

151.    The NDP Task Force organizes between 30,000 to 40,000 prayer gatherings across the Nation in conjunction with the National Day of Prayer.  (Ex. 123 at 26).

Response:  Not disputed for purposes of summary judgment.

152.    The Alliance Defense Fund has used the present lawsuit challenging the National Day of Prayer as a vehicle to solicit donations, including via a video presentation.  (Ex. 94 at 1).

Response:  Not disputed for purposes of summary judgment, but otherwise immaterial.

153.    The NDP Task Force, for its part also seeks "generous contributions to extend its efforts to bring the name of Christ out from behind church walls and into the public front-lines in all fifty states." (Ex. 52 at 1).

Response:  Not disputed for purposes of summary judgment, but otherwise immaterial.

154.    The National Day of Prayer, however, is highly divisive, amid concerns that it has been hijacked by fundamentalist Christians, including the NDP Task Force.  (Exs. 66-92).

Response:  Disputed.   The National Day of Prayer is simply a day in which Americans can "both pray and meditate in whatever way was appropriate for them."  Dobson Ex. B (Letter to President Barack Obama from Interfaith Alliance).  Even the Interfaith Alliance, which had

urged President Obama to "open the [National Day of Prayer] to believers of all religions, as well as those who profess no religion," later praised him for issuing a Proclamation that was "inclusive of all Americans." Ex. B (Letter to President Barack Obama from Interfaith Alliance); Ex. D (Interfaith Alliance Praises President's NDP Proclamation).  Just because members of the FFRF dislike religion does not means that the National Day of Prayer is divisive.

155.    The participation of public officials in NDP observances, including at public government buildings in Washington D.C., and State Capitol buildings throughout the nation, fuels the perception that the National Day of Prayer is intended to promote and encourage religion.  (Exs. 66-92).

Response:  Disputed that there is a perception that the National Day of Prayer is intended to promote and encourage religion.  Plaintiffs' exhibits do not support this conclusory statement. *See* Pl. Exs. 66-92; *see also* Dobson Ex. B (Letter to President Barack Obama from Interfaith Alliance) (The National Day of Prayer is simply a day in which Americans can "both pray and meditate in whatever way was appropriate for them.")  The Interfaith Alliance, which had urged President Obama to "open the [National Day of Prayer] to believers of all religions, as well as those who profess no religion," later praised him for issuing a Proclamation that was "inclusive of all Americans." Dobson Ex. B (Letter to President Barack Obama from Interfaith Alliance); Dobson Ex. D (Interfaith Alliance Praises President's NDP Proclamation).

156.    The NDP Task Force subscribes to the Lausanne Covenant, which was adopted by fundamentalists and other Evangelical Protestants from over 150 nations during the International Congress on World Evangelization at Lausanne, Switzerland in 1974.  (Ex. 50 at 3).

Response:  Not disputed for purposes of summary judgment, but otherwise immaterial.

157.    The Lausanne Covenant includes such beliefs as the inspiration and inerrancy of the Bible, the Trinity, the Second Coming of Jesus Christ, the Anti-Christ, etc.  (Ex. 50 at 3 and 66 at 4-55).

Response:  Dispute use of the vague abbreviation "etc.".  The remainder of the allegation is not disputed for purposes of summary judgment, but otherwise immaterial.

158.    The adherence of the NDP Task Force to the Lausanne Covenant has the effect of excluding even traditional Jewish groups, or any other non-Christian organization or inter-faith groups.  (Ex. 50 at 3 and Ex. 66 at 5).

Response:   Disputed and immaterial.  Disputed to the extent Plaintiffs have failed to define "excluding", such that it is unclear *how* people are being excluded, from *what* are they being excluded?

159.    The NDP Task Force, in effect, is an exclusively Evangelical Christian non-profit organization recognizing only those NDP events which are organized by Evangelical groups.  (Ex. 50 at 3).

Response:  Disputed as the term "exclusively" is vague and the Task Force does not exclude anyone from their events.   Not disputed as to the fact that the Task Force is an Evangelical Christian non-profit organization.

160.    The NDP Task Force prays to the God of the Bible, who is perceived as the only "correct God."  (Ex. 123 at 15).

Response:  Not disputed for purposes of summary judgment, but otherwise immaterial.

161.    The current budget of the NDP Task Force is about $1.2 million.  (Ex. 123 at 45).

Response:  Not disputed for purposes of summary judgment, but otherwise immaterial.

162.    The nonreligious are the fastest-growing segment of the United States population. (Ex. 97).

Response:  Immaterial and disputed for vagueness.

163.    Nonbelievers today are reported to represent a significant part of the American population, constituting approximately 15 percent or thirty-four million Americans, in a recent American Religious Identification Survey.  (Ex. 97).

Response:  Immaterial, and not disputed to the extent this was reported by this survey.

164.    The Plaintiff, Anne Gaylor, learned about the National Day of Prayer from publicity in newspapers and/or on television, making it pretty hard to avoid knowing about the National Day of Prayer.  (Ex. 1 at 2).

Response:   How she learned of it is not disputed for purposes of summary judgment. However, Mrs. Dobson does dispute Anne Gaylor contention that "it would be pretty hard to avoid knowing about the National Day of Prayer." Pl. Ex. 1 (Plaintiffs' Responses to Defendants President Barack Obama and Robert L. Gibbs' First Set of Interrogatories, No. 3, at 2) ("Interrogatory Answers").  This statement is not factual but instead represents Anne Gaylor's opinion.  In fact, FFRF members actively monitor the news and internet for NDP presidential proclamations and observances.  (Interrogatory Answers No. 4-6, at 8-12).  When asked how she learned of the 2009 Presidential Proclamation, for example, Annie Laurie Gaylor responded: "I did retrieve it.  I was waiting for it, of course.  We were very – of course we needed to see what he was going to be saying because we were suing him for it.  So naturally we needed to see it." Dobson Ex. C at 14-94:21 (Gaylor Dep.).

165.    Anne Gaylor also knew about the NDP from complaints by members who phoned

FFRF when they picked up on violations of the separation of church and state.  (Ex. 1 at 2).

Response:  Disputed as to any assertion that violations occurred.  In addition, the FFRF exists to challenge potential violations of the separation between church and state.  Pl. Ex. 1 (Interrogatory Answers, No. 3, at 3).

166.    The National Day of Prayer was and is truly shocking to Anne Gaylor, who grew up at a time when state/church separation was really respected.  One did not expect to find people praying in government meetings or on government property, much less having the government telling people to pray, according to Mrs. Gaylor.  (Ex. 1 at 2-3).

Response:  Immaterial and undisputed that this represents Mrs. Gaylor's opinion.  It is interesting to note that during this time period in which Mrs. Gaylor said the state\church separation was really respected, the National Day of Prayer statute was passed (1952) which is the target of this lawsuit.  See Pub. L. No. 82-324, 66 Stat. 64 (1952).

167.    Annie Laurie Gaylor has known and been concerned about the National Day of Prayer since at least shortly after 1976, when she, at age 21, with her mother Anne Gaylor, co-founded the Freedom From Religion Foundation as a regional group dedicated to work for state/church separation in Madison, Wisconsin.  (Ex. 1 at 3).

Response:  Not disputed for purposes of summary judgment.

168.    Annie Laurie Gaylor has served as a volunteer, an officer, a Board Member, and/or staff member since the group went national in 1978, and she became Co-President in 2004.  (Ex. 1 at 3).

Response:  Not disputed for purposes of summary judgment.

169.    Annie Laurie Gaylor joined the staff as editor of FFRF's newspaper, in 1985.  Freethought Today not only reports on FFRF actions but chronicles state/church violations

around the country, as well as the views and activism of FFRF membership toward prayer, religion, and religion in government.  (Ex. 1 at 3).

Response:  Dispute use of the term "violations" as this is a legal conclusion, and as the use of the term here reflects only the opinion of Annie Laurie Gaylor as expressed in her answers to defense counsel's interrogatories.  Pl. Ex. 1 (Interrogatory Answers, No. 3, at 3).  The remainder of the paragraph is not disputed for purposes of summary judgment.

170.    Annie Laurie Gaylor has regularly reported on the National Day of Prayer, federal state or local incidents, as well as reporting on activism by members over the National Day of Prayer and government-sponsored prayer.  She has also highlighted violations in articles she has written or edited.  (Ex. 1 at 3).

