**UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF WISCONSIN**

_____

|  |  |  |
|---|---|---|
| FREEDOM FROM RELIGION FOUNDATION, INC., ANNE NICOL GAYLOR, ANNIE LAURIE GAYLOR, PAUL GAYLOR, DAN BARKER, PHYLLIS ROSE, and JILL DEAN, | ) ) ) ) ) ) ) | |
| Plaintiffs, | ) ) ) | |
| v. | ) ) | Case No. 08-CV-588 |
| PRESIDENT BARACK OBAMA, WHITE HOUSE PRESS SECRETARY ROBERT L. GIBBS, WISCONSIN GOVERNOR JIM DOYLE, and SHIRLEY DOBSON, CHAIRMAN OF THE NATIONAL DAY OF PRAYER TASK FORCE, | ) ) ) ) ) ) ) | |
| Defendants. | ) ) | |

_____

**REPLY IN SUPPORT OF**
**THE FEDERAL DEFENDANTS'**
**MOTION FOR SUMMARY JUDGMENT**

TONY WEST
Assistant Attorney General

JOHN R. GRIFFITHS
Assistant Branch Director

BRAD P. ROSENBERG
Trial Attorney

COUNSEL FOR DEFENDANTS
PRESIDENT BARACK OBAMA AND
WHITE HOUSE PRESS SECRETARY
ROBERT L. GIBBS

## TABLE OF CONTENTS

TABLE OF AUTHORITIES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

INTRODUCTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

I.     PLAINTIFFS LACK STANDING. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

       A.     The Individual Plaintiffs Have Not Demonstrated Injury. . . . . . . . . . . . . . . . . . 3

              1.     The Individual Plaintiffs Have Failed To Demonstrate That
                     They Have Been Exposed To Presidential National Day Of Prayer
                     Proclamations In A Direct And Unwelcome Manner. . . . . . . . . . . . . . . . 3

                     a.     Plaintiffs Affirmatively Sought-Out Presidential
                            National Day Of Prayer Proclamations
                            Because They Are Offended By Them. . . . . . . . . . . . . . . . . . . . . 3

                     b.     Plaintiffs' Opposition To NDP Task Force-Sponsored
                            Events Does Not Confer Standing To Challenge
                            The National Day Of Prayer Statute. . . . . . . . . . . . . . . . . . . . . 6

              2.     Plaintiffs' Case Constitutes A Generalized Grievance
                     That Is Inappropriate For Resolution By This Court. . . . . . . . . . . . . . . . 9

       B.     "Viewpoint Discrimination" Does Not Provide
              A Basis For Standing In This Case. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

       C.     FFRF Has Not Been Injured. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

II.    PLAINTIFFS HAVE CONCEDED THE FORMS OF RELIEF THAT CREATE MOST
       OF THE JUSTICIABILITY CONCERNS RAISED IN THIS CASE. . . . . . . . . . . . . . . 20

III.   THE NATIONAL DAY OF PRAYER STATUTE IS CONSTITUTIONAL. . . . . . . . . . 24

       A.     The Supreme Court And Seventh Circuit Have Described
              The National Day Of Prayer In Favorable Terms. . . . . . . . . . . . . . . . . . . . . . . 24

       B.     President Obama's 2009 Proclamation Demonstrates That
              The National Day Of Prayer Statute Is Constitutional. . . . . . . . . . . . . . . . . . . 27

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

i

# TABLE OF AUTHORITIES

**CASES:**

Am. Legal Found. v. FCC, 808 F.2d 84 (D.C. Cir. 1987). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

Bd. of Educ. of Westside Com. Sch. v. Mergens, 496 U.S. 226 (1990). . . . . . . . . . . . . . . . . . . 33

Books v. City of Elkhart, 235 F.3d 292 (7th Cir. 2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 25

Buono v. Norton, 212 F. Supp. 2d 1202 (C.D. Cal. 2002). . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 11

Caldwell v. Caldwell, 545 F.3d 1126 (9th Cir. 2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 8

Chicago v. Matchmaker Real Estate Sales Ctr., 982 F.2d 1086 (7th Cir. 1992). . . . . . . . . . . . . 17

Citizens United v. FEC, No. 08-205, 2010 WL 183856 (U.S. Jan. 21, 2010). . . . . . . . . . . . . . 10

County of Allegheny v. ACLU, 492 U.S. 573 (1989). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25, 29

Crawford v. Marion County Election Bd., 472 F.3d 949 (7th Cir. 2007). . . . . . . . . . . . . . . . . . 17

DeBoer v. Village of Oak Park, 267 F.3d 558 (7th Cir. 2001). . . . . . . . . . . . . . . . . . . . . . . . 25, 30

Deveraux v. City of Chicago, 14 F.3d 328 (7th Cir. 1994). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

Fair Employment Council of Greater Washington v. BMC Marketing Corp.,
        28 F.3d 1268 (D.C. Cir. 1994). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18, 19

Fairhousing Council of Suburban Philadelphia v. Montgomery Newspapers,
        141 F.3d 71 (3d Cir. 1998). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

Florida State Conference of the NAACP v. Browning, 522 F.3d 1153 (11th Cir. 2008). . . . . . . 18

Franklin v. Massachusetts, 505 U.S. 788 (1992). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23, 24

Freedom From Religion Found. v. Webb, 93-CV-6056
        (District Court, City and County of Denver, Co., 1993). . . . . . . . . . . . . . . . . . . . . . . . . 30

Havens Realty Corp. v. Coleman, 455 U.S. 363 (1982). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 17

Jaffree v. Wallace, 705 F.2d 1526 (11th Cir. 1983). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

Jager v. Douglas County Sch. Dist., 862 F.2d 824 (11th Cir. 1989). . . . . . . . . . . . . . . . . . . . . . 30

Lee v. Weisman, 505 U.S. 577 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

Legal Svcs. Corp. v. Velazquez, 531 U.S. 533 (2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

Lujan v. Defenders of Wildlife, 504 U.S. 555 (1992) . . . . . . . . . . . . . . . . . . . . . . . . 6, 7, 8, 9, 10

Lynch v. Donnelly, 465 U.S. 668 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

Marsh v. Chambers, 463 U.S. 783 (1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

McConnell v. FEC, 540 U.S. 93 (2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

McCreary County v. ACLU of Kentucky, 545 U.S. 844 (2005) . . . . . . . . . . . . . . . . . . . . . 27, 32

Mississippi v. Johnson, 71 U.S. 475 (1866) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

Nat'l Taxpayers Union v. United States, 68 F.3d 1428 (D.C. Cir. 1995) . . . . . . . . . . . . . . . . . 16

Nat'l Treas. Employees Union v. United States, 101 F.3d 1423 (D.C. Cir. 1996) . . . . . . . . . . . 16

Newdow v. Bush, 391 F. Supp. 2d 95 (D.D.C. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

North Carolina Civil Liberties Union v. Constangy, 947 F.2d 1145 (4th Cir. 1991) . . . . . . . . . 30

North Shore Gas Co. v. Salomon, 152 F.3d 642 (7th Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . 22

Panama Refining Co. v. Ryan, 293 U.S. 388 (1935) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

Pennsylvania v. New Jersey, 426 U.S. 660 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

Planned Parenthood of South Carolina Inc. v. Rose, 361 F.3d 786 (4th Cir. 2004) . . . . . . . 13, 14

Plotkin v. Ryan, 239 F.3d 882 (7th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

Police Dep't of the City of Chicago v. Mosley, 408 U.S. 92 (1972) . . . . . . . . . . . . . . . . . . . 12, 13

Rosenberger v. Rector & Visitors of the Univ. of Va., 515 U.S. 819 (1995) . . . . . . . . . . . . 12, 13

Rostker v. Goldberg, 453 U.S. 57 (1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

Schlessinger v. Reservists Cmtee. to Stop the War, 418 U.S. 208 (1974) . . . . . . . . . . . . . . . . . 9

Seminole Tribe v. Florida, 517 U.S. 44 (1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

Simon v. E. Ky. Welfare Rights Org., 426 U.S. 26 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 8

Summers v. Adams, No. 3:08cv2265, 2008 WL 5401537 (D.S.C. Dec. 23, 2008). . . . . . . . . . . 15

United States v. Salerno, 481 U.S. 739 (1987). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

Valley Forge Christian Coll. v. Ams. United for Separation of Church and State,
 454 U.S. 464 (1982).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 8, 9, 10, 11

Van Orden v. Perry, 545 U.S. 677 (2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26, 27, 30

Van Zandt v. Thompson, 839 F.2d 1215 (7th Cir. 1988). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

Village of Bellwood v. Dwivedi, 895 F.2d 1521 (7th Cir. 1990). . . . . . . . . . . . . . . . . . . 16, 17, 19

Wallace v. Jaffree, 472 U.S. 79 (1985). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

Warth v. Seldin, 422 U.S. 490 (1975). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

Wash. State Grange v. Wash. State Republican Party, 128 S. Ct. 1184 (2008). . . . . . . . . . . . . 28

Youngstown Sheet & Tube Co. v. Sawyer, 343 U.S. 579 (1952). . . . . . . . . . . . . . . . . . . . . . . . 23

**STATUTES AND REGULATORY MATERIALS:**

36 U.S.C. § 119. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 14, 29

74 Fed. Reg. 52,383 (Oct. 13, 2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

## <u>INTRODUCTION</u>

There is no dispute that plaintiffs are vehemently opposed to the National Day of Prayer. For years, plaintiffs have picketed and protested local National Day of Prayer events, written newsletter articles in opposition to the National Day of Prayer, subscribed to Focus on the Family mailing lists to learn as much as they can about the National Day of Prayer, and scoured White House and National Day of Prayer Taskforce ("NDP Task Force") websites in order to dissect the language used in presidential National Day of Prayer proclamations.

