IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WISCONSIN

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

FREEDOM FROM RELIGION FOUNDATION, INC.,
ANNE NICOL GAYLOR, ANNIE LAURIE GAYLOR,
DAN BARKER, PAUL GAYLOR, PHYLLIS ROSE
and JILL DEAN,                                                  OPINION and ORDER

                 Plaintiffs,

                                       08-cv-588-bbc

        v.

President BARACK OBAMA,
White House Press Secretary ROBERT L. GIBBS
and SHIRLEY DOBSON, Chairman of the
National Day of Prayer Task Force,

                 Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

Under 36 U.S.C. § 119, the first Thursday of every May in the United States is designated as the "National Day of Prayer."  The statute directs the President to issue a proclamation to commemorate the day, which President Barack Obama has done, following the precedent of many former Presidents.  Defendant Shirley Dobson is the chairperson of the National Day of Prayer Task Force, which is a private organization that sponsors events celebrating the day.

Plaintiff Freedom from Religion Foundation is an organization of nonreligious

1

persons who object to what they view as the government's endorsement and encouragement of prayer. In this case brought under 42 U.S.C. § 1983, the foundation and several of its members are challenging the constitutionality of § 119 under the establishment clause. They seek an injunction prohibiting its enforcement. In addition, they want an order prohibiting the President from issuing "prayer proclamations" generally and prohibiting defendant Dobson from acting in concert with public officials in any way that would violate the establishment clause. The parties' cross motions for summary judgment are now before the court. Dkt. ## 79, 82 and 103.[1]

The threshold issue is standing. This requires the plaintiffs to show that they have suffered a "concrete" injury that is caused by each of the challenged actions and can be remedied through the relief they seek. "The concept of a 'concrete' injury is particularly elusive in the Establishment Clause context . . . because [that clause] is primarily aimed at protecting non-economic interests of a spiritual, as opposed to a physical or pecuniary, nature." Vasquez v. Los Angeles ("LA") County, 487 F.3d 1246, 1250 (9th Cir. 2007).

Although the answer is not free from doubt, I conclude that, under the unique circumstances of this case, plaintiffs have standing to challenge the constitutionality of the

---

[1]   Plaintiffs did not file a separate document entitled a "motion" for summary judgment, only a brief in support of judgment in their favor. However, the parties have agreed that no trial is necessary and that the court may decide the case for either side on the current record. Dkt. #100.

National Day of Prayer statute. The primary injury plaintiffs allege is the feeling of unwelcomeness and exclusion they experience as nonreligious persons because of what they view as a message from the government that it favors Americans who pray. That injury is intangible, but it is no less concrete than the injuries in the many cases in which courts have recognized the standing of persons subjected to unwelcome religious speech. The only difference between those cases and this one is that plaintiffs have not come into physical or visual contact with a religious display. However, that difference has little significance in a case like this one involving a national message intended to reach all Americans. Although plaintiffs do not have to "pass by" the National Day of Prayer, they are confronted with the government's message and affected by it just as strongly as someone who views a religious monument or sits through a "moment of silence," if not more so. To find standing in those cases while denying it in this one would be an exercise in formalism.

With respect to plaintiffs' challenge to "prayer proclamations" issued by the President (other than one required by § 119), none of the plaintiffs has read or heard such a proclamation except when they expressly sought one out. Such a self-inflicted "injury" cannot establish standing. With respect to defendant Dobson, plaintiffs have failed completely to show that any of her actions has injured them.

Accordingly, I will deny defendants' motions for summary judgment and grant plaintiffs' motion with respect to the question of standing on plaintiffs' claim that the

3

National Day of Prayer statute violates the establishment clause.  I will grant defendants'
motions and deny plaintiffs' on the question whether plaintiff has standing to challenge the
constitutionality of presidential prayer proclamations and any actions of defendant Dobson.
I will address the merits of plaintiffs' challenge to § 119 in a separate opinion.

From the parties' proposed findings of fact and the record, I find that the following
facts are undisputed.

UNDISPUTED FACTS

In 1952, Congress enacted a statute establishing the National Day of Prayer.  In
1988, Congress amended the statute so that it specified the day of the year the National Day
of Prayer would take place. Under the current version of the statute, "[t]he President shall
issue each year a proclamation designating the first Thursday in May as a National Day of
Prayer on which the people of the United States may turn to God in prayer and meditation
at churches, in groups, and as individuals." 36 U.S.C. § 119.  Most presidents since 1952,
including President Barack Obama and former President George W. Bush, have complied
with this statute, issuing proclamations through their press secretaries.

Plaintiff Freedom from Religion Foundation is an organization founded in 1976 in
Madison, Wisconsin and devoted to "promot[ing] the constitutional principle of separation
of church and state" and "educat[ing] the public on matters of nontheism."  It publishes the

4

newspaper <u>Freethought Today</u>, which reports on government conduct the foundation opposes as well as the views and activities of its members. Over the years, the foundation has responded to the National Day of Prayer in various ways, including by promoting secular proclamations for public officials to make, contacting public officials about their involvement and encouraging and publicizing efforts to protest the government involvement with the day. The foundation devotes staff time and resources to oppose the National Day of Prayer. Members of the foundation attend events related to the National Day of Prayer in order to monitor or protest them. At least 1500 members have read or seen media coverage of the National Day of Prayer and the presidential proclamations accompanying it.

Plaintiff Annie Laurie Gaylor is a co-founder of the foundation and is now its co-president. She "regularly reports" on the National Day of Prayer, writes press releases and letters of complaint about it and urges members to protest events celebrating the day. The complaints she receives from members about the National Day of Prayer have led her to believe that it creates much controversy and division. She "learned about" the 2008 proclamation from former President Bush by visiting the website of the National Day of Prayer Task Force, which she has "routinely monitored in the spring for many years." She corroborated the information she received using the "White House website." In 2009, she monitored both websites in advance of the proclamation. She learned that President Obama would be issuing a proclamation from "numerous prominent national news stories in the

5

Washington Post and over the wire." She "verified the wording" of the 2009 proclamation on the White House website. She "needed to see what [the President] was going to be saying because [she was] suing for it."

Plaintiff Annie Laurie Gaylor "does not believe in a god" and she does not believe in the efficacy of prayer. Members of the foundation share Gaylor's views. On the National Day of Prayer, she believes that the government is encouraging her to pray. She and other foundation members feel "excluded, disenfranchised, affronted, offended and deeply insulted."

Dan Barker is the co-president of the foundation. He "remembers seeing or hearing something on television (probably a news story) in the early 1980s when President Ronald Regan signed one of the NDP proclamations." He has been "watching" the National Day of Prayer "for years" and has "opposed" it publicly in writing. In early 2008, Barker read President Bush's National Day of Prayer proclamation after searching for it on the internet. The proclamation stated that

> America trusts in the abiding power of prayer and asks for the wisdom to discern God's will in times of joy and trial. As we observe the National Day of Prayer, we recognize our dependence on the Almighty, we thank him for the many blessings He has bestowed upon us, and we put our country's future in His hands. . . .[I] ask the citizens of our nation to give thanks . . . for God's continued guidance, comfort and protection.

In May 2009, Barker learned by watching the news on the internet that President Obama

had issued a National Day of Prayer proclamation.  The President called upon "Americans to pray in thanksgiving for our freedoms and blessings and to ask for God's continued guidance, grace, and protection for this land that we love."

Plaintiff Barker "does not believe in 'God' or any god" and he does not pray.  On the National Day of Prayer, Barker feels "excluded, like a second-class American."

Plaintiff Anne Nicol Gaylor is the president emeritus and co-founder of the foundation.  She learned about the National Day of Prayer from media coverage of it.  Other members of the foundation have complained to her about the National Day of Prayer, she has written press releases and letters about it and she has been contacted by the media to comment about it.  She learned about the 2008 and 2009 presidential proclamations for the National Day of Prayer from plaintiff Annie Laurie Gaylor.  She believes it is "shocking" to have such a day.

Plaintiff Paul Gaylor has been a member of the foundation for 33 years.  He "read about" the National Day of Prayer in a newspaper "long ago."  As a volunteer for the foundation, he has "encountered" complaints about the National Day of Prayer in letters from members. He learned about the 2008 prayer proclamation through plaintiff Anne Gaylor.

