IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WISCONSIN

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

FREEDOM FROM RELIGION FOUNDATION, INC.,
ANNE NICOL GAYLOR, ANNIE LAURIE GAYLOR,
DAN BARKER, PAUL GAYLOR, PHYLLIS ROSE                    OPINION and ORDER
and JILL DEAN,

     Plaintiffs,
              08-cv-588-bbc

   v.

President BARACK OBAMA and
White House Press Secretary ROBERT L. GIBBS,

     Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

   The role that prayer should play in public life has been a matter of intense debate in

this country since its founding.  When the Continental Congress met for its inaugural

session in September 1774, delegate Thomas Cushing proposed to open the session with a

prayer.  Delegates John Jay and John Rutledge (two future Chief Justices of the Supreme

Court) objected to the proposal on the ground that the Congress was "so divided in religious

Sentiments . . . that We could not join in the same Act of Worship."  Eventually, Samuel

Adams convinced the other delegates to allow the reading of a psalm the following day.

Letter from John Adams to Abigail Adams (Sept. 16, 1774), <u>available at</u>

1

http://www.masshist.org/digitaladams. The debate continued during the Constitutional Convention (which did not include prayer) and the terms of Presidents such as George Washington, Thomas Jefferson and James Madison, each of whom held different views about public prayer under the establishment clause. It continues today. In recent decades, the Supreme Court has decided a number cases regarding the constitutionality of public prayer in various contexts, often generating controversy regardless of the outcome.

This case explores one aspect of the line that separates government sponsored prayer practices that are constitutional from those that are not. Brought under 42 U.S.C. § 1983, the case raises the question whether the statute creating the "National Day of Prayer," 36 U.S.C. § 119, violates the establishment clause of the United States Constitution. Plaintiff Freedom from Religion Foundation and several of its members contend that the statute is unconstitutional because it endorses prayer and encourages citizens to engage in that particular religious exercise. President Barack Obama, who is charged with enforcing the statute by issuing a proclamation each year, and his press secretary, Robert Gibbs, contend that the statute is simply an "acknowledgment of the role of religion in American life" and is indistinguishable from government practices that courts have upheld in the past.

The parties have filed cross motions for summary judgment. Dkt. ##82 and 103. The American Center for Law and Justice, representing some members of Congress, has filed an amicus brief in favor of defendants. Dkt. #59. In a previous order, I concluded that

plaintiffs have standing to challenge § 119, but not to challenge presidential prayer proclamations generally. In addition, I concluded that because plaintiffs had failed to show that Shirley Dobson, the chairperson for the National Day of Prayer Task Force, injured them, they had no standing to sue her. Accordingly, I dismissed the complaint as to Dobson. Dkt. #131.

Plaintiffs' challenge to § 119 arises at the intersection of two different lines of Supreme Court jurisprudence. On one hand, the Court has held on many occasions that the government violates the establishment clause when it engages in conduct that a reasonable observer would view as an endorsement of a particular religious belief or practice, including prayer. On the other hand, the Court has held that some forms of "ceremonial deism," such as legislative prayer, do not violate the establishment clause. In <u>Van Orden v. Perry</u>, 545 U.S. 677, 683 (2005) (a case challenging the placement of a Ten Commandments monument on public property), a plurality of the Court stated that its establishment clause cases were "Januslike, point[ing] in two directions."

Although there is tension among these cases, I do not believe they are irreconcilable; they simply show that context is important when applying the establishment clause. In my view of the case law, government involvement in prayer may be consistent with the establishment clause when the government's conduct serves a significant secular purpose and is not a "call for religious action on the part of citizens." <u>McCreary County, Kentucky v.</u>

American Civil Liberties Union of Kentucky, 545 U.S. 844, 877 (2005).

Unfortunately, § 119 cannot meet that test. It goes beyond mere "acknowledgment" of religion because its sole purpose is to encourage all citizens to engage in prayer, an inherently religious exercise that serves no secular function in this context. In this instance, the government has taken sides on a matter that must be left to individual conscience. "When the government associates one set of religious beliefs with the state and identifies nonadherents as outsiders, it encroaches upon the individual's decision about whether and how to worship." McCreary County, 545 U.S. at 883 (O'Connor, J., concurring). Accordingly, I conclude that § 119 violates the establishment clause.

It bears emphasizing that a conclusion that the establishment clause prohibits the government from endorsing a religious exercise is not a judgment on the value of prayer or the millions of Americans who believe in its power. No one can doubt the important role that prayer plays in the spiritual life of a believer. In the best of times, people may pray as a way of expressing joy and thanks; during times of grief, many find that prayer provides comfort. Others may pray to give praise, seek forgiveness, ask for guidance or find the truth. "And perhaps it is not too much to say that since the beginning of th[e] history [of humans] many people have devoutly believed that 'More things are wrought by prayer than this world dreams of.'" Engel v. Vitale, 370 U.S. 421, 433 (1962). However, recognizing the importance of prayer to many people does not mean that the government may enact a

statute in support of it, any more than the government may encourage citizens to fast during the month of Ramadan, attend a synagogue, purify themselves in a sweat lodge or practice rune magic. In fact, it is because the nature of prayer is so personal and can have such a powerful effect on a community that the government may not use its authority to try to influence an individual's decision whether and when to pray.

From the parties' proposed findings of fact and the record, I find that the following facts are undisputed.

## UNDISPUTED FACTS

### A. The Parties

Plaintiff Freedom from Religion Foundation is an organization founded in 1976 in Madison, Wisconsin. It is devoted to "promot[ing] the constitutional principle of separation of church and state" and "educat[ing] the public on matters of nontheism." Plaintiffs Anne Nicol Gaylor, Annie Laurie Gaylor, Dan Barker, Paul Gaylor, Phyllis Rose and Jill Dean are members of the foundation. Defendant Barack Obama is the President of the United States. Defendant Robert Gibbs is the President's press secretary.

### B. The 1952 Statute

In 1952, evangelist Billy Graham led a six week religious campaign in Washington,

D.C., holding events in the National Guard Armory and on the Capitol steps. The campaign culminated in a speech in which Graham called for a national day of prayer:

> Ladies and gentlemen, our Nation was founded upon God, religion and the church . . . .
>
> . . .
>
> What a thrilling, glorious thing it would be to see the leaders of our country today kneeling before Almighty God in prayer. What a thrill would sweep this country. What renewed hope and courage would grip the Americans at this hour of peril.
>
> . . .
>
> We have dropped our pilot, the Lord Jesus Christ, and are sailing blindly on without divine chart or compass, hoping somehow to find our desired haven. We have certain leaders who are rank materialists; they do not recognize God nor care for Him; they spend their time in one round of parties after another. The Capital City of our Nation can have a great spiritual awakening, thousands coming to Jesus Christ, but certain leaders have not lifted an eyebrow, nor raised a finger, nor showed the slightest bit of concern.
>
> Ladies and gentlemen, I warn you, if this state of affairs continues, the end of the course is national shipwreck and ruin.

After Graham's speech, Representative Percy Priest introduced a bill to establish a National Day of Prayer. In addressing the House of Representatives, he noted that the country had been "challenged yesterday by the suggestion made on the east steps of the Capitol by Billy Graham that the Congress call on the President for the proclamation of a day of prayer."

In support of the bill, Representative Brooks stated that "the national interest would

be much better served if we turn aside for a full day of prayer for spiritual help and guidance from the Almighty during these troublous times. I hope that all denominations, Catholics, Jewish and Protestants, will join us in this day of prayer." Representative Peter W. Rodino, Jr., stated that "it is fitting and timely that the people of America, in approaching the Easter season, as God-fearing men and women, devote themselves to a day of prayer in the interest of peace."

Absalom Robertson introduced the bill in the Senate, stating that it was a measure against "the corrosive forces of communism which seek simultaneously to destroy our democratic way of life and the faith in an Almighty God on which it is based."  A committee report in the House of Representatives  stated that the purpose of the bill "is to direct the President to proclaim a National Day of Prayer each year."  A Senate report included the following statement:

> From its beginning the United States of America has been a nation fully cognizant of the value and power of prayer.  In the early days of colonization, the Pilgrims frequently engaged in prayer.  When the delegates to the Constitutional Convention encountered difficulties in writing and formation of a Constitution for this Nation, prayer was suggested and became an established practice at succeeding sessions.[1]  Today, both Houses of Congress are opened daily with prayer.
>
> Prayer has indeed been a vital force in the growth and development of

---

[1]  This part of the report is not accurate.  <u>Marsh v. Chambers</u>, 463 U.S. 783, 787 (1983) ("[P]rayers were not offered during the Constitutional Convention.")

this Nation.  It would certainly be appropriate if, pursuant to this resolution, and the proclamation it urges, the people of this country were to unite in a day of prayer each year, each in accordance with his own religious faith, thus reaffirming in a dramatic manner the deep religious conviction which has prevailed throughout the history of the United States.

On April 17, 1952, Congress passed Public Law 82- 324:

The President shall set aside and proclaim a suitable day each year, other than a Sunday, as a National Day of Prayer, on which the people of the United States may turn to God in prayer and meditation at churches, in groups, and as individuals.

## C.  The 1988 Statute

In 1988, Vonette Bright, founder of the Campus Crusade for Christ, and the National Day of Prayer Committee lobbied Congress to amend the National Day of Prayer statute because Bright "believed that we should have a day in this country where we cover this nation in prayer and the leaders."   When the bill was discussed in the House of Representatives in March 1988, Representative Tony Hall, the bill's sponsor, stated that its purpose was to "bring more certainty to the scheduling of events related to the National Day of Prayer and permit more effective long-range planning."  He quoted the statement of Pat Boone, the co-chairperson of the National Prayer Committee, that the law in existence at the time "offered little advance notice to adequately inform the grassroots constituencies."

Strom Thurmond introduced the bill in the Senate.  He stated that, because the

National Day of Prayer has "a date that changes each year, it is difficult for religious groups to give advance notice to the many citizens who would like to make plans for their church and community. Maximum participation in the public knowledge of this event could be achieved, if, in addition to its being proclaimed annually, it were established as a specific, annual, calendar day." Senator Jesse Helms stated that the bill would allow "Americans . . . to plan and prepare to intercede as a corporate body on behalf of the Nation and its leaders from year to year with certainty." He believed that "America must return to the spiritual source of her greatness and reclaim her religious heritage. Our prayer should be that—like the Old Testament nation of Israel—Americans would once again 'humble themselves, and pray, and seek God's face, and turn from [our] wicked ways' so that God in heaven will hear and forgive our sins and heal our land."

On May 5, 1988, Congress approved Public Law 100-307, "setting aside the first Thursday in May as the date on which the National Day of Prayer is celebrated." On May 9, 1988, President Ronald Reagan signed the bill into law. The current version of the statute provides:

> The President shall issue each year a proclamation designating the first Thursday in May as a National Day of Prayer on which the people of the United States may turn to God in prayer and meditation at churches, in groups, and as individuals.