Response:  Dispute use of the term "violations" as this is a legal conclusion, and the opinion of Annie Laurie Gaylor as expressed in her answers to defense counsel's interrogatories. Pl. Ex. 1 (Interrogatory Answers, No. 3, at 3).  The remainder of the paragraph is not disputed for purposes of summary judgment.

171.    FFRF exists to correct violations of the separation between church and state, so it hears complaints about NDP violations yearly, says Annie Laurie Gaylor.  (Ex. 1 at 3).

Response:  Dispute use of the term "violations" as this is a legal conclusion, and the opinion of Annie Laurie Gaylor as expressed in her answers to defense counsel's interrogatories. Pl. Ex. 1 (Interrogatory Answers, No. 3, at 3). The remainder of the paragraph is not disputed for purposes of summary judgment.

172.    FFRF's office has received phone calls about violations each year since at least 1978.  Since 1988, after the change in the law making the first Thursday in May the annual National Day of Prayer, complaints by members have increased.  (Ex. 1 at 3).

Response:  Dispute use of the term "violations" as this is a legal conclusion, and the opinion of Annie Laurie Gaylor as expressed in her answers to defense counsel's interrogatories. Pl. Ex. 1 (Interrogatory Answers, No. 3, at 3). Mrs. Dobson also disputes any insinuation that Plaintiffs have been harmed as their members "greatly enjoy fighting back" against what they perceive to be Establishment Clause violations.  Pl. Ex. 1 (Interrogatory Answers, No. 6, at 12). The remainder of the paragraph is not disputed for purposes of summary judgment.

173.    The complaints FFRF receives each year about the NDP have made Annie Laurie Gaylor very aware of how much division and controversy the Proclamations create, and how so many FFRF members have wished FFRF to take action against the practice.  (Ex. 1 at 3).

Response:  Mrs. Dobson disputes that the Proclamations cause "much division and controversy" as this is only the opinion of Mrs. Gaylor.  Mrs. Dobson does not dispute that this paragraph reflects the opinion of Mrs. Gaylor or that this lawsuit serves the mission and purpose of FFRF.

174.    FFRF members and members of the public are in continual contact with the FFRF office over countless violations of the Establishment Clause.  Prominent violations and federal violations, such as enactment of the 1952 law establishing the NDP, are of special concern to FFRF members.  (Ex. 1 at 3-4).

Response:  Dispute use of the term "violations" as this is a legal conclusion, and the opinion of Annie Laurie Gaylor as expressed in her answers to defense counsel's interrogatories. Pl. Ex. 1 (Interrogatory Answers, No. 3, at 3-4).  The remainder of the paragraph is not disputed for purposes of summary judgment as FFRF's purpose is to work for the separation of state and church and to educate the public on matters of nontheism.  Its members "greatly enjoy fighting back" against what they perceive to be Establishment Clause violations.  Pl. Ex. 1 (Interrogatory

Answers, No. 6, at 12).  Some FFRF members, however, do ignore the National Day of Prayer with no consequence whatsoever.  *See* Dobson Ex. C at 102:8-15 (Gaylor Dep.).

175.    Paul Gaylor, FFRF member for 33 years, volunteer, longtime Board member, and former Officer, read about the NDP in the newspapers so long ago he doesn't recall the first time. (Ex. 1 at 4).

Response:  Not disputed for purposes of summary judgment with the clarification that Paul Gaylor has purposely been on a "Focus on the Family" mailing list since sometime in the late 1980s or early 1990s in order to monitor the National Day of Prayer.  Pl. Ex. 1 (Interrogatory Answers, No. 4, at 6).

176.    Dan Barker heard of the NDP before the 1980s, when he was a minister, but he distinctly remembers seeing or hearing something on television (probably a news story) in the early 1980s when President Ronald Reagan signed one of the NDP Proclamations.  (Ex. 1 at 4).

Response:  Not disputed for purposes of summary judgment subjected to the clarification that Dan Barker now actively monitors National Day of Prayer observances.  For example, he visited the NDP Task Force's website in 2008 to determine what wording they were recommending for National Day of Prayer Proclamations.  Pl. Ex. 1 (Interrogatory Answers, No. 4, at 7).  Dan Barker learned by telephone from FFRF staff that President Bush issued a National Day of Prayer Proclamation in 2008, and then searched the internet to determine whether President Bush had incorporated the NDP Task Force's proposed theme into his Proclamation. Pl. Ex. 1 (Interrogatory Answers, No. 4, at 7).

177.    Jill Dean became aware of the National Day of Prayer over time by hearing news accounts, although she cannot recall the very first time she heard or saw such a report.  (Ex. 1 at 4).

Response:  Not disputed for purposes of summary judgment.

178.    Ms. Dean was distinctly aware of the National Day of Prayer in 2008, prompted by news accounts of an NDP prayer breakfast sponsored by the Burnett County Sheriff, in Wisconsin, at which event Wisconsin's newly elected Supreme Court Justice, William Gableman, appeared as the key note speaker.

Response:  Not disputed for purposes of summary judgment.

179.    Ms. Dean has been a volunteer worker for the Freedom From Religion Foundation since her retirement, in part because opposing governmental endorsement of religion is an important, but unpopular cause.  (Ex. 1 at 4).

Response:  Mrs. Dobson disputes that Ms. Dean's work is an unpopular cause as FFRF's work has generated 6.4 million in assets and almost a million dollars of profit after all expenses and salaries were paid in 2008.  *See* Dobson Ex. C at 30:15-32:11 (Gaylor's Dep.).

180.    Ms. Dean considers opposition to the establishment of religion to be important because events like the National Day of Prayer send a message that some citizens are better than others; such events like the National Day of Prayer categorize and distinguish between individuals who are supposedly better than others, while making no reference or acknowledgment of non-believers.  (Ex. 1 at 5).

Response:  Not disputed for purposes of summary judgment, but otherwise immaterial as it represents the opinion of one private person.

181.    According to Ms. Dean, events like the National Day of Prayer essentially make nonreligious person invisible, which both saddens and angers Ms. Dean.  (Ex. 1 at 5).

Response:  Not disputed for purposes of summary judgment, but otherwise immaterial as it represents the opinion of one private person.

182.    The government sends a message through events like the National Day of prayer that if a person doesn't pray, then they are un-American; such persons are devalued and made to feel like they are outside the norm of good citizenship, according to Ms. Dean. (Ex. 1 at 5).

Response:  Disputed, but otherwise immaterial as this only represents the opinion of one person.  President Obama celebrated Americans' freedom to "worship or not to worship," and discussed the Golden Rule.  Dobson Ex. A (2009 Proclamation).  His directive was "Let us also use this day to come together in a moment of peace and goodwill.  Our world grows smaller by the day, and our varied beliefs can bring us together to feed the hungry and comfort the afflicted; to make peace where there is strife; and to lift up those who have fallen on hard times."  Dobson Ex. A (2009 Proclamation).  The Interfaith Alliance, which had urged President Obama to "open the [National Day of Prayer] to believers of all religions, as well as those who profess no religion," later praised him for issuing a Proclamation that was "inclusive of all Americans."  Dobson Ex. B (Letter to President Barack Obama from Interfaith Alliance); Ex. D (Interfaith Alliance Praises President's NDP Proclamation).

183.    Ms. Dean also is quite concerned that promotions like the National Day of Prayer send a message about religion that is untrue.  (Ex. 1 at 5).

Response:  Not disputed for purposes of summary judgment, but otherwise immaterial as it represents the opinion of one private person.

184.    The premise of government officials who promote religion is that the United States is a Christian nation, defined by a very conservative variety of Christianity, according to Ms. Dean.  (Ex. 1 at 5).

Response:  Not disputed for purposes of summary judgment to the extent it is being offered only as the opinion of Ms. Dean, but otherwise immaterial.

185.    That depiction of the United States as a conservative Christian nation is historically inaccurate, according to Ms. Dean, who notes that many of the immigrants to the United States left their home countries because of religious intolerance, while the United States now ironically tries to define itself as a Christian nation characterized by religious intolerance. (Ex. 1 at 5).

Response:   Not disputed for purposes of summary judgment to the extent it is being offered only as the opinion of Ms. Dean, but otherwise immaterial.

186.    Ms. Dean, in short, is aware of and personally opposed to government promotion of religion, such as through the National Day of Prayer, because it has the effect of disenfranchising non-religious persons, like Ms. Dean, while favoring religious conservatives.

Response:   Not disputed for purposes of summary judgment to the extent it is being offered only as the opinion of Ms. Dean, but otherwise immaterial.  Disputed as to any assertion that the NDP disenfranchises non-religious persons.  *See* Dobson Exs. B and D.