These facts are all clear and uncontroverted.  They also represent plaintiffs' undoing.  For as much as plaintiffs may oppose the National Day of Prayer and object to the government speech contained in presidential proclamations, plaintiffs cannot show that they have been exposed to those proclamations in a direct and unwelcome manner.  Unfortunately for plaintiffs, that is the test for standing under the Establishment Clause; trying very hard to expose yourself to what you perceive to be unconstitutional conduct when there otherwise would be none simply does not count.  Plaintiffs also present a novel "viewpoint discrimination" argument in an attempt to demonstrate standing, but that argument is squarely foreclosed by the fact that the viewpoint being expressed in presidential proclamations is that of the government.

Nor does FFRF have standing:  Like the individual plaintiffs, FFRF as an institution has long opposed the National Day of Prayer.  And like the individual plaintiffs, FFRF attempts to turn that vehement opposition into some sort of "injury."  But in so doing, FFRF turns the law of standing on its head, advancing an argument that, if accepted by the courts, would allow any advocacy organization anywhere to challenge any government program to which the organization is opposed.

Plaintiffs fare no better on the merits.  Plaintiffs argue that Establishment Clause cases need to be reviewed in context, but then ignore all of the context surrounding President Obama's 2009 National Day of Prayer proclamation.  To that end, plaintiffs give short shrift to the facts that President Obama's proclamation placed the role of prayer in our Nation's history into historical context, explicitly acknowledged the freedom of individuals to not worship, and did not incorporate the NDP Task Force's proposed theme.  Plaintiffs similarly downplay much of the favorable legal authority—including substantial Seventh Circuit authority—discussing the National Day of Prayer.  That authority, as well as the express language of the National Day of Prayer statute and the context of President Obama's proclamation, makes clear that the National Day of Prayer is constitutional.

For these reasons, and as set forth in greater detail below, this Court should grant judgment to the federal defendants and find that plaintiffs lack standing to challenge the constitutionality of the National Day of Prayer statute and presidential proclamations issued thereunder.  In the alternative, and should it reach the merits of plaintiffs' claim, this Court should hold that the National Day of Prayer statute is constitutional.

2

<u>ARGUMENT</u>

I.     **PLAINTIFFS LACK STANDING.**

      A.     **The Individual Plaintiffs Have Not Demonstrated Injury.**

            1.     **The Individual Plaintiffs Have Failed To Demonstrate That They Have Been Exposed To Presidential National Day Of Prayer Proclamations In A Direct And Unwelcome Manner.**

                  a.     **Plaintiffs Affirmatively Sought-Out Presidential National Day Of Prayer Proclamations Because They Are Offended By Them.**

Plaintiffs and the federal defendants are seemingly in agreement regarding the standard to be applied for whether plaintiffs have standing to challenge the National Day of Prayer statute. Both parties agree that, in order to demonstrate standing, plaintiffs must have "unwelcome exposure to objectionable speech."  Plaintiffs' Brief In Support Of Judgment In Their Favor (Dkt. No. 103, 12/10/2009) ("Opp.") at 15.[1]  Where the parties part ways is in defining the type of conduct to which plaintiffs have been "exposed."

Plaintiffs' lawsuit challenges the constitutionality of the National Day of Prayer statute, 36 U.S.C. § 119.  That statute requires the President to issue a National Day of Prayer proclamation—and nothing more.  And pursuant to that statute, Presidents have issued such proclamations, which constitute the "[g]overnment speech" about which plaintiffs complain.  <u>See</u> Opp. at 14, 15; <u>see also</u> <u>id.</u> at 15 (noting that "courts have upheld standing for persons having

---

[1] Plaintiffs make a passing reference to <u>Books v. City of Elkhart</u> to infer that merely knowing of the existence of an unconstitutional religious display is enough to confer standing. <u>See</u> Opp. at 21 (citing <u>Books</u>, 235 F.3d 292, 297 (7th Cir. 2000)).  The case says nothing of the kind, but instead focuses on whether a plaintiff needs to assume a special burden—such as changing a routine in order to avoid a religious display—in order to demonstrate standing. <u>Books</u>, 235 F.3d at 300-01.  The court held that no such showing was necessary.  <u>See</u> <u>id.</u> at 301. Significantly, it was undisputed that the plaintiffs in that case came into direct and unwelcome contact with the religious display at issue, thus conferring standing.  <u>See</u> <u>id.</u> at 298-301.

unwelcome exposure to objectionable speech."). On this point, it is undisputed that plaintiffs

were not exposed in a direct and unwelcome manner to the "speech" contained in those

proclamations. To the contrary, Annie Laurie Gaylor waited with baited breath for those

proclamations to be issued:

> Q: Now, you first became aware of the specific language in President
> Obama's proclamation because you retrieved it from -- because you retrieved it
> from the White House's website?
>
> A: Yes. I did retrieve it. I was waiting for it, of course. We were very –
> of course we needed to see what he was going to be saying because we were suing
> him for it. So naturally we needed to see it.

Nov. 24, 2009 Deposition of Annie Laurie Gaylor ("Gaylor Tr.") (Ex. K) 94:14-94:21. In fact, it

is <u>because</u> plaintiffs are offended by the National Day of Prayer that they seek-out presidential

proclamations:

> Q: Is it because you're offended by the National Day of Prayer
> proclamations that you go to the White House's website to retrieve them?
>
> A: I want to know what the president is doing, yes, that is unconstitutional.
> That's what the foundation does.

Gaylor Tr. 122:11-16; <u>see also</u> Plaintiffs' Responses to Defendants President Barack Obama and

Robert L. Gibbs First Set of Interrogatories ("Interrogatory Answers") (Ex. E) No. 5, at 8 (Annie

Laurie Gaylor actively "<u>monitored</u> both the White House website and the National Day of Prayer

Taskforce in advance of the 2009 proclamation.") (emphasis added); <u>see generally</u> Interrogatory

Answers Nos. 4, 5 (describing how named plaintiffs went out of their way to obtain presidential

National Day of Prayer proclamations).

 Rather than fight a standard that the plaintiffs know they cannot meet, they instead

attempt to change the subject by referring to their knowledge of the <u>general existence</u> of the

National Day of Prayer. That is not enough. As plaintiffs themselves put it, they merely "know

4

of and hear about" presidential National Day of Prayer proclamations.  Opp. at 18.  But "know[ing] of and hear[ing] about" a proclamation is not the same as actually "knowing and hearing" it, since the latter is necessary in order to be exposed to the governmental "speech" to which plaintiffs object.  In that regard, nothing has changed since plaintiffs first filed their Complaint in this case: Armed with generalized knowledge (and a strong dislike) of the National Day of Prayer, plaintiffs "monitored" the White House and NDP Task Force websites to search for what they perceived to be Establishment Clause violations.  That places this case on all fours with Valley Force Christian College v. Americans United for Separation of Church and State, where plaintiffs similarly learned of the existence of what they perceived to be an Establishment Clause violation through a news release.  454 U.S. 464 (1982).  Just as in Valley Forge, plaintiffs here have "roam[ed] the country"—or, in this case, roamed the internet, including White House and NDP Task Force webpages—"in search of governmental wrongdoing and to reveal their discoveries in federal court."  Valley Forge, 454 U.S. at 487; see also Caldwell v. Caldwell, 545 F.3d 1126, 1128 (9th Cir. 2008) (plaintiff who asserted "an interest in being informed about how teachers teach the theory of evolution" lacked "standing to pursue an Establishment Clause claim arising out of her offense at the discussion of religious views" on a website that received governmental funding), cert. denied, 129 S. Ct. 1617 (2009).[2]

---

[2] Plaintiffs assert that "[t]he defendants' argument suggests that these individual plaintiffs are obligated to forego being informed, as by reading the newspaper, watching C-SPAN, or browsing government websites on the first Thursday of every May."  Opp. at 8.  But the federal defendants do not dispute the plaintiffs' generalized knowledge of the existence of the National Day of Prayer.  Because plaintiffs take issue with "government speech," the specific question is how plaintiffs obtained the President's National Day of Prayer proclamation.  They did not inadvertently stumble across the proclamation while surfing the web.  Instead, they affirmatively sought it out.

**b.      Plaintiffs' Opposition To NDP Task Force-Sponsored Events Does Not Confer Standing To Challenge The National Day Of Prayer Statute.**

Plaintiffs' opposition to the National Day of Prayer is based, in large part, on the many local celebrations that occur on that day.  According to plaintiffs, they cannot "avoid the National Day of Prayer bedlam."  Opp. at 16.  However, that "bedlam," which plaintiffs describe as efforts by the NDP Task Force to "mobilize Christian-centered events, rallies, statements and activities at all 50 capitols and government buildings, as well as private churches, across the land," Opp. at 4, has nothing whatsoever to do with presidential proclamations.  Instead, and as plaintiffs themselves describe it, those efforts reflect the activities of a private organization (which is also a separate defendant in this lawsuit) as well as private individuals who are expressing their First Amendment rights.  See Opp. at 4.