Plaintiff Jill Dean is a nonreligious person and a volunteer for the foundation.  She "became aware" of the National Day of Prayer "by hearing news accounts."  She is angered

7

and saddened by the National Day of Prayer because she believes that it "send[s] a message that some citizens are better than others" and that, "if a person doesn't pray, then they are un-American."

Plaintiff Phyllis Rose is a volunteer for the foundation. She is aware that the National Day of Prayer occurs every year and believes that prayer proclamations encourage all citizens to pray. Rose is "offended and disturbed" by the National Day of Prayer because she believes the government is taking the position that Americans "are a better people" because they pray.

Defendant Shirley Dobson is the chairperson of the National Day of Prayer Task Force, a private organization. The purpose of the task force is to "organiz[e] and promot[e] prayer observances conforming to a Judeo-Christian system of values." The task forces organizes many events in celebration of the National Day of Prayer. (Plaintiffs propose many additional facts about the task force, but I am not including them because plaintiffs fail to include any facts about their own involvement with any activities of the task force. Although some plaintiffs say that they have protested events relating to the National Day of Prayer, they do not say whether Dobson was involved with these events.)


OPINION

In any case brought in federal court, the plaintiffs' first hurdle is showing that the

8

court has jurisdiction to decide the merits of the case.  DaimlerChrysler Corp. v. Cuno, 547

U.S. 332, 341-42 (2006); Steel Co. v. Citizens for a Better Environment, 523 U.S. 83, 95

(1998).  Among other prerequisites, jurisdiction requires plaintiffs who have standing to

argue the claims they are advancing.  Sprint Communications Co., L.P. v. APCC Services,

Inc., 128 S. Ct. 2531, 2535 (2008).  Under the Supreme Court's interpretation of the

"Cases" and "Controversies" limitation on federal court jurisdiction  in Article III of the

Constitution, plaintiffs do not have standing to sue unless they show an "injury in fact" that

is "concrete and particularized," "fairly traceable to the challenged action of the defendant"

and "likely" to be "remedied by the relief plaintiff seeks in bringing suit."  Summers v. Earth

Island Institute, 129 S. Ct. 1142, 1148-49  (2009).  See also Association of Data Processing

Service Organizations, Inc. v. Camp, 397 U.S. 150, 152 (1970) (applying "injury in fact"

standing test for first time).  "At bottom, 'the gist of the question of standing' is whether

[plaintiffs] have 'such a personal stake in the outcome of the controversy as to assure that

concrete adverseness which sharpens the presentation of issues upon which the court so

largely depends for illumination.'"  Massachusetts v. EPA,  549 U.S. 497, 517 (2007)

(quoting Baker v. Carr, 369 U.S. 186, 204 (1962)).

Both sides argue that precedent easily resolves the standing question in their favor.

Defendants rely heavily on Valley Forge Christian College v. Americans United for

Separation of Church and State, Inc., 454 U.S. 464  (1982), in which the Court concluded

9

that the plaintiffs could not establish standing to challenge the government's land transfer to a religious institution through the "depriv[ation] of the fair and constitutional use of [their] tax dollar." Id. at 476-77. Plaintiffs rely primarily on a series of cases from the Court of Appeals for the Seventh Circuit in which the court concluded that "direct and unwelcome contact" with the government's religious speech or conduct is sufficient to show standing. E.g.,Books v. City of Elkhart, Indiana, 235 F.3d 292 (7th Cir. 2000) (Books I); Doe v. County of Montgomery, Illinois, 41 F.3d 1156, 1159 (7th Cir. 1994). Although the cases cited by the parties establish important principles that provide guidance, they do not provide obvious answers to the questions raised by this case. As commentators and even the Court have noted, precedent does not always provide a comprehensive theory for distinguishing the types of injuries that establish standing from ones that do not. Valley Forge, 454 U.S. at 475; Erwin Chemerinsky, Constitutional Law: Principles and Policies § 2.5.1 (3d ed. 2006).

One problem with the parties' discussion of standing is that they have treated it as an all-or-nothing issue, ignoring the different types of relief sought in the complaint. This is incorrect because "[a] plaintiff must demonstrate standing separately for each form of relief sought." DaimlerChrysler Corp., 547 U.S. at 352. Plaintiffs seek three types of relief: (1) a declaration that the statute creating the National Day of Prayer, 36 U.S.C. § 119, is unconstitutional and an injunction prohibiting its enforcement; (2) a declaration that all

10

"prayer proclamations" by the President are unconstitutional and an injunction prohibiting their publication; and (3) an injunction prohibiting Shirley Dobson from "acting in concert with state and federal officials, in joint action that violates the Establishment Clause." Am. Cpt. at 21, dkt. #38. I will address plaintiffs' standing with respect to each of these forms of relief.

## A. National Day of Prayer Statute

The current version of the statute establishing the National Day of Prayer provides that "[t]he President shall issue each year a proclamation designating the first Thursday in May as a National Day of Prayer on which the people of the United States may turn to God in prayer and meditation at churches, in groups, and as individuals." 36 U.S.C. § 119. The question is whether plaintiffs have suffered an injury from the statute that "distinguish[es] [them as] person[s] with a direct stake in the outcome of [the] litigation" rather than "person[s] with a mere interest in the problem." United States v. Students Challenging Regulatory Agency Procedures (SCRAP), 412 U.S. 669, 690 (1973).

### 1. Legal background

"In many cases the standing question can be answered chiefly by comparing the allegations of the particular complaint to those made in prior standing cases." Allen v.

Wright, 468 U.S. 737, 751-52 (1984).  Unfortunately, neither the Supreme Court nor the Court of Appeals for the Seventh Circuit has decided a case on all fours with this one.  Cases in which plaintiffs assert injuries as tax payers make up most of the decisions in which the Supreme Court has engaged in substantial discussions of standing in the context of an establishment clause challenge.  E.g., Hein v. Freedom From Religion Foundation, Inc., 551 U.S. 587 (2007); Valley Forge, 454 U.S. 464; Flast v. Cohen, 392 U.S. 83 (1968).  Plaintiffs are not asserting such an injury in this case.  In this circuit most of the cases have involved religious monuments or symbols.  E.g., Books v. Elkhart County, Indiana, 401 F.3d 857 (7th Cir. 2005) (Books II) (Ten Commandments monument); Gonzales v. North Township, 4 F.3d 1412 (7th Cir. 1993) (cross); Harris v. City of Zion, 927 F.2d 1401 (7th Cir. 1991) (city seal, emblem and logo containing Christian symbolism); American Civil Liberties Union v. City of St. Charles, 794 F.2d 265 (7th Cir. 1986) (cross).

        Although the standing question in this case is one of first impression, some established principles provide a starting point for the analysis.  Not surprisingly, cases involving "tangible" types of harm, such as physical injury or loss of property, are the easiest for establishing standing.  13A Charles Alan Wright, et al., Federal Practice & Procedure § 3531.4 (3d ed. 2008).  "Abstract" or ideological injuries generally are not sufficient. Thus, a person may not obtain the right to sue the government simply because she disagrees with the government's conduct or believes that a public official is violating the law, even when

that law is a constitutional right, no matter how strongly that person holds those beliefs. <u>Allen</u>, 468 U.S. at 754; <u>Valley Forge</u>, 454 U.S. at 483; <u>Schlesinger v. Reservists Committee to Stop the War</u>, 418 U.S. 208, 223 n. 13 (1974); <u>Laird v. Tatum</u>, 408 U.S. 1, 13-14 (1972).

However, defendants are incorrect to argue in their brief that "psychological harm does not confer Article III standing." Dfts.' Br., at 110, dkt. #114. The Supreme Court has made it clear that an injury may be "concrete and particularized" even if it cannot be quantified or observed. Rather, the Court has recognized a range of psychological injuries as well. These injuries include diminished use or enjoyment of a public space, <u>e.g.</u>, <u>Friends of the Earth, Inc. v. Laidlaw Environmental Services, Inc.</u>, 528 U.S. 167, 173-74 (2000); stigma as a result of discriminatory treatment, <u>e.g.</u>, <u>Heckler v. Mathews</u>, 465 U.S. 728, 739 (1984), or emotional distress caused by the loss of wildlife that one personally viewed. <u>Lujan v. Defenders of Wildlife</u>, 504 U.S. 555, 566-67 (1992). Even when the primary impetus for a lawsuit may be ideological, "[a]n identifiable trifle is enough for standing to fight out a question of principle." <u>SCRAP</u>, 412 U.S. at 690.