D.  <u>The National Day of Prayer in Practice</u>

All Presidents since 1952 have issued proclamations designating the National Day of Prayer each year.  Since 1988 the National Day of Prayer has been held on the first Thursday in May.  The President's proclamations are released by the Office of the Press Secretary.

In 2008, President Bush hosted an event in the East Room celebrating the National Day of Prayer. All 50 governors issued proclamations in support of the day.  On May 7, 2009, President Obama issued a proclamation designating the day to be the National Day of Prayer.

The National Day of Prayer Task Force was created in 1989.  It is a private organization with a mission to "communicate with every individual the need for personal repentance and prayer, mobilizing the Christian community to intercede for America and its leadership in the seven centers of power: Government, Military, Media, Business, Education, Church and Family."  It offers "draft" proclamations for the President to consider and it chooses a theme each year with supporting scripture from the Bible.  In 2001, the President incorporated the task force's theme of "One Nation under God"; in 2008 he adopted the task force's theme of "Prayer! America's Strength and Shield."  The chairperson for the task force has spoken at eight White House prayer services on the National Day of Prayer.

The task force organizes between 30,000 and 40,000 prayer gatherings across the country in conjunction with the National Day of Prayer. Events sponsored by the task force are "specifically limited to the Judeo-Christian heritage and those who share that conviction as expressed in the Lausanne Covenant," which includes beliefs that the Bible is "the only written word of God, without error in all that it affirms" and that "there is only one Savior and only one gospel." Coordinators, volunteers and speakers at task force events must share these views in order to participate.

OPINION

As world history and current events around the globe show all too clearly, few topics inspire stronger opinions and emotions than religion. Perhaps because of the importance of the questions addressed by religion and the centrality of religious beliefs to a person's identity, disagreements about those beliefs and their role in society can be intense and heated. L. Scott Smith, Religion, Politics and the Establishment Clause, 10 Chap. L. Rev. 299, 300 (2006) (arguing that religion "constitutes the most fundamental fault line of the conflict" regarding "political worldviews"). Thus, it should come as no surprise that the federal judiciary's interpretations of the establishment clause are among its most controversial decisions of the last few decades. Regardless whether a decision has favored a more robust interpretation of the clause or a more permissive one, controversy has followed

any ruling from the Supreme Court on the appropriate relationship between the government and religion. Even when the questions involve symbolism rather than tangible benefits, parties on both sides may expend substantial resources to support what they view as the correct resolution of the matter and protest vigorously those decisions they believe came out wrong.

Decisions under the establishment clause are controversial and difficult in part because of the competing values at stake in each case. Religious freedom under the First Amendment contains two components, the right to practice one's religion without undue interference under the free exercise clause and the right to be free from disfavor or disparagement on account of religion under the establishment clause. All three branches of government engage in a constant struggle to balance these competing rights, to protect religious freedom without denigrating any particular religious viewpoint. Cutter v. Wilkinson, 544 U.S. 709, 719 (2005) ("While the two Clauses express complementary values, they often exert conflicting pressures.").

Reasonable minds often differ regarding the appropriate balance in a given case. However, unlike other branches of government, the federal courts may not avoid controversial decisions or rely on public opinion in making those decisions when the answer is not clear. Rather, courts must review the applicable law in each case and determine in good faith how that law applies to the facts. That general commitment to the rule of law

applies with equal force when a decision may conflict with the deeply held beliefs of many, or even a majority, of citizens.

## A. Establishment Clause and the Executive Branch

The First Amendment states that "Congress shall make no law respecting an establishment of religion. . . ."  U.S. Const., amend I.  In her brief in support of her motion for summary judgment, former defendant Shirley Dobson argued that the establishment clause does not apply to the President because the executive branch is not included in the express language of the amendment, only Congress.  Although the President himself does not deny that he is bound by the establishment clause and Dobson is no longer a defendant in this case, I will address the argument briefly for the sake of completeness.

An initial problem with Dobson's argument is that the only question remaining in this case is the constitutionality of 36 U.S.C. § 119, a statute enacted by Congress.  However, even if the President's enforcement of the statute could be considered separately from the statute itself, it is far too late in the day to accept the argument Dobson advances.  The First Amendment contains not only the establishment clause, but also the clauses regarding free speech, free exercise of religion, a free press and petitioning the government for redress of grievances.  Thus, the logical conclusion of Dobson's argument is that the entire First Amendment is limited to legislative acts.

As courts and commentators have discussed, the framers used the word "Congress" in the First Amendment to make it clear that the Bill of Rights applied to the federal government and not the states, but there was no intention to limit the reach of the amendment to legislative acts. Shrum v. City of Coweta, Oklahoma, 449 F.3d 1132, 1140-43 (10th Cir. 2006); Akhil Amar, America's Constitution: A Biography 316 (2006). (The Supreme Court later concluded that the First Amendment applies to the states through the due process clause of the Fourteenth Amendment. Cantwell v. Connecticut, 310 U.S. 296, 303(1940)). If the executive branch were free to disregard the First Amendment, it would mean that decades of Supreme Court decisions are invalid. Although it may be true that the Court has not held expressly that the First Amendment applies to executive acts, it has applied that amendment to the executive branch on many occasions. E.g., United States v. National Treasury Employees Union, 513 U.S. 454, 465 (1995); New York Times Co. v. United States, 403 U.S. 713 (1971); Lamont v. Postmaster General, 381 U.S. 301, 305 (1965). See also McCreary County, Kentucky v. American Civil Liberties Union of Kentucky, 545 U.S. 844, 877 (2005) ("To that end, we have held that the guarantees of religious freedom protect citizens from religious incursions by the States as well as by the Federal *Government*.") (emphasis added); School District of Abington Township, Pennsylvania v. Schempp, 374 U.S. 203, 222 (1963) ("[T]he Establishment Clause prohibits . . . [the] official support of the State or Federal *Government* be[ing] placed behind the tenets

of one or of all orthodoxies.") (emphasis added).

Further, Dobson's argument is inconsistent with the Supreme Court's general view that constitutional rights should apply equally to different forms of government, even when a literal reading of the text would not support that conclusion. E.g., Adarand Constructors, Inc. v. Pena, 515 U.S. 200, 224 (1995) (concluding that due process clause in Fifth Amendment should be construed to apply to federal government under same standard that equal protection clause is applied to state government, even though those two amendments employ dissimilar texts); Wallace v. Jaffree, 472 U.S. 38, 48-55 (1985) (rejecting argument that establishment clause should apply differently to state government). At this stage of the development of constitutional jurisprudence, it is not reasonable to believe that one branch of government is not bound by the the First Amendment.

## B. Purpose and Effect: The Endorsement Test

The Supreme Court has noted often that the establishment clause is the result of the lesson learned from history that, when the government takes sides on questions of religious belief, a dangerous situation may be created, both for the favored and the disfavored groups. McCreary County, 545 U.S. at 876 ("The Framers and the citizens of their time intended not only to protect the integrity of individual conscience in religious matters, but to guard against the civic divisiveness that follows when the government weighs in on one side of

15

religious debate.") (internal citations omitted); <u>Lee v. Weisman</u>, 505 U.S. 577, 591-92 (1992) ("The explanation lies in the lesson of history that was and is the inspiration for the Establishment Clause, the lesson that in the hands of government what might begin as a tolerant expression of religious views may end in a policy to indoctrinate and coerce."); <u>Engel v. Vitale</u>, 370 U.S. 421, 430 (1962) ("[The clause's] first and most immediate purpose rested on the belief that a union of government and religion tends to destroy government and to degrade religion.")

Thus, although the Court has framed the requirements of the establishment clause in various ways, generally the tests revolve around principles of neutrality or equality, both among different religions and between religion and nonreligion. <u>E.g.</u>, <u>McCreary County</u>, 545 U.S. at 875-76 ("[T]he government may not favor one religion over another, or religion over irreligion, religious choice being the prerogative of individuals under the Free Exercise Clause."); <u>Board of Education of Kiryas Joel Village School Dist. v. Grumet</u>, 512 U.S. 687, 703 (1994) ("[T]he government should not prefer one religion to another, or religion to irreligion."); <u>County of Allegheny v. American Civil Liberties Union Greater Pittsburgh Chapter</u>, 492 U.S. 573, 590-91 (1989) ("[G]overnment may not promote or affiliate itself with any religious doctrine or organization, may not discriminate among persons on the basis of their religious beliefs and practices, may not delegate a governmental power to a religious institution, and may not involve itself too deeply in such an institution's affairs.");

Epperson v. Arkansas, 393 U.S. 97, 104 (1968) (government "may not . . . promote one religion or religious theory against another or even against the militant opposite").

The test applied most commonly by courts when interpreting the establishment clause was articulated first in Lemon v. Kurtzman, 403 U.S. 602 (1971). Under Lemon, government action violates the establishment clause if (1) it has no secular purpose; (2) its primary effect advances or inhibits religion; or (3) it fosters an excessive entanglement with religion. Although individual justices have criticized the test, e.g., Santa Fe Independent School District v. Doe, 530 U.S. 290, 319 (2000) (Rehnquist, C.J., dissenting); Tangipahoa Parish Board of Education v. Freiler, 530 U.S. 1251 (2000) (Scalia, J., dissenting from denial of certiorari), the Supreme Court as a whole continues to apply it. E.g., McCreary County, 545 U.S. at 859-67. Further, it is the test the Court of Appeals for the Seventh Circuit has employed in recent cases brought under the establishment clause. E.g., Milwaukee Deputy Sheriffs' Association v. Clarke, 588 F.3d 523 (7th Cir. 2009); Vision Church v. Village of Long Grove, 468 F.3d 975, 991-92 (7th Cir. 2006).

The first two parts of the Lemon test are often described as the "endorsement test." E.g., Linnemeir v. Board of Trustees of Purdue University, 260 F.3d 757, 764 (7th Cir. 2001) (Lemon test requires courts to "determin[e] . . . whether [government action] constitutes an impermissible endorsement or disapproval of religion"); Freedom from Religion Foundation, Inc. v. City of Marshfield, Wisconsin, 203 F.3d 487, 493 (7th Cir.

2000) (purpose of <u>Lemon</u> test is "to determine whether government action constitutes an endorsement of religion"). This means that "<u>Lemon's</u> inquiry as to the purpose and effect of a statute requires courts to examine whether government's purpose is to endorse religion and whether the statute actually conveys a message of endorsement." <u>Wallace</u>, 472 U.S. at 69. <u>See also</u> <u>Allegheny</u>, 492 U.S. at 592 ("[W]e have paid particularly close attention to whether the challenged governmental practice either has the purpose or effect of 'endorsing' religion, a concern that has long had a place in our Establishment Clause jurisprudence.")