187.    The 2008 NDP Proclamation by President Bush was brought to Anne Gaylor's attention by her daughter, Annie Laurie Gaylor, because FFRF has monitored this activity, while putting up with it for so many years.  (Ex. 1 at 6).

Response:  Not disputed for purposes of summary judgment  that Anne Gaylor learned of President Obama's 2009 National Day of Prayer Proclamation from her daughter, Annie Laurie Gaylor.  Disputed that FFRF has monitored this activity "while putting up with it for so many years."  Rather, FFRF monitors the news under Annie Laurie Gaylor's direction, and looks for updates regarding the National Day of Prayer at the White House website, NDP Task Force website, and various governor websites.   This is because FFRF's purpose is to work for the separation of state and church and to educate the public on matters of non-atheism.  As such,

FFRF enjoys fighting back against what they perceive as Establishment Clause violations.  Pl. Ex. 1 (Interrogatory Answers, No. 6, at 12 -13).

188.    Annie Laurie Gaylor reports on Establishment Clause violations to Anne regularly since Anne is the principal founder and president emeritus of the national state/church watchdog FFRF, and Anne is still officially a consultant with the Foundation, and remains on the Board of Directors.  (Ex. 1 at 6).

Response:  Not disputed for purposes of summary judgment.

189.    Annie Laurie Gaylor first learned about the 2008 Proclamation from the National Day of Prayer Taskforce website before the event itself, which she has routinely monitored in the spring for many years.  (Ex. 1 at 6).

Response:  Not disputed for purposes of summary judgment.

190.    Annie Laurie Gaylor also corroborated the 2008 Proclamation at the White House website.  (Ex. 1 at 6).

Response:  Not disputed for purposes of summary judgment subject to the clarification that Annie Laurie Gaylor's usual practice is to corroborate National Day of Prayer Proclamations at the White House website.  Pl. Ex. 1 (Interrogatory Answers, No. 4, at 6).

191.    Annie Laurie Gaylor routinely has also checked the NDP Taskforce website every year to see how many governors capitulate to the NDP Taskforce, and what the NDP Taskforce dictates for the annual theme and selected Bible verse.  (Ex. 1 at 6).

Response:  Dispute as the term "capitulate" mischaracterizes the respective governor's actions.  Not disputed for purposes of summary judgment subject to the clarification that the NDP Task Force can suggest, but not dictate, themes.  *See* Dobson Ex. A (2009 Proclamation).

192.    Annie Laurie Gaylor has reported on governors who refused to issue Proclamations in the past, such as Connecticut Governor Lowell Weicker (1991-1995), and Minnesota Governor Jesse Ventura.  (Ex. 1 at 6).

Response:  Not disputed for purposes of summary judgment.

193.    Annie Laurie Gaylor was also aware of the public pressure put on New York Governor Eliot Spitzer to issue an NDP Proclamation in 2007.  (Ex. 1 at 6).

Response:  Disputed as to vagueness of the term "pressure."  Not disputed for purposes of summary judgment that Annie Laurie Gaylor was aware of the lobbying of Governor Spitzer to issue an NDP Proclamation in 2007.

194.    Dan Barker, while working at FFRF, also has been watching the NDP for years. (Ex. 1 at 7).

Response:  Not disputed for purposes of summary judgment.

195.    In early 2008, Barker anticipated President Bush's signing and had been to the National Day of Prayer Taskforce website to see what wording they were recommending.  (Ex. 1 at 7).

Response:  Not disputed for purposes of summary judgment.

196.    Barker was at Harvard University for a debate on April 22, 2008, and on that day or the next, April 23, he heard by telephone from FFRF staff, including co-president Annie Laurie Gaylor, that President Bush had issued the Proclamation.  (Ex. 1 at 7).

Response:  Immaterial that Barker was at Harvard University for a debate on April 22, 2008.  Not disputed for purposes of summary judgment that Dan Barker learned by telephone from FFRF staff that President Bush issued a National Day of Prayer Proclamation in 2008.  This proposed finding is subject to the clarification that Dan Barker then searched the internet to

determine whether President Bush had incorporated the NDP Task Force's theme.  Pl. Ex. 1 (Interrogatory Answers, No. 4, at 7).

197.    On April 22 or 23, 2008, Barker learned, and soon after confirmed by looking on the internet, that President Bush had incorporated the "Prayer! America's Strength and Shield" (Ex. 1 at 7).

Response:  Not disputed for purposes of summary judgment.

198.    Annie Laurie Gaylor monitored both the White House website and the National Day of Prayer Taskforce in advance of the 2009 Proclamation.  (The NDP Taskforce website was stripped of much of its archives and did not do its usual detailed announcements prior to the event.) (Ex. 1 at 7-8).

Response:  Not disputed for purposes of summary judgment.  The language in parenthesis is immaterial for which no support was cited.

199.    Annie Laurie Gaylor learned that President Obama would be issuing a Proclamation from numerous prominent national news stories in the Washington Post and over the wire, which reported extensively on the expected Proclamation.  (Ex. 1 at 7-8).

Response:  Not disputed for purposes of summary judgment subject to the clarification that Annie Laurie Gaylor also learned that President Obama would be issuing a Proclamation through her active monitoring of the White House website in advance of the 2009 National Day of Prayer.  Pl. Ex. 1 (Interrogatory Answers, No. 4-5, at 7-8).  When asked about retrieving the 2009 Presidential Proclamation from the White House Website, Annie Laurie Gaylor responded, "I was waiting for it, of course.  We were very – of course we needed to see what he was going to be saying because we were suing for it.  So naturally we needed to see it."  Dobson Ex. C at 94:14-21 (Gaylor Dep.).

200.     Annie Laurie Gaylor was also able to verify the wording of Obama's Proclamation at the White House official website by the first Thursday in May 2009.  (Ex. 1 at 8).

Response:  Not disputed for purposes of summary judgment subject to the clarification that Annie Laurie Gaylor's usual practice is to corroborate National Day of Prayer Proclamations at the White House's website.  Pl. Ex. 1 (Interrogatory Answers, No. 4, at 6).

201.     Barker learned by watching the news on the internet on May 7 or 8, 2009, that President Obama had issued a NDP Proclamation on May 7.  (Ex. 1 at 8).

Response:  Not disputed for purposes of summary judgment subject to the clarification that Barker monitored the internet for updates on the National Day of Prayer and has been "watching the NDP for years."  Pl. Ex. 1 (Interrogatory Answers, No. 4, at 7).

202.     Anne Gaylor picketed the First Annual Wisconsin Prayer Breakfast, outside the Concourse Hotel in Madison, Wis., Friday, March 20, 1992, where she leafleted 600 participants and passerby.  (Ex. 1 at 9).

Response:  Not disputed for purposes of summary judgment.

203.     The first-ever "Wisconsin Prayer Breakfast" event in 1992 was an offshoot of the National Day of Prayer.  (Ex. 1 at 9).

Response:  Disputed.  The evidentiary support for this allegation is Ms. Gaylor's response to an interrogatory, and she is not qualified to speak as to whether the event was an "offshoot" of the NDP. *See* Pl. Ex. 1 at 9.   In addition, the term "offshoot" is vague and ambiguous.

204.     Anne Gaylor also formally protested the misuse of the Great Seal of the State of Wisconsin by the Madison Kiwanis-West, who were the private sponsors of the prayer breakfast,

but who advertised and promoted the event as the "Wisconsin Prayer Breakfast" using the state seal of Wisconsin.  (Ex. 1 at 9).

Response:  Not disputed for purposes of summary judgment.

205.    The main guest speaker at the prayer breakfast in 1992 was U.S. Senate Chaplain Rev. Richard C. Halverson, who had previously denied FFRF and its staff member (now President) Dan Barker, an ordained minister, the ability to present a message to open the U.S. Senate instead of a prayer.  (Ex. 1 at 9).

Response:  Not disputed for purposes of summary judgment, but otherwise immaterial.

206.    During the picketed prayer breakfast, Halverson made such attacks as: "Atheism has no room for human rights."  In speaking about the dissolution of the Soviet Union, Halverson said, "It was not the failure of politics or economics but it was because of atheism."

Response:  Not disputed for purposes of summary judgment, but otherwise immaterial.

207.    Anne Gaylor has talked with innumerable FFRF members from 1978 until her retirement in 2004, which members have called to see if there was something as an organization that FFRF could do about the NDP.  (Ex. 1 at 10).

Response:  Not disputed for purposes of summary judgment.