Plaintiffs attempt to use these local celebrations as a proxy to demonstrate that they have suffered injury at the hands of the National Day of Prayer statute.  This they cannot do.  Holding that plaintiffs have standing to challenge the National Day of Prayer statute because private individuals choose to exercise their First Amendment freedoms would be akin to holding that a plaintiff has standing to challenge the federal Christmas holiday because the Catholic Church encourages its members to attend a Midnight Mass on Christmas Eve.  In other words, plaintiffs must demonstrate that their injury is caused by the statute itself, and not the intervening acts of third parties such as the NDP Task Force.  See Lujan v. Defenders of Wildlife, 504 U.S. 555, 560 (1992). ("there must be a causal connection between the injury and the conduct complained of—the injury has to be 'fairly . . . trace[able] to the challenged action of the defendant, and not

6

. . . th[e] result [of] the independent action fo some third party not before the court.'") (quoting Simon v. E. Ky. Welfare Rights Org., 426 U.S. 26, 41-42 (1976)).[3]

Moreover, the "bedlam" of which plaintiffs complain was not caused by President Obama's 2009 proclamation.  The record reflects that many of the local events that plaintiffs oppose took place before President Obama issued that proclamation and, hence, before May 7, 2009 was even proclaimed by the President to be a National Day of Prayer.[4]  For example, plaintiffs take issue with a prayer event that was held at the Cannon House Office Building from 9 a.m. to 12 p.m. on May 7, 2009.  See Opp. at 73; Nov. 10, 2009 Deposition of Shirley Dobson ("Dobson Tr.") (Ex. L) 155:25-156:19 & Dobson Dep. Exs. 17, 18 (Exs. M & N).  The President's proclamation, however, did not appear on the White House website until later that afternoon.  Dobson Tr. 174:15-25.  Accordingly, President Obama's proclamation was not used at all during the Cannon House Office Building ceremony, by the NDP Task Force's coordinators, or by "anyone else."  Dobson Tr. 175:1-6.  That is fatal to plaintiffs' effort to demonstrate standing, because they cannot show that a critical element of their so-called "injury"—being aware of the existence of various National Day of Prayer-related activities—was caused by the President's National Day of Prayer proclamation.  See Lujan, 504 U.S. at 560; Simon, 426 U.S. at 41-42.  Moreover, the fact that the NDP Task Force may still coordinate prayer events on the first Thursday of May, even if this Court were to hold the National Day of

_____

[3] Here, of course, plaintiffs have named such a third party as a defendant; namely, the NDP Task Force.  However, the governing principle is the same to the extent plaintiffs seek relief against the federal defendants regarding the constitutionality of the National Day of Prayer statute.

[4] In this regard, the National Day of Prayer statute is not "self-executing," but instead directs the President to take the affirmative step of proclaiming a day of prayer.  Until the President does so, the day is not so-proclaimed.

Prayer statute is unconstitutional, indicates that plaintiffs have failed to meet their burden of demonstrating that their "injury" arising from the "bedlam"—whatever it is—can be redressed by this Court.  That, too, is fatal to plaintiffs' standing arguments.  See Lujan, 504 U.S. at 561 ("it must be 'likely,' as opposed to merely 'speculative,' that the injury will be 'redressed by a favorable decision'") (quoting Simon, 426 U.S. at 38, 43).

All that plaintiffs offer in response is to assert that the 1988 amendment to the statute that made the National Day of Prayer predictable (by requiring the President to designate the first Thursday in May as a National Day of Prayer) has made it easier for organizations like the NDP Task Force to coordinate their efforts.  But that is not the point.  The ability of the NDP Task Force to coordinate various events says nothing about whether plaintiffs have been injured by the National Day of Prayer statute, which merely requires the President to proclaim a day of prayer; it says nothing about local events.  And in any event, just as plaintiffs have affirmatively sought-out presidential National Day of Prayer proclamations in order to be offended by them, they have also attended these local events in order to monitor and picket them.  See Interrogatory Answers No. 9, at 41-42 ("FFRF members have attended NDP or related prayer breakfast events to monitor them . . . [and] have sometimes picketed events held on courthouse steps or municipal buildings") (emphasis added); see also id. No. 4, at 6 (plaintiff Gaylor "has been on a 'Focus on the Family' mailing list since sometime in the late 1980s or early 1990s").  Just as with plaintiffs' retrieval of presidential proclamations, this type of self-inflicted "injury" does not confer Article III standing.  See Valley Forge, 454 U.S. at 486-87; Caldwell, 545 F.3d at 1131-33.

8

## 2. Plaintiffs' Case Constitutes A Generalized Grievance That Is Inappropriate For Resolution By This Court.

Plaintiffs bemoan as "counterintuitive" the federal defendants' argument that the "national audience" for a National Day of Prayer proclamation makes such proclamations "immune to challenge."  Opp. at 5; see also id. at 14.  But it is precisely the "national" nature of those proclamations that makes judicial review inappropriate.  The Supreme Court has consistently held that a "generalized grievance" is insufficient to support Article III standing. See Lujan, 504 U.S. at 560 (citations omitted); see also id. at 573 (a plaintiff who seeks relief that "no more directly and tangibly benefits him than it does the public at large – does not state an Article III case or controversy"); Warth v. Seldin, 422 U.S. 490, 499 (1975) ("when the asserted harm is a 'generalized grievance' shared in substantially equal measure by all or a large class of citizens, that harm alone normally does not warrant exercise of jurisdiction"); Schlesinger v. Reservists Committee to Stop the War, 418 U.S. 208, 220 (1974) ("standing to sue may not be predicated upon an interest of the kind . . . which is held in common by all members of the public").  Standing may not be predicated on an interest that is held by the public at large "because of the necessarily abstract nature of the injury all citizens share."  Schlesinger, 418 U.S. at 220-21.  The requirement of particularized harm thus helps ensure that the federal courts are not transformed into councils that virtually anyone can invoke "to require that the Government be administered according to law . . . ."  Valley Forge, 454 U.S. at 482-83 (citations omitted).

Both Valley Forge and Lujan are particularly relevant here.  As discussed in Part I.A.1.a, supra, the plaintiffs in Valley Forge learned about a transfer of federal property to a religious organization through a news release.  See 454 U.S. at 486-87.  The Supreme Court held that the plaintiffs' alleged harm was too generalized, and that to rule otherwise would allow citizens "to

roam the country in search of governmental wrongdoing and to reveal their discoveries in federal court." Id. at 487.  And in Lujan, a case involving a challenge to a rule promulgated pursuant to the Endangered Species Act that limited application of that Act to the United States and the high seas, the Court held that "[i]t goes beyond the limit . . . to say that anyone who observes or works with an endangered species, anywhere in the world, is appreciably harmed by a single project affecting some portion of that species with which he has no more specific connection."  504 U.S. at 567.  As the Court went on to explain, "[i]t cannot be that a person with an interest in an animal automatically has standing to enjoin federal threats to that species of animal, anywhere in the world."  Id.

To hold that plaintiffs' media access to National Day of Prayer proclamations provides Article III injury would expand the doctrine of standing in precisely the way Valley Forge and Lujan forbids, by allowing plaintiffs to bring a federal court action challenging anything they choose to view on television, the internet, or any other mass media source.  That kind of standing regime would open the door for any citizen with a strongly held view of the law to file suit in federal court "to require that the Government be administered according to law . . ." Valley Forge, 454 U.S. at 482-83 (citations omitted), an idea the Supreme Court has consistently rejected.[5]

_____

[5] Plaintiffs never come to grips with the federal defendants' argument that their view of the law of standing would allow them to create their own standing.  See Memorandum of Law in Support of the Federal Defendants' Motion for Summary Judgment (Dkt. No. 83, 10/09/2009) ("Fed. Def. Mem.") at 15 (citing Pennsylvania v. New Jersey, 426 U.S. 660, 664 (1976) (per curiam) (holding that "self-inflicted" injuries do not establish Article III standing); McConnell v. FEC, 540 U.S. 93, 228 (2003) (plaintiffs lacked standing to challenge election financing law based on their alleged inability to compete effectively in elections because that alleged inability "stems not from the operation [of the law,] but from their own personal 'wish' not to solicit or accept large contributions"), overruled in part on other grounds by Citizens United v. FEC, No. 08-205, 2010 WL 183856 (U.S. Jan. 21, 2010).  And while plaintiffs do cite Buono v. Norton,