More relevant to this case, the Supreme Court has held or assumed in a long string of decisions that a plaintiff has standing to sue for an establishment clause violation if she is "subjected to unwelcome religious exercises," <u>Valley Forge</u>, 454 U.S. at 487 n.22, such as prayer or even a "moment of silence," <u>Santa Fe Independent School District v. Doe</u>, 530

U.S. 290, 313-14 (2000) (prayer at public school football game); <u>Lee v. Weisman</u>, 505 U.S. 577, 584 (1992) (prayer at public school graduation); <u>Wallace v. Jaffree</u>, 472 U.S. 38 (1985) (moment of silence in public school); <u>Abington School Dist. v. Schempp</u>, 374 U.S. 203, 224 n. 9 (1963) (Bible reading in public school classroom); <u>Engel v. Vitale</u>, 370 U.S. 421 (1962) (prayer in public school), or religious speech, such as a monument or sign. <u>County of Allegheny v. American Civil Liberties Union, Greater Pittsburgh Chapter</u>, 492 U.S. 573 (1989) (crèche on public property); <u>Lynch v. Donnelly</u>, 465 U.S. 668 (1984) (crèche in public park); <u>Stone v. Graham</u>, 449 U.S. 39, 101 (1980) (copy of Ten Commandments in public school classrooms).  Implicit in these cases is recognition of the fact that a plaintiff bringing an establishment clause claim

> is not likely to suffer physical injury or pecuniary loss. Rather, the spiritual, value-laden beliefs of the plaintiffs are often most directly affected by an alleged establishment of religion. Accordingly, rules of standing recognize that noneconomic or intangible injury may suffice to make an Establishment Clause claim justiciable.

<u>Suhre v. Haywood County</u>, 131 F.3d 1083, 1086 (4th Cir. 1997) (internal quotations and citations omitted).

I acknowledge that the Supreme Court did not expressly discuss the question of standing in many of the religious speech cases.  Although defendants are correct that "assumptions—even on jurisdictional issues—are not binding," <u>Domino's Pizza, Inc. v. McDonald</u>, 546 U.S. 470, 478-79 (2006), that does not mean I should ignore those cases

14

in deciding whether plaintiffs have standing.   It is telling that "the Court has not . . . appeared to be very concerned about the possibility that a nontaxpayer Establishment Clause plaintiff has not suffered the kind of individualized harm needed to support standing." Marc Rohr, <u>Tilting at Crosses: Nontaxpayer Standing to Sue under the Establishment Clause</u>, 11 Ga. St. U. L. Rev. 495, 505 (1995).  Federal courts, including the Supreme Court, have an independent obligation to insure their own jurisdiction even when the parties do not raise the issue, <u>Arbaugh v. Y & H Corp.</u>, 546 U.S. 500, 514 (2006), including on questions of standing. <u>FW/PBS, Inc. v. City of Dallas</u>, 493 U.S. 215, 230 (1990).  If members of the Court believed that injuries caused by religious speech and symbolism were insufficient to confer standing, it is unlikely that they would have failed to raise this issue in any of the many opinions involving establishment clause challenges.  <u>See also</u> <u>Doe</u>, 41 F.3d at 1159-60 (treating holdings on merits in Supreme Court's establishment clause cases as holdings that plaintiffs in those cases had standing).  This view is supported by cases such as <u>Lee</u>, 505 U.S. at 584, and <u>Schempp</u>, 374 U.S. at 224 n.9, in which the Court dispatched the question of standing with only a sentence or two of discussion, concluding that it was present. Accordingly, I conclude that plaintiffs may not challenge the National Day of Prayer statute simply because they think it is unwise, offensive or unconstitutional, but they may challenge it if their injuries are analogous to those alleged in the religious speech cases.

15

2. Plaintiffs' injury

Defendants attempt to depict plaintiffs' injuries as identical to the purely ideological injury asserted in Valley Forge. Although plaintiffs make it clear that they disagree with the National Day of Prayer, that is not the only injury they assert. Some of them explicitly identify themselves as nonreligious individuals who do not believe in prayer. These plaintiffs emphasize the sense of exclusion and unwelcomeness, even inferiority, that they feel as a result of what they view as the federal government's attempt to encourage them to pray through a statute and a presidential proclamation. Although not all of the plaintiffs state explicitly that they do not pray and feel excluded, that would not affect the analysis if the injuries of the other plaintiffs are sufficient. "[O]nce a court determines the existence of one plaintiff with standing, at least when generalized equitable relief is sought, it need not consider whether other plaintiffs also have standing to assert that claim." 15 Moore's Federal Practice § 101.23 (3d ed. 2009) (citing Arlington Heights v. Metropolitan Housing Development Corp., 429 U.S. 253, 264 (1977)). Further, if any of the individual plaintiffs has standing, the foundation would have standing as well. Friends of the Earth, 528 U.S. at 181 (organization has standing to sue when at least one of its members has standing on matter related to purpose of organization).

Plaintiffs' injury is not the same as the one asserted in Valley Forge, but is it analogous to the injuries identified in the religious speech cases? There is certainly little

16

difference between the *type* of injury alleged in this case and those recognized in the past. For those plaintiffs in other cases who did not alter their behavior to avoid the speech, the only possible injury was the emotional distress caused by being confronted with a government endorsement of religion.   <u>E.g.</u>, <u>Books II</u>, 401 F.3d at 861-62 (passing by religious display once a year); <u>Doe</u>, 41 F.3d at 1160 (walking under sign on courthouse stating, "THE WORLD NEEDS GOD").  <u>See also</u> <u>Saladin v. City of Milledgeville</u>, 812 F.2d 687, 693 (11th Cir. 1987) (concluding that plaintiffs were injured by city seal that used word "Christianity" because they claimed that seal "makes [them] feel like second class citizens"); <u>Mather v. Village of Mundelein</u>, 699 F. Supp. 1300, 1303 (N.D. Ill. 1988) (in case involving challenge to religious display, noting local resident's testimony that display "gives her a sense of inferiority. She feels that by the display the Village of Mundelein endorses Christianity, gives no credence to her religion and views her religion as far less important than the Christian religion.") However, defendants identify a number of differences between this case and those involving exposure to religious speech.

3.  <u>Comparing plaintiffs' injury with past injuries recognized by courts</u>

        First, defendants say that, to the extent courts have found a psychological injury sufficient to confer standing, they have done so only when the plaintiffs are required to come into contact with the religious speech in order to "fully engage as citizens or fulfill their civic

17

duties" Dfts.' Br., at 10-11, dkt. #114. This is simply wrong. Although the court of appeals has noted in some opinions that plaintiffs were fulfilling a legal obligation when they encountered religious speech, the court has never limited standing to those cases. For example, one of the injuries in <u>Books I</u>, 235 F.3d at 297, was viewing a religious monument on the way to a public library; in <u>Books II</u>, 401 F.3d at 861-82, the injuries included viewing a display before picking up a map in a public building. Further, most of the establishment clause challenges before the Supreme Court did not involve plaintiffs performing "civic duties." <u>E.g.</u>, <u>Santa Fe</u>, 530 U.S. 290 (football game); <u>Van Orden v. Perry</u>, 545 U.S. 677 (public library). <u>See also</u> <u>Mercier v. City of La Crosse</u>, 276 F. Supp. 2d 961, 969 (W.D. Wis. 2003) (visitors to public park had standing to challenge religious monument there), <u>rev'd on other grounds</u>, 395 F.3d 693 (7th Cir. 2005). Two other differences emphasized by defendants are more substantial: (1) plaintiffs are part of a potentially much larger group of injured persons than the plaintiffs who viewed religious exercises in past cases; and (2) in past cases, the plaintiffs had to "pass by" a religious display or be in the same place that a religious exercise was occurring, but in this case plaintiffs' theory of injury does not involve that type of physical or visual contact.

a. Is plaintiffs' injury a "generalized grievance"?