To many, the idea of government endorsement of religion is not only acceptable, but also a desirable way to promote public morality and strengthen community bonds. <u>E.g.</u>, <u>Schempp</u>, 374 U.S. at 223-24 (school's stated purpose in reading Bible passages to students was to "promot[e] moral values" and "contradic[t] the materialistic trends of our times"). To those people, the problem is that government does not promote religion *enough*. This view is demonstrated by Billy Graham in his speech calling for a National Day of Prayer and by former defendant Dobson in her deposition. She testified that "many people look to the President as the moral leader and sometimes even the spiritual leader. . . . [W]e would like to see him encourage people of all faiths to pray on that day. . . . I think it's critical that the leaders do support this nation's day of prayer because they're role models to their people." Dobson Dep., dkt. #124, at 82-83, 92. To those whose beliefs comport with the message sent by the government, it is difficult to understand why anyone would object to the

18

message.

However, religious expression by the government that is inspirational and comforting to a believer may seem exclusionary or even threatening to someone who does not share those beliefs. This is not simply a matter of being "too sensitive" or wanting to suppress the religious expression of others. Rather, as explained in a recent book by the Provost of Princeton University and the Dean of the University of Texas School of Law, it is a consequence of the unique danger that religious conduct by the government poses for creating "in" groups and "out" groups:

> Religious affiliation typically implicates an expansive web-of-belief and conduct, and individuals often feel and are seen as "in" or "out" of such webs. In a variety of ways the perceived and actual stakes of being within or without these webs of belief and membership can be very high: being fulfilled and redeemed or eternally damned; being welcomed as a member of the community or shunned. Moreover, it is in the nature of religion that persons outside a given faith will on occasion fail to understand or appreciate matters internal to that faith, and so will be inappropriately indifferent, suspicious, or even repelled and hostile to beliefs and practices central to that faith. These are matters of sociological fact, and they justify distinct constitutional concern that governmental conduct will valorize some beliefs at the cost of disparaging others, and further, that in the course of such conduct, government will valorize some citizens at the cost of disparaging others.

Christopher L. Eisgruber and Lawrence G. Sager, <u>Religious Freedom and the Constitution</u> 61-62 (2007).

As an example, Eisgruber and Sager ask the reader to imagine citizens who are erecting a large sign at the entrance to their town. One potential slogan is "Fineville: A

Nuclear-Free Community"; another possibility is "Fineville: A Christian Community." Although both signs could create heated disagreements among the citizens of the town, it is unlikely that the first sign would be construed as a message of *disparagement* by those who believe in nuclear power. In contrast, the second sign would almost certainly be viewed by non-Christians as a message that they are not welcome in the community or that they are simply a tolerated minority that does not have equal status to Christian residents of the town. Id. at 124-25.

Justice O'Connor has framed the problem concisely: "government cannot endorse the religious practices and beliefs of some citizens without sending a clear message to nonadherents that they are outsiders or less than full members of the political community." Allegheny, 492 U.S. at 627 (O'Connor, J., concurring); see also Santa Fe, 530 U.S. at 309-10 ("[S]ponsorship of a religious message is impermissible because it sends the ancillary message to members of the audience who are nonadherents that they are outsiders, not full members of the political community, and an accompanying message to adherents that they are insiders, favored members of the political community.") (internal quotations omitted). She explained the problem more fully in McCreary County, 545 U.S. at 883:

> When the government associates one set of religious beliefs with the state and identifies nonadherents as outsiders, it encroaches upon the individual's decision about whether and how to worship. In the marketplace of ideas, the government has vast resources and special status. Government religious expression therefore risks crowding out private observance and distorting the natural interplay between

competing beliefs. Allowing government to be a potential mouthpiece for competing religious ideas risks the sort of division that might easily spill over into suppression of rival beliefs. Tying secular and religious authority together poses risks to both.

Defendants suggest that <u>Lemon</u> and the endorsement test may not apply in this case, citing the opinion in <u>Van Orden v. Perry</u>, 545 U.S. 677, 686 (2005), in which a plurality of the Court concluded that <u>Lemon</u> was "not useful" in assessing the constitutionality of a Ten Commandments monument and that "the nature of the monument and . . . our Nation's history" were the important factors. <u>See also</u> <u>Lynch v. Donnelly</u>, 465 U.S. 668, 679 (1984) ("[W]e have repeatedly emphasized our unwillingness to be confined to any single test or criterion in this sensitive area."). Although defendants are correct that the endorsement test under <u>Lemon</u> is not without its exceptions, it remains the predominant test of the Supreme Court and the Court of Appeals for the Seventh Circuit. Accordingly, I will apply the endorsement test to § 119, considering whether the purpose and effect of the statute is to convey a message of government endorsement of religion, and then consider possible alternatives to that test.

### C. Applying the Endorsement Test to the National Day of Prayer

Under 36 U.S.C. § 119, "[t]he President shall issue each year a proclamation designating the first Thursday in May as a National Day of Prayer on which the people of the United States may turn to God in prayer and meditation at churches, in groups, and as

individuals."  If the endorsement test is controlling, there can be little doubt that § 119 violates the establishment clause.  I begin with the question whether the effect of § 119 is to convey a message that the government is endorsing religion.

1.  Effect of the National Day of Prayer

In evaluating the "effect" of any particular governmental action, the focus is on whether a "reasonable observer" would view the government's conduct as endorsing religion. Zelman v. Simmons-Harris, 536 U.S. 639, 655 (2002); Santa Fe, 530 U.S. at 308; Books v. Elkhart County, Indiana, 401 F.3d 857, 867 (7th Cir. 2005).  Defendants do not deny that prayer is an inherently religious exercise.  North Carolina Civil Liberties Union Legal Foundation v. Constangy, 947 F.2d 1145, 1150 (4th Cir. 1991) (stating that prayer is "intrinsically religious"); cf. Stone v. Graham, 449 U.S. 39, 41-42 (1980) (in concluding that state's Ten Commandments display violated establishment clause, noting that display was "plainly religious in nature" and that the Ten Commandments are an "instrument of religion").  The statute itself defines prayer as a method of "turn[ing] to God."

Further, it is difficult to argue that the statute does not "endorse" prayer within the meaning of past Supreme Court cases.  The National Day of Prayer is one of a select few days on the calendar that Congress has officially recognized in a statute.  The other days are directly related to patriotism, e.g., 36 U.S.C. § 106 (Constitution Day and Citizenship Day);

22

36 U.S.C. § 124 (National Freedom Day); 36 U.S.C. § 110 (Flag Day), public health, e.g., 36 U.S.C. § 101 (American Heart Month); 36 U.S.C. § 103 (Cancer Control Month), family, e.g., 36 U.S.C. § 117 (Mother's Day), or a celebrated historical figure, e.g., 36 U.S.C. § 141 (Thomas Jefferson's Birthday); 36 U.S.C. § 143 (Wright Brothers Day). All of these statutes are in a section of the United States Code called "Patriotic and National Observances." In other words, these are all matters that the government is encouraging its citizens to celebrate and respect. (Thanksgiving and Christmas are recognized in another part of the code in a statute listing federal holidays. 5 U.S.C. § 6103. These holidays are discussed in the next section.)

Even if one were to ignore the other statutes surrounding § 119 in the United States Code, the very nature of having a statute involving a "national day" in recognition of a particular act connotes endorsement and encouragement. Justice Kennedy has acknowledged that the National Day of Prayer "is a straightforward endorsement of the concept of 'turn[ing] to God in prayer.'" Allegheny, 492 U.S. at 672 (Kennedy, J., concurring in the judgment in part and dissenting in part). A reasonable observer of the statute or a proclamation designating the National Day of Prayer would conclude that the federal government is encouraging her to pray. Cf. Stone, 449 U.S. at 42 ("If the posted copies of the Ten Commandments are to have any effect at all, it will be to induce the schoolchildren to read, meditate upon, perhaps to venerate and obey, the Commandments. However

23

desirable this might be as a matter of private devotion, it is not a permissible state objective under the Establishment Clause.")

In previous cases, the Supreme Court has made statements that seem to bear directly on the constitutionality of § 119.  In Wallace, 472 U.S. at 59, the Court held that a statute providing a "moment of silence or voluntary prayer" in Alabama schools was unconstitutional because it "convey[ed] a message of state endorsement and promotion of prayer."   In Santa Fe, 530 U.S. at 313, the Court was even more on point:  "the religious liberty protected by the Constitution is abridged when the State affirmatively sponsors the particular religious practice of prayer."  These statements, found in the majority opinions of the Court, seem to leave little room to argue that an official day of prayer sponsored by the federal government can survive a challenge under the establishment clause.  See also Engel, 370 U.S. at 435 ("[E]ach separate government in this country should stay out of the business of writing or sanctioning official prayers and leave that purely religious function to the people themselves and to those the people choose to look to for religious guidance."); Mellen v. Bunting, 327 F.3d 355, 375 (4th Cir. 2003) ("[T]he Establishment Clause prohibits a state from promoting religion by . . . promoting prayer for its citizens.")

One might argue that the National Day of Prayer does not violate the establishment clause because it does not endorse any one religion.  Unfortunately, that does not cure the problem.  Although adherents of many religions "turn to God in prayer," not all of them do.

McCreary, 545 U.S. at 879-81 (rejecting view that establishment clause allows government to prefer monotheistic faiths to other religions). Further, the statute seems to contemplate a specifically Christian form of prayer with its reference to "churches" but no other places of worship and the limitation in the 1952 version of the statute that the National Day of Prayer may not be on a Sunday. Even some who believe in the form of prayer contemplated by the statute may object to encouragements to pray in such a public manner. E.g., Matthew 6:5 ("You, however, when you pray, go into your private room and, after shutting your door, pray to your Father who is in secret; then your Father who looks on in secret will repay you.").

In any event, the establishment clause is not limited to discrimination among different sects. The First Amendment "guarantee[s] religious liberty and equality to 'the infidel, the atheist, or the adherent of a non-Christian faith such as Islam or Judaism.'" Allegheny, 492 U.S. at 590 (quoting Wallace, 472 U.S. at 52). Even endorsement of "religion generally, clashes with the 'understanding, reached . . . after decades of religious war, that liberty and social stability demand a religious tolerance that respects the religious views of all citizens.'" McCreary County, 545 U.S. at 860 (quoting Zelman, 536 U.S. at 718 (Breyer, J., dissenting)). Thus, the government's religious conduct cannot survive scrutiny under the establishment clause simply because it endorses multiple religions instead of just one. Lee, 505 U.S. at 590 ("The suggestion that government may establish an official

or civic religion as a means of avoiding the establishment of a religion with more specific creeds strikes us as a contradiction that cannot be accepted."); id. at 617 (Souter, J., concurring) ("Nor does it solve the problem to say that the State should promote a 'diversity' of religious views; that position would necessarily compel the government and, inevitably, the courts to make wholly inappropriate judgments about the number of religions the State should sponsor and the relative frequency with which it should sponsor each."); Allegheny, 492 U.S. at 615 ("The simultaneous endorsement of Judaism and Christianity is no less constitutionally infirm than the endorsement of Christianity alone."); Engel, 370 U.S. at 430 ("[T]he fact that the prayer may be denominationally neutral [cannot] serve to free it from the limitations of the Establishment Clause").   As the Court pointed out in Lee, 505 U.S. at 594,  and Santa Fe, 530 U.S. at 305, although the government may be attempting to help more people feel included by endorsing widespread religious practices, this may actually exacerbate the sense of isolation and exclusion felt by the relatively few who remain on the outside.