208.    FFRF has responded in various ways, over the years, including by contacting various offending public officials; by promoting secular Proclamations for government officials to make; by publicizing violations after FFRF began publishing a newspaper in 1983 ten times a year; by periodically alerting members to ongoing violations; and by encouraging and publicizing efforts to protest the National Day of Prayer and local and regional off-shoots.  (Ex. 1 at 10).

Response:   Mrs. Dobson disputes use of the term "violations" as this is a legal conclusion, and the opinion of Annie Laurie Gaylor as expressed in her answers to defense counsel's interrogatories.  Pl. Ex. 1 (Interrogatory Answers, No. 6, at 10).  The remainder of the paragraph is not disputed for purposes of summary judgment.

209.   Anne Gaylor has studied the NDP Proclamations by various public officials, and contacted officials to protest the violation of a basic constitutional principle, sometimes releasing a statement to media.  (Ex. 1 at 11).

Response:   Mrs. Dobson disputes use of the term "violations" as this is a legal conclusion, and the opinion of Annie Laurie Gaylor as expressed in her answers to defense counsel's interrogatories.  Pl. Ex. 1 (Interrogatory Answers, No. 6, at 10).  The remainder of the paragraph is not disputed for purposes of summary judgment.

210.   In case of the picket of the Wisconsin Prayer Breakfast in 1992, Anne Gaylor carried a sign, helped compose a press release and leaflet, phoned area members to interest other protesters, and contacted media about FFRF's counterpicket and complaint about the misuse of the Great Seal of Wisconsin.  (Ex. 1 at 11).

Response:  Not disputed for purposes of summary judgment.

211.   Anne Gaylor has been contacted by various media for comment about the NDP Proclamations and government-fostered prayer over the many years.  (Ex. 1 at 11).

Response:  Not disputed for purposes of summary judgment.

212.   Since 1978, when Anne Gaylor was asked to take FFRF national, as an organization, she received countless complaints from FFRF members and members of the public about NDP-related violations, including comments by public officials, use of public facilities, and prayer breakfasts that had the appearance of public sponsorship.

Response:   Mrs. Dobson disputes use of the term "violations" as this is a legal conclusion, and the opinion of Annie Laurie Gaylor as expressed in her answers to defense counsel's interrogatories.  Pl. Ex. 1 (Interrogatory Answers, No. 6, at 10).  The remainder of the paragraph is not disputed for purposes of summary judgment subject to the clarification that FFRF's purpose is to work for the separation of state and church and to educate the public on matters of nontheism.  Its members "greatly enjoy fighting back" against what they perceive to be Establishment Clause violations.  Pl Ex. 1 (Interrogatory Answers, No. 6, at 12).

213.   As president of FFRF, in November 1993, Anne Gaylor authorized the filing of a lawsuit in Denver, Colorado, with the FFRF Denver chapter, to enjoin the mayor's office from cosponsoring a National Day of Prayer.  As a result, Judge John N. McMullen, District Court, enjoined the mayor from "any further endorsement, promotion, sponsorship, or support of the Day of Prayer."  FFRF v. Wellington Webb, Mayor of Denver, Case No. 93 CV 6056, District Court, City and County of Denver, Colo.) (Ex. 1 at 11).

Response:  Not disputed for purposes of summary judgment.

214.   Anne Gaylor's many activities include writing press releases and letters, as well as being quoted in Freethought Today and by other media, about her objections to the National Day of Prayer and related violations.  (Ex. 1 at 12).

Response:   Mrs. Dobson disputes use of the term "violations" as this is a legal conclusion, and the opinion of Annie Laurie Gaylor as expressed in her answers to defense counsel's interrogatories.  Pl. Ex. 1 (Interrogatory Answers, No. 6, at 12).  The remainder of the paragraph is not disputed for purposes of summary judgment.

215.   Prior to the National Day of Prayer each year, the Freethought Radio show has included commentary about the NDP, promoted a National Day of Reason, played part of the

song by Dan Barker "Nothing Fails Like Prayer," and also provided other timely commentary on government prayer throughout the year.  (Ex. 1 at 12).

Response:  Not disputed for purposes of summary judgment.

216.    FFRF also monitors published news under Annie Laurie Gaylor's direction, and looks for updates at the White House website, NDP Task Force website and various governor websites.  The National Day of Prayer violations occur every year, and therefore, they are not hard to find referenced, according to Annie Laurie Gaylor.  (Ex. 1 at 13).

Response:  Mrs. Dobson disputes that NDP violations occur every year as this is a legal conclusion.

217.    FFRF has also issued news releases critical of National Day of Prayer activities, sometimes asking for secular alternatives aimed at expressing the point of view of FFRF members and in some instances, asking members to take action.  (Ex. 1 at 13-14).

Response:  Not disputed for purposes of summary judgment.

218.    Annie Laurie Gaylor has been responsible for writing and disseminating press releases from 1985 to present.

Response:  Not disputed for purposes of summary judgment.

219.    "Prayer Proclamations by public officials convey to nonreligious Americans that we are expected to believe in a god, and in the suspension of the natural laws of the universe through wishful thinking," according to Foundation co-president Annie Laurie Gaylor.  (Ex. 1 at 14).

Response:  Not disputed for purposes of summary judgment that this statement represents the opinion of FFRF co-president Annie Laurie Gaylor.

220.    Annie Laurie Gaylor has reported on National Day of Prayer violations in Freethought Today, from January 1985 to present, and on the FFRF website.  (Ex. 1 at 14).

Response:  Mrs. Dobson disputes that violations occurred as this is a legal conclusion. She does not dispute for purposes of summary judgment that Annie Laurie Gaylor has reported on what she perceives to be National Day of Prayer violations from January 1985 to present.

221.    Annie Laurie Gaylor has written, solicited, edited, typeset (and, for at least 7 years, pasted up) many articles regarding prayer and government.

Response:  Not disputed for purposes of summary judgment.

222.    Annie Laurie Gaylor has tirelessly observed and participated in protesting the NDP by monitoring violations, often reporting on violations or FFRF protests of the violations, writing press releases or letters of complaint and urging members to protest violations at local, regional, or national levels.  (Ex. 1 at 37).

Response:  Mrs. Dobson disputes that violations occurred as this is a legal conclusion. Otherwise, not disputed.

223.    Paul Gaylor participated in and took photographs and was security for the "first annual Wisconsin prayer breakfast" counterpicket, at the Concourse Hotel, 1 W. Dayton St., Madison, Wis., Friday, March 20, 1992.  (Ex. 1 at 37).

Response:  Not disputed for purposes of summary judgment.

224.    As an FFRF volunteer, Paul Gaylor also helped to open the heavy volume of mail for FFRF for at least 10 years, and he encountered letters or clippings related to complaints about the National Day of Prayer and governmental prayer and prayer breakfasts, etc., and he discussed these violations and strategies to deal with them with his wife, Anne Gaylor, and other members of the FFRF Executive Council and Board of Directors.  (Ex. 1 at 37).

Response:  Mrs. Dobson disputes that violations occurred as this is a legal conclusion. Otherwise, not disputed.

225.    Dan Barker too has opposed the National Day of Prayer, in written comments that have been published over the years.  (Ex. 1 at 38).

Response:  Not disputed for purposes of summary judgment.

226.    Phyllis Rose, for her part, has become aware that the National Day of Prayer occurs every year, at which time the President issues a Proclamation encouraging all citizens to pray.  (Ex. 1 at 38).

Response:  Not disputed for purposes of summary judgment that Phyllis Rose has become aware that the National Day of Prayer occurs every year.  Disputed that the President issues a Proclamation "encouraging all citizens to pray."  In fact, President Truman established the National Day of Prayer in 1952 to "call upon Americans to both pray and meditate in what ever way was appropriate for them."  Dobson Ex. B (Letter to President Barack Obama from Interfaith Alliance).  Lyndon B. Johnson, in signing the 1965 Proclamation, stated, "I cannot proclaim that all Americans will pray on October 20th.  Nor would I do so even if I could."  Pl. Ex. 116 (Presidential Prayer Proclamations 1952-2008).  In his 2009 National Day of Prayer Proclamation, President Obama explicitly recognized the right of individuals to "worship or not worship according to the dictates of their conscience."  Dobson Ex. A (2009 Proclamation).

227.    Ms. Rose is offended and disturbed by the government asking persons to pray. (Ex. 1 at 38).

Response:  Not disputed, but otherwise immaterial as this reflects only the opinion of one private person.