Moreover, plaintiffs are not without redress regarding the National Day of Prayer; they have time and again proven themselves capable of challenging what they perceive to be Establishment Clause violations at the local level when they have actually been injured by those violations.  Indeed, the impetus for this entire lawsuit was plaintiffs' offense at a prayer breakfast held by the Burnett County Sheriff.  See Amended Complaint (Dkt. No. 38, 02/10/2009) ("Am. Compl.") ¶¶ 50-56; Gaylor Tr. 36:16-37:7.  Yet rather than sue the Burnett County Sheriff over that prayer breakfast, plaintiffs have chosen to sue the President of the United States in order to strike down a federal statute—"the gravest and most delicate duty [a court] is called upon to perform."  Rostker v. Goldberg, 453 U.S. 57, 64 (1981) (citation and quotation marks omitted).  That is a shortcut plaintiffs cannot take:  Just as plaintiffs cannot sue to strike down the entire federal Christmas holiday because they are offended by a local Christmas display, so, too, are they precluded from suing to strike down a federal statute due to their offense at some local prayer-day celebrations.  And while plaintiffs proclaim that this lawsuit provides the only method to "get at the root of the problem," Gaylor Tr. 72:23, the fact that there are more narrowly-targeted remedies—for example, individual lawsuits to challenge any allegedly unconstitutional celebrations of the National Day of Prayer at the local level—demonstrates why plaintiffs lack

---

see Opp. at 21, they ignore the court's admonition that a plaintiff's intention to visit a display of a cross in a national park "regularly 'because he finds the presence of the cross . . . offensive' may not establish injury in fact."  Buono v. Norton, 212 F. Supp. 2d 1202, 1212 (C.D. Cal. 2002) (citing Valley Forge, 454 U.S. at 487)), aff'd, 371 F.3d 543 (9th Cir. 2004).  In any event, in that case "each [p]laintiff came into a direct and unwelcome contact with the cross."  Buono, 212 F. Supp. 2d at 1211.  The relevant issue in Buono, therefore, is not whether plaintiffs are required to "avoid[ ] the harm," Opp. at 21, but instead whether plaintiffs have standing if they affirmatively seek-out that harm.

11

standing here.[6]

B.   **"Viewpoint Discrimination" Does Not Provide A Basis For Standing In This Case.**

Plaintiffs assert that the statute establishing a National Day of Prayer "promotes an opposing viewpoint above their own, as to the promotion of prayer and religion."  Opp. at 24. According to Plaintiffs, such discriminatory treatment constitutes a particularized injury under the First Amendment, which may be remedied by invalidating the National Day of Prayer statute. See id.

Plaintiffs, however, characterize presidential National Day of Prayer proclamations as "government speech," Opp. at 11, 14, 15, 22, 60, 72, a concession that undercuts their viewpoint discrimination claim.  As the Supreme Court explained in Rosenberger v. Rector and Visitors of University of Virginia, 515 U.S. 819 (1995), the distinction between government and private speech is dispositive on the issue of viewpoint discrimination.  "[W]hen the State is the speaker, it may make content-based choices."  Id., 515 U.S. at 833.  Plaintiffs' viewpoint discrimination argument is simply inapplicable to the government speech involved in presidential proclamations.

Plaintiffs' argument also misconstrues the "viewpoint discrimination" basis for standing under the First Amendment, which focuses on the prohibition of speech or expression.  In Police Department of the City of Chicago v. Mosley, 408 U.S. 92 (1972), for example, the Supreme Court held that the government may not permit use of a forum by people whose views it finds

---

[6] In another attempt to escape the Establishment Clause jurisprudence that precludes their standing, plaintiffs analogize to "testers" that have been found to have standing in the housing discrimination context.  See Opp. at 21-22.  The cases that plaintiffs cite for this proposition are completely inapposite to the Establishment Clause.

acceptable, but deny access to those with an opposing perspective.  See id. at 96.  In so doing, it

invalidated a Chicago ordinance that differentiated between labor picketing and other types of

peaceful picketing:  "the operative distinction is the message on a picket sign."  Id. at 95.  See

also Legal Services Corp. v. Velazquez, 531 U.S. 533 (2001) (restriction prohibiting recipients of

Legal Services Corporation funds from challenging welfare laws constituted viewpoint

discrimination); Rosenberger, 515 U.S. 819 (university's denial of funding for Christian

newspaper's publication costs was impermissible viewpoint discrimination under the First

Amendment).

 Attempting to evade the requirement of viewpoint prohibition, plaintiffs rely almost

exclusively on Planned Parenthood of South Carolina Inc. v. Rose, 361 F.3d 786, 790 (4th Cir.

2004) (holding that South Carolina's authorization of "Choose Life" license plates violated the

First Amendment).  That decision does note that, where "plaintiffs challenge a law on the ground

that it promotes an opposing political viewpoint above their own, they suffer a cognizable

injury."  Id.  However, plaintiffs do not address the Fourth Circuit's emphasis that the "Choose

Life" license plates resulted in the prohibition of the pro-choice viewpoint.  Central to the court's

analysis was the fact that "a person whose preferred plate is not authorized by the State cannot, as

an alternative, display a privately manufactured license plate that bears the message of her

choice." Id. at 791.  Permitting the expression of the pro-life viewpoint in the particular and

limited "licence plate forum," id. at 790, in other words, "effectively prohibited" plaintiffs' pro-

choice message in that forum, id. at 791.

 Unlike the situation in Rose, plaintiffs in this case are unable to demonstrate that the

National Day of Prayer statute prohibits the expression of their views in a particular forum with

respect to prayer; the only "forum" here is the government speech of presidential proclamations.

And even in that regard, plaintiffs' viewpoint is not precluded.  The statute establishing a National Day of Prayer states that "the people of the United States <u>may</u> turn to God in prayer and meditation at churches, in groups, and as individuals." 36 U.S.C. § 119 (emphasis added).  The statute hardly requires religious practice, nor does it prohibit expressions of non-observance. Plaintiffs may, and indeed have, expressed their views through protests, newspaper articles, internet postings, and even a "Non-Prayer" Breakfast, one of FFRF's "most popular convention innovations."  <u>See</u> Interrogatory Answers No. 6, at 12.   Moreover, the National Day of Prayer, particularly as observed by the Obama Administration, does not solely promote the pro-prayer perspective.  In his 2009 Proclamation, President Obama celebrated the right of individuals to "worship or not worship according to the dictates of their conscience."  Ex. A (2009 Proclamation).  To that end, the Interfaith Alliance, which had urged President Obama to "open the [National Day of Prayer] to believers of all religions, as well as those who profess no religion," later praised him for issuing a proclamation that was "inclusive of all Americans." Gaylor Dep. Ex. 29 (Ex. O) (Letter to President Barack Obama from Interfaith Alliance)[7]; Gaylor Dep. Ex. 34 (Ex. P) (Interfaith Alliance Praises President's NDP Proclamation).

To the extent that plaintiffs base standing on the absence of a countervailing non-religious holiday, their analysis falls flat.  The Fourth Circuit dismissed a similar argument in <u>Rose</u>, finding that plaintiffs' inability to obtain a pro-choice plate was not an injury caused by the enactment of the Choose Life Act, nor would it "be redressed by invalidating the Act." 361 F.3d at 790.  Plaintiffs' request that government officials proclaim a National Day of Reason, then, is immaterial for purposes of establishing an injury-in-fact.  <u>See</u> Opp. at 25.

---

[7] That letter was also signed by representatives of Jews On First.  <u>See</u> Ex. O.

Moreover, plaintiffs' argument would impermissibly broaden standing in Establishment Clause cases, allowing a party to circumvent the "direct and unwelcome contact" requirement for injury-in-fact.  To that end, in <u>Summers v. Adams</u>, No. 3:08cv2265, 2008 WL 5401537 (D.S.C. Dec. 23, 2008), a court found standing to challenge state-authorized "I Believe" license plates only under the standing requirements applicable to the Establishment Clause.  While plaintiffs cited <u>Rose</u> to argue that the legislature was improperly promoting Christianity over other viewpoints, the court characterized their claim as an "Establishment Clause argument, not a Free Speech (viewpoint discrimination) argument."  <u>Id.</u> at *8.

###### C.    FFRF Has Not Been Injured.

FFRF, as an organization, has two purposes: "to promote the constitutional principle of separation of church and state, and to educate the public on matters relating to nontheism."  Ex. B (Welcome to the Freedom From Religion Foundation webpage); <u>see also</u> Ex. C (Freedom From Religion Foundation pamphlet) (similar).  According to Annie Laurie Gaylor, co-chair of FFRF, there is "no question" that FFRF's efforts to combat the National Day of Prayer fit squarely within those two purposes:

> Q: Do you view this lawsuit as fitting within the overall objectives and goals of the organization?

> A: Yes.

> Q: Do you think this lawsuit serves the educational function of the foundation?

> A: I think there's no question.  Because a lot of people didn't know that -- I mean, we were letting them know that this is a relatively new violation and dating only to 1952.

Gaylor Tr. 48:2-10.

Those concessions are fatal to plaintiffs' claim that FFRF has organizational standing to challenge the National Day of Prayer.  Rather than causing specific harm to FFRF, the National Day of Prayer merely represents a "[f]rustration of [FFRF's] objectives" regarding the separation of church and state, which "'is the type of abstract concern that does not impart standing.'"  Nat'l Treas. Employees Union v. United States, 101 F.3d 1423, 1429 (D.C. Cir. 1996) (quoting Nat'l Taxpayers Union, Inc. v. United States, 68 F.3d 1428, 1433 (D.C. Cir. 1995)); see also Havens Realty Corp. v. Coleman, 455 U.S. 363, 379 (1982) (distinguishing injury to an "organization's activities" from a "setback to the organization's abstract social interests").  That is because a showing of injury "requires 'more than allegations of damage to an interest in 'seeing' the law obeyed or a social goal furthered.'"  Nat'l Taxpayers Union, 68 F.3d at 1433 (citing Am. Legal Found. v. FCC, 808 F.2d 84, 91 (D.C. Cir. 1987)).