With respect to the first point, defendants argue that the "national nature" of

18

plaintiffs' injury means that it is simply a "generalized grievance" that is "insufficient to support Article III standing." Dfts.' Br., at 14, dkt. #118. Defendants made the same argument in their motions to dismiss. Dkt. ##45 and 47. In the order denying those motions, dkt. #67, I pointed out the Supreme Court's holding that even "where an injury is widely shared [this] does not, by itself, automatically disqualify an interest for Article III purposes." Federal Election Commission v. Akins, 524 U.S. 11, 24, (1998). This point has been reiterated by the Supreme Court and the court of appeals. E.g., Massachusetts, 549 U.S. at 522 (plaintiff's "interest in the outcome of [the] litigation" not "minimize[d]" simply because it is "widely shared"); Lac Du Flambeau Band of Lake Superior Chippewa Indians v. Norton, 422 F.3d 490, 496-97 (7th Cir. 2005) ("[T]he particularity requirement does not mean . . . that a plaintiff lacks standing merely because it asserts an injury that is shared by many people."). In SCRAP, the Court concluded that the environmental injury asserted by the plaintiffs was sufficient to establish standing even though the injury could extend to "all persons who utilize the scenic resources of the country, and indeed all who breathe its air." Defendants simply ignore these cases.

The reason that the Court has declined to adopt the standing rule proposed by defendants should be clear enough. "To deny standing to persons who are in fact injured simply because many others are also injured, would mean that the most injurious and widespread Government actions could be questioned by nobody." SCRAP, 412 U.S. at

19

687-88. Thus, using defendants' logic, a federal statute requiring weekly church attendance for all citizens would be immune from judicial review because no plaintiff could distinguish her injury from anyone else's.

The question is not whether "too many" people share a particular harm; it is whether the harm is too abstract. <u>Akins</u>, 524 U.S. at 24. Again, the type of harm experienced by plaintiffs is the same as those in past cases. If diminished enjoyment of a public space for a few moments is sufficiently "concrete" for standing purposes, then it is difficult to argue that diminished enjoyment of an entire day is not.

b. Is plaintiffs' injury sufficiently "direct"?

This brings up defendants' second objection, which is that plaintiffs' injury is not sufficiently "direct" because they do not have to "pass by" a religious display or sit through a particular religious exercise. <u>E.g.</u>, <u>Books II</u>, 401 F.3d at 861 (plaintiff has standing to challenge religious display if he comes into "direct" contact with display). This argument gives me the most pause, if only because many past cases have involved this type of limitation. However, those cases must be read in context. To the extent they imposed a requirement of "physical proximity," this was a result of the nature of the speech involved.

The injury caused by religious conduct of the government is largely expressive, meaning that the harm is caused by receiving a message from the government that his or her

views on religion are disfavored.  Note, Expressive Harms and Standing, 112 Harv. L. Rev. 1313, 1314, 1325 (1999).  Thus, in determining whether a plaintiff's injury is sufficiently "direct" in this context, the important question becomes whether the plaintiff is part of the government's intended audience for that message and whether the plaintiff actually received the message.

When the injury is viewed this way, it should not be surprising that standing jurisprudence in the context of establishment clause challenges has included a requirement of physical proximity to a religious exercise.  A resident of Miami would have no business challenging a religious display in Anchorage because he is not part of the intended audience. Suhre v. Haywood County, 131 F.3d 1083,1086 (4th Cir. 1997) (in case involving challenge to religious monument, distinguishing plaintiff, a local resident, from someone living in another state);  Washegesic v. Bloomingdale Public Schools, 33 F.3d 679, 683 (6th Cir. 1994) ("The practices of our own community may create a larger psychological wound than someplace we are just passing through."); St. Charles, 794 F.2d at 268 (discussing difference for standing purposes between "a plaintiff . . . complaining about the unlawful establishment of a religion by the city, town, or state in which he lives, rather than about such an establishment elsewhere").

Further, using a person's residence as a limiting principle for standing is consistent with establishment clause jurisprudence generally.  Compare  Lewis v. Casey, 518 U.S. 343,

350-51 (1996) (using substantive law of constitutional right to determine whether plaintiffs alleged sufficient injury for purpose of standing).    As Justice O'Connor wrote, "The Establishment Clause prohibits government from making adherence to a religion relevant in any way to a person's standing *in the political community*."  Lynch, 465 U.S. at 687 (O'Connor, J., concurring) (emphasis added).  This is impermissible because it "sends a message to nonadherents that they are outsiders, not full members of the political community, and an accompanying message to adherents that they are insiders, favored members of the political community."  Id. at 688; see also Allegheny, 492 U.S. at 595 (adopting Justice O'Connor's rationale in Lynch).  Thus, if a person is not part of the "political community" to whom a religious message is directed and he has not even visited that community, he has no standing to sue.  Lynch, 465 U.S. at 671  (noting that plaintiffs were residents of city where religious display was located); Allegheny, 492 U.S. at 587 (same).

In this case the relevant political community is not a particular town.  Rather, because the National Day of Prayer has been established by a federal statute and is proclaimed by the President, the message is directed at all United States citizens, making the relevant community the entire country.  When a message is intended for and received by a national audience, it makes little sense to impose a geographic limitation for standing.  A person's location within the country is irrelevant under those circumstances because the injury he suffers is the same regardless where he is.  The court in Newdow v. Bush, 355 F. Supp. 2d

22

265, 278-79 (D.D.C. 2005), recognized this view in the context of a challenge involving the

Presidential inauguration:

> A Presidential inauguration is certainly national, perhaps uniquely so. The entire country is invited to view the swearing in of the President. It is a day to celebrate the new presidency, and permits the country to unite after a potentially fractious election. It is also nationally televised live for all citizens to view. As such, there is an argument that all those who "participate" in a Presidential inauguration, whether by television, radio, or in person, have a personal connection to the event sufficient to create an injury-in-fact, if they were injured through that participation. Therefore, the unique nature of the Inauguration may create a personal connection for Newdow, either by physically attending or merely watching on television, sufficient to establish Article III standing.

Id. at 279 (footnotes omitted).  As with the presidential inauguration, "[t]he entire country

is invited" to participate in the National Day of Prayer.

However, this does not mean that recognizing plaintiffs' standing in this case would

"unleas[h] hordes of litigants eager to joust with merely abstract judicial windmills."  13A

Charles Alan Wright, et al., Federal Practice & Procedure § 3531.3 (3d ed. 2008) (noting

theory that standing rules are way for courts to limit amount of litigation).  To begin with,

the unique nature of the National Day of Prayer as a ubiquitous statement from the

government on religion provides an inherent limitation on the effect that recognition of

standing in this case would have.  Further, the widespread nature of a message does not

mean that "everyone" has standing.  In this case, some people may suffer no concrete injury

because the message was not directed at them (because they are outside the United States)

23

or because they have not received the government's message (because they are not aware of the National Day of Prayer and the government's involvement with it). In addition, the many Americans who welcome and appreciate the National Day of Prayer or are indifferent to it suffer no injury. Finally, those Americans who personally believe in prayer but disagree with the government's role in declaring a national day in support of it might be in a similar situation to the plaintiffs in <u>Valley Forge</u>. However, individuals such as plaintiffs who do not pray and feel marginalized as a result of the government's message of prayer suffer a distinct harm. Note, 112 Harv. L. Rev. at 1315 ("[E]xpressive injuries are different from . . . ideological injury . . . because certain plaintiffs can claim to be directly injured by expressive harms and certain groups can claim to be more affected by them than others.")

Further, the absence of any physical manifestation of the message (such as a monument or a ceremony) does not mean that no one has standing to sue if the government's message is otherwise communicated to the plaintiffs. For example, in <u>Arizona Civil Liberties Union v. Dunham</u>, 112 F. Supp. 2d 927 (D. Ariz. 2000), the plaintiffs challenged on establishment clause grounds a town's proclamation making the last week in November "Bible Week." The injury identified by the plaintiffs (who were Jewish) was that the Bible Week proclamation "made them feel excluded by the Town in which they reside and by its Mayor 'because [they are] not part of the Town's Christian majority.'" <u>Id.</u> at 932.

The district court held that two residents of the town had standing to challenge the

24

designation even though it did not involve a "visual display" and the plaintiffs learned about it through the media.  The court discerned no basis for distinguishing between the plaintiffs' injury and the injury caused in other religious speech cases because the plaintiffs were "directly impacted by [their] residency in" the town.  Id. at 932-33.  The court rejected the argument that Valley Forge required a different result:

> The abstract injury in Valley Forge is the type of injury that would be suffered by a person residing hundreds of miles away who read about the Bible Week Proclamation issued in Gilbert and found it offensive to his or her beliefs about the Constitution's mandates. . . . Although the Sklars expressed a commitment to the principle of church-state separation, they also suffered the particularized injury of feeling unwelcome and excluded by the town wherein they reside.