None of the parties suggest that the inclusion of the phrase "or meditation" has any effect on the establishment clause analysis, such as by including an alternative for adherents of nontheistic religions or nonbelievers.  From its context within the statute, the inclusion of meditation seems to have been an afterthought.   The statute does not create a "National Day of Prayer and Meditation," but only a National Day of Prayer.   Further, the statute

seems to assume that even meditation is a religious exercise directed toward God because it is included in the awkward phrase "turn to God in . . . meditation." Finally, as will be discussed below, the legislative history of the statute includes no discussion of meditation, only a Judeo-Christian understanding of prayer.

## 2. Purpose of the National Day of Prayer

Sometimes a statute that may seem at first blush to promote a religious belief may survive scrutiny under the establishment clause if the benefit to religion is incidental and the government has a valid secular purpose for its conduct. Metzl v. Leininger, 57 F.3d 618, 620 (7th Cir. 1995) ("[A] law that promotes religion may nevertheless be upheld either because of the secular purposes that the law also serves or because the effect in promoting religion is too attenuated to worry about."). For example, in McGowan v. Maryland, 366 U.S. 420 (1961), the Court upheld a state's Sunday closing law because many employees would prefer not to work on Sunday regardless of their religion. Other commonly cited examples are the national observances of Christmas and Thanksgiving. E.g., Lynch, 465 U.S. at 675. Although these holidays have religious origins, their celebration by the government does not connote endorsement in the eyes of the reasonable observer because of the significant secular meaning the holidays now have. Metzl, 57 F.3d at 620.

The key question becomes whether the government can identify a secular purpose for

conduct that seems religious on its face.  Id. at 622 (stating that government has burden to demonstrate secular purpose for holiday that is religious on its face).  Thus, public recognition of a holiday may violate the establishment clause in one state but not another because of different showings made by the government.  Compare Bridenbaugh v. O'Bannon, 185 F.3d 796, 800-01 (7th Cir. 1999) (upholding Indiana law closing government offices on Good Friday because purpose of law was not to celebrate holiday but to give employees day off when many schools are closed and many other employers recognize it as a holiday), with Metzl, 57 F.3d at 623 (concluding that Illinois statute recognizing Good Friday as state holiday violated establishment clause because government did not adduce sufficient evidence to show that statute served secular purpose), and Freedom From Religion Foundation, Inc. v. Thompson, 920 F. Supp. 969 (W.D. Wis. 1996) (Wisconsin statutes establishabling Good Friday as state holiday for "the purpose of worship" and closing state government on afternoon of Good Friday violated establishment clause because express purpose of statutes was to favor Christianity).  See also McCreary County, 545 U.S. at 861 ("[I]f the government justified [Sunday closing laws] with a stated desire for all Americans to honor Christ, the divisive thrust of the official action would be inescapable."); Allegheny, 492 U.S. at 601 ("The government may acknowledge Christmas as a cultural phenomenon, but under the First Amendment it may not observe it as a Christian holy day by suggesting that people praise God for the birth of Jesus.")

a. Legislative history

In this case, examining the purpose of the statute does not diminish the message of endorsement in the statute. Defendants point to the "official" purpose of the original statute in the Congressional Record: "to direct the President to proclaim a National Day of Prayer each year." S. Rep. No. 82-1389. However, that is simply a restatement of the language in the statute, so it is difficult to see how it provides any helpful insight.

Although there is little legislative history for the National Day of Prayer, several of its sponsors made statements that were placed in the Congressional Record. As discussed in the undisputed facts section, the bill proposing the National Day of Prayer was introduced at the conclusion of a "phenomenal evangelistic revival" in Washington, D.C. led by Billy Graham in which he gave a speech on the Capitol steps asking Congress to "call on the President for the proclamation of a day of prayer." 98 Cong. Rec. 771, A910 (1952). Graham stated that "men have come to believe that religion has no place in the affairs of the state . . . We have dropped our pilot, the Lord Jesus Christ, and are sailing blindly on without divine chart or compass . . . God is warning the American people, through the preaching of His word, to repent of sin and turn to God while there is time." Id. at A910-11. He wished "to see the leaders of our country today kneeling before the Almighty God in prayer." Id. at A910.

Percy Priest introduced a bill in the House of Representatives "embod[ying] the suggestions made . . . on the steps of the Capitol by the great spiritual leader, Billy Graham." 98 Cong. Rec. 771. Representatives made statements in support of the bill that "the national interest would be much better served if we turn aside for a full day of prayer for spiritual help and guidance from the Almighty during these troublous times," id., and that "it is fitting and timely that the people of America, in approaching the Easter season, as God-fearing men and women, devote themselves to a day of prayer in the interest of peace."

In the Senate, sponsor Absalom Robertson stated that a National Day of Prayer was a measure against "the corrosive forces of communism which seek simultaneously to destroy our democratic way of life and the faith in an Almighty God on which it is based." 98 Cong. Rec. 976 (1952). A Senate report concluded that

> Prayer has indeed been a vital force in the growth and development of this Nation. It would certainly be appropriate if, pursuant to this resolution, and the proclamation it urges, the people of this country were to unite in a day of prayer each year, each in accordance with his own religious faith, thus reaffirming in a dramatic manner the deep religious conviction which has prevailed throughout the history of the United States.

S. Rep. No. 82-1389.

This legislative history supports the view that the purpose of the National Day of Prayer was to encourage all citizens to engage in prayer, and in particular the Judeo-Christian view of prayer. One might argue that members of Congress voiced secular purposes: to

protect against "the corrosive forces of communism" and promote peace. That is true, but the references to these purposes do nothing to diminish the message of endorsement. If anything, they contribute to a sense of disparagement by associating communism with people who do not pray. A fair inference that may be drawn from these statements is that "Americans" pray; if you do not believe in the power of prayer, you are not a true American. Identifying good citizenship with a particular religious belief is precisely the type of message prohibited by the establishment clause. Allegheny, 492 U.S. at 593-94 ("The Establishment Clause, at the very least, prohibits government from appearing to take a position on questions of religious belief."); see also Frederick Mark Gedicks & Roger Hendrix, Uncivil Religion: Judeo-Christianity and the Ten Commandments, 110 W. Va. L. Rev. 275, 305 (2007) ("[L]inking patriotism and citizenship to civil religion in circumstances of religious pluralism will inevitably result in alienation of those portions of the population who cannot see themselves in the model citizen presupposed by the civil religion.")

Citing Board of Education of Westside Community Schools v. Mergens By and Through Mergens, 496 U.S. 226 (1990), defendants argue that it is improper to rely on the motive of individual legislators to find a religious purpose. The Supreme Court has not been completely consistent on this issue. Compare Mergins, 496 U.S. at 249 ("[W]hat is relevant is the legislative purpose of the statute, not the possibly religious motives of the legislators who enacted the law."), with Edwards v. Aguillard, 482 U.S. 578, 587 (1987) (relying on

statement of statute's sponsor in finding that statute had religious purpose), and <u>Wallace</u>, 472 U.S. at 57 (same).  In any event, the point of reviewing the legislative history is not to show that the motives of individual legislators create a constitutional violation where one did not exist before; it is only to show that nothing in the legislative history serves to diminish the religious endorsement conveyed by the statute on its face.

The 1988 amendment to the statute creates an additional problem.  It is clear that the sole purpose of the amendment was to "permit more effective long-range planning" for religious groups that wish to celebrate the National Day of Prayer and use it to mobilize their "grassroots constituencies."  134 Cong. Rec. H22761-02.  In other words, the 1988 amendment does not serve any purpose for the government or the country as a whole, but simply facilitates the religious activities of particular religious groups. Although those groups undoubtedly appreciate that assistance, they are not entitled to it.  "[T]he Establishment Clause prohibits precisely what occurred here: the government's lending its support to the communication of a religious organization's religious message." <u>Allegheny</u>, 492 U.S. at 601. <u>See also</u> <u>Metzl</u>, 57 F.3d at 621 ("[T]he First Amendment does not allow a state to make it easier for adherents of one faith to practice their religion than for adherents of another faith to practice their religion, unless there is a secular justification for the difference in treatment.")

b.  Acknowledgment of religion

Defendants argue that the purpose and effect of the National Day of Prayer is to acknowledge the role of religion in American life, which is not objectionable. Lynch, 465 U.S. at 674 ("There is an unbroken history of official acknowledgment by all three branches of government of the role of religion in American life from at least 1789."); Wallace, 472 U.S. at 70 (O'Connor, J., concurring) ("The endorsement test does not preclude government from acknowledging religion."). Certainly, the statute accomplishes that purpose. However, the line between "acknowledgment" and "endorsement" is a fine one.  Because it is, "courts must keep in mind both the fundamental place held by the Establishment Clause in our constitutional scheme and the myriad, subtle ways in which Establishment Clause values can be eroded.  Government practices that purport to celebrate or acknowledge events with religious significance must be subjected to careful judicial scrutiny." Lynch, 465 U.S. at 694 (O'Connor, J., concurring).

Establishment clause values would be significantly eroded if the government could promote any longstanding religious practice of the majority under the guise of "acknowledgment."  *Any* religious conduct by the government could be framed as mere "acknowledgment" of religion, including the public prayers the Court declared unconstitutional in Lee and Santa Fe and the religious displays in McCreary and Allegheny. It is notable that, in cases in which a majority of the Court finds an establishment clause

violation, justices in dissenting opinions often argue that the religious conduct is simply an acknowledgment of religion.  McCreary, 545 U.S. at 906 (Scalia, J., dissenting); Lee, 505 U.S. at 631  (Scalia, J., dissenting); Allegheny, 492 U.S. at 657 (Kennedy, J., concurring in the judgment in part and dissenting in part).

The Court has been most likely to find "acknowledgment" of religion permissible when it is part of a larger secular message.  Lynch, 465 U.S. at 679-80 (upholding display of crèche that was part of larger holiday display); Van Orden, 645 U.S. at 704 (upholding display of Ten Commandments that was part of larger display of monuments "all designed to illustrate the 'ideals' of those who settled in Texas and of those who have lived there since that time").  In McCreary, 545 U.S. at 877 n.24, the Court stated that the government crosses the line between acknowledgment and endorsement when it "manifest[s] [the] objective of subjecting individual lives to religious influence," "insistently call[s] for religious action on the part of citizens" or "expresse[s] a purpose to urge citizens to act in prescribed ways as a personal response to divine authority."  This is exactly what § 119 does by encouraging all citizens to pray every first Thursday in May.  If the government were interested only in acknowledging the role of religion in America, it could have designated a "National Day of Religious Freedom" rather than promote a particular religious practice.

c.  Accommodating religion

Under some circumstances, religious conduct by the government may be justified by an interest in *accommodating* the free exercise rights of citizens. <u>Cutter</u>, 544 U.S. at 720 (holding that Religious Land Use and Institutionalized Persons Act, which prohibits government from imposing substantial burdens on prisoners' religious exercise except in narrow circumstances, is accommodation of religion); <u>Corporation of the Presiding Bishop</u> <u>of the Church of Jesus Christ of Latter-Day Saints v. Amos</u>, 483 U.S. 327, 334 (1987) (holding that it is accommodation of religion to exempt religious organizations from Title VII's prohibition on religious discrimination). However, a government's ability to provide benefits to a religion is not without limit, even and perhaps especially when the majority of those in the community adhere to that religion. In a sense, "[a]ny [government action] pertaining to religion can be viewed as an 'accommodation' of free exercise rights." <u>Amos</u>, 483 U.S. at 347 (O'Connor, J., concurring in judgment). Thus, the "principle that government may accommodate the free exercise of religion does not supersede the fundamental limitations imposed by the Establishment Clause." <u>Lee</u>, 505 U.S. at 587.