228.   Ms. Rose is offended by the government taking a position regarding religion, including the position that Americans are a better people because of their religious convictions. (Ex. 1 at 38).

Response:  Immaterial that Ms. Rose is offended.  Disputed that the government is taking a position regarding religion [through the National Day of Prayer], including the position that Americans are a better people because of their religious convictions.  President Obama asked Americans to "remember the one law that binds all great religions together: the Golden Rule, and its call to love one another; to understand one another; and to treat with dignity and respect those with whom we share a brief moment on this Earth."  Dobson Ex. A (2009 Proclamation).  His directive was: "Let us also use this day to come together in a moment of peace and goodwill.  Our world grows smaller by the day, and our varied beliefs can bring us together to feed the hungry and comfort the afflicted; to make peace where there is strife; and to lift up those who have fallen on hard times."  Dobson Ex. A (2009 Proclamation).

229.   Ms. Rose, in fact, began volunteering with the Freedom From Religion Foundation because she found the government's promotion of religion to be harder and harder to ignore.  (Ex. 1 at 38).

Response:  Immaterial.  Not disputed for purposes of summary judgment to the extent that this proposed finding of fact expresses only the personal feelings that prompted Ms. Rose to volunteer with FFRF.

230.   Ms. Rose is opposed to the government's promotion of religion and the false insinuation that Americans are better because of prayer.  (Ex. 1 at 38).

Response:  Immaterial and not disputed as this only portends to be the opinion of one person.

231.    Ms. Rose believes that her views regarding the separation of church and state are not being represented in government.  (Ex. 1 at 38-39).

Response:  Immaterial.  Not disputed for purposes of summary judgment that Ms. Rose believes that her views are not being represented.

232.    The assumption that the United States is a better country and that individuals are better persons as a result of prayer is not shared by Ms. Rose.  (Ex. 1 at 39).

Response:  Immaterial and not disputed as this is only being offered as evidence that Ms. Rose does not possess a certain understanding.

233.    The superiority of prayerfulness seems to have become mainstream view in the United States government, however, as reflected by the National Day of Prayer, according to Ms. Rose.  (Ex. 1 at 39).

Response:  Immaterial.  Not disputed for purposes of summary judgment to the extent that this proposed finding represents the opinion of Ms. Rose only.

234.    Ms. Rose feels that persons who profess religious beliefs are, in fact, accorded greater political influence.  (Ex. 1 at 39).

Response:  Immaterial.  Not disputed for purposes of summary judgment to the extent that this proposed finding represents the opinion of Ms. Rose only.

235.    Staff time and staff efforts have been dedicated by FFRF opposing the National

Day of Prayer, including by individual plaintiffs, as well as by staff attorney, Rebecca Kratz. (Ex. 1 at 39-40).

Response:  Not disputed for purposes of summary judgment subject to the clarification that FFRF has no documents sufficient to disclose expenditures made by FFRF regarding the National Day of Prayer.  Pl. Ex. 1 (Interrogatory Answers, No. 7, at 39).  Because FFRF's

purpose is to work for the separation of state and church and to educate the public on matters relating to nontheism, any such expenditures were made pursuant to FFRF's overall mission. Dobson Ex. C at 48:2-10 (Gaylor Dep.) (stating that the NDP lawsuit advanced FFRF's educational mission and broader policy goals).

236.   In Anne Gaylor's 28 years as president of FFRF, the repetition of National Day of Prayer violations, along with the accelerating local and regional violations and increased publicity about them all, and increased pressure by the religious right to involve public officials at all levels and to dictate the content of prayer Proclamations, made Anne's work harder. (Ex. 1 at 40).

Response:  Immaterial and disputed. This proposed finding of fact represents the opinion of Anne Gaylor as expressed in her answer to defense counsel's interrogatories. FFRF does not have any expenditures relating to the National Day of Prayer that are delineated by specific budgetary line items. Pl. Ex. 1 (Interrogatory Answers, No. 7, at 39). FFRF has no documents sufficient to disclose expenditures made by FFRF regarding the National Day of Prayer. Def. Ex. 1 (Plaintiffs' Responses to Federal Defendants' First Request for Production of Documents No. 4, at 2). Moreover, because FFRF's purpose is to work for the separation of state and church and to educate the public on matters relating to nontheism, any such expenditures were made pursuant to FFRF's overall mission. Dobson Ex. C at 48:2-10 (Gaylor Dep.) (stating that the NDP lawsuit advanced FFRF's educational mission and broader policy goals). Finally, Mrs. Dobson disputes use of the term "violations" as this is a legal conclusion, and the opinion of Annie Laurie Gaylor as expressed in her answers to defense counsel's interrogatories. Pl. Ex. 1 (Interrogatory Answers, No. 7, at 40).

237.    One cannot separate church and state when the highest office holder in the country is telling everybody to pray, according to Anne Gaylor.  (Ex. 1 at 40).

Response:  Disputed and otherwise immaterial as this reflects only the personal opinion of Mrs. Gaylor.

238.    State and local officials imitating the NDP Proclamation and events have made the work of FFRF all the harder.  (Ex. 1 at 40).

Response:  Immaterial.  Disputed.  This proposed finding of fact represents the opinion of Anne Gaylor as expressed in her answer to defense counsel's interrogatories.  (Pl. Ex. 1 at 40). FFRF does not have any expenditures relating to the National Day of Prayer that are delineated by specific budgetary line items.  Ex. 1 (Interrogatory Answers, No. 7, at 39).  FFRF has no documents sufficient to disclose expenditures made by FFRF regarding the National Day of Prayer.  Def. Ex. 1 (Plaintiffs' Responses to Federal Defendants' First Request for Production of Documents No. 4, at 2).  Moreover, because FFRF's purpose is to work for the separation of state and church and to educate the public on matters relating to nontheism, any such expenditures were made pursuant to FFRF's overall mission.  Dobson Ex. C at 48:2-10 (Gaylor Dep.) (stating that the NDP lawsuit advanced FFRF's educational mission and broader policy goals).

239.    FFRF's membership has urged FFRF to continue to protest the National Day of Prayer, and the members expect FFRF to show leadership and represent the views of the nonreligious who are excluded by NDP Proclamations and events.  (Ex. 1 at 40).

Response:  Not disputed for purposes of summary judgment subject to the clarification that some FFRF members ignore the National Day of Prayer altogether.  *See* Dobson Ex. C at 102:8-15 (Gaylor Dep.).   FFRF members have attended national Day of Prayer or related prayer

breakfast events in order to monitor them.  Pl. Ex. 1 (Interrogatory Answers, No. 9, at 44).  FFRF members have also picketed National Day of Prayer events held on courthouse steps or at municipal buildings.  Pl. Ex. 1  (Interrogatory Answers, No. 9, at 44).  FFRF members "greatly enjoy fighting back" against what they perceive to be Establishment Clause violations.  Pl. Ex. 1 (Interrogatory Answers, No. 6, at 12).  Disputed that the views of the nonreligious are excluded by NDP Proclamations and events.   President Obama's 2009 Proclamation explicitly acknowledged the non-religious who are entitled to "worship or not worship" as they wish. Dobson Ex. A (2009 Proclamation).   The Interfaith Alliance, which had urged President Obama to "open the [National Day of Prayer] to believers of all religions, as well as those who profess no religion," later praised him for issuing a Proclamation that was "inclusive of all Americans." Ex. B (Letter to President Barack Obama from Interfaith Alliance); Ex. D (Interfaith Alliance Praises President's NDP Proclamation).

240.    The National Day of Prayer law weakens the Establishment Clause, creates a bad example, and encourages public officials to promote their personal religious convictions on public time and dime with their imprimatur of support.  (Ex. 1 at 41).

<u>Response</u>:  Immaterial, as this statement involves opinions and legal conclusions, rather than material facts.  Disputed.  The National Day of Prayer is simply a day in which Americans can "both pray and meditate in whatever way [i]s appropriate for them."  Ex. B (Letter to President Barack Obama from Interfaith Alliance).  The Interfaith Alliance, which had urged President Obama to "open the [National Day of Prayer] to believers of all religions, as well as those who profess no religion," later praised him for issuing a Proclamation that was "inclusive of all Americans." Ex. B (Letter to President Barack Obama from Interfaith Alliance); Ex. D (Interfaith Alliance Praises President's NDP Proclamation).

241.    The National Day of Prayer law clearly has produced countless similar violations, which the Proclamations are intended to do, according to Anne Gaylor.  (Ex. 1 at 41-42).