None of the Seventh Circuit cases cited by plaintiffs changes this analysis.  Plaintiffs cite Village of Bellwood v. Dwivedi to argue that "the only injury necessary to confer standing is allocation of the organization's resources to efforts directed against the wrongful conduct of the defendant."  Opp. at 27 (citing Village of Bellwood v. Dwivedi, 895 F.2d 1521, 1526 (7th Cir. 1990)).  But the court in Village of Bellwood made clear that its analysis was limited to fair-housing agencies.  See Village of Bellwood, 895 F.2d at 1526 ("the only injury which need be shown to confer standing on a fair housing agency is deflection of the agency's time and money from counseling to legal efforts directed against discrimination" (emphasis added)).  That is because "[t]hese are opportunity costs of discrimination, since although the counseling is not impaired directly there would be more of it were it not for the defendant's discrimination."  Id.[8]

---

[8] Havens Realty, on which plaintiffs similarly rely, was also a fair housing case.  See Havens Realty Corp. v. Coleman, 455 U.S. 363 (1982).  That case, however, distinguished an

The same analysis also applies to Chicago v. Matchmaker Real Estate Sales Center, which also involved a fair housing agency.  Id., 982 F.2d 1086, 1095 (7th Cir. 1992) ("[T]he only injury which need be shown to confer standing on a fair-housing agency is deflection of the agency's time and money from counseling to legal efforts directed against discrimination.  . . . This standard is clearly satisfied in this case.  The Leadership Council is a fair-housing agency." (emphasis added) (quoting Village of Bellwood, 895 F.2d at 1526)).[9]  And in Crawford v. Marion County Election Board, a case not involving a fair housing agency, the court found organizational standing only upon a showing of a specific, concrete, and quantifiable injury upon the Democratic Party; namely, a new voter identification law "compell[ed] the party to devote resources to getting to the polls those of its supporters who would otherwise be discouraged by the new law from bothering to vote."  Crawford v. Marion County Election Bd., 472 F.3d 949,

_____

injury to an "organization's activities" from a "setback to the organization's abstract social interests."  Id. at 379.

[9] Plaintiffs also cite a Third Circuit case, Fairhousing Council of Suburban Philadelphia v. Montgomery Newspapers, 141 F.3d 71 (3d Cir. 1998).  That case, like Village of Bellwood and Matchmaker Real Estate Sales Center, involved a fair housing organization that devoted resources to counteract discrimination.  Plaintiffs paraphrase analysis contained in that case to argue that Article III is satisfied whenever a plaintiff organization has to "devote resources to combat the effects of the alleged wrongful action," Opp. at 28, even though the analysis at issue specifically referred to the devotion of resources to "counteract discrimination" as a basis for standing.  Fairhousing Council of Suburban Philadelphia, 141 F.3d at 78 (emphasis added).  Significantly, the court found that plaintiffs had failed to carry their burden of demonstrating standing at summary judgment by not submitting detailed evidence regarding their injury.  See id. at 76.  So too, here:  FFRF has no expenditures relating to the National Day of Prayer that are delineated by specific budgetary line items, see Interrogatory Answers, No. 7, at 39, nor any documents sufficient to disclose expenditures made by FFRf regarding the National Day of Prayer, see Plaintiffs' Responses to Federal Defendants' First Request for Production of Documents (Ex. I) No. 4, at 2.

951 (7th Cir. 2007), aff'd, 128 S. Ct. 1610 (2008).[10]  All these cases make clear that a plaintiff

organization must allege a concrete injury; "ordinary expenditures as part of an organization's

purpose do not constitute the necessary injury-in-fact required for standing."  Plotkin v. Ryan,

239 F.3d 882, 886 (7th Cir. 2001).

One case plaintiffs discuss affirmatively supports the federal defendants' position.

Plaintiffs cite Fair Employment Council of Greater Washington, Inc. v. BMC Marketing

Corporation, a fair employment case where the "allegations closely track[ed] the claims that the

Supreme Court found sufficient in Havens."  Id., 28 F.3d 1268, 1276 (D.C. Cir. 1994).

Significantly, that case also involved specific allegations that defendant's discriminatory conduct

made plaintiff's task more difficult.  See id. ("Discrimination by BMC, for instance, might

increase the number of people in need of counseling").  Moreover, plaintiffs describe as a

"holding" a partial quotation from that case.  See Opp. at 27.  The complete quotation, which

summarizes Havens Realty, actually describes the distinction between a setback to an

organization's social interests versus a specific harm to the organization:

> The Court [in Havens] did not base standing on the diversion of resources from
> one program to another, but rather on the alleged injury that the defendants'
> actions themselves had inflicted upon the organization's programs.  To be sure,
> the Court did mention the "drain on the organization's resources."  Yet this drain
> apparently sprang from the organization's need to "counteract" the defendants'
> assuredly illegal practices, and thus was simply another manifestation of the injury
> that those practices had inflicted upon "the organization's noneconomic interest in

---

[10] The Eleventh Circuit reached a similar result in Florida State Conference of the
NAACP v. Browning, 522 F.3d 1153 (11th Cir. 2008), a case involving a voter registration
statute.  In that case, plaintiffs demonstrated that they would need to devote substantial time and
effort to educating volunteers and voters on compliance with the new statute, as well as assisting
voters left off of registration rolls as a result of the statute.  See id. at 1166.  In other words,
plaintiffs "averred that their actual ability to conduct specific projects during a specific period of
time" would be frustrated by the statute.  Id.  Plaintiffs have proven no such specific injuries
here.

encouraging open housing," <u>an interest that is quite intelligible apart from the</u> <u>allied efforts at increasing legal pressure on civil rights violators.</u>

<u>Fair Employment Council of Greater Washington</u>, 28 F.3d at 1277 (emphasis added).[11]  Here, FFRF has a generalized interest in church-state separation; it has identified no "interest . . . apart from" its overall efforts that has been harmed by the National Day of Prayer statute.

Finally, FFRF does not have standing as a representative of its members.  Plaintiffs have not presented any evidence that individual members of FFRF have come into direct and unwelcome contact with Presidential National Day of Prayer proclamations.  Accordingly, those members stand in the same shoes as the named plaintiffs.[12]  As none of the named plaintiffs (or FFRF members) have demonstrated that they have standing to challenge the National Day of Prayer statute and presidential proclamations issued thereunder, FFRF lacks standing in a representative capacity.

*          *          *

For these reasons, plaintiffs lack standing to challenge the National Day of Prayer statute and presidential proclamations issued thereunder.  Accordingly, this Court should grant summary judgment to the federal defendants on standing grounds, without reaching the merits of plaintiffs' claim.

---

[11] In drawing this distinction, the D.C. Circuit was distinguishing <u>Village of Bellwood</u>, the Seventh Circuit case which the court characterized as having a broader (and, in the D.C. Circuit's view, incorrect) interpretation of <u>Havens</u>.  <u>See</u> <u>Fair Employment Council of Greater Washington</u>, 28 F.3d at 1277.

[12] Plaintiffs commissioned a survey in an attempt to demonstrate that FFRF has representational standing through alleged injury to its members.  <u>See</u> Gaylor Tr. 107:21-108:5 & Dep. Ex. 28 (Ex. Q).  However, the survey did not provide respondents with an option to indicate that they were exposed to Presidential National Day of Prayer proclamations in a direct and unwelcome manner.  <u>See</u> Gaylor Tr. 109:23-110:8.

19

## II.    PLAINTIFFS HAVE CONCEDED THE FORMS OF RELIEF THAT CREATE MOST OF THE JUSTICIABILITY CONCERNS RAISED IN THIS CASE.

Plaintiffs' Amended Complaint seeks multiple forms of relief, including:

- A declaration that Public Law 100-307 (the National Day of Prayer statute) is unconstitutional;

- A judgment enjoining the enforcement of Public Law 100-307;

- A declaration that payer proclamations disseminated by presidential press secretaries violate the Establishment Clause;

- A judgment enjoining the publication of presidential prayer proclamations; and

- A judgment enjoining "the defendants" from issuing and disseminating further prayer day proclamations and making designations of official days of prayer.

Am. Compl., Prayer for Relief.[13]  Due to these multiple forms of requested relief, the federal defendants raised arguments in their summary judgment brief that any declaration as to the constitutionality of past presidential proclamations would be moot, see Memorandum of Law in Support of the Federal Defendants' Motion for Summary Judgment (Dkt. No. 83, 10/09/2009) ("Fed. Def. Mem.") at 20-21, and that declaratory or injunctive relief against the President himself raises substantial separation of powers concerns, see Fed. Def. Mem. at 23-25.  The federal defendants did not challenge the authority of this Court to issue a declaration regarding the constitutionality of the National Day of Prayer statute, but noted that, should the Court find the statute unconstitutional, it could not issue declaratory or injunctive relief with regard to any future presidential proclamations.  See Fed. Def. Mem. at 21-22.