Id. at 933 (citations omitted).

Dunham supports the view that a plaintiff need not be physically confronted with a religious exercise to have standing and that the important question is whether the plaintiffs are part of the community to which the religious message is directed.  The injury in a case under the establishment clause is inflicted when the plaintiffs receive an unwelcome message that is directed at them; it does not matter what form that message takes.  As another example, if a particular school declared an official "prayer day," teachers or students at that school would have standing to challenge it even if they were not subjected to a particular religious exercise.  Cf. Metzl v. Leininger, 57 F.3d 618 (7th Cir. 1995) (assuming that public school teacher had standing to challenge state's designation of Good Friday as school

holiday).

This view is further supported by cases such as <u>Santa Fe</u>, 530 U.S. 290, and <u>Wallace</u>, 472 U.S. 38. In both of these cases, the Court considered the merits of school policies relating to prayer even before the policies were implemented. In <u>Santa Fe</u>, 530 U.S. at 316, the Court concluded that "the simple enactment of [the] policy, with the purpose and perception of school endorsement of student prayer" was enough to create a constitutional injury. In other words, the government had "sent the message" as soon as it enacted the policy and the damage was done. Like the plaintiffs in <u>Dunham</u>, <u>Metzl</u>, <u>Santa Fe</u> and <u>Wallace</u>, plaintiffs in this case have standing because they received a message of religious encouragement from the government in both the statute and the presidential proclamations.

Defendants note that many of the plaintiffs have not read or heard the particular language of presidential proclamations issued in conjunction with the National Day of Prayer, but that is irrelevant in the context of this claim. Section 119 does not require the President to use any particular language in his proclamation for the National Day of Prayer; it simply requires "a proclamation designating the first Thursday in May as a National Day of Prayer." Thus, the only harm that is "fairly traceable" to the statute is the harm caused by the simple fact of declaring a National Day of Prayer. Plaintiffs do not need to know the details of a proclamation to experience that harm; it is enough that they receive a message from the government that it supports the National Day of Prayer itself. That requirement

26

is satisfied whether plaintiffs read a proclamation in full or simply learn through the media that the President has proclaimed the National Day of Prayer.

In some cases, the Supreme Court has held that a person's knowledge or awareness of particular government conduct was not enough to establish standing. E.g., Lujan, 504 U.S. at 566-67 (knowledge that particular animal may be adversely affected by defendant does not establish standing if plaintiff has never observed that animal); Laird, 408 U.S. at 11 (knowledge of government's possible surveillance of third parties does not establish standing). However, the reason for the limitation in each of these cases was related to the Court's oft-cited rule that a plaintiff may not sue if she is a mere "concerned bystander." E.g., Arizonans for Official English v. Arizona, 520 U.S. 43, 64-65 (1997); Diamond v. Charles, 476 U.S. 54, 62 (1986).  As stated by Judge Posner, "[t]he main contemporary reason for having rules of standing . . . is to prevent kibitzers, bureaucrats, publicity seekers, and 'cause' mongers from wresting control of litigation from the people directly affected." Illinois Dept. of Transportation v. Hinson, 122 F.3d 370, 373-74 (7th Cir. 1997).

For example, in Valley Forge, the plaintiffs were challenging a land transfer to which they were not a party that occurred in another state.  In Allen, 468 U.S. at 755-56, the plaintiffs were challenging the government's decision to give tax exemptions to schools to which they had no relation.  In Schlesinger, 418 U.S. at 210-11, private citizens wanted to force the Secretary of Defense to kick members of Congress out of the Armed Forces

27

Reserve.  In <u>Lujan</u>, <u>Laird</u> and these other cases, the plaintiffs were challenging governmental conduct directed at *someone else* (or some*thing* else), where any harm to the plaintiffs could be resolved through the majoritarian process.

In this case, plaintiffs are not simply "concerned bystanders" aware of government conduct affecting other people; they are attempting to stop the government from encouraging *them* to engage in prayer.  <u>Lujan</u>, 504 U.S. at 561-62  ("[When] the plaintiff is himself an object of the action . . . at issue . . .  there is ordinarily little question that the action or inaction has caused him injury.")  In fact, they are asking the court to serve what one justice views as the courts' "traditional . . . role of protecting . . . minorities against the imposition of the majority."  Antonin Scalia, <u>Doctrine of Standing as an Essential Element of the Separation of Powers</u>, 17 Suffolk L. Rev. 881, 894 (1983).  It does not the alter the nature of the injury to plaintiffs whether the government sends its message by mailing a letter to each plaintiff individually or communicating *en masse* through the media.

Similarly, allowing plaintiffs to sue in this case does not conflict with the "important purpose of rules of standing . . . to identify the best-placed plaintiff and give him a clear shot at suit."  <u>North Shore Gas Co. v. EPA</u>, 930 F.2d 1239, 1242 (7th Cir. 1991); <u>see also</u> <u>People Organized for Welfare and Employment Rights (P.O.W.E.R.) v. Thompson</u>, 727 F.2d 167, 172-73 (7th Cir. 1984) ("[T]he ability of the actual victim to protect his legal rights may be impaired by the activity of his self-appointed protectors.").  As discussed above, people like

plaintiffs are the only ones adversely affected by the National Day of Prayer statute, so there is no "better plaintiff" waiting in the wings.

c. Other concerns

Another standing-related concern often noted by the Court is missing from this case as well.  In many cases in which the Court finds that standing is lacking, the relief requested by the plaintiff would require the judiciary to become embroiled in the inner workings of another branch of government. In <u>Allen</u>, 468 U.S. at  761, the Court noted that the plaintiffs' request for relief was problematic because they were "seek[ing] a restructuring of the apparatus established by the Executive Branch to fulfill its legal duties." In <u>Lujan</u>, 504 U.S. at 576-77, the plaintiff was asking the Court to supervise "agencies' observance of a particular, statutorily prescribed procedure" that would "transfer from the President to the courts the Chief Executive's most important constitutional duty, to 'take Care that the Laws be faithfully executed.'" <u>Id.</u> at 576-77 (quoting U.S. Const., art. II, § 3).  Justice Kennedy noted a similar concern in <u>Hein</u>, 551 U.S. at 617 (Kennedy, J., concurring in part and concurring in the judgment), in explaining why he believed that taxpayer standing should be limited to cases involving congressional appropriations: "The courts must be reluctant to expand their authority by requiring intrusive and unremitting judicial management of the way the Executive Branch performs its duties."

29

In this case, declaring 36 U.S.C. § 119 unconstitutional and enjoining its enforcement would not interfere with the executive branch's ability to perform its job or require "intrusive and unremitting judicial management."  In fact, relief on this claim would require no action by any of the defendants; it simply would prohibit a single act unrelated to the day-to-day activities of the executive branch.

Like the plaintiffs in <u>Dunham</u>, the plaintiffs in this case learned of the National Day of Prayer and the presidential proclamation through media reports and experienced emotional distress because of their perception that the government was encouraging them to pray and expressing favoritism for those who do.  It is "formalistic in the extreme," <u>Lee</u>, 505 U.S. at 595, to suggest that any injuries suffered by plaintiffs in this case are less significant than those of a person who views a public emblem with religious imagery or sits through a "moment of silence" or that plaintiffs' injury would be qualitatively different if they had to walk by a sign declaring the National Day of Prayer.