Generally, religious accommodation is appropriate when it is necessary to alleviate government-imposed burdens on religion. <u>Allegheny</u>, 492 U.S. at 601; <u>Wallace</u>, 472 U.S. at 57. In that case, the government's goal is not to advance or endorse religion, but to engender equality by lifting burdens that members of other faiths do not face.

No such burden exists in this case. With or without a statute, private citizens are free

to pray at any time. Cf. Santa Fe, 530 U.S. at 313 ("[N]othing in the Constitution as interpreted by this Court prohibits any public school student from voluntarily praying at any time before, during, or after the schoolday."); Wallace, 472 U.S. at 57 ("[A]t the time of the enactment of [the 'moment of silence' statute], there was no governmental practice impeding students from silently praying for one minute at the beginning of each schoolday; thus, there was no need to 'accommodate' or to exempt individuals from any general governmental requirement because of the dictates of our cases interpreting the Free Exercise Clause.") Private citizens are also free to join together to hold celebrations of their faith, including by proclaiming their own day of prayer.

The *only* way that § 119 "accommodates" religion is to communicate the message that the government endorses prayer and encourages its citizens to engage in it. That is not an accommodation under Supreme Court precedent; it is taking sides on a matter of religious belief. Because supporters of the National Day of Prayer "have no need for the machinery of the State to affirm their beliefs, the government's sponsorship" of that day in § 119 "is most reasonably understood as an official endorsement of religion and, in this instance, of theistic religion." Lee, 505 U.S. at 629-30 (Souter, J., concurring) (discussing whether allowing clergy-led prayer at public high school graduation could be described as "accommodation" of religion); see also Allegheny, 492 U.S. at 611-12 ("[S]ome Christians may wish to see the government proclaim its allegiance to Christianity in a religious

celebration of Christmas, but the Constitution does not permit the gratification of that desire."). "One may fairly say . . . that the government [enacted § 119] 'precisely because some people want a symbolic affirmation that government approves and endorses their religion, and because many of the people who want this affirmation place little or no value on the costs to religious minorities." Lee, 505 U.S. at 629-30 (Souter, J., concurring) (quoting Laycock, Summary and Synthesis: The Crisis in Religious Liberty, 60 Geo. Wash. L. Rev. 841, 844 (1992)).

Because the National Day of Prayer does not have a secular purpose or effect, it cannot survive scrutiny under Lemon and the endorsement test. Under these circumstances, the National Day of Prayer is indistinguishable from the Good Friday holiday the court of appeals struck down in Metzl, 57 F.3d 618. Like Good Friday and unlike Christmas and Thanksgiving, one could say about the National Day of Prayer that it "has accreted no secular rituals. . . . It is a day of . . . religious observance, and nothing else, for believ[ers] . . . [T]here is nothing in [the National Day of Prayer] for [non-believers], as there is in the other holidays [such as Christmas and Thanksgiving] despite the Christian origin of those holidays." Id. at 620-21. And unlike the defendant government in Bridenbaugh, which permitted a day off for state employees on Good Friday because it made logistical sense, defendants have identified no purpose that § 119 serves other than to encourage and facilitate prayer.

C.  Potential Limitations on *Lemon* and the Endorsement Test

Although a "straightforward" application of the endorsement test under Lemon supports a finding that the National Day of Prayer violates the establishment clause, defendants point out that the Supreme Court jurisprudence interpreting the establishment clause is not based exclusively on the endorsement test.  Thus, they argue that the endorsement test should not apply to this case; instead, the court should look at factors such as the lack of coercion in the statute and the long history of presidential prayer proclamations.

1.  Coercive effects and children as the primary audience

Defendants observe in both of their briefs that participation in the National Day of Prayer is voluntary.  Dfts.' Br., dkt. # 83 at 36; Dfts.' Br., dkt. # 118, at 31.  Although they do not explain why that observation is relevant to deciding this case, they cite two cases in which the Supreme Court discussed coercive elements of prayer at school graduations and football games.  Santa Fe, 530 U.S. 290; Lee, 505 U.S. 577.  They cite the same cases for the proposition that government sponsorship of prayer is not a problem under the establishment clause unless children are the primary audience.  Dfts.' Br., dkt. #83, at 28.

I am not persuaded that Santa Fe or Lee supports a view that government endorsement of prayer violates the establishment clause only when participation in a

religious exercise is "forced" or when children are the only subjects of the religious exercise. To begin with, as a number of Justices have recognized, incorporating an element of "coercion" into the establishment clause would give it little or no independent meaning apart from the free exercise clause, which prohibits the government from compelling conformity to any religious belief or practice. Lee, 505 U.S. at 621 (Souter, J., concurring with Stevens, J. and O'Connor, J.). Further, the "coercion" discussed in Santa Fe and Lee was not a requirement to act, but the relatively mild social pressure felt when one listens to a prayer at a public event. Lee, 505 U.S. at 592 (describing pressure as "subtle and indirect"). In Engel, 370 U.S. at 431, the Court went so far as to suggest that any government endorsement of religion has the potential to be coercive in that way: "[w]hen the power, prestige and financial support of government is placed behind a particular religious belief, the indirect coercive pressure upon religious minorities to conform to the prevailing officially approved religion is plain."

In any event, the Court has explicitly rejected the argument that religious conduct of the government "does not violate the Establishment Clause unless [it is] shown to be 'coercive.'" Allegheny, 492 U.S. at 579. For example, in Engel, 370 U.S. at 430, the Court stated that the "Establishment Clause, unlike the Free Exercise Clause, does not depend upon any showing of direct governmental compulsion and is violated by the enactment of laws which establish an official religion whether those laws operate directly to coerce

nonobserving individuals or not."  In <u>Wallace</u>, 472 U.S. at 60, the Court held that the "addition of 'or *voluntary* prayer' [to a statute calling for a 'moment of silence'] indicates that the State intended to characterize prayer as a favored practice. Such an endorsement is not consistent with the established principle that the government must pursue a course of complete neutrality toward religion."  <u>See also</u> <u>Lee</u>, 505 U.S. at 618-19 (Souter, J., concurring) (collecting cases in which Court has found government conduct to violate establishment clause without relying on coercion).  Although the Court noted potentially coercive forces contributing to an establishment clause violation in <u>Lee</u> and <u>Sante Fe</u>, it did not state that coercion was required or otherwise call into question <u>Engel</u>, <u>Allegheny</u>, <u>Wallace</u> or any other case involving endorsement without coercion.

Defendants are on stronger footing when they argue that religious conduct by the government in the school setting has received greater scrutiny from the Court than similar conduct elsewhere.  Many of the cases discussed in this opinion originated in schools and in some of those the Court emphasized the "impressionable" nature of children.  <u>Lee</u>, 505 U.S. at 593 ("[A]dolescents are often susceptible to pressure from their peers towards conformity, and that . . . influence is strongest in matters of social convention."); <u>Wallace</u>, 472 U.S. at 81 (O'Connor, J., concurring) ("This Court's decisions have recognized a distinction when government-sponsored religious exercises are directed at impressionable children who are required to attend school, for then government endorsement is much more

likely to result in coerced religious beliefs.").  Taking its cue from <u>Lee</u>, in <u>Tanford v. Brand</u>, 104 F.3d 982, 985-86 (7th Cir. 1997), the court of appeals went so far as to conclude that a "University's inclusion of a brief non-sectarian invocation and benediction" at graduation did not violate the establishment clause, relying in part on the fact that college graduates are more "mature" than high school students.  <u>But</u> <u>see</u> <u>Mellen</u>, 327 F.3d at 368 (supper prayers at Virginia Military Institute violate establishment clause); <u>Coles ex rel. Coles v. Cleveland Board of Education</u>, 171 F.3d 369, 381 (6th Cir. 1999) (opening school board meetings with prayer violates establishment clause).

Although these cases suggest that the standard under the establishment clause is sensitive to context, including the age of the audience, I cannot conclude that the Supreme Court or the court of appeals has implied that the endorsement test is limited to schools and students.  If that were the case, the Supreme Court could not have found establishment clause violations in <u>Allegheny</u> and <u>McCreary</u>, which involved religious displays that were not directed at children and had no element of coercion beyond the act of endorsement.  Similarly, the court of appeals has held in numerous cases that religious symbolism outside the school context violated the establishment clause simply because it represented a religious endorsement.  <u>E.g.</u>, <u>Indiana Civil Liberties Union v. O'Bannon</u>, 259 F.3d 766 (7th Cir. 2001); <u>Books v. City of Elkhart</u>, 235 F.3d 292 (7th Cir. 2000); <u>Gonzales v. North Township of Lake County</u>, 4 F.3d 1412 (7th Cir. 1993); <u>Harris v. City of Zion</u>, 927 F.2d 1401 (7th

Cir. 1991); American Civil Liberties Union v. City of St. Charles, 794 F.2d 265 (7th Cir. 1986).

Even in Tanford, the court did not suggest that it was abandoning the endorsement test. Rather, the court held that the invocation survived constitutional scrutiny because it did "not have a primary effect of endorsing or disapproving religion." Tanford, 104 F.3d at 986. In particular, the court concluded that the invocation was merely "ceremonial" and "serve[d] [the] legitimate secular purpos[e] of solemnizing [a] public occasio[n]." Id. Under Tanford, religious messages directed at adults may be different because adults are less likely to construe a "ceremonial" religious reference as an endorsement. Thus, the question for this case is whether the National Day of Prayer is akin to a ceremonial religious reference rather than a true endorsement. I address that question in the next section.

## 2. *Marsh v. Chambers*: "ceremonial deism"

In one instance, the Supreme Court rejected an establishment clause challenge against what has since been called an example of "ceremonial deism." In Marsh v. Chambers, 463 U.S. 783 (1983), the Court upheld a longstanding practice in the Nebraska legislature to open sessions with a prayer. The Court wrote that "the practice of opening legislative sessions with prayer has become part of the fabric of our society. To invoke Divine guidance on a public body entrusted with making the laws is . . . simply a tolerable acknowledgment

of beliefs widely held among the people of this country." Id. at 792.