Response:  Immaterial as this only represents the opinion of one person.  Disputed as to vagueness of the phrase "similar violations."

242.    Because the purpose of FFRF is state/church separation, it is destructive to its organization to have an illegal and unconstitutional law promoted year after year all across the country by public employees and politicians, notes Anne Gaylor.  (Ex. 1 at 42).

Response:  Immaterial.  Disputed.  This statement involves only opinions and legal conclusions, rather than material facts.  Pl. Ex. 1 (Interrogatory Answers, No. 9, at 41-42).

243.    It has been a continual burden on FFRF just replying to complaints about the National Day of Prayer, dealing with members who are impatient and urging FFRF to do something about it.  (Ex. 1 at 43).

Response:  Not disputed for purposes of summary judgment subject to the clarification that FFRF's purpose is to work for the separation of state and church and to educate the public on matters relating to nontheism.  Dobson Ex. C at 48:2-10 (Gaylor Dep.) (stating that the NDP lawsuit advanced FFRF's educational mission and broader policy goals).

244.    According to Annie Laurie Gaylor, the 1952 law establishing a National Day of Prayer has long impeded the ability of the Freedom From Religion Foundation to protect the constitutional principle of the separation between church and state.  (Ex. 1 at 43).

Response:  Immaterial.  Disputed.  This proposed finding of fact represents the opinion of Anne Gaylor as expressed in answers to defense counsel's interrogatories.   Pl. Ex. 1 (Interrogatory Answers, No. 9, at 41-42).  In fact, according to Annie Laurie Gaylor, this lawsuit

advances FFRF's educational mission and broader policy goals.   Dobson Ex. C at 48:2-10 (Gaylor Dep.).

245.   When FFRF members have phoned the office, irate over the existence of the National Day of Prayer, Annie Laurie Gaylor, as a co-founder, Board Member, longtime staff member, and now co-president and officer, has felt her hands were tied in addressing the fallout from the National Day of Prayer Law, given the apparent government sanction of the event.   (Ex. 1 at 43-44).

Response:   Immaterial. Not disputed for purposes of summary judgment to the extent "the event" refers to the issuing of Presidential NDP Proclamations.   Disputed to the extent that "the event" refers to private events, including events sponsored by the NDP Task Force. President Obama did not issue his NDP Proclamation until the afternoon of May 7, 2009.   While the NDP Task Force did not learn of the President's Proclamation until after 3:00 p.m., it was able to organize various observances throughout the country, as well as its traditional breakfast in the Cannon House Office Building on Capitol Hill.   Pl. Ex. 123 (Dobson Dep., 174:3-175:6). The Proclamation was issued too late in the day to be used by the Cannon House observance, NDP Task Force coordinators, or anyone else.   Pl. Ex. 123 (Dobson Dep., 175:3-6).

246.   It is clear to Annie Laurie Gaylor that the 1952 law has spawned a whole host of other violations, at the national, state and local levels around the country.   These violations include the National Prayer Breakfast (put on by a private Christian fundamentalist entity, but attracting almost every member of Congress, the President and international dignitaries every February and ample media coverage).   The violations also include annual gubernatorial Proclamations.   They include NDP involvement by many mayors and county executives and other public officials, including sheriffs, who make Proclamations or host official prayer

breakfasts or who allow prayer breakfasts to use their official position in the title.  In fact, there are now many state or local prayer breakfasts spawned by the National Day of Prayer.  (Ex. 1 at 44).

Response:  Immaterial.  Disputed.  Plaintiffs cannot demonstrate causation because they refer only to independent acts by third parties.  Furthermore, Plaintiffs' characterization of these actions and events as "violations" of the Establishment Clause is disputed as this is a legal conclusion and the opinion of Annie Laurie Gaylor as expressed in answers to defense counsel's interrogatories.  Pl. Ex. 1 (Interrogatory Answers, No. 9, at 44).

247.  FFRF members have attended NDP or related prayer breakfast events to monitor them, have written letters to public officials about such events, have sometimes picketed events held on courthouse steps or municipal buildings, but it is impossible to get to the heart of the problem – that it is unconstitutional and unconscionable for a public official to direct "the religious exercise of his constituents" (in Thomas Jefferson's words).  (Ex. 1 at 44).

Response:  Not disputed for purposes of summary judgment that FFRF members have attended NDP or related prayer breakfast events to monitor them, have written letters to public officials about such events, and have sometimes picketed events held on courthouse steps or municipal buildings.   Mrs. Dobson disputes the remainder of the paragraph as it is not factual, but instead a characterization of the National Day of Prayer put forth by Anne Gaylor in answers to defense counsel's interrogatories.     Pl. Ex. 1 (Interrogatory Answers, No. 9, at 44).  Mrs. Dobson also disputes Plaintiffs' use of the word "directed," as proclamations are entirely voluntary in nature.  A proclamation is merely "a public and official announcement."  The Random House Dictionary of the English Language, unabridged (2d ed. 1987).  As President Johnson recognized, the President may not proclaim that all Americans will pray on the National

Day of Prayer.  Pl. Ex. 116 (Presidential Prayer Proclamations 1952-2008).  President Obama celebrated the freedom that Americans have "to worship or not to worship" as they see fit. Dobson Ex. A (2009 Proclamation).

248.    FFRF members also are injured when the President and the Governors order them to pray, or tell them to pray, or even simply suggest that they and all other citizens ought to pray. (Ex. 1 at 45).

Response:  Disputed.  Plaintiffs have not been exposed to Presidential National Day of Prayer Proclamations in a direct and unwelcome manner.  Pl. Ex. 1 (Interrogatory Answer No. 9, at 40-47).  Moreover, the President does not order citizens to pray.  President Truman established the National Day of Prayer in 1952 to "call upon Americans to both pray and meditate in what ever way was appropriate for them."  Dep. Ex. 29 (Letter to President Barack Obama from Interfaith Alliance).  Lyndon B. Johnson, in signing the 1965 Proclamation, stated, "I cannot proclaim that all Americans will pray on October 20th.  Nor would I do so even if I could."  Pl. Ex. 116 (Presidential Prayer Proclamations 1952-2008).   In his 2009 National Day of Prayer Proclamation, President Obama explicitly recognized the right of individuals to "worship or not worship according to the dictates of their conscience."  Dobson Ex. A (2009 Proclamation).  The Interfaith Alliance, which had urged President Obama to "open the [National Day of Prayer] to believers of all religions, as well as those who profess no religion," later praised him for issuing a Proclamation that was "inclusive of all Americans." Ex. B (Letter to President Barack Obama from Interfaith Alliance); Ex. D (Interfaith Alliance Praises President's NDP Proclamation).

249.    Annie Laurie Gaylor does not believe in a god.  She does not believe that prayer can suspend the natural laws of the universe.  She considers the very concept of prayer to be absurd.  This intellectual aversion to prayer is shared by the membership of the Freedom From

Religion Foundation and by rationalists, who by definition reject the idea of the supernatural. (Ex. 1 at 45).

Response:  Immaterial.  Not disputed for purposes of summary judgment.

250.    When the President proclaims a National Day of Prayer, Annie Laurie Gaylor and other FFRF members feel excluded, disenfranchised, affronted, offended, and deeply insulted.

Response:  Disputed.  Plaintiffs have not been exposed to Presidential National Day of Prayer Proclamations in a direct and unwelcome manner.  Pl. Ex. 1 (Interrogatory Answers No. 9, at 40-47).   Moreover, FFRF members are encouraged to monitor and protest NDP observances.   They choose to ignore other presidential Proclamations that are equally controversial and often include similar directives.  For example, on Columbus Day 2009, the President "called upon" all Americans to "observe this day with appropriate ceremonies and activities."  Annie Laurie Gaylor admits that she does not observe Columbus Day and is neither offended by the federal holiday nor the President's commemoration of it in his annual Proclamation.  Dobson Ex. C 130:3-132:25 (Gaylor Dep.).  Some FFRF members similarly ignore the National Day of Prayer with no consequence whatsoever.  *See id.* at 102:8-15.

251.    When the President tells "all" Americans to pray, as most of them have exhorted in their Proclamations since 1952, this admonishment disenfranchises "all" who do not pray or believe in prayer or believe in a deity who answers prayer.  (Ex. 1 at 45).