---

[13] Plaintiffs also seek relief from Shirley Dobson and, prior to his dismissal from this lawsuit, sought relief from Governor Doyle.  See Am. Compl., Prayer for Relief.

Plaintiffs respond by rebutting strawman arguments that the federal defendants did not make. They refer to the "capable of repetition, yet evading review" doctrine as though the federal defendants were disputing this Court's ability to pass judgment on the constitutionality of the National Day of Prayer statute generally, and refer to a "moratorium" that the federal defendants never suggested. See Opp. at 31-34. Nonetheless, during the deposition of Annie Laurie Gaylor, plaintiffs clarified the scope of relief that they are seeking in this case:

> MR. BOLTON: I will represent that the subject of the pending lawsuit is the National Day of Prayer as mandated by Congress. And that's the – that is the subject of the pending lawsuit.
>
> . . .
>
> Q: I just need to know what you're asking for in this lawsuit. You filed the complaint. What are you seeking?
>
> A: We're asking that the president stop filing National Day of Prayer proclamations.
>
> Q: In general, any time of the year?
>
> A: Well, the National Day of Prayer proclamation is by law the first Thursday in May.
>
> Q: So, again, so I understand, you are not asking the president to not issue a prayer proclamation any other time other than the National Day of Prayer, the first Thursday in May?
>
> MR. BOLTON: I will represent that that is the subject of the lawsuit, and that is the relief that would be requested as part of this lawsuit. If you are asking whether or not we would go beyond that to your hypothetical, that's not the subject of the lawsuit. But that is not to say that depending on what the circumstances were, that we're agreeable to that situation. I'm simply saying that is speculative, and we would have to know the circumstances.

Gaylor Tr. 52:7-53:23. Later in that same deposition, counsel for plaintiffs offered further clarification:

21

MR. BOLTON: Again, I'll object to the extent that I think that calls for a legal conclusion. And to the extent that – I mean, I stated my understanding earlier with Mr. Oster that the issue pending in the lawsuit relates to the National Day of Prayer and the legislation mandating it. Whether or not the president issues other proclamations without that authority or mandate is not the subject of the lawsuit. Now, whether or not – if that hypothetical situation arises or not, whether or not it would involve legal issues, I'll tell you, we're not speculating on that. And so when you ask is that – is that the relief that we're seeking in this lawsuit, I can tell you that that is not the relief that we're seeking in the immediate lawsuit.

MR. ROSENBERG: So are plaintiffs, then – and I'm not sure who to direct this question to at this point. Are plaintiffs, then, not seeking any injunctive relief against the president of the United States?

MR. BOLTON: We are seeking to have the National Day of Prayer as its – as is mandated by – as a specific mandate through the legislation. That's the subject of the lawsuit.

If you are asking beyond that what would be required or prohibited, that's not the subject of the lawsuit.

Gaylor Tr. 89:20-90:22.

Plaintiffs' clarification, as a practical matter, takes many of the justiciability issues raised by the federal defendants off of the table.[14] The parties are now in agreement that any relief regarding proclamations that the President may issue independent of the National Day of Prayer statute would involve a "speculative" and "hypothetical" situation. Thus, should this Court declare that the National Day of Prayer statute is unconstitutional, further declaratory or

---

[14] That clarification did not address the relief plaintiffs seek regarding past presidential proclamations. For the reasons set forth in the federal defendants' opening brief, any declaratory judgment regarding past presidential proclamations is moot, see Fed. Def. Mem. at 20-21, and would invoke substantial separation of powers concerns, see Fed. Def. Mem. at 23-25. At minimum, this Court should decline to exercise its "discretionary power" to issue a declaratory judgment against the President under these circumstances. See Deveraux v. City of Chicago, 14 F.3d 328, 330 (7th Cir. 1994); see also North Shore Gas Co. v. Salomon, Inc., 152 F.3d 642, 647 (7th Cir. 1998) (Declaratory Judgment Act "does not obligate courts to issue declaratory judgments. Instead, district courts have wide discretion to decline to hear such actions.").

injunctive relief—including any declaratory or injunctive relief directed to the President or the White House Press Secretary—would be unnecessary and inappropriate.  That is because any proclamation that the President would issue subsequent to such a ruling that the statute is unconstitutional would, by definition, not be pursuant to that statute and its "mandate."

Moreover, and in light of plaintiffs' concession regarding the speculative nature of future proclamations, it would be especially inappropriate to issue injunctive or declaratory relief against the President and the White House Press Secretary due to the enormous separation of powers concerns that such relief would raise.  See Fed. Def. Mem. at 23-25.[15]  Plaintiffs concede that "[t]he Supreme Court has recognized the general principle that courts should not interfere with the exercise of Executive discretion," Opp. at 35 (citing Mississippi v. Johnson, 71 U.S. 475 (1866)), but nonetheless argue that the presidential proclamations are "ministerial" in nature. Nonsense.  A comparison of President Obama's 2009 proclamation to President Bush's 2008 proclamation reveals the discretion that Presidents employ when crafting proclamations. Plaintiffs also argue that presidential actions can be reviewed for constitutionality, but both of the cases plaintiffs cite—Youngstown Sheet and Tube Co. v. Sawyer, 343 U.S. 579 (1952) and Panama Refining Co. v. Ryan, 293 U.S 388 (1935)—involved the review of the actions of lower officers.  See Franklin v. Massachusetts, 505 U.S. 788, 828 (1992) (Scalia, J., concurring) ("[r]eview of the legality of Presidential action can ordinarily be obtained in a suit seeking to enjoin the offers who attempt to enforce the President's directive.").  The defendant "officer" here is the White House Press Secretary, but the Court cannot enjoin him from "issuing" prayer proclamations or "making designations of official days of prayer"; at most, it can enjoin him

_____

[15] The federal defendants make this argument in the event that plaintiffs attempt to back-pedal from their concessions at the Gaylor deposition.

23

from disseminating those proclamations that will have already been issued by the President.  E.g.,

Am. Compl. ¶¶ 14, 16, 21, 26, Prayer for Relief ¶¶ B, F.  And even if it did so, the President

could have someone else "disseminate" his proclamation, or could simply designate a day of

prayer at an event—such as a speech or press conference—that is covered by the media.  See

Newdow v. Bush, 391 F. Supp. 2d 95, 104 (D.D.C. 2005) (injunction against inaugural

committee responsible for extending invitations to clergy would not redress plaintiff's alleged

injuries arising from clergy-led inaugural prayer, since "the President could still extend

invitations to the clergy on his own").[16]  In this regard, any declarative or injunctive relief against

the President or White House Press Secretary would be inappropriate, if not unconstitutional.

## III.     THE NATIONAL DAY OF PRAYER STATUTE IS CONSTITUTIONAL.

### A.     The Supreme Court And Seventh Circuit Have Described The National Day Of Prayer In Favorable Terms.

Determining the constitutionality of the National Day of Prayer statute does not require

this Court to operate on a blank slate.  The Supreme Court in Lynch v. Donnelly has already

described the National Day of Prayer as being consistent with the Establishment Clause.  See

Lynch v. Donnelly, 465 U.S. 668, 677-78 (1984) (citing National Day of Prayer as one of

"countless . . . illustrations of the Government's acknowledgment of our religious heritage and

government sponsorship of graphic manifestations of that heritage").

---

[16] To that end, plaintiffs' prediction "that the President will abide by an authoritative directive to his Press Secretary, even though the President may not directly be bound by such a determination," Opp. at 37-38, is misplaced.  See Franklin, 505 U.S. at 825 (Scalia, J., concurring) ("Redressability requires that the court be able to afford relief through the exercise of its power, not through the persuasive or even awe-inspiring effect of the opinion explaining the exercise of its power.").  An injunction preventing the White House Press Secretary from "disseminating" a Presidential prayer day proclamation says nothing about whether the President has the threshold authority to issue the proclamation.  In that regard, there would be no "direction" for the President to follow.

The federal defendants previously acknowledged, and the plaintiffs have latched on to, a footnote in a subsequent Supreme Court decision discussing the National Day of Prayer.  See County of Allegheny v. ACLU, 492 U.S. 573, 603 n.52 (1989).  Unlike Lynch v. Donnelly—in which the Court's discussion of the National Day of Prayer was a necessary part of the Court's analysis of the constitutionality of the City of Pawtucket's Christmas display—the footnote in County of Allegheny v. ACLU was nothing more than a legal aside, written in response to Justice Kennedy's separate opinion.  That difference matters:  "When an opinion issues for the [Supreme] Court, it is not only the result but also those portions of the opinion necessary to that result by which we are bound."  Seminole Tribe v. Florida, 517 U.S. 44, 67 (1996) (emphasis added).  The footnote in County of Allegheny was not "necessary to [the] result" in that case; the analysis in Lynch v. Donnelly was.  And in any event, the language that plaintiffs cite to distinguish the National Day of Prayer from legislative prayers was followed by the notation that, "as [proclaiming a National Day of Prayer] is not before us, we express no judgment about its constitutionality."  County of Allegheny, 492 U.S. at 603 n.52.