If anything, plaintiffs' injury is more serious than someone who comes into unwanted contact with a monument because of the prominence of the National Day of Prayer and the fact that the message is coming from the highest level of government.  <u>Cf.</u> <u>Dunham</u>, 112 F. Supp. 2d at 932 ("Feelings of unwelcomeness and subordinate status may be even greater in the action at bar because the Proclamation was issued by the Mayor, the Town of Gilbert's highest elected official."); Meghan Tomasik, <u>Nothing to Stand On: Reading the Standing</u>

30

Doctrine to Include Religious Proclamations through <u>Arizona Civil Liberties Union v.</u>
<u>Dunham</u> 32 Ariz. St. L.J. 345, 358 (2000) ("[A]lthough a proclamation may not be as visible
as a religious statue or display in a public square, it is, in fact, more insidious than such
symbols, because it is a governmental promotion of religion that permeates throughout an
entire community.")  Further, a monument may be avoided by using a different entrance to
the building it sits in front of; an emblem may be avoided by averting one's eyes.  However,
plaintiffs cannot "avoid" the National Day of Prayer by averting their eyes or using an
alternate route.  Tomasik, 32 Ariz. St. L.J. at 359 ("Bible Week [is not] confined [to a]
building or park. Thus, even though an affront is intangible, conceptual, and atmospheric,
it pervades society, and a plaintiff is left without recourse: he cannot avoid the injury.")  It
may be that the only way the plaintiffs could truly "avoid" the National Day of Prayer would
be to leave the country every first Thursday in May.

In their brief, defendants emphasize the voluntary nature of the National Day of
Prayer.  Dfts.' Br., at 15-16, dkt. #83.  The statute says that citizens "*may* turn to God in
prayer," it does not require them to do so.  That argument is a nonstarter because the Court
has not required plaintiffs to prove coercion to show a violation of the establishment clause,
let alone to prove an injury sufficient to confer standing.  <u>Lee</u>, 505 U.S. at 618-19 (Souter,
J., concurring) ("Over the years, this Court has declared the invalidity of many noncoercive
state laws and practices conveying a message of religious endorsement."); <u>Schempp</u>, 374 U.S.

at 224 n. 9 (students had standing to challenge Bible reading in public school classroom even though they could be excused upon parental request).

Finally, I note that adopting defendants' view of standing would allow the government to have unrestrained authority to demean members of any religious group without legal consequence. The federal government could declare the "National Day of Anti-Semitism" or even declare Christianity the official religion of the United States, but no one would have standing to sue because no one would have to "pass by" those declarations. St. Charles, 794 F.2d at 268-69 (concluding that nontangible injuries must give rise to standing in establishment clause cases; otherwise, no one would have standing if city "conceived, proclaimed, organized—in a word, established—the 'Church of St. Charles' but appropriated no moneys for its support"). One could not argue plausibly that the disfavored groups in such cases would suffer no harm, even if that harm was intangible. Cf. United States v. Hays, 515 U.S. 737, 744 (1995) (concluding that being subject to racial classification is injury for standing purposes even if it does not lead to measurable harm because such classifications "threaten to stigmatize individuals by reason of their membership in a racial group and to incite racial hostility").

4. Redressability

This leaves the question of redressability. Defendants argue that plaintiffs cannot

32

obtain a remedy even if they have been injured by the National Day of Prayer statute because this court does not have the authority to enjoin the President from doing anything.

Defendants are correct that the prospect of declaratory or injunctive relief against a sitting President is "extraordinary" and raises significant issues related to the separation of powers. However, they are wrong to suggest that the President is immune from injunctive or declaratory relief. The view they cite seems to be held by only one justice. Franklin v. Massachusetts, 505 U.S. 788, 827-28 (Scalia, J., concurring). On several occasions, the Court has considered the merits of lawsuits involving potential or actual court orders directed to sitting Presidents, sometimes without even commenting on concerns related to redressability. E.g., Clinton v. New York, 524 U.S. 417, 426 n.9 (1998) (granting declaratory relief that President may not exercise line item veto); id. at 453-469 (Scalia, J., concurring in part and dissenting in part) (concluding that some plaintiffs had standing to challenge constitutionality of Line Item Veto Act without noting problems related to redressability); Clinton v. Jones, 520 U.S. 681 (1997) (allowing civil case to go forward that would require President to sit for deposition and noting several other cases in which this had occurred); United States v. Nixon, 418 U.S. 683 (1974) (upholding order directing President to produce certain tape recordings of conversations with aids). In fact, the Court has "long held that when the President takes official action, the Court has the authority to determine whether he has acted within the law." Jones, 520 U.S. at 703.

33

The concerns related to granting relief against the President are simply a heightened version of the general concern in standing jurisprudence regarding undue judicial interference with the executive branch. <u>Franklin</u>, 505 U.S. at 826 (Scalia, J., concurring) (noting danger that "[p]ermitting declaratory or injunctive relief against the President personally would . . . distract him from his constitutional responsibility to 'take Care that the Laws be faithfully executed'") (quoting U.S. Const., art. II, § 3).  This is why the Court has recognized a distinction for a judicial injunction requiring the performance of a purely "ministerial" duty by a President.  <u>Franklin</u>, 505 U.S. at 802; <u>Mississippi v. Johnson</u>, 71 U.S. (4 Wall.) 475, 498-499 (1866).  In this case, "there is no possibility that [a decision invalidating 36 U.S.C. § 119] will curtail the scope of the official powers of the Executive Branch," <u>Jones</u>, 520 U.S. at 701, or otherwise interfere with the President's duties under Article II.  As noted above, even if plaintiffs prevail on this claim, the President will not be directed to take any affirmative action.  A judgment in plaintiff's favor would result in an order enjoining the President from enforcing an unconstitutional statute that involves a single, largely symbolic act that occurs once a year.

Defendants argue that enforcement of § 119 involves more than a ministerial act, which is demonstrated by the substantial differences in the language that Presidents have used in prayer proclamations.  Like the argument that plaintiffs cannot have standing if they have not read a particular proclamation, this argument overstates the scope of this claim.

34

Section 119 simply requires the President to issue a proclamation designating a National Day of Prayer; it does *not* require the President to issue a separate statement regarding his own views on prayer. Thus, even if enforcement of the statute is enjoined, this would not prohibit the President from issuing "prayer proclamations" as a general matter (those are discussed in the next section), prohibit him from making references to prayer (or even encouraging it outside the enforcement of § 119) or restrict his speech in any manner except for designating a National Day of Prayer. Thus, any relief on this claim would be much less intrusive than orders approved in other cases such as Nixon and Clinton. See also Nixon v. Fitzgerald, 457 U.S. 731, 755 (1982) ("[T]his Court has recognized that the sphere of protected action must be related closely to the immunity's justifying purposes.") In fact, defendants' position on this issue is somewhat ironic because the effect of declaring § 119 unconstitutional would be to *relieve* the President of a duty imposed by Congress, not impose a new one.

In any event, I need not decide at this stage whether it is appropriate to enter declaratory or injunctive relief against the President in this case because plaintiffs have named the President's press secretary as a defendant as well. The Supreme Court has held that courts may enjoin the President's subordinates from carrying out an unconstitutional act instead of the President if doing so would be likely to redress the plaintiff's harm. Franklin, 505 U.S. at 803 (plurality); id. at 801 (citing Youngstown Sheet & Tube Co. v.

35

<u>Sawyer</u>, 343 U.S. 579 (1952); <u>Panama Refining Co. v. Ryan</u>, 293 U.S. 388 (1935)).

In their reply brief, defendants argue that relief against defendant Gibbs would not redress plaintiffs' harm because the President "could have someone else disseminate his proclamation." Dfts.' Br., at 24, dkt. #118. This argument is not persuasive for two reasons. First, defendants do not deny that the President generally has implemented § 119 through his press secretary and they offer no reason for believing that will change. Second, in *any* case involving a potential injunction against an executive officer, the argument could be made that the President could direct another officer to perform the same act, but the Court has not suggested that it is a reason for dismissing a case. In <u>Franklin</u>, 505 U.S. at 803, the plurality went so far as to say that, even if a judicial order to a subordinate would require the cooperation of the President, "we may assume it is substantially likely that the President . . . would abide by an authoritative interpretation of [a] statute and constitutional provision by the District Court, even though [he] would not be directly bound by such a determination."

In sum, I conclude that plaintiffs have standing to challenge the National Day of Prayer statute because it has caused them a concrete and particularized injury that is likely to be redressed by their requested relief. Accordingly, plaintiffs' motion for summary judgment on this issue must be granted and defendants' motion for summary judgment must be denied.

36

B.  Prayer Proclamations Generally

In addition to seeking an order declaring 36 U.S.C. § 119 unconstitutional and enjoining its enforcement, plaintiffs seek to enjoin the President from issuing "prayer proclamations" generally.  I understand this part of plaintiffs' claim to mean that they are challenging certain statements the President makes about prayer above and beyond one limited to "designating the first Thursday in May as a National Day of Prayer" as required by the statute.  This request faces multiple problems related to justiciability.