In addition to the invocation in Tanford, the Court of Appeals for the Seventh Circuit has concluded that the phrase "under God" in the Pledge of Allegiance does not violate the establishment clause because it is a "ceremonial referenc[e] to God" rather than a supplicatio[n] for divine assistance." Sherman v. Community Consolidated School District 21 of Wheeling Township, 980 F.2d 437, 446 (7th Cir. 1992). Thus, "reciting the pledge may be no more of a religious exercise than the reading aloud of Lincoln's Gettysburg Address" or other historical documents that contain "allusion[s]" to God. Id. at 447; see also Elk Grove Unified School District v. Newdow, 542 U.S. 1, 42-43 (2004) (O'Connor, J., concurring in judgment) (stating that "it is a close question" whether Pledge of Allegiance violates establishment clause, but concluding ultimately that it does not).

Defendants and amici rely heavily on Marsh, arguing that, if legislative prayer is an acceptable practice under the establishment clause, the National Day of Prayer statute must be constitutional as well. However, answering questions under the establishment clause requires more than simply comparing practices in different cases at a high level of generality. The Court found the government's display of a crèche permissible in Lynch, but unconstitutional in Allegheny. Similarly, in Stone and McCreary, the Court found that a display of the Ten Commandments violated the establishment clause, but declined to find a violation in Van Orden. These cases prove Justice O'Connor's observation in Lynch, 465

43

U.S. at 694, that "[e]very government practice must be judged in its unique circumstances to determine whether it constitutes an endorsement or disapproval of religion." See also Lee, 505 U.S. at 597 ("Our Establishment Clause jurisprudence remains a delicate and fact-sensitive one."). This requires a determination regarding whether the reasons for allowing ceremonial deism such as legislative prayer apply equally to the National Day of Prayer statute.

Case law does not necessarily provide clear guidance for determining the types of practices that fall into the category of ceremonial deism and the reason those practices survive constitutional scrutiny. The Court did not employ any particular test or theory for its decision in Marsh, 463 U.S. at 791 , instead relying on the "unique history" of legislative prayer. Although the Court has discussed Marsh in subsequent cases, it has not relied on it to justify similar practices. Coles, 171 F.3d at 381 ("As far as Marsh is concerned, there are no subsequent Supreme Court cases. Marsh is one-of-a-kind.") In McCreary, 545 U.S. at 860, the Court simply stated without elucidation that Marsh was a "special instanc[e] in which we have found good reason to hold governmental action legitimate even where its manifest purpose was presumably religious." One judge observed recently that ceremonial deism is a "hazily defined" concept and suggested that it "represents mainly the judiciary's less than courageous response" to certain longstanding religious practices. Newdow v. Rio Linda Union School District, 597 F.3d 1007, 1110 (Reinhardt, J., dissenting) (9th Cir.

2010).

Although the Court's explanation of the holding and scope of <u>Marsh</u> is less than clear, Justice O'Connor provided a helpful discussion in her concurrence in <u>Lynch</u>. She explained that the legislative prayer at issue in <u>Marsh</u> is similar to other practices such as the

> government['s] declaration of Thanksgiving as a public holiday, printing of "In God We Trust" on coins, and opening court sessions with "God save the United States and this honorable court." Those government acknowledgments of religion serve, in the only ways reasonably possible in our culture, the legitimate secular purposes of solemnizing public occasions, expressing confidence in the future, and encouraging the recognition of what is worthy of appreciation in society. For that reason, and because of their history and ubiquity, those practices are not understood as conveying government approval of particular religious beliefs.

<u>Lynch</u>, 465 U.S. at 693 (O'Connor, J., concurring); <u>see also</u> <u>Elk Grove</u>, 542 U.S. at 35 (O'Connor, J., concurring in the judgment) (ceremonial deism "speak[s] in the language of religious belief, [but it is] more properly understood as employing the idiom for essentially secular purposes"). The obvious appeal of Justice O'Connor's interpretation is that it harmonizes <u>Marsh</u> with <u>Lemon</u> and the endorsement test, resolving what otherwise seems to be an irreconcilable conflict in the cases. In <u>Allegheny</u>, 492 U.S. at 495, the Court acknowledged Justice O'Connor's view and seemed to adopt it. Since <u>Allegheny</u>, no majority of the Court has repudiated it.

Under this view, the key question is again whether a particular practice serves a secular purpose. A brief invocation opening certain public functions may serve to remind

45

the audience of the importance of their task without encouraging or endorsing the act of prayer itself. Similarly, the Pledge of Allegiance serves the obvious secular purpose of instilling patriotism. Newdow, 597 F.3d at 1012 ("We hold that the Pledge of Allegiance does not violate the Establishment Clause because Congress' ostensible and predominant purpose was to inspire patriotism and that the context of the Pledge—its wording as a whole, the preamble to the statute, and this nation's history—demonstrate that it is a predominantly patriotic exercise.")

Section 119 cannot be justified on similar grounds. The statute does not use prayer to further a secular purpose; it endorses prayer for its own sake. Further, as the Court recognized in Allegheny, 492 U.S. at 603 n.52, the National Day of Prayer is different from legislative prayer because "[l]egislative prayer does not urge citizens to engage in religious practices." More recently, in McCreary, 545 U.S. at 877 n.24, the Court reaffirmed a similar view when it stated that the government's conduct cannot be described as mere "acknowledgment" of religion if it "call[s] for religious action on the part of citizens." See also Simpson v. Chesterfield County Board of Supervisors, 404 F.3d 276, 289-90 (4th Cir. 2005) ("Ever since Marsh, the Supreme Court has continued to recognize the distinction between prayer engaged in by the government for itself and prayer imposed on the people, subjecting the latter form of prayer to heightened scrutiny."); Van Zandt v. Thompson, 839 F.2d 1215, 1219 (7th Cir. 1988) ("Based on Marsh we are inclined to view a legislature's

46

internal spiritual practices as a special case.").

3. _Marsh v. Chambers_: "history and ubiquity"

Defendants rely on a second aspect of <u>Marsh</u>, 462 U.S. at 783, unrelated to the nature of the religious practice, in which the Court noted that opening legislative sessions with prayer had an "unambiguous and unbroken history of more than 200 years." In particular, the Court noted that the first Congress had authorized such prayers: "Clearly the men who wrote the First Amendment Religion Clause did not view paid legislative chaplains and opening prayers as a violation of that Amendment, for the practice of opening sessions with prayer has continued without interruption ever since that early session of Congress." <u>Id.</u> at 788. Defendants and _amici_ argue vigorously that the National Day of Prayer should be upheld because its roots may be traced back to 1789 when the first Congress requested President Washington to issue a thanksgiving proclamation. I disagree for several reasons.

First, neither the Supreme Court nor the court of appeals has ever held that religious conduct that would otherwise violate the establishment clause may be upheld for the sole reason that the practice has a long history. "[N]o one acquires a vested or protected right in violation of the Constitution by long use, even when that span of time covers our entire national existence and indeed predates it." <u>Walz v. Tax Commisson of City of New York</u>, 397 U.S. 664, 678 (1970); <u>see also</u> <u>Allegheny</u>, 492 U.S. at 630 (O'Connor, J., concurring)

("Historical acceptance of a practice does not in itself validate that practice under the Establishment Clause if the practice violates the values protected by that Clause, just as historical acceptance of racial or gender based discrimination does not immunize such practices from scrutiny under the Fourteenth Amendment.") Even in <u>Marsh</u>, 463 U.S. at 790, the Court stated that, "[s]tanding alone, historical patterns cannot justify contemporary violations of constitutional guarantees." Some even have argued that the longstanding nature of a practice may exacerbate the constitutional injury rather than ameliorate it because "religious outsiders [must] tolerate these practices . . . with the awareness that those who share their religious beliefs have endured these practices for generations." Steven B. Epstein, <u>Rethinking the Constitutionality of Ceremonial Deism</u>, 96 Colum. L. Rev. 2083, 2164 (1996).

If one were to read the establishment clause as permitting any practice in existence around the time of the framers, this would likely mean that the government would be free to discriminate against all non-Christians:

> [H]istory shows that the religion of concern to the Framers was not that of the monotheistic faiths generally, but Christianity in particular, a fact that no Member of this Court takes as a premise for construing the Religion Clauses. Justice Story probably reflected the thinking of the framing generation when he wrote in his Commentaries that the purpose of the Clause was "not to countenance, much less to advance, Mahometanism, or Judaism, or infidelity, by prostrating Christianity; but to exclude all rivalry among Christian sects."

<u>McCreary County</u>, 545 U.S. at 880; <u>see also</u> <u>Allegheny</u>, 492 U.S. at 590 ("Perhaps in the

early days of the Republic [the establishment clause was] understood to protect only the diversity within Christianity.").  Although no one on the Court adheres to the view that the establishment clause is limited to prohibiting discrimination among Christian sects, it seems that such a belief endured for many years.  <u>Holy Trinity Church v. United States</u>, 143 U.S. 457, 471 (1892) (in unanimous opinion, stating that "this is a Christian nation").  Thus, if history is controlling, it would require the Supreme Court to overrule much of its establishment clause jurisprudence of the last 50 years.  <u>E.g.</u>, Garrett Coyle, <u>The Role of Tradition in Establishment Clause Jurisprudence</u>, 65 N.Y.U. Ann. Surv. Am. L. 137, 171 (2009) (noting that Court declared public school Bible reading in <u>Schempp</u> unconstitutional despite long history of practice).  In many of the cases in which the Supreme Court or the court of appeals concluded that a particular act violated the establishment clause, the dissenting justices argued that the majority was disregarding history.  <u>Santa Fe</u>, 530 U.S. at 318 (Rehnquist, C.J., dissenting) ("Neither the holding nor the tone of the opinion is faithful to the meaning of the Establishment Clause, when it is recalled that George Washington himself, at the request of the very Congress which passed the Bill of Rights, proclaimed a day of 'public thanksgiving and prayer'"); <u>Lee</u>, 505 U.S. at 633 (Scalia, J., dissenting) ("The history and tradition of our Nation are replete with public ceremonies featuring prayers of thanksgiving and petition."); <u>Wallace</u>, 472 U.S. at 85 (comparing "moment of silence" statute to practices in place "since 1789") (Burger, C.J., dissenting).