Response:  Disputed.  Plaintiffs have not been exposed to Presidential National Day of Prayer Proclamations in a direct and unwelcome manner.  Pl. Ex. 1 (Interrogatory Answers No. 9, at 40-47).  Moreover, Presidential Proclamations often address "all" Americans, but are ignored or disregarded by those citizens who choose not to observe.  For example, on Columbus Day 2009, the President "called upon" all Americans to "observe this day with appropriate

ceremonies and activities."   Annie Laurie Gaylor admits that she does not observe Columbus Day and is neither offended by the federal holiday nor the President's commemoration of it in his annual Proclamation.   Dobson Ex. C at 130:3-132:25 (Gaylor Dep.).   Moreover, the last Presidential Proclamation explicitly recognized the right of individuals to "worship or not worship according to the dictates of their conscience."  Dobson Ex. A (2009 Proclamation).  The Interfaith Alliance, which had urged President Obama to "open the [National Day of Prayer] to believers of all religions, as well as those who profess no religion," later praised him for issuing a Proclamation that was "inclusive of all Americans." Ex. B (Letter to President Barack Obama from Interfaith Alliance); Ex. D (Interfaith Alliance Praises President's NDP Proclamation).

252.   Annie Laurie Gaylor feels as excluded as most Christians would feel if the President or their Governor were to issue a prayer Proclamation to Allah, pointing out that Mohammed is his Prophet, or as they would feel if Vishnu were referenced, or Jehovah.  (Ex. 1 at 45).

Response:  Immaterial.  Disputed.  Plaintiffs have not been exposed to Presidential National Day of Prayer Proclamations in a direct and unwelcome manner.   Pl. Ex. 1 (Interrogatory Answers No. 9, at 40-47).  Moreover, this proposed finding of fact is only Annie Laurie Gaylor's opinion as expressed in an answer to defense counsel's interrogatories.  Pl. Ex. 1 (Interrogatory Answers, No. 9, at 45).

253.   No so-called civil religion or prayer to a deity can possibly include atheists, agnostics, and other self-identified "nonreligious."  (Ex. 1 at 45).

Response:  Immaterial.  Disputed.   This statement is not grounded in fact, but rather is merely Annie Laurie Gaylor's opinion as expressed in an answer to defense counsel's interrogatories.  Pl. Ex. 1 (Interrogatory Answers, No. 9, at 45).

254.    Annie Laurie Gaylor feels deeply embarrassed by governmental displays of faith, religion, or worship, but when they are directed at her, the feeling of being coerced and told how to think about religion is magnified.  (Ex. 1 at 45).

Response:  Immaterial.  Disputed.  This statement is not grounded in fact, but rather is merely Annie Laurie Gaylor's opinion, as expressed in an answer to defense counsel's interrogatories.  Pl. Ex. 1 (Interrogatory Answers, No. 9, at 45).  Moreover, "governmental displays" on the National Day of Prayer are not "directed at" Annie Laurie Gaylor.  First, Plaintiffs have not been exposed to Presidential National Day of Prayer proclamations in a direct and unwelcome manner.  Pl. Ex. 1 (Interrogatory Answers No. 9, at 40-47).  In addition, President Obama's 2009 Proclamation celebrated the freedom that Americans have "to worship or not to worship" as they see fit.  Dobson Ex. A (2009 Proclamation).  He discussed the Golden Rule, Dobson Ex. A (2009 Proclamation), and asked Americans to "use this day to come together in a moment of peace and goodwill.  Our world grows smaller by the day, and our varied beliefs can bring us together to feed the hungry and comfort the afflicted; to make peace where there is strife; and to lift up those who have fallen on hard times."  Dobson Ex. A (2009 Proclamation).  The President "call[ed] upon all Americans to pray" with standardized language used in nearly every presidential Proclamation that commemorates a holiday observance.  For example, on Columbus Day 2009, the President "called upon" all Americans to "observe this day with appropriate ceremonies and activities."  Annie Laurie Gaylor admits that she does not observe Columbus Day and is neither offended by the federal holiday nor the President's commemoration of it in his annual Proclamation. Dobson Ex. C at 131:1-132:25 (Gaylor Dep.).

255.    Annie Laurie Gaylor considers being told to pray, or even being encouraged to pray, by a President or Governor to be a tyrannical act, which robs her of freedom of conscience. (Ex. 1 at 46).

Response:   Immaterial.   Not disputed for purposes of summary judgment that this proposed finding of fact is Annie Laurie Gaylor's personal opinion, as expressed in an answer to defense counsel's interrogatories.  Pl. Ex. 1 (Interrogatory Answers, No. 9, at 46).

256.    Reading the 2008 Proclamation, by President Bush, Dan Barker was told by his President that "America trusts in the abiding power of prayer and asks for the wisdom to discern God's will in times of joy and of trial.  As we observe this National Day of Prayer, we recognize our dependence on the Almighty, we thank Him for the many blessings He has bestowed upon us, and we put our country's future in His hands."  (Ex. 1 at 46).

Response:   Not disputed for purposes of summary judgment subject to the clarification that Plaintiffs have not been exposed to Presidential National Day of Prayer Proclamations in a direct and unwelcome manner.  Pl. Ex. 1 (Interrogatory Answers No. 9, at 40-47).

257.    It appeared to Mr. Barker that President Bush was assuming that he, as an American, was also "observing," "recognizing," and "thanking God."  (Ex. 1 at 46).

Response:   Not disputed for purposes of summary judgment subject to the clarification that Plaintiffs have not been exposed to Presidential National Day of Prayer Proclamations in a direct and unwelcome manner.  Pl. Ex. 1 (Interrogatory Answers No. 9, at 40-47).   Furthermore, this statement represents Mr. Barker's perception of the 2008 Proclamation.

258.    Reading further, Mr. Barker was informed that President Bush asked "the citizens of our nation to give thanks . . . for God's continued guidance, comfort, and protection."  (Ex. 1 at 46).

Response:  Not disputed for purposes of summary judgment as this is being offered as Mr. Barker's perception of the 2008 Proclamation.  However, the proclamation speaks for itself.

259.    Mr. Barker is a citizen of the United States, but he does not believe in "God" or any god, so he felt excluded by that wording and concluded that President Bush considered only believers to be part of "we, the people."  (Ex. 1 at 46-47).

Response:  Not disputed for purposes of summary judgment as this was Mr. Barker's personal opinion, as expressed in an answer to defense counsel's interrogatories.  Pl. Ex. 1 (Interrogatory Answers No. 9, at 46-47).

260.    Similar to President Bush the year before, Mr. Barker read that President Obama called upon "Americans to pray in thanksgiving for our freedoms and blessings and to ask for God's continued guidance, grace, and protection for this land that we love."  (Ex. 1 at 47).

Response:  Not disputed for purposes of summary judgment as this is being offered as Mr. Barker's perception of the 2009 Proclamation.  However, the proclamation speaks for itself.

261.    Because Mr. Barker does not believe in God, or pray, he wondered how his president could ask him, an American, to "ask for God's guidance."  Mr. Barker felt excluded, like a second-class American.  (Ex. 1 at 47).

Response:  Not disputed for purposes of summary judgment as this is only being offered as Mr. Barker's opinion. However, Plaintiffs have not been exposed to Presidential National Day of Prayer Proclamations in a direct and unwelcome manner.  Pl. Ex. 1 (Interrogatory Answers No. 9, at 40-47).  Moreover, President Obama's proclamation expressly included Americans who do not believe in God when he stated that Americans are free to "worship or not to worship according to the dictates of their conscience."  Dobson Ex. A (2009 Proclamation).  The Interfaith Alliance, which had urged President Obama to "open the [National Day of Prayer] to

believers of all religions, as well as those who profess no religion," later praised him for issuing a Proclamation that was "inclusive of all Americans." Ex. B (Letter to President Barack Obama from Interfaith Alliance); Ex. D (Interfaith Alliance Praises President's NDP Proclamation).

262.    The FFRF office has received countless complaints over the years by members, and members of the public, critical of the National Day of Prayer, at the federal, state, or local level.  (Ex. 1 at 47).

Response:  Not disputed for purposes of summary judgment.

263.    FFRF has had several major campaigns to encourage public officials to balance NDP Proclamations and religious Proclamations with secular Proclamations.  They are identified at FFRF's website:  http://ffrf.org/timely/Proclamations.  (Ex. 1 at 48).

Response:  Not disputed for purposes of summary judgment.

264.    To balance or respond to the National Day of Prayer and its related spawns, FFRF and its members have asked governors, mayors and county executives to issue "Celebrate State/Church Separation Month,"   "Freethought Week," and Give Thanks for State/Church Separation Week."  (Ex. 1 at 48).

Response:  Not disputed for purposes of summary judgment.