County of Allegheny does not carry the weight plaintiffs place on the decision for another reason.  Following that decision, the Seventh Circuit described the National Day of Prayer as a "well-established practice."  DeBoer v. Village of Oak Park, 267 F.3d 558, 570 (7th Cir. 2001); see also Van Zandt v. Thompson, 839 F.2d 1215, 1221 (7th Cir. 1998) (National Day of Prayer is a "generally accepted and constitutionally permissible acknowledgment[ ] of the role of religion in American life.") (citing Lynch, 465 U.S. at 676-78).  Plaintiffs never come to grips with this Seventh Circuit authority, just as they never come to grips with Judge Manion's favorable description of the National Day of Prayer, even though that description also post-dates County of Allegheny.  See Books v. City of Elkhart, 235 F.3d 292, 325 (7th Cir. 2000) (Manion, J.,

25

concurring in part and dissenting in part) (describing National Day of Prayer as among "accepted practices").[17]

Moreover, and like the legislative prayers at issue in <u>Marsh v. Chambers</u>, the history of the National Day of Prayer dates back to the founding of our nation.  <u>See</u> Fed. Def. Mem. at 29 (noting that the First Congress urged President Washington "to proclaim '<u>a day of public thanksgiving and prayer</u>, to be observed by acknowledging with grateful hearts, the many and signal favours of Almighty God") (quoting <u>Lynch</u>, 465 U.S. at 675 n.2 (emphasis added) (citations omitted)).[18]  As noted in <u>Marsh</u>, the actions of the First Congress are "contemporaneous and weighty evidence" of the Constitution's "true meaning."  <u>Marsh v. Chambers</u>, 463 U.S. 783, 790 (1983) (citation and quotation marks omitted).  And while plaintiffs take issue with the continuity of such proclamations, <u>see</u> Opp. at 60, there is no dispute about the First Congress's request for a day of prayer.  <u>See</u> <u>Lynch</u>, 465 U.S. at 675 n.2.[19]

---

[17] Plaintiffs also fail to respond to the federal defendants' argument that the fifty-year gap between the enactment of the National Day of Prayer statute and this lawsuit reveals that the event cannot be construed to endorse religion.  <u>See</u> Fed. Def. Mem. at 30 n.16 (citing <u>Van Orden v. Perry</u>, 545 U.S. 677, 702-03 (2005) ((Breyer, J., concurring)).

[18] The Amicus Brief previously filed by the American Center for Law and Justice and various Members of Congress sets forth in detail the history of Presidential prayer proclamations.  <u>See</u> Brief in Support of Amicus Parties (Dkt. No. 59, 04/13/2009), at 4-8; <u>see also</u> <u>id.</u> at App. A (Presidential and Congressional Proclamations Calling the Nation to Prayer).

[19] Plaintiffs assert that Thomas Jefferson and James Madison opposed prayer proclamations, while conceding that James Madison nonetheless issued such proclamations.  <u>See</u> Opp. at 48-50.  Whatever Thomas Jefferson's and James Madison's views regarding prayer proclamations may have been, it is undisputed that other founding fathers thought prayer proclamations were acceptable.  <u>See</u> <u>Lynch</u>, 465 U.S. at 675 n.2 ("Presidents Adams and Madison also issued Thanksgiving Proclamations, as have almost all our Presidents").

For these reasons, and as the defendants argued in their opening brief, this Court can reject outright plaintiffs' challenges to the National Day of Prayer.  See Fed. Def. Mem. at 30; see also Van Orden v. Perry, 545 U.S. 677, 686 (noting that Lemon test was "not useful" in determining constitutionality of Ten Commandments monument, turning instead to "the nature of the monument and . . . our Nation's history") (plurality opinion).

**B.    President Obama's 2009 Proclamation Demonstrates That The National Day Of Prayer Statute Is Constitutional.**

Plaintiffs argue that the National Day of Prayer violates the "Endorsement Test"[20] in both its purpose and effect.  In so doing, plaintiffs assert that the National Day of Prayer must be viewed in the context of certain past presidential proclamations and the activities of the NDP Task Force, while ignoring the context of the most recent presidential proclamation.  Plaintiffs also improperly attempt to pass off the motives of private citizens and organizations as part of the National Day of Prayer statute's legislative history.  None of these arguments is persuasive.[21]

As the federal defendants noted in their opening brief, the merits of this case boil down to a facial challenge to the National Day of Prayer statute.  (That is because a challenge to past

---

[20] The "Endorsement Test" was first enunciated as a "clarification" of Establishment Clause doctrine by Justice O'Connor in her concurring opinion in Lynch.  See Lynch, 456 U.S. at 687-94 (O'Connor, J., concurring).

[21] Plaintiffs also compare the Endorsement Test to various housing discrimination cases decided outside of this Circuit.  See Opp. at 42.  Plaintiffs, however, cite no authority holding that the standard enunciated in those housing discrimination cases has somehow been incorporated into the Establishment Clause.  In any event, the Supreme Court has noted that it does not "adhere to the principle that the Establishment Clause bars any and all governmental preference for religion over irreligion."  Van Orden, 545 U.S. at 684 n.3 (plurality opinion).  This quoted language also undercuts plaintiffs' assertion that Van Orden and its companion case, McCreary County v. ACLU of Kentucky, 545 U.S. 844 (2005), do not "leave[ ] any doubt that if an objective observer could conclude from appearances and historic knowledge that the government was demonstrating a religious preference, then the Establishment Clause would be violated."  Opp. at 58.

proclamations is moot and future proclamations, at least in the absence of a valid statute, is speculative.)  Plaintiffs therefore "can only succeed in [their] facial challenge by 'establish[ing] that no set of circumstances exists under which the Act would be valid,' i.e., that the law is unconstitutional in all its applications."  Wash. State Grange v. Wash. State Republican Party, 128 S. Ct. 1184, 1190 (2008) (quoting United States v. Salerno, 481 U.S. 739, 745 (1987)).  As the federal defendants described in their opening brief, President Obama's 2009 proclamation provides a model for the constitutional application of the National Day of Prayer statute.

Perhaps recognizing the inherent limitations of their claim, plaintiffs attempt to litigate the merits of stale presidential proclamations from the prior administration.  See Opp. at 42 (accusing plaintiffs of "ignor[ing] the factual context of concerted action between the President and the NDP Task Force"); id. at 44 (describing "overwhelming evidence of the joint and concerted action between the President and the NDP Task Force"); see generally id. at 61-63. Plaintiffs, however, do not dispute the most obvious fact of all:  President Obama did not incorporate the NDP Task Force's theme in his 2009 proclamation (notwithstanding the NDP Task Force's request that he do so), much less host any public ceremonies at the White House. Any "reasonable observer" would therefore conclude that there is no connection between presidential proclamations and the NDP Task Force or, at minimum, any past connection has since been severed.

In this regard, plaintiffs' assertions that the federal defendants have failed to propose "facts relating to the merits of the case" and attempt "to skate by without any evidence," Opp. at 39, 44, are flatly wrong.  In addition to President Obama's decision not to incorporate the NDP Task Force's proposed theme, the federal defendants proposed as factual findings that President Obama's proclamation acknowledged the historical role of prayer in American society and

28

explicitly acknowledged the right of individuals to "worship or not worship according to the dictates of their conscience." See Federal Defendants' Statement Of Proposed Findings Of Fact As To Which There Is No Genuine Issue (Dkt. No. 84, 10/09/2009).[22]   Plaintiffs respond by quarreling with subsequent language in that (and other) proclamations which plaintiffs describe as "proselytizing," including the fact that language in presidential proclamations is often directed to "all Americans."  Opp. at 65.[23]

Those arguments fail for several reasons.  The starting point is the language in the National Day of Prayer statute itself, which recognizes the obvious fact that no one is being directed to pray:

> The President shall issue each year a proclamation designating the first Thursday in May as a National Day of Prayer on which the people of the United States may turn to God in prayer and meditation at churches, in groups, and as individuals.

36 U.S.C. § 119 (emphasis added).  As Justice Kennedy put it, the National Day of Prayer does not "require anyone to pray, of course."  County of Allegheny, 492 U.S. at 672 (Kennedy, J., concurring in part and dissenting in part).  Indeed, President Johnson's Remarks Upon the Signing of the 1965 National Day of Prayer proclamation explicitly said as much: "In putting my name to this paper, I cannot proclaim that all Americans will pray on October 20th.  Nor would I do so even if I could."  Gaylor Dep. Ex. 31 (Ex. R).  To that end, Justice O'Connor—the very

---

[22] To that end, the Interfaith Alliance, a group that champions religious freedom and individual rights, praised President Obama's proclamation as "inclusive of all Americans," noting that "[w]e must cherish the freedom in this country to pray or not to pray."  Gaylor Dep. Ex. 34 (Interfaith Alliance Praises President's NDP Proclamation) (Ex. P).