To begin with, it is not clear whether plaintiffs continue to assert this claim.  In their reply brief, defendants cite deposition testimony of some of the plaintiffs suggesting that they are no longer challenging prayer proclamations, only the statute itself. Dfts.' Br., at 20-24, dkt. #118.  However, plaintiffs have not moved to amend their complaint or otherwise filed anything with the court stating that they wish to withdraw this claim, so I will consider it.

It may be that reading a proclamation could qualify as direct and unwelcome exposure to religious speech under some circumstances. Compare Newdow, 355 F. Supp. 2d at 279 (viewing public prayer on television may be injury for standing purposes), with Caldwell v. Caldwell, 545 F.3d 1126, 1133 (9th Cir. 2008) (reading speech on website not necessarily injury for standing purposes).  However, plaintiffs Anne Nicol Gaylor, Paul Gaylor, Phyllis Rose and Jill Dean do not say that they have read or heard any of the proclamations issued

37

by the President in the past or that there is any likelihood that they will do so in the future. Nor do they say that they have altered their behavior in order to avoid seeing or hearing the proclamations. These plaintiffs may be aware through media reports, complaints from foundation members or other sources that Presidents have issued statements regarding prayer, but that is not enough in the context of this claim.

With respect to plaintiffs' challenge to the National Day of Prayer itself, ignorance of the language in the proclamations is not a barrier to standing because plaintiffs are harmed any time they know that the President has enforced the statute by proclaiming the National Day of Prayer. However, plaintiffs cannot challenge the constitutionality of particular statements made by the President if plaintiffs do not even know the content of those statements. Plaintiffs fail to explain how their mere awareness of a proclamation in this context is distinguishable from the injury the Court deemed insufficient in Valley Forge.

Plaintiffs Annie Laurie Gaylor and Dan Barker have personally read some of the presidential statements accompanying proclamations designating the National Day of Prayer, but both admit that the only reason they did so was that they were *looking* expressly for the proclamations. They do not suggest that they happened upon the proclamations while watching the news or reading the newspaper. In fact, Gaylor and Barker emphasize that they closely monitored the websites of the task force and the White House for the purpose of reading the proclamations. Thus, to the extent that such conduct qualifies as an

38

injury at all, whatever distress plaintiffs experienced from reading the proclamations was "fairly traceable" to their own research efforts rather than anything defendants did. Just as plaintiffs could not establish standing for challenging § 119 by poring over the statute books looking for something to be offended by, they may not challenge prayer proclamations by "roam[ing] the country" in search for them. Valley Forge, 454 U.S. at 487. See also National Family Planning and Reproductive Health Association, Inc. v. Gonzales, 468 F.3d 826, 831 (D.C. Cir. 2006) ("[E]ven if self-inflicted harm qualified as an injury it would not be fairly traceable to the defendant's challenged conduct."); Regional Association of Concerned Environmentalists v. United States Dept. of Agriculture, 765 F. Supp. 502, 505 (S.D. Ill. 1990) (plaintiff's visit to environmental site did not establish standing because he made those visits not for recreational purposes but "as part of his ongoing crusade of environmental activism"). Cf. Pennsylvania v. New Jersey, 426 U.S. 660, 664 (1976) ("No State can be heard to complain about damage inflicted by its own hand.")

Plaintiffs cite Buono v. Norton, 212 F. Supp. 2d 1202 (C.D. Cal .2002), for the proposition that a plaintiff may have standing even if she could have avoided the injury. This is true, but unhelpful. As discussed in Section A, taking steps to avoid unwelcome religious speech is a common way to establish standing, e.g., Gonzales, 4 F.3d at1416-17 (avoiding park where monument is); Harris, 927 F.2d at 1404-09 (altering travel route), but it is not the only way. Books II, 401 F.3d at 861-62 ("[C]hanges in behavior, though

39

sufficient to confer standing, are not a prerequisite."). The Court of Appeals for the Seventh Circuit has made it clear that a plaintiff may have standing even if she chooses not to change her routine in order to avoid the offending speech. E.g., Books I, 235 F.3d at 300-01 (plaintiffs who passed religious monument in front of municipal building had standing to bring establishment clause claim even though they could have use different entrance or averted their eyes when passing by monument); see also Mercier, 276 F. Supp. 2d at 969 ("[E]ven if plaintiffs had not altered their behavior, being forced to view a monument that distresses them every time they visited [the park] is an injury in itself. Although plaintiffs could choose not to attend the park, a standing analysis inquires only whether a plaintiff has been injured, not whether a plaintiff could avoid the injury.").

Cases like Books I do not help plaintiffs because the court has emphasized that the plaintiffs' contact with the speech must be incidental, that is, they must be exposed to the speech in the context of doing things they would have done regardless whether that speech existed. In Books I, 235 F.3d at 297, the plaintiffs had standing because they passed the religious monument when they went to the municipal building for other matters, such as paying a traffic ticket or attending city council meetings. In Doe, 41 F.3d at 1158, the plaintiffs had standing because they encountered a religious sign on the municipal building when they voted and performed jury duty. In distinguishing Freedom From Religion Foundation, Inc. v. Zielke, 845 F.2d 1463 (7th Cir. 1988), in which the court concluded

40

that the plaintiffs did not have standing to challenge a religious monument, the court explained that "[t]he plaintiffs in Zielke did not alter their behavior as a result of the monument and failed to demonstrate that they were exposed to the monument *during their normal routines or in the course of their usual driving or walking routes*." Doe, 41 F.3d at 1161 emphasis added). Instead, the plaintiff went to the park so that she could see the monument. Zielke, 845 F.2d at 1466.

Even in Buono, 212 F. Supp. 2d at 1212, the court emphasized that the plaintiff had standing to challenge a religious monument in a public park because his "'enjoyment of the area' will be lessened due to the presence of the cross when he passes through the Preserve in the future *for reasons other than checking on the status of the cross*." In other words, a plaintiff may establish standing by tolerating offensive speech she encounters through her normal routine or by altering her behavior to avoid exposure, but she *cannot* show standing by purposely altering her behavior so that she *is* exposed to the speech, which is what Gaylor and Barker did in this case.

Plaintiff cites Havens Realty Corp. v. Coleman, 455 U.S. 363 (1982), as an example of a case in which the Supreme Court concluded that the plaintiff had standing as a result of a self-inflicted injury. Havens involved a "tester" who was suing for violations of a provision in the Fair Housing Act that prohibits landlords from lying about the availability of an apartment. Id. at 373. The Court concluded that the plaintiff had standing even

41

though "'testers' are individuals who, without an intent to rent or purchase a home or apartment, pose as renters or purchasers for the purpose of collecting evidence of unlawful steering practices." Id. at 373. Thus, in a sense, the plaintiff in Havens was someone who "went looking" for an injury as Gaylor and Barker did.

Although Havens might seem to be in tension with the cases like Valley Forge, Zielke, Doe and Books I, I agree with defendants that Havens is not on point. In that case, the Court concluded that the tester had standing because it was the intent of Congress to create "a legal right to truthful information about available housing," regardless of the person's reasons for seeking the information. Havens, 455 U.S. at 373. The Court emphasized the authority of Congress to recognize injuries that otherwise would be nonjusticiable, suggesting that the tester's "injury" would not be sufficient to establish standing outside an area expressly authorized by Congress. See also Linda R.S. v. Richard D., 410 U.S. 614, 617 n. 3 (1973) ("Congress may enact statutes creating legal rights, the invasion of which creates standing, even though no injury would exist without the statute.")

The Court of Appeals for the Seventh Circuit emphasized this point later in Village of Bellwood v. Dwivedi, 895 F.2d 1521, 1526 (7th Cir. 1990), stating that "[t]he standing of the testers is, as an original matter, dubious" because "they suffer no harm other than that which they invite in order to make a case against the persons investigated." Without that statutory right, standing would not exist, as the court of appeals recognized in Kyles v. J.K.