As Justice Souter has noted, even "leaders who have drafted and voted for a text are eminently capable of violating their own rules." <u>Van Orden</u>, 545 U.S. at 726 (Souter, J., dissenting). This is shown by the fact that "the Congress that proposed the Fourteenth Amendment also enacted laws that tolerated segregation, and the fact that 10 years after proposing the First Amendment, Congress enacted the Alien and Sedition Act, which indisputably violated our present understanding of the First Amendment." <u>Id.</u>

For these reasons, "the early Congress's political actions" are "relevant" rather than "determinative . . . evidence of constitutional meaning." <u>Lee</u>, 505 U.S. 577 at 626 (Souter, J., concurring). Under the endorsement test, the "history and ubiquity of a practice is relevant because it provides part of the context in which a reasonable observer evaluates whether a challenged governmental practice conveys a message of endorsement of religion." <u>Allegheny</u>, 492 U.S. at 630-31 (O'Connor, J., concurring). However, this does not mean that a practice gets a "free pass" under the establishment clause simply because it is old. If a longstanding practice retains its religious significance and fails to acquire secular meaning, it may convey a message of endorsement. <u>Id.</u> Again, unlike legislative prayer or the Pledge of Allegiance, the National Day of Prayer serves no purpose but to encourage a religious exercise, making it difficult for a reasonable observer to see the statute as anything other than a religious endorsement.

However, even if I were to assume that history could be dispositive, it would be

important to determine the extent to which § 119 embodies a particular historical tradition. Defendants rely on individual presidential thanksgiving proclamations to show an "unambiguous and unbroken history," but the constitutionality of such proclamations is no longer at issue in this case. Although plaintiffs sought a declaration that all presidential "prayer proclamations" violate the establishment clause, I dismissed this claim because plaintiffs failed to show they had standing to raise it. Dkt. #131. The only remaining question in this case is whether 36 U.S.C. § 119 is unconstitutional.

No tradition existed in 1789 of Congress requiring an annual National Day of Prayer on a particular date. It was not until 1952 that Congress established a legislatively mandated National Day of Prayer; it was not until 1988 that Congress made the National Day of Prayer a fixed, annual event. Defendants identify no other instance in which Congress has endorsed a particular religious practice in a statute.

The thanksgiving proclamations are distinct from § 119 in at least three important ways. First, thanksgiving proclamations serve an obvious secular purpose of giving thanks. Of course, one can be thankful without subscribing to any particular religious belief. Other presidential proclamations mentioning prayer often were issued during war or other times of crisis. Derek H. Davis, Religion and the Continental Congress, 1774-1789 83-91 (2000). Thus, these proclamations were more about taking notice of particular events rather than prayer, making them similar to the ceremonial religious references in other cases. Second,

a President's statements of his *own* beliefs about prayer are less likely to be viewed as an official endorsement than a permanent statement from the government in the form of a statute encouraging all citizens to pray. Van Orden, 545 U.S. at 723 (Stevens, J., dissenting) (contrasting "Thanksgiving Day proclamations and inaugural speeches," which "have embedded within them the inherently personal views of the speaker as an individual member of the polity" with "permanent" messages that "amalgamat[e] otherwise discordant individual views into a collective statement of government approval"). Third, unlike § 119, thanksgiving proclamations are not an attempt to help particular religious groups organize.

Finally, even if I were to consider as relevant the actions of early Presidents, that tradition does not point in one direction. Although George Washington may have supported thanksgiving proclamations, Thomas Jefferson and James Madison did not. "President Jefferson . . . steadfastly refused to issue Thanksgiving proclamations of any kind, in part because he thought they violated the Religion Clauses." Lee, 505 U.S. at 623 (Souter, J., concurring). Jefferson explained that "[e]very religious society has a right to determine for itself the times for [prayers] and the objects proper for them according to their own particular tenets; and this right can never be safer than in their own hands where the Constitution has deposited it . . . [C]ivil powers alone have been given to the [federal government], and no authority to direct the religious exercises of [its] constituents." 11 Writings of Thomas Jefferson 429 (A. Lipscomb ed. 1904), quoted in Wallace, 472 U.S. at

103 (Rehnquist, J., dissenting).

Madison objected to thanksgiving proclamations because they "seem to imply and certainly nourish a *national* religion," 3 <u>The Papers of James Madison</u> 560 (1962), <u>quoted in</u> Davis, <u>supra</u>, at 90 (emphasis in original), and, more specifically, they tend "to narrow the recommendation to the standard of the predominant sect." <u>Madison's Detached Memoranda</u>, <u>quoted in</u> <u>Lee</u>, 505 U.S. at 617 (Souter, J., concurring). Although Madison "gave in to demands to proclaim days of thanksgiving" during the War of 1812, Davis, <u>supra</u>, at 90, he later regretted it, <u>McCreary</u>, 545 U.S. at 879 n. 25, which simply shows how difficult it can be as an elected official to resist popular opinion, even if it violates one's own principles.

A few years later, Andrew Jackson followed Jefferson's example and refused to issue thanksgiving prayer proclamations. Although he personally believed in "the efficacy of prayer," he also believed that such proclamations might "disturb the security which religion now enjoys in this country in its complete separation from the political concerns of the General Government." <u>Correspondence of Andrew Jackson</u> (1929), <u>quoted in</u> John Meacham, <u>American Gospel</u> 111 (2006).

"The fair inference is that there was no common understanding [among the framers] about the limits of the establishment prohibition," <u>McCreary County</u>, 545 U.S. at 879, or prayer proclamations specifically. Thus, defendants cannot rely on history to overcome the

endorsement test.

4.  Justice Breyer's concurrence in *Van Orden*

Justice Breyer provided the fifth vote in <u>Van Orden</u> to uphold the display of the Ten Commandments monument on the grounds of the Texas state capitol.  He did not join the opinion of Chief Justice Rehnquist in which a four-justice plurality concluded that the monument was consistent with the establishment clause because of "the nature of the monument and . . . our Nation's history."  <u>Van Orden</u>, 545 U.S. at 686; <u>id.</u> at 704 (Breyer, J., concurring in the judgment) ("I cannot agree with today's plurality's analysis.")  Instead, he concurred in the judgment, providing his own reasons for upholding the display in "a borderline case."  <u>Id.</u> at 700.

First, Justice Breyer stated that "no exact formula can dictate a resolution to such fact-intensive cases"; he preferred "the exercise of legal judgment" that takes into account "the underlying purposes of the Clauses [and the] context and consequences measured in light of those purposes."  <u>Id.</u>  He proceeded to consider a number of factors to support his conclusion  that "the State itself intended the . . . nonreligious aspects of the tablets' message to predominate [and] that that has been its effect."  <u>Id.</u> at 701.  For example, he noted the secular nature of the organization that donated the monument and the physical setting of the monument, which included numerous other monuments and markers "all designed to

illustrate the 'ideals' of those who settled in Texas and of those who have lived there since that time." Id. at 702. He concluded by noting that the "display is unlikely to prove divisive" because it has "stood apparently uncontested for nearly two generations." Id. at 704.

Because no single opinion in <u>Van Orden</u> garnered five votes, it provides little guidance for lower courts. The Court of Appeals for the Seventh Circuit has described what to do in this situation:

> [When] [n]o single opinion [speaks] for the Court[,] we thus must strive to discern what exactly the decision requires. <u>Marks v. United States</u>, 430 U.S. 188, 193 (1977) provides the general rule for dealing with this kind of outcome: "When a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds" (internal quotation marks omitted). When, however, a concurrence that provides the fifth vote necessary to reach a majority does not provide a "common denominator" for the judgment, the <u>Marks</u> rule does not help to resolve the ultimate question. . . . In a situation like [that], it is risky to assume that the Court has announced any particular rule of law.

<u>United States v. Heron</u>, 564 F.3d 879, 883-85 (7th Cir. 2009).

The parties do not discuss whether they believe that Justice Breyer's opinion is controlling under <u>Marks</u>. His opinion is so dissimilar to that of the plurality that it is difficult to say with certainty whether his opinion provides the "common denominator" for the outcome. The Court of Appeals for the Seventh Circuit has not considered this question

and other courts have provided varying answers.  Compare Card v. City of Everett, 520 F.3d 1009, 1018 (9th Cir. 2008) ("[T]he controlling opinion in Van Orden  is, of course, that of Justice Breyer."), and Staley v. Harris County, Texas, 485 F.3d 305, 309 (5th Cir. 2007) ("Justice Breyer's concurrence is the controlling opinion in Van Orden"), with O'Connor v. Washburn University, 416 F.3d 1216, 1224 (10th Cir. 2005) ("[After Van Orden,] [t]his court will therefore continue to apply the Lemon test as modified by Justice O'Connor's endorsement test, while remaining mindful that there is 'no test-related substitute for the exercise of legal judgment.'"), and Myers v. Loudoun County Public Schools, 418 F.3d 395, 402 (4th Cir. 2005) (citing Justice Breyer's statement that there is "no single mechanical formula that can accurately draw the constitutional line in every case," but not discussing directly extent to which Justice Breyer's reasoning controls).

To the extent that Justice Breyer's opinion in Van Orden is controlling, it is consistent with a conclusion that § 119 violates the establishment clause.  Arguably, Justice Breyer's opinion remains faithful to the endorsement test.  W. Jesse Weins, A Problematic Plurality Precedent, 85 Neb. L. Rev. 830, 849-50 (2007) ("Justice Breyer claimed to rely on abstract 'legal judgment' rather than the Court's traditional tests, but he essentially applied the  traditional endorsement test.").  He considered the purpose of the display and the effect it had, concluding that "the monument conveys a predominantly secular message."  Van Orden, 545 U.S. at 702.  Because I have concluded that the National Day of Prayer does not

serve a secular purpose, Justice Breyer's concurrence does not suggest a different result in this case.

The only new factor that Justice Breyer incorporated into his analysis was that the display did not have a "divisive" history before the lawsuit was filed. Id. at 704. To the extent this is a relevant factor in this case, it does not seem to favor defendants. At least in recent years, the National Day of Prayer has sparked a number of controversies around the country, demonstrating the sense of exclusion that religious endorsement by the government can create:

- In 2008, a national Jewish organization complained that the National Day of Prayer has been "hijacked by Christian conservatives," who are "excluding and dividing us on religious lines. Dkt. #93-43;

- In Plano, Texas, a multicultural group and a group of Christians held "dueling prayer services" on the National Day of Prayer after fighting over the right to hold their events at the city council building and threatening to file a lawsuit. Theodore Kim, "After threat of suit, city steps aside in prayer," Dallas Morning News, May 2, 2008, at 16B;

- In San Antonio, Texas, a local resident threatened to file a lawsuit over the mayor's involvement in National Day of Prayer events. "Day of Prayer Lawsuit Dropped," San Antonio Express-News, November 29, 2008, at 5B;

- In Richmond, Virginia, a Jewish organization criticized a National Day of Prayer event attended by various state officials at the state capitol because the event's sponsor excluded non-Christians. Robin Farmer, "Diverse gathering marks day of prayer: Christian-oriented event leaves some feeling excluded," Richmond Times Dispatch, May 2, 2008, at B1;

- In Anniston, Alabama, a church pastor complained that the National Day of Prayer has been "hijacked by evangelical Christians" because the National Day of Prayer Task Force has "establish[ed] a policy of excluding not only those of other faiths but also moderate and mainline Christians." Brett Buckner, "A Nation Divided?" <u>The Anniston Star</u>, May 1, 2008;