265.    FFRF has also suggested a "National Day of Reason" for the first Thursday in May (2005 news release).  (Ex. 1 at 48).

Response:  Not disputed for purposes of summary judgment.

266.    FFRF, in the late 1980s, also sent letters to all mayors of cities of 30,000 or more, asking them not to issue religious Proclamations and suggesting secular alternatives.  (Ex. 1 at 48).

Response:  Not disputed for purposes of summary judgment.

267.     In 2005, the Freedom from Religion Foundation wrote to each of the State governors complaining about the public observance of the National Day of Prayer and requesting issuance of secular Proclamations.  (Ex. 98).

Response:  Not disputed for purposes of summary judgment.

268.     FFRF has been actively involved in opposing the establishment of religion by government, including long opposition to the National Day of Prayer.  (Exs. 98-114).

Response:  Not disputed for purposes of summary judgment.

269.     In 2008, FFRF vigorously opposed an NDP Prayer Breakfast hosted by the Sheriff of Burnett County in Wisconsin, to which observance the Sheriff invited participants on his official letterhead.  (Ex. 103).

Response:  Not disputed for purposes of summary judgment.

270.     The Burnett County NDP observance featured newly elected Wisconsin Supreme Court Justice Michael Gableman, who espoused a creationist philosophy and the need for public prayer.  (Ex. 103 at 3-4).

Response:  Not disputed for purposes of summary judgment.

271.     Media coverage of local governmental observances of the National Day of Prayer has become pervasive and they have been opposed by FFRF.  (Exs. 103-105).

Response:  Mrs. Dobson disputes as the term "pervasive" is vague.  Mrs. Dobson does not dispute that the media does cover National Day of Prayer observances, and that the coverage has been opposed by FFRF.

272.     The exposure to, awareness of, and reactions of FFRF members to the National Day of Prayer are reported in many of their survey comments.  (Ex. 126).

<u>Response</u>:  Not disputed for purposes of summary judgment subject to the clarification that the survey was sent to FFRF members to establish standing for this lawsuit.  Dobson Ex. C at 106:3-108:5 (Gaylor Dep.).

273.    The Freedom From Religion Foundation is an educational group working for the separation of church and state; its purposes are to promote the constitutional principle of separation of church and state and to educate the public on matters of nontheism.  (Ex. 112 at 3) (Ex. 122).

<u>Response</u>:  Not disputed for purposes of summary judgment.

274.  FFRF tries to fulfill its purpose by acting on violations of separation of church and state on behalf of members and the public, including by filing successful lawsuits that have ended a variety of First Amendment violations.  (Ex. 113 at 1) (Ex. 122).

<u>Response</u>:  Not disputed for purposes of summary judgment that one of FFRF's functions is to file lawsuits to correct what the organization perceives to be violations of the Establishment Clause.  In fact, Annie Laurie Gaylor agrees that this lawsuit serves the educational function of the foundation: "I think there's no question.  Because a lot of people didn't know that – I mean, we were letting them know that this is a relatively new violation and dating only to 1952." Dobson Ex. C at 48:2-10 (Gaylor Dep.).

275.    FFRF also publishes the only freethought newspaper in the United States, Free Thought Today; sponsors annual high school and college Free Thought essay competitions with cash awards; conducts annual national conventions; promotes freedom from religion with educational products, bumper stickers, literature, etc.; publishes useful free thought books; provides speakers for events in debates; and has established a free thought book collection at the University of Wisconsin Memorial Library.  (Ex. 113 at 1 and Ex. 122).

Response:  Not disputed for purposes of summary judgment.

276.    FFRF's challenge to the National Day of Prayer in this court action is merely referenced as one of many activities of the Foundation in its 2008 Year in Review.  (Ex. 114).

Response:   Not disputed for purposes of summary judgment that this court action is referenced in FFRF's 2008 Year in Review.

277.    FFRF's opposition to the National Day of Prayer via the pending litigation does not represent the Foundation's first public opposition, which has been a constant in FFRF actions; FFRF has publicly expressed its objection to the National Day of Prayer for many years. (Ex. 103-111).

Response:  Not disputed for purposes of summary judgment, subject to the clarification that one of FFRF's functions is to file lawsuits to correct what the organization perceives to be violations of the Establishment Clause.  Dobson Ex. C at 48:2-10 (Gaylor Dep.).

278.    FFRF recently surveyed its members regarding their exposure to and reaction to the National Day of Prayer.  (Ex. 124)**.**

Response:  Not disputed for purposes of summary judgment subject to the clarification that the survey was conducted to establish standing for the current lawsuit.  Dobson Ex. C at 106:3-108:5 (Gaylor Dep.).  Annie Laurie Gaylor stated that the survey was created to "show the Court that this is a big issue to [FFRF's] members, that they really feel distressed."  *Id*. at 106:10-12.

279.    Nearly 1,500 respondents indicated they were exposed to media coverage of local or National Day of Prayer events and nearly 600 respondents reported exposure via participation by local or state officials in National Day of Prayer events.  (Ex. 125).

Response:  Not disputed for purposes of summary judgment subject to the clarification that FFRF has 14,000 members, meaning that less than a quarter of the people who were sent the survey responded to it.  Dobson Ex. C at 103:7-13 (Gaylor Dep.).  Moreover, the survey does not show that they were exposed to Presidential NDP Proclamations in a direct and unwelcome manner.  *Id.* at 109:23-110:8.

280.  Over 1,500 respondents also reported that the message conveyed by National Day of Prayer Proclamations constitutes religious endorsement and that as non-believers they are outsiders.  (Ex. 125).

Response:  Not disputed for purposes of summary judgment subject to the clarification that FFRF has 14,000 members, meaning that less than a quarter of the people who were sent the survey responded to it.  Dobson Ex. C at 103:7-13 (Gaylor Dep.).  Moreover, the survey does not show that they were exposed to Presidential NDP Proclamations in a direct and unwelcome manner.  *Id.* at 109:23-110:8.

281.    The exposure to, awareness of, and reactions of FFRF members to the National Day of Prayer are reported in many of their survey comments.  (Ex. 126).

Response:  Not disputed for purposes of summary judgment subject to the clarification that FFRF has 14,000 members, meaning that less than a quarter of the people who were sent the survey responded to it.  Dobson Ex. C at 103:7-13 (Gaylor Dep.).  Moreover, the survey does not show that they were exposed to Presidential NDP Proclamations in a direct and unwelcome manner.  *Id.* at 109:23-110:8.

282.    FFRF raises national awareness of the need to keep state and church separate, including by generating "significant publicity through its legal and educational challenges, free thought activities and the accomplishments of individual members."  (Ex. 112 at 5).

Response:  Not disputed for purposes of summary judgment.

283.    Rep. J. Randy Forbs, R-VA, head of the Congressional Prayer Caucus, describes the National Day of Prayer as a "monumental religious event."  (Ex. 127 at 2).

Response:  Immaterial.  Not disputed for purposes of summary judgment.

284.    FFRF members, including the individual plaintiffs, and also other members, are exposed to, and have opposed, the National Day of Prayer activities, including Linda Allewalt, in Kentucky.  (Allewalt Declaration).  Ms. Allewalt specifically has objected to Kentucky Governor Beshear's Proclamations which offend her and make her feel like an outsider as a result of her non-belief.  (Allewalt Declaration).

Response:  Immaterial.  Not disputed for purposes of summary judgment subject to the clarification that Ms. Allewalt did not demonstrate that she was exposed to Presidential NDP Proclamations in a direct and unwelcome manner.

Dated: January 21, 2010

Respectfully submitted,

                                        /s/Joel Oster____

Alan E. Sears, Esq.                     Joel Oster, KS Bar 18547
Benjamin W. Bull, Esq.                  Kevin Theriot, KS Bar 21565
ALLIANCE DEFENSE FUND                   ALLIANCE DEFENSE FUND
15100 N. 90th Street                    15192 Rosewood
Scottsdale, Arizona                     Leawood, KS 66224
Tel:  480-444-0020                      Tel: (913) 685-8000
Fax: 480-444-0025                       Fax: (913) 685-8001
joster@telladf.org

COUNSEL FOR DEFENDANT SHIRLEY DOBSON

**CERTIFICATE OF SERVICE**

I hereby certify that on January 21, 2010, I electronically filed a copy of the above using

the ECF System for the Western District of Wisconsin, which will send notification of that filing

to all counsel in this litigation who have entered an appearance, including counsel for plaintiffs.

<u>/s/Joel Oster</u>
Joel Oster