[23] Plaintiffs also quibble with the accuracy of the historical recitation contained in President Obama's proclamation, see Plaintiffs' Responses To Federal Defendants' Statement Of Proposed Findings Of Fact (Dkt. No. 104, 12/20/2009), but do not dispute that it is, in fact, a historical recitation.  Nonetheless, plaintiffs' own exhibits belie the assertion that President Obama's proclamation was historically inaccurate.  See Pl. Exs. 55, 56.

author of the Endorsement Test by which plaintiffs frame their argument—has specifically noted that Presidential Proclamations for "public prayers of Thanks" "would probably withstand Establishment Clause scrutiny given their long history."  Wallace v. Jaffree, 472 U.S. 38, 79, 81 & n.6 (1985) (O'Connor, J., concurring) (emphasis added).[24]  See also DeBoer v. Village of Oak Park, 267 F.3d 558, 570 (7th Cir. 2001) (describing National Day of Prayer as a "national observance designed to afford citizens who believe that prayer is an important component of civic obligation the opportunity to discharge that obligation") (emphasis added).[25]

---

[24] Plaintiffs contend that the National Day of Prayer is not comparable to the Memorial Day, Thanksgiving, or Christmas holidays because those holidays also contain secular components.  See Opp. at 54-55, 59-60.  The issue here, however, involves proclamations, not holidays.  And while Thanksgiving Day proclamations are infused with religious language, "they will not constitute the sort of governmental endorsement of religion at which the separation of church and state is aimed."  Van Orden, 545 U.S. at 723 (Stevens, J., dissenting); see Lynch, 465 U.S. at 675-76 (describing history of Thanksgiving as being "celebrated as a religious holiday to give thanks for the bounties of Nature as gifts from God" and noting that "Executive Orders and other official announcements of the Presidents and of the Congress have proclaimed both Christmas and Thanksgiving National Holidays in religious terms.").

[25] Plaintiffs cite Jaffree v. Wallace, 705 F.2d 1526, 1534-35 (11th Cir. 1983), and Jager v. Douglas County School District, 862 F.2d 824, 830 (11th Cir. 1989), to argue that prayer is a quintessential religious practice that cannot satisfy the Lemon test.  See Opp. at 43, 62-63. However, those cases involved prayer in the public school context.  As the Supreme Court has stated, "there are heightened concerns with protecting freedom of conscience from subtle coercive pressure in the elementary and secondary public schools."  Lee v. Weisman, 505 U.S. 577, 592 (1992).  North Carolina Civil Liberties Union v. Constangy, 947 F.2d 1145, 1150 (4th Cir. 1991), which is also cited by plaintiffs for the inherently-religious nature of prayer, Opp. at 62-63, involved a state court judge who opened his court proceedings with a prayer.  On the specific facts of that case, including that the judge did not "solemnify" all proceedings in his courtroom, the Fourth Circuit concluded that the district court's finding that the courtroom prayers lacked a secular purpose was not clearly erroneous.  Id. at 1150.  Moreover, the court did not rule out the possibility that prayer could have a secular purpose.  See id. at 1150 ("prayer cannot meet, or at least would have difficulty meeting, the secular purpose prong of the Lemon test" (emphasis added)).  Finally, plaintiffs cite an unpublished seventeen-year-old state court decision granting a preliminary injunction that prevented the Mayor of Denver from participating in a Day of Prayer Against Violence ceremony.  See Opp. at 43 (citing Freedom From Religion Found. v. Webb, 93-CV-6056 (District Court, City and County of Denver, Co., 1993)). Whatever resemblance the facts of that case may have to some of the allegations here, the case is

Next, plaintiffs misconstrue the effect of language contained in Presidential proclamations.  Having taken affirmative steps to obtain National Day of Prayer proclamations that they would not have otherwise received, plaintiffs complain that those proclamations constitute a "call to prayer" that encourages "all Americans to participate in the inherently religious activity of prayer."  Opp. at 64, 65.  As a threshold matter, however, President Obama's proclamation does not use the phrase "all Americans."  Ex. A (2009 proclamation).  And in any event, while plaintiffs have applied a laser-like focus to National Day of Prayer proclamations, they are seemingly oblivious to the countless other proclamations that Presidents issue each and every year.  Plaintiff Gaylor, for example, has done nothing to commemorate Leif Erickson Day, German American Day, or Columbus Day, even though proclamations for those days use similarly expansive language as National Day of Prayer proclamations.  See Gaylor Tr. 123:8-128:24.  Indeed, and notwithstanding the similar language,[26] Gaylor testified that she could ignore the President's call for all Americans to commemorate German-American day with no consequence whatsoever.  Gaylor Tr. 125:25-126:3.  Similarly, even though Gaylor was aware of Columbus Day and was not surprised that the President issues a proclamation on that day (again using similar language to the National Day of Prayer proclamations),[27] Gaylor did nothing to

---

of little precedential value.

[26] In his 2009 German American Day proclamation, President Obama encouraged "all Americans to learn more about the history of German Americans and to commemorate the many contributions they have made to our Nation."  Proclamation 8434, German-American Day, 2009 (Oct. 6, 2009), 74 Fed. Reg. 52,383 (Oct. 13, 2009).

[27] In his 2009 Columbus Day Proclamation, President Obama "call[ed] upon all the people of the United States to observe this day with appropriate ceremonies and activities." Gaylor Dep. Ex. 32 (Ex. S).

commemorate that day, see Gaylor Tr. 127:11-128:24.[28]  To that end, it is indisputable that one

can ignore the National Day of Prayer—just as one can ignore any presidential

proclamation—with absolutely no consequence whatsoever.  Certainly, some of FFRF's own

members do.  See Gaylor Tr. 102:8-15 (testimony that some FFRF members ignore the National

Day of Prayer with no consequence whatsoever); see also Gaylor Dep. Ex. 26 (Ex. T) (survey

response).[29]

        Third, plaintiffs assert that the history of the National Day of Prayer statute would lead a

reasonable observer to conclude that the National Day of Prayer endorses religion.  That,

however, ignores that the official "purpose" of the original 1952 statute was merely "to direct the

President to proclaim a National Day of Prayer each year."  S. Rep. No. 82-1389 (1952).[30]  That

is enough to pass constitutional muster, since "a legislature's stated reasons will generally get

deference."  McCreary County v. ACLU of Kentucky, 545 U.S. 844, 863 (2005).  Moreover, the

Supreme Court has already described the National Day of Prayer as an "acknowledgment of our

religious heritage."  Lynch, 465 U.S. at 677.  That, too, should settle this matter.  Nonetheless,

plaintiffs refer to the motives of Billy Graham in lobbying for the 1952 Act, as well as the

_____

        [28] Columbus Day, like the National Day of Prayer, is not without some controversy.  See
Gaylor Tr. 128:25-129:20.

        [29] There is apparently no language that would satisfy plaintiffs.  When confronted with a
hypothetical proclamation that mirrors the lean language contained in the National Day of Prayer
statute, including the permissive use of the term "may" as well as the option of meditating,
plaintiff Gaylor indicated that FFRF would take the position that the proclamation nonetheless
would violate the Establishment Clause, and that there can be no Presidential National Day of
Prayer proclamations issued pursuant to the National Day of Prayer statute that would be
consistent with the Establishment Clause.  See Gaylor Tr. 143:20-146:24 & Gaylor Dep. Ex. 35
(Ex. U).

        [30] As the parties have discussed in their briefs, that Senate Report also framed prayer in
historical terms.  See id.

motives of Pat Boone, the National Prayer Committee, the NDP Task Force, and others in lobbying for the 1988 amendment to the Act.  See Opp. at 39, 64.  However, plaintiffs place undue weight on the motives of private citizens and organizations in lobbying Congress regarding the National Day of Prayer statute, as those lobbying efforts say nothing regarding the legislative purpose of the statute.  As the Supreme Court has stated in applying Lemon's secular purpose prong to a statute that provided equal access in schools to religious groups,

> Even if some legislators were motivated by a conviction that religious speech in particular was valuable and worthy of protection, that alone would not invalidate the Act, because what is relevant is the legislative purpose of the statute, not the possibly religious motives of the legislators who enacted the law.

Bd. of Educ. of Westside Com. Sch. v. Mergens, 496 U.S. 226, 249 (1990) (plurality opinion) (emphasis in original).[31]

In short, the National Day of Prayer is consistent with the Establishment Clause.  The statute and proclamations issued thereunder have the secular purpose of acknowledging our nation's religious history.  The voluntary nature of both the statute's language (including the use of the word "may") and proclamations issued thereunder reveal that its effect is neither to advance nor inhibit religion.  Certainly, President Obama's proclamation neither advances nor inhibits religion.  And finally, neither the statute nor the proclamations issued thereunder fosters an excessive entanglement with religion.

---

[31] Moreover, the Interfaith Alliance, in a letter to President Obama, has indicated that, when President Truman established the National Day of Prayer in 1952, he intended for it to be a day when Americans may "pray and mediate in whatever way was appropriate for them."  Ex. O.

## CONCLUSION

For the foregoing reasons, judgment should be entered for the federal defendants.

Dated: January 21, 2010                    Respectfully submitted,

TONY WEST
Assistant Attorney General

JOHN R. GRIFFITHS
Assistant Branch Director

  /s/ Brad P. Rosenberg
BRAD P. ROSENBERG (DC Bar 467513)
Trial Attorney
United States Department of Justice
Civil Division, Federal Programs Branch
Tel: (202) 514-3374
Fax: (202) 616-8460
brad.rosenberg@usdoj.gov

Mailing Address:
Post Office Box 883
Washington, D.C.  20044

Courier Address:
20 Massachusetts Ave., N.W.
Washington, D.C. 20001

COUNSEL FOR DEFENDANTS
PRESIDENT BARACK OBAMA AND
WHITE HOUSE PRESS SECRETARY
ROBERT L. GIBBS