42

Guardian Security Services, Inc., 222 F.3d 289, 302 (7th Cir. 2000), when it concluded that testers do not have standing to bring a discrimination claim under 42 U.S.C. § 1981 because the language in that statute does not recognize the rights of those not genuinely interested in making a contract. Because of the limited reach of the theory of standing in Havens, it comes as no surprise that plaintiffs fail to identify a single case in which a court relied on Havens outside the context of a statute using similar language. The case is ignored entirely in all of the cases the parties cite regarding standing in the context of challenges under the establishment clause. See also 13A Charles Alan Wright, et al., Federal Practice & Procedure § 3531.2 (3d ed. 2008) (noting several reasons Havens Realty has limited precedential value, including "the role of Congress" in recognizing claimed injury, plaintiffs' request for monetary damages rather than simply injunctive relief and lack of any separation of powers concerns because plaintiffs and defendants were private parties).

This leaves plaintiff Freedom from Religion Foundation. Because plaintiffs have not shown that any of the foundation's members has standing to challenge the President's statements on prayer, the foundation must prove its standing through another route. It attempts to do this by arguing that it has been injured through the expenditure of resources in counteracting presidential proclamations that it could have used for other purposes. In essence, plaintiffs' argument seems to be, "we have standing to challenge presidential prayer proclamations because we spend money and resources challenging presidential prayer

43

proclamations."

Assuming that it is reasonable to infer that the foundation devotes resources to counteracting particular prayer proclamations rather than the National Day of Prayer generally, this is another kind of self-inflicted "injury" that cannot provide the basis for standing.  An immediate red flag raised by plaintiffs' argument is the fact that their theory of organizational standing would allow any group to file a lawsuit on any issue so long as the group could plausibly allege that it had expended a token amount of time or resources in opposition to whatever government action that is the subject of the lawsuit.  That would give automatic standing to virtually every advocacy group in the country on any issue within its purview, a result that is inconsistent with the rule that a "setback to the organization's abstract social interests" is inadequate to establish standing.  Havens Realty, 455 U.S. at 379.  Under plaintiffs' test, even the plaintiff organization in Valley Forge would likely have standing.

The view of the Court of Appeals for the Seventh Circuit on this issue is clear: "[O]rdinary expenditures as part of an organization's purpose do not constitute the necessary injury-in-fact required for standing."  Plotkin v. Ryan, 239 F.3d 882, 886 (7th Cir. 2001). See also Florida State Conference of NAACP v. Browning, 522 F.3d 1153, 1166 (11th Cir. 2008)("[P]laintiffs cannot bootstrap the cost of detecting and challenging illegal practices into injury for standing purposes."); Fair Employment Council of Greater Washington, Inc.

v. BMC Marketing Corp., 28 F.3d 1268, 1276-77 (DC Cir. 1994) (rejecting argument that "an organization devoted exclusively to advancing more rigorous enforcement of selected laws could secure standing simply by showing that one alleged illegality had 'deflected' it from pursuit of another"). The cases cited by plaintiffs involved matters that distracted the organization from its central purpose or made its purpose more difficult; they did not involve the very matters for which the organization was created to combat. E.g., Havens Realty, 455 U.S. at 378-39 (fair housing agency had standing to challenge realty company's racial steering practices because they "perceptibly impaired [agency's] ability to provide counseling and referral services for low-and moderate-income homeseekers"); Crawford v. Marion County Election Board, 472 F.3d 949, 951 (7th Cir. 2007) (Democratic party had standing to challenge photo ID requirement for voting because "the new law . . . compell[ed] the party to devote resources to getting to the polls those of its supporters who would otherwise be discouraged by the new law from bothering to vote").

Even if any of the plaintiffs could show that they had been injured by a particular proclamation, I agree with defendants that plaintiffs would face problems related to ripeness and mootness. Because plaintiffs are not seeking damages, any injuries they might have sustained from *past* prayer proclamations are moot. St. John's United Church of Christ v. City of Chicago, 502 F.3d 616, 627-28 (7th Cir. 2007). With respect to future proclamations, one can only speculate as to the content of any particular proclamation, so

45

those claims are not ripe. Cf. Newdow, 391 F. Supp. 2d at 108 ("[T]his Court cannot now rule on the constitutionality of prayers yet unspoken at future inaugurations of Presidents who will make their own assessments and choices with respect to the inclusion of prayer.")

I also agree with defendants that grave concerns regarding separation of powers are raised by the prospect of granting relief on this claim. It is one thing to issue a narrowly circumscribed injunction regarding a single, ministerial act; it is quite another for a court to issue a broad ruling that dictates the particular language the President may use in any context. If I issued an injunction prohibiting the President from making any "prayer proclamations" (hardly a self-defining term), this would allow plaintiffs to seek an order of contempt against the President any time he made a statement they believed fell within the injunction. Hein, 551 U.S. at 611-12 (plurality opinion) (expressing concern over rule of standing that would require "the federal courts to superintend . . . the speeches, statements, and myriad daily activities of the President, his staff, and other Executive Branch officials") That type of intrusive judicial oversight would not be consistent with the separation of powers doctrine.

## C. Activities of the National Day of Prayer Task Force

Defendant Shirley Dobson is not a government employee. As plaintiffs acknowledge, a person may not be sued for a constitutional violation unless "the challenged action may

46

be fairly treated as that of the [government] itself."  Rodriguez v. Plymouth Ambulance

Service, 577 F.3d 816, 823-24 (7th Cir. 2009) (internal quotations omitted).  However, in

this case, plaintiffs devote almost no argument in their briefs to showing that defendant

Dobson's relationship with government officials is so close that is appropriate to treat her

as if she were a public official.  In fact, plaintiffs say nothing about Dobson's relationship

with President Obama.

This lack of argument is problematic, particularly in light of plaintiffs' incredibly

broad (and vague) request to enjoin Dobson from "acting in concert" with any public official

in any manner that would violate the establishment clause.  It is unlikely that such a

sweeping injunction would be appropriate under any circumstances, but it certainly could

not be justified through anecdotal evidence of Dobson's joint action with selected officials.

A violation in New York would not mean that plaintiff was entitled to relief in California.

Lewis, 518 U.S. at 357 (plaintiff's requested "remedy must of course be limited to the

[violation] that produced the injury in fact that the plaintiff has established").

I need not reach the question whether any of Dobson's activities may be attributed

to the government because plaintiffs have proposed no facts showing that any of her

activities harmed them.  Although plaintiffs argue generally about events related to the

National Day of Prayer, they included no proposed findings of fact in which they say that

they attended any events sponsored by the task force (except perhaps those they sought out

47

in order to protest), altered their behavior to avoid such events or were injured in any way by the events.  To the extent that other information may be lurking in other evidentiary materials, it is not the court's obligation to "scour the record" in search of it.  <u>Johnson v. Cambridge Industries, Inc.</u>, 325 F.3d 892, 898 (7th Cir. 2003).  <u>See also</u> <u>Chelios v. Heavener</u>, 520 F.3d 678 (7th Cir. 2008) ("Given the often daunting nature of motions for summary judgment, we have emphasized the importance of local rules and have consistently and repeatedly upheld a district court's discretion to require strict compliance with its local rules.") (internal quotations omitted).  Accordingly, I must grant defendant Dobson's motion for summary judgment and dismiss the complaint as to plaintiffs' claims against her.


ORDER

IT IS ORDERED that

1.  The motions for summary judgment filed by plaintiffs Freedom from Religion Foundation, Anne Nicol Gaylor, Annie Laurie Gaylor, Paul Gaylor, Dan Barker, Phyllis Rose and Jill Dean, dkt. #103, and by defendants Barack Obama and Robert Gibbs, dkt. #82, are GRANTED in part and DENIED in part:

(a) Plaintiffs' motion is GRANTED and defendants' motion is DENIED  on the question whether plaintiffs have standing to challenge the constitutionality of 36 U.S.C. § 119;

(b) Defendants' motion is GRANTED and plaintiffs' motion is DENIED on the question whether plaintiffs have standing to challenge the constitutionality of prayer proclamations generally.  Plaintiffs' complaint is DISMISSED as to that claim for plaintiffs' lack of standing.

2.   Defendant Shirley Dobson's motion for summary judgment, dkt. #79, is GRANTED on the ground that plaintiffs have not shown they have standing to sue her. Plaintiffs' complaint is DISMISSED as to that defendant.

3.  I will address the merits of plaintiffs' claim challenging the constitutionality of § 119 in a separate opinion.

Entered this 1st day of March, 2010.

BY THE COURT:

/s/

_____
BARBARA B. CRABB
District Judge

49