- In Bakersfield California, a Christian group created controversy when its coordinator stated that "[t]he National Day of Prayer is actually all about the Lord. So we're representing the Christian community." A local rabbi stated that "I think the National Day of Prayer, if it was ever inclusive—which I'm not sure it ever was entirely—has morphed into something else." Louis Medina, "Day of Prayer spawns Christian event that some call divisive," <u>The Bakersfield Californian</u>, May 1, 2008;

- In Buffalo, New York, Jewish and Muslim groups complained that the local National Day of Prayer events are "more about politics than prayer" and that the day is more accurately called the "Christian National Day of Prayer." Jay Tokasz, "Prayer Day events spur complaints of co-option by evangelicals," <u>The Buffalo News</u>, May 1, 2008;

- In Memphis, Tennessee, local groups complained that the National Day of Prayer "mak[es] members of minority religions feel that unless they adhere to Christianity they are unpatriotic" and that "[p]eople of minority faiths are very alarmed by" the exclusively Christian nature of the events. Lindsay Melvin, "National Day of Prayer is controversial—Some find it divisive and unconstitutional," <u>Memphis Commercial Appeal</u>, May 1, 2008;

- In Victorville, California, local residents complained that "Hindus, Buddhists, Muslims and Sikhs are being excluded" from the National Day of Prayer event at the town hall. The organizer responded, "this entire nation was founded on Christian faith. The reason we are a great county is because we're Christian. In the Muslim countries, you can get shot if you're Christian." Brooke Edwards, "Faiths clash over Day of Prayer," <u>Daily Press</u>, April 27, 2008;

- In Springfield, Illinois, organizers of a National Day of Prayer event at the state capitol were criticized after saying that event is "only about Jesus and Jesus the Savior alone"; they had "no problem having [members of other

religions] participate, though not in speaking roles." Steven Spearie, "National Day of Prayer returns to Capitol," <u>Springfield State-Journal Register</u>, April 30, 2006, at 19;

- In Troy, Michigan, a Christian group and an interfaith group fought over access to city hall to hold an event on the National Day of Prayer, both sides threatening law suits. When the mayor announced that she would attend the interfaith event, she was accused of promoting "witches and Satanists." An effort to recall the mayor was started later. "Troy prayer day stirs recall effort," <u>Detroit News</u>, May 23, 2005, at B1; "Day of Prayer splits Troy," Detroit News, May 4, 2005, at K15;

- In 2004, religious leaders and nonprofit groups accused the "White House of using prayer for political purposes" after the President broadcast National Day of Prayer remarks "over several Christian and television and radio networks as part of an evangelical concert." Dkt. #93-39;

- In Salt Lake City, Utah, Mormons were excluded from National Day of Prayer of events because they are not "in accordance with the evangelical principles [of] the task force," including a belief in the "Holy Trinity" and that the Bible is the "only written word of God." Travis Reed, <u>Associated Press</u>, May 4, 2004;

- In Muncie, Indiana, the organizer of National Day of Prayer event denied requests to speak by Unitarian, Muslim and Jewish leaders, "sharply divid[ing]" city residents. Stephanie Simon, "Dispatch from Muncie, Indiana," <u>Los Angeles Times</u>, May 1, 2003;

- A federal judge ruled that a school district violated the establishment clause by sponsoring National Day of Prayer events. <u>Doe v. Wilson County School System</u>, 564 F. Supp. 2d 766, 801-02 (M.D. Tenn. 2008);

<u>See also</u> Opinion, "Wasted prayers?" <u>Deseret Morning News</u>, Oct, 20, 2009, at A18 (letter to editor from Mormon reader stating that she "didn't think [she] was allowed to participate" in the National Day of Prayer because she "pray[s] to the wrong God"); Matt

59

Cherry, "Using day of prayer to divide us," <u>Albany Times Union</u>, May 12, 2007 (editorial stating that National Day of Prayer has "become a symbol of division, not unity"); dkt. #93-55 (news report of Baptist group protesting National Day of Prayer). These incidents suggest that James Madison's prediction seems to have come true: in many instances, the National Day of Prayer has "narrow[ed] the recommendation [to pray] to the standard of the predominant sect."

It is true that much of the controversy has been generated by events of private organizations such as the National Day of Prayer Task Force. However, government officials, including former Presidents, have sometimes aligned themselves so closely with those exclusionary groups that it becomes difficult to tell the difference between the government's message and that of the private group. <u>E.g.</u>, Dkt. #93-39 (President hosts National Day of Prayer event with National Day of Prayer Task Force in 2008); dkt. #93-61 (task force organizes National Day of Prayer event at White House in 2006); dkt. #93-65 (article stating that task force "often schedules its events at government buildings and seeks endorsements and participation by governors, mayors and other elected officials"). Even when the federal government is not directly involved in an event, its general endorsement of the National Day of Prayer may create confusion about its role in prayer events. If the National Day of Prayer was not a public observance, members of minority religious groups or secular groups would have less reason to be concerned about being excluded from events

celebrating the day.

On the other hand, last year, some groups, including the task force, criticized the President because they believed he did not celebrate the National Day of Prayer *enough*. Manya A. Brachear, "National Day of Prayer: Evangelical Christians are upset that White House isn't doing more," <u>Chicago Tribune</u>, May 6, 2009. These disputes support a view that governmental involvement in the National Day of Prayer may be inherently problematic.

### D. <u>References to the National Day of Prayer in Case Law</u>

Finally, defendants argue that, regardless how the National Day of Prayer fares under any particular establishment clause test, this court should uphold the constitutionality of the statute because the Supreme Court and the Court of Appeals for the Seventh Circuit "have both discussed the constitutionality of the National Day of Prayer in favorable terms." Dfts.' Br., dkt. #83, at 26. Defendants acknowledge that no court has actually held that the National Day of Prayer is constitutional, but they believe that the indications in case law are strong enough to control the outcome of this case.

Defendants rely primarily on <u>Lynch</u>, 465 U.S. 668. The question in that case was whether a city's display of a crèche in the context of a larger holiday display violated the establishment clause. In the midst of that discussion, the Court provided a list of "illustrations of the Government's acknowledgment of our religious heritage and

governmental sponsorship of graphic manifestations of that heritage." Id. at 677. Included in the list was the National Day of Prayer. The Court did not address the constitutionality of the National Day of Prayer or discuss it any further.

I cannot conclude that such an isolated reference to the National Day of Prayer is instructive or that it requires this court to disregard the endorsement test. Even if the passage in Lynch seemed to provide a hint regarding the Court's view of § 119, the Court made it clear in Allegheny that the constitutionality of the National Day of Prayer remained an open question:

> It is worth noting that just because Marsh sustained the validity of legislative prayer, it does not necessarily follow that practices like proclaiming a National Day of Prayer are constitutional. Legislative prayer does not urge citizens to engage in religious practices, and on that basis could well be distinguishable from an exhortation from government to the people that they engage in religious conduct. But, as this practice is not before us, we express no judgment about its constitutionality.

Allegheny, 492 U.S. at 603 n.52 (citations omitted). After Allegheny, any mention of the National Day of Prayer is conspicuously absent from Supreme Court opinions listing examples of "tolerable acknowledgments" by the government of religion, such as the "In God We Trust" motto and using "So help me God" to make an oath.

Defendants argue that Allegheny may be ignored because the Court's discussion of the National Day of Prayer "was nothing more than a legal aside" while the discussion in Lynch was a "necessary part" of the result. Dfts.' Br., dkt. #118, at 25. This argument is

62

puzzling because, in both cases, the Court was considering the constitutionality of religious displays, not the National Day of Prayer, so neither discussion can be described as "necessary" to the result.  In fact, neither discussion could be described even as *dicta* because the Court did not give an opinion about the constitutionality of the National Day of Prayer statute in either case.

The other opinions defendants cite are not helpful.  In Van Zandt, 839 F.2d at 1221, the court did not discuss the National Day of Prayer, but simply quoted the passage from Lynch in the context of a discussion about a legislative prayer room.  In DeBoer v. Village of Oak Park, 267 F.3d 558, 561 (7th Cir. 2001), the question was whether the village could prohibit a private organization from celebrating the National Day of Prayer, not whether the government could hold such a celebration.   The others are *dissenting* opinions in which the author argues that the majority opinion implies the invalidity of the National Day of Prayer. Books, 235 F.3d at 325 (Manion, J., dissenting); American Jewish Congress v. City of Chicago, 827 F.2d 120, 133 (7th Cir. 1987) (Easterbrook, J., dissenting).  These opinions seem to undermine defendants' argument rather than help it.


E.  Conclusion

As this case shows, "it may not be easy, in every possible case, to trace the line of separation between the rights of religion and the Civil authority."  Letter from James

Madison to R. Adams (1832), quoted in McCreary County, 545 U.S. at 876. The duty of this court is to review the relevant case law and determine how it applies in a particular case. Although the law does not always point in the same direction on matters related to the establishment clause, my review of that law requires a conclusion that 36 U.S.C. § 119 is unconstitutional.

I understand that many may disagree with that conclusion and some may even view it as a criticism of prayer or those who pray. That is unfortunate. A determination that the government may not endorse a religious message is not a determination that the message itself is harmful, unimportant or undeserving of dissemination. Rather, it is part of the effort to "carry out the Founders' plan of preserving religious liberty to the fullest extent possible in a pluralistic society." McCreary County, 545 U.S. at 882 (O'Connor, J., concurring). The same law that prohibits the government from declaring a National Day of Prayer also prohibits it from declaring a National Day of Blasphemy.

It is important to clarify what this decision does *not* prohibit. Of course, "[n]o law prevents a [citizen] who is so inclined from praying" at any time. Wallace, 472 U.S. at 83-84 (O'Connor, J., concurring in the judgment). And religious groups remain free to "organize a privately sponsored [prayer event] if they desire the company of likeminded" citizens. Lee, 505 U.S. at 629 (Souter, J., concurring). The President too remains free to discuss his own views on prayer. Van Orden, 545 U.S. at 723 (Stevens, J., dissenting). The

64

*only* issue decided in this case is that the federal government may not endorse prayer in a statute as it has in § 119.


ORDER

IT IS ORDERED that

1.  The motion for summary judgment filed by plaintiffs Freedom from Religion Foundation, Inc., Anne Nicol Gaylor, Annie Laurie Gaylor, Dan Barker, Paul Gaylor, Phyllis Rose and Jill Dean, dkt. #103, is GRANTED with respect to plaintiffs' claim that 36 U.S.C. § 119 violates the establishment clause; the motion for summary judgment filed by defendants Barack Obama and Robert Gibbs, dkt. #82, is DENIED with respect to that claim.

2.  It is DECLARED that 36 U.S.C. § 119 violates the establishment clause of the First Amendment to the United States Constitution.

3.  Defendants are ENJOINED from enforcing 36 U.S.C. § 119.  The injunction shall take effect at the conclusion of any appeals filed by defendants or the expiration of

defendants' deadline for filing an appeal, whichever is later.

Entered this 15th day of April, 2010.

BY THE COURT:
/s/
BARBARA B. CRABB
District Judge